1               IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF ARKANSAS
2                      WESTERN DIVISION

3    UNITED STATES OF AMERICA,

4           Plaintiff,
        v.                          No. 4:09CR00099-01-02 BSM
5
     RANDEEP MANN (1); and          May 11, 2011
6    SANGEETA MANN, a/k/a SUE MANN (2),   Little Rock, Arkansas
                                        2:03 p.m.
7           Defendants.

8                 **TRANSCRIPT OF MOTIONS HEARING**
                 BEFORE THE HONORABLE BRIAN S. MILLER,
9                    UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   On Behalf of the Government:
         MS. KAREN D. WHATLEY, Assistant U.S. Attorney
12       MS. STACEY ELISE MCCORD, Assistant U.S. Attorney
           U.S. Attorney's Office
13         425 West Capitol Avenue, Suite 500
           Post Office Box 1229
14         Little Rock, Arkansas  72201-1229

15   On Behalf of Defendant Randeep Mann (1):
         MS. ERIN CASSINELLI COUCH, Attorney at Law
16         Lassiter & Couch
           813 West Third Street
17         Little Rock, Arkansas  72201

18       MR. J. BLAKE HENDRIX, Attorney at Law
           Law Office of Joseph Blake Hendrix, Jr.
19         813 West Third Street, Suite 200
           Little Rock, Arkansas  72201
20
     On Behalf of Defendant Sangeeta Mann (2):
21       MR. JEFFREY M. ROSENZWEIG, Attorney at Law
           300 Spring Building, Suite 310
22         Little Rock, Arkansas  72201-2421

23   Defendants present.
     Also Present:
24   Mr. Jack Wagoner III, Attorney at Law
           (Proceedings reported by machine stenography and displayed
25   in realtime; transcript prepared utilizing computer-aided
     transcription.)


                     Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

1                          I N D E X

2    WITNESSES FOR THE GOVERNMENT: Direct  Cross  Redirect  Recross

3    PAM FALKNER                     16     37      50

4

5    WITNESSES FOR THE DEFENDANTS: Direct  Cross  Redirect

6    ROBERT E. "JAY" MARSH           53     81      95

7

8

9

10

11

12

13   **EXHIBITS**:                                          **RECEIVED**

14   (Restitution) Government's Exhibits 1 - 6 ................P.37

15   (TRO) Government's Exhibits 1 - 3 .......................P.127

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE COURT:  All right.  Is everybody ready?

3          MR. HENDRIX:  Yes, sir.

4          THE COURT:  Okay.  The next case on the docket is the

5   United States of America versus Randeep Mann and Sangeeta Mann.

6   The case number is 09CR99.

7          We have a couple of issues on the docket for today.  We

8   have the issue of restitution for Dr. Mann that was continued

9   from our hearing, our sentencing hearing.  We have a temporary

10  restraining order that's been filed by the United States to

11  prohibit the Manns from disposing of assets.  And we have a

12  motion by Ms. Mann to stay payment of fine pending appeal, but

13  that's something we'll just deal with pretty quickly at the end

14  of the hearing.

15         I would imagine -- I was sitting up here trying to figure

16  out which one should we take up first: the TRO, or the

17  restitution issue.  But let's deal with the restitution issue

18  first.  We can deal with -- I think we're going to have

19  witnesses by the government to set restitution, and then we're

20  going to have some cross-examination, then we'll have -- maybe

21  the defense will put on witnesses to counter the defendants'

22  proof with regard to restitution.

23         I show we have Karen Whatley here for the government.  We

24  have Jeff Rosenzweig representing Sangeeta Mann.  And we have

25  Blake Hendrix representing Dr. Mann.  And we have other counsel

1    at the table.  We have Erin Couch also representing Dr. Mann.

2    And we have Jack Wagoner also representing Sangeeta Mann.  And

3    we have -- and I'm going to get in trouble with Ms. Whatley --

4             MS. MCCORD:  That's all right, Your Honor.  I don't

5    come over here that often.  Stacey McCord.

6             THE COURT:  Ms. McCord here also representing the

7    United States of America.

8        Let's do this.  Ms. Whatley, since you need to put on your

9    proof with regard to restitution, let's have everybody stand

10   who is going to testify regarding restitution, get them sworn

11   in, and then we'll get started.

12            MS. WHATLEY:  Your Honor, the only witness the United

13   States intends to call regarding restitution is Pam Falkner.

14   But the Pierces are both here, and I don't know what will come

15   out on cross.

16            THE COURT:  I understand.  I understand.  Is

17   Ms. Falkner here?

18        And who do the defendants have to testify in opposition to

19   the issue of restitution?

20            MR. HENDRIX:  Jay Marsh.

21            THE COURT:  Let's have both people stand and let's get

22   you sworn in.

23        (Pam Falkner and Robert E. "Jay" Marsh were duly sworn.)

24            THE COURT:  Ms. Whatley, call your first.

25            MS. WHATLEY:  Your Honor, can I address a couple of

1    things before I get to Ms. Falkner?

2              THE COURT:  You may.  Yes.

3              MS. WHATLEY:  Mr. Hendrix and I are attempting to

4    actually agree on a few things, Your Honor.

5              MR. HENDRIX:  Trying.

6              MS. WHATLEY:  We're trying.  I believe that we agree

7    to restitution in the amount of $404,751.38 to Golden Rule

8    Insurance for past medical payments.

9              THE COURT:  Just one second.  Okay.

10             MS. WHATLEY:  Okay.  And we agree to restitution in

11   the amount of $33,995.64 to Encompass Insurance.  $10,000 of

12   that is for past medical.  17,228.29 is for property damage to

13   the Pierces' vehicle.  $6,767.35 is for property damage to the

14   residence.

15             THE COURT:  Okay.

16             MS. WHATLEY:  For both Golden Rule and Encompass

17   Insurance, I have the addresses and phone numbers.  And for

18   Encompass, I have the claim numbers which I can provide to the

19   clerk.

20        We also agree to restitution for Dr. Trent Pierce in the

21   amount of $36,814.47.  $25,692.93 of that would be for past

22   medical that Dr. Pierce had to pay out of pocket prior to 2011.

23   $6,671.99 are for costs incurred in 2011 for his medical bills

24   to date.  $1,000 is the property damage for the vehicle that he

25   had to pay to have the vehicle fixed.  $3,449.55 is monies that

1    he had to pay to have property damage fixed as a result of the

2    bombing.

3           THE COURT:  So essentially 36,814.47 for out-of-pocket

4    expenses?

5           MS. WHATLEY:  Yes, Your Honor.  For a total amount of

6    an agreed-upon restitution of $475,561.49, if Mr. Hendrix

7    trusts my math.

8           MR. HENDRIX:  More than mine.

9           THE COURT:  Okay.

10          MS. WHATLEY:  Okay.  So that leaves the following out

11   there.  The United States believes that Unum is owed $79,925.94

12   for payments it made pursuant to the disability policy.

13          THE COURT:  And Unum is an insurance company?

14          MS. WHATLEY:  Yes, Your Honor.  The breakdown of that

15   amount was set forth in our brief.  $65,800 of that amount was

16   income replacement.  $14,065.94 was rehabilitation benefit,

17   which was to outfit Dr. Pierce and his medical clinic to allow

18   him to return to work.  This would be -- he has to have a

19   special stethoscope.  So that $14,000 was to help pay for items

20   like that to assist him in going back to practicing medicine.

21          Other than Unum, we disagree regarding lost past income.

22   It's my understanding I think we're off by about $14,000 on

23   that amount.  We disagree regarding future medical and

24   regarding future lost income.  For future medical, the United

25   States will argue that 178,275 up to $188,275 is owed for

1    future medical.  And I do have letters, some of which I believe

2    were attached to our brief, showing -- for plastic surgery,

3    we're estimating from Dr. Phillip Langsdon a total of $120,400.

4    From UT Medical Group from Dr. Fleming, there is an estimate of

5    $17,875.  And from the Vanderbilt Bill Wilkerson Center for

6    Otolaryngology, this would be for hearing aids and other

7    audiological rehabilitation, it is an estimate of 40,000 to

8    $50,000 for future medical.  And I do have letters that I can

9    present to the Court in support of those figures.

10         May I approach?

11            THE COURT:  Yes.

12         Have you seen these, Mr. Hendrix?

13            MR. HENDRIX:  Your Honor, they were attached to the

14    government's original brief.

15            MS. WHATLEY:  I think the -- the one from Dr. Fleming

16    may not have been attached because we did not get the final

17    numbers from him until after we filed our brief.  But that is

18    the $17,875.  And that's everything with the exception of the

19    lost income.

20         And I just have argument regarding --

21            THE COURT:  Loss of future income?

22            MS. WHATLEY:  And past income based on what Mr.

23    Hendrix told me a little while ago.

24         Regarding future medical, I just have argument to make

25    regarding that.

1          THE COURT:  Okay.

2          MS. WHATLEY:  And then if you want me to do that and

3     then put Ms. Falkner on --

4          THE COURT:  You can do that.  That works.

5          MS. WHATLEY:  I don't need you anymore.

6          MR. HENDRIX:  But I'm going to respond.

7          MS. WHATLEY:  I believe that the defense is arguing

8     that future medical is speculative in this case.  However, it's

9     the government's position that there is and there can be no

10    question that the future medicals contemplated in this case are

11    as a direct and proximate result of the bombing.  The cases

12    cited by the defense are all cases regarding child exploitation

13    victims.  And for the most part, the future medicals that are

14    contemplated in those cases are psychological and other mental

15    health counseling that would be needed in the future based on

16    issues that the children may or may not have.  The cases have

17    been saying, if it's hard to figure out and you can't show it's

18    a direct and proximate result -- because in one of the cases

19    the issue was these children had had problems before, so how

20    can you even link it to the victimization they had.

21         THE COURT:  I will permit you to make the argument,

22    but I understand the argument without you even making it.  I

23    understand the position of the government.  The position is

24    that but for being blasted, Dr. Pierce has none of these

25    problems.

1          MS. WHATLEY:  Exactly.

2          THE COURT:  And can we ever say exactly down to the

3    penny how much this will cost him?  Probably not.  But are

4    these assessments or projections reasonable given the injuries

5    sustained and the injuries that he now has?  I think that's --

6    that cuts straight through and it gets to it.  Whereas, it's a

7    little -- it's far more speculative if you're talking about

8    some other types of cases like the ones you've talked about.

9    You know, how do you ever say -- well, I'm not going to get

10   into all of that.  But I understand your argument, and you can

11   more fully develop your record in case you need to.

12          MS. WHATLEY:  All I was going to say, Your Honor, is

13   we think that these items that have been placed forth by the

14   doctors are extremely reasonable, and we would ask --

15   originally in our brief, I think we stated we would ask it to

16   be held in trust.  However, based on my reading of the case

17   law, it can be paid to Dr. Pierce now, and we would like for it

18   to be paid to Dr. Pierce now.  We do understand that in the

19   event future medicals are not ordered today, we could and would

20   have to come back to the Court to get a different restitution

21   order each and every time Dr. Pierce goes to the doctor for any

22   of the reasons set forth for the bombing.  And we would like to

23   not have to take each of those steps each and every time, and

24   just ask that future medical award between 178,275 and 188,275

25   as determined by the Court to be ordered payable to Dr. Pierce

1     at this time.

2                THE COURT:  Mr. Hendrix.

3                MR. HENDRIX:  Judge, on those issues, the case law is

4     clear.  The number can't be based on speculation, and the need

5     for the service cannot be a possibility.  There's got to be

6     some precision in this process.  The case law is clear on that.

7     As to these future medical needs, one really simply just needs

8     to read Dr. Langsdon's letter that begins, "Below is a list of

9     procedures and possible future costs for Dr. Trent Pierce";

10    the key word being "possible" future costs.

11         We read the *Follet* case from the Ninth Circuit, and it

12    uses that precise language, restitution is not appropriate

13    because of the possibility of future medical expenses.  More

14    importantly, Judge, the scheme, the process that the government

15    is suggesting, is an unworkable process.  What they are saying

16    is put money -- have the clerk's office establish a trust

17    account.  Have Dr. Mann put money in that trust account.  And

18    then let Dr. Pierce draw down from that money.  That's an

19    unworkable process.  More importantly, it's not authorized by

20    the MVRA, which sets forth the process for the Court and the

21    victim to utilize.  And it's in 18 U.S.C. 3664(d)(5).  And the

22    MVRA is explicit.  "If the victim subsequently discovers

23    further losses, the victim shall have 60 days after discovery

24    of those losses in which to petition the Court for an amended

25    restitution order."  So this concept of establishing a trust

1    fund that's administered by the Court is an extraordinary

2    proposition, and, in fact, is simply not one authorized by the

3    MVRA, and then an unworkable scenario.

4        So what happens if, whatever, 300,000 bucks is put in the

5    trust?  What happens at the end of two years or at the

6    conclusion of Dr. Pierce's treatment, there's $100,000 left

7    over?  Is the Court going to write Dr. Mann a $100,000 check?

8    Vice-versa: if it's determined that he had -- 300,000 is put in

9    the trust, but he has the need for 400,000, how are we going to

10   work that?  That's why the MVRA is explicit.  When that future

11   need arises and that bill is actually incurred, then the victim

12   has 60 days to petition you to amend the restitution award.

13           THE COURT:  Okay.

14           MR. HENDRIX:  And, Judge, that sort of encompasses the

15   whole notion here.  We were able to make this agreement based

16   on the discovery that we were provided and the verifications

17   that we went through on the amounts that we've talked to you

18   about, and believe that the Court should appropriately enter an

19   order of restitution award for past medicals in that amount and

20   the property damage in the agreed-upon amount.

21       From here on out, the three final categories that we're

22   dealing with are past lost income, income lost as a result of

23   the injuries; potential projecting that out then of lost future

24   income; and then, of course, these -- the speculation on the

25   future medicals.  And our position, Judge, is, of course -- and

1    the *Oslund* case that we cited to you at the Eighth Circuit has

2    been explicit on this, and it's two criteria.  The Court is not

3    to enter a restitution award if two simple things occur: the

4    amount is in dispute -- the amounts are in dispute; and, two,

5    the Court has to engage in any calculation to determine an

6    amount.

7        And what you're fixing to have to go through is an

8    amazing -- not just a calculation of adding a few numbers

9    together, but as the *Fountain* case from the Seventh Circuit

10   that I cited to you, the determining lost future income is a

11   complicated calculus in and of itself.  So we believe, Your

12   Honor, the *Oslund* case in the Eighth Circuit supports the

13   notion that at this point, the Court should feel free to order

14   a restitution for these two past things that are agreed on.

15       We know that there is a civil suit pending from Dr. Pierce

16   against Dr. Mann where these exact same things are being asked

17   for through the civil litigation.  And we suggest to the Court

18   that -- enter an award for the agreed-upon amounts, and let the

19   civil court, which would be a more appropriate forum for this,

20   decide future lost income, future medicals, and past lost

21   income.

22       THE COURT:  So have all of the -- has restitution for

23   all -- everything that has occurred up to now been agreed on

24   for -- I know you're objecting to an award of restitution for

25   projected lost income, for projected medicals.  But with regard

1    to everything that the doctor has had to pay out so far, you've

2    agreed to a restitution amount for those?

3          MR. HENDRIX:  Right.  When it comes to a hard

4    verifiable number that doesn't involve anything that a

5    calculator -- the insurance company was paid out this,

6    Dr. Pierce paid this for fixing his home -- when it comes to a

7    hard number, we've all agreed on those hard numbers.  When it

8    comes to possibilities, and essentially speculation, we

9    obviously don't agree to those.  And it's because they involve

10   mathematical, economic equations.  And that's going to put the

11   Court into a bind here of listening to an accountant explain

12   the methodology for determining -- projecting losses and an

13   economist who is going to give you the equation for projecting

14   losses.  And so when we get to those, essentially, it's --

15   you're going to have to engage in complicated mathematical

16   methods.  And we're dealing again with projections which are

17   inherently guesses.  Does that answer your question?  Yeah, we

18   have agreed on all of the hard numbers.

19          THE COURT:  Thank you.  Let's hear from the

20   government's witness.

21       You know, I was asking Mr. Creasey, because maybe I just

22   missed it, both sides have referred to briefs that they've

23   filed.  I haven't read a brief at all and didn't know that

24   there were any briefs filed.  In fact, I went through the

25   docket sheet this morning and read everything to make sure that

1   I had briefs.  I talked to probation, I talked to everybody

2   before today to make sure that I had everything.

3           MR. HENDRIX:  It's now becoming clear some of Your

4   Honor's looks.

5           THE COURT:  That's why I'm looking bewildered because

6   I don't think I've read anything that you're talking about.  If

7   you can just give me a copy and let David get copies --

8           MR. HENDRIX:  Your Honor, some of this makes sense.

9   Both of these -- the government filed an original brief.  We

10  have then filed this.  And they are all under seal.  If I can

11  make this suggestion to Your Honor --

12          THE COURT:  That's why I didn't get it.  I didn't even

13  see it on the docket sheet that it was under seal.  I just

14  missed it.

15          MR. HENDRIX:  I'll tell you, this is going to take

16  some time and some --

17          THE COURT:  Okay.  Here's what I'll do.  I will get

18  copies of this now.  I will listen to the witness -- because

19  the issues you've raised, Mr. Hendrix, are issues of law

20  whether I can and whether I can't.  I'll see what the case is

21  saying.  I will listen to the witnesses and determine if I can

22  give what I will -- I'll make that determination whether I

23  will, and then the amount.  And then I'll just enter a

24  restitution order maybe by Friday.  I'll let you know what my

25  ruling is by Friday.

1          MR. HENDRIX:  Okay.

2          THE COURT:  That way you won't walk away from here

3     today knowing what it is, but at least you'll know by Friday

4     what it is.

5          MS. WHATLEY:  And, Your Honor, just to respond briefly

6     to something that Mr. Hendrix said, I disagree with him about

7     what the *Oslund* case says.  It believed the second is not that

8     if the Court has to make any calculations.  The issue is if

9     it's unduly burdensome.

10         THE COURT:  I'll read the *Oslund* case and I'll know

11    what it says when I read it.

12         MS. WHATLEY:  And as to future medicals, the issue

13    under the MVRA is 3664(d)(5), it says further losses; it

14    doesn't say future losses.  And our position is that we pretty

15    much know, based on what the three doctors have told us, what

16    the losses are, and it should be ordered now.  And I believe I

17    stated earlier we're withdrawing our request to hold it in

18    trust and are asking it be immediately paid to Dr. Pierce.

19         THE COURT:  Okay.

20         MS. WHATLEY:  As to past and future lost income, the

21    United States calls Pam Falkner.

22         THE COURT:  Ms. Falkner, would you stand there?

23    You've already been sworn, so just have a seat.

24         **PAM FALKNER, GOVERNMENT WITNESS, PREVIOUSLY SWORN**

25         MS. WHATLEY:  Your Honor, may I approach with a stack

Falkner - Direct

1    of the exhibits I intend to show her?

2           THE COURT:  You may.  Thank you.

3           MS. WHATLEY:  May I approach the witness with the

4    stack?

5           THE COURT:  You may.

6                       DIRECT EXAMINATION

7    BY MS. WHATLEY:

8    Q.   Good afternoon.

9    A.   Good afternoon.

10   Q.   And you are just now getting your voice back, so make sure

11   you pull that microphone right up in front of you and make sure

12   it's on.  Is the red light on it?

13   A.   Yes, ma'am.  And I apologize for my voice.  I'll do the

14   best I can.

15   Q.   Please state your name for the record.

16   A.   Pam Falkner.

17   Q.   And spell your last name.

18   A.   F-A-L-K-N-E-R.

19   Q.   And how are you employed?

20   A.   I'm a self-employed CPA.

21   Q.   And how long have you been a CPA?

22   A.   30 years.

23   Q.   Where did you go to college?

24   A.   I got a bachelor's degree in agricultural economics from

25   the University of Tennessee in Knoxville, and then I have a

1    master's degree from Memphis State University in accountancy.

2    Q.    And you stated that you're a CPA?

3    A.    Yes, ma'am.

4    Q.    And in order to maintain your certification, do you have

5    to undergo continuing professional education each year?

6    A.    Yes, ma'am.

7    Q.    And how many hours a year do you have to get?

8    A.    40.

9    Q.    And since you became a CPA, what types of continuing

10   education classes have you taken?

11   A.    Well, considering it's 40 hours over 30 years, that's a

12   lot of classes, but there's always the update in taxation,

13   there's ethics classes, there's classes in principles of

14   accounting and financial statement preparation.  Several years

15   ago I took a series of 80 hours of classes in personal

16   financial planning for clients, which involve risk investment

17   like insurance, saving for retirement, saving for kids'

18   education, calculating amounts to be put aside today that will

19   be there for college education in the future or amounts to put

20   aside today that will be there for retirement in the future.

21   Q.    So part of that personal financial planning class was

22   regarding the future valuation of dollars?

23   A.    Yes, ma'am.

24   Q.    How large is your accounting practice?

25   A.    I have about 120 clients that I work with on a monthly

Falkner - Direct

1    basis and provide accounting information.  I actually do

2    payroll for some of them, keep them in compliance with sales

3    tax, payroll tax reports, and year-end tax planning.  And of

4    those -- in addition to that, there's about 180 more tax

5    returns that I do, so we do about 300 returns.

6    Q.    And where is your practice located?

7    A.    West Memphis, Arkansas.

8    Q.    And what is your client base regarding your monthly

9    clients?

10   A.    It's a mixture of some physicians, some veterinarians,

11   some dentists, some retail stores, some farmers.  It's just a

12   pretty wide variety.

13   Q.    Is Dr. Pierce one of your monthly paid clients?

14   A.    Yes, ma'am.

15   Q.    How long have you been doing accounting work for

16   Dr. Pierce?

17   A.    Since he moved to West Memphis and opened his practice,

18   which I believe was in 1982.

19   Q.    Did you know him prior to the time he moved to West

20   Memphis?

21   A.    No, ma'am.

22   Q.    Since 1982, have you been doing pretty much the same thing

23   for him every year?

24   A.    Yes, ma'am.

25   Q.    And is he one of your monthly clients?

1    A.    Yes, ma'am.

2    Q.    So what you talked about earlier: consulting, payroll,

3    year-end tax planning, that's something that you do for

4    Dr. Pierce --

5    A.    Yes.

6    Q.    -- every month?

7    A.    Yes, ma'am.

8    Q.    Do you do any work for Dr. and Mrs. Pierce on a personal

9    level?

10   A.    Sure.  Sure.

11   Q.    You do their tax returns?

12   A.    We do their tax returns.

13   Q.    Have you ever consulted with them for future planning?

14   A.    Sure.  Years ago we did -- I mean, he started as a client

15   before they had their second child.  So we've done financial

16   planning to make sure college education funds were there.

17   We've done financial planning from the get-go for retirement,

18   when that time comes, make sure the money is there; just

19   various sorts of things.

20   Q.    Approximately how many hours a year do you and your office

21   perform accounting work for Dr. Pierce?

22   A.    Approximately 55 to 60, I would guess.

23   Q.    In anticipation of this hearing, did the United States

24   request that you project the future lost income of Dr. Pierce

25   based on the bombing?

1    A.    Yes, ma'am.

2    Q.    Will Dr. Pierce -- based on your calculations, will

3    Dr. Pierce have a loss of income as a result of the injuries he

4    sustained on February 4th, 2009?

5    A.    Yes, ma'am, in my opinion.

6    Q.    Why will he have a loss of income?

7    A.    Because Dr. Pierce has been the Michael Jordan,

8    essentially, of medical practices.  He's not the norm.  His

9    productivity has exceeded the inflation rate.  And he's no

10   longer able to do that.

11   Q.    He's not able to perform at prior capacity?

12   A.    No.

13   Q.    Prior to the bombing, how many patients was he seeing on

14   average a day?

15   A.    He was averaging 65 to 70 patients a day.

16   Q.    How many patients is he currently seeing on average?

17   A.    50 to 53.

18   Q.    And are there some days that he's not even able to

19   practice medicine?

20   A.    Sure.  And he's out of the office more because of his

21   medical needs, going to the eye doctor and going to the hearing

22   people, so he's not in his office as many days on an annual

23   basis as he was.

24   Q.    And you stated that he used to be seeing 65 to 70, and now

25   it's about 50 to 53, correct?

1    A.    Yes.

2    Q.    What's causing the decrease in him seeing the number of

3    patients?

4    A.    Well, his stamina, he can't work as long every day as he

5    used to, and he also takes longer with each patient.

6    Q.    Why does he take longer with each patient?

7    A.    Because of his hearing and his eye impairment.

8    Q.    Prior to the bombing, did you and Dr. Pierce discuss how

9    long he intended to work?

10   A.    Yes, ma'am.

11   Q.    Did you assist him in financial planning based on the

12   information you were provided about his anticipated retirement

13   age?

14   A.    Yes, ma'am.

15   Q.    And at what age did he intend to retire?

16   A.    70.

17   Q.    And that was information that you knew prior to

18   February 4th of 2009?

19   A.    Oh, yes, ma'am, long ago.

20   Q.    And that was information you were using to help him with

21   his financial planning?

22   A.    Yes.

23   Q.    Does Dr. Pierce have another doctor working with him at

24   the clinic?

25   A.    Not presently.

Falkner - Direct

1    Q.   Has he in the past?

2    A.   He had a Dr. Chester Peeples in his clinic from August 1

3    of 2009 till September 22nd of 2010.

4    Q.   And how old was Dr. Peeples when he was working with

5    Dr. Pierce?

6    A.   He turned 80 in July of 2010.

7    Q.   Why was Dr. Peeples brought on?

8    A.   To assist Dr. -- sorry.  My voice is cracking.  To assist

9    Dr. Pierce in seeing his patients to give them the care they

10   needed because he was unable to see them all.

11   Q.   When did Dr. Pierce come back to the medical clinic?

12   A.   He came back September 1st of 2010.

13   Q.   2009?

14   A.   '9.  I'm sorry.  2009.

15   Q.   So Dr. Peeples was there by himself for a month before

16   Dr. Pierce got back?

17   A.   Right.

18   Q.   Before the bombing, did Dr. Pierce ever have another

19   doctor associated with the clinic on a full-time basis?

20   A.   No.

21   Q.   To your knowledge, does Dr. Pierce intend to hire a doctor

22   to replace Dr. Peeples?

23   A.   No.

24   Q.   And is there a reason for that?

25   A.   The medical facility, the building he's in, is just not

1    set up for two doctors as a practical measure.

2    Q.   Has Dr. Pierce always been a solo practitioner?

3    A.   Yes, ma'am.

4    Q.   Dr. Peeples came on August 1st of 2009.  The bombing

5    happened February 4th of 2009.  There's a number of months in

6    there.  How was the clinic able to stay open?

7    A.   It was open by volunteer doctors from across the state

8    coming and working a day or half a day at their own expense and

9    for no reimbursement to see his patients to keep the clinic

10   open.

11   Q.   So other than that, he would have had a significantly

12   greater lost past income?

13   A.   Oh, sure, because that was like a gift to him.

14   Q.   You have before you a copy of Government Exhibit 1.

15   A.   Yes, ma'am.

16   Q.   And what is that?

17   A.   That's a projection I made of the future lost income that

18   Dr. Pierce will have.

19   Q.   And does this fairly and accurately state your projections

20   based on the calculations you performed?

21   A.   Yes, it does.

22        MS. WHATLEY:  And, Your Honor, we'll get into all of

23   the calculations, but I would like to admit Government Exhibit

24   1.

25        MR. HENDRIX:  No objection.

1          THE COURT:  It's received.

2     BY MS. WHATLEY:

3     Q.    In Government Exhibit No. 1, you give the present value --

4     this is updated through December 31st of 2010.  You give the

5     present day value of projected future net income loss at

6     $824,252.39?

7     A.    Yes, ma'am.

8     Q.    How did you calculate that amount?

9     A.    I actually started with the number on the top left-hand --

10    the left-hand column, the top row, 540,000.  That number came

11    directly from a spreadsheet that I used at trial in July.  That

12    was the actual earnings of Dr. Pierce for the year 2008.

13    Q.    Okay.  Now, if we can turn to -- I would like to turn to

14    Government Exhibit 2 unless Mr. Hendrix has an objection.

15    Okay.  Is this that document that you talked about?

16    A.    Yes, ma'am.

17    Q.    This one is actually different from the one at trial

18    because it's been updated through December of 2010; is that

19    correct?

20    A.    Yes, ma'am.

21    Q.    But up until this last line, this is everything that was

22    presented at trial in July of 2010?

23    A.    Yes, ma'am.

24    Q.    And down the left-hand column is the years, correct?

25    A.    Yes, ma'am.

Falkner - Direct

1    Q.    And then what is this column, gross medical fees?  What

2    does that take into account?

3    A.    You're back on Exhibit 2?

4    Q.    Yes.

5    A.    Those are the actual medical fees deposited into the

6    family practice bank account year by year as reported on

7    Dr. Pierce's Schedule C, part of his federal income tax return.

8    Q.    So these are the monies that Dr. Pierce earned as a

9    doctor?

10   A.    Collected and earned, yes.

11   Q.    Collected and earned.  Now, as with every business, we

12   have operating expenses.  And that's what's set forth in this

13   column; is that correct?

14   A.    Yes, ma'am.

15   Q.    So then what is this column?

16   A.    That's just the difference of those two.  That's the gross

17   receipts put in the bank minus the operating expenses.  And

18   those -- that number column will tie to the Schedule C form in

19   Dr. Pierce's 1040 for all of those years.

20   Q.    Did you go back and verify these numbers against the

21   Schedule C that was filed for Dr. Pierce for each of the years

22   on this document?

23   A.    Yes.

24   Q.    Now, once you get to 2002, the net income of the clinic --

25   let me back up a second.  Because he's a solo practitioner,

1   does all of the net income automatically flow through to

2   Dr. Pierce and that's his salary, that's his income for the

3   year?

4   A.   Yes.

5   Q.   Now, starting in 2002 forward, the net income of the

6   clinic does not match total earnings.  Why is that?

7   A.   It's because Arkansas instituted a retirement plan.  The

8   only thing I can equate it to is a 401(k) that most people are

9   familiar with.  It's a deferred comp.  It's money Dr. Pierce

10  actually worked for and earned; he didn't receive and he didn't

11  pay taxes on it.  So that was earnings that he created, but he

12  doesn't have them in his hand and he'll pay taxes in the

13  future.

14  Q.   Do you need some water?  Would that help?

15  A.   Probably.  Sorry.  Thank you.

16  Q.   So looking at 2008, the last column, which was total

17  earnings, showed 540,401, correct?

18  A.   Yes.

19  Q.   And that number is what you have down as the starting

20  point on Government Exhibit 1?

21  A.   Yes, ma'am.

22  Q.   Okay.  Let's talk about each column in Government Exhibit

23  1.  These are obviously the years.  And how far did you carry

24  the years forward?

25  A.   Until Dr. Pierce will be age 70.

Falkner - Direct

1   Q.   He turns 70 in 2025?

2   A.   Yes.

3   Q.   So what is this first column?

4   A.   I went back to the Government Exhibit 2.  And in the

5   right-hand column, I calculated an average of the prior ten

6   years to the bombing of what Dr. Pierce's true total earnings

7   had been from his productivity.  And that average over --

8   annual average over that time period was 3.5498 percent.

9   Q.   So you took this last column, each year, added it up, and

10  then determined what the -- I'm sorry -- took from each year

11  and then determined how much increase each year and then

12  averaged that increase?

13  A.   Yes, ma'am.

14  Q.   That's the 3.5498 percent increase?

15  A.   That was a real concrete number of Dr. Pierce's increase

16  in his own productivity from his medical practice for the prior

17  ten years.

18  Q.   Okay.  What is the second column on Government Exhibit 1?

19  A.   I started the second column with Dr. Pierce's actual 2010

20  earnings.

21  Q.   Okay.  So 2010, this number right here, the 554,757.68, is

22  how much Dr. Pierce actually earned in 2010?

23  A.   Yes.

24  Q.   And it's actually less than what you would have projected

25  based on his activity in 2008 forward?

1    A.    Yes.

2    Q.    Okay.  And so then starting in 2011, it says:  Projected

3    future net income based on 2.8978 percent increase per year.

4    What is that 2.8978 increase?

5    A.    To match time periods, I did the same thing with the

6    inflation rate as I did Dr. Pierce's productivity.  Yes, his

7    productivity did increase 3.5498 percent, but part of that

8    would have been a result of inflation and not of his -- in

9    excess of inflation productivity.  So the inflation rate for

10   that same time period averaged 2.8978 percent.

11   Q.    And how did you determine the inflation rate that you

12   used?

13   A.    I took an average of the same year time period that I did

14   his productivity.

15   Q.    And is that also captured on Government Exhibit 2 in this

16   first column?

17   A.    Yes, ma'am.

18   Q.    And where did you get these figures that you plugged into

19   that column?

20   A.    From the government, Department of Labor.

21   Q.    And then did you average those to come up with the

22   2.8978 percent?

23   A.    Yes, ma'am.

24   Q.    But you based on the same years that you based his

25   increase of productivity?

1    A.    I did.

2    Q.    Okay.  Going back to Government Exhibit 1, the starting

3    point was 2008.  Was that the last year that Dr. Pierce earned

4    a full year of income prior to the bombing?

5    A.    Yes.

6    Q.    So walk us through how you started at 540,401 and ended up

7    with a projected net income loss present day value of

8    824,252.39.

9    A.    My theory was that had it not been for the bombing --

10   Dr. Pierce is essentially in the prime of his practice.  There

11   wouldn't be any reason to anticipate that he would not continue

12   the trend he had for the prior ten years.  So if the 540,401

13   increased on an annual basis of 3.5498 percent, those are the

14   numbers year by year that his income would anticipate to be.

15   Q.    Okay.  But then you had to take inflation into account?

16   A.    Inflation and where he is right now because he did make

17   554,757.68 in 2010.  But he's maxed out at his -- as a result

18   of the bombing, he's not able now to produce that difference

19   between staying even and making more than the ordinary.  So if

20   you increase that at an inflation rate, that's what that

21   number -- that's what I now anticipate his earnings to be over

22   the next years.

23   Q.    So it would just go up based on inflation each and every

24   year, not based on productivity?

25   A.    And matching the time periods to the earnings.

1    Q.    Okay.  So that's the third column, the projected annual

2    dollar loss of income?

3    A.    That's merely the difference in those two columns.

4    Q.    And in order to get it to present day values, what did you

5    do?

6    A.    I took those numbers and, again, I used the same inflation

7    rate and discounted those numbers back to today as if -- if

8    you'll take the bottom number there at $126,288.49, that's my

9    actual calculation of the money Dr. Pierce would suffer as a

10   loss, as a result of the bombing in the year 2025, but that's

11   15 years from now.  So if we discount that at a discounted rate

12   of 2.8978 percent, he would be willing to accept today

13   $82,275.86.

14   Q.    And you just added all of those up to come up with the

15   824-?

16   A.    Yes, ma'am.

17   Q.    Are you aware that the defendant in this case hired an

18   economist?

19   A.    Yes, ma'am.

20   Q.    And have you reviewed the report of the economist?

21   A.    Yes, ma'am.

22   Q.    Is it fair to say the numbers are different?

23   A.    Yes, ma'am.

24   Q.    Did you use the same methodology that Mr. Marsh is using?

25   A.    Essentially that's what anybody does, whether they are an

1    economist or a CPA.  It doesn't take a rocket scientist to do

2    the calculations.  You start with the base earnings.  Now, you

3    have to make some assumptions of the inflation rate, the

4    productivity increase that would have been there, and the

5    discount rate.  And those are the variables that create the

6    different numbers, but the actual calculations are the same.

7    Q.    And the variables that you used were on hard, fast numbers

8    from the past?

9    A.    I looked back ten years at Dr. Pierce's actual practice

10   from age 45 to 55, and took those as sound numbers to start

11   from.  And that's what I used, yes.

12   Q.    And you did the same thing for the inflation rate?

13   A.    Yes, I did.

14   Q.    And did Mr. Marsh's inflation rate differ from your

15   inflation rate?

16   A.    Yes, ma'am.

17   Q.    And how?

18   A.    Oh, he went through a long process.  And I think there was

19   a five-page letter and 46 pages of documentation and

20   calculations.  And he broke Dr. Pierce's numbers down into

21   monthly numbers as opposed to annual that were from reports and

22   not from tax returns.  So there were numerous differences in

23   the numbers.

24   Q.    And for the inflation rate, did he not use a past ten-year

25   average?

1    A.   He used a lot longer-term average.  He went back to 1952

2    to start with his inflation.

3    Q.   And it's my understanding he converted all of his to

4    December 2010 dollars whereas you chose your starting point as

5    the true numbers that were there as of 2008?

6    A.   Yes.

7    Q.   You have Table 1 in front of you?

8    A.   Yes, ma'am.

9    Q.   And is this one of the tables that was attached to the

10   economist's report?

11   A.   Yes.

12          MS. WHATLEY:  I'm marking this as Government Exhibit

13   3, Your Honor, just for purposes of the record.

14   BY MS. WHATLEY:

15   Q.   Whose numbers are these that are in this document?

16   A.   They are mine.  I provided them to the defense.

17   Q.   And are these -- these are in a year date format, right?

18   A.   Yes, ma'am.

19   Q.   These are numbers that you gave them, not numbers that

20   they had come up with on their own, correct?

21   A.   That's correct.  I provided all of those numbers.

22   Q.   And did you also provide the numbers that are presented in

23   Government Exhibit 4 --

24   A.   2.

25   Q.   -- to the defense?  Table 2?

1    A.    Table 2, yes.

2    Q.    Government Exhibit 4?

3    A.    I did.

4    Q.    In looking at Government Exhibit No. 5, what is this?

5    A.    This is where the economist took my numbers and he used

6    the Consumer Price Index and adjusted the month-by-month

7    numbers of Dr. Pierce.  He adjusted the total fees by the

8    medical care index only, and he -- to get to dollars for

9    December 2010.  And then on the operating expenses, he used the

10   entire overall Consumer Price Index adjustment to adjust to

11   get -- to put the dollars to December 2010.

12   Q.    Based on everything you know about Dr. Pierce's practice

13   and Dr. Pierce, is this a fair way to calculate Dr. Pierce's

14   lost future income?

15   A.    I don't believe so.

16   Q.    And why not?

17   A.    Because Dr. Pierce is not your standard doctor.  And just

18   as I referred to in the past, when you've got a Michael Jordan

19   or a Lance Armstrong, you can't -- if some incident happens to

20   them, no matter what it is, in their mid-career, you can't

21   project their future earnings based on the norm or the standard

22   because they are the exception.  They are not the same.

23   Dr. Pierce's practice -- he's a high volume practice.  He's got

24   about 6,500 active patients in his practice.

25   Q.    Does Dr. Pierce's practice differ from other doctors in

Falkner - Direct

1    this region?

2    A.    Yes, ma'am.

3    Q.    Does he admit to the hospital?

4    A.    No, ma'am.

5    Q.    And is he a director of a nursing home?

6    A.    No.

7    Q.    You said his office is high volume.  What is his patient

8    mix when we're talking about private pay, Medicare, Medicaid?

9    A.    He's basically commercial insurance practice, which is

10   extremely, extremely rare.  11 percent of his patients are

11   private pay, 11 percent are Medicaid, 13 percent are Medicare,

12   and 65 percent are commercial insurance.  Now, the --

13   Q.    Let me stop you there.  Did you do some research to

14   determine what the average Medicaid and Medicare percentages

15   are for doctors in this region?

16   A.    I did.  The American Academy of Family Physicians has

17   published numbers that says the average family practitioner in

18   the South Atlantic and East South Central area, which is where

19   we're located, their Medicaid patient load is normally

20   18 percent.  Dr. Pierce is 11.  Their Medicare load is 26 1/2

21   percent.  Dr. Pierce is 13.  And the mean income for a family

22   physician in 2008 in a solo practice was $161,000.

23   Dr. Pierce's was 540-.

24   Q.    And you said a family practitioner.  What type of medicine

25   does Dr. Pierce do?

1  A.   He's a family practitioner; all sorts of medicine.

2  Q.   So he's not -- doesn't specialize in asthma treatment?

3  A.   No, ma'am.

4  Q.   And you talked about Medicare.  Medicare is kind of a

5  different beast, isn't it?

6  A.   Yes, ma'am.

7  Q.   And tell the Court what Dr. Pierce does with his Medicare

8  that's different from what a lot of other doctors do with their

9  Medicare.

10 A.   The majority of doctors accept Medicare assignment for

11 payment.  So when a Medicare patient comes in, the doctor

12 performs a service, the doctor gets paid whatever Medicare has

13 said they'll pay for that service.  For an example, if the

14 office visit is $80, Medicare has approved 60, so the doctor is

15 going to get 60.  And that's the vast majority of physician

16 offices.  Dr. Pierce doesn't do that.  When that patient comes

17 in, even though they are Medicare, that patient pays him 80.

18 That's what he receives.  Dr. Pierce's office files the claim

19 correctly with Medicare, and Medicare reimburses each patient

20 $60.  So each patient takes that 20-dollar hit as opposed to

21 Dr. Pierce taking multiples of 20-dollar hits.

22 Q.   So just to make sure I'm understanding all of this

23 correctly, you used Dr. Pierce's own actual concrete historical

24 numbers to project future lost earnings as opposed to the

25 methodology used by the defense where they came up with a base

Falkner - Direct

1    number based on moving a whole lot of things to December 2010?

2    A.    Correct.

3    Q.    I'm going to talk briefly about lost past income.  I know

4    that you've testified a lot about this at trial, and I'm sure

5    the judge remembers all of that.  And we have that transcript

6    as well.  But looking at Government Exhibit 6, do you have that

7    in front of you?

8    A.    Yes, ma'am.

9    Q.    Is this the calculation that you did for lost income

10   for 2009 and 2010?

11   A.    Yes, ma'am.

12   Q.    And what is this first number?

13   A.    The first number is actually from the Schedule C of

14   Dr. Pierce's business, Family Practice Center, for their joint

15   tax return for the year 2009 and 2010.

16   Q.    And it looks like you took some funds out.  "Fees created

17   by Dr. Peeples," what does that mean?

18   A.    Well, Dr. Peeples was hired by Dr. Pierce and he was being

19   paid a percent of fees he collected sometime and a salary

20   sometime, but he was not being paid everything he generated.

21   In other words, there was an excess of income that Dr. Peeples

22   created that benefited Dr. Pierce because he employed

23   Dr. Peeples.  So if Dr. Peeples collected, like, a thousand

24   dollars that went in the bank of Family Practice Center,

25   Dr. Peeples might get $450, and Dr. Pierce retained $550.

1    Q.   But Dr. Peeples is not working there anymore, so

2    Dr. Peeples' salary is not included in anything for future --

3    A.   That's correct.  That's why I backed this out.

4    Q.   That's why you backed this out.  Then you had what was

5    actually the income for Dr. Pierce in 2009 and 2010, correct?

6    A.   Adjusted for removing Dr. Peeples and adjusted for adding

7    the deferred comp.

8    Q.   Okay.  Then you took the anticipated income based on the

9    calculations you did which are set forth in Government Exhibit

10   1; is that correct?

11   A.   Yes, ma'am.

12   Q.   And then calculated the loss of income for those two years

13   to $214,226.74?

14   A.   Yes, ma'am.

15          MS. WHATLEY:  Your Honor, for purposes of my record, I

16   would like to move for the admission of Government's Exhibits 1

17   through 6.

18          MR. HENDRIX:  No objection.

19          THE COURT:  They are received.

20       (Government's Exhibits 1 through 6 received in evidence.)

21          MS. WHATLEY:  Your Honor, I believe that's all of the

22   questions I have at this time.

23          THE COURT:  Cross-examination?

24                    CROSS-EXAMINATION

25   BY MR. HENDRIX:

1    Q.   Ms. Falkner, I understand you're a CPA for 30 years; is

2    that correct?

3    A.   Yes.

4    Q.   And have a master's in accountancy?

5    A.   Yes.

6    Q.   When did you get your master's?

7    A.   1980, I believe, '79 or '80.

8    Q.   Okay.  And your duties generally on a day-to-day basis as

9    an accountant are doing folks' tax returns and other financial

10   equations like that; is that right?

11   A.   Yes, sir.

12   Q.   How often in your practice do you project lost future

13   income?

14   A.   It varies.  It comes in spurts.  I might do a couple a

15   year, and then I might go three years without doing any or four

16   years, and I might do a couple or might do one a year.

17   Q.   Prior to this case, when was the last time you were

18   engaged in the projection of lost future income?

19   A.   To project lost future income?

20   Q.   Uh-huh.

21   A.   Probably 15 years ago.

22   Q.   So the last time before testifying in court today that you

23   engaged in the process of projecting lost future income was 15

24   years ago?

25   A.   Approximately.

Falkner - Cross

1    Q.    Okay.  Your background in economics, I understand you to

2    say -- did you have a class on lost future income?

3    A.    I took a series of classes offered by the American

4    Institute of Certified Public Accountants, an 80-hour series of

5    courses for personal financial planning that involved -- you're

6    saying loss of future income, but it also -- that same

7    calculations are involved in college education funding,

8    retirement funding, that sort of thing.  It involved investment

9    risk with insurance, it involved debt structure of financing,

10   that sort of thing.

11   Q.    So my specific question then is, did you take a class or

12   series of classes that taught you the methodology for

13   projecting lost future income?

14   A.    A variety of methodologies.  To my knowledge, there is not

15   one concrete methodology to do that.

16   Q.    When did you take those classes?

17   A.    Probably 12 years ago.

18   Q.    12 years ago.  Okay.  Do you -- did you take any economics

19   courses in college?

20   A.    My bachelor's degree is in agricultural economics, so,

21   yes, sir.

22   Q.    On the master's level, any economic classes?

23   A.    No.

24   Q.    Have you testified before --

25   A.    Yes.

Falkner - Cross

1    Q.    -- in a courtroom?

2    A.    Yes.

3    Q.    Have you been qualified as an expert before?

4    A.    Yes.

5    Q.    And have you been qualified as an expert in economics?

6    A.    I have testified and been challenged as an expert by the

7    other side and allowed to testify.

8    Q.    As an expert in economy -- economics?

9    A.    Actually, this was the last time I testified, and it was a

10   lady who got killed in a wreck and was a future value that it

11   would take to educate her two small kids.

12   Q.    So, again, my question is, were you qualified as an expert

13   in economics?

14   A.    I was qualified to testify is the only way I know to

15   answer that question.  That was the qualification that the

16   judge said.

17   Q.    Okay.  You have an accountant -- accountancy degree --

18   A.    Yes.

19   Q.    -- and one would not assume that you were not an inexpert

20   in that field?  Is that fair to say?

21   A.    (Nodding head.)

22   Q.    Now, you worked for the Pierces for years, I guess, since

23   1982, so 20-something years; is that right?

24   A.    Almost 30.

25   Q.    How much have you gotten paid for your work relative to

1    determining the stream of income and restitution in this case?

2    A.    Nothing.

3    Q.    You've been paid nothing?

4    A.    Nothing.

5    Q.    And you submitted essentially an invoice to the

6    government, did you not, seeking restitution on your own behalf

7    from Dr. Mann in the amount of $12,600?

8    A.    I was instructed by an attorney -- not a government

9    attorney to put that on that line.  I did not submit an

10   invoice.  I've not submitted time tickets.

11   Q.    Okay.  You have asked someone to be awarded $12,600 for

12   your work in this case; is that right?

13   A.    Sure.

14   Q.    Okay.  Let's go over some of your report.  I noticed a few

15   areas to cover with you.

16          MR. HENDRIX:  It would probably be easier -- may I

17   approach, Judge?

18   BY MR. HENDRIX:

19   Q.    Now, your conclusions in this case regarding Dr. Pierce's

20   lost future income have changed several times, have they not?

21   A.    No, sir.  They were issued last fall when I was requested

22   to prepare these numbers.  And that's Exhibit B that you handed

23   me.  And then I was requested to update those same numbers

24   through December 31.  And that's this attachment 6.

25   Q.    And hold that one.  That's your latest, and they were

Falkner - Cross

1    using -- you came to your conclusions based on data through

2    December 31st of 2010, right?

3    A.   Yes, sir.

4    Q.   And in that report, you conclude that the present value of

5    the lost income stream is $824,252.39, correct?

6    A.   Yes.

7    Q.   Now, the report in your other hand, you said you did the

8    same calculation earlier, a couple of months earlier?

9    A.   No, way back earlier, back in the fall.

10   Q.   Back in the fall of 2009, or 2010?

11   A.   2010.

12   Q.   2010.  So how many months -- Report No. 1 --

13   A.   Report No. 1 was based on through May of 2010.  This was

14   based on December of 2010.

15   Q.   Okay.  So Report No. 1, you had data up through May

16   of 2010 --

17   A.   Correct.

18   Q.   -- correct?  And the second report, you had data current

19   through December 31st of 2010, right?

20   A.   Yes, sir.

21   Q.   In your projection on the initial report for when your

22   figures went through March, what was your projection for the

23   present value of Dr. Pierce's lost future income?

24   A.   1,041,472.

25   Q.   So from May, and then including the data from -- to

1  December 31st, your projection of his lost future income

2  decreased by about $200,000; is that right?

3  A.   Yes.

4  Q.   So when you had further data and more reliable data, you

5  apparently saw a trend where Dr. Pierce was actually making

6  more money, correct?

7  A.   Yes.

8  Q.   And that's why then your projection of the lost future

9  income provided more data was lower by $200,000; is that right?

10  (sic)

11  A.   Yes.

12  Q.   And is that trend -- he's obviously doing well and making

13  a lot of money.  And has that trend continued in your

14  calculations?

15  A.   No, because he's maxed out at working all day as much as

16  he can and seeing the maximum number of patients that he can at

17  this point.  Until then -- Dr. Peeples didn't leave until

18  September.  From the time Dr. Peeples came to when he left,

19  Dr. Peeples was seeing patients, but Dr. Pierce was increasing.

20  Q.   Well, let's talk about Dr. Peeples in just a second.  But

21  let's stick with this figure.

22  A.   Okay.

23  Q.   Necessarily in projecting this future lost stream of

24  income, you're basing that on several assumptions, right?

25  A.   Sure.

Falkner - Cross

Q.   And one of the assumptions you've already testified to is
that Dr. Pierce is an exceptional doctor and in the mode of a
Michael Jordan of medicine, correct?

A.   Sure.

Q.   And, in fact, your projections back then were saying that
he was seeing 70 to 75 patients per day, right?

A.   Those weren't projections.  Those were actual prior to the
bombing.

Q.   So he was seeing 70 to 75 patients per day.  If that's an
8-hour day, how many patients per hour was he seeing?

A.   That's not an 8-hour day, by any means.

Q.   Do it on 10 hours.  Seven patients an hour?

A.   Probably six.

Q.   So he's seeing six or seven patients every hour?

A.   Uh-huh.

Q.   And now you're saying he's down to 50 to 53.  I'm going to
take a guess.  So now he's seeing three or four patients every
hour?

A.   Well, because of the bombing, as a result of his injuries,
he's not able to work those long days anymore.  So
stamina-wise, he cannot put in that many hours.

Q.   I understand.  The difference between your first and
second report, in your first report you assumed that he would
not be doing as well, but by the time you got to your second
report, that assumption proved yourself wrong and he was doing

1  better than you had originally assumed, right?

2  A.   Yes.

3  Q.   Okay.  Dr. Peeples.  Dr. Peeples came into the practice

4  in 2009 and worked through 2010, right?

5  A.   Correct.

6  Q.   And so he was there -- I think Dr. Pierce came back to the

7  clinic in late fall or sometime in the fall of 2009, right?

8  A.   September 1, 2009.

9  Q.   September 1 of 2009?

10  A.   Uh-huh.

11  Q.   So there for a period of time, you have both Dr. Pierce

12  and Dr. Peeples in the clinic, right?

13  A.   Correct.

14  Q.   Now, one of the things that you had said on your direct

15  examination was that you didn't feel that the clinic was set up

16  to handle two doctors, and Dr. Pierce would always, therefore,

17  be a solo practitioner.  But we know now at some point in time

18  two doctors have, in fact, been working there together, right?

19  A.   Yes.

20         MR. HENDRIX:  Now, may I approach again, Judge?

21         THE COURT:  You may.

22  BY MR. HENDRIX:

23  Q.   Now, what I showed you is -- tell us what I've shown you.

24  A.   I'm sorry?

25  Q.   Tell me -- tell the judge what I'm showing you.

Falkner - Cross

1   A.   I believe it's what we just went over as a Government

2   Exhibit 6.

3   Q.   Right.  May I have it, and I'll go ahead and put it up

4   here so we can all see it?  And part of this involves your

5   projections in how Dr. Peeples' income affected it; is that

6   right?

7   A.   Yes.

8   Q.   Now, just by looking at this, if I'm looking at it right,

9   what you've got is you've got 2009 and 2010, and Dr. Peeples

10  worked in the clinic during portions of those two years, right?

11  A.   Yes, sir.

12  Q.   Okay.  And so you're now trying to project Dr. Pierce's

13  income lost as a result of the injury, right?

14  A.   Yes.

15  Q.   And Dr. Peeples had to come in the clinic to take up

16  slack, correct?

17  A.   Correct.

18  Q.   And the fees created by Dr. Peeples were essentially

19  $60,000 in 2009 and $76,000 in 2010, right?

20  A.   That's correct.

21  Q.   So he generated fees for the clinic of essentially

22  $136,000 during that time period, right?

23  A.   Correct.

24  Q.   Now, in determining income, you have to back out expenses,

25  right?

1    A.    Uh-huh.

2    Q.    And that's what you did is then you deducted Dr. Peeples'

3    salary and the payroll taxes that were paid on him, right?

4    A.    Yes, sir.

5    Q.    And 44,000 and 46,000 for those two years, right?

6    A.    Yes, sir.

7    Q.    So generally those expense numbers are $90,000, right?

8    A.    Yes, sir.

9    Q.    So you take 90,000 as an expense from the grand profit of

10   136,000, and it appears that Dr. Pierce made $46,000 off of

11   Dr. Peeples' work; is that right?

12   A.    That's correct.

13   Q.    And that's $46,000 that went into the Pierce bank account,

14   correct?

15   A.    Yes.

16   Q.    Now, what you ended up doing in your calculation --

17   however, that's a profit, $46,000 worth of profit to

18   Dr. Pierce, right?

19   A.    Yes.

20   Q.    But you didn't include that profit, did you, in using your

21   calculations?

22   A.    No, because my request was to calculate the profit of --

23   loss of Dr. Pierce.  And that's what I did.  And I clearly

24   showed that I backed it out.

25   Q.    Well, if you think through that though, I believe our task

1    in part of the calculus in doing this is determining what was

2    the income lost directly as a result of an injury.  And we're

3    looking at a medical clinic here.  And while Dr. Pierce may not

4    have been working, he had someone working for him that gave him

5    $46,000 worth of profit, correct?

6    A.    Correct.

7    Q.    And you're just not including that profit in your

8    calculation, correct?

9    A.    I'm backing it out.  Yes, sir.

10   Q.    Also on that you talk about deferred compensation, and you

11   talked about deferred compensation in your direct examination.

12   And explain to us what we're talking about.

13   A.    Those are fees that Dr. Pierce earned that were from

14   Medicaid patients that he chose not to receive the money.  So

15   they were not reported on his tax return.  They were not in any

16   financial statements I prepared.  He's not paid tax on it.  But

17   it's in like a deferred comp plan.  If most people are familiar

18   with 401(k)s, it's very similar to that.

19   Q.    This one in particular is called Arkansas Diamond

20   Deferred --

21   A.    I think so, but it's a state plan.

22   Q.    -- Compensation Plan?  Dr. Pierce is a private

23   practitioner, correct?

24   A.    Yes.

25   Q.    What allows him then to invest in a state employee

1    deferred compensation plan?

2    A.    It's not a state employee.  It's a Medicaid service.

3    Q.    I think that answers the question.

4    A.    It comes from the Medicaid fees only.

5    Q.    Okay.  It actually is for state employees, but the hook is

6    you've got to have some connection to state employment.  And

7    that was my question, actually, was just, do you know what it

8    was?  Was he getting this compensation -- or it's actually able

9    to defer compensation, because I know he was also president of

10   the medical board, right, which would be a state employee?

11   A.    Uh-huh.

12   Q.    So is he that -- I think you generate -- you have got

13   deferred compensation generally of, what, about 22,000, 20-,

14   22,000?

15   A.    Uh-huh.

16   Q.    Who writes that check?  Does that make sense?  Does the

17   State of Arkansas?

18   A.    Not really.  There's no check written.

19   Q.    I understand what we're talking about when you're --

20   A.    I'm confused.

21   Q.    Sure.  And I think that's the whole point is this calculus

22   is very confusing.  What I'm talking about, to put it in the

23   simple term, in deferred compensation, you're putting money

24   into this plan as an investment like a 401(k)?

25   A.    Right.

1    Q.   But the money has to be generated from somewhere.  It's

2    some income, right?

3    A.   Right.

4    Q.   Do you know whether the source of that income is from him

5    acting as the president of the state medical board in that

6    capacity, or as some Medicare or Medicaid provider?

7    A.   It would be a Medicaid provider.

8         MR. HENDRIX:  Okay.  That's all I've got.  Thanks.

9         THE COURT:  Any redirect?

10        MS. WHATLEY:  Briefly, Your Honor.

11                       REDIRECT EXAMINATION

12   BY MS. WHATLEY:

13   Q.   I want to talk about that deferred compensation for just a

14   second.

15   A.   Sure.

16   Q.   Dr. Pierce gets paid through -- part of his income is

17   Medicaid?

18   A.   Medicaid patients.

19   Q.   Medicaid patients.  And so he has to bill Medicaid for

20   Medicaid to pay him for those patients?

21   A.   Correct.

22   Q.   But he's able to defer part of the income that Medicaid

23   owes him into this deferred compensation package?

24   A.   Yes.

25   Q.   So these are actually funds that he has earned as a

1    Medicaid provider?

2    A.   Yes, ma'am.

3    Q.   So, but rather than Medicaid writing him a check, part of

4    that money goes into a deferred compensation package?

5    A.   Yes, ma'am.

6    Q.   Now, the 12- or $14,000 figure that Mr. Hendrix talked

7    about early on that you had -- that was the amount of fees --

8    the amount of hours you had worked on this case?

9    A.   Yes.

10   Q.   And that was prior to us asking you to do this work?  That

11   was the work you did getting ready for trial; is that correct?

12   A.   In the fall, yes, ma'am.

13   Q.   And that was actually -- the government didn't tell you to

14   calculate that?

15   A.   No.

16   Q.   Somebody else did?

17   A.   Yes, ma'am.

18   Q.   You anticipate getting paid for your testimony here today?

19   A.   Yes, ma'am.

20   Q.   Okay.  But you just haven't submitted a bill to the United

21   States government yet?

22   A.   No.

23   Q.   Now, when Dr. Pierce first went back to work at the

24   clinic, was he able to see 50 to 53 patients a day?

25   A.   No.

1    Q.   From September 2009 to present, has he -- was he able to

2    increase the number of patients he saw?

3    A.   Oh, sure.

4    Q.   And at some point in time was he seeing 50 to 53 patients?

5    A.   At the end of 2010 he was.

6    Q.   And has he actually been at the 50 to 53 patient max for

7    quite awhile now?

8    A.   Probably six months.

9    Q.   Okay.  So he's been maxed out for a little bit?

10   A.   Yes, ma'am.

11   Q.   Now, when Dr. Peeples was there, was he there full-time?

12   A.   No, he was not there full-time.

13   Q.   So there weren't two doctors running over each other

14   full-time?

15   A.   No.

16   Q.   Prior to the ten years that we looked at -- you've been

17   doing Dr. Pierce's finances since 1982.  So prior to 2000 -- I

18   guess prior to 2000, was Dr. Pierce making a profit?

19   A.   Yes, ma'am.

20   Q.   And was his income increasing from year to year?

21   A.   Yes, ma'am.

22        MS. WHATLEY:  No further questions.

23        THE COURT:  Anything further?

24        Okay.  You can stand down.

25        THE WITNESS:  What do I do with these?

1          THE COURT:  Take them with you, I guess.  You can hand

2     them back to Ms. Whatley.  I think I have the originals.

3          Ms. Whatley, do you have another witness you want to call?

4          MS. WHATLEY:  No, Your Honor.

5          THE COURT:  Mr. Hendrix, call your first.

6          MR. HENDRIX:  Jay Marsh.

7          THE COURT:  Just have a seat.

8          MR. MARSH:  Thank you, Your Honor.

9     Can I get a glass of water?

10         THE COURT:  Yes, you may.

11   **ROBERT E. "JAY" MARSH, DEFENDANTS' WITNESS, PREVIOUSLY SWORN**

12                        DIRECT EXAMINATION

13   BY MR. HENDRIX:

14   Q.   Tell Judge Miller your name, please.

15   A.   My name is Robert, E. is the middle initial.  Most people

16   call me Jay Marsh.

17   Q.   What do you do for a living?

18   A.   I'm an economist.

19   Q.   How long have you done that?

20   A.   I have been doing economic and financial analysis since

21   1973.  I've been doing economic and financial analysis mostly

22   with respect to litigation since 1990.  I started my own

23   practice in 1992, so I'm 20 years of working on my own as an

24   economist doing this kind of work.

25   Q.   And give Judge Miller a notion of your educational

1  background.

2  A.   I have four degrees, Your Honor.  I have a bachelor of

3  science in electrical engineering, and a bachelor of science in

4  mathematics.  I studied mathematics probability analysis and

5  statistics.  I have a master's in business administration.  I

6  majored in finance, which is the specialty area of economics

7  that deals with money.

8  Q.   Where was that master's from?

9  A.   The master's is from the Wharton Graduate School of

10  Finance at the University of Pennsylvania in Philadelphia.  I

11  received that in 1973.  In addition, I have a law degree from

12  the University of Arkansas at Little Rock.  I received that law

13  degree in 1982.  And, finally, I completed doctoral level

14  courses in economics, economic forecastings, statistics and

15  financial theory in the fall of 1989 at the University of

16  Arkansas at Fayetteville.

17  Q.   Is the projection of lost future income and determining

18  past income part of what you do for a living?

19  A.   It is.  And I do that quite often and have done so for

20  about 20 years or so.

21  Q.   And have you testified before?

22  A.   I have.  I've testified hundreds of times.  I've testified

23  as an economic expert in the Eastern District of Arkansas.  For

24  instance, I testified before judges such as Judge Wright, Judge

25  Moody, Judge Wilson.  Showing my age, I've even testified

1    before Judge Woods and Judge Reasoner and Judge Howard.  That's

2    in the Eastern District of Arkansas.  In the Western District

3    it's been Judge Dawson and Judge Barnes and others.  And that's

4    just the state of Arkansas.  I've testified literally hundreds

5    of times both in state and federal court.

6    Q.    And have you been qualified as an expert in economics?

7    A.    Yes.  I have never not been able to testify in economic

8    and financial analysis.

9    Q.    And all of those times you were just telling us about,

10   were you qualified as an expert in every one of those cases

11   here in the Eastern District of Arkansas including that?

12   A.    Yes.

13   Q.    Okay.  Mr. Marsh, let's begin with some basic

14   propositions.  What do you understand was Ms. Falkner's final

15   conclusion of her projection of the lost future stream of

16   income?

17   A.    Her future value, as I understand it, is 824,252.39.  Then

18   she has a past value, I think, of some 212- or thereabouts.

19   Q.    Okay.  And we provided you through discovery in this case

20   with quite a bit of financial information; is that correct?

21   A.    Yes.  I had both the income tax returns as well as monthly

22   financial statements.  The monthly financial statements were

23   for the months from January 2003 through December 2010.

24   Q.    Who prepared those financial statements?

25   A.    Ms. Pam Falkner prepared them.  And, in fact, she's

1    attached my analysis of the -- or rendition, if you will, of

2    those financial statements as the Government's Exhibit 3.

3    Q.   So in arriving at your conclusions in this case, were you

4    relying on documents prepared and submitted by Ms. Falkner?

5    A.   Yes, sir.

6    Q.   Okay.  And what ultimately then is your conclusion for the

7    lost stream of income?

8    A.   Both the past and the lost in total -- let me get to the

9    chart.  Both the past and lost total income is 321,325.34, if

10   you will.  And of that total, 198,233.27 is in the past,

11   leaving the remainder of roughly 121,000 -- actually, 123,000,

12   thereabouts, in the future.

13   Q.   So essentially, Ms. Falkner's numbers are about a million,

14   and your calculation showed about 300,000?

15   A.   Yes, sir.

16   Q.   Okay.  Now, what I'd like to do, Mr. Marsh, is go through

17   the methodology that you utilized in this case to arriving at

18   your conclusion.  And then once we're through that, I'm going

19   to ask you about what you understood about Ms. Falkner's

20   methodology.  So if you'll begin with yours and explain to us

21   how, particularly in this case, you determined a lost future

22   income.

23   A.   Yes, sir.

24        Your Honor, the starting point for me was sales.  This is

25   contrasted with Ms. Falkner whose starting point was net

1    income.  I started with an analysis of sales because his

2    injury, Dr. Pierce's injury, affects his ability to generate

3    fees, which is revenue, which is sales.  And so if you're going

4    to do an economic analysis, you need to start there as opposed

5    to net income.  And his ability to generate fees only affects

6    the quantity, not the pricing.  I'm assuming that Dr. Pierce

7    will continue to provide a standard of care, a normal standard

8    of care as opposed to a substandard of care.  And so he will be

9    able to price his product as he has in the past.  The effect it

10   has is on the volume, not the price.

11       So I took the sales, the historical sales that I had for

12   the period from January of 2003 through December of 2010 by

13   month.  And I first converted those sales into dollars as

14   of 2010 so I could remove the effects of inflation.  I used the

15   price index for physician services because that's what he

16   sells.  He provides physician services.  And the government

17   provides an index that we can use to put all of those fees into

18   dollars adjusted for inflation.

19   Q.   And when we're -- let me stop you right there.  When we're

20   talking about inflation and inflation rates, we are talking

21   about there is a -- some standardized way to go about it, and

22   it's the Consumer Price Index, isn't it?

23   A.   Yes.  And it's not only the Consumer Price Index, it's the

24   Consumer Price Index that's most applicable to the stream of

25   income that you're trying to put into current dollars and

1   adjust for inflation.  So we use the Consumer Price Index for

2   physician services because that's what we're talking about.

3   We're talking about a doctor who is providing services to his

4   patients.

5   Q.   So there is a specific Consumer Price Index for the

6   medical profession?

7   A.   For physician services.

8   Q.   Physician services.  And that's what you utilized?

9   A.   I did.

10  Q.   Go ahead.

11  A.   So I converted the sales into dollars adjusted for

12  inflation.  Then I add monthly sales.  And I calculated a

13  forecast, made a forecast of what his monthly sales would have

14  been but for the injury, in other words, how much money would

15  he have made in the months of February 2009 through

16  December 2010 had he not been injured.  And to do that I looked

17  at what his trend of sales were from January of '03 through

18  January of '09.  And I had a monthly sales, and I looked at

19  what that trend was of sales.

20  Q.   And this -- correct me if I'm wrong -- is actually the

21  real now starting part of the methodology.  And that

22  methodology is you first determine what this person would have

23  made had they not been injured?

24  A.   Yes.  What fees would he have earned had he not been

25  injured.

1    Q.    Okay.  Good.

2    A.    So you look at historically what he's done.  And in this

3    case, it's a period from January '09 through -- January '03

4    through January '09.  And you say, what was going on during

5    that period of time in terms of his fees where you've backed

6    out inflation.  You've put all of these into numbers as of 2010

7    so that you could look at what has been the change in real

8    growth during that time frame.  And based on the trend of sales

9    doing a standard analysis, we use a linear least squares

10   analysis.  It's sort of a standard trend line analysis.  In

11   fact, it's so standard that you push a button in Microsoft

12   Excel and it tells you what the numbers are.  It's a standard

13   economics 101 analysis.

14        Based on that, I determined that his real growth in

15   addition on top of inflation -- but his real growth on top of

16   inflation was .63 percent per year.  And, of course, it's less

17   than that per month.  And then I did a forecast of what his

18   sales were -- would have been had he not been injured based on

19   his historical sales for the period from February of '09

20   through December of 2010 in 2010 dollars where I backed out

21   inflation.  Then the next step was, given sales, you then have

22   to say:  Okay.  What impact did the sales have on net income?

23             THE COURT:  Let me ask you something just so I'm

24   clear.  When you say "sales," are you talking about actual

25   sales, or the value of the sales?  And what I mean by that is,

1    are you saying how many patients seen, or are you -- and

2    counting that as a sale, or are you talking about the value of

3    sales, or the sale, the money generated from the patients seen?

4    I'm just trying to make sure.

5          THE WITNESS:  There is no data in any of the

6    government exhibits or my exhibits on actual patients seen.

7    Ms. Falkner has stated they were X, but I certainly haven't

8    seen any record of that.  And, of course, if you heard the

9    testimony, I find it a little hard -- maybe that's not the

10   right word, but 75 patients a day, given the number of hours in

11   the day -- but in any event, the revenue loss or the sales that

12   I looked at are dollar sales.  They are actual dollar sales,

13   but they are adjusted for the change in inflation so that

14   changes in the actual dollar sales reflect changes in sales

15   volume as opposed to changes in sales due to pricing.

16   BY MR. HENDRIX:

17   Q.   So in dealing with sales, you're, one, dealing with the

18   hard numbers that Ms. Falkner provided you off the Schedule Cs

19   for the Pierces --

20   A.   Yes.

21   Q.   -- and the financial statements, I think, that she did on

22   a monthly basis?

23   A.   Right.

24   Q.   Okay.

25   A.   Having determined a projection of what the sales would be,

1       the next question is, well, what effect -- or what would the

2       income have been?  In other words, I now have a projection of

3       sales based on what he's done historically, so I know what

4       changes should be due to volume increases that he's had

5       historically.  The next question is, what income would he have

6       earned?  In order to do that, you have to do what we commonly

7       refer to as a fixed variable income analysis.

8               As you can appreciate, Your Honor, when you have an

9       increase in sales, that doesn't mean that your expenses

10      increase proportionately because some expenses are fixed.

11      You've got, for instance, a law practice, and you may get more

12      patient fees, but that doesn't mean the rent on your law office

13      is going to go up.  I say patient fees; more client fees.  So

14      you have some expenses which are fixed and some which are

15      variable.

16              What we typically do as economists is we do analysis of

17      fixed versus variable costs.  The easiest way to do that is to

18      again to do a regression line regressing operating profit

19      against sales so you can determine what portion is variable and

20      what portion is fixed.  Again, it's a fairly standard

21      methodology.

22              But having done so, I then determined what the operating

23      expenses that would be associated with that income, and

24      subtracted the two, I had a forecast in current dollars, 2010

25      dollars, of what his operating profit would have been had he

1    not been injured based on historically what he did in revenues,

2    fees, and based on the historical relationship of his variable

3    and fixed expenses to his historical sales.  That then gave me

4    a forecast of here's how much money he should have earned had

5    he not been injured.  I compared that then to what he actually

6    earned from February of '09 to December 2010, which is

7    post-injury.  And I calculated what that difference would be.

8    It's interestingly, not unexpectedly -- initially when you look

9    at that difference -- and that difference, incidentally, is on

10   the last table if you want to -- I say the last table.  Table

11   4.

12             MR. HENDRIX:  Do you have that, Your Honor?

13             THE COURT:  I have.

14             THE WITNESS:  The last column over on the -- to the

15   right is the operating profit reduction.  That's in actual

16   dollars, so that's what he actually would have incurred.  The

17   column that is just to the left of it is the operating profit

18   reduction in December of 2010 dollars.  What's pretty clear is

19   that following the injury, but not immediately, probably

20   because there's a little bit of lag -- he uses a cash basis

21   report of income, so there is some lag between his receipt of

22   income and when the services were performed.  And so you don't

23   see much of a loss initially in February '09, March '09, and

24   April '09 because he's collecting revenues during that period

25   of time from work that preceded that.

1          THE COURT:  What document are you looking at?

2          THE WITNESS:  I'm looking at Table 4 of my --

3          MR. HENDRIX:  His report, Judge.

4          THE WITNESS:  My report.

5          THE COURT:  I have it.  No.  I have Table 3.

6          MR. HENDRIX:  I can find it, sir.

7          THE WITNESS:  Your Honor, I think you have to go

8    further in that direction.  Yes, sir.  Now you're close.  Right

9    before then.  Table 4.

10         Your Honor, if you look at Table 4, as I mentioned

11   earlier, the column that's furthest to the right is the

12   operating profit reduction in actual dollars.  The page -- or

13   the column before that is the operating profit reduction in

14   December of 2010 dollars.  It states what you would expect

15   actually, giving some validity to the forecast.  There's not

16   much of an operating profit reduction in February '09, March

17   '09, and April '09 because there is a lag between when he

18   performed the services and when he collects the money.  He's a

19   cash basis taxpayer, so he would be getting revenues in

20   February, March and April that were actually generated for work

21   performed prior to the injury.  So there's not much initial

22   effect from the injury.

23         Then you see beginning in May and continuing through

24   October, that there is a fairly substantial loss.  And those

25   are months obviously when he's not working at all and he

1   doesn't have any revenues coming in to speak of and he's got

2   ongoing expenses.

3        Then you see after he returns to work -- he returns to

4   work in September '09.  It looks like it takes a month or two

5   of continuing losses again because he's a cash basis taxpayer.

6   So while he may be working, he won't be receiving the revenues

7   until a subsequent month.  So you have a little bit of a

8   continuing loss after he continues to work, but then you see

9   that the profits after that point in time become mixed.  He has

10  some months where he's actually making less than what you would

11  expect had he not been injured, and then some months where he's

12  actually making more than what you would expect.

13       Of particular note, if you look at the months of

14  September, October, and November, and we take those months

15  alone, the total of those three months suggest that he was

16  actually making a little bit more.  If you add up those

17  negative numbers, negative being you're making more than what

18  you would have expected, he's actually making about 4,000

19  more -- 4,267.12 to be specific -- more than what you would

20  have anticipated.  Why those months are somewhat important is

21  because those are months when, arguably, Dr. Peeples was not

22  with him.  And so by the time Dr. Peeples leaves, he's back to

23  sort of breaking even.

24       And you note that he's lost some more money in December

25  of 2010, some 18,000 in December 2010, but that's largely the

1    result of year-end journal entries.  You know, accountants --

2    and I must also add that I'm a CPA and a chartered financial

3    analyst and a whole bunch of things.  But typically accountants

4    at year end, we make a number of adjustments that we only make

5    once a year for things like depreciation and whatnot.  And

6    those year-end adjustments tend to result in a larger loss

7    during the last month than you would normally have during

8    preceding months.  So if you ignore the month of December,

9    which, as I said, is somewhat the result of year-end

10   adjustments, it looks like after Dr. Peeples left, that he's

11   back to sort of a break-even position.

12        If you add up all of the reductions in actual dollars, he

13   lost some 198,233.27 for the period from February of 2009

14   through December of 2010.

15   BY MR. HENDRIX:

16   Q.   And so that's one of the conclusions in the opinions in

17   the case now we've gotten to the point of:  What did he lose as

18   a result of the injury?  Right?

19   A.   Right.

20   Q.   And you got that 198,000; is that correct?

21   A.   That's correct.

22   Q.   And I think Ms. Falkner had it at not too terribly off,

23   like 214- or something?

24   A.   Yes.  As I recall, it was something like that.  I think I

25   can give you the specific number.  $214,226.74.

1    Q.    So if I understand where we are in the process, Calculus

2    No. 1 is determining how much the person would have made had

3    they not been hurt.  You worked through that.  Calculus No. 2

4    then is:  What did the person actually make?  Correct?

5    A.    Yes, although that's not much of a calculus because we

6    already know what it is.  It's simply a matter of converting it

7    into 2010 dollars.  I should note that the conversion of

8    operating expenses into 2010 dollars does not use the physician

9    CPI, but instead uses the overall CPI because we're talking

10   about price changes regarding things like paper and supplies

11   and a whole bunch of things that have nothing to do with

12   medical care; the cost of computers in your office, et cetera.

13   Q.    Why don't you go ahead and for the judge -- Ms. Falkner

14   commented on that, right, and had taken issue with your report

15   on what -- use of one CPI index and not --

16   A.    She did not understand why I used the physician index to

17   back out inflation out of fees, patient-generated fees by a

18   physician, and why I used the overall index for backing

19   inflation out of the expenses of running a medical practice.

20   And the reason is because the operating expenses are for all

21   kinds of things.  For example, he has staff in his office which

22   are not all medical professionals.  He has fees for Ms. Falkner

23   as an accountant that has nothing to do with medical expenses.

24   So it's best to use an overall index when we're adjusting

25   operating expenses for inflation and use an index specific to

1    physician care when we're adjusting the sales for inflation to

2    back out deflation out of both expenses and sales so we can

3    talk about the real effect of growth because that's what the

4    issue is:  What is the real effect of being able to see fewer

5    patients?

6         Now, the other thing that's noteworthy on Table 4, and

7    that is:  What is the future reduction?  If you look at the

8    period from November '09 through December '10 -- and that's

9    really the period when the losses finally stop.  He's back to

10   work.  Okay.  And you have -- you go to November because he

11   still has some continuing loss because while he may be back to

12   work, he's not collecting fees until, arguably, November.  He

13   doesn't collect fees immediately.  But if you look at that

14   figure from November '09 through December 2010, the average

15   reduction -- or not the average reduction -- yeah, the average

16   reduction during that period of time is 13,173.29.  So if you

17   added up all of those numbers, that's what you would have.  I

18   said average.  It's just the sum of all of those.  But that

19   period is 14 months.  November of 2009 through December of 2010

20   is 14 months.

21        So if you looked at what the loss you would anticipate for

22   a year, the annual loss is some 11,291.39.  So what you have is

23   an actual loss in dollars, in current dollars, December 2010

24   dollars, because that's when we've all calculated this as of

25   that point in time.  That is based on a forecast of what he did

1    based on what he has previously done backing out inflation of

2    both revenues and expenses and looking at it month by month.

3    And when you look at this operating profit reduction month by

4    month, it makes a lot of sense, which gives some credence to

5    the forecast.

6        The two subsequent pages, I think, can explain -- for

7    instance, sales, it shows you what the trend of sales was and

8    how we use least squares to arrive at future sales.  Then I

9    have the sales profit, which shows you the basic formula to

10   look at fixed versus variable costs.

11       The future calculation is on the last table, which is

12   Table 5.  If you look furthest to the column on the right, you

13   see the past figure of 198,233.27 which is consistent with the

14   calculation in Table 4.  And then if you look at the future --

15   if you look at the third column, you see the 11,291.39, which

16   is the annual cost based on what actually occurred from

17   November of -- November of 2009 through December of 2010, so --

18   in fact, I spoke to you earlier of the 11,291.39.  Then you

19   compute the present value.  The present value here is -- you

20   see the survival factor.  That's taken into account, the

21   likelihood that he might not live.  That, incidentally, is

22   consistent with the Bureau of Census Technical Paper 16, which

23   is attached, which says you should take into account the

24   probability of survival among other things.

25       You see the adjusted operating profit reduction, which is

1    simply the money annual that he lost, 11,000, adjusted for the

2    likelihood of not living.  And then you see the present value

3    discount factor.  That's an important discount rate.  You see

4    the figure of 1.82 percent above that present value factor.

5    That's the -- that is the net discount rate combining a real

6    interest rate, which in this case is some 2 1/2 percent, with

7    the real growth rate of .63 percent that we calculated when we

8    computed the sales.  So rather than increase sales by

9    .63 percent and then turn around and discount by 2.5 percent, I

10   calculated -- I just combined them in one mathematical

11   calculation.  And so the present value factor is a factor which

12   recognizes both the real interest rate and recognizes the fact

13   that there was and would continue to be some historical growth,

14   namely .63 percent per year in volume, which is what he

15   historically has done.

16        Then that calculates the present value of each of those

17   cash flows.  And you accumulate them year by year to arrive at

18   the number.  And so that's the methodology that I've used.

19   There are obviously a number of differences between Ms. Falkner

20   and myself.  And I think you wanted to go --

21   Q.   Right before we get there, Mr. Marsh, to make sure that I

22   understand the last part of the calculation is, one, life

23   expectancy because you're projecting this out over a lifetime,

24   correct?

25   A.   You're projecting it through age 70.

1         You know, I've actually run the projection year by year so

2    that, Your Honor, you could -- if you decided that, gee, it

3    makes more sense to use age 67 than 70, then you can stop that

4    loss at any point you deem more appropriate.  But I've

5    continued it through age 70.  The survival factors, though, you

6    note they go all the way to age 110 because it isn't until age

7    110 that the government figures that all of us are dead.  So we

8    do a calculation that takes it all the way until there's

9    arguably no one else alive.  But you can see that the

10   likelihood of survival at age 110 is .0000002.  It's slim and

11   none.

12   Q.   And the final part, in determining present value, is that

13   the function of two things?  You're having to reduce something

14   future into a present value and making it a lump sum, right?

15   A.   Yes.  It's -- it's a function of two things.  It's a

16   function, first, of the interest that can be earned on any

17   money received now.  Dr. Pierce is going to get a lump sum,

18   arguably, or that's the request, and he's going to be able to

19   put that money in the bank and earn some interest.  So I've

20   assumed that he can put it into a U.S. government treasury

21   securities and on average earn interest of some 2 1/2 percent

22   since that's the real interest rate as it has been over the

23   last 50 years.  Current real interest rates are a little bit

24   lower.  But I think most economists, myself included, believe

25   that we will very shortly get to long-term average interest

1    rates, particularly given the magnitude of the federal

2    government deficit of some 14 trillion-plus which doesn't seem

3    to be going down anytime soon.  So I think using a long-term

4    forecast of interest rates -- and I've used actually the period

5    of '53 through the present, December of 2010.  What real

6    interest rates have existed during that time frame makes a lot

7    more sense.

8    Q.    Which gives the broadest and most accurate view in

9    projecting a future interest rate.  Because I know we are in

10   the lowest interest rate times in the past --

11   A.    Yes.  And in my humble opinion, they are not going to

12   last.

13   Q.    Why is that?

14   A.    Just because of the magnitude of the deficit, because of

15   the trade imbalance that this country has.  Ultimately, the

16   federal government is going to be forced to raise interest

17   rates in order to roll over its debt.

18   Q.    So everyone beware of interest rates are about to go up?

19   A.    Yes.  And I don't think there's anyone that disagrees with

20   that.

21         The other thing that it picks up, as I stated earlier, the

22   real growth in sales volume.  He has had some historical real

23   growth.  I think you can make an argument that there's only one

24   person and you can only grow your business so long as one

25   individual.  But, nonetheless, I've assumed that he will grow

1  his business volume-wise by .63 percent per year, which is what

2  he did from 2003 through 2009, January of 2009.

3  Q.    Okay.  Let's now switch over to your reaction to -- did

4  you understand the methodology that Ms. Falkner --

5  A.    I did.

6  Q.    -- used, and can you comment on it?

7  A.    I had a number of issues.  They are actually addressed in

8  my cover letter.  The first one, as I alluded to earlier, is

9  that Ms. Falkner starts with net income instead of sales volume

10 when, in fact, it's been sales volume that's been affected.

11 That is simply inappropriate because sales volume -- net income

12 is not a direct function of sales volume.  It's a function of

13 what happened on pricing and what you have to back out the

14 effect of, and it's a function of fixed and variable expenses.

15 So that's Problem No. 1.

16     The second is Problem No. 2 is that she projects inflation

17 that occurred from 1999 to 2008 to continue in the future.

18 That's, first, inconsistent with what most economists do, and,

19 in fact, it's inconsistent with the U.S. Supreme Court case in

20 the *Pfeifer* case.  Basically what we do as economists is not do

21 a speculative forecast of future inflation.  Instead, what we

22 do is we take all of our historic numbers and we back out the

23 effects of inflation so we're making a forecast based on real

24 numbers.  And real numbers are in this case 2010 numbers.  And

25 then we don't make a future inflation forecast.  We don't say

1    inflation is going to be, you know, 10 percent or 5 percent.

2    We simply say that the real changes in numbers historically

3    will continue.  So we're making a forecast based on real

4    numbers rather than inflated numbers.  That's why my real

5    growth is .63 percent as opposed to 3-point whatever percent

6    that Ms. Falkner came up -- that's simply an inappropriate

7    methodology.

8    Q.   I think Ms. Falkner determined that she looked back at the

9    past ten years of his practice, and, on average, saw a 3 1/2

10   percent increase or 3 1/2 percent gain, that was the method she

11   used?

12   A.   Yes, she's doing a speculative inflation forecast, which,

13   as I said, you shouldn't do.  And of course now inflation is

14   less than that.  I mean inflation last year was 1.64 percent

15   in 2010.  So that's clearly different from the inflation that's

16   implicit in her number of 3.9 percent.  You've got to change

17   the inflationary environment.

18       The second problem is this issue of Dr. Peeples.  I think

19   I've pronounced that right.  The problem is this.  First of

20   all, if you have to -- I don't know of any rational reason for

21   subtracting out money that Dr. Pierce actually made from past

22   losses.  I mean, he actually has that money, he reported it, he

23   pays taxes on it.  I'm not sure why there should be a reduction

24   when you look at what he would have made compared to what he

25   actually made.  I think the appropriate figure to subtract out

1    is what he actually made.

2    Q.    This is the $46,000 that Dr. Peeples --

3    A.    $46,000 --

4    Q.    -- generated for Dr. Pierce's clinic?

5    A.    Sure, but it's also important with respect to the future

6    because, as I said earlier, 1, in cases -- and as you can

7    appreciate, I testify a lot in civil cases.  In civil cases, at

8    least, when I do an economic analysis, one of the issues is

9    always residual earning capacity and responsibility or

10   obligation to mitigate damages.  And if you can hire someone to

11   take some slack, then why shouldn't you continue to do that in

12   the future?  The argument that somehow or other you can't have

13   an office for two people, I think, has to be done in the

14   context of exactly what Dr. Peeples was doing.

15       The -- if you look at his fees generated for 2010,

16   Dr. Peeples generated fees of 76,301.76.  The other fees were

17   some $1,001,733.  Total fees were 1,000,078.  Which means that

18   Dr. Peeples' contribution to fee generation to the business

19   in 2010 was only 7.07 percent.  He wasn't a big part of the fee

20   generation picture.  He wasn't in that office, arguably,

21   full-time.  And all he did is on some days when Dr. Pierce

22   wasn't there, he might have picked up the slack.  But it

23   doesn't look as if you necessarily needed a full-time office

24   for someone who was there just, you know, periodically.  He

25   just didn't have a very big effect on the fee generation

1    capability of the business.  And, you know, to subtract it out

2    makes no sense.

3         And the third reason why it doesn't make sense is because

4    as I explained to you earlier, Your Honor, if you simply look

5    at the months of September, October, and November, there is no

6    reduction, which means that Dr. Pierce at some point has gotten

7    to generate as much income as you would have expected him to

8    make based on his history.  So I see no reason to make that

9    adjustment.

10        The second thing, Your Honor, that has troubled me and it

11   really relates to this deferred compensation, Ms. Falkner has

12   stated something that just surprises me, and I guess that's the

13   best word to say it.  She made a statement that when it comes

14   to deferred compensation, you don't have to report income that

15   medical -- Medicaid providers would have paid Dr. Pierce.  In

16   other words, he had income that he was entitled to receive from

17   Medicare for billing them, and he didn't have to report that

18   income on his income tax return because it's deferred.

19        Generally how that works, Your Honor, is the IRS -- and,

20   you know, as I say, I'm a CPA, and maybe she may know it, but

21   generally the IRS says:  Listen.  If you want deferred income,

22   there are some plans when you can actually defer it and it

23   doesn't get picked up, but it's not on money that you're

24   entitled to receive.  What typically happens is that that

25   income ends up being received, and then you take a retirement

1    deduction.  You know, you get a 401(k) reduction or you get an

2    SEP reduction.  But if it's deferred income, it ends up being

3    deferred where you don't pay taxes on it, but both pieces get

4    reported on your income tax return.  In other words, you report

5    it, then you subtract it out.

6         There's no mention of any of this deferred income, and I

7    don't -- you know, I haven't gone back.  This is the first time

8    I've heard of this, so I haven't gone back and researched it,

9    but I would be very surprised if doctors who receive Medicaid

10   reimbursements somehow don't have to report that for tax

11   purposes and then subtract it out.  And, quite frankly, as a

12   result of that, when I first saw that deferred charge, I

13   thought it was the Arkansas Diamond Program that if I recall

14   correctly is mostly applicable to State of Arkansas employees.

15   I think it's a program that's available to them.  And I always

16   thought this deferred compensation was the result of money that

17   the State of Arkansas is deferring.  And that would be normal

18   because, you know, for instance, my wife is a State of Arkansas

19   retired teacher.  And they have an ability to take income and

20   put it in a retirement account for Arkansas teachers.  That

21   doesn't get reported to them at all.  But I know of no such

22   program set up -- you know, the State of Arkansas has a

23   program, but I don't know of any Medicare reimbursement program

24   where the federal government has set up the ability for doctors

25   to simply not report money they are entitled to under Medicaid.

1    Q.   And that's -- again, we heard that for the first time from

2    Ms. Falkner --

3    A.   We heard that for the first time.  And I can't say for

4    certainty that it doesn't exist, but it would surprise me.  And

5    I may be -- I may be back in this courtroom and say I got

6    surprised but, Your Honor, it does surprise me.

7    Q.   Okay.  What else?

8    A.   So that's the second area I disagree with.

9         The third area, Your Honor, has to do with this discount

10   rate.  If you look at Ms. Falkner's calculation of present

11   value -- and I'm not sure I can give you a -- it's the first

12   page of Exhibit 1.  You'll note that her income is projected to

13   increase in the third column there at 2.8978 percent per year,

14   and that her discount rate is 2.8978 percent per year as well.

15   Do you see those two numbers?

16             THE COURT:  I do.

17             THE WITNESS:  Now, she said that the 2.89 percent is

18   the inflation rate.  And she said -- that's in the third

19   column.  And, arguably, she's increased the income that he will

20   make in spite of being injured by the inflation rate.  And then

21   she's discounted it to determine the present value at the same

22   inflation rate.  Well, that's just -- that just doesn't happen

23   in real life.  And the reason for it is, I guess, best stated

24   by an illustration.

25        Your Honor, if I were to give you $100 -- or excuse me.

1    If you were to ask me for $100 and I gave you $100 to buy this

2    TV set that you wanted, and I gave you $100, and inflation was

3    10 percent, and a year later you gave me $105, I would not have

4    been compensated for having loaned you money.  The interest

5    rate that you receive in real terms is what you get paid for

6    deferring income.  In other words, if I'm loaning you $100,

7    that's $100 I can't spend right now.  And if you pay me $105 a

8    year from now when inflation has been 10 percent, that means I

9    can't buy the TV set because I don't now have the money that I

10   got back from you to buy the TV set because it's now a $110 TV

11   set as opposed to a $100 TV set.  Following me?

12            THE COURT:  I am.

13            THE WITNESS:  So in real terms, we don't have zero

14   interest rates and we don't have negative real interest rates.

15   She's proposing a zero real interest rate.  And we can have

16   periods of time, and we have had periods of time, where we've

17   had zero real interest rates on short-term securities, but we

18   do not have certainly, over the remaining work life of

19   Dr. Pierce, a period of time when we can anticipate reasonably

20   to have zero real interest rates.

21   BY MR. HENDRIX:

22   Q.   In her methodology, she's using one and canceling it with

23   the other resulting in a zero interest rate?

24   A.   Yes.  You simply don't discount at the inflation rate.

25   You discount at some rate.  And all of that gets to the problem

1    of doing an inflation forecast.  You should not be doing a

2    forecast based on future inflation.  You should be doing a

3    forecast based on real numbers and using real interest rates

4    net of inflation.  And that's what I do.  The real interest

5    rate historically on ten-year securities net of inflation has

6    been 2 1/2 percent.  If I reduce it by the .63 percent for the

7    real growth, I'm at the 1.8 percent real interest rate, which

8    is what I use.  And to suggest that we have a zero real

9    interest rate instead of a 2 1/2 percent interest rate is

10   patently absurd.  It's not going to happen.

11   Q.    The difference between something arbitrary and something

12   standardized is what you're getting at?

13   A.    It's not just arbitrary and standardized.  It reflects a

14   lack of economic knowledge in terms of financial markets.

15   Q.    Okay.  What else?

16   A.    The -- you know, the other thing that is a problem and

17   that is, of course, she's ignored the probability of survival.

18   There is a Technical Paper 16.  If you bother to read it,

19   you'll see that the government says you should take into

20   account the probability of survival when you do an analysis of

21   future earnings.  She hasn't done that.

22   Q.    That's attached to your report, correct?

23   A.    It is.

24         I think that's got the bulk of it.  I think if I've missed

25   something, it will be in the narrative, but I think those are

1   the principal issues that result in the 700,000-dollar

2   difference in the numbers.

3   Q.   It's an extraordinary difference --

4   A.   It is extraordinary --

5   Q.   -- assuming it's not something -- when two accountants

6   usually get together, your figures aren't usually that off?

7   A.   Yes.  It's a difference between an accountant and an

8   economist.

9   Q.   A couple of final things.  In your opinion, did

10  Ms. Falkner use generally accepted economic and financial

11  principles in arriving at her conclusion?

12  A.   No, sir, she didn't, for all of the reasons that I've

13  stated.

14  Q.   And were the principles that you used, in fact, generally

15  accepted in both fields?

16  A.   Yes.  They are a quite standard methodology.  There's a

17  number of -- there's a great textbook on economic forecasting,

18  you'll find all of it in there, by a fellow by the name of

19  Kennedy.

20  Q.   How much have we paid you?

21  A.   I think a total is probably 5,000 at best.  I think it's

22  probably less than that.  And if you actually look at the time

23  spent doing the analysis, it's been less than that.  There have

24  been some meetings to explain things to some lawyers who needed

25  a great deal of time understanding things.  And so if you were

1    to back that out, we'd have a fairly modest fee, I think,

2    compared to perhaps some others.

3    Q.    Thank you for that last bit.

4    A.    You deserved it.

5         MR. HENDRIX:  I pass the witness.

6         THE COURT:  Cross-examination?

7         MS. WHATLEY:  Yes, Your Honor.

8                     CROSS-EXAMINATION

9    BY MS. WHATLEY:

10   Q.    Not taking into account the, I'm sure, many long hours you

11   had to spend explaining all of this to Mr. Hendrix, how much

12   time do you think you actually spent putting this report

13   together and coming up with your calculations?

14   A.    I would guess that the total billing for actual time spent

15   putting together, probably about $3,000.  The biggest chunk of

16   it was putting together the financials because I had to take

17   all of the financials that Ms. Falkner generated and get them

18   into a spreadsheet form so that you could understand them.  So

19   it was clerical work as opposed to mind work, somewhat mindless

20   work.

21   Q.    You spent a lot of time taking the numbers given to you to

22   put it into a chart that could be utilized the way you wanted

23   it to be utilized?

24   A.    Yes.  I had to take the numbers out of her financial

25   statements and put them into Microsoft Excel so that you could

Marsh - Cross

1    do an analysis that made some sense.

2    Q.    Okay.  And not taking into account that much time, the

3    time you did for the clerical as you just termed it, how much

4    time did you spend actually crunching numbers?

5    A.    If you avoid all of that time, the analysis itself is

6    pretty straightforward.  I would say probably no more than --

7    it would be 1,500, maybe $2,000, for the actual brain time.  I

8    would think that would be all it is because for me this is a

9    pretty standard computation.

10   Q.    Okay.  You keep giving it to me in dollars.  How many

11   hours?

12   A.    I charge -- I'm sorry.  I charge 250 an hour.  So

13   $2,000 --

14   Q.    I saw you with a calculator earlier.  I know you have it.

15   A.    I have a calculator.  I always have a calculator.

16         About 8 hours; 8 hours of brain time.

17   Q.    And does that include writing the report that you

18   presented?

19   A.    Yes, that would include writing the report.

20   Q.    Would you agree that there's not one hard and fast

21   methodology that can be used in determining future income?

22   A.    The methodology is pretty generally accepted.  I think the

23   methodology -- there's not a whole lot of question about the

24   methodology.  I think where you get questions are what

25   statistics do you apply in that methodology and what baseline

1    numbers do you use?  Do you use, for instance, a current

2    number, or do you use an average number?  So I think in terms

3    of the methodology, that's pretty well accepted.  There's some

4    economists, for instance, that don't take into account the

5    probability of survival.  But, I mean, when faced with

6    Technical Paper 16, most of them recognize that, yes, they

7    should.

8    Q.    But didn't the United States Supreme Court in *Jones &*

9    *Laughlin Steel v Pfeifer* even state there's a whole lot of

10   different methodologies that are out there?

11   A.    Well, they may have stated, but if I read that lawsuit, I

12   think the real issue with them was that there is some variance

13   in the net discount rate.  I think in that case they said the

14   net discount rate could range from zero to 3 percent.  And so

15   it was an issue of what statistics do you use to arrive at what

16   interest rate.  So I think -- I mean, there's not a whole lot

17   of discussion about how you compute present value.  I mean,

18   that's well understood.  That methodology is very well

19   accepted, very well understood.  I think the Supreme Court was

20   addressing:  Do you use a ten-year security, do you use a

21   one-year security to determine the interest rate?  Do you value

22   that based on a five-year period, do you value that based on a

23   50-year period?  There are some differences as to the numbers,

24   but not really with respect to the methodology.

25   Q.    Have you ever met Dr. Pierce?

1   A.   No, I have not.

2   Q.   Have you ever been to his clinic?

3   A.   No, I've not.

4   Q.   I want to talk briefly about deferred income.  And as I

5   was reading through your report, you were making comments in

6   your report, specifically on page 4 on the first full paragraph

7   where you say, "Third," you start talking about -- the last

8   sentence reads, "The initial pre-incident net income is

9   overstated by $21,202.75."  Do you see that in your report?

10  A.   I do.

11  Q.   And do you understand now that that's because that's

12  deferred compensation?

13  A.   I believe so.

14  Q.   And at no point in time in any of your calculations did

15  you take into account the deferred compensation?

16  A.   That's correct.  In my opinion, unless someone convinces

17  me otherwise to do so would be inappropriate.

18  Q.   You're not accusing Dr. Pierce of committing tax fraud,

19  are you?

20  A.   No.  I'm simply suggesting that I believe the deferred

21  compensation may be from the State of Arkansas rather than from

22  Medicaid or Medicare.

23  Q.   It's actually from Medicaid.  And do you understand that

24  Medicaid is a state-run health benefit program?

25  A.   But it's not a retirement program.

Q.   But so what you're telling me is you don't know anything

about what Medicaid and the State of Arkansas have set up for

deferred income for physicians?

A.   They may have done something.  It would be the first time

that I've heard of that where it's actually a deferment of

Medicaid by the state since the federal government typically

reimburses the State of Arkansas for Medicaid.

Q.   But not 100 percent, do they?

A.   No, but I would be very surprised if the government

says -- the federal government says, "Gee, we're reimbursing

you, the State of Arkansas, for Medicaid.  But, oh, by the way,

you don't have to report it as a doctor."  As I said, I may --

Q.   But you don't know whether or not the Medicaid program has

a deferred compensation account set up for physicians in the

State of Arkansas?

A.   That is a fact.  I don't know.  I would be surprised if

they did, which is why I did not include that in my analysis,

but I don't know for certain.

Q.   Okay.  You made a comment earlier that from 2003 until

2009, Dr. Pierce was growing his business?

A.   Yes.

Q.   Do you know that the bombing happened on February 4th,

2009?

A.   Yes.  And when I said 2009, I'm saying through January

of 2009 prior to the business.

Marsh - Cross

1    Q.    Okay.  So prior to the bombing, he was growing his

2    business?

3    A.    Yes, at .63 percent per year.

4    Q.    Okay.  You also had a -- you made a comment that you would

5    be shocked if Dr. Pierce was really seeing 70-something

6    patients a day?

7    A.    Yeah, based on -- you know, I go to the doctor and it

8    seems to take more than --

9    Q.    But you will agree with me that you have never been to

10   Dr. Pierce's clinic?

11   A.    I have never been in Dr. Pierce's clinic.  Moreover, I

12   have not seen any itemization of how many patients he's

13   actually seen per day.  I haven't seen a single record on that.

14   Q.    The defense didn't give that to you?

15   A.    No.  I have not seen any records, historical records, of

16   the number of patients he has seen.

17   Q.    So you did not know that in the trial this past July we

18   actually presented a witness that showed an average of the

19   number of patients that Dr. Pierce has seen prior to and after

20   the bombing?

21   A.    That's correct.  I've not seen any patient data in terms

22   of the number of patients seen per day or per year or per

23   month.

24   Q.    But you're not disputing that he saw between 70 and 75

25   patients a day if that's what our numbers that were presented

1  at trial showed?

2  A.   I have not seen them.  It just surprises me based on how

3  much time I spend talking to a doctor.  And I think there's a

4  question really of:  Is he seeing these patients, or is there

5  someone else in his office seeing them?  And I think you have

6  to differentiate between how many patients came to the clinic

7  and perhaps how many patients he actually saw.  And I just

8  don't know the answer to any of that because I haven't seen

9  specific time cards and specific patient records in terms of

10  what they did when they came to the office and exactly who they

11  saw.

12  Q.   You're disputing what the accountant and information

13  received from the Pierces is?

14  A.   No.  I'm saying that I have not seen it, and the number of

15  75 surprises me.  I haven't seen it, but it just seems like a

16  very big number.

17  Q.   What type of practice does Dr. Pierce have?

18  A.   My understanding is he's a family practitioner with a

19  focus on asthma patients.

20  Q.   Where did you get that information?

21  A.   Off the Internet.

22  Q.   So that's where you did your research:  On the Internet?

23  A.   That's where I looked up Dr. Pierce was on the Internet,

24  yes.  They have -- I think they have a spec on all of the

25  doctors that they have.

Marsh - Cross

1    Q.   But that's not actually a website that Dr. Pierce put up

2    or updates or anything like that?

3    A.   I think they solicit information from him.  I think he has

4    the ability to change the information on some of those websites

5    if it's inaccurate, but I don't know to what extent he was

6    involved in the information that's on those sites.

7    Q.   Are you aware that actually Dr. Pierce does not have a

8    specialty in asthma and he is a general practitioner who sees

9    people for everything from the flu to a cold to even worse than

10   that?

11   A.   He may well.  As I said, I saw that on a website, but it

12   made no difference in the economic analysis, so it's

13   irrelevant.

14   Q.   And do you understand that when people -- I mean, he

15   doesn't have a specialty.  He's not a plastic surgeon, not

16   doing things like elective medicine.  I mean, people get sick,

17   they've got to go to the doctor.  Do you understand that?

18   A.   Well, a lot of them, quite frankly, go to the emergency

19   room as opposed to a private physician.  But be that as it may,

20   some people when they get sick, they go to a private physician.

21   Q.   And pricing in family practice, a lot of times it's done

22   based on medical codes, correct?

23   A.   With respect to Medicare and Medicaid, it is.

24   Q.   And even with private pay insurance, with commercial

25   insurance, they'll only pay up to a certain amount on certain

Marsh - Cross

1    codes; isn't that correct?

2    A.    With regard to insurance reimbursement, yes.

3    Q.    And only 11 percent of Dr. Pierce's patient load is

4    private pay, so everything else is based on codes.  Isn't that

5    true?

6    A.    You tell me.  I don't know.

7    Q.    And aren't the pricing codes pretty stable?

8    A.    Are the pricing codes stable?

9    Q.    Yes.

10   A.    If you look at the cost of health insurance and you look

11   at the changes in the cost of health care, I would say it is

12   not stable with regard to the overall community.

13   Q.    But if I go in and see Dr. Pierce today for a cold and you

14   go in and see Dr. Pierce today for a cold, and we both have

15   insurance, we're pretty much going to pay the same amount,

16   correct?

17   A.    You're beyond my -- I would think so, but I don't have any

18   personal experience when it comes to that.

19   Q.    Okay.  I want to talk about past lost income briefly.

20   Okay?  You have it at $198,233.27?

21   A.    Yes.

22   Q.    And Ms. Falkner has it at $214,226.74, correct?

23   A.    Yes.

24   Q.    And if my math, which I did by hand, is correct, we're

25   talking about a $15,993.47 difference?

Marsh - Cross

1    A.    That sounds about right.

2    Q.    So about a $16,000 difference between what you think lost

3    past income is and what she thinks lost past income is?

4    A.    Yes, thereabouts.

5    Q.    Where the rubber hits the road on all of this is future

6    lost income, correct?

7    A.    Correct.

8    Q.    Based on your calculations, you were stating that

9    Dr. Pierce will only lose $123,092.07 from 2011 to 2025?

10   A.    Present value, yes.

11   Q.    Whereas, she's saying present value is $824,000?

12   A.    Yes.

13   Q.    And you disagree with her use of using real numbers going

14   back ten years on both sides of the equation?

15   A.    She is not using real numbers.  She is using inflated

16   numbers.  They may be actual inflated numbers.  But in economic

17   terms, we think of real numbers as being numbers that are net

18   of inflation, excluding the effects of inflation.  So she's

19   using inflated numbers to make a forecast where, arguably,

20   we'll have a different inflation environment, so --

21   Q.    How is she using inflated numbers in Government Exhibit 2?

22   A.    Because those numbers reflect price inflation from year to

23   year.

24   Q.    But then doesn't she back out the inflation from year to

25   year when she goes forward?

Marsh - Cross

1    A.   She should convert all of those numbers into dollars of

2    some period.  In this case, the best way to do it is dollars

3    of 2010.  You know, the best way to explain it, it's like if

4    you get a raise and your pay goes up 1.64 percent, and the cost

5    of living goes up 1.64 percent, you may think you got a raise,

6    but in terms of your standard of living, you are standing

7    still.  You did not get a raise.  So in real terms, you got

8    nowhere.  That's why we, as economists, use real dollars as

9    opposed to inflated dollars to measure what the real effect has

10   been on a business.

11   Q.   In order to get your bottom line number, your 300-and-

12   some-odd-thousand-dollar number, you decreased it by

13   1.8233 percent; is that correct?

14   A.   Yes.  My net discount rate was 1.83 percent.  Obviously it

15   doesn't affect the full 300,000 because, as we've noted, 198-

16   of that is the past, but it did affect the future.

17   Q.   It affected the future, where she was doing 2.8, you were

18   doing 1.8, so we're off by a percentage point on the discount?

19   A.   No, she was not doing the 2.8.  She was essentially doing

20   a zero because she inflated the numbers by the same amount at

21   which she discounted it.  The 2.98 percent is not a discount

22   rate.  It's an inflation rate.

23   Q.   In your report on page 4, second full paragraph, you make

24   a comment that the 2010 actual net income exceeds the 2008

25   actual net income, and therefore you were going -- arguing for

1    future lost income is kind of unsupportable.  Do you

2    understand -- do you recall that you stated that?

3    A.    Yes.

4    Q.    And do you understand based on her numbers that even

5    though Dr. Pierce made more, he did not make as much more as

6    she would have expected him to make?  Do you acknowledge that?

7    A.    Well, in 2010 -- if you look at 2010 and you look at 2008,

8    he's actually making a fair amount of money even under her

9    numbers.  If you look at the last page -- I say the last page.

10   If you look at Exhibit 2.

11   Q.    Your Exhibit 2, or my Exhibit 2?

12   A.    Your Exhibit 2.

13   Q.    Okay.

14   A.    In 2010, his net income -- well, let's add in the Arkansas

15   deferred, if you want.  In 2010, his total earnings were 554-.

16   In 2008, it's 540-.  So he actually made more money in 2008 --

17   in 2010 than he did in 2008, even under her numbers.

18   Q.    And we have inflation in there, right?

19   A.    According to her, we have some inflation, but I can tell

20   you that inflation in 2008 -- in 2009, in the middle of the

21   recession, was negative.  And if you look over there at the

22   column, she even has a negative number of 0.34 percent

23   negative.

24   Q.    But then there's an increase for 2010?

25   A.    Yeah, there's a slight increase in 2010 of 1.64 percent.

1    Q.    I notice that you represent both plaintiffs and

2    defendants?

3    A.    I do.

4    Q.    And do you use the same methodology when you do defense

5    calculations as you do when you do plaintiff calculations?

6    A.    Yes.

7    Q.    And you don't know anything about the Arkansas Diamond

8    Deferred Income Program?

9    A.    I don't know about the Arkansas Diamond Deferred Income.

10   As I said, I would be surprised if the federal government says

11   you don't have to report it on your income tax returns.  But,

12   you know, I have not investigated that.  It's simply new

13   learning for me --

14   Q.    And --

15   A.    -- if that's the case.

16   Q.    -- based on what you told me earlier, you spent 8 hours

17   looking at years of numbers, but you don't have numbers to tell

18   us how many patients Dr. Pierce used to see and sees now?

19   A.    I have not seen the data on the number of patients he saw

20   as opposed, for instance, to maybe the number of patients that

21   visited the clinic.  I don't know what time cards he has,

22   whether those time cards match up with patients, so I've not

23   seen any kind of records like that that would enable me to get

24   at how many patients he actually saw per day.

25   Q.    But you're basing your findings on sales and you're

Marsh - Cross

1    attributing sales to patients?

2    A.    No, I'm not.  I did not do an analysis of patients --

3    Q.    But you're attributing sales to what he's selling, and

4    he's selling patient care; is that correct?

5    A.    No.  What I've done is I've adjusted the sales for

6    inflation assuming that his pricing of the fees that he charges

7    patients would be consistent with the pricing of patients

8    around this country.  That is, you could deflate them using the

9    index for physicians to arrive at a volume effect.  I simply

10   assume that he's going to charge marketplace prices for his

11   services, period.  That's all I've assumed without trying to

12   identify how many patients he saw.

13   Q.    And you're lumping him in with every other doctor in the

14   area?

15   A.    Yes.  I'm assuming he keeps up with the Joneses in terms

16   of if family physicians in Arkansas increase their prices by X,

17   that he's going to increase his prices by X.  That's the extent

18   of the assumption I've made.  It's a statistical assumption

19   that says, in the long run particularly, he will keep up with

20   pricing consistent with how other doctors price their services.

21          MS. WHATLEY:  Your Honor, may I have a moment?

22          THE COURT:  Yeah.

23          MS. WHATLEY:  Nothing further, Your Honor.

24          THE COURT:  Okay.  Any redirect?

25          MR. HENDRIX:  Just a few.  Can I approach, Judge?

1          THE COURT:  Yes.

2                      REDIRECT EXAMINATION

3    BY MR. HENDRIX:

4    Q.   I'm showing you the document -- one of the documents

5    produced by Ms. Falkner.  And at the end is where she is

6    telling us that Dr. Pierce saw 70 to 75 patients a day.  And I

7    think what she says in that report is now it's 50 to 55, right?

8    A.   Yes.

9    Q.   And, to your knowledge, that's all of the information

10   about his patient load that we've ever seen.  And what you're

11   saying is you've never seen a patient list that would verify

12   that number or not, right?

13   A.   Yeah.  If you're going to do the analysis, you'd want a

14   patient list, you'd want to know who they saw, you'd want to

15   have some evidence of the time cards so you know exactly, you

16   know, at least some way of documenting all of this --

17   Q.   Just to verify --

18   A.   -- but I've not seen any of that.

19   Q.   In other words, our information is clear, it's anecdotal,

20   it came from Ms. Falkner to us likely because she's not in that

21   medical clinic 8 or 10 hours a day and can personally verify

22   it.  It's just the number that Dr. Pierce generated, correct?

23   A.   I don't know who generated the number, quite candidly.

24   Q.   Does it make any bit of difference?

25   A.   No, it makes no difference to my economic analysis because

Marsh - Redirect

1    I simply assumed that -- I know what total sales are.  There's

2    no question about that.  And I assumed that his pricing for his

3    services is going to be consistent with the marketplace.

4    Q.    Right.

5    A.    And then the difference -- if you know what the total is

6    and you know what the price effect is, then the difference has

7    got to be the volume effect regardless of how many patients

8    he's seen.  And that's, quite candidly, the best way to

9    approach it economically.

10   Q.    Sure.  You're dealing with hard numbers, hard numbers that

11   were provided to you on a Schedule C from a 1040 tax return,

12   correct?

13   A.    I'm dealing with numbers that were provided on financial

14   statements as opposed to the tax return.

15   Q.    And numbers that Dr. Pierce's CPA put on her financial

16   statements that they gave to us, right?

17   A.    Yes.  And --

18   Q.    So they're hard numbers?

19   A.    Hard numbers that she provided and, in fact, included as

20   their Exhibit 3.

21   Q.    It doesn't matter if Dr. Pierce is seeing a hundred

22   patients a day, or one patient a day.  The issue is how much

23   money does that generate, correct?

24   A.    Yes.

25   Q.    Okay.  And that's what you're basing your analysis on is

1    the sales?

2    A.   Is the sales before, the sales after, the effect on net

3    income, and the difference in net income.

4    Q.   And most importantly on figures that were -- Dr. Pierce's

5    figures, these are the numbers they gave us?

6    A.   Correct.

7    Q.   Just to write it down for accuracy, what is your

8    conclusion to the penny on lost past income?

9    A.   The lost past income is $198,233.27.

10   Q.   And future?

11   A.   The past and future in total is 321,325.34.

12   Q.   321,325?

13   A.   And 34 cents.

14   Q.   But that's both combined?

15   A.   That's both combined, past and future.  And the difference

16   then between those two, which is a little over 20- -- about

17   23,000, is future.

18   Q.   Okay.  Thanks.

19            THE COURT:  Anything final?

20            MS. WHATLEY:  No, Your Honor.

21            THE COURT:  You may stand down.

22        Anything else from the defendant?

23            MR. HENDRIX:  No, sir.

24            THE WITNESS:  Thank you, Your Honor.

25            THE COURT:  What I'm going to do, as I said, I'm going

1    to read the two briefs that you've given me.  It shouldn't take

2    me very long to do that.  And I'll look at the cases you cited

3    to see what I am allowed to do.  I think -- I received a note

4    already that I'm allowed -- that I have discretion, for the

5    most part, on most of these matters, but I have to determine, I

6    think, what the case says as per -- Mr. Creasey, who has been

7    over there researching and writing and sending me messages

8    regarding the cases, indicates I have discretion, but I want to

9    look at the case.  And to the extent that I can be somewhat

10   certain in what the numbers are, if it calls for too much

11   speculation, I think that's what the case says, then that

12   weighs in favor of not exercising the discretion to give the

13   maximum amount of restitution.  But I will look at the case

14   first before I rule on that.  And I will have a ruling on

15   restitution and we'll wrap this up by Friday so we don't have

16   this hanging out.

17        Now, the next issue we have to take up today is the

18   temporary restraining order.  The government has moved to

19   restrain -- first, let me step back.

20        Ms. Mann has filed a divorce proceeding in the circuit

21   court, I think, here in Pulaski County against Dr. Mann.  I

22   think it's here in Pulaski County.  Am I correct?

23             MR. HENDRIX:  Yes.

24             THE COURT:  And Dr. Mann has responded.  The

25   government has moved to restrain the defendants from disposing

1    of assets until we have restitution in place and until the

2    government has been -- or restitution has been taken care of.

3    I think here are the issues as I see them, and I want the

4    parties to address these.  And I don't want to be here all

5    night on this.  This is something we probably can wrap up

6    pretty quickly.  I've had several thoughts as I mowed my grass

7    and done other things because I think about this case all of

8    the time.

9         My initial thought is that I'm not going to tell two

10   people they can't get divorced.  And I'm not going to tell

11   Ms. Mann, who is not -- has not been held responsible for any

12   aspect of the bombing, that she can't have whatever division

13   the circuit court gives her of assets.  That's my first

14   thought.  But then when I started thinking about it, this

15   creates a somewhat complex problem.  In reading the complaint

16   for divorce and the answer, it seems like this is somewhat of a

17   friendly divorce.  And I used to do some divorces, so I know

18   that sometimes you have a husband and wife who agree amicably

19   to part ways and move on and separate the property for various

20   reasons.

21        What I would not want -- I don't care about Ms. Mann

22   getting whatever division she gets and moving on with her life.

23   What I would not want to see, however, is for there to be a

24   division, I not restrain -- or I not take any action, and then

25   Dr. Mann's portion of the marital assets be used to pay for the

1    civil case, or for not even the civil case -- I shouldn't even

2    go down that road -- but being used to pay for restitution, and

3    then Ms. Mann using her portion to essentially continue to take

4    care of Dr. Mann.

5         Now, I know Ms. Couch is looking like where is that coming

6    from, but here's what -- here's the dilemma this presents.  If

7    it's a friendly divorce, they are still going to stay married

8    in spiritual ways, but be divorced on paper, divide up the

9    assets, and then Ms. Mann essentially get half -- get her half,

10   so to speak, and then use that half to carry on as though she's

11   Dr. Mann's wife, sending him money in prison, taking care of

12   his family, doing all of the things that he would have done but

13   for the divorce, I think that creates a problem.

14        Now, tell me why I should not take all of that into

15   consideration in determining whether to enter a preliminary

16   injunction prohibiting the Manns from disposing of assets,

17   dividing assets, those types of things.

18        MR. HENDRIX:  I hate to keep talking because I know

19   Jeff is about to chomp at the bit wanting to speak.  It seems

20   to create all sorts of problems.  And I think problems -- one

21   just practically, Judge, quite frankly, you're assuming a

22   corrupt state court judge.

23        THE COURT:  No, no, no.

24        MR. HENDRIX:  You're assuming a judge that --

25        THE COURT:  No, no, no.  I was a state court judge, so

1    don't say I assume anything.  If I'm a state court circuit

2    judge, all I'm going to say is, I'm going to divide these

3    assets.  I'm through.  He doesn't know what Dr. Mann and his

4    wife are planning secretly -- he or she.  I don't know who is

5    handling the case.  They are just going to make a division

6    based on the petitions and the documents.  And if the lawyers

7    for each party come up with an amicable settlement agreement or

8    agreement divorce decree, the state court judge is not going to

9    sit there and go behind her to try to say, "Well, no, no, no.

10   I detect this, that, and the other."  That state court judge

11   doesn't care at all what's going on over here in the federal

12   court.  At least, as a state court circuit judge in a divorce

13   proceeding, I don't know that I would.  I would just handle

14   what is in front of me.  So I'm not saying that the judge would

15   be in on the case at all.  I'm just -- I guess what I'm asking

16   for, I'm asking for the lawyers to give me something to assure

17   me that that's not what is happening.

18          MR. HENDRIX:  That's what I said, and I don't know if

19   you've got to read my brief on that or not.  But that's the

20   point is under the All Writs Act, it's unnecessary.  That order

21   is already in place and being enforced and has oversight by a

22   state court judge.  And then we get into the federal court

23   intermeddling in a state court proceeding where you've got a

24   federal judge potentially telling a state court judge how to do

25   their business, it's murky ground to me.

1          THE COURT:  I understand.  What if I have a criminal

2     case where I am going to grant restitution -- wherever I go

3     with that, we'll figure that out -- and the parties run over to

4     the state court to try to get a proceeding in state court that

5     would essentially prevent me from doing my job?  How am I

6     intermeddling with the state court?  Why is it that the parties

7     aren't going into the state court asking the state court to

8     intermeddle with what I'm doing here?  Why not wait until after

9     the restitution is taken care of to get the divorce?

10          MR. HENDRIX:  And, again, the first problem I've got

11     with it is if it's not assuming a corrupt state court judge,

12     it's assuming collusion over here based on no evidence --

13          THE COURT:  I don't have that.

14          MR. HENDRIX:   -- they are colluding, they've got to

15     be, because she filed for divorce.  Although they've been

16     separated for 2 1/2 years, they immediately jump to the

17     conclusion there's some form of collusion, yet can produce no

18     evidence of it.  That's the main problem that I've got with it.

19     What's a practical solution?  I think that procedurally it's

20     got so many levels of problems in how to proceed on this.  But

21     as a practical thing, look, they are restrained anyway.

22     There's a whole entire body of federal law to deal with this

23     mechanism later, the Federal Debt Collection Procedures Act.

24     And it can get into -- it's the mechanism that the federal

25     government uses to collect debts of the United States

1    government.  And part of it is, hey, there's a transfer there.

2    We need to determine whether it's a fraudulent transfer or not

3    and whether that money could actually be executed on.  So my

4    point is there's a whole body of law that deals with this.  I'm

5    not sure now is the appropriate form --

6           THE COURT:  Let me do this, Mr. Hendrix, because I

7    think in this case, because the restitution order would not be

8    against Ms. Mann, it would be against Dr. Mann --

9           MR. HENDRIX:  Right.

10          THE COURT:  -- I would say technically she has no

11   interest in the restitution case.  And I would assume, and I

12   don't fault -- and, see, don't take my words wrong.  If I were

13   married to somebody who was charged with a crime, and we were

14   going to get a divorce or there was some idea of getting a

15   divorce, and I knew there was going to be a huge restitution

16   order against her, I'd rush down to the courthouse and get the

17   divorce and get the property divided quickly.  I mean, there's

18   nothing wrong with that.  I put that on the table first.

19   There's nothing wrong with that.  For one thing, you've been

20   with this person all these years.  You have a certain amount of

21   interest in the family's property.  At some point you should be

22   allowed to walk away with whatever your interest is, especially

23   if you're not involved at all in the crime.  So I understand

24   that.  Let's put that on the table.

25          The question is, but if I were then essentially going to

1    tell her, "Look, let's get this divorce, let's be friendly

2    about it.  And then what I'll do is, after the divorce, I will

3    continue to take care of you, take care of your family, and do

4    all of those things that I was doing before the divorce," and

5    that's what creates the problem.

6              MR. HENDRIX:  Out of her half?

7              THE COURT:  From her half.  And so -- no, no, no, no.

8    We divorce.  Her half goes to restitution, but there's still

9    restitution left over.

10             MR. HENDRIX:  His half?

11             THE COURT:  I'm talking about the hypothetical me.

12   I'm getting a divorce.  I'm not saying about Dr. and Ms. Mann.

13   I'm getting a divorce.  My wife is having to pay restitution

14   for a crime she has committed.  We decide to get a divorce

15   because I know that if we don't get this divorce before the

16   restitution is awarded, then all of it will go -- everything we

17   worked for will go to pay the restitution.  We heard -- we

18   decide to go on and get the divorce.  If I'm going to take my

19   half and go live my life, that's one thing.  But if I'm going

20   to take my half and then use it to take care of her and her

21   family and everything as though we were still married, then I

22   don't know that it's a proper -- I don't know whether that's

23   proper.

24        And so I think in this case, if Ms. Mann is going to

25   continue living as though she's still married to Dr. Mann and

1   use her assets to take care of him in prison, send him money,

2   put money on his books and do all of those types of things,

3   then I don't know that that's proper.  And so I want to hear

4   from Mr. Rosenzweig just to get an idea.  And y'all can confer.

5        And I'll say this.  Mr. Wagoner, I know you're handling

6   the divorce.  There's only so much you want to say over here

7   probably.  I really don't mind hearing from everybody because

8   essentially where I am is I just want to make sure that what I

9   ultimately do is the right thing.  I would not want to -- even

10  though I understand what has happened to Dr. Pierce and his

11  family and everything he's facing, Ms. Mann has not been found

12  guilty of perpetrating that crime.  And so she's been with Dr.

13  Mann for however many years.  I have no problem with her having

14  a right to a certain amount of the family's assets in a

15  property division.  The only question I have is whether this

16  divorce is a friendly divorce that's being used to circumvent

17  the payment of restitution.  And I need -- just need to have

18  some assurances that that's not the case.  And I will listen to

19  Mr. Rosenzweig since he's representing her.  Or, Mr. Wagoner,

20  if you want to address me, I will allow you to do it.

21       MR. ROSENZWEIG:  May we confer for just a minute?

22    (Mr. Rosenzweig and Mr. Wagoner confer briefly off the

23  record.)

24       THE COURT:  Yes.

25       MR. ROSENZWEIG:  Your Honor, first, I think the Court

1    is confusing the issue of people acting extremely bitterly to

2    each other with some sort of sham.  People can be civil, they

3    can be -- they have, of course, a long history of being married

4    to each other.  And I don't think the fact that they are not

5    yelling and screaming at each other should be considered as a

6    sham.

7            THE COURT:  No.  Hold on, Mr. Rosenzweig, just so I

8    can set the debate.

9            MR. ROSENZWEIG:  Okay.

10           THE COURT:  I'm not assuming that.

11           MR. ROSENZWEIG:  Okay.

12           THE COURT:  Don't take anything I've said as being an

13   assumption.  I said that my initial thought was that there was

14   no way I was going to restrain Ms. Mann from getting her

15   divorce, getting her property division, and moving on.  But

16   then I started thinking about it, and there are some factors

17   that I have to weigh or consider before I come to that

18   conclusion.  And the question is whether, you know, there is a

19   sham.  I have to consider that.  And I have to consider what

20   the purpose of the divorce is.  If it's legitimate and it's

21   real -- I'm a divorced man.  I'm remarried.  My wife and I have

22   a beautiful -- my ex-wife -- my wife and I have a beautiful

23   relationship, but my ex-wife and I have a wonderful

24   relationship.  I love her to death.  We've raised two kids

25   together.  She makes sure I'm in the kids' life.  I'm in her

1     house with her and her husband, she's in my house with my wife

2     and me.  You understand?  When our daughters have birthdays,

3     the two families get together and go out together.  We do

4     things together.  Very few people have divorces like that.

5          But I understand a -- I understand -- not the perfect

6     divorce, but I understand a working divorce where you don't

7     fight, you don't yell on the phone, you don't call each other

8     names, you work things out.  She calls me when something is

9     going on with the children.  I call her about things.  Look, I

10    have no problem with that.  What I'm saying is, I just want to

11    make sure that the purpose of the divorce and the division of

12    marital assets is not simply to circumvent the payment of

13    restitution of Dr. and Ms. Mann, because, if that's the purpose

14    of it, then we have a problem.

15          MR. ROSENZWEIG:  Your Honor, the point that we're

16    getting at -- a couple.  The basic point I think you're

17    concerned about is, is this going to be some sort of fraudulent

18    transfer.  And what we are shooting for is something -- No. 1,

19    there will not be a fraudulent transfer.  What we're shooting

20    for is a 50/50 split of the assets of the marriage.  I mean,

21    they didn't have anything essentially when they got married,

22    and they've been married for decades.  We're shooting for

23    50 percent.  If there were some -- if there were some

24    fraudulence about it, it would be because the assets were split

25    in some way other than 50/50.  And, again, that's what we are

1    looking to -- what we are looking to do is 50/50.  And if it's

2    50/50, there shouldn't be any problem.

3         The other thing, Your Honor, you referred to taking care

4    of his family.  Well, his family is also her family.

5         THE COURT:  You're not convincing me at all,

6    Mr. Rosenzweig.  As a matter of fact, you're going the opposite

7    direction on convincing me.  You're absolutely killing your

8    case right now.

9         MR. ROSENZWEIG:  I don't understand.

10        THE COURT:  And I've set the debate.  My point is, if

11   they are going to continue to just be married, but not on

12   paper, then I'm ruling against you.

13        MR. ROSENZWEIG:  Well --

14        THE COURT:  No, no, no, no, because I think I said it

15   quite clearly, and I even gave an example of me using myself.

16   If the purpose of this is simply to circumvent the payment of

17   restitution so that they can keep half, they -- I'm not talking

18   about Ms. Mann, because she would have a right to her half and

19   move on with her life.  But if it's simply so they can keep

20   half of their assets, "We'll give up half, but we're going to

21   keep half," and that's the purpose of this divorce, then I'm

22   ruling against you.

23        MR. ROSENZWEIG:  No.  I'm not saying that at all, Your

24   Honor.

25        THE COURT:  No.  I'm saying -- not that you're saying

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1   that; you're not addressing that.  And I want to hear something

2   that gets me to believe that that's not what is happening.

3          MR. ROSENZWEIG:  Your Honor, you sentenced Dr. Mann to

4   life imprisonment.

5          THE COURT:  Yes.

6          MR. ROSENZWEIG:  And let's assume the conviction is

7   overturned on appeal.  They are never going to be together

8   again in any meaningful marital sense.

9          THE COURT:  If it's overturned on appeal, then it's

10  all off anyway.

11         MR. ROSENZWEIG:  There might be a new trial.

12         THE COURT:  I would imagine if it's overturned on

13  appeal, the restitution is gone.

14         MR. ROSENZWEIG:  Let's assume for our purposes --

15  right now you have sentenced him to life imprisonment.  She's

16  got to move on with her life.  In order to -- and getting

17  divorced is part of it.  You've recognized this.

18         THE COURT:  I understand.

19         MR. ROSENZWEIG:  That's No. 1.  No. 2, you have -- and

20  maybe I'm misunderstanding you, but I'm getting the implication

21  that if you -- that you think, for instance, that if she

22  contributes to the support of children they have together, that

23  this is some sort of --

24         THE COURT:  No.  The children are grown.

25         MR. ROSENZWEIG:  Well, I understand, but, for

1    instance, if you help one get a graduate education or that type

2    of thing.

3              THE COURT:  They are grown.  I don't care about that.

4              MR. ROSENZWEIG:  I'm not sure what you're saying.

5              THE COURT:  I think you almost have to look at the

6    totality of the circumstances.  If they continue -- although

7    he's going to be in prison, so they can't cohabit as man and

8    wife.  But if it's just they just carry on as they always have

9    together as a couple, although he's in prison and she's coming

10   to visit him -- and I don't know how many times she would have

11   to come and visit him to be considered still together.  I don't

12   know.  But I know that if -- I need some type of assurance that

13   this isn't a sham.

14             MR. ROSENZWEIG:  Well, Your Honor, what we can tell

15   you is this is -- they have decided to -- or she has decided

16   she wants a divorce.  He's going -- and she needs to move on

17   with her life.  We know that.  I think you've -- and you've

18   recognized that as legitimate.

19        Now, during the course of the marriage, they accumulated

20   assets.  She is entitled, as you have recognized, to a -- to

21   her fair share of those assets.  Under Arkansas law, that's

22   generally regarded as 50 percent, and almost certainly would

23   be.  And she is not seeking anything -- a dime more than that.

24   That's what she is seeking.  And we submit that she would be

25   entitled to that now and move on with her life.  Of course,

1  she's still going to be under the supervision of the Court to

2  some extent unless her conviction is overturned.

3  THE COURT:  Is she going to turn around and sign the

4  property back over to Dr. Mann?

5  MR. ROSENZWEIG:  No, absolutely not.

6  THE COURT:  Is she going to wait until after the smoke

7  clears and start giving him the money back?

8  MR. ROSENZWEIG:  Absolutely not.

9  THE COURT:  Is she going to wait until the smoke

10  clears and start going -- buying his guns back and making sure

11  they're -- and take pictures of them and send them to him in

12  prison?

13  MR. ROSENZWEIG:  I'm sorry?

14  THE COURT:  Is she going to wait until after the smoke

15  clears and start buying his guns back?

16  MR. ROSENZWEIG:  She doesn't want the guns.  She can't

17  have the guns anyway, Your Honor.

18  THE COURT:  Is she going to wait until the smoke

19  clears and go back and start buying Dr. Mann's cars and

20  Sea-Doos and all of that stuff back just so she can take

21  pictures of them and send them to him in prison?  Because I'm

22  asking you to address the issues, and you haven't yet.  All I

23  want you to say, Mr. Rosenzweig, so I can tell you -- I think

24  everybody in the courtroom is laughing because all I want you

25  to say is, "She's not going to do that, Judge."

1      MR. ROSENZWEIG:  No, Judge --

2      THE COURT:  No, no, no.  Listen to me.  All I want you

3  to say is, "Judge, she really wants a divorce.  She's severing

4  her ties.  She's not going to use this money to come back and

5  take care of Dr. Mann as though it's his money.  She's not

6  going to give it back to him.  She's not going to buy his stuff

7  back and send it to him.  This is the stuff she's not going to

8  do."  All of that would indicate that this is all a sham.

9  That's all I'm asking for.

10      MR. ROSENZWEIG:  And I've tried to make that clear,

11  she's not going to do that.  Now, she is not going to do that.

12  And I would -- and, you know, they have a history together, so

13  I hope you're not saying that they are to have no contact with

14  each other --

15      THE COURT:  Of course not.

16      MR. ROSENZWEIG:  -- because they have children and

17  presumably at some point will have grandchildren.

18      THE COURT:  Of course not.  I would never say that.  I

19  would never say that.  And I would never ask her not to have a

20  relationship with her ex-husband.

21      MR. ROSENZWEIG:  And divorced couples have to work out

22  relationships among themselves.  But if you're talking about

23  that this is just some sort of circuitous of money that's going

24  to end up back toward Dr. Mann, the answer to that is no.

25      THE COURT:  That's all I'm asking:  Is that the goal?


Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1      MR. ROSENZWEIG:  It is not the goal to get the money

2  back to Dr. Mann.

3      THE COURT:  Okay.

4      MS. CASSINELLI COUCH:  Your Honor, if I may.  I think

5  that the Court's concern is will it go back to Dr. Mann.  I

6  don't think there's any way it can.  If Ms. Mann puts the money

7  on his books, there's a limit to what she can put, and the

8  government gets half of it.  So it wouldn't help Dr. Mann for

9  her to give him money in prison.  It would actually go to pay

10  restitution, in all likelihood.  So there's really no way for

11  her to give him back any of the property.

12      I would also just want the Court to know that the

13  government has all of the guns.  They have about a million

14  dollars' worth of assets that they are holding, so that should

15  be pretty good security for the restitution that they are

16  asking for.  I just don't understand quite why or how Ms. Mann

17  really would give it back because she'll be in the free world

18  and he won't be.

19      THE COURT:  I don't know.

20      MS. CASSINELLI COUCH:  If we figure that out, all of

21  my clients will want to know, I guess, but I don't think that's

22  possible.

23      THE COURT:  I know that there are people who are in

24  prison who run all types of operations outside of prison.

25      MS. CASSINELLI COUCH:  That's true.

1          THE COURT:  I know that there are people in prison who

2     have networks of people who continue to carry on businesses and

3     everything else for them.

4          MS. CASSINELLI COUCH:  Sure.  And that's I think where

5     the evidence comes in.  I don't think there's any evidence that

6     Ms. Mann has a drug organization or that Mr. Mann does.

7          THE COURT:  I understand.  And I'm going to hear from

8     Ms. Whatley on the issue of what proof she has to prove up any

9     of that, but the question -- and here's the thing.  Sometimes

10    judges just want to hear from the parties, "No, Judge, that's

11    not what we're intending."  There's no magic to it.  There's no

12    secret to it.  There's no special thing you have to say.  They

13    just want to have you look them right in the face and say,

14    "Judge, this is not the purpose of what's going on, and here

15    are the five reasons why."  And I think now we've kind of

16    gotten to it, but that's all I wanted to hear.

17         And I think, Mr. Rosenzweig, when I got on to you, I

18    didn't mean to get on you real bad.  But when I got on to you,

19    you were coming at me from theoretical and technical things.

20    We're not talking theory here:  Why would people do these types

21    of things?  I don't know.  But I just want somebody to look me

22    right in the face and tell me the truth, and that's what I was

23    asking you to do.  And I think you were probably confused by my

24    questions, and that's my fault.

25         Ms. Couch, I think you getting up and saying it can't

1    happen and won't happen and that's not the purpose, that helps.

2         MS. CASSINELLI COUCH:  I can represent that that's not

3    what Dr. Mann will do for only one reason, and that's because

4    he will be in prison for life.  So cars and boats --

5         THE COURT:  And the truth is in this issue with regard

6    to the restitution -- okay.  With regard to whether the divorce

7    goes through and preserves part of the family assets for

8    Ms. Mann, Dr. Mann really has no stake in that.  Do you

9    understand what I'm saying?  You know, she gets half, she goes

10   about her own business.  Whether she keeps her half or not

11   really doesn't matter to Dr. Mann if it's truly an arm's length

12   transaction.  If it's not an arm's-length transaction, he hopes

13   she does get 50 percent because he's hoping one day it's going

14   to come back.

15        MS. CASSINELLI COUCH:  But I don't know when that day

16   would be because the Court gave him life in prison, so I think

17   we have to assume that there won't be that day.

18        THE COURT:  There are various ways it can come back

19   and not come back the way we're used to it.

20        MS. CASSINELLI COUCH:  I should also say that I don't

21   think the state court judge would let this happen.

22        MR. ROSENZWEIG:  Yeah.  Judge, this case has enough

23   publicity that Judge McGowan is going to look at it very

24   closely, I would think.

25        THE COURT:  I understand.


                    Judith A. Ammons, RPR, CRR, CCR
                       United States Court Reporter

1        Let me hear from Ms. Whatley.  Now, Ms. Whatley, I think

2    it was Mr. Gordon who filed the motions on this issue.  And did

3    you come prepared to even address this issue about the divorce?

4              MS. WHATLEY:  I believe Ms. McCord is able to do that.

5              THE COURT:  I'm sorry, Ms. McCord.  I keep looking

6    over you --

7              MS. MCCORD:  That's okay, Judge.  I'm about to get a

8    complex.

9              THE COURT:  I always look over you because you weren't

10   there for the actual trial.

11             MS. MCCORD:  You're right, Your Honor.  I didn't get

12   to be here during the trial.  I just come in afterwards.

13             THE COURT:  We were all here for weeks and weeks at a

14   time, so I know everybody.

15             MS. MCCORD:  I understand.  But when there's money

16   comes up, that's when I have to get involved.

17        And, Your Honor, I know we have been here a long time, and

18   I don't want to outdo your patience, but I sort of need to back

19   up just a little bit.  You entered the temporary restraining

20   order and you ordered the Manns to give us their financial

21   affidavits in the divorce.  Maybe from my lack of experience

22   from being in a divorce court, I thought these would be more

23   meaningful than they were.  There's not even a list of real

24   property.  There's no really list of personal assets like cars

25   or jewelry or boats.  I don't know if you've had a chance to

1    review them, Your Honor.  I don't know if they provided them to

2    the courts.

3            THE COURT:  I saw Ms. Mann's.  I think I did not see

4    Dr. Mann's.

5            MS. MCCORD:  I can provide you with a copy of that,

6    Your Honor.

7            MR. HENDRIX:  Stacey, do you mind if I interrupt?

8    I've got ours, and I sent them over to the government before,

9    but we need to correct that there is a $5,000 plus income we

10   need to add on there.  We're doing some last minute

11   deciphering.

12        (Proceedings held off the record briefly.)

13           MS. MCCORD:  Your Honor, I'd like to introduce as an

14   exhibit what they gave me.  And if Mr. Hendrix wants to amend

15   it --

16           THE COURT:  Yes.

17           MS. MCCORD:  Does that sound fair to you?

18           THE COURT:  Yes.

19           MS. MCCORD:  I don't have an exhibit sticker on it.

20           THE COURT:  Come around, please.  Thank you,

21   Ms. McCord.  I appreciate it.

22           MS. MCCORD:  And, Your Honor, if I could continue, I

23   don't want to be rude to Mr. Hendrix.

24           MR. HENDRIX:  No, not at all.  Please go ahead.

25           MS. MCCORD:  And so, Your Honor, I find myself still

1    in the same position that made me file my motion to begin with,

2    that we really do not know the assets of these parties.  And to

3    say that Mr. Mann's affidavit did not provide me much

4    information probably is maybe the understatement of the year.

5    And I still don't know -- I don't know their assets.  Once they

6    were convicted, they refused to give any financial information

7    to probation.  The only information in the presentence report,

8    which the Court reviewed, was given presentence by Ms. Mann.

9         And, Your Honor, under the Mandatory Victims Restitution

10   Act, as you know, the Court has a duty to get a full and

11   accurate and true picture of the economic circumstances of each

12   defendant.  And the United States, of course, has a duty to

13   maximize the amount of restitution recovered for the victims.

14   And we're at the place here, Your Honor, I don't have a

15   complete picture of their assets.  They are wanting to go over

16   to divorce court and tell me, "Everything is fine.  We're just

17   going to split up 50/50."  I don't know what that is.  I don't

18   know what it is they are going to split up.  You brought out a

19   good point.  What's the hurry?  What's the rush?  Why can't we

20   deal with getting the restitution order and give the United

21   States time, Your Honor, to conduct discovery, to get them to

22   fill out the financial information sheet that I sent to their

23   attorneys a month ago and demand letter for their finals?  I

24   need more information, Your Honor.  So I would like, you know,

25   you to continue the temporary restraining order.  I don't see

1     what the rush is.  It's not Judge McGowan's duty, Your Honor,

2     to enforce our restitution order and to protect our restitution

3     order.  We're not saying she's corrupt, we're not saying she's

4     going to ignore us, but it's not her duty.  It's this Court's

5     duty to make sure that we can enforce the restitution order.

6              THE COURT:  Let me ask Mr. Hendrix this.

7          Mr. Hendrix -- and I've seen the -- now I've seen the

8     affidavit of financial means that was filed in the Pulaski

9     County court.  You know, I listened to the evidence at the

10    trial, and we went through all of the assets that Dr. Mann had,

11    at least at the time.  And I don't see any of that on here.

12    And why is none of that listed on any of these documents?

13             MR. HENDRIX:  That's the one that they use -- I'm not

14    a divorce guy, so I think Jack can answer this thing better.

15    My understanding that I just learned when I went out Monday to

16    the jail with Dr. Mann's divorce lawyer is that these are

17    really used to set child support, so -- and I think -- I

18    don't -- they don't list assets in all of that; sort of a

19    monthly income thing, as I gather.

20             THE COURT:  Can't we just cut this short and just -- I

21    mean, Dr. Mann can almost sit down in a couple of hours and

22    write out everything he owns and just hand it to them.  I mean,

23    he can write it on a napkin almost and hand it to them so at

24    least they have a list of everything they own so they can check

25    into it to see what the values are.

1          MR. HENDRIX:  Right.

2          THE COURT:  And it doesn't mean -- and just understand

3     this.  It doesn't mean that I'm going to look at it and say

4     he's worth this much, so therefore I'm going to find that

5     Dr. Pierce should get all of this restitution.  It's just that

6     the government has a right to at least know what his assets

7     are.

8          MR. HENDRIX:  And I'll tell you, Judge.  There's no

9     game playing on this deal.  Here's the God's honest truth.  I

10    have tried to figure out the financial arrangements now that --

11    in the businesses of two different doctors in this state.  And

12    it all confuses me.  I can't figure out how businesses are run.

13    So I'm happy to provide that information.

14         Let me back up and begin with this proposition.  Of

15    course, at the end I'm going to ask you to stay the fine

16    proceedings and stay the restitution proceedings so that we can

17    go ahead and bump up into the Eighth Circuit and see what

18    happens there.  Because if we start going through collection

19    procedures at this stage and we get a reversal and a dismissal

20    for lack of evidence, then we have problems getting money back

21    and that sort of thing.

22         THE COURT:  But if -- okay.

23         MS. MCCORD:  Your Honor, before we jump to that issue,

24    I would like to finish my argument on this.

25         THE COURT:  Let me ask this question real quick.  What

1    would I do?  Continue restraining the Manns from disposing of

2    any assets until we go through the Eighth Circuit?

3            MR. HENDRIX:  You know, again, I can address it

4    practically and I can address it technically.  Practically, I

5    get it.  I get what the point of that is.  Technically, I've

6    got issues:  Can a federal court really do it?  But as a

7    practical matter, I get exactly what Your Honor --

8            MS. WHATLEY:  We can't hear a word Mr. Hendrix is

9    saying.

10           THE COURT:  And Ms. McCord was really making an

11   argument.

12           MS. MCCORD:  Your Honor, I feel kind of bullied.

13   First I'm ignored --

14           THE COURT:  He raises this issue, so I wanted to

15   ask him --

16           MS. MCCORD:  I understand.

17           THE COURT:  Okay.  Let's dial back real quickly.  I

18   asked the question:  Why can't Dr. Mann just sit down --

19   because from what I listened to in that trial indicates I would

20   be extremely surprised if Dr. Mann did not know where every

21   penny he has is.  I would be very surprised if -- because with

22   his business dealings, with his businesses that he has had

23   going on, with all of the moving parts and business-wise he had

24   going on, that he would not know where his property is, where

25   his cars are, I mean, real property, personal property,

1    different assets are, where his money is invested.  I bet you,

2    within an hour or two, he can just sit there and write it down

3    and say this is where it is and hand it to you, and then you

4    can give it to the government so they can go look into it.

5         MR. HENDRIX:  I think that what we can do -- and,

6    actually, I don't mean to disagree with you, but I know you're

7    a doctor's son, too.  And in my experience, doctors really --

8         THE COURT:  I'm a doctor's son and grandson of a

9    doctor.

10        MR. HENDRIX:  Oftentimes I find that doctors, at least

11   the ones I represent, don't have the greatest handle on their

12   finances.  And in this case, of course, Ms. Mann has the

13   finance degree.

14      I think that generally what we're going to get -- in other

15   words, if you ask me right now, let's go this -- how much money

16   does he make, obviously he doesn't know right now.

17        THE COURT:  It's not as much the money that he makes

18   because we can get to that.  His assets, what does he own?

19        MR. HENDRIX:  I think it's pretty accurate in the PSR,

20   but I'm happy to sit down and work that issue out.

21        THE COURT:  And, Ms. McCord, you don't believe --

22        MS. MCCORD:  No, Your Honor.  There was no information

23   given by Mr. Mann to the PSR and he refused to give us

24   information.  He wrote in here he has no idea what his assets

25   are, which is just, you know, what?  False?

1          THE COURT:  Ridiculous.

2          MS. MCCORD:  It is ridiculous.  It is ridiculous.  And

3    now he's asking us to rush this up so they can go to divorce

4    court.  And call me cynical, Your Honor.  What's going to

5    happen is all of the assets are going to move over to Ms.

6    Mann's.  He's going to have nothing for me to go collect my

7    restitution against.  Zero.

8          THE COURT:  That's what it looks like.

9          MS. MCCORD:  And it's not Judge McGowan's

10   responsibility to protect my restitution, Your Honor.  It's my

11   responsibility to collect it and it's your responsibility to

12   make sure I can enforce it.  And, Your Honor, I have evidence

13   that I -- trial testimony that they have moved assets before,

14   Your Honor.  You asked me my evidence, I mentioned it in my

15   briefs.  But in a detention hearing, Bobbi Spradlin, a special

16   agent for the IRS, she testified, Your Honor -- and I can

17   introduce an exhibit, sections of her testimony, that when

18   civil lawsuits were pending against Dr. Mann, they moved

19   assets.  They moved them to her -- his brother's name, who

20   lives in India, was deported in 2002.  And they moved money

21   overseas.  They put property in different people's names.

22        And also, Your Honor, David Oliver testified in this trial

23   before you that several cars that were at the address of the

24   Manns are actually in their brother's name that lives in India

25   that was deported in 2002.  In fact, cars after 2002, Your

1    Honor, somehow are in his name.  The son also owns property.

2    If you do a property search on him, one of their sons has

3    several cars and owns real property.

4        I can introduce -- I know you've heard -- the transcript

5    evidence for David Oliver is in testimony, Your Honor, but I

6    will go ahead if you would like me to present that.

7        Can I mark that as Government Exhibit 1?

8            THE COURT:  You may.  Refer me to the pages,

9    Ms. McCord, that you think are the most important.

10           MR. ROSENZWEIG:  What document is she handing you?

11           THE COURT:  This is going to be her Exhibit 1 to this

12   hearing.  It is the trial transcript, Volume 11 --

13           MS. MCCORD:  Let me find mine --

14           THE COURT:  -- the testimony of David Oliver during

15   the criminal trial.

16           MS. MCCORD:  Your Honor, if you'll look at

17   page 2187 -- well, let's see.  I'm sorry -- 2182, that

18   establishes that the brother was deported in 2002.  And then

19   you'll see where, "During the course of your investigation has

20   the name Sandip Mann came up earlier?"  Do you follow me, Your

21   Honor?  I am on line 13.  And then 14, "How so?"  And after

22   that, and his answer, Your Honor on line 15, 16, 17 and 18, he

23   says, "The vehicles at Dr. Mann's house are registered to

24   Sandip Mann."  And also he adds in that paragraph that he also

25   learned that he owned the medical clinic.

1      And if you'll go to page 2187, the next page that I have

2   included in this, Your Honor, the personal property assessment

3   for Sandip Mann, there's listed watercraft, cars.  And later

4   on, Your Honor, on that page, he's asked specifically on

5   page 18 -- I mean, line 18 and 19, "Which cars were added after

6   his deportation?"  And he has a 2005 Ford, 2005 motorcycle, and

7   a 2003 Lamborghini.

8      And, Your Honor, on page 2190 of the transcript that's

9   attached there, if you'll look at line 9, 10, and 11, 12, 13,

10   and 14, we find that another piece of property was transferred

11   to Sandip Mann in 2005.  And again at page 2191, Your Honor,

12   lines 13 through 16, another piece of property after the time

13   he was deported was transferred.

14      THE COURT:  Here's what I think that that would show

15   me.  That was well before this case, well before the actual

16   bombing in this case.  So none of those transfers could have

17   been made for the purpose of avoiding restitution.  However,

18   what it shows -- and I don't know that it shows this, but what

19   the implication is when you just look at it is that all

20   along -- well, it would seem that considering that Sandip Mann

21   left in 2002 and they were still buying property in his name

22   was that Dr. Mann maybe wanted to become judgment-proof at some

23   point, maybe not ever anticipating this day, but maybe

24   anticipating somebody suing him or for whatever reason.

25      MS. MCCORD:  Yes, Your Honor.  I'm sorry if I'm

1    interrupting you.  If I can show you the transcript from the

2    detention hearing.

3            THE COURT:  You may.

4            MS. MCCORD:  All right.

5            THE COURT:  Let's look at that now.

6            MS. MCCORD:  I'd like to make this Government's

7    Exhibit 2.

8        Your Honor, let me find my tabulated copy.  I'm sorry.  I

9    have too many papers up here.  Your Honor, in this transcript,

10   this again is the detention hearing, this was before Judge

11   Young on March 9th, 2009.  And Ms. Spradlin is an IRS criminal

12   investigation agent.  And if you'll look at page -- the bottom

13   of 114 and 115, she explains that they found that he had

14   transferred some property to his brother while there were civil

15   suits pending.

16       And, Your Honor, I know this is not the restitution order,

17   but I think it shows a reason for the United States to have a

18   suspicion that this is indeed what's happening now before us is

19   that they are trying to transfer assets to keep it from being

20   able to be collected.

21       I also have a property card, Your Honor, from Pope County,

22   that I would like to show you as well if I could.

23            THE COURT:  You may.

24            MS. MCCORD:  I'd like to make that Government Exhibit

25   3, Your Honor.

1          THE COURT:  All right.

2          MS. MCCORD:  What this shows, Your Honor, is on

3    June 11th, 2004, again keeping in mind civil lawsuits pending

4    against Mr. Mann, he transfers the Skyline Medical Clinic to

5    his brother, Sandip Mann, who again, Your Honor, is deported,

6    is living in India.

7        Your Honor, I don't know how much time you want me to go

8    on.  I also have jailhouse telephone calls that -- I can't tell

9    you I'm going to be very efficient if you want to play them.  I

10   have CDs of the whole calls and transcripts.

11         THE COURT:  Are these from calls made before trial, or

12   are these from calls since conviction, post-conviction?

13         MS. WHATLEY:  These are calls made pretrial.  These

14   are actually calls that were made around the time of his arrest

15   in March of 2009.

16         MS. MCCORD:  But what these say, Your Honor, is they

17   are basically talking about selling assets.

18         THE COURT:  Queue them up.  Let's listen to them.

19         MS. MCCORD:  Can I have just a minute to see which one

20   I want to start with?

21       (Government's Exhibits 1 - 3 received in evidence.)

22         MS. MCCORD:  Here's a transcript.

23         MS. CASSINELLI COUCH:  Are these all one, or different

24   calls?

25         MS. MCCORD:  Different calls.


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

1          MS. CASSINELLI COUCH:  Your Honor, you heard these

2     during trial.

3          THE COURT:  I don't think these are the ones we heard

4     previously.  I think these are others that weren't played in

5     trial.

6          MS. CASSINELLI COUCH:  The one referenced in her brief

7     was played at trial.  And I think we got into kind of an

8     argument because only part of it was played.  But I know that

9     the one she referenced was played.  And no offense, but I don't

10    really want to listen to all of these again.

11         MR. HENDRIX:  So to make this come to a little bit of

12    a head, here's my objection.  And I object to the introduction

13    of all of this evidence because it's being taken out of

14    context.  Point No. 1, that bit in the detention hearing

15    transcript, what the government didn't give you is my

16    cross-examination of Agent Spradlin -- of my cross-examination

17    of her and which showed the tracing of that money and its

18    legitimacy.  Of course, you're not being provided that and I

19    wasn't prepared to come in today to be ambushed by this.  Now

20    we're going to listen to apparently excerpts from transcripts.

21    I'm going to ask that you sit and listen to all of them so we

22    have a fair proceeding.  Why we're going through this is still

23    beyond me.

24         MS. CASSINELLI COUCH:  They have a million dollar

25    asset.

1         MR. HENDRIX:  Is the main thing.  They are sitting on

2   our million dollar gun collection.

3         MS. MCCORD:  Your Honor, can I speak to that --

4         THE COURT:  You can.

5         MS. MCCORD:  -- a million dollar asset?  The guns --

6   the United States, Your Honor, is not in the practice of

7   selling guns, as you can imagine.  How we can liquidate that is

8   a very problematic problem.  It's not an asset that's going to

9   be easily appliable to Dr. Pierce's restitution, Your Honor.

10        THE COURT:  So what do you do with them?

11        MS. MCCORD:  That's what we're exploring, Your Honor,

12  but it is not at all securing their obligation.

13        THE COURT:  Well, I think at some point we have to

14  figure out a way to monetize those guns.

15        MS. MCCORD:  Your Honor, I'm trying, but as you can

16  imagine, the United States can't put up a banner and say,

17  "We're selling guns.  Come stop by."

18        MR. ROSENZWEIG:  Your Honor, the government forfeits

19  exotic dance clubs and things like that.

20        MS. MCCORD:  We don't take guns and --

21        MS. CASSINELLI COUCH:  I think I can address this.  I

22  spoke to regional counsel.  We wanted to get the guns back for

23  this purpose, to sell them.  And ATF would not allow that

24  because they wanted to keep them.  So we tried to sell them and

25  they wouldn't let us.  And also I think that the Court will

1    remember that John Norrell testified that he actually assisted

2    the ATF in liquidating some guns that were seized in a prior

3    case.  So there are actually ways that that happened.  And they

4    valued the guns at a million dollars, not us.  So, I mean, if

5    they want to give us the guns back, we'll sell them and you can

6    have them as security, I guess.

7            THE COURT:  Now, you're not saying that the guns are

8    the only asset that the Manns have?

9            MS. CASSINELLI COUCH:  No.  I'm saying that that's a

10   million dollar asset that is security that they are worried

11   about.

12           THE COURT:  But here's what I think Ms. McCord would

13   say she needs.  She needs to know what are the other assets in

14   addition to the guns, I mean, and that just doesn't seem to be

15   that hard.  It really doesn't.  I mean, if you were to tell any

16   of us to list our assets out and put a value on them, pretty

17   much all of us could do that.

18           MS. CASSINELLI COUCH:  I think the issue having talked

19   to Dr. Mann --

20           MR. HENDRIX:  The problem is when they give us an

21   affidavit that's a 20-page long thing, if we can arrive at a

22   reasonable -- and let you decide what is a reasonable

23   affidavit, give it to us, we'll fill it out.  The government is

24   seeking discovery to further its proposition right now and is

25   super goal-oriented.  Like, everybody calm down and we can get

1    this stuff taken care of.

2           THE COURT:  I understand.  But even if you didn't

3    respond to that affidavit, couldn't you do your own affidavit

4    saying these are what the assets are and list them out?

5           MS. MCCORD:  Respectfully, Your Honor, I would like

6    them to fill out my affidavit just like anyone else, any other

7    criminal defendant does, Your Honor.  I don't understand why

8    the Manns feel they are special and don't get to fill out my

9    affidavit.

10          MS. CASSINELLI COUCH:  I haven't seen the affidavit in

11   this case.

12          THE COURT:  Hold on just one second.  Hold on just one

13   second.  But I think ultimately what we're trying to get to is

14   what are the assets.  And as it stands right now, Ms. McCord is

15   saying other than these guns, she doesn't have anything.

16          MR. HENDRIX:  That's not true.

17          MS. CASSINELLI COUCH:  That's not true.

18          MR. ROSENZWEIG:  Your Honor, I gave her some stuff

19   today.

20          THE COURT:  I mean, that's today.

21          MS. MCCORD:  Five minutes before the hearing, Your

22   Honor.

23          MR. ROSENZWEIG:  It was material that properly go to

24   Dr. Mann's -- we thought would properly go to Dr. Mann's

25   affidavit.  We said that if he doesn't do it, we'll give it to

1    you.  I got an e-mail from her yesterday saying, "He didn't

2    give it to us.  Will you give it to me?"  And I brought it to

3    her.

4              MS. MCCORD:  He did bring it to Court, Your Honor.

5              THE COURT:  Mr. Hendrix --

6              MR. HENDRIX:  No.  I e-mailed this affidavit on the

7    day you told me to.  I don't know what the government is

8    talking about not getting an affidavit from me.  I by God

9    e-mailed it.

10             THE COURT:  So you're saying you did send that back

11   filled in?

12             MR. HENDRIX:  Yes.

13             MS. CASSINELLI COUCH:  No, not the long one, not the

14   50-pager.

15             MR. HENDRIX:  The one you told us to fill out in your

16   order.  Done.  I went Monday, met with Dr. Mann, sat down with

17   the divorce lawyer, we sat down and filled it out.  Called

18   Karen and said, "Hey, I got it and I'll e-mail it to you.  We

19   can't get it notarized because I'm here in the jail."

20             THE COURT:  So is that the case?

21             MS. MCCORD:  That's what I handed you, Your Honor, and

22   you see that he said he doesn't know his assets.

23             THE COURT:  You're talking about the statement of

24   financial means?

25             MS. MCCORD:  Yes, that Ms. Mann is in charge of all of

1    his assets.  But, you know, if you listen to some of these

2    prison conversations, he's definitely telling her what to sell,

3    when to sell.

4              MS. CASSINELLI COUCH:  Okay.  As of two years ago, he

5    did have a much better handle on his assets when he was in the

6    world dealing with them.  And when those phone calls were made,

7    he was telling her, "I need money for attorneys' fees."  He's

8    explaining to her what is happening.  Two years later, he

9    doesn't have a handle on all of this.  He can generally tell

10   you, which, in the presentence report --

11             MR. HENDRIX:  "I've got a house, I've got a piece of

12   property."

13             THE COURT:  Does anybody have a copy of the 50-paged

14   -- or is it 50 questions?

15             MS. CASSINELLI COUCH:  It's impossible.

16             MS. MCCORD:  I have it, Your Honor.

17             THE COURT:  I'll see if -- I'll see if it's that

18   impossible.

19             MS. CASSINELLI COUCH:  I mean, we can fill out the

20   probation one, but he's going to have all zeroes because he

21   doesn't have groceries.  And, you know, Ms. Mann is in a better

22   position to handle this.

23             MR. ROSENZWEIG:  Your Honor, we have said, and

24   Mr. Wagoner is going to tell you in a second, too, that we said

25   in our pleading, we'll show -- working up a list, negotiations

1    with the other side, and we will show the government the

2    proposed property settlement before it's presented to the

3    Court.

4         MR. WAGONER:  Your Honor, as one who is in the divorce

5    proceeding as a lawyer, can I kind of -- it's a little -- it's

6    probably maybe frustrating to watch me here in federal court

7    because I'm not over here very much.  So if I do something I'm

8    not supposed to, let me know.  But I'm over in the divorce

9    court all of the time.  I've done 5- or 600 of them.  I think

10   it's been frustrating a little bit to watch this discussion

11   because there's a lot of things I think I can clear up in two

12   or three minutes.

13        One is, the affidavit of financial means, when we have a

14   divorce, the Arkansas Supreme Court has one of their

15   administrative orders, which is Administrative Order No. 10,

16   and it says:  Prior to any hearing where support is an issue,

17   you'll provide an affidavit of financial means.  And you'll use

18   this specific form.  And so the order I got said -- we give the

19   affidavits of financial means.  I prepared one like I normally

20   would in a divorce case.  Mr. Rosenzweig told me -- we put more

21   in there than we normally would because the affidavit of

22   financial means isn't supposed to be a financial statement.

23   It's basically to look at to determine support issues.  You

24   know, if you go to trial on the assets and liabilities, there's

25   discovery and there's other things that people put on as

1    evidence to show what the assets and liabilities are.

2        Being asked to deal with this on the divorce side of

3    things, you know, I look at it and, one, I've got to tell my

4    client that she's got to be very careful because of all that's

5    going on.  It's all got to be aboveboard and it's all got to be

6    done in a way where nobody feels like their interests are

7    getting taken away, the government's interests aren't being

8    infringed upon unfairly.

9        On the other hand, my client in the divorce, Ms. Mann, her

10   assets really aren't responsible for payment of criminal

11   penalties that would be assessed against her husband.  In fact,

12   the law on criminal penalties and that sort of thing is it's

13   not even a marital debt in a divorce case.  It's the obligation

14   of the spouse who engaged in the wrongful conduct.

15       So how does that all shake out and what do I have to do to

16   do it right?  I've researched a lot.  And I hesitate because

17   Mr. Rosenzweig started talking about fraudulent transfer and

18   that sort of thing.  But it kind of -- the law says it kind of

19   comes down to that.  These situations have come up in a lot of

20   instances where a spouse is facing judgments or other types of

21   financial harms, it's one of them's fault, where they go try to

22   get divorced to shelter some of the assets.  And creditors of

23   the one spouse who, you know, owes the money have come in and

24   tried to say:  No.  This divorce was a sham and it shouldn't be

25   able to be done that way.  They are just doing it to get her

1    half of the assets.

2        And the cases in -- what the deciding factor is upon there

3    is was there fair value given in the divorce.  It's looked at

4    like a fraudulent transfer case.  And the cases generally say

5    if it's a litigated divorce and the judge comes down and makes

6    the decision, then those are pretty much given complete respect

7    as far as how the property is divided.  If the judge doesn't

8    make the decision and it is a property settlement, it's

9    generally -- is it 50/50?

10        And if we were litigating this case with the facts and

11   circumstances, I would be in court arguing there ought to be an

12   unequal division of the property.  And my client, who is not

13   going to be imprisoned, ought to receive a lot more than half

14   of the property.  But to make sure there really can't be a

15   legitimate challenge to the divorce as being a fraud or a sham

16   or fraudulent transfer of assets, we're doing 50/50.  And not

17   only that, I've already given a draft decree to Dr. Mann's

18   attorneys.  And we're being a lot more specific and a lot more

19   careful here in listing every asset and valuing every asset.

20   That draft, the government can have it, I assume, where it's at

21   right now.

22        MS. CASSINELLI COUCH:  We can't speak for Dr. Mann on

23   that.  We do not represent him in the divorce.

24        MR. HENDRIX:  When you say you gave it to the lawyers,

25   you didn't give it to us.


                    Judith A. Ammons, RPR, CRR, CCR
                        United States Court Reporter

1          MR. WAGONER:  No.  I gave it to the lawyer handling

2     Dr. Mann's divorce is who I gave it to.  So that's going back

3     and forth.  But, you know, we're having the guns appraised by

4     an expert.  We're having the personal property in the house,

5     somebody go through with an auction company and actually put

6     values on that.  We are going a lot further than we normally

7     would and we're detailing all of this stuff and we're

8     supporting it with values.  And, you know, if somebody tells --

9     unless somebody tells me I can't, I understand it's our

10    position we can't, we'll give that stuff to the government what

11    we've got now and more as it becomes available.

12          MR. HENDRIX:  Can I ask the divorce expert --

13          THE COURT:  Why shouldn't I just leave the TRO in

14    effect or convert it to a temporary injunction?  And then once

15    the divorce is filed and we have a division of property, have

16    them come in here and present it and I'll take a look at it and

17    try to make a determination then, instead of me lifting it now

18    and it just being over?  Why shouldn't we just do that?  It's

19    not like anything is going to be done before then anyway.

20          MR. HENDRIX:  I was going to ask Jack, as the divorce

21    expert, is if Your Honor puts in a TRO right now, is that going

22    to restrain Mary McGowan from --

23          THE COURT:  No.  She can make the division.  I'm just

24    saying they can't dispose of anything.

25          MR. WAGONER:  Other than making the division between

1    themselves, sure, the government can come in later and

2    challenge and say, "This isn't just a transfer.  It's a

3    fraudulent transfer.  They gave her more than she should have

4    gotten."  And they could bring that before you, Your Honor.

5         THE COURT:  I'm asking about that one issue now.  But

6    there are several things on the table as we stand here.

7    Ms. McCord is still just trying to figure out what the assets

8    are.  And you-all are over here dividing them up.  Not you,

9    Mr. Hendrix, because you're not involved in the divorce.  But

10   you-all are sitting here dividing everything up.  And if you

11   are dividing, it seems like you would know what you're

12   dividing.  And she should be able to see what are we dividing

13   here.  I think what she's worried about is, as you say, we're

14   just going to do half and half or something very broad that

15   doesn't get down into specifics, and she'll never know what the

16   true assets were.

17        And, Mr. Hendrix, I've sat here and read this financial

18   statement of debtor document.  I agree with you on one hand --

19   I agree with Ms. Couch, actually, on one hand, but then I

20   understand Ms. McCord's position.  Ms. McCord's position is

21   this isn't that difficult.  And it's not.

22        But Ms. Couch makes a point, Ms. McCord, that given that

23   Dr. Mann has been in prison for several years, is he really

24   going to be able to -- most of this stuff, like federal taxes

25   and all of this stuff, what's he going to put?  Does he even

1    have access to some of this information to fill it in?  I think

2    you deserve to at least have him fill it out and turn it in.

3    And then at least you'd have something to look at and dispute

4    whether he should have that information.

5           MS. MCCORD:  Well, Your Honor, I would submit -- if

6    he's going to be in divorce court, he has to be giving

7    information to his attorneys to represent him.  I would submit

8    that this information is obtainable, Your Honor.  I agree he's

9    in prison, but, once again, here they are in divorce court able

10   to say, "I have this.  I have this.  Let's do 50/50," and they

11   can't give me anything?

12          THE COURT:  I think that's true.

13       I know you don't represent him in the divorce.

14          MR. HENDRIX:  Listen -- not only that, but because

15   that collusion has been alleged and in the government's brief

16   makes this note, "A lawyer for the defense works for the

17   divorce," or some damned outrageous thing, I personally am not

18   involved in any way.  I've met with the divorce lawyer one

19   time, it was Monday, to go over that affidavit.  I don't know

20   anything about the divorce.  I've personally divorced myself

21   from their divorce because of an allegation of collusion.  I

22   don't know anything about their finances.

23          MS. CASSINELLI COUCH:  May I speak for Dr. Mann on the

24   issue of this form?  I don't think Dr. Mann will have access to

25   a lot of this information.  I think a lot of the information in

1    the divorce is coming from Sue Mann's side because she does

2    have access and she has been keeping up with it having to live

3    for two years without a husband who is running a medical

4    clinic.  So she's had to be familiar with that where Dr. Mann

5    has not.

6         Also, I hate to say this, but I'm going to, we're afraid

7    that this document -- if we start filling this out, every

8    little piece of it is going to be torn apart.  And he's going

9    to be doing the best he can from the jail with us or with a

10   divorce attorney, and they're going to look at every line and

11   say, "Well, it was really $450, and so he committed perjury."

12   We don't want it stretched that thin.

13            THE COURT:  Give this form to Dr. Mann and have him

14   fill it out and have him turn it in.  I will understand, the

15   record has been made, that he will make these representations

16   with the best information he has.

17        Now, I will say this, that if he fills out something here

18   and then I find out later he's representing something over in

19   the divorce court, then that's a problem.

20            MS. CASSINELLI COUCH:  Sure.  Sure.

21            THE COURT:  But he needs to fill out this form, turn

22   it in to the government, so at least they have something to go

23   by.

24            MS. CASSINELLI COUCH:  Can I ask one question?

25            THE COURT:  Yes.

1          MS. CASSINELLI COUCH:  I just want to be clear, that

2     when we fill out this affidavit, we're filling it out as of the

3     date it's filled out.  So it's not going to say, "I have $500

4     in groceries."  It's not going to cover what the Manns do

5     outside of Dr. Mann?

6          MS. MCCORD:  Your Honor, that's an interesting point

7     because under the Mandatory Victims Restitution Act, we have a

8     duty to find out what they owned at the time and now.  So that

9     means I need to look at this and maybe do some discovery.  I

10    may need to depose Dr. Mann, I may need to depose Ms. Mann.

11         MS. CASSINELLI COUCH:  That's an excellent point.

12    That's a separate proceeding.  And that's why we have the Debt

13    Collection Act that was recited in their brief because it

14    allows for discovery when they are collecting on a judgment.

15    So, I mean, it seems to me that that would be where you would

16    do discovery.

17         THE COURT:  Well, but that -- no.

18         MS. CASSINELLI COUCH:  I don't mind filling this out.

19         MS. MCCORD:  Your Honor, could I --

20         THE COURT:  It seems like we would have -- they should

21    be able to determine what he has in determining what

22    restitution to seek, right?

23         MS. CASSINELLI COUCH:  And we will fill this out.  I

24    just want to be clear that it's as of today.  There was a

25    presentence report that the Court embraced that we corrected at

1    sentencing at the first hearing.  So there is some idea there

2    what they had.  Ms. Mann will provide information, so --

3              THE COURT:  Ms. McCord, what's your position on this?

4    I know you need to know what it was at the time --

5              MS. MCCORD:  Yes, Your Honor.

6              THE COURT:  -- that the -- is it at the time that the

7    bombing occurred, or at the time of the conviction?  Which date

8    is the time?

9              MS. WHATLEY:  Your Honor, under the Mandatory Victims

10   Act at 3664(d)(3), it says, "including a complete listing of

11   all assets owned or controlled by the defendant as of the date

12   on which the defendant was arrested."  The defendant was

13   arrested on March 5th, 2009.

14             THE COURT:  Well, that's the information that we want.

15   And it's owned and controlled, we know -- I know from the trial

16   that he had a number of cars, that he had the medical clinic,

17   that he had -- they might have been in the names of somebody

18   else, but there's no question that Dr. Mann was the only one

19   there practicing.  There's no question that he was driving

20   those cars.  There's no question that his family had access to

21   the Sea-Doo and all of these other things.  There's no

22   question.  And he might have had a brother or cousin, father,

23   whoever, that was in India or wherever, but that person didn't

24   have control of these things.

25             MR. HENDRIX:  I tell you the government's strong

1    position that it's taking in this is getting me close to

2    advising my client to assert the Fifth Amendment privilege to

3    every question on an affidavit.

4            THE COURT:  How can he assert the Fifth when he's

5    already convicted?

6            MR. HENDRIX:  Because these are different deals.

7    You're asking him to make an assertion right now.

8            THE COURT:  Yeah, but it's not like I'm going to

9    recharge him and convict him again.

10           MR. HENDRIX:  They might.

11           MS. CASSINELLI COUCH:  We're not worried about you,

12   Judge.

13           MS. MCCORD:  I'm just here to collect restitution.

14           THE COURT:  What are you going to do?  Make him serve

15   life and then convict him and make him serve another one?  I

16   think we're getting a little outrageous here.  Provide the

17   information that they want as of the date that he was arrested.

18   All we can do is call on Dr. Mann to remember as much as he

19   can.  And I understand that the government might look at it and

20   say, "Well, you say that you had a bank account at Regions, but

21   we know you had one over at BankSouth or whatever," and we'll

22   deal with that.  But I'm not going to hold him to trying to

23   remember every little-bitty thing that happened three years

24   ago.  But I am going to -- he does have to fill this thing out

25   and get it turned in.

1          MS. MCCORD:  And, Your Honor, we need a present day

2     picture, too.

3          THE COURT:  Do you want to do it now?

4          MS. MCCORD:  No.

5          THE COURT:  I have another hearing this evening.  I

6     have another hearing to start up right after this one, so I'll

7     be here all evening if you want to do it now.

8          MS. CASSINELLI COUCH:  No, we do not want to do it

9     now.  We have other --

10          THE COURT:  I need you to get this done though very

11     quickly and we need to get this turned in.

12          MS. CASSINELLI COUCH:  Again, current, or two --

13          THE COURT:  As of the date that he was arrested.

14          MS. MCCORD:  I also need a current picture, too, Your

15     Honor.  I'm sorry.  It's both.

16          MS. CASSINELLI COUCH:  I'm not going to allow him to

17     give a sworn statement about something two years ago that he's

18     not sure of.  I mean, we'll be sure of what we say, and the

19     rest of it, we'll say we don't really know because I can't give

20     a sworn statement if we're not sure.  I think, as of today,

21     that would be a lot easier to fill all the way out.

22          THE COURT:  The statute says it's as of the date of

23     arrest.

24          MS. WHATLEY:  Your Honor, that was for them to have

25     prepared prior to the time of the presentence report.  So they

1    actually owe us from then, and now they owe us one for

2    Ms. McCord.

3             MS. CASSINELLI COUCH:  The presentence report had

4    financial information that you-all discussed.  You actually

5    made changes, Judge, and accepted it because it was the most

6    accurate representation that we had of his financial position.

7    So that's kind of a backdoor way of getting here saying now

8    this late that we didn't do it.

9             THE COURT:  I don't remember now what happened.

10            MS. CASSINELLI COUCH:  If you recall, Mr. Hendrix

11   pointed out that some car was new or sold or something.  And

12   you-all discussed it and you modified the presentence report

13   based on it.  So they did have that information.  It's not like

14   the presentence report was just, you know, void of anything

15   financial.

16            MS. MCCORD:  Again, Your Honor, it was information

17   that Ms. Mann gave at the time of her arrest.

18            THE COURT:  Will this aid you in collection?

19            MS. MCCORD:  I'm sorry?

20            THE COURT:  Will this affidavit aid you in collection?

21            MS. MCCORD:  I'm hoping, Your Honor.  It's the only

22   tool I have.  It's where I would like to start to review to see

23   what other discovery needs to be made.

24            MS. CASSINELLI COUCH:  But there's a different

25   mechanism for that.

1           MS. MCCORD:  No, Your Honor.  Ms. Couch is wrong about

2      that.  The Federal Debt Collection Procedures Act lets me

3      proceed, but it's right here before you, Your Honor, it's not a

4      different action.

5           THE COURT:  I want you to fill this out as of the date

6      of arrest.  And we will assume that whatever property he owned

7      at that time he owns now.  If he doesn't own it now and it's

8      been disposed of, we'll take that up.  I don't need you to do

9      one for then and now, you know.  The best period -- if the

10     statute says as of the date of conviction, that's what we'll

11     do.  And that cuts through all of this.  And have him do it.

12     And have him, based on the best information he has, provide

13     that information.  In fact, you can have this one.

14          MR. HENDRIX:  Thanks.

15          THE COURT:  Now, as far as the TRO is concerned, I'm

16     going to leave that in place.  In fact, I'll convert it to a

17     temporary injunction.

18          We will take up the issue -- I mean, go on and get the

19     divorce and take care of all of that, and we'll take up the

20     issue of the disposition of the property once there has been a

21     division.  But we need to have --

22          MR. ROSENZWEIG:  Your Honor, if I could clarify

23     something.

24          THE COURT:  Yes.

25          MR. ROSENZWEIG:  Are we talking about -- when you say

1      take it up when there's been a division, are we talking about

2      presenting it to you before we go to Judge -- assuming a

3      settlement -- before we go to Judge McGowan, or after, assuming

4      Judge McGowan accepts it?  Do you want it before, or after?

5              MS. MCCORD:  Could I comment on that?

6              THE COURT:  No.  I once had Judge Morris Sheppard

7      Arnold say something to me that I'm starting to understand.  He

8      said:  There's nothing more powerful than a district court

9      judge because you can't tell them what to do.  I'm essentially

10     going to restrain or enjoin the selling of any of this property

11     regardless of what Judge McGowan does.  Now, she can divide it.

12     She can give it to Ms. Mann.  Let Ms. Mann go out and try to

13     sell it.  Let either one of these parties start disposing of

14     any of these assets, then you'll deal with me.  I don't care

15     what you do at this point.  I'm finished with this.  Divide the

16     property.  But before you sell one bank note, before you sell

17     one pencil, before you sell anything, you'd better come over

18     here and get approval.  The Eighth Circuit might tell me I'm

19     wrong.  I'll deal with them.  I've done it before.  But that's

20     it.  We're through with this hearing.  The temporary

21     restraining order has been converted to a temporary injunction.

22     The defendant is ordered to prepare that document --

23             MR. HENDRIX:  Got it.

24             THE COURT:  -- turn it in to the government as of the

25     date of --

1          MR. HENDRIX:  March --

2          THE COURT:  -- arrest.

3          MR. HENDRIX:  -- 4th of '09.

4          THE COURT:  I understand that some stuff -- I'm not

5     going to hold you -- I'm going to hold you to your best, but

6     I'm not going to hold you to trying to figure out every

7     little-bitty thing or being 100 percent accurate on every

8     little thing, but you've got to do your best.

9          MR. HENDRIX:  Sure.

10         THE COURT:  So the government gets what it wants.  You

11    can't dispose of any of these assets.  You've got to give them

12    this information.  And that's it.

13         MS. MCCORD:  Your Honor --

14         THE COURT:  Yes, ma'am.

15         MS. MCCORD:  -- my only problem with that -- and I

16    know your patience is running thin.  But if you let them

17    transfer it, the assets are now in Ms. Mann's name.  Even if

18    she doesn't sell them, I can't take collection action against

19    her.

20         THE COURT:  That's not what I said.  I said she can

21    enter an order dividing it, but none of it better transfer

22    over.  It better not be divided out.

23         MS. MCCORD:  Okay.  I see.

24         MR. HENDRIX:  Understood.

25         THE COURT:  Her order is fine.  I mean, she can do

1    whatever she wants to.  I can't tell a state court judge what

2    to do.  I do believe in federalism.  I believe in that.  And I

3    have no right to tell her what to do.  She does her job.  But

4    I'm telling the parties who are here before the Court today,

5    they better hold on to that property.

6              MR. HENDRIX:  I couldn't persuade you to stay the fine

7    and restitution while we appeal, can I?

8              THE COURT:  No.

9              MR. HENDRIX:  Had to ask.

10              THE COURT:  No, sir.

11              MR. ROSENZWEIG:  Your Honor, with regard to Ms. Mann's

12    motion to stay the fine, I may be able to shorten this out for

13    you.  Ms. Mann has indicated --

14              THE COURT:  I'll let her post her bond.

15              MR. ROSENZWEIG:  Excuse me?

16              THE COURT:  I'll let her post her bond.

17              MR. ROSENZWEIG:  Her parents have indicated to her

18    they will provide the funds to post the bond.

19              THE COURT:  Okay.  I'll let her post the bond.

20         Is there anything else we need to take up?

21              MR. ROSENZWEIG:  She'll need a couple of weeks to

22    get -- they'll need a couple of weeks to get liquid.

23              THE COURT:  That's fine.  Two weeks.

24              MS. WHATLEY:  Your Honor, I've been sitting here

25    feverishly searching for my brief which I cannot find for some

1   reason -- oh, because I gave it to you.  I just want to make

2   sure that -- the Court may or may not order this, but I want to

3   put it on the record that we are asking that any restitution

4   that's ordered in this case be ordered due and payable

5   immediately.  And I wanted to put that on the record.

6         THE COURT:  That was in your motion.

7         MS. CASSINELLI COUCH:  Maybe we can talk later about

8   that because that's going to depend on what the Court

9   determines that they are able to pay.  So how the Court orders

10   it paid -- so I guess you would have to look at the financial

11   situation later to determine that.  I don't think the Court can

12   make that decision without more information.

13         THE COURT:  I understand.  I understand your point.

14         MS. CASSINELLI COUCH:  Have a good evening.

15         THE COURT:  Anything else?

16     Now, I think I have another case starting up right after

17   this one.

18         MS. CASSINELLI COUCH:  Oh, no.

19         MR. HENDRIX:  You do not.

20         THE COURT:  Let's recess and then we'll take a couple

21   of seconds and get started on the next hearing.

22     (Proceedings concluded at 5:34 p.m.)

23                    REPORTER'S CERTIFICATE
      I certify that the foregoing is a correct transcript from
24   the record of proceedings in the above-entitled matter.

25   /s/ Judith A. Ammons, RPR, CRR, CCR  Date:  May 25, 2011
     United States Court Reporter


                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter