FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT 2 _ 20 4

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

RANDEEP SINGH MANN, M.D.,          )
                                   )
            Movant,                )   No. _____
                                   )
    v.                             )   Criminal Case No.
                                   )     4:09CR00099-01 BSM
UNITED STATES,                     )
                                   )   EVIDENTIARY HEARING DEMANDED
            Respondent.            )

**VERIFIED MOTION UNDER 28 U.S.C. § 2255**
**TO VACATE, SET ASIDE, OR CORRECT SENTENCE**
**BY A PERSON IN FEDERAL CUSTODY**

COMES NOW the movant, Randeep Singh Mann, M.D., and prays

the Court for its order granting relief under 28 U.S.C. § 2255.

Place of Confinement:  USP Terre Haute, 4700 Bureau Road South,
    Terre Haute, Indiana  47802

Prisoner No.:  24775-009

1.    (a) Name and location of court that entered the judgment of
      conviction you are challenging:  United States District
      Court for the Eastern District of Arkansas, Little Rock,
      Arkansas

      (b) Criminal docket or case number (if you know):
      4:09CR00099-01 BSM.  Dr. Mann requests that the Court take
      judicial notice of its files and records in the latter
      case.  Dr. Mann cites to documents in the underlying
      criminal case as "Doc. No." and the number assigned by the
      Clerk, the trial transcript as "TT" and the page or pages,
      the detention hearing transcript as "DT", the appellee's
      brief in the Eighth Circuit as "AB", the respondent's brief
      in the Eighth Circuit as "RB", the reply brief in the
      Eighth Circuit as "ARB", and the respondent's brief in
      opposition in the Supreme Court as "BIO".

2.    (a)  Date of judgment of conviction:  May 10, 2013

(b)   Date of sentencing:  May 10, 2013

3.   Length of sentence:  Life imprisonment (Count 1); 360 months (Count II); 120 months (Count 3); 120 months (Count 6), all to run concurrently, with five years' supervised release.  Dr. Mann was also convicted of two additional counts and initially sentenced to five years' imprisonment (Count 7) and five years' imprisonment (Count 8) also to run concurrently with the previous terms of imprisonment. Doc. No. 222.

4.   Nature of crime (all counts):  Use of a Weapon of Mass Destruction (Count 1); Use of an Explosive Resulting in Personal Injury (Count 2); Possession of Unregistered Firearm (Count 3); and Possession of a Machine Gun (Count 6).  Dr. Mann was also convicted and initially sentenced for Conspiracy to Obstruct an Official Proceeding (Count 7) and Aiding and Abetting Tampering with Evidence (Count 8). Doc. No. 222.

5.   (a)  What was your plea?  (Check one)

     (1)  Not guilty          ___√___
     (2)  Guilty              _____
     (3)  Nolo contendere     _____

     (b)  If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?  N/A

6.   (c)  Kind of trial: (Check one) (a) Jury ___√___    (b) Judge only ___

7.   Did you testify at a pretrial hearing, trial, or post-trial hearing?  Yes [ ]   No [ √ ]

8.   Did you appeal from the judgment of conviction?  Yes [ √ ] No [ ]

9.   If you did appeal, answer the following:

     (a)  Name of court:  United States Court of Appeals for the Eighth Circuit

     (b)  Docket or case number (if you know):  11-1500

(c)   Result:  affirmed as to convictions on Counts 1, 2, 3, 7, and 8, but remanded as to Counts 5 and 6 with instructions to set aside one of the convictions

(d)   Date of result:  December 6, 2012

(e)   Citation to the case (if you know):  United States v. Mann, 701 F.3d 274 (8th Cir. 2012)

(f)   Grounds raised:

(1)   The evidence was insufficient to sustain the conviction for using a weapon of mass destruction (Count 1), arguing that (a) the evidence that Dr. Mann (whom the prosecution did not charge as a principal, the person who planted a grenade near the victim's vehicle) was guilty as either a conspirator or an aider and abettor was nonexistent, incredible, implausible, or strained, or required piling an inference on an inference to establish an element through circumstantial evidence; and (b) the victim was an individual, but under a proper construction of the operative statute--18 U.S.C. § 2332a--actions against individuals normally have a lesser impact on interstate commerce than actions against businesses, and the connection must be substantial, whereas the proof was that the victim's clinic made money during his recuperation, with the effect that the prosecution's evidence did not satisfy the jurisdictional predicate for applying the statute consistently with the Commerce Clause;

(2)   The evidence was insufficient to sustain the conviction for use of an explosive resulting in personal injury (Count 2), arguing that (a) for the same reasons adduced in subpoint (1)(a), the prosecution's evidence was too attenuated from the act to draw the conclusion Dr. Mann aided and abetted the damage to the victim's vehicle; and (b) the vehicle's use to transport the victim to state medical board meetings did not meet the jurisdictional predicate for applying

- 3 -

the operative statute--18 U.S.C. § 844(i)--
consistently with the Commerce Clause;

(3)    The evidence was insufficient to sustain the
conviction for possession of unregistered
firearm, approximately ninety-eight 40 mm
HE, M406 grenades (Count 3), in that the
testimony and exhibits were insufficient to
create a reasonable inference Dr. Mann was
knowingly and unlawfully in constructive
possession of the grenades, arguing that the
testimony of gun dealer Lloyd Hahn was
either incredible or incomplete to establish
that Dr. Mann was in constructive possession
of the grenades in question, when Hahn had
told the grand jury that he sold Dr. Mann 90
or 92 grenades but increased the number when
the prosecution team told him they needed it
to be 98, and when Hahn could not recollect
when the transaction occurred, but the last
transaction with Mann was July 2001, which
would have been outside the statute of
limitations.

(4)    The evidence was insufficient to sustain the
conviction for possession of an unregistered
firearm, a 7.62 caliber machinegun, serial
number BM-0834, also known as an RPD (Count
5) and possession of the very same firearm
(Count 6), arguing, inter alia, that the
prosecution presented one theory of
liability to the grand jury but another at
trial, and the prosecution's shifting
theories of criminality denied Dr. Mann the
right to be tried on charges found by a
grand jury and denied him the right to fair
notice of the charges, and that indisputable
documentary evidence proved Dr. Mann's RPD
was lawfully transferred and properly
registered, whereas the prosecution's
testimony to the contrary was directly
contradictory to this evidence and was
internally inconsistent;

(5)    The prosecution failed to provide sufficient
notice of the alleged criminal conduct, and
the bill of particulars amended the
indictment;

- 4 -

(6)    The evidence was insufficient to sustain the
conviction for conspiracy to corruptly
obstruct, influence, and impede an official
proceeding (Count 7) and to corruptly
conceal, and attempt to corruptly conceal a
special power of attorney, a general power
of attorney, and presigned blank checks and
other financial documents or objects related
to a bank account ending in the numbers
8796, with the intent to impair the
documents' and other objects' availability
for use in an official proceeding (Count 8),
in that the prosecution's evidence did not
support a conclusion that Dr. Mann and his
accused coconspirator knew the acts the
prosecution alleged against them were likely
to affect an official proceeding (or that it
had that effect), and thus that they had the
intent to obstruct;

(7)    The district court erred in denying the
motion for severance in that Fed. R. Crim.
P. 8(b) required severance to correct the
misjoinder of offenses and defendants
because the indictment did not allege one
overall scheme in which both defendants
participated, and Fed. R. Crim. P. 14
required severance because Dr. Mann suffered
prejudice from the misjoinder of counts in
that he had important testimony to give
concerning some counts (i.e., regulatory)
and a strong need to refrain from testifying
on others (i.e., alleged conspiracy to use a
grenade at all or to injure Dr. Pierce or to
damage his vehicle);

(8)    The district court erred in denying the
motion to motion to dismiss counts for
multiplicity and violation of due process,
in that counts 1 and 2 charged the same act,
use of a "weapon of mass destruction"
(within the meaning of the act) to damage
property, and in that counts 5 and 6 charged
the same act as the other charged, i.e., Dr.
Mann's possession of the same weapon;

(9)    The district court erred in refusing to
dismiss the original indictment under the

Speedy Trial Act, 18 US.C. §3161(b), because the prosecution did not obtain an indictment within thirty days of Dr. Mann's arrest, and did not seek a continuance of an additional thirty days in which to obtain the indictment, as the statute requires when there is no indictment within the first thirty days;

(10) The district court erred in its application of the U.S. Sentencing Guidelines in that it the court applied the crossreference to § 2Al.2 when the acts charged were not, as that provision requires, tantamount to attempted murder because the prosecution's own evidence showed that the grenade used was not lethal in an open area such as the victim's driveway versus the interior of a tank or of a small bunker; the government official enhancement, when the victim was a parttime board member; and the obstruction of justice enhancement based on the removal of documents from Dr. Mann's clinic, for which he received a separate sentence; a two-level obstruction enhancement based on an assault on a federal inmate, when there was no record evidence that Dr. Mann had done, caused, or directed such an assault; a two-level enhancement based on possession of stolen firearms when the prosecution had taken the position at trial that the grenades were <u>not</u> stolen--despite the prosecution's not having pursuing enhancement--and a four-level enhancement for possessing grenades with obliterated serial numbers, when the prosecution's evidence removal of the date of manufacture, not the serial numbers, from the devices; and

(11) Cumulative errors deprived Dr. Mann of a fair trial.

(g) Did you file a petition for certiorari in the United States Supreme Court?  Yes [ √ ] No [  ]

If yes, answer the following:

(1) Docket or case number (if you know):  12-1444

(2) Result:  Petition denied

(3) Date of result (if you know):  October 21 2013

(4) Citation to the case (if you know):  Mann v. United States, 134 S.Ct. 470 (2013) (mem.)

(5) Grounds raised:

1.   The quantum of proof to establish a nexus with interstate commerce differs under the weapons of mass destruction statute, 18 U.S.C. § 2332a, depending on whether the explosion targeted an individual or a business, such that if the offense charged was against a business, a de minimis effect on interstate commerce meets the interstate commerce element, but if the offense charged was against an individual, the prosecution must prove a substantial effect on interstate commerce.

2.   A privately owned vehicle used to transport its owner to and from work is not "used in" or "affecting" interstate commerce so as to invoke federal jurisdiction under 18 U.S.C. § 844(i).

10.  Other than a direct appeal listed above, have you previously filed any petitions, applications or motions with respect to this judgment in any court?

     Yes [ ]   No [ √ ]  There are pending matters concerning weapons forfeiture; but they do not appear to be what this question concerns.

11.  If your answer to 10 was "yes," give the following information:  N/A.  See note to 10.

12.  For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.  Attach additional pages if you have more than four grounds.  State the facts supporting each ground.

     In the AO form for motions under section 2255, there are questions after each ground that appear to have been drafted for

- 7 -

section 2254 petitions, because they ask about whether the ground had been raised on direct appeal or post-conviction relief.  Dr. Mann has fully reported on the direct appeal in this case, and incorporates his answers to Questions 8 and 9 at this point.  This pleading is the post-conviction relief motion initially contemplated by the applicable federal statutes and precedents.  As it is just being filed, there has been no hearing, no testimony, no result, no appeal, and no certiorari proceeding in or relating to it.  Therefore Dr. Mann proceeds to set out the grounds and the facts supporting each ground without repeating this information at the end of each separate ground.

To distinguish them from the answers to the questions in the form, the ground numbers are underlined.

1.  Respondent's custody over Dr. Mann depends violation of the Due Process Clause of the Fifth Amendment by the fabrication and planting of an ammunition canister containing ninety-eight M406 40-mm. high-explosive grenades by the respondent's agents or at their behest in March 2009 on property close to Dr. Mann's home for the purpose of obtaining a search warrant, and the prosecution-police team's use of the fruits of the resulting search.

1.1.  The pictures that Pope County Deputy Sheriff Jason Smith and the ATF took, and that the prosecution introduced into evidence at trial, show that the hole from which the ammunition canister was allegedly removed was in fact an old hole that would not have held the canister with only one corner sticking out.

1.1.1.  The depression in the surface of the earth from which prosecution witnesses Mark Rinke and Ryan Kimbell testified they removed the ammunition canister containing the 40-mm. high-explosive grenades had not just been vacated, but was of indeterminate age, at least weeks to months old.

1.1.1.1.  Dr. Larry T. West is a soil scientist who earned his Ph.D. in Soil Science at Texas A&M University in 1986; taught the subject at the University of Georgia for fifteen years and later worked for the USDA for five years.  He finds that the hole pictured in Government Exhibits 98-A, -B, -C, -H & -I and in Government Exhibit 101-C (part two) was not a freshly dug hole.  The leaves in the hole are similar to the ones on the surrounding ground,

- 8 -

indicating that they had fallen at the same time with the hole already in existence. The soil surrounding the hole is tan to brown in color, whereas the soil in the area of the hole is red clay below three to five inches. The soil surrounding the hole appears to have been walked on or rained on for some time. Any red soil in the pictures of the questioned hole is some distance from it, on the periphery of the picture, and there is no telling that it came from the hole. PCR/Habeas Exhibit 1 at 3-5.

1.1.1.2.   Prof. Frederick W. Spiegel is a botanist who earned his Ph.D. at the University of North Carolina-Chapel Hill in 1978 and has taught botany at the University of Arkansas-Fayetteville since 1982. He finds that the hole pictured in Government Exhibits 98-A, -B, -C, -H & -I and in Government Exhibit 101-C (part two) was <u>not a freshly dug or freshly opened hole</u>, but that it had been open for at least several weeks before these pictures were taken. It would have taken that long for the leaves in the hole to be consistent with the leaves on the ground surrounding the hole. In addition, the leaves in the bottom of the hole in these pictures are substantially less flattened and fragmented than those which were in fact under a weighted canister of the same size and shape as Government Exhibit 99-A for only two days. Prof. Spiegel used the ATF ruler in one of the pictures that the ATF took the next day to extrapolate the width of the duct tape, and from it, to confirm the size of a Southern Red Oak leaf to be no more than four inches wide from lobe tip to lobe tip. Given the size of the leaf, he concluded that the hole could have been no deeper than one foot. PCR/Habeas Exhibit 2.

1.1.1.3.   The physical evidence shows that the depression in the face of the earth was not the result of a recent excavation or removal of the canister, but was simply there on the surface of the earth and the prosecution witnesses only said it was the hole from which they removed the canister.

- 9 -

1.1.2.    The hole is not large enough to have held an object the size of the ammunition canister, _i.e._, 17 3/8 inches by 7 1/2 inches by 14 3/8 inches, even with one corner just sticking out of the ground as the trial testimony indicated. TT:1073.

    1.1.2.1.    The hole was neither wide enough nor deep enough to have accommodated a box of the given dimensions within it consistently with the testimony of Mark Rinke that it "was almost completely covered", with "a slight corner that was exposed", when "that was exposed after [he] stepped on it, dragging [his] foot across it." TT:1074.

    1.1.2.2.    Rinke did not simply testify that the hole held the canister flush with the surface of the earth, but that it was deeper, creating a "slight depression" in which he "caught the heel of [his] boot." TT:1082. Therefore in order for Rinke's testimony to have been true, the hole had to have been greater than the depth of the canister per se.

    1.1.2.3.    Rinke testified that when he initially "found" the canister, he "dug [his] fingers around the lid". TT:1082. See also TT:1083. Rinke testified that the hole was deep enough to hold the canister, lid up, with a small amount of room to spare. TT:1088. If Rinke's testimony were true, the canister had been placed in the ground with the lid up, _i.e._, over 14 3/8 inches into the ground.

1.1.3.    But Prof. Ming-Chih Hung is a geographer whose teaching and research includes photogrammetry. He earned his Ph.D. at the University of Utah in 2003 and is a tenured professor at Northwest Missouri State University, where he has taught since 2003. Applying photogrammetry to the pictures admitted into evidence and tendered to trial counsel in discovery, he finds that the hole could be no more than 10.231 inches deep. PCR/Habeas Exhibit 3 at 3-4.

1.1.4.    Because the soil surrounding the hole is old,
          weathered soil, there is no evidence of
          excavation--let alone the twenty minutes of
          excavation that Rinke testified it took him and
          Kimbell to get the canister out of the asserted
          hole.  TT:1086 ("It took us that long to get it
          up, dig it out of the ground").

1.2.    The prosecution-police witness admitted that there
        were fingerprints on the grenades, but the prints were
        not Dr. Mann's.  TT:640.  They had taken his DNA
        sample, but there was no match for that either, or
        else the prosecution-police team would have used it
        against him.

1.3.    When one views the set of pictures that ATF agents
        took on March 4, 2009, alongside the former set that
        Deputy Smith took in the course of responding to a
        call from Rinke's and Kimbell's employer on March 3,
        2009, the pictures by the ATF show the hole to be
        "fresher" a day after the date of its alleged
        excavation.  The well-settled leaves appear to have
        been agitated, the soil loosen, the walls freshened,
        revealing moist soil.  This evidence reflects yet
        another attempt by the ATF agents to alter the
        evidence in order to make it appear consistent with
        Rinke's and Kimbell's testimony.

1.4.    On an early morning in or around March 2009, Will
        Elkins saw two men he recognized as employees of the
        City of London, Arkansas, taking an ammunition
        canister Mr. Elkins identified as the one in a
        prosecution exhibit at trial onto the property where
        they subsequently claimed to have "found" the
        canister.  PCR/Habeas Exhibit 4.

1.5.    Respondent's deception has continued after the ill-
        gotten convictions and sentences flowing from the
        "finding" of the canister near Dr. Mann's property, in
        that it has refused his Freedom of Information Act
        requests to obtain the dimensions of the bottle that
        its agents placed in the hole, which would confirm the
        shallowness of the hole compared to the size of the
        canister and the consequences for the testimony that
        the canister was "found" at the cul-de-sac at the end
        of Galaxy Lane.  PCR/Habeas Exhibit 5.

1.6.    On information and belief, when the Mayor of London,
        Arkansas, Edwin Price--Mark Rinke's and Ryan Kimbell's
        employer, who had called law enforcement on the basis
        of their phone call to him--attempted to question
        Rinke about the testimony and circumstances pertaining
        to the discovery of the box, Rinke stated, "I was told
        not to talk about it", before abruptly walking away.
        Rinke did not even say who told him not to talk about
        the "discovery" of the box on City time, or by whom
        and when he was so instructed.

1.7.    Rinke's subsequent statements to a reporter in an
        interview revealed some material differences from his
        testimony at trial.  To the reporter, he said the box
        was only "half buried", and that he was in the
        vicinity of the clearing off the cul-de-sac checking
        water meters (rather than the story he told the jury
        about looking at a swimming pool that the
        propertyowner testified one could not see from the
        clearing).  Compare PCR Habeas Exhibit 6 with TT:1070
        (Rinke) & 3080-82 (Lynn Blunier).

1.8.    Whereas Rinke spoke to the media about the case, he
        refused to speak to an investigator from the defense
        team.  TT:1101-02.

1.9.    The ammunition canister and the grenades it held were
        fabricated and subsequently planted--placed next to a
        preexisting hole--in order to obtain a search warrant
        and the subsequent convictions and sentences on
        multiple counts.

1.10.   Because the foregoing acts and omissions occurred
        within the cloak of the respondent's ability to act
        without notice to Dr. Mann or by withholding
        information from him, they are amenable to
        supplementation as this action proceeds, and the
        inability to list every fact in support of this ground
        is attributable to the respondent rather than to Dr.
        Mann.

1.11.    Dr. Mann does not concede that he must show prejudice
         from willful deception of both state and federal
         courts to circumvent the Fourth Amendment and bring
         about the conviction and life imprisonment of a
         citizen of the United States.  But the respondent is
         estopped to argue that he did <u>not</u> suffer prejudice
         from the planting of evidence on property close to
         his, the sponsoring of testimony reaffirming the
         falsehoods that procured the search warrant, stifling
         of questions from the person who called local law
         enforcement on Rinke's and Kimbell's say-so, and the
         ATF's ongoing coverup of the precise dimensions of the
         bottle the ATF placed in the hole.

    1.11.1.    The prosecution-police team used hearsay from
               Rinke in the affidavit for the search warrant
               that led them to the objects they later argued
               were evidence of Dr. Mann's liability for
               multiple offenses including the supposed
               possession of the planted 40-mm. high-explosive
               grenades.

    1.11.2.    At detention hearing, ATF employee David Oliver
               testified to double or triple hearsay from Rinke
               and Kimbell to the effect that the latter had
               "found" the canister as he later testified at
               trial.  DT:I.4-5.  From the testimony, Exhibits
               1-9 are evidently a selection from the pictures
               Jason Smith took after responding to a 911 call
               from Rinke's and Kimbell's employer and the ones
               the ATF took the next day.  DT:I.6-9.  The
               prosecutor represented to the Court that he had
               provided the pictures to trial counsel.  DT:I.6.

    1.11.3.    At trial the prosecution-police team presented
               Rinke's testimony and referred to it in closing
               argument.  <u>E.g.</u>, TT:3273.

    1.11.4.    Respondent recited the story as part of the
               statement of the case in its Eighth-Circuit
               brief.  RB:11-12.

    1.11.5.    The Eighth Circuit accepted the prosecution-
               police line, and found the planted canister the
               leading instance of "overwhelming evidence" of
               his guilt of possession of the contents of the
               canister.  701 F.3d 274, 291-92 (8th Cir. 2012).

- 13 -

1.11.6.   On certiorari, even the Solicitor General's Office leant its credibility to the line that the canister was discovered "by chance." BIO:3. The Supreme Court denied the petition. 701 F.3d 274. Denial of certiorari is not a judgment on the merits; but here it left Dr. Mann in the Bureau of Prisons for life while the actual perpetrator is at large.

2.   Respondent's custody over Dr. Mann depends on the deprivation of his right to the effective assistance of counsel in violation of the Sixth Amendment that occurred when trial counsel failed to consult with experts and present expert evidence to demonstrate the perjured nature of the assertions on which the search warrant of March 4, 2009, was based, and otherwise to establish that the initial search of Dr. Mann's home and all subsequent searches were in violation of the Searches and Seizures Clause of the Fourth Amendment to the Constitution of the United States and the Due Process Clause of the Fifth Amendment.

2.1.   Trial counsel were on notice of the appearance of the hole from which Rinke and Kimbell claimed to have pulled the canister well before trial.

2.1.1.   To the extent trial counsel did not receive the affidavit based on hearsay from Rinke that would have put them on inquiry about the transactional facts of the "finding" of the canister any earlier than they did because the prosecution-police team had the search warrants sealed, the ineffective assistance resulting from the delay is attributable to interference by the respondent's officials. But the inquiry under the Sixth Amendment is not whether defense counsel was at fault, but whether the client received effective assistance of counsel. If defense counsel would have done more or done it sooner but for judicial, prosecutorial, or police obstruction, there is a Sixth Amendment violation regardless of defense counsel's freedom from fault.

2.1.2.    The prosecution-police team presented double or triple hearsay through David Oliver at the detention hearing on May 10, 2009.  Although this testimony confabulates Rinke's and Kimbell's testimony into one declarant's, it put trial counsel on notice of the general tenor of the allegations of a "finding".  DT:4-5.

2.1.3.    The affidavit for search warrant predicated on the "finding" of the canister is the beginning of the discovery the prosecution provided trial counsel.  409cr00099-1 & 409cr00099-2.  The internal statement of Deputy Sheriff Jason Smith reciting what Rinke and Kimbell had told him appears shortly thereafter.  409cr00099-7.

2.1.4.    At trial the prosecution-police team presented Rinke's testimony and referred to it in closing argument.  E.g., TT:3273.

2.1.5.    Respondent recited the story as part of the statement of the case in its Eighth-Circuit brief.  RB:11-12.

2.1.6.    Even the Solicitor General's Office leant its credibility to the line that the canister was discovered "by chance."  BIO:3.

2.2.    Trial counsel could have retained one or more expert witnesses who would have given scientific opinions about the age and size of the hole that would have demonstrated that the prosecution-police story about "finding" the canister near Dr. Mann's property was false.

2.2.1.    Trial counsel did not approach Dr. West.  He would have had the same opinion--that the hole the prosecution-police team claims to have held the canister was not a freshly dug hole--which he gives in PCR/Habeas Exhibit 1 if he had been consulted, and would have given evidence to that effect unless his then-employer, a federal agency, had denied him permission to do so.  PCR/Habeas Exhibit 1 at 5.

2.2.2.   Trial counsel did not approach Prof. Spiegel.  He
would have given the evidence to the same
effect--that the hole the prosecution-police team
claims to have held the canister was not a
freshly dug or freshly opened hole--which he has
in PCR/Habeas Exhibit 2 if he had been called at
trial.  PCR/Habeas Exhibit 2 at 5.

2.2.3.   Trial counsel did not approach Prof. Hung.  He,
too, would have given the same evidence that the
hole was at most 10.231 inches deep which he has
given in PCR/Habeas Exhibit 3 if he had been
presented with the same or substantially the same
data before trial.  PCR/Habeas Exhibit 3 at 4.

2.3.   Trial counsel had no strategic reason for acquiescing
in Rinke's story about "finding" the canister,
including the part that the canister had been in the
ground with only one corner sticking out.  In fact
they did not acquiesce in the story.

2.3.1.   Trial counsel personally argued in front of the
jury with Rinke and Kimbell about the appearance
of the age of the hole, giving them the
opportunity to say that they were supposed to say
additional times.  TT:1090-91 & 1101 (Kimbell
does admit he is not an expert).

2.3.2.   Trial counsel argued with Arkansas State Police
Bomb Squad Director Buford on the matter when
neither man was qualified as an expert on the
subject.  TT:1271-72.

2.3.3.   Trial counsel adduced testimony from Wayne Henry,
a home-maintenance contractor, that the hole
appeared old to him based on his experience of
having dug post holes in the course of his work.
TT:3056-58.

2.4.   An occurrence witness saw Rinke and Kimbell put the
canister in the location where they later claimed to
have "found" it.  PCR/Habeas Exhibit 4.  Because there
appears to have been no investigation that would have
yielded such testimony, there can be no strategic
reason for not pursuing it.

2.5.    In light of all the circumstances, the acts or
        omissions here identified were outside the wide range
        of professionally competent assistance.

2.6.    There is a reasonable probability that but for
        counsel's unprofessional errors, the result of the
        proceeding would have been different, _i.e._, the
        probability undermines confidence in the outcome.

   2.6.1.    Respondent's agent Gordon impeached Wayne Henry's
             testimony that the hole was old by asking him if
             he was a "hole expert".   TT:3058.

   2.6.2.    In closing argument, trial counsel claimed that
             "none of us were able to get a hole expert here
             in front of you to talk about this, about when
             were these things buried." TT:3315.   In fact
             trial counsel had presented expert witnesses on
             other subjects.   TT:2644-2664 (Hopen) & TT: 2674-
             2825 (Norrell).

2.7.    The fact that trial counsel did not learn sufficient
        facts about the planting of the grenades close to Dr.
        Mann's property (yet out of sight from his property)
        in time to stop the initial Fourth Amendment violation
        is no reason for failing to assert the constitutional
        violation at a later time.

2.8.    Suppression of the fruits of the search the
        respondent's agents conducted on the basis of the ill-
        gotten search warrant would have had a reasonable
        probability of a different outcome, as the repeated
        press releases by U.S. Attorney Jane W. Duke make
        clear.   _E.g._, PCR/Habeas Exhibit 7 at 2-3; see also
        http://www.justice.gov/usao/are/news/2009/April/manngr
        enades.indict.040809.pdf (last visited Oct. 19, 2014).

   2.8.1.    But for the "finding" of the 40-mm. grenades,
             there would have been no counts 3-6 relating to
             "possession" of the grenades themselves and
             alleged regulatory violations as to two firearms
             out of over a hundred.

2.8.2.    The alleged obstruction of justice charges in counts 7-8 are parasitic on the foregoing substantive and regulatory charges.  Dr. Mann would not have been on a jailhouse phone, and sensitive financial documents including pre-signed checks would not have been subject to seizure by law enforcement individuals he had experienced to be hostile or indifferent to his economic welfare, if he had not been in jail.  He would not have been in jail but for the "finding" of the grenades.

2.8.3.    Although Dr. Mann does not concede that the materials found in his home prove that he was involved in the West Memphis injury of Dr. Pierce, the respondent is estopped to argue that the search of the home did not play a substantial role in his being charged and ultimately convicted for counts 1 and 2, because they held this evidence out to the jury (e.g., TT:3273-74), the Eighth Circuit (RB:11-12), and the Supreme Court (BIO:3) as probative on these counts.

3.    Respondent's custody over Dr. Mann depends on violation of the Due Process Clause of the Fifth Amendment in that the prosecution-police team (Assistant U.S. Attorneys and ATF employees) suborned, sponsored, adduced, and failed to correct perjured grand-jury testimony commencing in January 2010.  In this process, the distinction between prosecutors and police broke down, with prosecutors participating in subornation of perjury and at least one policeman sitting at the prosecution's counsel table throughout the trial. E.g., TT:18 (Norris excused from rule of sequestration of witnesses without objection).

3.1.    The prosecution team suborned perjured grand-jury testimony from Hamis Alshareqi, which Mr. Alshareqi recanted under oath before trial.  PCR/Habeas Exhibit 8.

- 18 -

3.1.1.     After they had gotten Dr. Mann detained before
           trial, Assistant U.S. Attorneys Karen Whatley and
           Michael Gordon along with two ATF agents
           approached an immigrant inmate, Hamis Alshareqi,
           who had celled and otherwise been housed with Dr.
           Mann.  The prosecution team threatened, coerced,
           and even bribed him with a promise of
           intervention to stop his deportation on the
           completion of his sentence.  PCR/Habeas Exhibit 8
           at 6-7 & 14.

3.1.2.     The purpose of these threats and this promise was
           to cause him to provide false testimony
           derogatory and inculpatory to Dr. Mann before the
           grand jury.

3.1.3.     Coached and prepared, Alshareqi was then taken
           before the grand jury where he conformed to the
           wishes of the Government.  Alshareqi's suborned
           perjured testimony was to the effect that Dr.
           Mann had confessed to Alshareqi of his
           involvement in the bombing and that Dr. Mann had
           possessed the 40-mm. grenades.  It was
           prejudicial to Dr. Mann with respect to the
           indictment.

3.1.4.     A few weeks later, Mr. Alshareqi recanted that
           testimony, writing a sworn, notarized 20-page
           narrative to the Court explaining how these
           federal agents suborned that perjured testimony.
           Well before Dr. Mann's trial was to commence,
           Alshareqi recanted his testimony, saying under
           oath that the AUSA's and ATF agents had wanted
           him to lie because they had no direct evidence
           against Dr. Mann.  In the 20-page sworn
           recantation, Alshareqi elaborated in detail how
           the prosecution-police team systematically
           suborned his perjured grand-jury testimony.
           PCR/Habeas Exhibit 8.

3.1.5.   By recanting, Alshareqi had then become a rather
substantial liability to "the Government".   Dr.
Mann will testify that while they were at Pulaski
County Regional Detention Facility, Little Rock,
Arkansas, another prosecution informant, Steven
Briscoe, provoked Alshareqi into a physical
altercation by both using derogatory language
toward him and threatening him physically.
Because Briscoe was larger than Alshareqi, the
latter took a showerhead, wrapped it in a towel,
and used it as an equalizer to strike back at
Briscoe.   That event provided the prosecution
team the opportunity it needed.   They had a
hammer over Alshareqi they did not have before:
they were able to hit Alshareqi not with a
showerhead but with thirty years of
incarceration, for "assaulting a Government
witness, with an intent to kill" if Alshareqi
told the truth in court.

3.1.6.   At trial, Alshareqi never took the stand.
Because the respondent's agents were thus able to
avoid Alshareqi's testimony, the sworn evidence
of their subornation of perjury was never brought
to the jury's attention.

3.2.   The prosecution team suborned perjured trial testimony
from Phil Barthelme, by threatening to arrest him,
which Mr. Barthelme essentially acknowledged at trial.
TT:2146-47 (agents made him feel like they would cuff
him and stuff him, then suggested the story about the
tire).

3.3.   On information and belief, and as a matter of logic,
there were other prosecution witnesses who testified
falsely, and other defense witnesses who were
intimidated from testifying truthfully, and by the
surreptitious and illegitimate nature of the activity
of procuring such testimony, the behavior of the
prosecution team is responsible for the fact that Dr.
Mann cannot at this time supply the names or the
specific testimony involved.

<u>4.</u>      Respondent's custody over Dr. Mann depends on the
         deprivation of his right to the effective assistance of
         counsel in violation of the Sixth Amendment that occurred
         when trial counsel's failed to use the Alshareqi
         recantation affidavit, and to investigate Mr. Alshareqi's
         averments and to subpoena and call him as a witness if
         appropriate, to challenge Dr. Mann's indictment as
         violating of the Indictment and Due Process Clauses of the
         Fifth Amendment to the Constitution of the United States.

   4.1.    Trial counsel received the recantation affidavit by
           Mr. Alshareqi.

   4.2.    Trial counsel did not move to quash the indictment on
           the basis that the respondent's agents had obtained it
           through the subornation and knowing use of perjured
           testimony.

   4.3.    In light of all the circumstances, the identified acts
           or omissions were outside the wide range of
           professionally competent assistance.

       4.3.1.    Sworn evidence of subornation of perjury is the
                 kind of offensive conduct that defense counsel
                 cannot sweep under the rug.  Questions of Mr.
                 Alshareqi's credibility are for judicial, not
                 personal, determination.

       4.3.2.    Eagerness to go to trial is not a strategic
                 reason for failure to investigate evidence like
                 the Alshareqi recantation affidavit.

   4.4.    There is a reasonable probability that, but for
           counsel's foregoing errors, the result of the
           proceeding would have been different, <u>i.e.</u>, the
           probability undermines confidence in the outcome.

5.    Respondent's custody over Dr. Mann depends on the
      deprivation of his right to the effective assistance of
      counsel in violation of the Sixth Amendment that occurred
      when trial counsel failed to investigate the Alshareqi
      recantation by interviewing and, if appropriate,
      subpoenaing and calling, the federal public defenders
      representing Mr. Alshareqi at the time, Omar Green and
      Floyd Hancock, to confirm Mr. Alshareqi's account of what
      Assistant U.S. Attorneys Gordon and Whatley and their
      teammates Newman and Oliver did in their presence or to
      their knowledge to procure Mr. Alshareqi's grand-jury
      testimony.

      5.1.   Failure to investigate is not the basis for a
             reasonable strategic decision.

      5.2.   Assuming that at least one of these attorneys had
             testified truthfully, it would have eliminated the
             case against Dr. Mann and Mrs. Mann on all counts by
             bearing out the averments that the indictment was
             procured through the knowing use of perjured testimony
             actively suborned through the promise of favorable
             immigration-law treatment for Mr. Alshareqi and the
             threats of seeking a higher sentence on his pending
             case and of threat of charging him with a new, thirty-
             year case.

6.    Respondent's custody over Dr. Mann depends on violation of
      the Assistance of Counsel Clause of the Sixth Amendment in
      that trial counsel failed to obtain an expert on Hindu
      ceremonial practices to confirm that at least in northern
      India--where the pictures were sent--some Hindus use
      pictures of persons they are praying for in services, or a
      witness of any kind who had attended the service at which
      Dr. Mann's family had used the pictures of Drs. Jouett and
      Pierce in their prayers.  Instead, trial counsel called Dr.
      Mann's and Mrs. Mann's daughter, an American college
      student, when her parents were both on trial in the same
      case, as their witness on this issue.  TT:3017-18 & 3022-
      25.

      6.1.   Under the circumstances of this case, calling an
             immediate family member of the accused to present
             testimony to a contested fact concerning which she was
             neither qualified to testify as an expert to the
             general practice referred to nor a percipient witness
             to the specific fact to be explained was outside the
             wide range of professionally competent assistance.

                              - 22 -

6.1.1.     Trial counsel had no strategic reason for failing to establish the true purpose of sending the pictures to Dr. Mann's family in northern India. They did in fact attempt to do so.

6.1.2.     Trial counsel attempted to establish the true purpose of sending the pictures to India through the testimony of Dr. Mann's American daughter, Ms. Sarina Mann--then a student at the University of Arkansas-Fayetteville, and not even majoring in comparative religions or in preparation to become a pandit.

6.1.2.1.   The jury could not help but discount the credibility of Ms. Mann's testimony by the fact that she is a close family member of the accused and had a powerful interest in giving the testimony she did.

6.1.2.2.   Questions about practices of a religious tradition other than that of the jurors or the vicinage of the trial, which are done on the other side of the world, are matters on which an expert or other percipient witness was required in order to be effective.

6.1.2.2.1.     Ms. Mann was not an expert on Hindu practices in northern India.

6.1.2.2.2.     Ms. Mann did not attend the service at which the pictures were used.

6.2.    Failure to call an expert on practices and/or a percipient witness on the use of the picture in this instance caused prejudice to Dr. Mann.

6.2.1.     In a case relying entirely on circumstantial evidence, pieces of evidence like the pictures take on more importance than they would when there was an eyewitness, an admissible confession, or forensic evidence linking the accused to the actus reus of the offense, as there was not here.

6.2.2.    The prosecution-police team raised the picture in closing argument, denying in a conclusory manner the testimony that the purpose of sending the picture to India was in order that Dr. Mann's family would pray for ASMB's wisdom in its disposition of matters relating to their loved one.  TT:3292-93.  The inescapable implication was that Dr. Mann caused the picture to be sent to India to hire a hitman to do a job in West Memphis, to fit Velma Gales's ethnic characterization of the mystery jogger.

6.2.3.    The prosecution-police team referred two times to the e-mail to India (i.e., the pictures) in the rebuttal closing argument alone--the last time any lawyer spoke to the jury before it began an overnight recess.  TT:3367 & 3375.  This lawyer did so in a sustained manner at 3367, misstating the evidence to the effect that Dr. Pierce appeared in the picture but Dr. Jouett did not.  He did so without objection.  He did so again in the penultimate paragraph of his rebuttal closing argument, the one before he said, "It's late" and brought the last word to the jury to a close.

6.2.4.    Respondent is estopped to argue that the omission to find and present neutral expert testimony or a percipient witness to the true use of the picture did not prejudice Dr. Mann.

6.2.4.1.  The prosecution-police team used it as an argument for convicting Dr. Mann at trial.

6.2.4.2.  Respondent used it in its brief before the Eighth Circuit as a pretext for its "investigation" of Dr. Mann's brother, who received the e-mail to which the picture was attached.  RB:20-21.

6.3.  If trial counsel had consulted with him, Pandit (Priest) Rameshwar Dass of the Hindu Temple of St. Louis would have provided evidence to a reasonable degree of clerical certainty providing an informed alternative explanation for the fact underlying the spurious and inflammatory insinuation that Dr. Mann sent or caused to be sent the pictures of Dr. Jouett and Dr. Pierce to India in order to put out a hit on either of them.  PCR/Habeas Exhibit 9.

6.3.1.   Pandit Dass was a practicing Hindu in the state in northern India adjacent to the one where the Mann family used the pictures in a service for approximately forty years;

6.3.2.   He trained to be a pandit (or priest) in the Hindu faith for ten years;

6.3.3.   He passed an examination to be a pandit in scripture and ritual;

6.3.4.   He has been a pandit for approximately thirty-two years;

6.3.5.   He came to the United States in 2001 and became a naturalized citizen;

6.3.6.   He has been a pandit at the Hindu Temple of St. Louis since his moving to this country in 2001;

6.3.7.   It is his opinion that in India, it is common for people to use pictures of people who have died in Hindu services for them, and people sometimes also use pictures of living persons for whom they are praying;

6.3.8.   Trial counsel for Dr. Mann did not contact him;

6.3.9.   If they had, he would have provided the same information he has provided in this action.

7.   Respondent's custody over Dr. Mann depends on the deprivation of his right to the effective assistance of counsel in violation of the Sixth Amendment that occurred when trial counsel failed to investigate the official complaint Dr. Mann had presented to FBI Agent John Ford in connection with the loss of about $200K in 2005 in a scam by individuals in Amsterdam through the misuse of pre-signed checks as showing that safety, not failure to cooperate, was the reason for removing Sandip Mann's materials from the office that was about to be vacated.

7.1.   Trial counsel attempted to deny the corrupt or criminal nature of the discussion of the records at the clinic, but that does not excuse them for overlooking this additional line of inquiry in doing so.

- 25 -

7.1.1.    In 2005, Dr. Mann lost about $200,000 in a scheme by individuals in the Netherlands.

7.1.2.    Dr. Mann contacted the Interpol office in Washington, D.C., who agreed to pursue the case on the condition that the local law enforcement agency in Russellville, Arkansas, give Interpol the permission to proceed with the investigation.

7.1.3.    Dr. Mann filed a report with Officer Corey James of the Russellville, Arkansas, Police Department.

7.1.4.    Officer James told Dr. Mann that he was unable to proceed with the investigation, yet he refused to contact either the FBI or Interpol to allow them to do so.

7.1.5.    Dr. Mann contacted the FBI office in Little Rock, and spoke with "Special Agent" John Ford.

7.1.5.1.   Mr. Ford told Dr. Mann that because the perpetrators were not Muslims, he would not pursue the investigation.

7.1.5.2.   Mr. Ford also refused to give Interpol permission to proceed or to solicit its assistance.

7.1.6.    As a result of the unwillingness of either state or federal law enforcement agencies and personnel even to allow Interpol to investigate the loss, Dr. Mann received no remedy for the taking of about $200,000.

7.1.7.    Subsequently, Dr. Mann flew to Amsterdam to assist in the apprehension of the scam artists. This did not yield reimbursement of the funds.

7.1.8.    The foregoing loss enabled by local agents of the state and federal government made it an honest concern for both Dr. and Mrs. Mann that the individuals Dr. Mann had approached without success before would simply steal the pre-signed blank checks which they both knew were at the clinic.

7.1.9.    Honest concern with a repetition of what happened
          with the amount of about $200,000 if those pre-
          signed checks and powers of attorney, especially
          if they came into the hands of the same agencies
          that had enabled the fraud by individuals in the
          Netherlands by refusing to allow Interpol to move
          forward, fueled Dr. and Mrs. Mann's concern for
          the safety of the financial papers.

7.1.10.   Dr. Mann told trial counsel about the scam and
          the refusal by local agents of the state and
          federal governments which were searching his
          clinic and home to allow Interpol to investigate
          the Netherlands-based case.

7.1.11.   Trial counsel had no strategic reason for failing
          to explain the removal of the financial papers
          from the clinic for this honest reason.

7.1.12.   Investigating the refusal of local agents of the
          state and federal governments, who were searching
          and seizing at both the clinic and the home,
          would have buttressed with facts of an egregious
          proportion the concern the Manns had with the
          safety of these financial papers.  It would have
          helped to counter the prosecution's argument that
          the papers would have been secure in the gun
          safes the same agents or their privies were
          running through virtually at will once the 40-mm.
          high-explosive grenades were "found" near their
          property.

7.2.   There is a reasonable probability that but for the
       foregoing errors, the result of the proceeding would
       have been different, i.e., the probability undermines
       confidence in the outcome.

7.2.1.    As a result of trial counsel's failure to pursue
          a line of inquiry that the client provided them,
          there was one less reason to doubt the
          defendants' testimony that the reason for moving
          the pre-signed checks and other financial papers
          of the same kind that had resulted in this
          previous loss from a soon-to-be abandoned clinic
          (or a soon-to-be abandoned home) to the custody
          of a family friend.

7.2.2.    On information and belief, Sangeeta Mann knew
about the loss of about $200,000, so any
statement by Dr. Mann would have been at most a
reminder rather than a but-for cause for her
moving the documents.

7.2.3.    In a case relying entirely on circumstantial
evidence, pieces of evidence like the loss of
about $200,000 through failure to take
precautions like Mrs. Mann took have more
importance than they would when there had been an
eyewitness, an admissible confession, or forensic
evidence linking the accused to the actus reus of
the offense as there was not here.

8.    Respondent's custody over Dr. Mann depends on the
deprivation of his right to the effective assistance of
counsel in violation of the Sixth Amendment that occurred
because the trial court denied their motion for severance
of the counts relating to the planting of a grenade outside
the vehicle of Dr. Pierce, on the one hand, and the
grenade/regulatory counts.

8.1.    This ground does not attribute fault to trial counsel
for failing to go into every piece of evidence of
harassment of Dr. Mann because it would have harmed
his interests in respect to the charge that he had a
hand in the injury of Dr. Pierce and damage to his
SUV.  Dr. Mann was nonetheless deprived of the
assistance of counsel envisioned by the Sixth
Amendment and the precedents applying it.

8.1.1.    This ground is analogous to the grievance that
denying trial counsel the opportunity to make a
closing argument deprives the accused of the
right to the effective assistance of counsel
despite the fact that trial counsel was willing
and able to make the argument.

8.1.2.    This ground is analogous to the grievance that
forbidding trial counsel to consult with the
accused during a seventeen-hour overnight recess,
when an accused would normally confer with
counsel, despite the fact that trial counsel was
willing and able to meet with the client.

7.2.2.    On information and belief, Sangeeta Mann knew
about the loss of about $200,000, so any
statement by Dr. Mann would have been at most a
reminder rather than a but-for cause for her
moving the documents.

7.2.3.    In a case relying entirely on circumstantial
evidence, pieces of evidence like the loss of
about $200,000 through failure to take
precautions like Mrs. Mann took have more
importance than they would when there had been an
eyewitness, an admissible confession, or forensic
evidence linking the accused to the actus reus of
the offense as there was not here.

8.   Respondent's custody over Dr. Mann depends on the
deprivation of his right to the effective assistance of
counsel in violation of the Sixth Amendment that occurred
because the trial court denied their motion for severance
of the counts relating to the planting of a grenade outside
the vehicle of Dr. Pierce, on the one hand, and the
grenade/regulatory/documentary counts.

8.1.    This ground does not attribute fault to trial counsel
for failing to go into every piece of evidence of
harassment of Dr. Mann because it would have harmed
his interests in respect to the charge that he had a
hand in the injury of Dr. Pierce and damage to his
SUV.  Dr. Mann was nonetheless deprived of the
assistance of counsel envisioned by the Sixth
Amendment and the precedents applying it.

8.1.1.    This ground is analogous to the grievance that
denying trial counsel the opportunity to make a
closing argument deprives the accused of the
right to the effective assistance of counsel
despite the fact that trial counsel was willing
and able to make the argument.

8.1.2.    This ground is analogous to the grievance that
forbidding trial counsel to consult with the
accused during a seventeen-hour overnight recess,
when an accused would normally confer with
counsel, despite the fact that trial counsel was
willing and able to meet with the client.

8.1.3.    In all three cases, the question is not who
caused the omission, but whether it occurred, was
consistent with professional norms, and caused
prejudice to the accused sufficient to undermine
confidence in the outcome of the proceeding.

8.2.    Failure to inform the jury of the way local agents of
the federal and state governments separate and apart
from Dr. Pierce or ASMB had treated Dr. Mann for years
was less than the zealous and prepared presentation of
his case that the legal system presumes to be the
standard of care in criminal defense and the assurance
of reliability in the judicial deprivation of life and
liberty.

8.2.1.    But for the denial of the motion for severance,
trial counsel could have adduced evidence of
multiple attempts to entrap Dr. Mann into
violating the law or violating professional
ethics in a way for which he could legitimately
be disciplined.

8.2.2.    But for the denial of the motion for severance,
trial counsel could have adduced evidence of the
respondent's agent Newman's relationship to a
family in which the mother blamed Dr. Mann for
her daughter's death from a drug overdose.  If
counsel had not been or at least felt trammeled
by the threat of harming their client's chances
of acquittal on counts 1 and 2 by presenting the
motives of rogue agents of the respondent to
plant the M406 40-mm. grenades close to his
property, counsel could have adduced the
background of prejudice and envy that combined
with personal or family bias to explain why the
grenades had been planted on him rather than
cached by him.

8.2.2.1.    Dr. Mann is originally from India.  He is of
Hindu heritage and has dark skin.  He has a
thick Indian accent.  His dark complexion makes
him appear Middle-Eastern to less educated
people at a conscious level and to others at an
unconscious level.

8.2.2.2.    He immigrated to the United States in 1983, and
became a naturalized citizen in 1986.  Before
his conviction he was a physician board-

- 29 -

certified in Internal Medicine, Emergency
Medicine and Pain Management.  He lived in
London, Arkansas, and practiced in
Russellville, since 1999.

8.2.2.3.  In view of his dark complexion and grossly
inaccurate stereotypes, Dr. Mann suffered from
the backlash against many immigrants as a
result of the attack on 9/11.  To make matters
worse, Dr. Mann was affluent.

8.2.2.4.  From 1991 until his conviction, he was a gun
enthusiast and collector.  This began in 1990,
when the Crime Control Act of 1990 (P.L. 101-
647) banned manufacturing and importing
semiautomatic assault weapons in the United
States, which he anticipated would lead to an
appreciation of the value of the affected
categories of firearms legally available.
Under the law, he sought and received a Class 3
license.  It allowed him both to buy and to
sell machine guns.  He had a vast inventory of
NFA weapons.  He collected exotic weapons as an
investment and a hobby.

8.2.2.5.  In part because of his knowledge and possession
of firearms, Dr. Mann had made friendships with
local citizens who also were independently
interested in firearms.  His assembly of a
varied collection of firearms, and his shared
taste for target shooting, were means of
bonding with Arkansas natives who also liked
guns.

8.2.2.6.  This rubbed some local residents the wrong way.
His affluence and assimilation into the
community was exacerbated in the minds of some
by the allegations that he had prescribed
medications for people who overdosed on them.

8.2.2.7.  On information and belief, at the time Dr. Mann
moved to Russellville or shortly thereafter,
the mayor was the spouse of a physician at the
then-dominant firm of physicians, who later
sold out his share in the company for
approximately $1.5 million, and the mayor used
her position to incite municipal employees such
as police officers to take actions against Dr.

- 30 -

Mann because he posed a threat to her husband's business.

8.2.2.8.    On information and belief, one of the decedents was related by marriage to Warren Newman, the rogue individual agent of the respondent who attempted for years to entrap Dr. Mann into writing prescriptions for sex or selling firearms illegally. Instigated, led, and supported by Newman, local agents of the state and federal governments pursued two sting operations against Dr. Mann in the years preceding the complaints against him before the ASMB.

8.2.2.8.1.    The first sting operation entailed getting felons to buy weapons from Dr. Mann. Newman spearheaded that sting. He enlisted the assistance of state and local law-enforcement officers, including Glenn Daniels and Chris Goodman. Dr. Mann recorded phone conversations documenting some of these efforts, of which he presents certified transcripts as PCR/Habeas Exhibit 10.

8.2.2.8.2.    Daisy Edberg was a patient of Dr. Mann. Newman offered Ms. Edberg $2,500 if she would buy a fully-automatic firearm from Dr. Mann. PCR/Habeas Exhibit 10.1. Richard Herrera was a patient of Dr. Mann who had a felony record. "Chris" told Mr. Herrera that his cocaine-related conviction would be annulled if he got Dr. Mann to sell him a gun when he had a felony record. PCR/Habeas Exhibit 10.2. Julie Hernandez was a patient of Dr. Mann. "Chris" agreed to take care of some fines for her if she got Dr. Mann to write a prescription for someone besides her, admitting that they had been trying to get someone to do something like that but he would not. PCR/Habeas Exhibit 10.3. David and Patricia Blevins were also patients of Dr. Mann. David repeated to Dr. Mann statements by local law enforcement

- 31 -

agents that they were attempting to get Dr. Mann into trouble by getting him to see fully-automatic weapons illegally. PCR/Habeas Exhibit 10.4.

8.2.2.8.3.      Dr. Mann's patient Barry Downs, a felon and an informant, discussed how local law-enforcement officers had offered to "pay [him] well" for an attempt to purchase "machine guns" from Dr. Mann, in which Mr. Downs indicates that Newman was bragging publicly about how he would confiscate Dr. Mann's property, using Dr. Mann's Dodge Viper "makin' busts in it". PCR/Habeas Exhibit 10.5.

8.2.2.8.4.      On learning of this attack on his livelihood and his freedom itself, Dr. Mann went to the Little Rock ATF Office and personally met with Newman's superior office, Jeff Brzowski. Dr. Mann describing Newman's activities in detail. He requested that Mr. Brzowski have Newman quit targeting and harassing him. PCR/Habeas Exhibit 11.

8.2.2.8.5.      Despite this effort at petitioning the government for a redress of grievances, Newman did not back down. Dr. Mann met personally with FBI agent Lance Smythe at the Little Rock FBI office to discuss his predicament and to solicit his assistance. Getting none, he took his plea to DEA agents Hickman and Bill Bryant as well as other. That too proved to be an exercise in futility. PCR/Habeas Exhibit 12.

8.2.2.8.6.      Unable to entrap Dr. Mann, Newman resorted to a new scheme.

8.2.2.8.7.      The second sting operation attempted to get patients of Dr. Mann's into sexual relationships with him in order to make him lose his medical license. In addition, if an exchange of drugs took place to go ahead and arrest and

convict Dr. Mann.  When Daisy Edberg
propositioned Dr. Mann, he informed Mr.
Brzowski of that attempt as well.

8.2.2.8.8.     Instead of backing down, Newman even
sent his own wife at the time, Terri L.
Jacobs--a registered nurse who lived
and worked in Little Rock, an hour's
drive away from Dr. Mann's office and
when Russellville is a smaller city--to
become a patient of Dr. Mann's, with
the sole purpose of getting Dr. Mann
into an illicit relationship with her
and thereby triggering the revocation
of his medical license.

8.2.2.8.8.1.     This misconduct demonstrates the
length to which Newman would go to
procure an indictment or other
harm to Dr. Mann.

8.2.2.8.8.2.     A man who would suborn a violation
of the Seventh Commandment by his
own current wife would a fortiori
suborn a violation of the Ninth,
let alone the injury of a stranger
with a device that in a driveway
as opposed to the interior of a
tank or bunker is nonlethal.

8.2.2.8.9.     When Dr. Mann spurned Terri Jacobs's
advances, Newman became even more
desperate.  He embarked on a venture to
suborn some extremely damning perjured
testimony from Dr. Mann's patients.
Sums of money and other consideration
were offered to patients who would
bear false witness that they had sexual
relations with Dr. Mann in exchange for
drugs that Dr. Mann had provided or
prescribed.

8.2.2.8.9.1.     Amanda Virden, a patient of Dr.
Mann's, testified at the ASMB
hearings in June 2003 that she had
been offered $500 by Newman and
confederates to say falsely that
Dr. Mann had had sex with her in

- 33 -

exchange for drugs that Dr. Mann had provided.  PCR/Habeas Exhibit 13.

8.2.2.8.9.2. Other patients, such as Shelly Green (PCR/Habeas Exhibit 14) and Asia Montgomery Wells (PCR/Habeas Exhibit 15) also came forth with how Goodman, Daniels, and John Wade had tried to pursuade them to file false reports against Dr. Mann, in which they would allege that they had had sex with Dr. Mann in exchange for drugs in order to have their pending legal charges expunged.

8.2.2.8.9.3. Brenda Beavers, another patient, swore that Wade had tortiously interfered with Dr. Mann's contractual relations, telling her ex-husband that if he cared about the health of his children's mother, he should be sure she stayed away from Dr. Mann's clinic.  PCR/Habeas Exhibit 16.

8.2.2.8.10. Getting nowhere with their sting operations, Newman and his confederates appeared to have backed down for a while.  Then there was an explosion in West Memphis that injured a popular, powerful physician who had publicly bought some of the attacks on Dr. Mann's practice.  This presented the opportunity Newman and his confederates had been waiting for.

8.2.2.8.11. The ASMB testimony of Amanda Virden and the affidavits of multiple patients that Newman and his confederates had offered money or absolution for past or present crimes as consideration for setting Dr. Mann up for a false prosecution.  The idea that they would pay someone to plant weapons evidence near his home is by no means ridiculous.  Cf. TT:3371.

8.2.2.9.   Before Dr. Mann's trial, Tony Haley and several
other agents of the respondent once again
approached Amanda Virden.  This time they
served her with a subpoena to appear in court
as a prosecution witness.  At the same time,
they told her not under any circumstances to
make an appearance on her own volition.  This
was official interference to keep trial counsel
from contacting her, for fear of the
respondent's agents' prosecuting them for
obstruction of justice.

8.2.2.10.  On information and belief, after Dr. Mann's
trial, his son posted some information about
the case on the Internet; Chris Ridenour--one
of the state or local agents who was a
confederate of Newman's--was confronted
regarding the endeavors to destroy Dr. Mann's
medical career by having Amanda Virden falsely
testify before the ASMB in 2003; Ridenour
nonchalantly and mockingly replied, "Had we
pulled it off back then, he [Dr. Mann] would
not have done the bombing . . . ."

8.2.2.11.  During his incarceration, Dr. Mann made several
attempts under the Freedom of Information Act
to get the ATF to provide him with the details
and specifics of these sting operations.
Despite making four separate requests to their
Washington and Little Rock offices, neither
have they provided him with any information,
nor have they even acknowledged any of Dr.
Mann's requests.

8.2.2.12.  Trial counsel made several attempts before and
during the trial to serve subpoenas on ATF
personnel.  The ATF agents kept dodging the
subpoenas with the process server being unable
to deliver them.  In connection with related
obstruction by the ATF, the Court was even made
aware of this situation and at one time even
went as far as threatening to declare a
mistrial if the agents continued to dodge the
subpoenas and not make an appearance as was
required of them.  Nonetheless, the ATF Agents
continued to dodge the subpoenas and as a
result, avoided taking the stand altogether.

- 35 -

Trial counsel did not to push the mistrial
option, and it was not declared.  TT:2587.

8.2.2.13. As a result of local prejudice against Dr.
Mann, he was not allowed to join either of the
firing ranges in the Russellville area.

8.3.   Failure to inform the jury of the way local law-
enforcement had treated Dr. Mann, including its
attempted bribery of Dr. Mann's patients caused
prejudice to Dr. Mann.

8.3.1.   It allowed the prosecution to ridicule the idea
that the ammunition canister had been planted in
the clearing off the cul-de-sac at the end of
Galaxy Lane, when examination of the pictures and
the soil indicate that that was a more likely
explanation than that Dr. Mann had cached the
grenades there in anticipation of the search
warrant which the report of their presence
triggered.  TT:3371.

8.3.2.   It removed from the trial the evidence--of which
Dr. Mann was conscious but the jury was not--that
Dr. Pierce was <u>not</u> the instigator, but a target,
of the attacks on Dr. Mann's ability to continue
practicing medicine.  Presentation of the actual
background of the difficulties Dr. Mann had faced
would have undermined the prosecution-police
team's oft-repeated allegation that Dr. Mann was
fixated on Dr. Pierce, when Dr. Mann had evidence
that <u>others</u> were deceiving or attempting to
deceive the ASBM, of which Dr. Pierce was a
member who usually did not vote because the chair
did not vote except to break a tie.

8.3.3.   Evidence of local prejudice would have explained
why Dr. Mann had purchased property to use as a
shooting range.  Whereas the prosecution-police
team presented this fact as evidence he was
predisposed to violence and therefore guilty on
counts 1 and 2, he had to do so because he was
barred from either of the existing firing ranges
when he sought to join them.

- 36 -

8.3.4.     The Eighth Circuit found that the joinder of all
           of the counts in one trial was improper under
           Fed. R. Crim. P. 8(a).  701 F.3d 274, 289-90.  It
           declined to find that the misjoinder amounted to
           a violation of the <u>Fifth</u> Amendment.  <u>Id.</u> at 290-
           91.

   8.3.4.1.   In doing so, it relied in part on the
              "overwhelming evidence of guilt as to Mann's
              possession of the unregistered grenades."  <u>Id.</u>
              at 291.  Unless there is some exception to the
              laws of physics at the end of Galaxy Lane, that
              perception is founded on separate violations of
              the Due Process Clause of the Fifth Amendment
              and of the Assistance Clause of the Sixth
              Amendment, which it is the office of sections
              2255 and, when necessary, section 2241, to
              correct, with the Suspension Clause of U.S.
              Const. art. I, § 9, hovering over them.  It is
              barefaced bootstrapping to use the planted
              evidence itself as evidence that it was not
              planted.

   8.3.4.2.   It relied on the testimony of Lloyd Hahn.
              Because claims of ineffective assistance of
              counsel cannot normally be raised on direct
              appeal, and direct-appeal counsel were also
              trial counsel, the feet of clay in Hahn's
              testimony were not fully before the Court of
              Appeals.

   8.3.4.3.   It relied on the commonality of lot numbers
              between the ammunition canister that would not
              have fit Rinke's and Kimbell's testimony, and
              two in Dr. Mann's home, which was searched as a
              result of their actions.  Trial counsel <u>did</u>
              establish the dubious nature of this evidence,
              even if admissible in light of the Fourth
              Amendment violation that was overlooked before
              and at trial, as putting the grenades in Dr.
              Mann's possession at any time.  <u>E.g.</u>, TT:3321
              (summarizing testimony).

   8.3.4.4.   That leaves Jeff Kimbrough.  Again, on direct
              appeal--especially <u>this</u> direct appeal--failure
              to investigate the workers who accompanied Mr.
              Kimbrough to the Manns' home was not before the
              tribunal.

8.3.5.  In a footnote, 701 F.3d at 291 n.9, the Eighth Circuit observes that the adjudicated misjoinder infringed on Dr. Mann's right to testify on counts 3-6 when he chose to exercise his right not to testify under the Fifth Amendment as to counts 1 & 2.  The Court of Appeals holds that neither in this Court nor before it had the issue been presented squarely and properly preserved.  Dr. Mann was not pro se.  Like the finding of "overwhelming evidence of guilt", this finding relies on omissions of counsel.

8.3.6.  What the Eighth Circuit did not decide about joinder was whether it operated to deprive him of the effective assistance of counsel.  That, and not the other issues the Court of Appeals had before it, is presented in this ground.

9.  Respondent's custody over Dr. Mann depends on the deprivation of his right to the effective assistance of counsel in violation of the Sixth Amendment that occurred when trial and direct-appeal counsel (who were also trial counsel) failed to raise in this Court and advance on appeal the grievance that the denial of severance prejudiced Dr. Mann by effectively precluding him from testifying on the firearms counts and asserting his right not to testify on the "weapons of mass destruction" counts.

9.1.  Trial counsel attempted to make this point in both tribunals.  Therefore they had no strategic reason for failing to do so effectively.

9.2.  The Eighth Circuit found that the grievance was not clearly presented and adequately documented.  701 F.3d at 291 n.9.  Its footnote establishes both deficient performance and resulting prejudice.

9.3.  In its brief on appeal, the respondent admits that the standard of review under Rule 8(a) is abuse of discretion.  RB:75-76.  By contrast, ineffective assistance of counsel is a mixed question of fact and law, to be determined de novo where, as here, 28 U.S.C. § 2254(d) does not place considerations of federalism between the petitioner and the correct decision.  Once more, the Court of Appeals did not have before it the question that is now before this Court.

10.  Respondent's custody over Dr. Mann depends on the on the
     deprivation of his right to the effective assistance of
     counsel in violation of the Sixth Amendment that occurred
     when trial counsel failed to move to strike the testimony
     of Lloyd Hahn because of its radical internal
     contradictions, his mental incompetence, and the
     respondent's threat of his prosecution and imprisonment at
     his advanced age.

   10.1.  On information and belief, Mr. Hahn had an advanced
          case of prostate cancer and would logically have been
          on pain medications that affect human beings' mental
          processes.

   10.2.  To the extent trial counsel did not have sufficient
          basis for striking the testimony, it was because they
          had not requested a mental examination of Mr. Hahn,
          which is a complementary ground for relief in this
          motion.

   10.3.  Respondent is estopped to argue that Dr. Mann did not
          suffer prejudice from the admission of Lloyd Hahn's
          testimony, because the prosecution-police team relied
          on it in closing argument and on appeal. E.g.,
          TT:3290 & 3366-67; RB:48.

11.  Respondent's custody over Dr. Mann depends on the
     deprivation of his right to the effective assistance of
     counsel in violation of the Sixth Amendment that occurred
     when trial counsel failed to move for a mental examination
     of Lloyd Hahn in light of his admitted memory problems.

   11.1.  On information and belief, Mr. Hahn had an advanced
          case of prostate cancer and would logically have been
          on pain medications that affect human beings' mental
          processes.

   11.2.  Hahn's testimony itself put trial counsel on notice
          that his memory was either intentionally selective
          depending on what the respondent's local agents wanted
          him to say if they would keep him out of prison or the
          product of dementia or pain-medications or both.

11.2.1.   Whereas the former was in fact demonstrated by
their crossexamination, the latter is amenable to
scientific demonstration that would not have
involved rolling the dice to the extent a
lawyer's unassisted argument did and eventually
failed.

11.2.2.   Retention of an expert and advocacy for an
examination would have assisted the Court and
jury in assessing the worth of Hahn's testimony
in a manner that would have benefitted Dr. Mann
and served the purpose of truthfinding at the
same time.

11.3.   Dr. Mann suffered prejudice from allowing Lloyd Hahn
to testify against him because his testimony, if
believed, linked him however marginally to the
possible possession of MK3A2 nonlethal grenades as
well as to possession of the M406 40-mm. grenades in
the ammunition canister as well as other regulatory
counts.

12.   Respondent's custody over Dr. Mann depends on the
respondent's failure to produce exculpatory evidence in
violation of the Due Process Clause of the Fifth Amendment
or, in the alternative, the deprivation of his right to the
effective assistance of counsel in violation of the Sixth
Amendment, that occurred the prosecution-police team did
not disclose to the defense any evidence that they had
tested these grenades (or in arguing that they were live in
reckless disregard for the truth), and when trial counsel
failed to seek independent forensic testing of the M406 40-
mm. high-explosive grenades.

12.1.   Without testing, one cannot say whether they were
        operative, or inert--as are, on information and
        belief, thousands sold at gun shows.  This applies to
        the prosecution-police team as well as to the defense
        team, i.e., whether they could represent to the media,
        Court, and jury (in that order, of course) that the
        grenades actually came within the act criminalizing
        their unregistered possession.  Prosecution witnesses
        testified that some of the M406 grenades in the
        ammunition canister were "live" because of the color
        of paint on the outside.  E.g., TT:1098.  At TT:1168,
        one policeman's testimony makes it clear that in
        searching Dr. Mann's home, he, too, defined "live" by
        the color on the outside rather than the operability
        of the grenade.  At TT:1279-80, the prosecution-police
        team tendered, and the defense team accepted, a
        stipulation that called 98 rounds "live" based on the
        paint on the outside.  That only distinguished the
        questioned (or ought-to-have-been-questioned) grenades
        from the test grenades.

12.2.   Even the prosecution-police witness who was best able
        to assess the operability of the questioned or ought-
        to-have-been-questioned grenades, Stephen Shelley,
        declared the "live" M406 grenades "live" based on an
        x-ray showing that they contained a fragmentation
        ball.  TT:1312-13.  That distinguished them from the
        practice rounds; but it did not prove they were
        operational instances of the "live" species of M406
        40-mm. high-explosive grenades.  One can put lipstick
        on a pig, but it's still a pig.

12.3.   If the question were not whether to keep Dr. Mann in
        prison, but whether to send these grenades to our
        troops in the Middle East, no one would blink an eye
        at testing them first.

12.4.   Failure to test these grenades for their potency
        caused prejudice to Dr. Mann.

12.4.1.    Failure to test allowed prosecution witnesses to
           speculate that these grenades were dangerous to
           the public in the place where Rinke and Kimbell
           said they found them.  If one believes that Dr.
           Mann or the phantom jogger from West Memphis put
           these grenades in the clearing off the cul-de-sac
           at the end of Galaxy Lane in London, Arkansas,
           this speculation created prejudice to Dr. Mann
           over and above whether the alleged possession of
           the grenades was a statutory offense.

12.4.2.    Whether a firearm is operable goes both to the
           actus reus and the mens rea of a charge under 26
           U.S.C. § 5861(d).

12.4.3.    Failure to test allowed these objects, regardless
           of their true source, to be the basis of a
           separate count as well as the predicate for the
           initial search of Dr. Mann's home.

12.4.4.    Until closing argument, trial counsel appear to
           have taken at face value the paint on the grenade
           as satisfying an element of the offense in count
           3, rather than subjecting to the adversarial
           testing the Sixth Amendment guarantees an entity
           with far greater potential for violence and evil
           than any individual malefactor or combination of
           them.

12.4.5.    In closing argument, trial counsel argued that
           the prosecution-police team should have tested
           the grenade launchers.  TT:3322.  The question
           applies equally to the grenades themselves,
           except to the extent Shelley made sure the paint
           jobs were accurate; but it also applies to the
           defense team.  There was no downside, because as
           to both articles, the courtroom simply assumed
           the worse for Dr. Mann.

12.4.6.    In a case relying entirely on circumstantial
           evidence, absence of forensic testing of critical
           objects takes on more importance than it would
           when there had been an eyewitness, an admissible
           confession, or forensic evidence linking the
           accused to the actus reus of the offense as there
           was not here.

13.  Respondent's custody over Dr. Mann depends on the on the
     deprivation of his right to the effective assistance of
     counsel in violation of the Sixth Amendment that occurred
     when trial counsel failed to obtain independent forensic
     testing of the M203 40-mm. grenade launchers to determine
     whether they had ever fired a live round.

   13.1.   The prosecution relied from Day One or at least Day
           Two on the premise that Dr. Mann possessed grenade
           launchers capable of firing the M406 40-mm. high-
           explosive grenades.  Yet Dr. Mann possessed a wide
           variety of firearms.  Possession of any given weapon
           did not mean that it had ever been fired or ever would
           be before Dr. Mann sold it.  Possession of common
           military hardware like a grenade launcher was
           therefore not evidence of possession of grenades it
           was capable of launching.  Federal law does not
           require that if one possesses a weapon, one also
           possess the ammunition it can fire.  If it did, there
           would have been many more counts against Dr. Mann for
           the weapons for which he did not stock ammunition.

   13.2.   Testing of the launchers in Dr. Mann's possession
           would have allowed trial counsel to argue, if the
           testing supported it, that the launchers had never
           been used.  If the results were adverse, then of
           course it would have been reasonable strategy not to
           introduce them.  But simply assuming that the
           launchers had been used because "the Government" said
           Dr. Mann was guilty was not strategy, but failure to
           investigate, when investigation is a prerequisite to
           the exercise of strategic judgment.

   13.3.   In a case relying entirely on circumstantial evidence,
           absence of forensic testing of critical objects takes
           on more importance than it would when there had been
           an eyewitness, an admissible confession, or forensic
           evidence linking the accused to the actus reus of the
           offense as there was not here.

14.  Respondent's custody over Dr. Mann depends on the
     deprivation of his right to the effective assistance of
     counsel in violation of the Sixth Amendment that occurred
     when trial counsel failed to investigate and, if
     appropriate, call the workers who went to Dr. Mann's home
     with Jeff Kimbrough to bring out the weaknesses in his
     testimony regarding what he said he thought he saw in the
     home.

- 43 -

14.1.   Other than the testimony of Hahn, which was internally
        contradictory, plagued by admitted memory problems,
        procured by immunity for his own complicity in the
        alleged liability he sought to create, and--on
        information and belief--addled by lawful prescription
        medication--Kimbrough came as close as the
        prosecution-police team ever did to putting the MK3A2
        grenades in Dr. Mann's possession.  Yet his very
        testimony was questionable as to its content, and
        based on transient opportunity to observe items with
        which the witness was admittedly not familiar.

14.2.   Kimbrough testified that several other men were with
        him at Dr. Mann's home.  Interviewing of them could in
        theory have yielded the same indefinite and
        inconclusive answers which were nonetheless consistent
        with the prosecution's case.  But if even one of these
        workers had had military or Naval experience
        sufficient to have understood what kind of object he
        saw and to rule out a MK3A2, this could have negated
        Kimbrough's testimony as to Dr. Mann's possession of
        the MK3A2's and confirmed the best trial counsel could
        do to undermine the jury's confidence in Hahn without
        a mental examination.

14.3.   Assuming that they testified truthfully, these
        workers' testimony would have impeached that of Mr.
        Kimbrough.  In Dr. Mann's house, there never were any
        millions of dollars' worth of weapons just lying in
        safes with their doors gaping open.  Nor were there
        "large bullets" and grenade-like objects just lying
        around in the home of four children.

14.4.   If a given worker had believed that he saw MK3A2's, or
        would have given the same indefinite and inconclusive
        answers Kimbrough did, then it would have been
        reasonable trial strategy not to have called such a
        witness.  But that does not mean the failure to
        investigate what their testimony would have been was
        strategy, reasonable or otherwise.

14.5.   On this ground the prongs of deficiency and prejudice
        coalesce, in that the failure to interview the workers
        before trial, combined with the passage of time,
        renders moot any argument that their testimony would
        not have helped Dr. Mann, and in any event presumes
        that they would have perjured themselves to avoid
        conflict with their then-employer.

15.   Respondent's custody over Dr. Mann depends on the
      respondent's failure to produce exculpatory evidence in
      violation of the Due Process Clause of the Fifth Amendment
      or, in the alternative, the deprivation of his right to the
      effective assistance of counsel in violation of the Sixth
      Amendment, that occurred when the prosecution did not disclose
      to trial counsel the records of the complaint to the
      Arkansas State Medical Board (ASMB) in relation to Rita
      Barthelme, and when trial counsel failed to investigate the
      circumstances of the complaint to ASMB in relation to Rita
      Barthelme and, if necessary, to subpoena the records of
      ASMB to determine whether Dr. Mann had received any
      indication of the nature and cause of the complaint against
      him before the West Memphis explosion and to determine
      whether her trial testimony was consistent with the
      allegations presented to ASMB in respect to her care by Dr.
      Mann.

   15.1.   Dr. Mann received no notice before the West Memphis
           explosion that would have led him to believe the loss
           of his license was inevitable or even seriously at
           issue.

       15.1.1.   Respondent's counsel knew or should have known
                 that there was no pre-explosion notice, but
                 argued that he must have received it because they
                 had to say that to get him convicted on the
                 evidence they did have.

       15.1.2.   If the prosecution-police team did not violate
                 the Fifth Amendment by failing to disclose
                 evidence that undercut their argument, then trial
                 counsel was constitutionally ineffective for
                 failing to seek the same evidence.

       15.1.3.   Regardless of which set of lawyers was to blame,
                 Dr. Mann was left supine before the prosecution-
                 police team's allegations that he was on notice
                 long enough before the explosion that ASMB had
                 received a complaint which if upheld would result
                 in the loss of his license that he could call in
                 the Nineteenth Hijacker.

15.1.4.   Trial counsel had no strategic reason for not
attempting to disprove the prosecution's
arguments to this effect, but in fact made other
attempts to do so.  TT:1036-39 & 1041
(crossexamination of Rita Barthelme); TT:2912
(defense direct of Peggy Cryer).

15.2.  Rita Barthelme sent Dr. Mann a card indicating that
the federal authorities had coerced her into
testifying as she had.

15.2.1.   Coercion of testimony to convict the latest
person a prosecutor has charged or brought to
trial violates the Due Process Clause of the
Fifth Amendment.

15.2.2.   Failure to disclose evidence of the coercion
violates the Due Process Clause of the Fifth
Amendment.

15.2.3.   Dr. Mann provided the card from Ms. Barthelme or
a copy of it to trial counsel.

15.2.4.   If the prosecution-police team did not violate
the Fifth Amendment by failing to turn over the
evidence of their coercion of Ms. Barthelme, then
trial counsel were constitutionally ineffective
for failing to obtain the complaint regarding Ms.
Barthelme's care by Dr. Mann to determine whether
her testimony was consistent with the averments
of the ASMB complaint and whether her testimony
had been coerced by the prosecution.

16.   Respondent's custody over Dr. Mann depends on the
      deprivation of his right to the effective assistance of
      counsel in violation of the Sixth Amendment that occurred
      when trial counsel failed to pay attention to information
      and ideas from Dr. Mann without investigating or even
      considering them, whether or not such consideration or
      investigation would have yielded the conclusion in every
      instance that anything should have been done in addition to
      or differently from what they did do.  Dr. Mann provided
      information to counsel and requested counsel to act on it
      in respect to several of the foregoing grounds for relief,
      including the pivotal failure to obtain expert evidence of
      the planting of the 40-mm. grenades near his home.  As a
      result of the disparagement of his attempt to communicate
      with counsel, there was a breakdown of the attorney-client
      relationship on which the legal system relies for the
      reliable determination of guilt and punishment.  As a
      result, the prosecution-police team's case was not
      subjected to the crucible of meaningful adversarial testing
      on which the Bill of Rights and our legal culture generally
      relies for the protection of the rights of everyone in this
      Country whether they arrived last week or their ancestors
      came over on the Mayflower.

  16.1.   Simply ignoring the client on matters of fact on which
          he or she is likely to know things that counsel did
          not learn in law school or the prosecution-police team
          would not have found out in their investigation or
          disclosed in discovery or later in presenting their
          case cannot be deemed a strategic judgment.

  16.2.   In one instance after another, some of which Dr. Mann
          sets out as separate grounds for relief, trial counsel
          simply grunted or did nothing at all when the client
          presented facts that put counsel on inquiry regarding
          issues Dr. Mann has had to raise in court for the
          first time in the context of post-conviction relief.

16.2.1.   In respect to hiring an expert to testify on the age and size of the hole, Dr. Mann begged trial counsel to do so, and counsel for Mrs. Mann said that he knew faculty in agriculture who could serve as such, but that it needed to be Dr. Mann's counsel who contacted them.  Trial counsel simply ignored Dr. Mann.  This example is illustrative of this ground and not exhaustive. Dr. Mann will testify that he tried to tell trial counsel various things that he knew and trial counsel didn't, and was rebuffed with grunts and gestures.

16.2.2.   As a second example, Dr. Mann saw that trial counsel received originals or copies of the recordings transcribed in PCR/Exhibit 10.   Trial counsel told Dr. Mann that they would have them transcribed in a more official way than Dr. Mann had done.  They never provided Dr. Mann a copy, and to the best of his knowledge never did as they said.

16.2.3.   Dr. Mann is not in a position to enumerate each and every instance of disparagement because the evidence is embedded in communications that relate to transactions on which he does not challenge the performance of trial and direct-appeal counsel, and to which the attorney-client duty of confidentiality continues to apply.  But he has raised the ground, and additional facts to support it can be presented in a surgical manner in the ensuing litigation of the case.

16.3.   In evaluating the prejudice from trial counsel's disparagement of the client's attempt to provide them information for which they had no other source or at least had not obtained on their own initiative, the Court must consider the totality of prejudice from all of the instances in which it occurred.

- 48 -

16.3.1.   If the recognition of this ground relied on considering the acts and omissions of counsel cumulatively to determine whether the caused prejudice to Dr. Mann, he recognizes that the Eighth Circuit is on the side (with the Fourth, Sixth, and Tenth) of a longstanding split among the circuits on the issue which rejects the concept.  On the other hand, the Second, Seventh, and Ninth recognize the concept, and the Eleventh has recognized the existence of the conflict, deferring to a state supreme court's rejection of the concept under 28 U.S.C. § 2254(d).  Dr. Mann asks the Court to extend, modify, or reverse existing law or to establish new law to consider the errors of counsel in the context of the entire proceeding.

16.3.2.   But in fact this ground does not depend on a concept of cumulative deficiency or cumulative prejudice.  It is a multifaceted ground of disparagement of the client as a source of information leading a breakdown of the attorney-client relationship.

17.   Respondent's custody over Dr. Mann depends on the deprivation of his right to the effective assistance of counsel in violation of the Sixth Amendment that occurred when trial counsel failed to seek protective orders against displaying to or playing for the jury gratuitous prejudicial matter, or seeking appropriate relief even after the fact.

17.1.   The prosecution-police team presented photographs that included, along with historical and other exotic firearms, the flags of fallen powers hostile to the United States and especially repugnant to significant numbers of participants in the process because of what those powers did to our ancestors.  Assuming that any display at all would have been unobjectionable, trial counsel took no steps to assure that the use of these pictures was limited to their probative value, to seek a limiting instruction, or to explain them on crossexamination or in closing argument.

17.2.   On information and belief, the prosecution-police team
repeatedly played recordings in which Dr. Mann used a
colloquial term usually regarded as derogatory for gay
men, when the foreman of the jury was a gay man.
Assuming that the recording had any legitimate
probative value, the way it was used at trial went
beyond that value and was an ad hominem appeal to at
least one juror who turned out to be of special
importance and of special regard among his fellow
jurors.

18.   Respondent's custody over Dr. Mann depends on the
deprivation of his rights to due process of law under the
Fifth Amendment and to the effective assistance of counsel
under the Sixth Amendment, in that the prosecution
presented evidence from which the jury could have concluded
that Dr. Pierce's clinic suffered a gross loss of income in
2009 compared with what it made in 2008, without attempting
to show that it suffered a net loss over the same period,
and trial counsel failed to preserve and explain their
disagreement with the prosecution-police accountant's
conclusions or to present expert evidence to counter her
testimony.

18.1.   The prosecution's proof did not satisfy an element of
the offense under the relevant statute and therefore
did not clear the constitutional hurdle for
prosecuting what would be state crimes or torts as if
they were federal crimes on the pretext that the
conduct affects interstate and foreign commerce.

18.1.1.   On information and belief, Dr. Pierce's clinic
made more money than it had before the incident
of February 4, 2009, because in 2008 Dr. Pierce's
clinic's gross income was $1,300,000; his salary
was $500,000; and the clinic's net profit was
$800,000 less expenses--whereas in 2009, its
gross income was $1,100,000; the cost of the
volunteer physicians who operated the clinic was
zero; there was an employed physician at a cost
of $150,000, with the effect that it made
$950,000 less expenses besides the employed
physician.

- 50 -

18.1.2.   Although the respondent did not agree with Dr.
Mann's conclusions in either the Eighth Circuit
or the Supreme Court, it did not directly
confront direct-appeal counsel's argument that
the clinic made money after Dr. Pierce's
injuries.  Therefore, the clinic did not suffer a
depletion of assets as opposed to potential
cashflow.  It may be admitted to have had lost
opportunity costs (fewer patients seen, lesser
gross profits, etc.); but as trial and direct-
appeal counsel interpreted the prosecution-police
accountant's answers to their questions on
crossexamination, its assets were not depleted in
light of the accountant's figures at TT:2476-77.

18.1.3.   In addition to compromising Dr. Mann's position
in respect to the constitutional issue of
Commerce Clause jurisdiction, presentation of
inaccurate or misleading evidence of the quantity
of harm caused by the incident of February 4,
2009, inflicted artificial prejudice on Dr. Mann
and predisposed the jury to convict in order that
the otherwise horrific offense would not go
unpunished at least as to someone.

18.2.   Trial counsel failed to refute testimony and exhibits
from which the prosecution argued that Dr. Pierce's
clinic suffered a loss as a result of the incident in
West Memphis with which Dr. Mann was charged with
aiding and abetting.

18.2.1.   Trial counsel did not object to the prosecution
accountant's use of charts and tables she had
prepared in lieu of actual documents reflecting
income, expenses, and other real data.  TT:3114.

18.2.2.   At trial, Dr. Mann's counsel did not question the
accuracy of the numbers and relationships in the
foregoing demonstrative evidence.  TT:3114.

18.2.3.   After losing at trial, the defense team engaged
their own accountant to review the figures from
the other side.  They filed his report under seal
on April 19, 2011, in the context of restitution.
It found flaws in the prosecution-police
accountant's methods and conclusions that went
well beyond the unexplained exchange which took
place on crossexamination.  In light of the
salience of the Commerce Clause issue in
liability on the "weapons of mass destruction"
count for which Dr. Mann is serving a life
sentence, this was like capital trial counsel's
failing to investigate an element of a capital
offense (as opposed to aggravating factor) until
the jury has returned a verdict of guilty in the
first phase of the trial.

18.3.   Trial counsel had no strategic reason for failure to
hold the prosecution to its burden of proof--including
the responsibility of a proponent of evidence to lay a
foundation for it--on the jurisdiction element of
subsection 844(i), which depends on the effect on
interstate and foreign commerce of the underlying act
with which the respondent accused Dr. Mann.

18.3.1.   Both parties were aware from the start that the
nexus to interstate commerce would be an issue as
to the most serious counts against Dr. Mann.

18.3.2.   Under preexisting decisional law, there would be
a question of the quantum of effect the injuries
to Dr. Pierce and the damage to his SUV had on
interstate commerce.

18.3.3.   The Eighth Circuit found that the showing the
prosecution-police team made on this issue
sufficed to support federal jurisdiction.  701
F.3d 274, 296.  Trial and direct-appeal counsel
sought certiorari on the issue, and the Supreme
Court denied the petition.  134 S.Ct. 470.

<u>19.</u>   Respondent's custody over Dr. Mann depends on the
deprivation of his right to the effective assistance of
counsel in violation of the Sixth Amendment that occurred
when in light of all the circumstances, the acts or
omissions throughout this motion were outside the wide
range of professionally competent assistance, with the
effect that on balance Dr. Mann's case did not receive the
adversarial testing the Fifth and Sixth Amendments require
for the deprivation of life, liberty, and property of
persons within the jurisdiction of the United States.

   19.1.   Whereas a previous ground for relief seeks cumulative
ineffective assistance of counsel review only as one
option when the ground is in fact a single,
multifaceted ground for relief, this ground expressly
seeks the Court to adopt a cumulative approach
covering all the foregoing grounds of ineffective
assistance of counsel.

   19.1.1.   In making important business and personal
decisions, reasonable men and women look at all
of the reasons for going one way or the other,
and do not compartmentalize them for the purpose
of reaching a preordained result.

   19.1.2.   Dr. Mann recognizes that the Eighth Circuit is on
the side (with the Fourth, Sixth, and Tenth) of a
longstanding split among the circuits on the
issue which rejects the concept.  On the other
hand, the Second, Seventh, and Ninth recognize
the concept.  The Eleventh has recognized the
existence of the conflict, deferring to a state
supreme court's rejection of the concept under 28
U.S.C. § 2254(d), which does not put that
circuit's imprimatur on rejecting cumulative
analysis but only declines to strike it down.  It
declines in the interests of federalism and
states' rights, which are not present in an
internal federal post-conviction relief
proceeding such as this one.

   19.1.3.   As a matter of fact, it is inevitable that the
Supreme Court will decide this issue to resolve
the conflict among the circuits.  For this reason
Dr. Mann asks the Court to extend, modify, or
reverse existing law or to establish new law to
consider the errors of counsel in the context of
the entire proceeding.

19.2.   Respondent is estopped to argue that the Court should
        balkanize the grounds of ineffective assistance of
        counsel in this case, because it was the prosecution-
        police team that cobbled this case together, opposed
        severance, and instead called on the jury to look at
        the entire picture.  TT:3363.  Qui acceperint gladium
        gladio peribunt.

13.  Is there any ground in this motion that you have <u>not</u>
     presented in some state or federal court?  If so, which
     ground or grounds have not been presented, and state your
     reasons for not presenting them:  Due to the surreptitious
     nature of certain of the constitutional and federal
     statutory or rule-based violations set forth in this
     motion, there are likely to be additional violations that
     Dr. Mann has yet to find sufficient facts to set forth the
     grounds seeking relief for them.  The foregoing grounds
     should be construed to encompass subsidiary claims and
     issues that could not be foreseen or plead in light of the
     lack of compulsory process or other guaranties of
     transparency that have gone back at least to 9/11 in Dr.
     Mann's case.

14.  Have you previously filed any type of petition,
     application, or motion <u>now pending</u> in a federal court
     regarding the conviction that you challenge in this
     petition?  Yes [ ]  No [ √ ]

     If "Yes," state the name and location of the court, the
     docket or case number, the type of proceeding, and the
     issues raised  N/A

15.  Give the name and address, if known, of each attorney who
     represented you in the following stages of the judgment you
     are challenging.

(a)  At preliminary hearing:  N/A (indicted)

(b)  At arraignment and plea:  Jack Lassiter and Erin
     Cassinelli, Lassiter & Cassinelli, 813 West Third Street,
     Little Rock, Arkansas 72201; J. Blake Hendrix, 425 West
     Capitol Avenue, Suite 400, Little Rock, Arkansas 72201;
     John Wesley Hall, Jr.; 1202 Main Street; Suite 210; Little
     Rock, Arkansas 72202-5057; P. Drake Mann, Gill Elrod Ragon
     Owen & Sherman, P.A., Metropolitan Tower; 425 West Capitol
     Avenue; Suite 3801; Little Rock, Arkansas 72201-2413

(c)  At trial:  Jack Lassiter and Erin Cassinelli, Lassiter &
     Cassinelli, 813 West Third Street, Little Rock, Arkansas
     72201; J. Blake Hendrix, 425 West Capitol Avenue, Suite
     400, Little Rock, Arkansas 72201; John Wesley Hall, Jr.;
     1202 Main Street; Suite 210; Little Rock, Arkansas 72202-
     5057

(d)  At sentencing:  Jack Lassiter and Erin Cassinelli, Lassiter
     & Cassinelli, 813 West Third Street, Little Rock, Arkansas
     72201; J. Blake Hendrix, 425 West Capitol Avenue, Suite
     400, Little Rock, Arkansas 72201

(e)  On appeal:  Jack Lassiter and Erin Cassinelli, Lassiter &
     Cassinelli, 813 West Third Street, Little Rock, Arkansas
     72201; J. Blake Hendrix, 425 West Capitol Avenue, Suite
     400, Little Rock, Arkansas 72201; certiorari counsel of
     record, P. Drake Mann, Gill Elrod Ragon Owen & Sherman,
     P.A., Metropolitan Tower; 425 West Capitol Avenue; Suite
     3801; Little Rock, Arkansas 72201-2413

(f)  In any post-conviction proceeding:  John William Simon,
     Constitutional Advocacy LLC, 7201 Delmar Blvd. # 201, St.
     Louis, Missouri 63136-4106 (this proceeding)

     (g)  On appeal from any adverse ruling in a post-conviction
          proceeding:  N/A (proceeding pending in this Court)


16.  Were you sentenced on more than one count of an indictment,
     or on more than one indictment, in the same court and at
     the same time?  Yes [ √ ]   No [ ]

17.  Do you have any future sentence to serve after you complete
     the sentence imposed by the judgment you are challenging? √
     Yes [ ]  No  [ √ ]

     (a)  If so, give name and location of court which imposed
          sentence to be served in the future:

          N/A

     (b)  Give date of other sentence that was imposed:

          N/A

     (c)  Give length of other sentence:

          N/A

- 55 -

(d)   Have you filed, or do you contemplate filing any
      motion, petition, or application attacking the
      judgment which imposed the sentence to be served in
      the future?

      Yes  [  ]  No  [  ]  N/A

18.  TIMELINESS OF PETITION:  If your judgment of conviction
     became final over one year ago, you must explain why the
     one-year statute of limitations as contained in 28 U.S.C.
     § 2255 does not bar your motion.*

N/A: My convictions and sentences became final on the denial of
     certiorari from the Eighth Circuit's affirmance of them on
     direct appeal.  That occurred on October 21, 2013.  This
     motion is filed on or before October 21, 2014.  See Fed. R.
     Civ. P. 6(a)(1)(A).  There is therefore no question of its
     timeliness as to the grounds contained in it, or of
     additional facts found in support of those grounds.  28
     U.S.C. § 2255(f)(1).  I reserve the right to amend this
     motion or otherwise to seek additional relief on other and
     further grounds in light of facts discovered in the course
     of litigating this motion, or otherwise on the basis of
     facts that respondent and its agents have concealed, within

---

*The Antiterrorism and Effective Death Penalty Act of 1996
("AEDPA") as contained in 28 U.S.C.§ 2255, paragraph 6, provides
in part that:
          A one-year period of limitation shall apply to a
     motion under this section. The limitation period shall run
     from the latest of —
               (1) the date on which the judgment of conviction
          became final;
               (2) the date on which the impediment to making a
          motion created by governmental action in violation of
          the Constitution or laws of the United States is
          removed, if the movant was prevented from making such
          a motion by such governmental action;
               (3) the date on which the right asserted was
          initially recognized by the Supreme Court, if that
          right has been newly recognized by the Supreme Court
          and made retroactively applicable to cases on
          collateral review; or
               (4) the date on which the facts supporting the
          claim or claims presented could have been discovered
          through the exercise of due diligence.

one year from the discovery of such facts, and for the
other reasons allowed under 28 U.S.C. § 2255(f)(2)-(4)
and/or under the caselaw construing it consistently with
the Suspension Clause, U.S. Const. art. I, § 9, and the Due
Process Clause, U.S. Const. amend. V.

WHEREFORE, the movant prays the Court for its order vacating the judgment of conviction and sentence in the underlying matter, No. 4:09CR00099-01 BSM, and for any other relief to which the movant may be entitled.

Respectfully submitted,

s/John William Simon
JOHN WILLIAM SIMON
Constitutional Advocacy LLC
7201 Delmar Blvd. # 201
St. Louis, Missouri  63130-4106
(314) 604-6982
FAX  (314) 754-9083
simonjw1@yahoo.com

Attorney for Movant/Petitioner

### Declaration of Verification

I declare under penalty of perjury that the foregoing is true and correct.

Executed October 6, 2014

RANDEEP SINGH MANN
Movant/Petitioner

- 58 -

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

RANDEEP SINGH MANN, M.D.,          )
                                   )
          Movant,                  )
                                   )   No. _____
     v.                            )
                                   )   Criminal Case No.
UNITED STATES,                     )     4:09CR00099-01 BSM
                                   )
          Respondent.              )

## TABLE OF EXHIBITS SUBMITTED WITH
## VERIFIED MOTION UNDER 28 U.S.C. § 2255
## TO VACATE, SET ASIDE, OR CORRECT SENTENCE
## BY A PERSON IN FEDERAL CUSTODY

1.   Declaration of Dr. Larry T. West

2.   Declaration of Prof. Frederick W. Spiegel

3.   Declaration of Prof. Ming-Chih Hung

4.   Declaration of William Michael Elkins

5.   Special declaration of Dr. Mann certifying requests and
     accompanying papers to ATF under the Freedom of Information
     Act

6.   Janice Broach, "Special Report: Dr. Ammo", WMC Action News
     5, Memphis, Tennessee, Apr. 28, 2009, available at
     http://www.wmcactionnews5.com/story/10257098/special-
     report-dr-ammo (last visited Oct. 18, 2014)

7.   Press release by U.S. Attorney Jane Duke, January 6, 2010

8.   Affidavit of Hamis Alshareqi executed May 12, 2010

9.   Declaration of Rameshwar Dass

10.  Certified transcripts of five telephone conversations,
     prefaced by foundational declaration by Dr. Mann:

     10.1 Offer of $2500 by Warren Newman to Daisy Edberg, a
          patient of Dr. Mann's, if she would buy a fully-
          automatic firearm from him without proper

documentation, and admission that "Chris" would pay her $250 to say Dr. Mann had given her drugs for sex

10.2 Offer from "Chris" to Dr. Mann's patient Richard Herrera, to get Mr. Herrera "off the hook" if he got Dr. Mann to sell him a fully-automatic firearm

10.3 Offer from "Chris" to Dr. Mann's patient Julie Hernandez to take care of some fines for her if she got Dr. Mann to write a prescription for someone besides her, and admitting that they had been trying to get someone to do something like that but he would not

10.4 Discussion with Dr. Mann's patients David and Patricia Blevins of statements by local law enforcement agents to get Dr. Mann into trouble by getting him to see fully-automatic weapons illegally

10.5 Discussion of inducements offered to Dr. Mann's patient Barry Downs, to attempt to purchasing a fully-automatic firearm from Dr. Mann, in which Mr. Downs indicates that Newman was bragging publicly about how he would confiscate Dr. Mann's property, using Dr. Mann's Dodge Viper "makin' busts in it"

11. Letter from Dr. Mann to Jeff Brzowski, Dec. 5, 2002

12. Transcript of telephone conversation between Dr. Mann and Bill Bryant

13. Transcript of testimony of Amanda Virden before Arkansas State Medical Board, Oct. 2, 2003

14. Affidavit of Shelly Green

15. Affidavit of Asia Montgomery

16. Affidavit of Brenda Beavers

Respectfully submitted,

JOHN WILLIAM SIMON
Constitutional Advocacy LLC
7201 Delmar Blvd. # 201
St. Louis, Missouri  63130-4106
314-604-6982 FAX 314-754-9083
Attorney for Movant/Petitioner

- 2 -

United States
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 1

## DECLARATION

COMES NOW the declarant, Larry T. West, PH.D., and as authorized by 28 U.S.C.

§ 1746, states and declares under penalty of perjury all as follows:

1.      My name is Larry T. West.

2.      I reside in Washington County, Arkansas.

3.      I am of legal age and of sound mind and body.

4.      In 1973 I graduated from the University of Arkansas with a Bachelor of Science

in Agriculture, majoring in Agronomy (Soil Science).

5.      In 1978 I earned a Master of Science degree in Soil Science from the University

of Arkansas.

6.      In 1986 I earned a Ph.D. in Soil Science from Texas A&M University.

7.      My practice as a Soil Scientist has included the following positions:

    a.      1978 to 1980 — Soil Scientist, USDA Soil Conservation Service in
        Gatesville, Texas

    b.      1981-1986 — Research Associate, Soil and Crop Sciences Department, Texas
        A&M University, College Station, Texas

    c.      1986-1987 — Soil Scientist and Adjunct Assistant Professor, USDA-ARS and
        Agronomy Department, Purdue University, West Lafayette, Indiana

    d.      1993-2008 — Professor (previously Assistant and Associate Professor),
        Department of Crop & Soil Sciences, University of Georgia, Athens, Georgia

    e.      2008-2013 — National Leader for Soil Survey Research and Laboratory,
        USDA-NRCS, National Soil Survey Center, Lincoln, Nebraska

    f.      2013-present — Soil Scientist, Soil Systems LLC, Fayetteville, Arkansas

A more comprehensive listing of my record of experience and public service appears in pages 1-

2 and 13-15 of the accompanying West Declaration Exhibit A.

8.      During the past ten years, I have published 32 journal articles, three chapters in

books, 29 scientific conference abstracts, and ten other research reports.  My publications,

including those earlier than the past ten years, are cited on pages 2-10 of the accompanying West Declaration Exhibit A.

9.      In 1990 I received the Superior Service Award from the USDA. In 1995 I received a Paper Award from the American Society of Agricultural Engineers. Other recognitions are listed on page 12 of the accompanying West Declaration Exhibit A.

10.     I have not offered expert testimony in last four years.

11.     In 2014, I was approached to serve as a consulting expert in a post-conviction relief or habeas corpus action to be filed in federal district court on behalf of Dr. Randeep Singh Mann. In this capacity I am being compensated for my professional time in studying the soil and soil-related evidence in this case at my standard consulting rate of $100 per hour.

12.     I have been provided the following materials specifically relating to Dr. Mann's case:

    a.      Jason Smith still photographs taken on March 3, 2009, in a clearing off a cul-de-sac at the end of Galaxy Lane, in London, Arkansas, subsequently admitted as Government Exhibits 98-A through 98-I at Dr. Mann's criminal trial

    b.      ATF still photographs taken on March 4, 2009, in a clearing off a cul-de-sac at the end of Galaxy Lane, in London, Arkansas

    c.      Video clips dated February 17, 2010, on the menu and created March 22, 2010, according to the directory on the disk containing them, depicting the same clearing as well as other , sites on Milky Way Lane and Galaxy Lane, in London, Arkansas, subsequently admitted as Government Exhibit 101-C at Dr. Mann's criminal trial

    d.      Photographs of the creation of holes at the same clearing in March 2014 that would have in fact accommodated an ammunition canister that Mark Rinke testified that he found in a clearing off a cul-de-sac at the end of Galaxy Lane, in London, Arkansas, on March 3, 2009; the placement of ammunition canisters of the same or similar size to the one introduced at Dr. Mann's criminal trial as Government Exhibit 99-A; placement of the canisters in these holes; and removal of the canisters, together with declarations explaining the process and certifying the accuracy of the pictures

    e.      Photographs of the weathering of holes of a size consistent with placement of Government Exhibit 99-A consistently with Mr. Rinke's testimony, and

showing this weathering and the accumulation of biological data in and around the holes at various points in time, from two days to six days to 91 days after the initial dig, together with affidavits and declarations explaining the process and certifying the accuracy of the pictures

f.　　Weather data from weathersource.com for both National Weather Service stations in the Russellville, Arkansas, area for January-March 2009 and from the Dardanelle weather station for January 1 through March 9, 2014, and precipitation records for 2009-2014 from March 15 through April 16;

13.　　The hole in Government Exhibits 98-C, 98-H & 98-I photographed in 2009 contains a much larger quantity of leaves than the holes of known dimensions created in the same month in 2014. Even after the 2014 holes had been exposed to the elements for three months, they contained fewer new leaves—as opposed to the leaves that were left in them as part of the creation of holes that would accommodate the ammunition canister which was said to have been in the hole in Government Exhibits 98-C, 98-H, and 98-I.

14.　　The leaves in the hole in the latter three exhibits are similar or identical to the ones surrounding the hole. They appear to have fallen into the hole well before the pictures were taken. From this I conclude that the hole was open before the leaves fell.

15.　　Soil that is removed from a hole in the course of creating it is called "spoil".

16.　　There appears to be soil surrounding Government Exhibits 98-C, 98-H, and 98-I that came out of the hole when it was created. It is relatively smooth. In the main it is not cloddy. It appears to have been walked on or rained on for some time.

17.　　By contrast, the spoil from either of the holes of known depth and volume is greater in quantity than the material around the hole in Government Exhibits 98-C, 98-H, and 98-I which I assume to be spoil. Either the latter hole is smaller, or the assumed spoil has been spread around.

18.　　The material close to the holes in Government Exhibits 98-C, 98-H, and 98-I that I assume to be the spoil from the hole is tan to brown in color. The only noticeable red soil in

- 3 -

the foregoing exhibits is on the far right periphery of Government Exhibit 98-I. This is a distance from the hole identified as the one where the object had been retrieved the same day. I cannot say from the exhibit that the reddish material was spoil from the hole at the center of the exhibit.

19.    By contrast, the spoil from the holes of known depth and volume is red clay soil.

20.    At least at the location where the pictures were taken, red soil starts at a depth of three or four, or possibly five, inches.

21.     For the foregoing reasons, it is my opinion, to a reasonable degree of scientific certainty, that the hole pictured in Government Exhibits 98-A, 98-B, 98-C, 98-H & 98-I, and in Government Exhibit 101-C (part two), was not a freshly dug hole.

22.     I was not contacted about Dr. Mann's case until 2014. If I had been consulted in 2009 or 2010, and presented with the same or substantially the same data, the opinions I would have expressed would have been the same as I have expressed in this document.

23.     In 2009-10 I was employed by the USDA, and would have required to obtain permission to give evidence then. Whether or not this federal agency chose to allow me to give the evidence, the evidence would have been the same as it is in this document. Based on the facts reflected in the data of the hole pictured in the 2009 exhibits, and the applicable principles of soil science, it is my opinion that any person with the same or similar education and experience would have given the same opinion if agents of the federal government had not allowed me to give it.

Further, the declarant saith naught.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: *October 15, 2014*

_____

LARRY T. WEST
Ph.D. in Soil Science
Soil Systems LLC
Fayetteville, Arkansas

**Larry T. West**

Soil Systems LLC
3640 Monte Vallo Mnr
Fayetteville, AR 72764
479-225-8201
larrywestar@gmail.com

**Educational Background:**

B.S.A., Agronomy (Soil Science), University of Arkansas, 1973
M.S., Soil Science, University of Arkansas, 1978
Ph.D., Soil Science, Texas A&M University, 1986

**Professional Employment:**

| | |
|---|---|
| 2013-present | Soil Scientist, Soil Systems LLC; Fayetteville, AR |
| 2008-2013 | National Leader for Soil Survey Research and Laboratory, USDA-NRCS, National Soil Survey Center, Lincoln, NE |
| 1998-2008 | Professor, Department of Crop & Soil Sciences, University of Georgia, Athens, GA |
| 1993-1998 | Associate Professor, Department of Crop & Soil Sciences, University of Georgia, Athens, GA |
| 1988-1993 | Assistant Professor, Department of Crop & Soil Sciences, University of Georgia, Athens, GA |
| 1986-1987 | Soil Scientist and Adjunct Assistant Professor, USDA-ARS and Agronomy Department, Purdue University, West Lafayette, IN |
| 1981-1986 | Research Associate, Soil and Crop Sciences Department, Texas A&M University, College Station, TX |
| 1980-1981 | Graduate Teaching Assistant, Soil and Crop Sciences Department, Texas A&M University, College Station, TX |
| 1978-1980 | Soil Scientist, USDA-Soil Conservation Service, Gatesville, TX |
| 1973-1978 | Research Assistant, Department of Agronomy, University of Arkansas, Fayetteville, AR |

**Research Interests:**

Landscape distribution of soils and soil properties; effects of soil horizons and properties on landscape redistribution of water; soil suitability and function for wastewater management systems.

**West Declaration Exhibit A**

**Teaching responsibilities** (1988-2007, University of Georgia)**:**

| | |
|---|---|
| Pedology | CRSS 4540/6540 (yearly) |
| Soil Mineralogy | CRSS 8540 (alternant years) |
| Contaminants in Soils (team taught) | CRSS 4510 (yearly, 1993-97) |
| Soil and Site Assessment (team taught) | CRSS 4520 (yearly, 2002-2006) |

**Publications:**

**Chapters in Books**

1.  Rabenhorst, M.C., L.T. West, and L.P. Wilding. 1991. Genesis of calcic and petrocalcic horizons in soils over carbonate rocks. p. 61-74 In W.D. Nettleton (ed.) Occurrence, characteristics, and genesis of carbonate, gypsum, and silica accumulation in soils. Spec. Publ. No. 26, Soil Science Society of America, Madison, WI.

2.  West, L.T., S.C. Chiang, and L.D. Norton. 1992. The morphology of surface crusts. p. 73-92 In M.E. Sumner and B.A. Stewart (eds.) Soil crusting: Chemical and physical processes. Lewis Publishing Co. Chelsea, MI.

3.  West, L. T. and D.D. Bosch. 1997. Scaling and extrapolation of soil degradation assessments. p. 359-376 IN R. Lal, W.H. Blum, and C. Valentin (eds.) Methods for assessment of soil degradation. Advances in Soil Science. CRC Press, Inc. Boca Raton, FL.

4.  West, L.T., F.H. Beinroth, M.E. Sumner, and B.T. Kang. 1997. Ultisols: Characteristics and impacts on society. Advances in Agronomy 63:179-236.

5.  West, L.T., J.N. Shaw, E.R. Blood, and L.K. Kirkman. 1998. Correlation of water tables to redoximorphic features in the Dougherty Plain, southwest Georgia. p. 247-258 IN M.C. Rabenhorst, J.C. Bell, and P.A. McDaniel (eds.) Quantifying soil hydromorphology. Soil Sci. Soc. Am. Spec. Publ. no. 54, SSSA, Madison, WI.

6.  West, L.T. and F.H. Beinroth. 1999. Ultisols. p. E-358-E-372 IN M.E. Sumner (ed.) Handbook of Soil Science. CRC Press, Boca Raton, FL.

7.  Hamiliton-Wood, D.A., L.T. West, and P.A. Schroeder. 2002. Weathering Sequences of Contrasting Mafic and Felsic Parent Materials in the Georgia Piedmont, US. Proc. 17th World Cong. Soil Sci., Aug. 14-21, 2002., Bangkok, Thailand. p. 871-1 - 875-9.

8.  Shaw, J.N. and L.T. West. 2002. Sesquioxides (Fe, Mn, Al, and Si). p. 1192-1196 IN R. Lal (ed.) Encyclopedia of Soil Science. Marcel-Dekker, Inc., New York.

2

9.   West, L.T. 2002. Entisols. p. 391-394 *IN* R. Lal (ed.) Encyclopedia of Soil Science. Marcel-Dekker, Inc., New York.

10.  West, L.T. 2004. Soils and site: Landscape and soil classification for forest management. p. 1216-1223 IN J. Burley, J. Evans, and J. Youngquist (eds.) Encyclopedia of Forest Science. Elsevier, Amsterdam.

11.  West, L.T., J.N. Shaw, and F.H. Beinroth. 2011. Ultisols. IN Yuncong Li and M.E. Sumner (ed.) Handbook of Soil Science. CRC Press, Boca Raton, FL.

12.  Bliss, Norman B., Sharon W. Waltman, Larry T. West, Anne Neale, and Megan Mehaffey. 2014. Distribution of soil organic carbon in the conterminous United States. P. 85-93 IN A.E. Hartemink and K. McSweeney (eds.), Soil Carbon. Progress in Soil Science, Springer International Pub., Switzerland DOI 10.1007/978-3-319-04084-4_9.

**Journal Articles** (past 10 years; 100 total)

1.   Chen, F., D.E. Kissel, L.T. West, D. Rickman, J.C. Luvall, and W. Adkins. 2005. Mapping surface soil organic carbon for crop fields with remote sensing. J. Soil & Water Cons. 60:51-57.

2.   Faucette, L.B., C.F. Jordan, L.M. Risse, M. Cabrera, D.C. Coleman, and L.T. West. 2005. Evaluation of stormwater from compost and conventional erosion control practices in construction activities. J. Soil Water Cons. 60:288-297.

3.   Jackson, C.R., J.K. Martin, D.S. Leigh, and L.T. West. 2005. A Southeastern Piedmont Watershed Sediment Budget; Evidence for a Multi-Millenial Agricultural Legacy. J. Soil Water Cons. 60:298-310.

4.   Radcliffe, D. E., L.T. West, and J. Singer. 2005. Gravel effect on wastewater infiltration from septic system trenches. Soil Sci. Soc. Am. J. 2005 69: 1217-1224.

5.   Chen, F., D.E. Kissel, L.T. West, W. Adkins, D. Rickman, and J.C. Luvall. 2006. Feature selection and similarity analysis of crop fields for mapping organic carbon concentration in soil. Computers and Electronics in Agric. 54:8-21.

6.   Finch, S.D., L.T. West, D.E. Radcliffe, and E.V. Hufstetler. 2007. Thickness and Hydraulic Properties of Drainfield Trench Biomats formed in Georgia Soils. IN On-site wastewater treatment XI. Proc. 11th National Symposium on Individual and Small Community Sewage Systems. October 21-25, 2007, Providence, RI, ASABE, St. Joesph, MI.

3

7.  Franklin, D.H., L.T. West, D.E. Radcliffe, and P.F. Hendrix. 2007. Characteristics and genesis of preferential flow paths in a Piedmont Ultisol. Soil Sci. Soc. Am. J. 71:752-758.

8.  Franklin, D.H., M.L. Cabrera, L.T. West, V.H. Calvert, and J.A. Rema. 2007. Aerating Grasslands: Effects on runoff and phosphorus losses from applied broiler litter. J. Environ. Qual. 36:208-215.

9.  White, W.J., L.A. Morris, A.P. Pinho, C.R. Jackson, and L.T. West. 2007. Sediment Retention by Forested Filter Strips in the Piedmont. J. Soil and Water Cons. 62:453-463.

10. Butler, D.M., D.H. Franklin, M.L. Cabrera, A.S. Tasistro, K. Xia, and L.T. West. 2008. Evaluating aeration techniques for decreasing phosphorus export from grasslands receiving manure. J. Eviron. Q. 37:1279-1287.

11. Chen, F., D.E. Kissel, L.T. West, W. Adkins, W, D. Rickman, and J.C. Luvall. 2008. Mapping soil organic carbon concentration for multiple fields with image similarity analysis. Soil Sci. Soc. Am. J. 72:186-193.

12. Elrashidi, M.A., C.A. Seybold, D.A. Wysocki, S.D. Peaslee, R. Ferguson, and L.T. West. 2008. Phosphorus in runoff from two watersheds in Lost River basin, West Virginia. Soil Sci. 183:792-806.

13. Fimmen, R.L., D.D. Richter, D. Vasudevan, M.A. Williams, and L.T. West. 2008. Rhizogenic Fe-C redox cycling: a hypothetical biogeochemical mechanism that drives crustal weathering in upland soils. Biogeochem. 87:127-141.

14. Finch, S.D., D.E. Radcliffe, and L.T. West. 2008. Modeling trench sidewall and bottom flow in on-site wastewater systems. J. Hydro. Eng. 13:693-701.

15. West, L.T., M.A. Abreu, and J.P. Bishop. 2008. Saturated Hydraulic Conductivity of Soils in the Southern Piedmont of Georgia, USA: Field Evaluation and Relation to Horizon and Landscape Properties. Catena 73:174-179.

16. Elrashidi, M.A., L.T. West, C.A. Seybold, D.A. Wysocki, E.C. Benham, R. Ferguson, S.D. Peaslee. 2009. Nonpoint source of nitrogen contamination from land management practices in Lost River Basin, West Virginia. Soil Sci. 174: 180-192.

17. Radcliffe, D.E., and L.T. West. 2009a. Design Hydraulic Loading Rates for Onsite Wastewater Systems. Vadose Zone J 8:64-74.

4

18.  Radcliffe, D.E. and L.T. West. 2009b. Spreadsheet for converting saturated hydraulic conductivity to long term acceptance rate for on-site wastewater systems. Soil Survey Horizons 50:45-52.

19.  Elrashidi, M.A., L.T. West, C.A. Seybold, E.C. Benham, P.A. Schoeneberger, R. Ferguson. 2010. Effects of Gypsum Addition on Solubility of Nutrients in Soil Amended With Peat. Soil Sci. 175:162-172.

20.  Zhu, X., L.M. Risse, S.C. McCutcheon, E.W. Tollner, T.C. Rasmussen, and L.T. West. 2010. Laboratory Investigation of Rill Erosion on Compost Blankets under Concentrated Flow Conditions. Trans. ASABE 53:1077-1086.

21.  Franklin, D.H., D. M. Butler, M. L. Cabrera, V. H. Calvert, L. T. West and J. A. Rema. 2011. Influence of Aeration Implements, Phosphorus Fertilizers, and Soil Taxa on Phosphorus Losses from Grasslands. J. Environ. Q. 40: 312-319.

22.  Richter., D.deB., A.R. Bacon, M.L. Mobley, C.J. Richardson, S.S. Andrews, L. West, S. Wills, et al. 2011. Human-soil relations are changing rapidly: Proposals from SSSA's cross-divisional soil change working group. Soil Sci. Soc. Am. J. 75:2079-2084.

23.  Bosch, D.D. C.C. Truman, T.L. Potter, L.T. West, T.C. Strickland, and R.K. Hubbard. 2012. Tillage and slope position impact on field-scale hydrologic processes in the South Atlantic Coastal Plain. Agric. Water Man. 111:40-52.

24.  Elrashidi, M.A., L.T. West, and N. Persaud. 2012. Phosphorus Loss and Forms in Runoff from Watersheds in the Great Plains. Soil Sci. 177:638-649.

25.  Elrashidi, M.A., L.T. West, and C. Smith. 2012. Phosphorus Availability and Release Characteristics for Irrigated Cropland in Afghanistan. Soil Sci. 177:251-262.

26.  Herrick, J.E., K.C. Urama, J. Karl, J. Boos, M-V.V. Johnson, K.D. Shepherd, J. Hempel, B.T. Bestelmeyer, J. Davies, J.L. Guerra1, C. Kosnik1, D.W. Kimiti, A. Losinyen, K. Muller, L. Norfleet, N. Ozor, T. Reinsch, J. Sarukhan K., and L.T. West. 2013. The global Land-Potential Knowledge System (LandPKS): supporting evidence-based, site specific land use and management through cloud computing, mobile apps and crowdsourcing. J. Soil and Water Cons. 68:5A-12A. doi:10.2489/jswc.68.1.5A.

27.  Wills, Skye, Cathy Seybold, Joe Chiaretti, Cleiton Sequeira, and Larry West. 2013. Quantifying tacit knowledge about soil organic carbon stocks using soil taxa and official soil series descriptions. Soil Sci. Am. J. doi:10.2136/sssaj2012.0168

5

28.  DeGloria, S.D., J.R. Irons, and L.T. West. 2014. Remote sensing of soils for
environmental assessment and management (Special Issue Forward).
Photogrammetric Eng. & Remote Sensing 80:309-310.

29.  DeGloria, S.D., D.E. Beaudette, J.R. Irons, A. Libohova, P.E. O'Neil, P.R. Owens,
P.J. Schoeneberger, L.T. West, and D.A. Wysocki. 2014. Emergent imaging and
geospatial technologies for soil investigations. Photogrammetric Eng. & Remote
Sensing 80:289-294.

30.  Hartley, P.E., D. R. Presley, M.D. Ransom, G.M. Hattiarachchi, and L.T.West. 2014.
Vertisols and vertic properties of soils of the Cherokee Prairies of Kansas. Soil Sci.
Soc. Am. J. 78:556-566 doi:10.2136/sssaj2013.06.0217

31.  Libohova, Z., J. Doolittle, R. Sims, T. Villars, and L.T. West. 2014. Mapping the
subaqueous soils of Lake Champlain's Missisquoi Bay using ground-penetrating
radar, digital soil mapping, and field measurements. Photogrammetric Eng. &
Remote Sensing 80:323-332.

32.  Sequeira, Cleiton H., Skye A. Wills, Cathy A. Seybold, and Larry T. West. 2014.
Predicting soil bulk density for incomplete databases. Geoderma 213:64–73.

**Bulletins and Reports**

1.  Hallmark, C. T., L. T. West, L. P. Wilding, and L. R. Drees. 1986. Characterization
data for selected Texas soils. MP-1583; Tex. Agric. Exp. Stn., College Station.

2.  Goebel, C.P., B.J. Palik, L.K. Kirkman, and L.T. West. 1997. Landscape ecosystem
types of Ichauway. Tech. Rep. 97-1, J.W. Jones Ecological Research Center at
Ichauway, Newton, GA.

3.  Ainslie, W.B., R.D. Smith, B.A. Pruitt, T.H. Roberts, E.J. Sparks, L.T. West, G.L.
Godshalk, and M.V. Miller. 1999. A regional guidebook for assessing the functions
of low gradient, riverine wetlands in western Kentucky. U.S. Army Corps of
Engineers, Vicksburg, MS.

4.  West, L.T. and L.A. McKinley. 2000. Site evaluation. Bull. 1152-2. Georgia Coop.
Ext. Ser., Athens, GA.

5.  Gaskin, Julia, Brian Kiepper and Larry West. 2007. Understanding Wastewater
Treatment Systems. UGA Cooperative Extension. Available online at
http://pubs.caes.uga.edu/caespubs/pubcd/EB-100/EB-100.htm.

**Scientific Conference Abstracts** (past 10 years, 129 total)

6

1.    Abreu, M.E, and L.T. West. 2005. Evaluation of saturated hydraulic conductivity for soils in the Southern Piedmont in Georgia. ASA, CSSA, SSSA Annual Meeting Abstracts 97.

2.    Shroeder, P.A., and L.T. West. 2005. Weathering profiles developed on granitic and mafic terrains in the area of Elberton, Georgia. Georgia Geologic Society Guidebook. 25:20-37.

3.    West, L.T., D.E. Radcliffe, T. Rasmussen, W. P. Miller, R. Jackson, and L.A. Morris. 2005. Soil science education in Georgia: Expanding the clientele. ASA, CSSA, SSSA Annual Meeting Abstracts 97.

4.    Abreu, M.E, L.T. West, D.E. Radcliffe, and M.L. Cabrera. 2006. Impact of soil structure on saturated hydraulic conductivity in the Piedmont of Georgia, USA. World Congress of Soil Science, Philadelphia, PA.

5.    Bishop, J., M.E. Abreu, and L.T. West. 2006. Evaluation of hydraulic conductivity Piedmont landscapes. Southern Regional Soil Survey Conference, Oklahoma City, OK.

6.    Chen, F., David Kissel, Larry West, Rex Clark, and Wayne Adkins. 2006. Field-Scale Mapping of Soil Organic Carbon with Soil-Landscape Modelling. ASA, CSSA, SSSA Annual Meeting Abstracts 98.Pearson, M., T.G. Reinsch, R. Ferguson, and L. West. 2008. Particle size analysis of gypseous soils. ASA, CSSA, SSSA Annual Meeting Abstracts 99.

7.    Worsham, L., D. Markewitz, N. Nibbelink, and L. West. 2008. A comparison of three landscape sampling methods to estimate soil carbon. ASA, CSSA, SSSA Annual Meeting Abstracts 99.

8.    Beck, J.F., J. Thompson, M. Harman, P. Schoeneberger, L. West, and S. Wills. 2009. Confidence Intervals for Estimated Saturated Hydraulic Conductivity Measured Using Compact Constant Head Permeameters. ASA, CSSA, SSSA Annual Meeting Abstracts 100.

9.    Elrashidi, M. L. West, and S. Peaslee. 2009. Effect of Manure Application On Nitrogen Contamination for Watersheds in West Virginia. ASA, CSSA, SSSA Annual Meeting Abstracts 100.

10.   Hammer, R.D., L. West, M.G. Johnson˙ and C.A. Stiles. 2009. The Roles of Soil Science in Global Climate Change Mitigation and Evaluation of Ecosystem Services. ASA, CSSA, SSSA Annual Meeting Abstracts 100.

11.  Hartley, P, M D. Ransom, D. Presley and L.T. West. 2009. Genesis, Mineralogy, and Micromorphology of Vertic Soils in Southeastern Kansas. ASA, CSSA, SSSA Annual Meeting Abstracts 100.

12.  Johnson, M.G., R. D. Hammer, D.W. Ebert, M. Fillmore, J.S. Noller, and L.T. West. 2009. A Terrain-Attribute Based Approach to Assessing Soil Carbon Sequestration in the Oregon Coast Range Mountains. ASA, CSSA, SSSA Annual Meeting Abstracts 100.

13.  Stiles, C.A. Stiles, R. D. Hammer, R. Ferguson, L. West, P. Jones, K. Newman[1], M.G. Johnson, J.Shaw, J. Arriaga, A. Falen, P. McDaniel, A.T. O'Geen, J.M. Galbraith, and R.J. Miles. 2009. Development and Cooperator Testing of An Active Carbon Field Kit.ASA, CSSA, SSSA Annual Meeting Abstracts 100.

14.  Benham, E., R. Ferguson, M.J. Pearson, and L. West. 2010. A Comparison of Geographically Broad Models for Prediction of Soil Carbonate, Total Carbon, and Gypsum Using VNIR. ASA, CSSA, SSSA Annual Meeting Abstracts 101.

15.  Ferguson, R., E. Benham, M.J. Pearson, and L. West. 2010. A Comparison of Three Light Sources for VNIR Analysis of Soil Samples. ASA, CSSA, SSSA Annual Meeting Abstracts 101.

16.  Stiles, C., L. West, and A. Tugel. 2010. Evaluating Soil Change Using Standardized Dynamic Soil Properties Comparison Projects. ASA, CSSA, SSSA Annual Meeting Abstracts 101.

17.  Franklin, D.H., M. Cabrera, D. Butler, J. Gaskin, L. West, and L.M. Risse. 2011. Integrating Management Into the Georgia P-Index. ASA, CSSA, SSSA Annual Meeting Abstracts 102.

18.  Libohova, Z. R. Ferguson, R. Nesser, N. Odgers, J. Thompson, and L. West. 2011. Soil Reaction Conversions Between ISO and US Soil Survey Methods for GlobalSoilmap.Net Specifications. ASA, CSSA, SSSA Annual Meeting Abstracts 102.

19.  Sequeira, C. E. Benham, R. Ferguson, D. Harms, K. Scheffe, Z. Libohova, S. Monteith, C. Seybold, L. West, and S. Wills. 2011. U.S. Soil Carbon Assessment with VNIR Diffuse Reflectance Spectroscopy. ASA, CSSA, SSSA Annual Meeting Abstracts 102.

20.  Stiles, C. R. Ferguson, P. Jones, and L. West. 2011. Assessing the Accuracy of Permanganate Reactive Carbon Fraction Analysis In High Carbon Content Soils.

21. Waltman, S.W., A.C. Neale, N. Bliss, and L. West. 2011. Soils – A Critical Layer for Estimating Ecosystem Services. ASA, CSSA, SSSA Annual Meeting Abstracts 102.

22. West, L., and C. Rasmussen. 2011. A Pedologist Looks At Sixty. ASA, CSSA, SSSA Annual Meeting Abstracts 102.

23. West, L., S. Waltman, S. Wills, T. Reirsch. E. Benham, R. Ferguson, and C.W. Smith. 2011. U.S. Soil Carbon Stocks Derived From SSURGO and Pedon Data. ASA, CSSA, SSSA Annual Meeting Abstracts 102.

24. Wills, S. L. West, and C. Sequeira. 2011. Sample Design for National Carbon Stock Assessment. ASA, CSSA, SSSA Annual Meeting Abstracts 102.

25. Sequeira, C. S. Wills, C. Seybold, and L. West. 2012. Predicting Soil Bulk Density for Incomplete Databases. ASA, CSSA, SSSA Annual Meeting Abstracts 103.

26. West, L. M. Wilson, and D. Wysocki. 2012. The National Cooperative Soil Survey and Soil Systems Research. ASA, CSSA, SSSA Annual Meeting Abstracts 103.

27. Wills, S., C. Sequeira, L. West, K. Scheffe, E. Benham, R. Ferguson, G. Teachman, and D. Harms. 2012. Initial Summary of Soil Carbon Stocks From the Rapid Assessment of Carbon Project. ASA, CSSA, SSSA Annual Meeting Abstracts 103.

28. Xiong, X., S. Grunwald, D.B. Myers, L. West, W. Harris, N. Comerford. 2012. Characterizing Multi-Scale Variation of Soil Organic Carbon in the United States. ASA, CSSA, SSSA Annual Meeting Abstracts 103.

29. Williams, C., J. Chiaretti, L. West, and D. Harms. 2013. Evaluation of the EPIC Model to Predict Soil Moisture and Temperature Regimes. ASA, CSSA, SSSA Annual Meeting Abstracts 104.

**Book Reviews**

1. West, L.T. 1999. Soil Genesis and Classification - Fourth Edition. J. S.W. Buol, F.D. Hole, R.J. McCracken, and R.J. Southard. J. Environ. Qual. 28:355.

**Other Research Reports** (past 10 years, 23 total)

1. Abreu, M.E, and L.T. West. 2005. Evaluation of permeability estimates for soils in the Southern Piedmont in Georgia. *IN* K.J. Hatcher (ed.) Proc. 2005 Georgia Water Resources Conference, April 25-27, 2005, Athens, GA. University of Georgia, Athens, Georgia.

2.   da Costa. L.M., Guedes, I.M.R., L.A. Morris, L.T.West, and A.P.de Oliveira. 2005. Biogeoghemistry of silica phytoliths in agriculture. p. 23-25 *IN* Proc. III Silicon in Agriculture Conference, Uberlandia, Brazil.

3.   Finch, S.D., L.T. West, and E.V. Hufstetler. 2005. Biomat effects on wastewater infiltration from onsite system dispersal trenches. *IN* K.J. Hatcher (ed.) Proc. 2005 Georgia Water Resources Conference, April 25-27, 2005, Athens, GA. University of Georgia, Athens, Georgia.

4.   Finch, S.D., L.T. West, D.E. Radcliffe, and E.V. Hufstetler. 2005. Hydraulic Properties of drainfield trench biomats formed in Georgia Soils. Proc. National Onsite Wastewater Recyling Association, October 9-13, Cleveland, OH. National Onsite Wastewater Recyling Association, Edgewater, MD.

5.   West, L.T., and D.E. Radcliffe. 2005. The STATSGO database: Simulation modelers as users. Proc. National Cooperative Soil Survey Conference. May 22-25, Corpus Christi, TX. USDA-NRCS, Washington, D.C.

6.   Borden, D., K.A. Payne, and L.T. West. 2006. Management Measures for On-Site Disposal Systems (OSDS). Marine Extension Service, University of Georgia, Athens.

7.   Finch, S.D., and L.T. West. 2006. Biomat effects on wastewater infiltration from onsite system dispersal trenches. *IN* D. Lindbo (ed.) Proc. 22nd Annual On-site Wastewater Treatment Conference: Advances in Systems, Standardization, and Technology, April 24-26, 2006. NC State University, Raleigh.

8.   Radcliffe, D.E., B. Bumback, S. Udvardy, P.G. Hartel, L.T. West, T. Rasmussen. 2006. Scientific basis for bacterial TMDLs in Georgia. University of Georgia and the Georgia Conservancy, Atlanta.

9.   West, L.T., S.W. Waltman, S. Wills, T.G. Reinsch, E.C. Benham, C.S. Smith, and R. Ferguson. 2010. Soil carbon stocks in the U.S.: Current data and future inventories. Proc. of Int. Workshop on Evaluation and Sustainable Management of Soil Carbon Sequestration in Asian Countries. Bogor, Indonesia Sept. 28-29, 2010.

10.  Herrick, J.E., K.C. Urama, J. Karl, J. Boos, M.V.V. Johnson, K.D. Shepherd, J. Hempel, B.T. Bestelmeyer, J. Davies, J.L. Guerra1, C. Kosnik1, D.W. Kimiti, A. Losinyen, K. Muller, L. Norfleet, N. Ozor, T. Reinsch, J. Sarukhan K., and L.T. West. 2013. A Land-Potential Knowledge System (LandPKS) Based on Local and Scientific Knowledge of Land Productivity and Resilience. 2nd UNCCD Scientific Conference, Feb. 2-13.

**Grants Received** – (2002-2007 at University of Georgia)

| Contributions to Soil Judging | | | |
|---|---|---|---|
| | 1989-2007 | Contributions from various groups to support the UGA Soil Judging Team. | $35,000 |
| National Small Flows Clearinghouse | | | |
| | 2001-2007 | On-site demonstration project – Hall County, GA (co-principal investigator, Dr. West's portion - $30,000 | $120,000 |
| | | | |
| USDA-CREES | | | |
| | 2001-2004 | Single Landuse Watersheds for Accurate TMDLs (co-principal investigator, Dr. West's portion - $60,000 | $560,000 |
| | 2006-2007 | Development of a field-scale protocol to measure the long term hydraulic acceptance rate of mature wastewater drainfield systems with varying interface architecture. UGA portion, $3,300. | $15,000 |
| | | | |
| Georgia Department of Human Resources | | | |
| | 2002-2005 | Soil Properties Influencing Performance of On-Site Wastewater Management Systems in Georgia (sole principal investigator) | $114,620 |
| | 2005-2007 | Onsite Wastewater Management Training | $120,000 |
| | 2007-2010 | Evaluation of gravel-filled drainfield trench hydraulics and treatment efficiency | $118,605 |
| | | | |
| Georgia Department of Natural Resources | | | |
| | 2003-2006 | Management measures for on-site disposal programs. Georgia DNR Coastal Management Program. West portion - $10,000. | $63,112 |
| | | | |
| USDA-NRCS | | | |
| | 2003-2006 | Evaluation of Permeability Estimates for Soils in the Southern Piedmont in Georgia. (sole PI) | $64,000 |

11

| | | | |
|---|---|---|---|
| | 2005-2006 | Quantification of Seasonal Saturation and Saturated Hydraulic Conductivity for Selected Soils in MLRA 128 in Georgia. | $9,900 |
| | 2006-2009 | Order 1 soil survey, landscape attributes, management-dependent soil properties, and simulation modeling to predict seasonal saturation of plinthic soils in the Southeastern Coastal Plain | $75,000 |
| | | | |
| Water Environment Research Foundation | | | |
| | 2007-2010 | Development of quantitative tools to determine the expected performance of unit processes in wastewater soil treatment units. UGA portion - $189,614. | $2,000,000 |
| | | | |

## Recognitions and Outstanding Achievements

- 1990      Superior Service Award (group), USDA
- 1990      Outstanding Teacher Award, UGA Agronomy Club
- 1995      Paper Award, American Society of Agricultural Engineers
- 1995      Outstanding Teacher Award, UGA Agronomy Club
- 1995-96 Selected to participate in ESCOP/ACOP Leadership Development Program.
- 2011      Friend of Water Office Award. U.S. EPA.
- 2013      Fellow, Soil Science Society of America

## Supervision of Student Research

While at the University of Georgia, Dr. West served as major advisor on nine graduate student research projects. He served on the graduate committee of 60 students.

## Editorship and Editorial Board Activities

Editor, Soils of the USA, Springer Publishing, 2013-
Editorial Board, Geoderma, 2013-
Guest Editor, Remote Sensing of Soils for Environmental Assessment and Management, Photogrammetric Engineering & Remote Sensing Special Issue, 2012-2014.
Pedology Section Editor, Handbook of Soil Science, 2008-2011
Co-Editor, Minerals and Landscapes, Geoderma Special Issue, 2008-2010
Associate Editor, Soil Survey Horizons 1993-1998
Associate Editor, Soil Science Society of America Journal 1999-2005

**Public Service**

From 1988-2008, Dr. West served as the representative of the Georgia Agricultural Experiment Station to the National Cooperative Soil Survey (NCSS). In this capacity, Dr. West provided laboratory characterization of soils from around the state to insure proper classification and interpretation, participated in quality control reviews of active soil surveys with NRCS personnel, and provided technical information concerning properties and interpretations of soils in Georgia as requested. Dr. West also cooperated with NRCS and Forest Service Soil Scientists in Georgia and from the National Soil Survey Center on special studies of soils in Georgia.

**Workshops and Short Courses**

1. 1995. Field investigations of forest soils for management - Piedmont and Coastal Plain (2 day workshop; West - one of three instructors). Georgia Center for Continuing Education (40 forest managers).

2. 1996. Wetland Delineation Shortcourse. (4 day workshop; West - one of four instructors). Georgia Center of Continuing Education (30 students).

3. 1996. Field investigations of forest soils for management - Piedmont and Blue Ridge Mountains (2 day workshop; West - one of three instructors). Georgia Center for Continuing Education (20 forest managers).

4. 1998. Piedmont Soil Scientist Training Workshop (4 day workshop; West - one of five instructors). USDA-Natural Resources Conservation Service and Department of Crop and Soil Sciences, University of Georgia (65 soil scientists).

5. 2004. Basic and Advanced Hydric Soils (4 day workshop; West was one of three instructors). Georgia Center for Continuing Education (30 participants).

6. 2005. Basic and Advanced Hydric Soils (4 day workshop; West was one of three instructors). Georgia Center for Continuing Education (28 participants).

7. 2006. Basic and Advanced Hydric Soils (4 day workshop; West was one of three instructors). Georgia Center for Continuing Education (29 participants).

8. 2007. Basic and Advanced Hydric Soils (4 day workshop; West was one of three instructors). Georgia Center for Continuing Education (22 participants).

9. 2007. Soils and onsite systems for engineers. Georgia Center for Continuing Education (28 participants).

Between 2000 and 2007, Dr. West organized and was principal instructor in a 5-day lecture and field short course on soils, hydrology, and onsite systems for Georgia Department of Human Resources Environmentalists who regulate onsite system installations in the State. This short course was taught 22 times to over 500 DHR environmentalists.

Dr. West is regularly called upon to present lectures in continuing education sessions for certified crop advisors, soil scientists, engineers, and geologists. He also regularly presents educational sessions on use and maintenance of onsite systems to homeowners and local officials.

### Service to Professional Organizations

#### Professional Society Offices and Committee Assignments

Organizing Committee for VIII International Working Meeting on Soil Micromorphology (S-884), Soil Science Society of America, 1986-1988.

Soil Geomorphology Committee (S-880), Soil Science Society of America, 1990-1993.

Kubiena Award Committee, International Soil Science Society, 1992.

Chairman, Nominating Committee for Sub-commission B, International Soil Science Society, 1992.

Soil Judging Committee, Soil Science Society of America, 1994-1998, Chair 1998.

Soil Micromorphology Committee, Soil Science Society of America, 1994-1998.

Feasibility Committee for U.S. Hosting International Soil Science Congress, Soil Science Society of America, 1995-1997

Chair-elect, Soil Science Society of America, Division S-5, 2001

Chair, Soil Science Society of America, Division S-5, 2002

Soil Geomorphology Committee, 2006-2008; Chair 2008.

### Professional and Honorary Society Memberships

Soil Science Society of America
      Chair, Division S-5, 2002
International Union of Soil Science
Alpha Zeta
Gamma Sigma Delta
Society of Sigma Xi (Associate Member)
AGHON - Honorary Member

United States
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 2

## DECLARATION

COMES NOW the declarant, Frederick W. Spiegel, PH.D., and as authorized by 28

U.S.C. § 1746, states and declares under penalty of perjury all as follows:

1.      My name is Frederick W. Spiegel.

2.      I reside in Washington County, Arkansas.

3.      I am of legal age and of sound mind and body.

4.      I graduated from Drew University, Madison, New Jersey, in 1974, with a B.A.

degree and majors in botany and anthropology.

5.      I earned a PH. D. in Botany from the University of North Carolina–Chapel Hill in

1978, with concentrations in botany and mycology.

6.      I was a post-doctoral fellow at Princeton University from 1978-1980 working on

developmental biology of mycological organisms.

7.      Mycology is the branch of botany that studies fungi, and involves the

decomposition of leaves and other flora in or on the earth, which is one of the principal functions

of fungi.

8.      I have held the following faculty positions teaching biology, botany, and

mycology:

a.      1980-1982 — Visiting Assistant Professor, Department of Botany, Miami
University, Oxford, Ohio

b.      1982-1988 — Assistant Professor, Department of Botany and Microbiology,
University of Arkansas–Fayetteville

c.      1988-1990 — Associate Professor, Department of Botany and Microbiology,
University of Arkansas–Fayetteville

d.      1990-present — Associate Professor, Department of Biological Sciences,
University of Arkansas–Fayetteville

9.     During the past ten years, I have published approximately thirty-six works (with the exact number depending on the date of publications within the calendar year 2004). I have listed my publications in the accompanying Spiegel Declaration Exhibit A.

10.     I have not offered expert testimony in last four years.

11.     In March 2014, I was approached to serve as a consulting expert in a post-conviction relief or habeas corpus action to be filed in federal district court on behalf of Dr. Randeep Singh Mann. In this capacity I am being compensated for my professional time in studying the biological evidence in this case at my standard consulting rate of $200 per hour.

12.     I have been provided the following materials specifically relating to Dr. Mann's case:

    a.     Jason Smith still photographs taken on March 3, 2009, in a clearing off a cul-de-sac at the end of Galaxy Lane, in London, Arkansas, subsequently admitted as Government Exhibits 98-A through 98-I at Dr. Mann's criminal trial

    b.     ATF still photographs taken on March 4, 2009, in a clearing off a cul-de-sac at the end of Galaxy Lane, in London, Arkansas

    c.     Video clips dated February 17, 2010, on the menu and created March 22, 2010, according to the directory on the disk containing them, depicting the same clearing as well as other , sites on Milky Way Lane and Galaxy Lane, in London, Arkansas, subsequently admitted as Government Exhibit 101-C at Dr. Mann's criminal trial

    d.     Transcripts of the testimony of Deputy Sheriff Jason Smith, Katherine Barton-Scanlon, Mark Rinke, Ryan Kimbell, and Wayne Henry at Dr. Mann's criminal trial

    e.     Photographs of the creation of holes at the same clearing in March 2014 that would have in fact accommodated an ammunition canister that Mark Rinke testified that he found in a clearing off a cul-de-sac at the end of Galaxy Lane, in London, Arkansas, on March 3, 2009; the placement of ammunition canisters of the same or similar size to the one introduced at Dr. Mann's criminal trial as Government Exhibit 99-A; placement of the canisters in these holes; and removal of the canisters, together with declarations explaining the process and certifying the accuracy of the pictures

    f.     Photographs of the weathering of holes of a size consistent with placement of Government Exhibit 99-A consistently with Mr. Rinke's testimony, and showing this weathering and the accumulation of biological data in and around the holes at

- 2 -

various points in time, from two days to six days to 91 days, together with affidavits explaining the process and certifying the accuracy of the pictures

g.    Weather data from weathersource.com for both National Weather Service stations in the Russellville, Arkansas, area for January-March 2009 and from the Dardanelle weather station for January 1 through March 9, 2014, and precipitation records for 2009-2014 from March 15 through April 16;

h.    Aerial maps from Google Maps showing the location of the clearing off the cul-de-sac relative to Lake Dardanelle, Arkansas One, Dr. Mann's home, and the home closest to the clearing at the end of the cul-de-sac at the end of Galaxy Lane, in London, Arkansas; and

i.    Data on the time of sunset and sunrise in March 2009 in London, Arkansas, from www.SunriseSunset.com

13.    The hole in Government Exhibits 98-A, 98-B, 98-C, 98-H & 98-I appears to have been open to the elements for some time prior to when these images were taken. It does not look like the hole was freshly opened and emptied of a large rectangular canister within the last few hours. It is clearly weathered, more than would be consistent with exposure of the interior of the hole to the elements if it had been dug during the previous few months and then opened in the previous few hours.

14.    The leaves that appear in the hole pictured in the Jason Smith photographs appear to have settled into the hole after it was opened. From the degree of their decomposition, the leaves in and around the hole appear to have fallen the previous autumn and winter. There appears to be no discontinuity among the leaves around the area of the hole photographed by Jason Smith. If the canister had been in the hole for a very long time, the leaves would have been more flattened and fragmented, and they would have be scattered with small bits of soil. Compare the hole photographed by Jason Smith with the known holes before the test canisters were put into them on March 13, 2014, and immediately after the canisters were removed on March 15, 2014. Also, look at the leaves that were in the known holes in June, 2014. Though covered with mud, many of these leaves are intact and unflattened.

- 3 -

15.     The leaves in the hole photographed by Jason Smith have kept their shape reasonably well, *i.e.*, there is not much decomposition of them, nor are they flattened as if they had been under a heavy object and under the surface of the earth for any length of time, even as little as two days based upon the condition of the leaves in the known holes immediately after the test canisters were removed from them on March 15, 2014.

16.     Some of the leaves in the hole appear just flattened and fragmented enough to have been under the weight of the canister for a brief period of well less than two days.

17.     The leaves in the hole in Government Exhibits 98-A though 98-C, Exhibits 98-H & 98-I, and 101-C are substantially less flattened and fragmented—and less likely to have been under the canister—than the leaves in the bottoms of the 2014 holes of known depths for only two days in which weighted canisters had actually been placed in the earth as Mr. Rinke testified that he saw Government Exhibit 99-A.

18.     In ATF Galaxy Lane pictures, "40mm rounds scene 012.jpg" shows an ATF ruler next to a piece of the duct tape that Messrs. Rinke and Kimbell testified they saw on the canister. Assuming the truth of the markings on the ATF ruler, and that the size of neither it nor the duct tape has been distorted in the ATF picture, the piece of duct tape in this picture is approximately 14 cm. long and 4.5 to 5 cm. wide. Thus, the duct tape is about two inches wide.

19.     In the first of the Jason Smith still photographs of the Galaxy Lane scene, later introduced at trial as "Government Exhibit 98-C", there is a leaf with three points, resembling a turkey foot, that is no less than one-third of the way into the hole. It is from a Southern Red Oak tree (*Quecus falcata*, also known as Turkey Foot Oak). It is no more than four inches wide from lobe tip to lobe tip upon comparison with the duct tape in the image. That is in the normal size range for a leaf of that species. Based on the width of this leaf, the hole could be not more than one foot deep, and not necessarily even one foot deep.

- 4 -

20.     For the foregoing reasons, it is my opinion, to a reasonable degree of scientific certainty, that the hole pictured in Government Exhibits 98-A, 98-B, 98-C, 98-H & 98-I, and in Government Exhibit 101-C (part two), was not a freshly dug hole nor a freshly opened hole, but had been created by some means and left open for at least several weeks before these pictures were taken. It would take that amount of time for the layer of leaves in that hole to have blown in and be continuous with the leaves in the surrounding ground litter.

21.     I was not contacted about Dr. Mann's case until 2014. If I had been consulted in 2009 or 2010, and presented with the same or substantially the same data, the opinions I would have expressed would have been the same as I have expressed in this document. I would have been available to give evidence then as I have now.

Further, the declarant saith naught.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:  _14 October, 2014_

FREDERICK W SPIEGEL
Professor
Department of Biological Sciences
SCEN 601
1 University of Arkansas–Fayetteville
Fayetteville, Arkansas 72701

**Frederick W. Spiegel**

Department of Biological Sciences, SCEN 601
1 University of Arkansas
Fayetteville, AR 72701
Phone: 479-575-4248
Email: fspiegel@uark.edu

## (a) Professional Preparation

Drew University, Madison, NJ — Botany and Anthropology — BA, 1974

University of North Carolina, Chapel Hill, NC — Botany — PhD, 1978

Princeton University, Princeton, NJ (postdoc) — Biology — 1978-1980

## (b) Appointments

1982-present:  Assistant Professor (1982-88), Associate Professor (1988-2005), Professor (2005-present), Department of Biological Sciences (Botany and Microbiology, 1982-1990), University of Arkansas, Fayetteville

1980-1982:  Visiting Assistant Professor, Department of Botany, Miami University

1978-1980:  NIH Postdoctoral Fellow, Department of Biology, Princeton University

## (c) Publications

**Spiegel, FW,** LL Shadwick, G Ndiritu, MW Brown, M Aguilar, and JDL Shadwick. 2015 (anticipated). Protosteloid Amoeboazoa (Protosteliids, Protosporangiida, Cavostellida, Schizoplasmodiida, Froactoviteliida, and sporcarpic members of Vanellida, Centramoebida, and Pellitida). In: JM Archibald, AGB Simpson, and C. Slamovits, eds.  Handbook of the Protists (Second Edition of the Handbook of Protoctista by Margulis et al.) Springer Reference Works (e-book)  Manscript with the editors.

Kudryavtsev, A, MW Brown, A Tice, **FW Spiegel.** J Pawlowski, and OR Anderson. 2014. A revision of the order Pellitida Smirnov et al., 2011 (Amoebozoa, Discosea) based on ultrastructural and molecular evidence, with description of *Endostelium cystalliferum*. n. sp. Protist 165:208-229. DOI:10.1016/j.protis.2014.02.003

Zahn, G, SL Stephenson, and **FW Spiegel**. 2014. Ecological distribution of protosteloid amoebae in New Zealand.  PeerJ 2:e296; DOI 10.7717/peerj.296.

de Haan, M, C Cocquyt, A Tice, G Zahn, and **FW Spiegel**. 2014. First records of protosteloid amoebae (Eumycetozoa) from the Democratic Republic of the Congo. Plant Ecology and Evolution 147:85-92. dx.doi.org/10.5091/plecevo.2014.883.

Adl, SM, AGB Simpson, CE Lane, J Lukes, D Bass, SS Bowser, MW Brown, F Burki, M Dunthorn, V Hampl, A Heiss, M Hoppenrath, E Lara, L Le Gall, DH Lynn, H McManus, EAD Mitchell, SE Mozley-Stanridge, LW Parfrey, J Pawlowski, S Rueckert, L Shadwick, CL Schoch, A Smirnov, and **FW Spiegel**. 2012. The Revised Classification of Eukaryotes. J. Eukaryot. Microbiol. 59:429-493

Schnittler, M, YK Novozhilov, E Carvahal, **FW Spiegel**. 2012. Myxomycete diversity in the Tarim basin and eastern Tian-Shan, Xingian Prov., China. Fungal Diversity. In press. DOI 10.1007/s13225-012-0186-5.

Schnittler, M, YK Novozhilov, M Romeralo, M Brown, and **FW Spiegel**. 2012. Myxomycetes and myxomycete-like organisms. In: Frey, W (ed). Engler's Syllabus of Plant Families, Part 1/1, Blue-green algae, myxomycetes and myxomycete-like organisms, Phytoparasitic protists, heterotrophic Heterokontobiota and Fungi p.p. Borntrāger, Stuttgart. Pp. 40-88.

**Spiegel, FW**. 2012. Contemplating the first Plantae. Science 335:809-810. DOI:10.1126/science.1218515. Invited.

Brown, MW, JD Silberman, **FW Spiegel**. 2012. A contemporary evaluation of the acrasids (Acrasidae, Heterolobosea, Excavata). Eur. J. Protistol. 48:103-123.

DOI:10/1016/j.ejop.2011.10.001.

**Spiegel, FW**. 2011. Commentary on the chastity of amoebae: re-evaluating evidence for sex in amoeboid organisms. Proc. R. Soc. B. 278:2096-2097. DOI: 10.1098/rspb.2001.0608. Invited.

Aguilar, M, **FW Spiegel**, C Lado. 2011. Microhabitat and climatic preferences of protosteloid amoebae in a region with a Mediterranean climate. Microb. Ecol. 62:361-373. DOI: 10.1007/s00248-011-9843-6.

Brown, MW, JD Silberman, and **FW Spiegel**. 2011. "Slime molds" among the Tubulinea (Amoebozoa): molecular systematic and taxonomy of *Copromyxa*. Protist 162:277-287. DOI: 10.1016/protist.2010.09.003.

Brown, MW, JD Silberman, and **F.W. Spiegel**. 2010. A morphologically simple species of *Acrasis* (Heterolobosea, Excavata), *Acrasis helenhemmesae* n. sp. J. Eukaryot. Microbiol. 57:346-353. DOI: 10.1111/j.1550-7408.2010.00481.x.

Romeralo, M. **FW Spiegel**, and S Baldauf. 2010. A fully resolved phylogeny of the social amoebas (Dictyostelia) based on combined ncSSU and ITS rDNA sequences. Protist 161:539-548. DOI: 10.1016/j.protist.2009.12.006.

Ndiritu, GN, **FW Spiegel**, and SL Stephenson. 2009. Rapid biodiversity assessment of myxomycetes in two regions of Kenya. Sydowia 61:287-319.

Shadwick. L, **FW Spiegel**, JDLShadwick, MW Brown, and JD Silberman. 2009. *Eumycetozoa=Amoebozoa?*: SSUrDNA Phylogeny of protosteloid slime molds and its significance for the amoebozoan supergroup. PLoS One 4:e6754.

Brown, MW, **FW Spiegel**, JD Silberman. 2009. Phylogeny of the "forgotten" cellular slime mold, *Fonticula alba*, reveals a key evolutionary branch within Opisthokonta. Mol. Biol. and Evol. 26:2699-2709. DOI:10.1093/molbev/msp185.

Shadwick JD, Stephenson and SL,**Spiegel** FW. 2009. Distribution and ecology of protostelids in the Great Smoky Mountains National Park. Mycologia 101:320-328. DOI: 10.3852/08-167.

Ndiritu, GN, **FW Spiegel**, and SL Stephenson. 2009. Distribution and ecology of the assemblages of myxomycetes associated with the major vegetation types in Big Bend National Park, USA. Fungal Ecology 4:168-183. DOI:10.1016/j.funeco.2009.03.002.

Ndiritu, GG, Winsett, KE, **Spiegel**, FW and Stephenson, S.L. 2009. A checklist of African Myxomycetes. Mycotaxon 107:353-356. DOI: 10.5248/107.353.

Ndiritu, GG, Stephenson, SL and **Spiegel** FW 2009. First records and microhabitat assessment of protostelids in the Aberdare Region, Central Kenya. J. Eukaryot. Microbiol. 56:148-158. DOI: 10.1111/j.1550-7408.2008.00382.x.

Brown, MW, **FW Spiegel**, and JD Silberman. 2007. Amoeba at attention – phylogenetic affinity of *Sappinia pedata*. J. Eukaryotic Microbiol. 54:511-519. DOI: 10.1111/j.1550-7408.2007.00292.x

Lindley, LA, SL Stephenson, and **FW Spiegel**. 2007. Protostelids and Myxomycetes isolated from aquatic habitats. Mycologia. 99:504-509.

Aguilar, M, C Lado, and **FW Spiegel**. 2007. Protostelids from deciduous forests: first data from southwestern Europe. Mycol. Res. 111:863-872. DOI: 10.1016/j.mycres.2007.05.010.

Adl, SM, BS Leander, AGB Simpson, JM Archibald, OR Anderson, D Bass, SS Bowser, G Brugerolle, MA Farmer, S. Karpov, M Kolisko, CE Lane, DJ Lodge, DG Mann, R Meisterfeld, L. Mendoza, O. Moestrup, SE Mozley-Standridge, AV

Smirnov, and **F Spiegel**. 2007. Diversity, nomenclature, and taxonomy of protists. Syst. Biol. 56(4):1-6. DOI: 1080/10635150701494127.

**Spiegel, FW,** JD Shadwick, LA Lindley, MW Brown, and G. Nderitu. 2007. A beginner's guide to identifying the protostelids. Available as a pdf on the Eumycetozoan Project website: http://slimemold.uark.edu/Handbook1_3rd.pdf.

Lindley, LA, SM Edwards, and **FW Spiegel**. 2006. Variations in nucleolar morphology in eumycetozoans. Revista Mexicana de Micologia. 23:75-81.

**Spiegel FW**, Shadwick JD, Hemmes DE. 2006. A new ballistosporous species of *Protostelium*. Mycologia 98:144-148.

Tesmer, J, B Rulik, **FW Spiegel**, J Shadwick, and M Schnittler. 2005. Protostelids from German beech forests. Mycological Progress 4:266-271.

Adl, M.S., A.G.B. Simpson, M.A. Farmer, R.A. Andersen, R.O. Andersen, J. Barta, S. Bowser, G. Brugerolle, R. Fensome, S. Fredericq, T.Y. James, S. Karpov, P. Kugrens, J. Krug, C. Lane, L.A. Lewis, J. Lodge, D.H. Lynn, D. Mann, R.M. McCourt, L. Mendoza, O. Moestrup, S.E. Mozeley-Strandridge, T.A. Nerad, C. Shearer, **F. Spiegel**, and M.F.R.J. Taylor. 2005. The new higher level classification of eukaryotes and taxonomy of protists. J. Euk. Microbiol. 52:399-451. DOI:10.1111/j.1550-7408.2005.00053.x.

**Spiegel FW**, Haskins EF, Cavender JC, Landolt JC, Lindley-Settlemyre LA, Edwards SM, Nderitu G, Shadwick JD. 2005. A beginner's guide to isolating and culturing eumycetozoans. Available as a pdf on the Eumycetozoan Project website: http://slimemold.uark.edu/IsoHandbook.pdf.

**Spiegel, F.W.**, J.D. Shadwick, and L. Lindley-Settlemyre. 2005. A beginner's guide to identifying the common protostelids. Revised, May, 2005. Available as a pdf on the Eumycetozoan Project website: http://slimemold.uark.edu/Handbook1.pdf (Better pictures for some species and several new species have been added since the first in 2004.)

**Spiegel, F.W.**, J. D Shadwick, and L. Lindley-Settlemyre. 2004. A beginner's guide to identifying the common protostelids. Available in PDF format from The Eumycetozoan Project Web Site (http://slimemold.uark.edu)

**Spiegel, F.W.**, S.L. Stephenson, H.W. Keller, D.L. Moore, and J.C. Cavender. 2004. Mycetozoans. In: Biodiversity of Fungi, Inventory and Monitoring Methods. (G.M. Mueller, G.F. Bills and M.S. Foster, eds). Elsevier Academic Press, Burlington, MA. 547-576.

Stephenson, S.L., M. Schnittler, C. Lado, A. Estrada-Torres, D. Wrigley-de Basanta, J. C. Landolt, Y.K. Novozhilov, J. Clark, D.L. Moore, and **F.W. Spiegel**. 2004. Studies of neotropical mycetozoans. Syst. Geogr. Pl. 74:87-108.

Swanson, A. R., J.D. Shadwick, D.E. Hemmes, and **F.W. Spiegel**. 2004. Ecological succession of dictyostelid slime molds on the island of Hawai'i. Syst. Geogr. Pl. 74:67-79.

Swanson, A.R., **F.W. Spiegel**, and J.C. Cavender. 2002. Taxonomy, slime molds, and the questions we ask. Mycologia 94:968-979.

Moore, D.L. and **F.W. Spiegel**. 2000. Microhabitat distribution of protostelids in temperate habitats in northwest Arkansas. Can. J. Bot. 78:985-994.

Moore, D.L. and **F.W. Spiegel**. 2000. Microhabitat distribution of protostelids in tropical forests of the Caribbean National Forest, Puerto Rico. Mycologia 92:616-625.

Moore, D.L. and **F.W. Spiegel**. 2000. The effect of season on protostelids communities. Mycologia 92:599-608.

**Spiegel, F.W.** and S.L. Stephenson. 2000. Protostelids of Macquarie Island. Mycologia 92:849-852.

**Spiegel, F.W.**, S.B. Lee, and S.A. Rusk. 1995. Eumycetozoans and molecular systematics. Can. J. Bot.73:s738-s746.

Moore, D.L. and **F.W. Spiegel**. 1995. A new technique for sampling protostelids. Mycologia 87:414-418.

**Spiegel, F. W.**, D.L. Moore, and J. Feldman. 1995. *Tychosporium acutostipes*, a new protostelid which modifies the concept of the Protosteliidae. Mycologia 87:265-270.

Rusk, S., **F.W. Spiegel,** and S.B. Lee. 1995. Design of polymerase chain reaction (PCR) primers for amplifying nuclear ribosomal DNA from slime molds. Mycologia 87:140-143.

**Spiegel, F.W.** 1994. Review of: Nannenga-Bremekamp N.E. (1991): A Guide to the Temperate Myxomycetes. Translated by Feest A. and Burggraaf Y. Biopress Limited, Bristol, 409pp. ISBN 0 948737-12-3. Eur. J. Protistol. 30:126-127.

**Spiegel, F.W.**, S.C. Gecks, and J. Feldman. 1994. Revision of the genus *Protostelium* (Eumycetozoa) I: the *Protostelium mycophaga* group and the *P. irregularis* group. J. Eukaryotic Micro. 41:511-518.

Cisar, C.R., D.O. TeBeest, and **F.W. Spiegel**. 1994. Sequence similarity of mating type idiomorphs: A method which detects similarity among the Sordariaceae fails to detect similar sequences in other filamentous ascomycetes. Mycologia 86:540-546.

Cisar, C.R., **F.W. Spiegel**, D.O. TeBeest, and C. Trout. 1994. Evidence for mating between isolates of *Colletotrichum gloeosporioides* with different host specificities. Current Genetics 25:330-335.

**Spiegel, F.W.** and J. Feldman. 1993. Fruiting body ultrastructure in the protostelid *Schizoplasmodiopsis vulgare*. Mycologia 85:894-897.

Xia, J-Q., F.N. Lee, K.S. Kim, and **F.W. Spiegel**. 1993. Characterization of monoclonal antibodies to conidial antigens of *Pyricularia grisea*. Exper. Mycol. 17:170-181.

**Spiegel, F.W.** 1991. A proposed phylogeny of the protostelids. BioSystems 25:113-120.

**Spiegel, F.W.** and J. Feldman. 1991. Microtubular cytoskeletons of the trophic cells of five eumycetozoans. Protoplasma 63:189-198.

**Spiegel, F.W.** 1990. Phylum plasmodial slime molds, Class Protostelida. In: Handbook of Protoctista. (L. Margulis, J.O. Corliss, M. Melkonian, and D. Chapman, eds.). Jones and Bartlett, Boston. 484-497.

**Spiegel, F.W.** and J. Feldman. 1989. Fruiting body development in the mycetozoan *Echinostelium bisporum*. Can. J. Bot. 67:1285-1283.

Cox. E.C., **F.W. Spiegel**, G. Byrne, J.W. McNally, and L. Eisenbud. 1988. Spatial patterns in the fruiting bodies of the cellular slime mold *Polysphondylium pallidum*. Differentiation 38:73-81.

**Spiegel, F.W.** and J. Feldman. 1988. The trophic cells of *Clastostelium recurvatum*, a third member of the myxomycete-like protostelids. Mycologia 80:525-535.

**Spiegel, F.W.,** J. Feldman, and W.E. Bennett. 1986. Ultrastructure and development of the amoebo-flagellate cells of the protostelid *Protosporangium articulatum*. Protoplasma 132:115-128.

**Spiegel, F.W.** and J. Feldman. 1986. Mitosis in the protostelid *Ceratiomyxella tahitiensis* (Eumycetozoa). Can. J. Bot. 64:932-942.

**Spiegel, F.W.** and J. Feldman. 1985. Obligate amoebae of the protostelids: significance for the concept of Eumycetozoa. BioSystems 18:377-386.

Best, S.C. and **F.W. Spiegel**. 1984. Protostelids and other simple slime molds of Hueston Woods State Park. In: Hueston Woods State Park and Nature Preserve,

Proceedings of Symposium, April 16-18, 1982. (G.E. Willeke, ed.). Miami University, Oxford, OH. 116-121.

**Spiegel, F.W.** 1984. *Protostelium nocturnum*, a new, minute, ballistosporous protostelid. Mycologia 76:443-447.

**Spiegel, F.W.** 1982. Mitosis in the protostelid *Planoprotostelium aurantium*. Protoplasma 113:178-188.

**Spiegel, F.W.** 1982. The ultrastructure of the trophic cells of the protostelid *Planoprotostelium aurantium*. Protoplasma 113:165-177.

**Spiegel, F.W.** 1981. Phylogenetic significance of the flagellar apparatus of *Ceratiomyxa fruticulosa*. J. Elisha Mitchell Sci. Soc. 97:183-189.

**Spiegel, F.W.** 1981. Phylogenetic significance of the flagellar apparatus in protostelids (Eumycetozoa). BioSystems 14:491-499.

**Spiegel, F.W.** and E.C. Cox. 1980. A one-dimensional pattern in the cellular slime mould *Polysphondylium pallidum*. Nature (London) 286:806-807.

**Spiegel, F.W.,** L.S. Olive, and R.M. Brown, Jr. 1979. Roles of actin during sporocarp culmination in the simple mycetozoan *Planoprotostelium aurantium*. Proc. Natl. Acad. Sci. USA 76:2335-2339.

**Spiegel, F.W.** and L.S. Olive. 1978. New evidence for the validity of *Copromyxa protea*. Mycologia 70:843-847.

*Mann v. United States*
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 3

## DECLARATION

COMES NOW the declarant, Ming-Chih Hung, and as authorized by 28 U.S.C. § 1746, states and declares under penalty of perjury all as follows:

1.    My name is Ming-Chih Hung.

2.    I reside in Nodaway County, Missouri.

3.    I am of legal age and of sound mind and body.

4.    In 1993 I graduated from the National Taiwan University, Taipei, Taiwan, with a Bachelor of Science in Geography.

5.    In 1996 I earned a Master of Science in Geography from the University of Utah in Salt Lake City.

6.    In 2003 I earned a PH.D. in Geography from the University of Utah in Salt Lake City.

7.    My professional experience has included the following positions:

    a.    08/2012 – present, Associate Professor, Department of Humanities and Social Sciences, Northwest Missouri State University (NWMSU).

    b.    08/2010 – 08/2012, Associate Professor, Department of Geology/Geography, Northwest Missouri State University (NWMSU)

    c.    08/2003 - 08/2010, Assistant Professor, Department of Geology/Geography, Northwest Missouri State University (NWMSU)

    d.    08/2002 - 05/2003, Instructor, Department of Geography, University of Utah

    e.    09/1996 - 07/2003, GIS analyst, Digitally Integrated Geographic Information Technologies (DIGIT) Laboratory, Department of Geography, University of Utah

    f.    09/1992 - 11/1993, Chief of Software Engineering and Tool-Developing Group, Cartography, Remote Sensing, and Land Use (CRSLU) Laboratory, Department of Geography, National Taiwan University

    g.    02/1991 - 07/1994, Research assistant, Cartography, Remote Sensing, and Land Use Laboratory, Department of Geography, National Taiwan University

8.      During the past ten years, I have published six of the eight articles I have so far published in peer-reviewed journals; nine book chapters, book reviews, or monographs; and nine entries in conference proceedings.  During the same period I have delivered 51 presentations or papers at professional meetings, and received 20 grants or project assignments analogous to publications.  My publications, including those earlier than the past ten years, are cited in the accompanying Hung Declaration Exhibit A.

9.      I am a member of the American Society for Photogrammetry & Remote Sensing (ASPRS).  I served as president of its St. Louis Region from 6/2010 to 6/2011, and in other roles set forth in Hung Declaration Exhibit A.

10.      I specialize in GIScience (Geographic Information Science), including photogrammetry, remote sensing, GIS (Geographic Information System), GPS (Global Positioning System), and Cartography.  In my line of work, I perform visual interpretation, as well as digital image processing, of photos and/or images in order to get useful information, such as classification of land use/cover types, identification of objects, length and area of objects, etc.  When performing visual interpretation of photos, it is important to find "reference object" with known size.

11.      I have not offered expert testimony in last four years.

12.      In 2014, I was approached to serve as a consulting expert in a post-conviction relief or habeas corpus action to be filed in federal district court on behalf of Dr. Randeep Singh Mann.  In this capacity I am being compensated for my professional time in studying the soil and soil-related evidence in this case at a rate of $100 per hour.

13.      I have been provided the following materials specifically relating to Dr. Mann's case:

- 2 -

a.    Jason Smith still photographs taken on March 3, 2009, in a clearing off a cul-de-sac at the end of Galaxy Lane, in London, Arkansas, subsequently admitted as Government Exhibits 98-A through 98-I at Dr. Mann's criminal trial

b.    ATF still photographs taken on March 4, 2009, in a clearing off a cul-de-sac at the end of Galaxy Lane, in London, Arkansas

c.    Photographs of the creation of holes at the same clearing in March 2014 that would have in fact accommodated an ammunition canister which a prosecution witness testified that he found in a clearing off a cul-de-sac at the end of Galaxy Lane, in London, Arkansas, on March 3, 2009; the placement of ammunition canisters of the same or similar size to the one introduced at Dr. Mann's criminal trial as Government Exhibit 99-A; placement of the canisters in these holes; and removal of the canisters, together with declarations explaining the process and certifying the accuracy of the pictures

d.    Photographs of the weathering of holes of a size consistent with placement of Government Exhibit 99-A consistently with prosecution testimony, and showing this weathering and the accumulation of biological data in and around the holes at various points in time, from two days to six days to 91 days after the initial dig, together with affidavits explaining the process and certifying the accuracy of the pictures

e.    Weather data from weathersource.com for both National Weather Service stations in the Russellville, Arkansas, area for January-March 2009 and from the Dardanelle weather station for January 1 through March 9, 2014, and precipitation records for 2009-2014 from March 15 through April 16.

14.    Figure 1 attached to this declaration is a picture disclosed by the prosecution to the defense and labeled as "40mm rounds scene 012.jpg" in the pictures trial counsel provided to Dr. Mann's current counsel, and the latter provided to me. This image is important because I found my reference object (ruler and duct tape).

15.    Figure 2 was also provided to me. It is a zoom-in image of "GE 98-E.jpg". In this image, both reference object and hole are present at the same scene. I drew two red lines (one shorter and the other longer) to assist my calculation on the depth of the hole.

16.    In Figure 1, the duct tape is about 4.5 cm in width.

17.    In Figure 2, the duct tape is about 4.5 cm, also about 55 pixels (shorter red line), meaning one pixel is about 0.082 cm.

18.    The straight line from the top of the hole to the bottom of the hole is about 317 pixels (longer red line), meaning 25.94 cm.

19.    In a right triangle, the hypotenuse is always bigger than two sides.

20.    Therefore the actual depth of the hole cannot exceed 25.94 cm.

21.    25.94 cm is 10.213 inches.

22.    For the foregoing reasons, it is my opinion, to a reasonable degree of scientific certainty, that the depth of the hole pictured in Government Exhibits 98-A, 98-B, 98-C, 98-H & 98-I, and throughout the ATF pictures taken the next day, is no greater than approximately ten inches.

23.    I was not contacted about Dr. Mann's case until 2014. If I had been consulted in 2009 or 2010, and presented with the same or substantially the same data, the opinions I would have expressed would have been the same as I have expressed in this document. I would have been available to give evidence then as I have now.

Further, the declarant saith naught.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: 10/16/2014

MING-CHIH HUNG

- 4 -



Figure 1.  Measure the width of duct tape.



Figure 2.  Measure the depth of the hole.

# Ming-Chih Hung

Geography/Geographic Information Science
Northwest Missouri State University
800 University Drive
Maryville, MO 64468

Phone: (660) 562-1797
Fax: (660) 562-1055
E-mail: mhung@nwmissouri.edu

## Education

Ph.D., Geography, 2003, University of Utah, Salt Lake City, Utah.
M.S., Geography, 1996, University of Utah, Salt Lake City, Utah.
B.S., Geography, 1993, National Taiwan University, Taipei, Taiwan.

## Research Interests

Remote sensing, GIS, GPS, LiDAR, Precision agriculture, Environmental modeling,
GeoVisualization, Land use/land cover analysis, Database design/development, Urban
environments, Urbanization, Physical geography

## Professional Experience

| | |
|---|---|
| 08/12 – | Associate Professor, Department of Humanities and Social Sciences, Northwest Missouri State University (NWMSU). |
| 08/10 – 08/12 | Associate Professor, Department of Geology/Geography, Northwest Missouri State University (NWMSU). |
| 08/03 – 08/10 | Assistant Professor, Department of Geology/Geography, Northwest Missouri State University (NWMSU). |
| 08/02 - 05/03 | Instructor, Department of Geography, University of Utah. |
| 09/96 - 07/03 | GIS analyst, Digitally Integrated Geographic Information Technologies (DIGIT) Laboratory, Department of Geography, University of Utah. |
| 09/92 - 11/93 | Chief of Software Engineering and Tool-Developing Group, Cartography, Remote Sensing, and Land Use (CRSLU) Laboratory, Department of Geography, National Taiwan University. |
| 02/91 - 07/94 | Research Assistant, Cartography, Remote Sensing, and Land Use (CRSLU) Laboratory, Department of Geography, National Taiwan University. |

## Professional Associations

| | |
|---|---|
| 04/10 – 03/11 | Member, Soil and Water Conservation Society (SWCS). |

| 01/09 - present | Member, Missouri Academy of Science (MAS). |
|---|---|
| 01/07 - present | Member, North American Cartographic Information Society (NACIS). |
| 09/06 - present | Gamma Theta Upsilon (GTU, the International Geography Honor Society). |
| 06/05 - present | Member, Urban and Regional Information Systems Association (URISA). |

01/09 - present   Member, Missouri Academy of Science (MAS).
01/07 - present   Member, North American Cartographic Information Society (NACIS).
09/06 - present   Gamma Theta Upsilon (GTU, the International Geography Honor Society).
06/05 - present   Member, Urban and Regional Information Systems Association (URISA).
      Judge, Conference Student Paper Competition, 2007/05 – 2011/11
09/03 - present   Member, Association of American Geographers (AAG).
      Member, Award Committee, Remote Sensing SG, 2011/04 -
      Member, Award Committee, Geography Education SG, 2011/04 -
06/99 - 05/00    Member, International Association for Landscape Ecology (IALE).
10/96 - present   Member, American Society for Photogrammetry & Remote Sensing (ASPRS).
      St. Louis Region (Heartland Region since 2014/03):
        Member, Board of Director, 2005/06 – 2009/06.
        Vice President, President, Past President, 2009/06 – 2012/06
          Region of the Year Award 2011 winner
        Newsletter editor, 2010/06 –
          Region Newsletter of the Year Award 2012 second runner-up
        Chair, Membership Committee, 2011/07 –
        Organizer and judge, Geography Awareness Week poster competition
          Annual event since 2006
        Organizer, judge, and presenter, ASPRS Special Award, Greater Kansas
          City Science and Engineering Fair
          Annual event since 2008
        Organizer, GeoSpatial Scholarship (Lortz GeoSpatial Scholarship since
          2014)
          Annual event since 2011
      National level:
        Deputy Chair, Membership Committee, 2012/04 -

# Awards

| 2013 | Outstanding Reviewer 2012, ASCE (American Society of Civil Engineers). |
|---|---|
| 2011 | Excellence in Research, Department of Geology/Geography, Northwest Missouri State University. |
| 2004 | CITE eAward in recognition of excellence in the use of instructional technology, Northwest Missouri State University, recipients: Hung, M.-C., Corson, M.W., Drews, P.L., Wu, Y.-H., & Haddock, G. |
| 2001 | Horwood Student Critique Prize, Honorable Mention, Urban and Regional Information Systems Association (URISA). |
| 1999 | Spatial Modeler Contest, Third Place, ERDAS, Inc. |

# Publications

## A. Books / Chapters / Reviews / Monographs

Hung, M.-C., 2013, *Using Remote Sensing to Detect Stream Sediment Footprints around Road Crossings*, a final report submitted to US Fish and Wildlife Service (USFWS), 29 pp.

Hung, M.-C., 2013, Book review of "Remote Sensing of Land Use and Land Cover: Principles and Applications" edited by Dr. Chandra Giri in *Photogrammetric Engineering and Remote Sensing*, Vol.79, No.11, pp.989 and 992.

Hung, M.-C., Wu, Y.-H., Patton, J., 2013, *A Pilot Study for an Early Detection and Warning System for Invasive Plants in Aquatic Environments using Remote Sensing*, a final report submitted to US Fish and Wildlife Service (USFWS) and Ohio River Valley Water Sanitation Commission (ORVWSC), 51 pp.

Hung, M.-C., Wu, Y.-H., Patton, J., 2012, *Use of Formosat-2 Satellite Images with High Cross-Track Angle on Detecting Stream Sediment around Road Crossing in Badriver Watershed, WI, USA*, a final report submitted to Formosat-2 Image Application and Distribution Center, National Taiwan University (NTU SAT-2) and Taiwan National Space Organization (NSPO), 16 pp.

Wu, Y.-H. & Hung, M.-C., 2011, Book review of "New Frontiers in Urban Analysis: In Honor of Atsuyuki Okabe" edited by Drs. Yasushi Asami, Yukio Sadahiro, and Toru Ishikawa in *Photogrammetric Engineering and Remote Sensing*, Vol.77, No.2, p.108.

Hung, M.-C., 2010, Book review of "Remote Sensing and GIS Integration: Theories, Methods, and Applications" by Dr. Qihao Weng in *Annals of GIS*, Vol.16, No.4, pp.277-278.

Hung, M.-C., Wu, Y.-H., Patton, J., 2009, *Database Management System and Interface for APEX*, a final report submitted to Blackland Research and Extension Center (BREC), Texas AgriLife Research, Texas A&M University System, 49 pp. (22 pp. for user manual + 27 pp. for final report)

Hung, M.-C., 2009, Book review of "Topographic Mapping" by Dr. John N. Hatzopoulos in *Photogrammetric Engineering and Remote Sensing*, Vol.75, No.1, pp.11-12.

Hung, M.-C., 2006, Current Research and Future Directions in the Application of Remote Sensing to Human Settlements (Ed.), In *Manual of Remote Sensing, 3rd Ed., Vol. 5: Remote Sensing of Human Settlements*, M.K. Ridd and J.D. Hipple, (Ed.), pp.673-712, (Bethesda, Maryland: ASPRS: American Society for Photogrammetry and Remote Sensing, 2006).

## B. Peer-Reviewed Journals

Wu, Y.-H. & Hung, M.-C. & Patton, J., 2014, Development of Database and Graphic User Interface for Farmland Delineation in ArcGIS Environment Based on APEX Requirement, *International Journal of Geoinformatics*, Vol.10, No.3, pp. 31-39.

Wu, Y.-H. & Hung, M.-C. & Patton, J., 2013, Assessment and Visualization of Spatial Interpolation of Soil pH Values in Farmland, *Precision Agriculture*, Vol.14, No.6, pp. 565-585.

Germaine, K. & Hung, M.-C., 2011, Delineation of Impervious Surface from Multispectral Imagery and LiDAR Incorporating Knowledge-Based Expert System Rules, *Photogrammetric Engineering and Remote Sensing*, Vol.77, No.1, pp.75-85.

Wu, Y.-H. & <u>Hung, M.-C.</u>, 2010, Non-Connective Linear Cartograms for Mapping Traffic Conditions, *Cartographic Perspectives*, Vol.65, pp.33-50.

<u>Hung, M.-C.</u>, 2009, Describing Urban Land Covers Using the V-I-S (Vegetation-Impervious Surface-Soil) Model: Modeling Salt Lake City, Utah Metropolitan Area, *Journal of Geographic Research*, Vol.50, pp.67-91.

<u>Hung, M.-C.</u> & Wu, Y.-H., 2005, Mapping and Visualizing the Great Salt Lake Landscape Dynamics Using Multi-Temporal Satellite Images, 1972-1996, *International Journal of Remote Sensing*, Vol.26, No.9, pp.1815-1834.

<u>Hung, M.-C.</u> & Ridd, M.K., 2002, A Sub-pixel Classifier for Urban Land Cover Mapping Based on a Maximum Likelihood Approach and Expert System Rules, *Photogrammetric Engineering and Remote Sensing*, Vol.68, No.11, pp.1173-1180.

Wu, Y.-H. & Miller, H.J. & <u>Hung, M.-C.</u>, 2001, A GIS-Based Decision Support System for Analysis of Route Choice in Congested Urban Road Networks, *Journal of Geographical Systems*, Vol.3, No.1, pp.3-24.

## C. Conference Proceedings

<u>Hung, M.-C.</u>, 2014, Challenges and Opportunities for Online Graduate GIScience Education, *Proceedings of the 2014 International Geographical Conference of Taiwan*, May 24, 2014, Taipei, Taiwan. (invited).

<u>Hung, M.-C.</u> & Drews, P. & Wu, Y.-H., 2011, Admission and Retention in an Online M.S. in GIScience Program, *Proceedings of the Urban and Regional Information Systems Association (URISA) 2011 Annual Conference*, Nov. 1-4, 2011, Indianapolis, IN, USA.

<u>Hung, M.-C.</u> & Duckworth, R.P. & Wu, Y.-H. & Patton, J., 2010, GIS Database Design for APEX Model, *Proceedings of the American Society for Photogrammetry and Remote Sensing (ASPRS) 2010 Annual Conference*, April 26-30, 2010, San Diego, CA, USA.

<u>Hung, M.-C.</u> & Germaine, K., 2008, Delineating Impervious Surfaces Utilizing High-Spatial Resolution Multispectral Imagery and LiDAR Data, *Proceedings of the American Society for Photogrammetry and Remote Sensing (ASPRS) 2008 Annual Conference*, Apr. 28 – May 2, 2008, Portland, OR, USA.

<u>Hung, M.-C.</u> & Wolf, E., 2008, Mapping Cemeteries with Balloon Aerial Photography, *Proceedings of the American Society for Photogrammetry and Remote Sensing (ASPRS) 2008 Annual Conference*, Apr. 28 – May 2, 2008, Portland, OR, USA.

<u>Hung, M.-C.</u>, 2006, Character Maps from Classified Satellite Images, *Proceedings of the American Society for Photogrammetry and Remote Sensing (ASPRS) 2006 Annual Conference*, May 1-5, 2006, Reno, NV, USA.

<u>Hung, M.-C.</u>, 2005, Modeling Urban Land Cover from TM Imagery, *Proceedings of the Urban and Regional Information Systems Association (URISA) 43rd Annual Conference*, Oct. 9-12, 2005, Kansas City, MO, USA.

<u>Hung, M.-C.</u> & Wu, Y.-H., 2005, Time Dependent Shortest Path on Urban Transportation Network, *Proceedings of the Urban and Regional Information Systems Association (URISA) 43rd Annual Conference*, Oct. 9-12, 2005, Kansas City, MO, USA.

<u>Hung, M.-C.</u>, 2005, Remote Sensing for Urban Environmental Modeling, *Proceedings of the American Society for Photogrammetry and Remote Sensing (ASPRS) 2005 Annual Conference*, Mar. 7-11, 2005, Baltimore, MD, USA.

Hung, M.-C., 2004, Subpixel Analysis of Urban Land Cover from TM Imagery, *Proceedings of the American Society for Photogrammetry and Remote Sensing (ASPRS) 2004 Annual Conference*, May 23-28, 2004, Denver, CO, USA.

Hung, M.-C., 2002, Urban Land Cover Analysis from Satellite Images, *Proceedings of the Pecora 15 Conference*, Nov. 10-15, 2002, Denver, CO, USA.

Hung, M.-C., 2001, Using the V-I-S Model to Analyze Urban Environments from TM Imagery, *Proceedings of the Urban and Regional Information Systems Association (URISA) 2001 Annual Conference*, Oct. 20-24, 2001, Long Beach, CA, USA.

Hung, M.-C. & Ridd, M.K., 2001, Development of a Supervised Classifier for Subpixel Remote Sensing, *Proceedings of the IEEE 2001 International Geoscience and Remote Sensing Symposium (IGARSS 2001)*, Vol. 4, pp.1892-1894, Jul. 9-13, 2001, Sydney, NSW, Australia.

Hung, M.-C. & Gault, G. & Wu, Y.-H., 2000, Mapping and Monitoring Great Salt Lake Dynamics 1972 - 1996, *Proceedings of the American Society for Photogrammetry and Remote Sensing (ASPRS) 2000 Annual Conference*, May 22-26, 2000, Washington, DC, USA.

Hung, M.-C. & Ridd, M.K., 2000, Development of a Classifier for TM Images to Extract Component Percentage Information on Urban Areas, *Proceedings of the American Society for Photogrammetry and Remote Sensing (ASPRS) 2000 Annual Conference*, May 22-26, 2000, Washington, DC, USA.

Miller, H.J. & Wu, Y.-H. & Hung, M.-C., 1999, GIS-Based Dynamic Traffic Congestion Modeling to Support Time-Critical Logistics, *Proceedings of the Hawaii International Conference on Systems Science*, Jan. 5-8, 1999, Maui, HI, USA. (peer-reviewed).

Chu, T.H. & Hung, M.-C., 1994, Establishing a Digital Database for 1/50000 Topographic Maps through Scanning, *Proceedings of the 13th Symposium on Survey in Theories and Applications* (in Chinese), Sep. 1994, HsinChu, Taiwan.

Hung, M.-C., 1993, DTM Viewshed Analysis -- Based on Visual Management, *Proceedings of the 12th Symposium on Survey in Theories and Applications* (in Chinese), Sep. 1993, Zhongli, Taiwan.

## D. Conference / Professional Presentations

Hung, M.-C., 2014, Discussant, Joint meeting of MGISAC (Missouri Geographic Information Systems Advisory Council) Education Committee, 4-H Geospatial Program, and MGA (Missouri Geographic Alliance) & K-12 GIS License, Oct. 8, 2014, Columbia, MO, USA. (invited)

Hung, M.-C., 2014, Recent Education and Application Opportunities for GIScience, presented at the Department of Geography Spring 2014 Seminar Series, National Kaohsiung Normal University, Jun. 11, 2014, Kaohsiung, Taiwan. (invited).

Kelp, C. & Hung, M.-C., 2014, MERGEOS: A Pilot Study for Collaborative Mapping and Dynamic GIS Web Application, presented at the American Society for Photogrammetry and Remote Sensing (ASPRS) 2014 Annual Conference and co-located JACIE (Joint Agency Commercial Imagery Evaluation) Workshop, Mar. 23-28, 2014, Louisville, KY, USA.

5

Hung, M.-C. & Wu, Y.-H. & Kegode, G., 2014, Estimating baobab tree size and fruit product rate from Formosat-2 satellite images, presented at the American Society for Photogrammetry and Remote Sensing (ASPRS) 2014 Annual Conference and co-located JACIE (Joint Agency Commercial Imagery Evaluation) Workshop, Mar. 23-28, 2014, Louisville, KY, USA.

Hung, M.-C. & Wu, Y.-H., 2013, Design of an Online Course for Interpretation and Assessment of Images before and after Events, presented at the joint Cartography and Geographic Information Society (CaGIS) / American Society for Photogrammetry and Remote Sensing (ASPRS) 2013 Fall Specialty Conference, Oct. 27-30, 2013, San Antonio, TX, USA.

Hung, M.-C. & Wu, Y.-H., 2013, Land Cover Composition Changes Through Urban Landscape with Different Observation Units, presented at the Association of American Geographers (AAG) 2013 Annual Meeting, Apr. 9-13, 2013, Los Angeles, CA, USA.

Hung, M.-C. & Wu, Y.-H. & Patton, J., 2013, Use of Google Earth Historical Imagery on Dynamics of Aquatic Invasive Plants Along Ohio River, presented at the American Society for Photogrammetry and Remote Sensing (ASPRS) 2013 Annual Conference, Mar. 24-28, 2013, Baltimore, MD, USA.

Hung, M.-C. & Wu, Y.-H. & Patton, J., 2013, Spectral Reflectance of Vegetation from Multispectral Images and Hyperspectral Images, presented at the 14th Biennial State of Missouri GIS (MO-GIS) Conference, Feb. 19-21, 2013, Chesterfield, MO, USA.

Hung, M.-C. & Wu, Y.-H. & Patton, J., 2013, Identifying Mature Baobab Trees from Background Vegetation with Formosat-2 Images, presented at the 14th Biennial State of Missouri GIS (MO-GIS) Conference, Feb. 19-21, 2013, Chesterfield, MO, USA.

Hung, M.-C. & Wu, Y.-H., 2013, Urban V-I-S (Vegetation-Impervious Surface-Soil) Composition with Various Mapping Units, presented at the 14th Biennial State of Missouri GIS (MO-GIS) Conference, Feb. 19-21, 2013, Chesterfield, MO, USA.

Platt, W. & Hung, M.-C., 2013, The Change of Land Cover Composition in Urban Area from 1972-1999, presented at the 14th Biennial State of Missouri GIS (MO-GIS) Conference, Feb. 19-21, 2013, Chesterfield, MO, USA. (Outstanding Student Poster, 3rd Place)

Hung, M.-C. & Gallagher, M., 2012, Detection of Erosion and Sediment Changes near Road/River Crossing in the Bad River Watershed, WI, presented at the 73rd Midwest Fish and Wildlife Conference, Dec. 9-12, 2012, Wichita, KS, USA.

Hung, M.-C. & Thomas, J. & Gallagher, M., 2012, Observation and Detection of Aquatic Invasive Plants in the Racine Pool, Ohio River, presented at the 73rd Midwest Fish and Wildlife Conference, Dec. 9-12, 2012, Wichita, KS, USA.

Hung, M.-C. & Wu, Y.-H. & Patton, J., 2012, Formosat-2 Imagery to Detect Aquatic Invasive Plants along the Ohio River, presented at the American Society for Photogrammetry and Remote Sensing (ASPRS) 2012 Fall Specialty Conference, Oct. 29-Nov. 1, 2012, Tampa, FL, USA.

Hung, M.-C. & Wu, Y.-H. & Patton, J., 2012, High Resolution Imagery to Detect Sediment and Erosion Changes in the Badriver Watershed, WI, presented at the American Society for Photogrammetry and Remote Sensing (ASPRS) 2012 Fall Specialty Conference, Oct. 29-Nov. 1, 2012, Tampa, FL, USA.

Hung, M.-C. & Robinson, A. & Hick, S. & Wilson J., 2012, Online GIS Graduate Programs panel session, presented at the American Society for Photogrammetry and Remote Sensing (ASPRS) 2012 Conference, Mar. 19-23, 2012, Sacramento, CA, USA.

Hung, M.-C. & Wu, Y.-H. & Patton, J., 2012, Monitoring Nitrate Levels in Nodaway County, Missouri, presented at the American Society for Photogrammetry and Remote Sensing (ASPRS) 2012 Conference, Mar. 19-23, 2012, Sacramento, CA, USA.

Hung, M.-C. & Wu, Y.-H. & Rohs, R. & Johnson, A. & Hickey, J. & Pope, J. & Drews, P., 2012, Collaborative Activities between Geology and Geography in Northwest Missouri State University, presented at the Association of American Geographers (AAG) 2012 Annual Meeting, Feb. 24-28, 2012, New York, NY, USA.

Hung, M.-C. & Wu, Y.-H., 2011, Character Maps from Close Range Multispectral Images, presented at the American Society for Photogrammetry and Remote Sensing (ASPRS) 2011 Conference, May 1-5, 2011, Milwaukee, WI, USA.

Hung, M.-C. & Salyer, M., 2011, Remote sensing to examine coal mining impacts to vegetation in Flap Cap, Wise County, Virginia, presented at the Association of American Geographers (AAG) 2011 Annual Meeting, Apr. 12-16, 2011, Seattle, WA, USA.

Swan, E. & Hung, M.-C., 2011, Missouri Atlas of Severe Weather Events, presented at the 13th Biennial State of Missouri GIS (MO-GIS) Conference, Feb. 14-16, 2011, Osage Beach, MO, USA. (Outstanding Student Poster winner)

Karguth, N.J. & Hung, M.-C. & Wu, Y.-H., 2011, Close-Range Multispectral Images and Vegetation Indices, presented at the 13th Biennial State of Missouri GIS (MO-GIS) Conference, Feb. 14-16, 2011, Osage Beach, MO, USA.

Hung, M.-C. & Wu, Y.-H. & Patton, J., 2011, Visualization of Nitrates in Groundwater in Nodaway County, Missouri, presented at the 13th Biennial State of Missouri GIS (MO-GIS) Conference, Feb. 14-16, 2011, Osage Beach, MO, USA.

Hung, M.-C. & Paul, N., 2011, Creating a Multiple Natural Disaster Database with Online Query and Display, presented at the 13th Biennial State of Missouri GIS (MO-GIS) Conference, Feb. 14-16, 2011, Osage Beach, MO, USA.

Hung, M.-C. & Duckworth, R.P. & Wu, Y.-H. & Patton, J., 2010, Farmland Delineation in a GIS Environment with APEX Model, presented at the American Society for Photogrammetry and Remote Sensing (ASPRS) 2010 Fall Specialty Conference, Nov. 15-19, 2010, Orlando, FL, USA.

Hung, M.-C. & Patton, J. & Wu, Y.-H. & Hoffman, D. & Wolfe, J., 2010, Nitrates in Groundwater, A Forty Year Northwest Missouri Assessment, presented at the Soil and Water Conservation Society (SWCS) 2010 Annual Conference, Jul. 18-21, 2010, St. Louis, MO, USA.

DiBiase, D. & Wu, Y.-H. & Hung, M.-C. & Harvey, F. & Wilson, J. & Anderson, S. & Fisher, T. & Drews, P. & Solem, M. & Flewelling, D. & Marshall, W., 2010, Community of Professional Graduate Programs in GIS&T Panel Session, Association of American Geographers (AAG) 2010 Annual Meeting, Apr. 14-18, 2010, Washington, D.C., USA.

Wu, Y.-H. & Duckworth, R.P. & Hung, M.-C. & Patton, J., 2010, Graphic User Interface Design to Integrate GIS and APEX Model, presented at the Association of American Geographers (AAG) 2010 Annual Meeting, Apr. 14-18, 2010, Washington, D.C., USA.

Hung, M.-C. & Royal, K., 2010, Comparisons of Commercial Geospatial Publishing Tools, presented at the Association of American Geographers (AAG) 2010 Annual Meeting, Apr. 14-18, 2010, Washington, D.C., USA.

Wu, Y.-H. & Hung, M.-C. & Chu, T.-H., 2009, High Spatial Resolution Aerial Photos to Assess Subpixel Classification Accuracy of Formosat-2 Image, presented at the Association of

American Geographers (AAG) 105th Annual Meeting, Mar. 22-27, 2009, Las Vegas, NV, USA.

Hung, M.-C. & Wu, Y.-H. & Patton, J.J., 2009, Adaption of Commercial Digital Cameras to Capture Close-Range Multispectral Images, presented at the Association of American Geographers (AAG) 105th Annual Meeting, Mar. 22-27, 2009, Las Vegas, NV, USA.

Hung, M.-C. & Wu, Y.-H. and Patton, J., 2009, Commercial Digital Cameras and Near Infrared Images, presented at 12th Biennial State of Missouri GIS Conference, Feb. 16-18, 2009, Osage Beach, MO, USA.

Wu, Y.-H. & Hung, M.-C., 2009, Changes of Urban Land Cover Composition Through Space and Time from Remote Sensing, presented at 12th Biennial State of Missouri GIS Conference, Feb. 16-18, 2009, Osage Beach, MO, USA.

Wu, Y.-H. & Hung, M.-C., 2009, Modeling Dynamic Traffic Conditions with GIS, presented at 12th Biennial State of Missouri GIS Conference, Feb. 16-18, 2009, Osage Beach, MO, USA.

Duckworth, R. & Hung, M.-C. & Patton, J., 2009, Field Level Hydrology and Terrain Management Assessment Tool, Spring 2009 Seminar Series, Blackland Research and Extension Center, Texas AgriLife Research, Texas A&M University System, Feb. 10, 2009, Temple, TX, USA.

Hung, M.-C., 2008, Detecting Urban Land Cover Composition from Satellite Images, presented at the Center for Space and Remote Sensing Research Spring 2008 Seminar Series, National Central University, May 21, 2008, Zhongli, Taiwan. (invited).

Hung, M.-C., 2008, Detecting Urban Land Cover Composition from Satellite Images, presented at the Department of Computer Science and Information Engineering Spring 2008 Graduate Seminar Series, National Taiwan University of Science and Technology, May 19, 2008, Taipei, Taiwan. (invited).

Patton, J. & Hung, M.-C., 2008, Using Spatial Technologies to Improve Energy Innovation and Environmental Quality in the Rural Midwest, presented to U.S. Senator Bond's Office (R-MO) representative for State Appropriation Funding, May 5, 2008, Maryville, MO, USA. (invited).

Hung, M.-C. & Wu, Y.-H. & Chu, T.-H., 2008, Formosat-2 Image to Estimate Urban Land Cover in Taipei, Taiwan, presented at the Association of American Geographers (AAG) 104th Annual Meeting, Apr. 15-19, 2008, Boston, MA, USA.

Wu, Y.-H. & Hung, M.-C., 2008, A Simple Aerial Photo Database Query Interface to Facilitate Ground Truth Assessment, presented at the Association of American Geographers (AAG) 104th Annual Meeting, Apr. 15-19, 2008, Boston, MA, USA.

Hung, M.-C. & Germaine, K., 2008, Delineating Impervious Surfaces Utilizing High-Spatial Resolution Multispectral Imagery and LiDAR Data, presented at the Kansas City ArcInfo Users Group Meeting, Mar. 11, 2008, Liberty, MO, USA. (invited).

Hung, M.-C. & Wolf, E., 2008, Mapping Cemeteries with Balloon Aerial Photography, presented at the Kansas City ArcInfo Users Group Meeting, Mar. 11, 2008, Liberty, MO, USA. (invited).

Hung, M.-C. & Wu, Y.-H., 2007, Character maps and fieldwork, presented at the North American Cartography Information Society (NACIS) Annual Meeting, Oct. 10 - 13, 2007, St. Louis, MO, USA.

Hung, M.-C., 2007, GIScience on Environmental Problems and Disaster Responses, presented at the Department of Geography Spring 2007 Seminar Series, National Taiwan Normal University, May 9, 2007, Taipei, Taiwan. (invited).

Butterworth, E. & Singh, R. & Backe, K., & Hung, M.-C., 2007, Geographers' Role and Working in Geospatial Interoperability Standards Panel Session, Association of American Geographers (AAG) 103rd Annual Meeting, Apr. 17-21, 2007, San Francisco, CA, USA. (invited).

Hung, M.-C. & Wu, Y.-H. & DiBiase, D. & Drews, P. & Johnson, L. & Phoenix, M. & Wilson, J. & Wright, D. & Wolf, E., 2007, Distance Learning and GIScience Panel Session, Association of American Geographers (AAG) 103rd Annual Meeting, Apr. 17-21, 2007, San Francisco, CA, USA.

Hung, M.-C. & Harper, E., 2007, Web-Based GIS from Commercial Software or Open-Source Software, presented at the Association of American Geographers (AAG) 103rd Annual Meeting, Apr. 17-21, 2007, San Francisco, CA, USA.

Wu, Y.-H. & Hung, M.-C., 2007, Spatial Interpolation of Soil pH Readings from Farmland, presented at the Association of American Geographers (AAG) 103rd Annual Meeting, Apr. 17-21, 2007, San Francisco, CA, USA.

Hung, M.-C., 2006, Use of Character Maps on GPS/Remote Sensing Fieldwork, presented at the Association of American Geographers (AAG) 102nd Annual Meeting, Mar. 7-11, 2006, Chicago, IL, USA.

Hung, M.-C., 2005, TM Imagery for Urban Environmental Modeling, presented at the Association of American Geographers (AAG) 101st Annual Meeting, Apr. 5-9, 2005, Denver, CO, USA.

Wu, Y.-H., & Hung, M.-C., 2005, Dynamic Shortest Path on Urban Transportation Network, presented at the Association of American Geographers (AAG) 101st Annual Meeting, Apr. 5-9, 2005, Denver, CO, USA.

Hung, M.-C., 2004, TM Imagery for Urban Land Cover Analysis, presented at the Association of American Geographers (AAG) 100th Annual Meeting, Mar. 14-19, 2004, Philadelphia, PA, USA.

Hung, M.-C., 2004, Geo-Visualization, presented at the Department of Geology/Geography Spring 2004 Seminar Series, Northwest Missouri State University, Mar. 11, 2004, Maryville, MO, USA. (invited).

Miller, H.J. & Wu, Y.-H. & Hung, M.-C., 2003, A GIS Toolkit for Assessing Vulnerability to Transportation Network Disruption, presented at the Association of American Geographers (AAG) 99th Annual Meeting, Mar. 4-8, 2003, New Orleans, LA, USA.

Hung, M.-C., 2002, Urbanization Analysis from Multi-Temporal TM Imagery, presented at the Utah Geographical Society (UGS) 18th Annual Fall Meeting, Oct. 18, 2002, Salt Lake City, UT, USA. (invited).

Miller, H.J. & Wu, Y.-H. & Hung, M.-C., 2001, GIS-Based Dynamic Transportation Congestion Network Modeling, presented at the 2001 Annual Meeting of the Utah Geographic Information Council (UGIC), Sep. 27-28, 2001, Park City, UT, USA. (invited).

Hung, M.-C. & Wu, Y.-H. & McNeally, P., 2001, Monitoring and Visualizing the Great Salt Lake Water Level and Wetland Areas Using Satellite Images 1972 - 1996, presented at the Automated Geographic Reference Center (AGRC) 2001 Remote Sensing Workshop, Jun. 19, 2001, Salt Lake City, UT, USA. (invited).

Hung, M.-C. & Wu, Y.-H. & Gault, G., 2000, Visualization of Great Salt Lake Dynamics from Satellite Images, presented at the Association of American Geographers (AAG) 96th Annual Meeting, Apr. 4-8, 2000, Pittsburgh, PA, USA.

Wu, Y.-H. & Hung, M.-C., 2000, Visualization of Transportation Network Dynamics, presented at the Association of American Geographers (AAG) 96th Annual Meeting, Apr. 4-8, 2000, Pittsburgh, PA, USA.

Hung, M.-C. & Gault, G., 1999, Visualizing the Dynamic Character of Great Salt Lake, presented at the 1999 Annual Meeting of the Utah Geographic Information Council (UGIC), Sep. 22-24, 1999, Snowbird, UT, USA. (invited).

Hung, M.-C. & Wu, Y.-H., 1999, Visualization of Landscape Change by Remotely Sensed Data, presented at the International Association for Landscape Ecology (IALE) 5th World Congress, Jul. 29 - Aug. 3, 1999, Snowmass, CO, USA.

Ridd, M.K. & Hung, M.-C. & Gluch, R.R., 1999, Modeling the Urban-Rural Gradient through Remote Sensing Using a V-I-S Model, presented at the International Association for Landscape Ecology (IALE) 5th World Congress, Jul. 29 - Aug. 3, 1999, Snowmass, CO, USA.

Miller, H.J. & Wu, Y.-H. & Hung, M.-C., 1998, GIS-Based Dynamic Congestion Modeling: Examples from the Salt Lake Metropolitan Region, presented at The 11th Annual Geographic Information Systems for Transportation Symposium, Apr. 20-22, 1998, Salt Lake City, UT, USA.

## E. Poster Competition Reports / Presentations

Hung, M.-C., 2013 (annual event), Winning Posters from 2013 Geography Awareness Week/GIS Day Poster Competition (sponsored by St. Louis Region, ASPRS and Northwest Missouri State University), presented during the Geography Awareness Week in the Garrett-Strong Science Building, Northwest Missouri State University, Nov. 17-23, 2013, Maryville, MO, USA.
        Nov. 11-17, 2012, Maryville, MO, USA.
        Nov. 13-19, 2011, Maryville, MO, USA.
        Nov. 14-20, 2010, Maryville, MO, USA.
        Nov. 15-21, 2009, Maryville, MO, USA.
        Nov. 16-22, 2008, Maryville, MO, USA.
        Nov. 11-17, 2007, Maryville, MO, USA.
        Nov. 12-18, 2006, Maryville, MO, USA.

Hung, M.-C., 2014 (annual event), Winning Posters from 2014 Geography Awareness Week/GIS Day Poster Competition (sponsored by St. Louis Region, ASPRS and Northwest Missouri State University), presented at the American Society for Photogrammetry and Remote Sensing (ASPRS) 2014 Annual Conference and co-located JACIE (Joint Agency Commercial Imagery Evaluation) Workshop, Mar. 23-28, 2014, Louisville, KY, USA.
        Mar. 24-28, 2013, Baltimore, MD, USA.
        Mar. 19-23, 2012, Sacramento, CA, USA.
        May 1-5, 2011, Milwaukee, WI, USA.
        April 26-30, 2010, San Diego, CA, USA.
        Mar. 8-13, 2009, Baltimore, MD, USA.

Hung, M.-C., 2013 (annual event), Winning Posters from 2012 Geography Awareness Week/GIS
  Day Poster Competition (sponsored by St. Louis Region, ASPRS and Northwest Missouri
  State University), presented at the St. Louis Region, American Society for
  Photogrammetry and Remote Sensing (ASPRS) Annual Regional Meeting/Dinner, Jun. 20,
  2013, St. Louis, MO, USA.
      Jun. 28, 2012, St. Louis, MO, USA.
      Jun. 23, 2011, St. Louis, MO, USA.
      Jun. 17, 2010, St. Louis, MO, USA.
      Jun. 18, 2009, St. Louis, MO, USA.
      Jun. 12, 2008, St. Louis, MO, USA.
      Sep. 6, 2007, St. Louis, MO, USA.

# Teaching Experience

## A. Department of Geology/Geography, Northwest Missouri State University

| | |
|---|---|
| Geog 32-660 | Trends in GIS (online course). |
| Geog 32-650 | GIS Database Design (online course). |
| Geog 32-640 | GIS Customization (online course, developed and taught). |
| Geog 32-601 | GIScience Research Seminar (online course, developed and taught). |
| Geog 32-563-12 | Digital Image Processing (online course, developed and taught). |
| Geog 32-563 | Digital Image Processing (on campus course) |
| Geog 32-562-12 | Digital Cartography and GeoVisualization (online course, developed and taught). |
| Geog 32-562 | Digital Cartography and GeoVisualization (on campus course, developed/revised from 32-562 Advanced Cartography and taught). |
| Geog 32-562 | Advanced Cartography. |
| Geog 32-545 | Principles of GIS (online course). |
| Geog 32-543 | Applications of Remotely Sensed Data (online course, developed and taught). |
| Geog 32-499 | Geography Senior Seminar. |
| Geog 32-465 | Introduction to Customized GIS (developed and taught). |
| Geog 32-365 | Geographic Information Systems. |
| Geog 32-207 | GPS Fundamentals (developed and taught). |
| Geog 32-201 | Maps and Map Interpretation. |
| Geog 32-101 | Introduction to Geography. |

## B. Department of Geography, University of Utah

| | |
|---|---|
| Geog 5160/6160 | Advanced GIS Methods II Laboratory. |
| Geog 3110 | TA, Remote Sensing of the Environment. |
| Geog 1000 | Mountain West Environments. |
| Geog 686 | TA, Seminar on Remote Sensing Research Writing. |

Geog 511          TA, Image Analysis.

## C. Guest Lecture

Recr 45-444        Fal. 14, Outdoor Recreation/Education.
                   Guest lecture: Use of GPS.
                   Department of Health and Human Services, Northwest Missouri State
                        University.
CS 3010301         Sum. 14, Database Systems.
                   Guest lecture: GIS, Graph, and Relational Database Model.
                   Department of Computer Science and Information Engineering, National
                        Taiwan University of Science and Technology.
Recr 45-444        Fal. 13, Outdoor Recreation/Education.
                   Guest lecture: Use of GPS.
                   Department of Health and Human Services, Northwest Missouri State
                        University.
ECI 62-410         Fal. 12, Elementary School Social Studies.
                   Guest lecture: Use of GPS - Geocaching.
                   Department of Professional Education, Northwest Missouri State University.
Recr 45-444        Fal. 12, Outdoor Recreation/Education.
                   Guest lecture: Use of GPS.
                   Department of Health and Human Services, Northwest Missouri State
                        University.
Geog 32-102        Fal. 11, People and Culture.
                   Guest lecture: Use of GPS.
                   Department of Geology/Geography, Northwest Missouri State University.

Geog 32-101        Fal. 11, Introduction to Geography.
                   Guest lecture: Use of GPS.
                   Department of Geology/Geography, Northwest Missouri State University.

Recr 45-444        Fal. 11, Outdoor Recreation/Education.
                   Guest lecture: Use of GPS.
                   Department of Health, Physical Education, Recreation, and Dance, Northwest
                        Missouri State University.
ECI 62-410         Fal. 11, Elementary School Social Studies.
                   Guest lecture: Use of GPS - Geocaching.
                   Department of Education: Curriculum and Instruction, Northwest Missouri State
                        University.
Recr 45-444        Fal. 10, Outdoor Recreation/Education.
                   Guest lecture: Use of GPS.
                   Department of Health, Physical Education, Recreation, and Dance, Northwest
                        Missouri State University.
ECI 62-410         Fal. 10, Elementary School Social Studies.
                   Guest lecture: Use of GPS - Geocaching.

| | |
|---|---|
| | Department of Education: Curriculum and Instruction, Northwest Missouri State University. |
| CS 3010301 | Sum. 10, Database Systems. |
| | Guest lecture: Relational Database and GIS. |
| | Department of Computer Science and Information Engineering, National Taiwan University of Science and Technology. |
| ECI 62-410 | Spr. 10, Elementary School Social Studies. |
| | Guest lecture: Use of GPS - Geocaching. |
| | Department of Education: Curriculum and Instruction, Northwest Missouri State University. |
| ECI 62-410 | Fal. 09, Elementary School Social Studies. (two demos for two sessions). |
| | Guest lecture: Use of GPS - Geocaching. |
| | Department of Education: Curriculum and Instruction, Northwest Missouri State University. |
| Recr 45-444 | Fal. 09, Outdoor Recreation/Education. |
| | Guest lecture: Use of GPS. |
| | Department of Health, Physical Education, Recreation, and Dance, Northwest Missouri State University. |
| ECI 62-410 | Sum. 09, Elementary School Social Studies. |
| | Guest lecture: Use of GPS - Geocaching. |
| | Department of Education: Curriculum and Instruction, Northwest Missouri State University. |
| CS 3010301 | Sum. 09, Database Systems. |
| | Guest lecture: Relational Database and GIS. |
| | Department of Computer Science and Information Engineering, National Taiwan University of Science and Technology. |
| ECI 62-410 | Fal. 08, Elementary School Social Studies. |
| | Guest lecture: Use of GPS - Geocaching. |
| | Department of Education: Curriculum and Instruction, Northwest Missouri State University. |
| Comm 29-225 | Fal. 08, Intercultural Communication. |
| | Guest lecture: Chinese Culture. |
| | Department of Communication, Theatre, and Language, Northwest Missouri State University. |
| Recr 45-444 | Fal. 08, Outdoor Recreation/Education. |
| | Guest lecture: Use of GPS. |
| | Department of Health, Physical Education, Recreation, and Dance, Northwest Missouri State University. |
| CS 3010301 | Sum. 08, Database Systems. |
| | Guest lecture: Relational Database and GIS. |
| | Department of Computer Science and Information Engineering, National Taiwan University of Science and Technology. |
| Comm 29-225 | Fal. 07, Intercultural Communication. |
| | Guest lecture: Chinese Culture. |
| | Department of Communication, Theatre, and Language, Northwest Missouri |

13

|  | State University. |
| Recr 45-444 | Fal. 07, Outdoor Recreation/Education. |
|  | Guest lecture: Use of GPS. |
|  | Department of Health, Physical Education, Recreation, and Dance, Northwest Missouri State University. |
| CS 3010301 | Sum. 07, Database Systems. |
|  | Guest lecture: GIScience on Environmental Problems and Disaster Responses. |
|  | Department of Computer Science and Information Engineering, National Taiwan University of Science and Technology. |
| CS 3010301 | Sum. 06, Database Systems. |
|  | Guest lecture: Geographic Information System and Remote Sensing. |
|  | Department of Computer Science and Information Engineering, National Taiwan University of Science and Technology. |
| Comm 29-225 | Fal. 05, Intercultural Communication. |
|  | Guest lecture: Chinese Culture. |
|  | Department of Communication, Theatre, and Language, Northwest Missouri State University. |
| Comm 29-225 | Spr. 05, Intercultural Communication. |
|  | Guest lecture: Chinese Culture. |
|  | Department of Communication, Theatre, and Language, Northwest Missouri State University. |
| Geog 32-101 | Spr. 05, Introduction to Geography. |
|  | Guest lecture: GIS Overview. |
|  | Department of Geology/Geography, Northwest Missouri State University. |
| Comm 29-225 | Fal. 04, Intercultural Communication. |
|  | Guest lecture: Chinese Culture. |
|  | Department of Communication, Theatre, and Language, Northwest Missouri State University. |
| Agri 03-440 | Fal. 04, Soil Testing and Plant Analysis. |
|  | Guest lecture: GIS Overview. |
|  | Department of Agriculture, Northwest Missouri State University. |
| Geog 32-101 | Fal. 04, Introduction to Geography. |
|  | Guest lecture: GIS Overview. |
|  | Department of Geology/Geography, Northwest Missouri State University. |
| Geog 3140 | Fal. 02, Introduction to GIS. |
|  | Guest lecture: GeoVisualization. |
|  | Department of Geography, University of Utah. |
| Geog 3110 | Fal. 01, Remote Sensing of the Environment. |
|  | Guest lecture: Remote Sensing on Monitoring Great Salt Lake and Wetland. |
|  | Department of Geography, University of Utah. |
| Geog 511 | Fal. 98, Image Analysis. |
|  | Guest lecture: Character Map for Field Trip. |
|  | Department of Geography, University of Utah. |

## Student Supervision

Master's thesis committee chair: 48 (21 finished)
Master's thesis committee member: 52 (25 finished)
Additional Master's comp exam committee member: 2
Graduate student curriculum advisor: 62
Undergraduate major advisor: 21
Undergraduate Research Project: 4
Undergraduate Independent Study: 5
Undergraduate Internship: 2

## Project Experience

Northwest Missouri State University, The Effect of Green Parking Lots on Urban Runoff from Simulated Scenarios on Satellite Images, Principal Investigator, with one other co-PI: Dr. Yi-Hwa Wu (NWMSU), $2,843.00 (2013-2014).

Northwest Missouri State University, A GIS Approach for Finding Ideal Locations for Multiple Radio Towers, Co-Principal Investigator, PI: Dr. Yi-Hwa Wu (NWMSU), $2,825.00 (2012-2014).

U.S. Department of Interior, U.S. Fish and Wildlife Service (USFWS), From Raw Data to Implementation Plan: Using Our Monitoring Data to Drive Specific Habitat Conservation Decisions, Principal Investigator, $10,000.00 (2012-2013).

Northwest Missouri State University, Close-Range Hyperspectral and Multispectral Imagery to Examine the Effects of Shadow on Vegetation NDVI, Co-Principal Investigator, PI: Dr. Jamie Patton, and one other co-PI: Dr. Yi-Hwa Wu (NWMSU), $2,760.00 (2011-2012).

St. Louis Region (Heartland Region since 2014), American Society for Photogrammetry and Remote Sensing (ASPRS), GeoSpatial Scholarship (Lortz GeoSpatial Scholarship since 2014), Principal Investigator, (ongoing project, 2011: $545.00, 2012: $545.00, 2013: $545.00, 2014: $1,045.00).

Northwest Missouri State University, Identification and estimation of baobab tree fruit production in Southern Malawi using remote sensing, Co-Principal Investigator, PI: Dr. George Kegode, and two other co-PIs: Drs. Yi-Hwa Wu and Jamie Patton (NWMSU), $6,632.00 ($4,920.00 in 2010-2013, $1,712.00 in 2013-2014).

U.S. Department of Interior, U.S. Fish and Wildlife Service (USFWS), Using Remote Sensing to Detect Stream Sediment Footprints around Road Crossings, Principal Investigator, $5,000.00 (2010-2013).

U.S. Department of Interior, U.S. Fish and Wildlife Service (USFWS), A Pilot Study for an Early Detection and Warning System for Invasive Plants in Aquatic Environments using Remote Sensing, Principal Investigator, with two other co-PIs: Drs. Yi-Hwa Wu and Jamie Patton (NWMSU), $13,000.00 (2009-2013).

Northwest Missouri State University, Measure the Changes in Well Water Quality in Nodaway County between 1970 and 2010, Co-Principal Investigator, PI: Dr. Yi-Hwa Wu, and one other co-PI: Dr. Jamie Patton (NWMSU), $5,445.00 ($3,400 in 2009-2011, $2,045 in 2011-2012).

Northwest Missouri State University, Surveying Well Water Quality in Nodaway County, Principal Investigator, with two other co-PIs: Drs. Yi-Hwa Wu and Jamie Patton (NWMSU), $1,150.00 (2009-2011).

U.S. Department of Agriculture, Natural Resources Conservation Service (USDA-NRCS) subcontract through Blackland Research and Extension Center (BREC), Texas AgriLIFE Research, Texas A&M University System, Database Management System and Interface for APEX, Principal Investigator, with two other co-PIs: Drs. Yi-Hwa Wu and Jamie Patton (NWMSU), $40,516.00 (2008-2010).

Northwest Missouri State University, Using Color-Infrared Photography to Create Color Vision Impairment Friendly Character Maps, Principal Investigator, with one other co-PI: Dr. Yi-Hwa Wu (NWMSU), $5,094 ($2,282.00 in 2008-2010, $2,812 in 2010-2011).

St. Louis Region and Central Region (Heartland Region since 2014), American Society for Photogrammetry and Remote Sensing (ASPRS), ASPRS Special Award, 57th Greater Kansas City Science & Engineering Fair 2008, Principal Investigator, (ongoing project, 2008: $661.85, 2009: $630.00, 2010: $530.00, 2011: $468.00, 2012: $334.00, 2013: $450.00, 2014: $370.00).

Northwest Missouri State University, Creating a Kansas City digital aerial photo database, co-Principal Investigator, PI: Dr. Yi-Hwa Wu (NWMSU), $2,817.00 ($1,200.00 in 2007-2008, $1,617.00 in 2007-2008).

Northwest Missouri State University, Adapting commercial digital cameras to capture multi-spectral images, Principal Investigator, with two other co-PIs: Drs. Yi-Hwa Wu and Jamie Patton (NWMSU), $4,413.00 ($2,800.00 in 2007-2008, $1,613.00 in 2008-2009).

Northwest Missouri State University, Purchase of LiDAR data for topography related applications in the MS in GIScience curriculum, co- Principal Investigator, PI: Dr. Yi-Hwa Wu (NWMSU), $3,600.00 (2006-2008).

Northwest Missouri State University, Subpixel classification technology for Taiwan land cover composition, Principal Investigator, one quarter release in Spring 2007 and $246.00 (2006-2007, collaboration with Dr. Tzu-How Chu, Department of Geography, National Taiwan University).

St. Louis Region (Heartland Region since 2014), American Society for Photogrammetry and Remote Sensing (ASPRS), 2006 Geography Awareness Week/GIS Day Poster Competition, Principal Investigator, (ongoing project, 2006: $750.00, 2007: $750.00, 2008: $1,561.00, 2009: $1,261.00, 2010: $1,216.00, 2011: $1,382.00, 2012: $1,382.00, 2013: $1,382.00, 2014: $1,382.00).

Northwest Missouri State University, Interpolation of soil and plant spatial variability to promote site specific management strategies at the R.T. Wright University Farm, Co-Principal Investigator, PI: Dr. Jamie Patton, and one other co-PI: Dr. Thomas Zweifel (NWMSU), $6,152.00 ($5,027.00 in 2005-2008, $1,125.00 in 2007).

Northwest Missouri State University, A GIS based transportation movement control training simulator, Co-Principal Investigator, PI: Dr. Mark Corson, and three other co-PIs: Drs. Gregory Haddock, Patricia Drews, Yi-Hwa Wu (NWMSU), $7,630.00 (2005-2007).

Northwest Missouri State University, Using remote sensing technology to monitor temporal changes in crop health and growth at the R.T. Wright University Farm, Principal Investigator, with one other co-PI: Dr. Jamie Patton (NWMSU), $6,168.00 (2004-2006).

Northwest Missouri State University, Using GIS (Geographic Information System) and remote sensing to help students understand the local environment and environmental changes, Principal Investigator, $5,173.00 (2003-2005).

U.S. Department of Transportation, University Center for Research on the use of geospatial technologies in transportation related hazards and disaster assessment, Research Assistant (2002-2003).

Tohono O'odham Nation, Characterizing vegetation species and land cover types in the Tohono O'odham Nation, Research Assistant (2002-2003).

The University of Utah, Developing departmental GIS online course, Research Assistant/Co-PI, $3,000.00 (2001-2002).

State of Utah, Creating Jordanelle Reservation Area aerial photograph database, Research Assistant (2001-2002).

Utah County, Utah, Creating Utah Lake aerial photograph database, Research Assistant (2000-2001).

The University of Utah, Developing interactive campus query system, Research Assistant (2000-2001).

Aerial Photography Field Office, Utah, Developing Salt Lake Valley aerial photograph query system, Research Assistant (1999-2000).

Ute Tribe, Utah, Creating Ute Tribe aerial photograph database, Research Assistant (1999-2000).

Utah Reclamation, Mitigation, and Conservation Commission, Monitoring and visualizing Great Salt Lake dynamics, Research Assistant (1999-2001).

Evans & Sutherland Inc., Creating Compressed Arc Digitized Raster Graphic (CADRG) data from vector topography maps, Research Assistant (1998-2000).

Evans & Sutherland Inc., Creating vector topography maps by Map Production System, Research Assistant (1998-2000).

University of Utah, Measuring space-time accessibility benefits within transportation networks: basic theory and computational procedures, Research Assistant (1998-1999).

Casper City, Wyoming, Creating Casper City geodetic database, Research Assistant (1997-1998).

The Military Traffic Management Command – Transportation Engineering Agency, Implementing dynamic traffic assignment for urban transportation, Research Assistant (1997-1998).

Evans & Sutherland Inc., Developing the Front-end Terrain Tool, Research Assistant (1996-1997).

Council of Agriculture Executive Yuan, Taiwan, Monitoring the changing condition and disturbance of sloping land by remote sensing, Research Assistant (1993-1994).

Ministry of the Interior, Taiwan, Initializing the National Geographic Information System integration plan, Research Assistant (1993-1994).

Department of Defense, Taiwan, Integrating and building military geographic information systems, Research Assistant (1992-1994).

Aero-Survey Department for Agriculture and Forest, Taiwan, Developing large-scale topographic maps and establishing an aerial photograph database, Research Assistant (1991-1993).

Ministry of the Interior, Taiwan, Developing a topographic map management system, Research Assistant (1991-1992).

## Service

Editorial Board, Journal of Urban Planning and Development (Outstanding Reviewer 2012).

Manuscript reviewer, International Journal of Geographical Information Science.

Manuscript reviewer, Photogrammetric Engineering and Remote Sensing.

Grant proposal reviewer, National Aeronautics and Space Administration (NASA).

Grant proposal reviewer, National Science Foundation (NSF).

| | |
|---|---|
| 08/14 - 05/15 | Member, Faculty Senate Executive Committee, Northwest Missouri State University. |
| 08/14 - 05/15 | Chair, Budget, Planning, and Development Committee, Northwest Missouri State University. |
| 07/14 | Host, GIScience Social Gathering – San Diego 2014 Summer, San Diego, CA. |
| 07/14 | Representative, Department of Humanities and Social Sciences Booth, Academic GIS Programs Fair, ESRI 2014 User Conference, July 14–18, 2014, San Diego, CA, USA. |
| 07/14 | Judge, 2014 GeoShowcase Contest, hosted by URISA (Urban and Regional Information Systems Association) South California Chapter, SANDAG (San Diego Association of Governments), and San Diego State University. |
| 04/14 - 04/16 | Faculty Senate at large, College of Arts and Sciences, Northwest Missouri State University. |
| 02/13 | Representative, Department of Humanities and Social Sciences Exhibit, 2013 Missouri GIS Conference, Feb. 19-21, 2013, Chesterfield, MO, USA. |
| 08/12 – present | Assistant to Webmaster, Department homepage, Department of Humanities and Social Sciences, Northwest Missouri State University. |
| 06/12 – 02/13 | Chair, Poster Session, 2013 Missouri GIS Conference, Feb. 19-21, 2013, Chesterfield, MO, USA. |
| 06/12 | Host, GIScience Social Gathering – St. Louis 2012 Summer, St. Louis, MO. |
| 04/12 – 04/14 | Deputy Chair, Membership Committee, American Society for Photogrammetry and Remote Sensing (ASPRS). |
| 04/12 - 04/13 | Secretary, 39th Faculty Senate, Northwest Missouri State University. |
| 04/12 - 04/13 | Faculty Senate, Department of Humanities and Social Sciences, Northwest Missouri State University. |
| 12/11 – 04/12 | Member, Asia Film Series Planning Committee, Northwest Missouri State University). |
| 07/11 – present | Chair, Membership Committee, St. Louis Region, American Society for Photogrammetry & Remote Sensing (ASPRS). |
| 07/11 | Representative, Department of Geology/Geography Booth, Academic GIS Programs Fair, ESRI 2011 User Conference, July 11–15, 2011, San Diego, CA, USA. |
| 06/11 - 03/12 | Organizer (with Dr. Yi-Hwa Wu) and Chair, Online GIS Graduate Programs panel session, American Society for Photogrammetry and Remote Sensing |

|  | (ASPRS) 2012 Conference, Mar. 19-23, 2012, Sacramento, CA, USA. |
|---|---|
| 06/11 | Host, GIScience Social Gathering – St. Louis 2011 Summer, St. Louis, MO. |
| 06/11 – 06/12 | Past President, St. Louis Region, American Society for Photogrammetry & Remote Sensing (ASPRS). |
| 04/11 – 04/13 | Member, Award Committee, Geography Education Specialty Group, Association of American Geographers (AAG). |
| 04/11 – present | Member, Award Committee, Remote Sensing Specialty Group, Association of American Geographers (AAG). |
| 09/10 – 05/12 | Assistant to Webmaster, Department homepage, Department of Geology/Geography, Northwest Missouri State University. |
| 07/10 | Host, GIScience Social Gathering – St. Louis 2010 Summer, St. Louis, MO. |
| 07/10 | Reviewer and Evaluator, American Society for Photogrammetry & Remote Sensing (ASPRS) Ten Year Industry Forecast survey questionnaire. |
| 06/10 – 02/11 | Chair, Poster Session and Project Showcase Session, 2011 Missouri GIS Conference, Feb. 14-16, 2011, Osage Beach, MO, USA. |
| 06/10 – 06/11 | President, St. Louis Region, American Society for Photogrammetry & Remote Sensing (ASPRS), won Region of the Year Award 2010. |
| 04/10 | Moderator, Data Processing and Analysis: Data Visualization I Technical Session, American Society for Photogrammetry & Remote Sensing (ASPRS) 2010 Annual Meeting, April 26-30, 2010, San Diego, CA, USA. |
| 04/10 | Chair, Community of Professional Graduate Programs in GIS&T Panel Session, Association of American Geographers (AAG) 2010 Annual Meeting, April 14-18, 2010, Washington, D.C., USA. |
| 08/09 – 05/11 | Member, International Studies and Programs Committee, Northwest Missouri State University. |
| 06/09 – 06/10 | Vice President, St. Louis Region, American Society for Photogrammetry & Remote Sensing (ASPRS). |
| 03/09 - present | Member, Missouri GIS Advisory Council (MGISAC), formally Missouri GIS Advisory Committee. |
| 09/08 - 08/09 | Chair, Graduate Council, Northwest Missouri State University. |
| 11/07 – present | Person of Contact, Use of Formosat-2 satellite images for Northwest Missouri State University educational and research activities, Northwest Missouri State University Department of Geology/Geography (NWMSU G/G), National Taiwan Normal University Formosat-2 Image Application and Distribution Center (NTNU FS-2), and Taiwan National Space Organization (NSPO). |
| 10/07 | Host, GIScience Social Gathering – St. Louis 2007 Fall, St. Louis, MO. |
| 09/07 – 05/08 | Member, Research Committee, Northwest Missouri State University. |
| 09/07 – 05/10 | Member, Graduate Council, Northwest Missouri State University. |
| 05/07 – 10/12 | Member, Urban and Regional Information Systems Association (URISA) Annual Conference Student Paper Competition Sub-Committee. |
| 05/07 – 11/07 | Writer, Memorandum of Understanding between Northwest Missouri State University Department of Geology/Geography and National Taiwan Normal University Formosat-2 Image Application and Distribution Center, Use of Formosat-2 satellite images for Northwest Missouri State University educational and research activities. |

19

| | |
|---|---|
| 02/07 | Member, Department Scholarship 2007-2008 Application Review Committee, Department of Geology/Geography, Northwest Missouri State University. |
| 09/06 – 04/07 | Organizer (with Dr. Yi-Hwa Wu) and Chair, Distance Learning and GIScience Panel Session, Association of American Geographers (AAG) 103rd Annual Meeting, Apr. 17-21, 2007, San Francisco, CA, USA. |
| 09/06 – 04/09 | Academic advisor, Gamma Theta Upsilon (GTU, the International Geography Honor Society), Zeta Theta Chapter, Northwest Missouri State University. |
| 08/06 – 10/06 | Assistant proposal writer 106-03-01 (with Dr. Jamie Patton), Creation of Precision Agriculture Minor, Department of Agriculture, Northwest Missouri State University. |
| 02/06 – 10/07 | Member, Publications Committee, Urban and Regional Information Systems Association (URISA). |
| 01/06 | Supervisor, Road Scholar event, 2006 Junior High Science Olympiad, Northwest Missouri State University. |
| 06/05 – 06/09 | Member, Board of Directors, St. Louis Region, American Society for Photogrammetry & Remote Sensing (ASPRS). |
| 01/05 | Supervisor, Road Scholar event, 2005 Junior High Science Olympiad, Northwest Missouri State University. |
| 09/04 – 10/06 | Person of Contact, Creation of an intellectual minor in Precision Agriculture between Departments of Geology/Geography and Agriculture (collaboration with Dr. Jamie Patton, Person of Contact in the Department of Agriculture), Northwest Missouri State University. |
| 09/04 – 04/06 | Member, Research Committee, Northwest Missouri State University. |
| 01/04 | Supervisor, Road Scholar event, 2004 Junior High Science Olympiad, Northwest Missouri State University. |
| 01/04 – 09/10 | Webmaster, Department homepage, Department of Geology/Geography, Northwest Missouri State University. |
| 09/92 - 06/93 | Head of senior class, Department of Geography, National Taiwan University. |
| 02/90 - 09/90 | Editor of newsletter, Mountain-Hiking Club, National Taiwan University. |
| 09/89 - 06/93 | Guide for mountain-hiking, Mountain-Hiking Club, National Taiwan University. |
| 09/89 - 06/93 | Assistant Guide for rock-climbing, Mountain-Hiking Club, National Taiwan University. |

United States
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 4

## DECLARATION

COMES NOW the declarant, William Michael Elkins, and as authorized by 28 U.S.C. § 1746, states and declares under penalty of perjury all as follows:

1.    My name is William Michael Elkins.

2.    I reside in Pope County, Arkansas.

3.    I am twenty-three years, and of sound body with the exception of having a steel rod in my right leg and a steel toe on the right foot. I am under the care of Counseling Associates, on Skyline Drive, in Russellville, Arkansas, with diagnoses as schizophrenic and bipolar, for which I now take prescription medications as prescribed.

4.    In or around March 2009, I was approximately 900 yards from Dr. Randeep S. Mann's front yard, doing some yard work for other people. A white Chevrolet 4x4 truck came down the cul de sac in front of Dr. Mann's home, turned around, and backed up to the loop. Two men jumped out of the truck. Both had shovels. One dropped down the tailgate, and they dragged out an odd-shaped box with black material looking like trash bags wrapped around it.

5.      My father is a veteran who had a box that was about 17″ in diameter and about 17″ high, and the box had two handles, one on each side.

6.      The box that these men with two shovels took out of the truck with them resembles the box pictured in Elkins Declaration Exhibits 1, 2, and 3.

7.      The box that my father used to store military artifacts resembles the box pictured in Elkins Declaration Exhibit 1, 2, and 3.

8.      My father used the similar box that he owned to store military-related artifacts.

9.      The two men with shovels and the box went into the loop for about fifteen minutes, then came out without the box, and took off.

10.     The two men who jumped out of the truck with the box and shovels, then came back without it, worked for the City of London.  One has subsequently moved away.  The other still works for the Mayor as a water worker.

Further, the declarant saith naught.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: 3-14-14

MICHAEL WILLIAM ELKINS



Elkins Declaration Exhibit 1

Elkins Declaration Exhibit 2



*Mann v. United States*
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 5

# DECLARATION

COMES NOW the declarant, Dr. Randeep Singh Mann, and as authorized

by 28 U.S.C. § 1746, states and declares under penalty of perjury all as follows:

1.      My name is Randeep Singh Mann.

2.      I am of legal age and, with qualifications not relevant to my ability

to make this declaration, of sound mind and body.

3.      I am incarcerated at USP Terre Haute.

4.      I have reviewed the attached papers, which are Freedom of

Information Act requests that I completed on May 13, 2013; June 21, 2013; June

24, 2013, and June 25, 2013, together with cover letters to the latter three requests.

5.      The attached documents are true and correct copies of the

documents that I mailed to agents of the Bureau of Alcohol, Tobacco, Firearms &

Explosives on or about the dates on the foregoing documents, to which I have

received no response.

Further, the declarant saith naught.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:   October 6, 2014

RANDEEP SINGH MANN

# FREEDOM OF INFORMATION PRIVACY ACT REQUEST

TO: ~~Director of ATFE~~
~~Chief, Disclosure Division~~
~~ATFE, Rm Suite 860~~
~~650 New York Ave,~~
~~Washington D.C. 20226~~

FROM: Randeep S. Mann
#24775-009
US Med Ctr for Federal Prisoners
PO Box 4000
Springfield, MO 65801-4000

PURSUANT TO TITLE 5, UNITED STATES CODE, SECTIONS 552, 552(a), I THE UNDERSIGNED, IDENTIFIED AS ABOVE, RESPECTFULLY REQUEST THE ACCESS TO, THE DISCLOSURE OF, THE RELEASE OF, AND THE OPPORTUNITY TO CORRECT AND AMEND, THE FOLLOWING RECORDS MAINTAINED BY YOUR AGENCY:

All the identities of officers/agents their records, notes, photos, tapes pertaining to their visit [dates + times] of their visit, prevailing weather conditions ie temp, wind speed, direction, humidity, rainfall, dew case light conditions] to the woods ~20 yds from the cul de sac at the end of Galaxy Lane, London, AR on or after 3/3/09. Could I also have the size of the bottle depicted in the ATFs taken photographs.

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

I AM ALSO REQUESTING A COPY OF THE APPLICABLE RULES & REGULATIONS FOR YOUR AGENCY AS PROVIDED FOR BY THE FOI/PA, AS AMENDED BY PUBLIC LAW 93-502, 88 STAT. 1561.

IF FOR ANY REASON, ANY OF THE ABOVE-REQUESTED RECORDS ARE DEEMED TO BE NON-DISCLOSABLE, OR NON-RELEASABLE, PLEASE SPECIFY THE REGULATORY & STATUTORY EXEMPTION RELIED UPON, AND STATE WHETHER THE ENTIRE DOCUMENT OR ONLY A PORTION THEREOF, IS DEEMED NON-DISCLOSABLE, AND FURNISH THE NAME AND TITLE OF THE PERSON MAKING THE DECISION.

REQUESTER IS AN INDIGENT INMATE AT _____ AND REQUESTS THAT ANY SEARCH, AND/OR DUPLICATION FEES BE WAIVED, OR IN THE ALTERNATIVE, THAT ACCESS BE PROVIDED BY ALLOWING REQUESTER TO VIEW AND TAKE NOTES OF THE RECORDS RATHER THAN BE PROVIDED WITH COPIES.

THE FOI/PA PROVIDES FOR A REPLY TO THIS REQUEST IN TEN(10) WORKING DAYS. REQUESTER HEREBY INVOKES THIS PROVISION FOR A RESPONSE TO THIS REQUEST WITHIN TEN(10) WORKING DAYS.

Respectfully submitted, _____
                        **(requester)**

Dated this _____ day of _____, 19____

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

PRIVACY ACT STATEMENT: In accordance with 28 CFR Section 16.41, personal data sufficient to identify the individual submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required.

FULL NAME OF REQUESTER: Randeep Singh Mann

CURRENT ADDRESS: US Med Ctr for Federal Prisoners, PO Box 4000, Springfield MO 65801

DATE OF BIRTH: ~~Ambala, Haryana, India~~ Jul, 11, 1958

PLACE OF BIRTH: Ambala, Haryana, India

EMPLOYEE I.D. NUMBER: _____

I certify that I am the person named above and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five(5) years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. 552a(i)(3), by a fine of not more than $5,000

Signature: _____

Dated this 13 day of May 2013

In as much as the requested information is in the "Public Interest", and I have declared myself to be indigent, I ask that you waive all fees, cost, and/or charges pursuant to 5 U.S.C. 552a (1) (3) et. seq.

I, _____, am the requester in the attached F.O.I.A./Privacy Act Request and I declare under the penalty of perjury that I am an indigent inmate and have the amount of _____ in my prison account, and have no other assets available.

_____        _____
SIGNATURE                          DATE

Sworn to before me this _____ day of _____, 20____.

_____
WITNESS

U.S. Department of Justice

## Certification of Identity



**Privacy Act Statement.** In accordance with 28 CFR Section 16.41(d) personal data sufficient to identify the individuals submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required. The purpose of this solicitation is to ensure that the records of individuals who are the subject of U.S. Department of Justice systems of records are not wrongfully disclosed by the Department. Failure to furnish this information will result in no action being taken on the request. False information on this form may subject the requester to criminal penalties under 18 U.S.C. Section 1001 and/or 5 U.S.C. Section 552a(i)(3).

Public reporting burden for this collection of information is estimated to average 0.50 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Suggestions for reducing this burden may be submitted to Director, Facilities and Administrative Services Staff, Justice Management Division, U.S. Department of Justice, Washington, DC 20530 and the Office of Information and Regulatory Affairs, Office of Management and Budget, Public Use Reports Project (1103-0016), Washington, DC 20503.

Full Name of Requester [1]   _Randeep Singh Mann_

Citizenship Status [2]   _USA_       Social Security Number [3]   _022 - 64 - 6629_

_BOP # 24775-009_

Current Address   _US Medical Center for Federal Prisoners, PO Box 4000_
_Springfield, MO 65801_

Date of Birth   _July 11, 2013 1958_   Place of Birth   _Ambala, Haryana India_

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named above, and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. 552a(i)(3) by a fine of not more than $5,000.

Signature [4]   _[signature]_       Date _May 13, 2013_
_Randeep S. Mann_

## OPTIONAL: Authorization to Release Information to Another Person

This form is also to be completed by a requester who is authorizing information relating to himself or herself to be released to another person.

Further, pursuant to 5 U.S.C. Section 552a(b), I authorize the U.S. Department of Justice to release any and all information relating to me to:

_____

### Print or Type Name

[1] Name of individual who is the subject of the record sought.

[2] Individual submitting a request under the Privacy Act of 1974 must be either "a citizen of the United States or an alien lawfully admitted for permanent residence," pursuant to 5 U.S.C. Section 552a(a)(2). Requests will be processed as Freedom of Information Act requests pursuant to 5 U.S.C. Section 552, rather than Privacy Act requests, for individuals who are not United States citizens or aliens lawfully admitted for permanent residence.

[3] Providing your social security number is voluntary. You are asked to provide your social security number only to facilitate the identification of records relating to you. Without your social security number, the Department may be unable to locate any or all records pertaining to you.

[4] Signature of individual who is the subject of the record sought.

FORM APPROVED OMB NO. 1103-0016
EXPIRES 4/31/07

FORM DOJ-361
SEPT 04

US Medical Center For Federal Prisoners
PO Box 4000
Springfield, MO 65801
6/21/13

Alcohol, Tobacco, Firearms + Explosives
Resident Agent In Charge
425 West Capitol Ave, Suite # 775
Little Rock, AR 72201

Re: Information Pertaining To Randeep Singh Mann under FOIA
  Sir / Mme,
    I, Randeep S. Mann am requesting the following information pertaining to me under the Freedom Of Information Act

① All the identities of officers/agents, their records, notes, tapes, obtained photographs pertaining to their visit/visits [dates, times, prevailing weather conditions ie temp, wind speed and direction, humidity, rainfall, light conditions, visibility] to the woods ~ 20 yds from the cul-de-sac at the end of Galaxy Lane, London, AR on or and after 3/3/09.

② The size (height + width) of the bottle depicted in the ATF pictures.

③ The time of the 911 call made by the Mayor of London, AR - Mr. Price

④ The time of arrival of AR State Police Officer - Jason Smith to Galaxy Lane, London, AR in response to the 911 call made by Mr. Price

⑤ Any and all records, memos, tapes, photographs pertaining to investigations related to me, Randeep S. Mann commencing Oct 1999, ending May 2011. This would include but not be limited to notes and entries and memos created and sent by Agent Warren Newman.

    Thankyou,
    Yours sincerely
          Randeep S. Mann
C.C. Attorney Drake Mann, Attorney Blake Hendrix.

*cory*

# FREEDOM OF INFORMATION PRIVACY ACT REQUEST

Alcohol, Tobacco, Firearms
Resident Agent in Charge                    FROM: BOP # 24775-009
: 425 W. Capitol Ave # 775                          US Medical Ctr for Federal Prisoners
Little Rock, AR 72201                               PO Box 4000
                                                    Springfield, MO 65801

URSUANT TO TITLE 5, UNITED STATES CODE, SECTIONS 552, 552(a), I THE UNDERSIGNED, IDENTIFIED
S ABOVE, RESPECTFULLY REQUEST THE ACCESS TO, THE DISCLOSURE OF, THE RELEASE OF, AND
HE OPPORTUNITY TO CORRECT AND AMEND. THE FOLLOWING RECORDS MAINTAINED BY YOUR
GENCY:

All the identities of officers/agents, their records, notes, photographs, tapes pertaining
to their visit/visits [ dates, times, prevailing weather conditions ie temp, wind
speed, wind direction, humidity, rainfall, light conditions ] to the woods ~20 yds from
the cul-de-sac at the end of Clabby Lane, London, AR on or and after 3/3/09.
The size of the bottle depicted in the ATF pictures          regarding Randeep S. Mann
Anyand all records, memos, tapes pertaining to investigations commencing Oct 1999 through
the time on 3/3/09 that the 911 call was made by Mayor Price @ Time of arrival at site of AR State Police
May 2011

AM ALSO REQUESTING A COPY OF THE APPLICABLE RULES & REGULATIONS FOR YOUR AGENCY AS
ROVIDED FOR BY THE FOI/PA, AS AMENDED BY PUBLIC LAW 93-502, 88 STAT. 1561.

FOR ANY REASON, ANY OF THE ABOVE-REQUESTED RECORDS ARE DEEMED TO BE NON-
SCLOSABLE, OR NON-RELEASABLE, PLEASE SPECIFY THE REGULATORY & STATUTORY EXEMPTION
ELIED UPON, AND STATE WHETHER THE ENTIRE DOCUMENT OR ONLY A PORTION THEREOF, IS
EEMED NON-DISCLOSABLE, AND FURNISH THE NAME AND TITLE OF THE PERSON MAKING THE
ECISION.

EQUESTER IS AN INDIGENT INMATE AT _____ AND REQUESTS THAT ANY SEARCH,
ND/OR DUPLICATION FEES BE WAIVED, OR IN THE ALTERNATIVE, THAT ACCESS BE PROVIDED BY
LLOWING REQUESTER TO VIEW AND TAKE NOTES OF THE RECORDS RATHER THAN BE PROVIDED
ITH COPIES.

HE FOI/PA PROVIDES FOR A REPLY TO THIS REQUEST IN TEN(10) WORKING DAYS.  REQUESTER
EREBY INVOKES THIS PROVISION FOR A RESPONSE TO THIS REQUEST WITHIN TEN(10) WORKING
AYS.

espectfully  submitted, _____

                        (requester)

                                        Dated this _____ day of _____, 19_____

RIVACY ACT STATEMENT:  In accordance with 28 CFR Section 16.41, personal data sufficient to identify the
individual submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required.

ULL NAME OF REQUESTER: Randeep Singh Mann

URRENT  ADDRESS: BOP # 24775-009, US Medical Ctr for Federal Prisoners, PO Box 4000
                  Springfield, MO 65801   July 11, 1958
ATE OF BIRTH: _____

LACE OF BIRTH: Ambala (City), Haryana (State), India (Country)

EMPLOYEE I.D. NUMBER:  NA

certify that I am the person named above and I understand that any falsification of this statement is punishable under the
rovisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five(5)
ears or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5
U.S.C. 552a(i)(3), by a fine of not more than $5,000

Dated this 21st day of June 2013            Signature: _____

Randeep Singh Mann # 24775-009
US Medical Center for Federal Prisoners
P.O. Box 4000
Springfield, MO 65801
6/24/13

Alcohol Tobacco Firearms + Explosives
Resident Agent In charge
425 West Capital Ave, Suite #715
Little Rock, AR 72201

Re: Additional Information Pertaining To Randeep Singh Mann
pursuant to FOIA,

Sir/Mme,

I, Randeep S. Mann had sent a letter to you dated 6/21/13 where I had notified you of some information that I needed pursuant to the FOIA.

In addition to that information I would appreciate it if you could give me

① The make and model of the camera used by Officer Jason Smith of the AR State Police to take the pictures in the woods, ~ 20 yds from the cul de sac at the end of Galaxy Lane, London, AR on 3/3/09

② The make and model of the camera used by the ATF to take additional pictures at the same site on or after 3/3/09.

Thank you
Yours sincerely
                     Randeep S. Mann

CC  Atty Drake Mann
    Atty Blake Hendrix

## FREEDOM OF INFORMATION/PRIVACY ACT REQUEST

Alcohol, Tobacco Firearms + Explosives       Randeep Singh Mann
O: Resident Agent In Charge       FROM: BOP # 24775-009
425 West Capitol Drive, Suite #775       US Medical Center for Federal Prisoner
Little Rock, AR 72201       PO Box 4000
Springfield, MO 65801

URSUANT TO TITLE 5, UNITED STATES CODE, SECTIONS 552, 552(a), I THE UNDERSIGNED, IDENTIFIED
S ABOVE, RESPECTFULLY REQUEST THE ACCESS TO, THE DISCLOSURE OF, THE RELEASE OF, AND
HE OPPORTUNITY TO CORRECT AND AMEND, THE FOLLOWING RECORDS MAINTAINED BY YOUR
GENCY: In addition to the information sought in my FOIA request dated 6/21/13
Could you provide me: ① The make and model of the camera used by Officer
Jason Smith on 3/3/09 to take the pictures of the bomb in the woods at the end of
the cul de sac of Galaxy Lane, London, AR ② The make and model of the camera
used to take the pictures taken by the ATF on or after 3/3/09 of the same site.

AM ALSO REQUESTING A COPY OF THE APPLICABLE RULES & REGULATIONS FOR YOUR AGENCY AS
ROVIDED FOR BY THE FOI/PA, AS AMENDED BY PUBLIC LAW 93-502, 88 STAT. 1561.

F FOR ANY REASON, ANY OF THE ABOVE-REQUESTED RECORDS ARE DEEMED TO BE NON-
ISCLOSABLE, OR NON-RELEASABLE, PLEASE SPECIFY THE REGULATORY & STATUTORY EXEMPTION
ELIED UPON, AND STATE WHETHER THE ENTIRE DOCUMENT OR ONLY A PORTION THEREOF, IS
EEMED NON-DISCLOSABLE, AND FURNISH THE NAME AND TITLE OF THE PERSON MAKING THE
ECISION.

EQUESTER IS AN INDIGENT INMATE AT _____ AND REQUESTS THAT ANY SEARCH,
ND/OR DUPLICATION FEES BE WAIVED, OR IN THE ALTERNATIVE, THAT ACCESS BE PROVIDED BY
LLOWING REQUESTER TO VIEW AND TAKE NOTES OF THE RECORDS RATHER THAN BE PROVIDED
VITH COPIES.

HE FOI/PA PROVIDES FOR A REPLY TO THIS REQUEST IN TEN(10) WORKING DAYS. REQUESTER
IEREBY INVOKES THIS PROVISION FOR A RESPONSE TO THIS REQUEST WITHIN TEN(10) WORKING
)AYS.

Respectfully submitted, _____
                              (requester)

                    Dated this _____ day of _____ , 19_____

PRIVACY ACT STATEMENT: In accordance with 28 CFR Section 16.41, personal data sufficient to identify the
ndividual submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required.

FULL NAME OF REQUESTER: Randeep Singh Mann
CURRENT ADDRESS: BOP # 24775-009, US Med Ctr for Federal Prisoner, PO Box 4000
Springfield, MO 65801
DATE OF BIRTH: July 11, 1958
PLACE OF BIRTH: Ambala, Haryana, India
EMPLOYEE I.D. NUMBER: _____

i certify that I am the person named above and I understand that any falsification of this statement is punishable under the
provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five(5)
years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5
U.S.C. 552a(i)(3), by a fine of not more than $5,000

                                        Signature: _____

Dated this 24th day of June 2013

Randeep Singh Mann # 24775-009
US Med Ctr for Federal Prisoners
P.O.Box 4000
Springfield, MO 65801
6/25/13

Alcohol Tobacco Firearms + Explosives
Resident Agent In Charge
425 West Capitol Ave, Suite # 775
Little Rock, AR 72201

Re: Information Pertaining to "Evidence" used to obtain a
search warrant on the premises of Randeep Singh
Mann pursuant to FOIA.

Sir/Mme,

1, Randeep S Mann have sent you 2 seperate letters
dated 6/21/13 and 6/24/13 in order to obtain Information
Pertaining to "Evidence" used to obtain a search warrant
on my premises and my subsequent arrest on 3/4/09.

In addition to the information already requested
I would like for you to provide me

① The dimensions in inches of the green ammunition can
"found" in the woods 300 yards from my residence
313 Milky Way Lane, London, AR on 3/3/09. The
box was in the woods 20 yards from the cul de sac
at the end of Galaxy Lane, London, AR.

Thank you.
Yours sincerely
Randeep S. Mann

cc. Attorneys: Drake Mann
Blake Hendrix

FREEDOM OF INFORMATION/PRIVACY ACT REQUEST

TO: Alcohol Tobacco Firearms
Resident Agent In Charge
425 W. Capitol Ave, Suite 775
Little Rock, AR 72201

FROM: Randeep Singh Mann
BOP # 24775-009
US Med Ctr for Federal Prisoners
PO Box 4000
Springfield, MO 65801

PURSUANT TO TITLE 5, UNITED STATES CODE, SECTIONS 552, 552(a), I THE UNDERSIGNED, IDENTIFIED AS ABOVE, RESPECTFULLY REQUEST THE ACCESS TO, THE DISCLOSURE OF, THE RELEASE OF, AND THE OPPORTUNITY TO CORRECT AND AMEND, THE FOLLOWING RECORDS MAINTAINED BY YOUR AGENCY:

Could you provide me ① The dimensions, in inches, of the green ammunition can "found" in the woods, 300 yds from my residence of 313 Milky I Day Lane, London, AR, 20 yds from the cul de sac at the end of Galaxy Lane, London, AR on 3/3/09 by Marele Ruike and Ryan Kimball.

I AM ALSO REQUESTING A COPY OF THE APPLICABLE RULES & REGULATIONS FOR YOUR AGENCY AS PROVIDED FOR BY THE FOI/PA, AS AMENDED BY PUBLIC LAW 93-502, 88 STAT. 1561.

IF FOR ANY REASON, ANY OF THE ABOVE-REQUESTED RECORDS ARE DEEMED TO BE NON-DISCLOSABLE, OR NON-RELEASABLE, PLEASE SPECIFY THE REGULATORY & STATUTORY EXEMPTION RELIED UPON, AND STATE WHETHER THE ENTIRE DOCUMENT OR ONLY A PORTION THEREOF, IS DEEMED NON-DISCLOSABLE, AND FURNISH THE NAME AND TITLE OF THE PERSON MAKING THE DECISION.

REQUESTER IS AN INDIGENT INMATE AT _____ AND REQUESTS THAT ANY SEARCH, AND/OR DUPLICATION FEES BE WAIVED, OR IN THE ALTERNATIVE, THAT ACCESS BE PROVIDED BY ALLOWING REQUESTER TO VIEW AND TAKE NOTES OF THE RECORDS RATHER THAN BE PROVIDED WITH COPIES.

THE FOI/PA PROVIDES FOR A REPLY TO THIS REQUEST IN TEN(10) WORKING DAYS.  REQUESTER HEREBY INVOKES THIS PROVISION FOR A RESPONSE TO THIS REQUEST WITHIN TEN(10) WORKING DAYS.

Respectfully  submitted, _____
(requester)

Dated this _____ day of _____, 19_____

PRIVACY ACT STATEMENT:  In accordance with 28 CFR Section 16.41, personal data sufficient to identify the individual submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required.

FULL NAME OF REQUESTER: Randeep Singh Mann
CURRENT   ADDRESS: BOP # 24775-009, US Medical Ctr for Federal Prisoners, PO Box 4000 Springfield, MO 65801
DATE OF BIRTH: July 11, 1958
PLACE OF BIRTH: Ambala, Haryana, India
EMPLOYEE I.D. NUMBER: N/A

I certify that I am the person named above and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five(5) years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. 552a(i)(3), by a fine of not more than $5,000

Dated this 25th day of June 2013

Signature: _____



**Best Price Guarantee**
or your first night is free    **BOOK NOW**

**5**



*Mann v. United States*
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 6

KEN RASH'S

## Special Report: Dr. Ammo

*Updated Apr 28, 2009 5 56 AM CDT*

By Janice Broach - bio | email | Follow us on Twitter

GERMANTOWN, TN (WMC-TV) - Could a former Germantown doctor, indicted in Arkansas on federal weapons charges, be connected to a car bombing in West Memphis?

Dr Randeep Mann has an explosive history with authorities in both Tennessee and Arkansas  He's not only a doctor  he's also a licensed arms collector  It's a hobby that landed him in jail, and investigators have seen his weapons before - in Germantown

Mann's former home in Germantown is a house with a history

"We did know Randeep Mann owned it," current owner Lynn Sutherland said  "That was in 2003 we bought the house "

Lynn and Ernie Sutherland live there now, and have heard stories about what went on when Dr  Mann owned the property

"There were weapons found here and heavy artillery," Lynn said

"High powered weapons and ammunition of different types," Ernie added

The arsenal of weapons was so alarming a neighbor called police  The neighbor, who did not want to appear on camera, said he was invited to Mann's home on Christmas Eve in 2000 for a beer  When he went inside, he was shown a whole house filled with high-powered weapons - 200 machine guns locked in huge gun cases

The neighbor said in a room upstairs, there was a  50 caliber machine gun on a stand  He saw more guns in the garage, while the ammo was kept in a storage shed off the garage

The Bureau of Alcohol, Tobacco and Firearms searched Mann's Germantown home in 2000, and determined he had properly registered all the weapons and had the license to own them

That may not be the case in Arkansas, where just last month, ATF agents searched Mann's new home in London, after city workers made a surprising discovery

"I'm glad we found it instead of somebody else," city employee Mark Rinke said

Rinke and a co-worker were checking water meters near the doctor's home when they stumbled upon a half-buried bag

"When I found it I just took the co-worker up there with me, and at first I didn't think it was anything - just trash," he said

That trash turned out to be 98 highly explosive grenades

"In a military container," Rinke said  "Triple wrapped in a hefty bag "

Investigators turned to Mann, and when they searched his home, they uncovered an arsenal very similar to the one uncovered in Germantown almost nine years earlier

In fact, the ATF believes Mann moved the Germantown arsenal to Arkansas  Court records show Arkansas State Police uncovered 110 fully automatic guns located throughout the doctor's house, spread out on the floor, inside closets and locked in safes  He also had grenade launchers, and ATF agents say they found $50,000 in cash inside the home, and $34,000 hidden inside the trunk of a car

Once again the guns were properly registered, but not the grenades

"Randeep Mann is charged with possessing Title Two weapons that are not registered with the ATF," the ATF's Grover Crossland said  "The explosive devices were not registered, and therefore he cannot possess them "

For now, the Feds possess Mann, and West Memphis Police Chief Bob Paudert believes the doctor could be in even more trouble

"I think they interviewed him on February fourth, the same day Dr  Pierce was bombed," Paudert said

Dr  Trent Pierce, the former head of the Arkansas Medical Disciplinary Board, was critically injured in a car bombing in West Memphis  Investigators questioned Mann in the bombing because of his numerous appearances in front of Pierce's board

During a hearing in 2006, Pierce denied reinstating Mann's narcotics license, after state records showed at least 10 of Mann's patients died from overdoses

Mann said his supporters were shut out of the hearing

"If you've got something bad to say they want to hear you," he told reporters outside the meeting  "If you've got something good to say, forget it "

Paudert says the ATF shouldn't forget Mann

"These items-grenade launchers are used in warfare," he said  "They're not used in a civilian environment  They're made to cause death "

Paudert said he would not rule Mann out as a suspect

"Absolutely not  I wouldn't have ruled him out in the very beginning," he said

ATF investigators say Mann is a person of interest in the West Memphis bombing, but add that list is long
What they know for sure is they've seen this doctor and his arsenal before, on a quite street in Germantown

The attorney representing Mann was not willing to interview for this story

Mann is charged only with possessing explosive devices not properly registered with the ATF  His attorney
wants the weapons charges dropped, and just two weeks ago Mann sued Pierce and the Arkansas Medical
Board, claiming the Board was prejudiced against him because he is a native of India and is Hindu

We'll keep you updated on both cases - and the car bombing in West Memphis

To read the criminal complaint against Randeep Mann, click here
http //showtime arkansasonline com/e/pdf3/Doctor-Grenade.pdf

## WE RECOMMEND

- Man admits involvement in 'forcible rape of Holly Bobo' - WMC Action News 5 - Memphis, Tennessee
- Debns field spotted on radar at time of boom heard around the A - WMC Action News 5 - Memphis, Tennessee
- Grandma accused of shoplifting now charged with attempted murder - WMC Action News 5 - Memphis, Tennessee
- Lumber yard owner finds Jesus in tree trunk - WMC Action News 5 - Memphis, Tennessee
- 1 dead, 2 injured in early morning robbery, shooting - WMC Action News 5 - Memphis, Tennessee

## FROM AROUND THE WEB

- If Only He Had Been Carrying a Gun  Oh, Wait  *(Blue Nation Review)*
- Malaysian airliner crashes near Donetsk, seemingly shot down *(Fortune)*
- Wal-Mart spokesman resigns over lie on resume *(Fortune)*
- Birthday Sleepover Ends with 12-Year-Old Close to Death     *(ABC 2020)*
- 10 Dangerous US Cities You Should Avoid Traveling To *(EscapeHere)*

Recommended by

Offers and Articles From Around the Web                                           ADVERTISE!


30 Child Actors Who Tragically Died Young


Ford has introduced a new police car that has


Who in Missouri has been Arrested? You may be


Tiger Woods' Girlfriend Lindsey Vonn Caught


Disney has been keeping a deep secret that's in


The 99 Greatest Awkward Family Photos in Internet


New Site Exposes Anyone! So addicting


if your cable bill has gott too high, you now



1960 Union Ave.
Memphis, TN 38104
(901) 726-0555

**FCC Public File**
**publicfile@wmctv.com**
901-726-0501
**EEO Report**
**Closed Captioning**

**News**
ACTION 5 MOBILE
ACTION 5 NEWS
CONTESTS
EMAIL/TEXT ALERTS
EVENTS
SLIDESHOWS
TRAFFIC TRACKER
FACEBOOK
TWITTER

**Weather**
WEATHER CENTER
7 DAY FORECAST
WATCHES & WARNINGS
INTERACTIVE RADAR
STORM TRACK DOPPLER
TRAFFIC

**Sports**
LOCAL SPORTS
NATIONAL SPORTS
BASEBALL
BASKETBALL
FOOTBALL
HOCKEY
GOLF
SOCCER
SCOREBOARDS

All content © Copyright 2000 - 2014 Worldnow and WMCTV  All Rights Reserved

For more information on this site, please read our Privacy Policy and Terms of Service

 Departmen
t of
Justice
Seal

*Mann v. United States*
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 7

# U.S. Department of Justice

## United States Attorney
## Eastern District of Arkansas

www.justice.gov/usao/are

For Immediate Release

January 6, 2010

Jane W. Duke, United States Attorney

Contacts: Jane W. Duke

(501) 340-26005

### Grand Jury Returns Indictment Charging Russellville Area Doctor With Bombing of State Medical Board Chairman

LITTLE ROCK, ARK. — Jane W. Duke, U.S. Attorney for the Eastern District of Arkansas, and Phillip Durham, Special Agent in Charge of the New Orleans Field Division of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), announced today the return of a second superseding indictment against Dr. Randeep Mann, age 51, of London, Ark. In addition to earlier charges, Mann is now also charged with the Feb. 4, 2009, bombing of Dr. Trent Pierce, Chairman of the Arkansas State Medical Board. Count one charges that Mann, aided and abetted by a person or persons unknown to the grand jury, used and conspired to use a "weapon of mass destruction" against a person and property within the United States, in violation of Title 18, U.S. Code, Section 2332a. Count two charges that Mann, aided and abetted by a person or persons unknown to the grand jury, maliciously damaged or destroyed a vehicle by means of an explosive, in violation of Title 18, U.S. Code, Section 844(I).

The only other new charge, Count 10, charges Mann with unlawfully possessing contraband, specifically, chloroform, while being held in federal custody at the Pulaski County Regional Detention Facility, in violation of Title 18, U.S. Code, Section 1791.

The remaining counts of the 10-count second superseding indictment reassert earlier charges against Mann and his wife, Sangeeta "Sue" Mann, age 48. Counts 3-5 charge Mann with possessing 98 grenades and two firearms that were not registered to him in the National Firearms Registration and Transfer Record, in violation of Title 26, U.S. Code, Section 5861(d). Count six charges Mann with unlawfully possessing a machine gun in violation of Title 18, U.S. Code, Section 922(o). Counts 7

and 8 charge Mann and his wife with conspiring to obstruct or impede the proceedings against Mann and with concealing some checks with the intent to impair their availability for use in proceedings against Mann. Sue Mann is charged individually in count nine for making a false declaration to the federal grand jury during its investigation of her husband.

Dr. Mann was arrested on March 4, 2009, and has been in federal custody since that date. Sue Mann was arrested on Aug. 7, 2009. She was released on her own recognizance by the Honorable Beth Deere, U.S. Magistrate Judge, after a detention hearing on Aug. 10, 2009.

The Manns' trial, for which there is currently pending a motion to sever defendants, is slated to begin on March 15, 2010. However, it is uncertain whether that trial setting will remain in place in light of the new charges.

"Dr. Pierce was, and remains, a dedicated professional committed to the health and healing of others. We believe that very dedication–exemplified through his service on the Arkansas State Medical Board–was what caused him to be targeted by Dr. Mann in this heinous act," stated Duke. She added, "Several months ago, Dr. Mann was identified as a suspect in this bombing. But, without the diligent efforts of the ATF investigators and analysts on this case, Dr. Mann could have simply remained an uncharged suspect in this matter. I want to recognize the efforts of the ATF personnel, as well as the prosecutors in my office, who worked on this case and commend them for not simply jumping to conclusions or walking away from a complex investigation. Instead, they patiently and thoroughly uncovered the evidence needed to charge the individual we believe to have been responsible for perpetrating this violent crime."

"The calculated plan to harm Dr. Trent Pierce, a well respected physician and pillar of the West Memphis community, caused him serious injury," said ATF Special Agent in Charge Phil Durham of the New Orleans Field Division. "Today, ATF has sought to put the person responsible for this crime behind bars for a very long time. ATF will continue to work closely with our law enforcement agencies to send a clear message to those who commit violent crime that they will be brought to justice."

According to an affidavit filed in support of the original complaint against Mann, the case began on March 3, 2009, when Pope County Sheriff's deputies responded to a call regarding military ordinances that were found on wooded property in London, Ark. On that date, City of London Public Works employees observed a partially buried plastic bag in the woods. A worker dug up the bag and discovered a military canister containing military ordinances inside. These ordinances were later determined to be high explosive rounds designed to be fired from a grenade launcher.

Dr. Mann, who lives approximately 875 feet from where the grenades were found, was previously interviewed by ATF agents during their investigation into an explosion that injured Dr. Trent Pierce on Feb. 4, 2009, outside Dr. Pierce's home in West Memphis, Ark. During Mann's interview, which took place the day of the bombing, Mann showed investigators at least one grenade launcher he legally owned.

Armed with the discovery of the grenades, the information regarding Mann's possession of a grenade launcher, and Mann's close proximity to the location where the grenades were found, law enforcement officers obtained a search warrant for Mann's London, Ark. residence on March 4, 2009. In the course of executing that warrant, officers found five military canisters that were the exact shape, size and color as the canister recovered from the woods, with one of the five bearing the same lot number as the canister found in the woods. Also located during the search of Mann's house was a

box containing 45 practice rounds of ammunition for a grenade launcher, as well as two grenade launchers that were found in a basement safe. Both grenade launchers were capable of firing the grenades found in the woods. Investigators also found 110 semi and fully automatic firearms in Mann's house, with an estimated aggregate value in excess of $1,000,000. Investigation revealed that the majority of those weapons were lawfully registered to Mann.

If convicted of count one of the second superseding indictment, Mann faces up to life imprisonment. Count two carries a possible punishment of not less than seven years and not more than 40 years imprisonment and a fine of up to $250,000. Mann also could be sentenced to up to five years imprisonment and a fine of up to $250,000 if he is convicted of possessing chloroform while detained as a federal inmate. The possession of unregistered firearms offenses carry a possible punishment of up to 10 years imprisonment and a fine of up to $10,000. The possession of the machine gun charge carries a possible punishment of up to 10 years imprisonment and a $250,000 fine. The statutory penalty for the obstruction charges are up to 20 years imprisonment and a $250,000 fine for each defendant. Sue Mann faces up to five years imprisonment and a $250,000 fine if she is convicted of making a false declaration before the grand jury.

The investigation was conducted by the ATF; the FBI; the Pope County Sheriff's Office; the West Memphis Police Department Bomb Squad; the Shelby County Sheriff's Department Bomb Squad; and the Arkansas State Police with assistance from the Arkansas Prosecuting Attorneys Offices of the 5th and 2nd Judicial Districts – David Gibbons and Michael Walden, prosecutors. It is being prosecuted by Assistant U.S. Attorneys Michael Gordon and Karen Whatley.

An indictment contains only allegations. The defendants are presumed innocent unless and until proven guilty.

###

*Mann v. United States*
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 8

Case 4:09-cr-00099-BSM   Document 395   Filed 10/20/14   Page 141 of 210   1 of 20

To the Honorable Brian S. Miller,

My name is Hamis Alsharki, your my Judge in Case no. 4:09CR0002-01 BSM, I'm writing you this out of fear for my life. The stuff I'm going to tell you are true facts of what happened. I feel like your the only one (other then GOD) I can trust at this time. I've meet you, your an upstanding guy, I like the way you handle your business and most of all I can tell your a man of truth. Please I NEED YOUR HELP! Please take a few mins out of your time and hear what I got to say. I was forced to do something I didn't want to be part of. I have seen these people mess a man up with millions of dollars and if they can do what they want to him, well then i'm a nobody. If tommorrow they find me hang in my cell, well I believe and trust in you and want to let you know if anything where to happen to me, you'll know before hand the "Why. Your Honor I scared for my life. I don't trust my lawyer or even to tell my wife over the phone, or even write her in a letter My lawyer is a part of this criminal offense.

At frist I thought they came to me with an future, an opportunity for me and my wif

and Kids. I don't have nobody else here in America, my mom, dad, brothers, and sisters got deported back to Yemen. I've been locked-up for over a year, all my friends I had, gone. They offered me an imunty so I can be with my wife and Kids here in America. But at the same time I was scared because they told me "... if you don't take up on this offer, you would regreat it" So what other chous I had? I was scared and I did what thee wanted me to do and say, out of fear. It all started on Aug 28, 2009 ....

~ Aug 28, 2009 ~

One that Friday in the afternoon I was moved from cell number P-311 to P-317 with Bar deep Mann. We became cellmates and we go to know each other better. Six (6) day later...

~ Sept 3, 2009 ~

I was one of the units clean-up craw. M job that night was to clean the showers. have did the showers because I need som bleach (so called "clorform") to wash my clot They Keep the bleach in the deputys bath room just cause we (inmates) Keeps on tak

it, but only brings out just enough for a
spray bottle. I had went to the utility room
and grabed a small trush bag and pourd the
bleach in to it. I went by our room (P-317)
and asked Randeep if he needed some and
he tells me 'NO, I'm alright'. I then asked
him if I should sell it, he says "Whatever,
do what you want". I had took it in to the
room and put it beside of the sink and had
put a fase rag on top of it (in away was try-
ng to hide it). The next day....
~Sept 4, 2009~

After eating lunch me and Randeep was bac
in the room. Deputy Evins and Sgt. Tensley and
Sgt. Bangs came in to the cell and told us
to step out. There was 3 U.S. Marshal's wait-
ting to search our room. The Sgt. put me in
the cellyport and Randeep in to a shower f
a strip search, I thought I would be nex
but the Marshals never searched me or said
anything to me. The deputy asked me whten
was my stuff in the room, when I was st
in the cellyport. They (Sgt's and U.S. Marshal's)
walked Randeep out of the unit and move
him to a suicide cell by himself in another

unit. The deputy let me went back to my
room (P-317). I had changed rooms and moved
back to my old room (P-311). Six (6) days
later...

~Sept. 10, 2009~

I was in my room (P-311) and was told to
get ready to go to court. So I grabed
my paperwork thinking you wanted to see
me. One of the Sgt's that's in the transport
department, Sgt Redmen came and got me from
the unit and walked me to where the Marshals
always come and get the inmates for court,
but on our little walk we talked a little bit.
She asked me how I was doing and I told
her I was fine and asked her the same but
then I asked her "was the Marshals' down stair
already" she said "No, not yet but A.T.F is comi
for you". So, I was like "huh, what's the differen
she said "I don't know, but they called and
asked to get you ready, they was on the way".
So, I get down to the holding booth and the
ainle come. Two (2) A.T.F. agents (still dont
know they names, but one is 5'9, 150 lbs, w/m,
about 30-35 years old and the other one
's about 5'7, 190-210 lbs, buld body, w/m,

about 40-48 years old) comes and tell me
"Hi, how are you doing?" I tell them good and
then asked me "You ready". So they put the
akelcuffs on but no handcuffs. I thought that
was kind of wiered because everytime I wen
to any court, they'll have both on. On our
way out I asked them "Whats the differens
between you two and the Marshal's taking
me to court?" They say "we'll tell you in a
few mins." So now I'm like "What the hell is
going on?" "Whats happening here?" I get in to
a gray Impala and they tell me "We're going
to have a meeting with you, your lawyer-
Omar Green, and US Attorney-Karen Whatley
in the front building, when we get there
we'll talk about this some more." I wa
like "well, at lest Omar will be there". We g
there and Karen Whatley hasn't showed up y
so the short A.T.F. agent says "Omar, I'll let
you bring him up-to-date and we'll be out
here until Karen shows up. He leaves an
I start talking; (*note* Omar Green (O.G.), Kar
Whatley (K.W.), short A.T.F. agent (S.A.), and tall
A.T.F. agent (T.A.))
   Me: Omar whats going on here?
   O.G.: I got good news for you.

Me: What?

O.G: These people is fanna ask you about Randeep Mann and in return they are willing to give you a "time-cut" on your sentence. But I advice you it's in your best in trust

Me: What? like what plus my time is already short, I ant got nothing but like 6 to 9 months and plus I'm fasing deportion anyway.

O.G. Really you only got that much left? I believe they can help you get imunite to stay here in the States

Me: Man, I wouldn't know what to tell them anyway it's not like I knew him from the free world.

O.G. Just answer what they ask you.

By that time they all walked in the room, the two unknown A.T.F. agents an Karen Whatley. We all said our "hi's" and "How are you dong's" and then it went on like this:

O.G. He doesn't have a lot of time to get any "time-cut," but he do has an immigration hold and they're going to deport him back to Yemen. He's been here 18 years b

all his family had got deported not to long ago and he don't wants to go. What you think?

K.W.: We can grent him imvinte to stay in the States.

O.G.: It sounds like an oppertunty of a life time to me. What you think Hamis?

Me: Yea, but what I got to do?

S.A.: Answer to what we ask you.

Me: And if I don't?

S.A.: Well, it's like this off the reco, if you help us with what we need, we will give you imvinte to stay here with your wife and kids in the States and wi not get deported to Yemen, but if you don't take up on this offer you would regreat it.

K.W.: I'm going to make sure everything works out with immigration. I g alot of friends in that department.

Me: Okay, where do we start?

(*note* They wouldn't tell me what to say but as you'll see, they were tell me how to say what they wanted i to say. This is what they were

asking and me answering)

S.A: Did Mr. Mann send anybody to do
the bombing on Dr. Peires car?
Me: I don't know
S.A: No, try again
Me: Yes
S.A.: That's better
S.A: How does he feel about Dr. Peires?
Me: He don't like him
S.A: Better
S.A: Have you hard him say, "Good thin
come to an end", or "It starts one wae
but it ends another way", or "People ge
what they deserve", or even "An eye
for an eye". Do you think he was talkin
about the bombing?
Me: I might or I might not have
hard him say them, but I even say stu
like that —
S.A: We're talking about him
Me: Well, okay
S.A.: Do you think it had something
with the bombing?
Me: No, he could've been talking about
nything

S.A. Nope, that's not it
Me: Yea, it did
S.A. Your getting better at this
S.A. Who's clorform was that?
Me: Mine, I got it from a spray bottle
S.A. No, try again
Me: It was his
S.A. Who put them gernades there?
Me: Somebody
S.A. Was it somebody he knows
Me: It could be
K.W. That's real good today. You did
a good job. We advice you, that you shall
not talk to nobody about this, even your
wife. Do you have anything you want
to ask anyone here?
Me: No
K.W. Well, then if you want to get
in contact with us, you could let Oma
know and he'll let us know then we'll
set-up a meeting. But we'll be telling
the county that your going to court
because we want to keep this betwe
us only.
Me: Alright

We had said our good-byes, and then the two A.T.F. agents brought me back to the holding booth and then they left and I'm back to the unit.

Your Honor I was scared what else I was suppose to do, when they told me "... if you don't take up on this offer you would regreat it". I did what they wanted me to do out of fear, I mean after my lawyer said "It sounds like an opperturinty of a life time to me, what you think Hamis"? I knew he wasn't there to be on my side and after he seen and hard the whole thing and knew it was wrong, he didn't stop it at all but let it happen. Afte that day I didn't hear nothing from them not until...

~ Nov. 2, 2009 ~

On this day I had came back in front of you but before I seen you I was rought in to an interview room (the re where I would talk to my lawyer efore we go in front of you). I wasn't pporized when I seen the two unknow

A.T.F. agents, Karen Whatley with Omar Green in the room. We said our "Hi's" and "How are you doing's", and then we got in to it;

S.A: We see you've been getting letters from him.

Me: Yea, he's been writing me since Sep—

K.W: Anything you want to add?

Me: No, he's not saying anything about his case, you got all the letters I ever got from him.

Me: Do you want me to stop writing him?

K.W: It doesn't matter, other then you can't be asking him about his case and that's because you haven't read him his rights and that's only because since you with us, your concered an agent and that would be unuseable in court because mostlikly he'll show the court, what you asked him is on paper.

Me: So, it's alright to write him?

K.W. Yea, just don't set-your self up.

Me: Alright

The 3 left and Omar stood behind me and him talked about my case for a little bit. He told me he had got the P.S.R. that day and I was going to plead guilty and put in a motion for a continuance on my sentencing. A few mins after that I came in frount of you plead guilty and then Omar and the U.S. Attorney had approused the barch and informed you that, I'm being used as a leading witness in another case and if I would to get sentence that day then immigration will deport me and need a continuance for that reson.

Now the next date will be when I was put infrount of the Grand Jury, but I was never told about seeing the Grand Jury....
~Nov. 7, 2009

On this day, I thought something happened with my case and you wanted to see me. Again I was seen by Omar, aren Whatley, the two unknown A.T.F.

agents, and a male prosecutor ( I don't remember his name, but he looks like about 5'7, 150 lbs, looks about 25 years but is about 30-35 years, w/m and pink in the fase). Before they put me in frount of the Grand Jury the male prosecutor (M.P.) asked me the same questens I was asked in my frist intervive and when I hard the frist queston, I already knew what I had to do because I was scraed of what they said in the frist intervive ("...you would regreat it"), so I said what they wanted me to say out of fear. And it went like this......

M.P: Did Mr. Mann send anybody to do the boming on Dr Peires' car?

Me: Yes

M.P: Do you know who?

me: No, but it was somebody.

M.P: Did you ever hear him say, "People get what they deserve, or "Good thing come to an end, or what about "It sts rts one way but it ends another wa Do you think he was talking about th

booming?

Me: Yea, it did

M.P: Who put them Grenades there?

Me: Somebody, he knew

M.P: Who's clorform was that?

Me: it was his

M.P: Garen tells me you'll be getti

an imunte to stay in the States for doing

this. Right

Me: Yea

K.W: You will be asked "Why are you

doing this?" and you would responed

with "I want to stay in the States and

be with my wife and kids." That way i

will help me get you the imunte whe

you go to immigration court.

Me: Alright

K.W: You ready to do this, so we can

get you back to your family and stay

here in the States?

Me: Yea


I was then brought in frount of

the Grand Jury in min's, they told me

after we finshed that I did a great

job and proud of me and it went

well but I swar Your Honor I felt
like I could jump out the window. I
know that was wrong what they had
me do, but it was like "do it or you'll
pay" and I just want to tell the trut
Why now? Because it's eatting me up from
inside-out, at frist it was just a nam
but then that name gots a fase and tha
fase gots a wife, kids, a momma and a
dad, and may be a brother and a siste
I'll never forgive myself for letting
them send a man to prison by using n
    The next date Your Honor, was my
last and resent vist by them, and th
when I grow some balls......
 ~April 22, 2010~

     I was brought down to the holdi
booth that morning. The two A.T.F. ag
nts was already there waiting on me
come down from the unit. I was jok
and said "I didn't do it" to the agent
because I could tell there was someth
on there minds and the short agent sa
to his parter "Well, he already knows
why we're here", and that kind of fre

me out because with these guy you don't know what to expect. They asked me what have I been up to and told me my lawyer won't be there and Floyd Hancock-chief of investigators of the F.P.P office will be there instead and also Karen Whatley. We all got our seats but this time the short bodybuild agent grabs a chair and sits besides of me and says "I'm gonna sit here just in case he acts up." (*note* all the other time he and everybody else sat across from and only my lawyer would sit besides of me, but now he's putting a lot of pursher on me already knows I'm uncom- forble as it is) Karen Whatley. Stats;

K.W.: What's new with Mr.Mann these days?

Me: Well, ever since he got his dis- corvey and found out that there was N evidence he's been very carfull of what he says.

K.W.: Has he spoken about Dr.Peires o the Med. bord?

Me: Nope, not a word

K.W.: Gernades?

Me: NO

K.W.: How about the boming?

Me: Not that eather

K.W.: Bullshit! We know he like's to run his mouth, and your the closest perso to him. He likes you, trust you, and you tw have been writing to eachother for a long time.

Me: Yes, that is true but like I said he's not saying a word about the case.

K.W.: Clorform, what about that?

Me: It was mine, I got it out of the spray bottle, I brought it in to the room.

K.W.: Really, where was it in the roon

Me: By the sink

K.W.: was anything on top, beside, or unde it?

Me: Yea, a fase rag on top of the bag I was kind of hinding it in away.

K.W.: In one letter he asks you to fin out about a person but then on the next he's thanking for the infomation. What w that infomation?

Me: O' that was a name he needed

and I happen to come across him.

K.W.: Why him? What did he do? What's
he's name?

Me: The dude had got over on him and
wanted his real name not nickname. I don't
remember his name right now, it was some-
thing I had wrote down because I was
in a rush, but when I get back to the
unit I'll call Omar and let him know.

K.W.: We believe your helping him

Me:

K.W.: We need that name.

Then up and gone, and I was on my
way back to the unit, no good-byes
where said, no hang-in there, no nothin.
The next day I called Omar and I tal-
ed to him, he tells me he couldn't be
there because he had jury trail and I
told him about the intervlue and how
they where putting pursher on me and
the short A.T.F making me uncomfortble
and he says "Its how the case is goin
and from what you said yesterday it's go-
ing down the drain and don't take it
personal its just business and don't wo

everything will be alright", but then
the phone cuts off and I've tried to
call back a few time that day and
a few times this past week.
    I would like to end this by saying
I'm sorry for what I was forced to
do and should've spoke up earlyah, but
trial for this case is still 7 weeks
from now and I pray its not to late. But
please understand what I'm doing now.
I didn't and never did wanted to be
apart of this, to send a man to pri
son without evidence, that would be vea
wrong and I don't want to be the
person to help them, NO! Not no more! Bu
Your Honor you see why I'm coming to
you, I need your help, I can't trust n
body at this time. Your Honor I'm mor
then willing to do whatever you need me
to do, if that mean to get a lie deteut
test "I'll do it", get on the stand "I'll d
it", whatever you want. Yea, I won't get
to stay here in America and get ser
back to Yemen, but in my heart I
know I'm doing the right thing. Than
you for your time, and please Your

OFFICIAL SEAL
ELIZABETH M. CHURCH
NOTARY PUBLIC-ARKANSAS
SALINE COUNTY
MY COMMISSION EXPIRES 1-27-18

Honor, let me get some type of responds letting me know you got this. I'm doing this on my free will. This right here, I can say I wasn't forced, bribed, or even threated to do this. I just want to tell the truth, and let it be known to you.

Respectfully,
Hamis Alsharki

In witness wherefore, I hereunto set my hand this 12th day of May 2010.

State of Arkansas )
                  (ss
County of Pulaski )

Hamis Alsharki
Hamis Alsharki

Subscribed and sworn to before me this 12th day of May 2010.

My commission expires. 04-21-2019

OFFICIAL SEAL - #12370966
ELIZABETH M. CROUCH
NOTARY PUBLIC-ARKANSAS
SALINE COUNTY
MY COMMISSION EXPIRES: 04-21-19

*Manny v. United States*
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 9

# DECLARATION

COMES NOW the declarant, Rameshwar Dass, and as authorized by

28 U.S.C. § 1746, states and declares under penalty of perjury all as follows:

1.      My name is Rameshwar Dass.

2.      I reside in St. Louis County, Missouri.

3.      I am of legal age and of sound mind and body.

4.      I was born in India, and come from the State of Punjab.  Punjab

is a state in northern India that is immediately adjacent to the State of

Haryana, which includes the city of Karnal.  Until 1966, Punjab and

Haryana were one state.

5.      I resided as a practicing Hindu in northern India for

approximately forty years.

6.      I moved to the United States in April 2001.

7.      I am a naturalized citizen of the United States.

8.      I was trained for ten years to be a pandit, or priest, in the Hindu

faith.

9.      After this training, I passed an examination to qualify to be a

pandit in Hindu Shastras (scriptures and ritual).

10.     I have been a pandit in the Hindu faith for approximately thirty-two years.

11.     I have been a pandit at the Hindu Temple of St. Louis since my moving to the United States in April 2001.

12.     I am familiar with the practices of the Hindu faith both in northern India and in general.

13.     A pooja is a worship service.

14.     In conducting a pooja, it is common to pray for individuals.

15.     When the pooja is for a person who has died, it is common for there to be a picture of the individual at the pooja.

16.     When prayers are offered at the pooja relating to a person who is absent for some other reason, some people in India may use the individual's picture.  Usually this is done by Tantrics and not the priest, to the best of my knowledge.

17.     I am giving the foregoing opinion to a reasonable degree of clerical certainty.

18.     I was not approached by counsel for Dr. Randeep Singh Mann to offer an opinion on the use of pictures in poojas until 2014.

19.     If I had been approached in 2009 or 2010, my answer would have been the same as it is in this document.

20.     If I had been approached in 2009 or 2010, I would have been available as a witness to provide the information in this document.

Further, the declarant saith naught.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:   10—10—2014

RAMESHWAR DASS

- 3 -

*Mann v. United States*
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 10

# DECLARATION

COMES NOW the declarant, Dr. Randeep Singh Mann, and as authorized

by 28 U.S.C. § 1746, states and declares under penalty of perjury all as follows:

1.      My name is Randeep Singh Mann.

2.      I am of legal age and, with qualifications not relevant to my ability

to make this declaration, of sound mind and body.

3.      I am incarcerated at USP Terre Haute.

4.      I have reviewed the attached papers, which are transcripts of sound

recordings of telephone calls placed or received by my patients Daisy Edberg,

Richard Herrera, Julie Hernandez, David and Patricia Blevins, and Barry Downs.

I recognize the voices of each of these patients as participants in the calls

recorded.

5.      In respect to the recordings, I was familiar with the equipment, it

was in good working order, I used it in accordance with the directions, and the

recordings were good reproductions of the conversation.

6.      Although I do not now have custody of the recordings, that is the

result of the respondent's custody over me and the ways in which it uses the

latter custody to obstruct my efforts to challenge it, which is the object of the

litigation in which I offer the transcripts. True and correct copies of the recordings themselves are in the custody of my counsel.

7.     In respect to each of the foregoing transcripts, I have compared the written documents with the sound recordings, and the former are true and accurate representations of the contents of the latter.

Further, the declarant saith naught.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: _October 6, 2014_

_RANDEEP SINGH MANN_

-2-

PCR/Habeas Exhibit 10
Redacted
Page 2

11-4-02

Answer: Hello. ATF.

Daisy: Yes. May I speak with Warren Newman please.

Warren Newman: This is Agent Newman.

Daisy: Hello, Warren. This is Daisy. I though about your offer you made me. I am willing to try to buy the guns from Dr. Mann for you. What kind of guns was it you wanted me to buy?

Warren Newman: AK-47's fully automatic or Uzi's. Buy as many as you can, and I'll give you $2500.00. Just buy at least just that kind.

Daisy: What about the money you said you would pay me for getting him to offer me drugs for sex?

Warren Newman: Well, I ain't got nothing to do with that. Chris is going to handle that part and pay you the $250.00 for that just as we discussed.

Daisy: So when can we get together and do this?

Warren Newman: I'll call you back tomorrow and make that time. Better yet, let's just meet at the DEA office about 1:00 or 1:30 and we'll wire you up and send you in.

Daisy: Okay. I'll see you tomorrow. First I'm going to have to call and see how much he wants for the guns, right?

Warren Newman: Right.

Daisy: Okay. I'll see you tomorrow Newman.

*Mann v. United States*
Case 4:09-cr-00099-BSM   Document 395   Filed 10/20/14   Page 1 of 2
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 10.1b

Mann v. United States
Motion to Vacate, Set
Aside, or Correct Sentence
Mann Declaration Exhibit 1
Part B

(Daisy was asked to address Warren Newman as "Marty".

Marty: Hello

Daisy: Hey, this is Daisy

Marty: Yeah, what s up

Daisy: Well, I m over here at my friend s, uh, place, and I told him that I d give you a call, and you could explain to him, exactly what kind of uh, guns that you w, that you were wanting.  Cause I told him that you weren t interested in the Braum.

Marty: Uh, now is not a good time

Daisy: Now is not a good time?

Marty: Now is not a good time, no.

Daisy: Ok Marty well, I ll just give you a call later then.  Uh..

Marty: Just tell him, tell him, uh like a Mac 10 or an AK47, something that s fully automatic

Daisy: Ok yeah I told him that, and I told him that you said 3 to 5 thousand per gun right?

Marty: Nope, no more, I ain t spending no more than 3 to 5 thousand.

Daisy: You ain t spending no more than 3 to 5 thousand?

Marty: Right

Daisy: Altogether?

Marty: Right

Daisy: Ok

Marty: Alright

Daisy: Alright

Marty: Alright, I ll see ya

**NOTE: Numerous people who are familiar with Agent Warren Newman have stated that the voice in these 2 recordings is not that of Agent Newman, despite the fact that Daisy Edberg claimed it to be that of his. The implication being that a voice altering device was utilized. In addition the content and context of the dialogue, nothing of which is even remotely illegal, would point to it being delivered by a LE / ATF Agent.**

**However, Daisy Edberg and Agent Newman could shed light on the truth of this matter which only an Investigative Agency could ascertain.**

First Conversation

Chris: Hello?

Richard: Chris?

Chris: Yes.

Richard: This is Richard.

Chris: Hi. What's up Richard?

Richard: Hey, uh, do you still want to try to get that gun you were talking about, the, you know, still try to get that gun you were talking about.

Chris: Yeah. Are you somewhere where you can't talk really good?

Richard: Yeah.

Chris: Okay. Yeah. Yeah, I'm interested in it.

Richard: Okay. Will it get me off the hook.

Chris: Yeah. Can you talk to me right now?

Richard: Yeah.

Chris: Okay. Well, what are you talking about. I have no idea what gun you're talking about.

Richard: Well, do you remember we talked about, you know, if I could get a gun from the doctor that you'd get me off the hook.

Chris: Can you get a gun from the doctor?

Richard: Yeah.

Chris: What kind of gun?

Richard: Whatever.

Chris: Can you get a fully automatic gun?

Richard: Uh, I'll work on it.

Chris:  Okay, that would get you off the hook if you can get a fully automatic gun from him.

Richard: A handgun.

Chris: No. Fully automatic. Some kind of gun. Fully automatic. Not a semi-automatic pistol. A fully automatic gun.

Richard: Okay, uh, I'll get back with you then.

Chris: Okay.

Richard: Okay. Let me get ahold of him and I'll call you back.

Chris: Alright.

Richard: Okay, bye.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

02-17-03

Second Conversation

Chris: Hello?

Richard: Chris?

Chris: Yes?

Richard: This is Richard.

Chris: Hey Richard, what's going on?

Richard: Okay, uh, okay I can get an AK-47, but he wants $8,000, Dr. Mann.

Chris: He wants $8,000 for an AK-47.

Richard: Dr. Mann.

Chris: Fully automatic?

Richard: Fully automatic.

Chris: Where could you buy it from him at? At his office?

Richard: I don't know, from his office or from work, but I could get it.

Chris: Okay, well let me, uh, .......

Richard: But I want to make sure I'm off the hook man. I want .... You know, you told me, you know what I mean, paperwork, you know, you're gonna get me off of this.

Chris: Hey what did you, uh, how did you explain you were gonna be able to get $8,000 to Dr. Mann?

Richard: No. You're gonna come up with $8,000 ......

Chris: I know that, but Richard if you ask him to sell you an AK-47, and you agree to that, how does he think you're getting that $8,000?

Richard: I said if you guys wanted to get the gun, then you come up with the money.

Chris: What?

Richard: You guys want a gun?

Chris: We want to buy the gun. We'll come up with the money, Richard, I'm asking you what you told Dr. Mann about the money, or have you even talked to Dr. Mann?

Richard: Yeah, I talked to Dr. Mann.

Chris: Okay, then what was said about you coming up with money? Did he ask you how you were going to get that money or anything?

Richard: I said I don't have the money.

Chris: You told him you don't have the money?

Richard: I don't have the money.

Chris: Okay, then why did he offer to sell you a gun if you told him you don't have the money.

Richard: Cause you offered me a deal, if I get you a gun ......

Chris: Yeah.

Richard: If I get you a gun, then we'll work a deal. Remember you told me that?

Chris: Richard.

Richard: You told me that.

Chris: Richard, that is the deal, but what you're gonna have to do is sober up and then call me back because I can't talk to you right now.

Richard: Hey, hey, hey I'm sober. I'm sober. I'm sober as a rock man.

Chris: Richard, I'm not saying you've been drinking. I'm saying you've taken too many pills today. I can't talk to you right now because I'm asking you questions that you're giving me completely off-the-wall answers to. I need to know what was said to Dr. Mann about how you're gonna receive the money. Did you tell him you've got a check coming in? Did you even tell him anything? I need to know what was said about how he thinks you're getting that money. I know you didn't tell him that Chris and Glen from the police department were gonna pay for the gun......

Richard: No. Hell, no. No, no, no.

Chris: That's what I need to know, is how you told him you were going to get the money, or was there any discussion about it.

Richard: He wants cash money.

Chris: I know he does. I'm asking you how you said he was going to get the money, or how you were gonna get the money to him.

Richard: I didn't tell him nothing about anything like that, and you know what? I'm, I'm sober man. I'm not high on nothing.

Chris: You haven't taken a pill today.

Richard: No, I ain't taken no pills today.

Chris: Okay. When does he want the money?

Richard: Whenever you come up with it.

Chris: Whenever you can come up with it?

Richard: Yeah.

Chris: Okay. So did you set this deal up for anytime soon, or did you just tell him you'd get back with him?

Richard: I'll get back with him.

Chris: Okay. So how is this deal supposed to take place? Does he want the money first and then he'll give you the gun? Or will he do it at the same time.

Richard: You come up with the money and then you get the gun.

Chris: Does he have the gun already or does he have to go get the gun or something?

Richard: Yes. He has it.

Chris: He already has it?

Richard: Yes.

Chris: Okay. Are you going to be at your house later on?

Richard: Yeah. About an hour.

Chris: Okay.

Richard: Hey, but Chris what makes you think that I'm high. You know, I'm straight man. I'm trying to get off this hook man, you know what I mean?

Chris: No. Richard it's okay man, don't get upset, okay, I just..... You were kind of giving me some weird answers there and I didn't understand why. It just seemed like you're kind of a little, like you're slurring your speech a little bit like you've had a couple of pills or something.

Richard: No, there ain't no pills involved in this.

Chris: Okay.

Richard: But you know this straight to Dr. Mann, you know what I mean, like I told you, that's who I work with.......

Chris: How early could we do this. Do we do this towards the end of this week?

Richard: Yeah. Whenever you guys come up with the money.

Chris: We can come up with the money. Where are you supposed to, when you call him back, how are you gonna set up the deal? Are you just gonna say, "Hey, can I come down there," or is he gonna want you to meet him somewhere?

Richard: Well, when you get the money, uh, we'll set up a place, whatever arrangement you want, you know what I mean? I'm not the cop, you know. You guys are the ones that make the......

Chris: I know, I know, Richard, I know. But he is going to want to dictate this somehow I would think. He's gonna want to say, "You come to my business," or " You come to my house," or "I'll meet you at your house," or something like that, and so I was just wandering if you knew anything about how this would go down.

Richard: Okay. I'll get it from Dr. Mann.

Chris: No. Don't, don't worry about it. You don't have to call him back and get any details or nothing like that. We'll just .... Let me make some phone calls and I'll get a hold of you either today or tomorrow, okay, if you're gonna be at home.

Richard: Well, you want me to call you back?

Chris: Well, do you have a number I could call you back?

Richard: Yeah.

Chris: You keep blocking your caller i.d.

Richard: No. I ain't blocking it.

Chris: Okay. Well it keeps coming up blocked. What's your number and I'll get a hold of you probably tomorrow, okay?

Richard: You want my number?

Chris: Yeah. I want your number so I can get a hold of you.

Richard: Okay. It's ▮▮▮▮▮▮.

Chris: Okay Richard. I'll call you back either today or tomorrow, okay man.

Richard: Okay.

Chris: Alright.

Richard: Okay. Bye-bye.

Chris: Hello?

Julie: Hey, Chris?

Chris: Yeah?

Julie: This is Julie. How you doing?

Chris: I'm making it. What's up?

Julie: I just wanted to know, you know, what I could do? I need to get some fines and stuff paid off. Can I get Dr. Mann or somebody right away to wipe them out, or ....

Chris: Could he do what?

Julie: Dr. Mann or something to take out those fines. I have to do something about those fines. I can't pay 'em. I'm worried about 'em.

Chris: I know, but it's the same..... I thought we were talking about buying rocks.

Julie: Well, I talked to you, you know, you had mentioned about Dr. Mann, and I could come see him so I just thought that would be the easiest. I mean whatever.....

Chris: You're in his office right now?

Julie: No. No, No, No, No.

Chris: I thought you said you had come to see him.

Julie: No. I mean I see Dr. Mann. It's easier for me, you know, if I could do something with Dr. Mann, uh....

Chris: Well, I'll just you. Dr. Mann will be a situation where we have to get other people involved besides just us and it's kind of a .......

Julie: Oh, you have to involve other ......

Chris: Yeah, it would be more of a long, drawn out process. It's not going to be one of these crack, spur of the moment things, you know what I'm saying?

Julie: Uh, huh.

Chris: It would be one of those where we would have to get the State Health Board down here and find out exactly what they need for you to do and exactly what they need him to do and ......

Julie: Well, I kind of thought, you know, how you had mentioned before, like, how he was like sex for prescriptions and stuff like that, and I was thinking about it. I would sign a paper, because thinking back on it, you know, I can kind of see where that was coming from.

Chris: What? Where what was coming from?

Julie: Like the sex for drugs and stuff like that or sex for the prescriptions.

Chris: Why? I mean I don't know what you're saying.

Julie: Well, I just, I mean I'd sign a paper or whatever I need to do with Dr. Mann saying, you know, I mean, I don't know it's kind of hard to just throw all of this at you at once, but .....

Chris: No. Are you saying you think he would, if you offered him sex for a prescription he would take you up on that?

Julie: Uh, yeah.

Chris: I mean, okay....

Julie: You know, I mean I would sign something or I don't know how I would have to work that out. I'd sign something.

Chris: You know what I mean. They wouldn't let you go through with it, obviously.

Julie: Well, no, I wouldn't think so.

Chris: Okay. Well, really right now I'm not able....I tried this morning to get a hold of that guy from the Health Board and they said he wasn't in, but, and they didn't know when he would be in, so I'll have to call him back.

Julie: From the Health Board?

Chris: The Health Department guy, or whatever his duties are. I don't ..... My sergeant just gave me a phone number to call him, the guy that's working the case.

Julie: Uh, huh.

Chris: I think it's from the Health Board or something like that, but ......

Julie: Oh, what, they're going after him?

Chris: Yeah, they're the one's that would need it. It really wouldn't help us that much, because unless you could get him doing a criminal act, and a criminal act would be ...has he ever written you a prescription in somebody else's name?

Julie: Written me a prescription in somebody else's name?  No. Uh, uh.

Chris: Never has?

Julie: No.

Chris: Okay. Hey, hey can you hold on just a second?

Julie: Oh, you know what? Wait a second, he did write a prescription .....

Chris: Hey, can you hold on a second. I've got another call.

---

Noise, noise, noise.

Julie: Are you still there?

Chris: Yeah. What were you saying?

Julie: I was just thinking that, you know, I mean I'll do whatever I have to do. I mean I'd lose my medication and everything. I'd have to find a doctor you know, to help me out but you know whatever you need to say or whatever we need to do.

Chris: Well, has he ever written you a prescription in somebody elses name?

Julie: No, he hasn't written it, I mean, to me . I would sign something saying that he did, I know of.

Chris: No, I don't need you to sign anything.I need him to do something. Like if you've tapped him in the past....

Julie: How could I set him up to do something? I mean,I don't know what you mean. Like physical..

Chris: Like say,"Could I get a little more of these than what I normally get, you know?"

Julie: "Could I get extra pills?"

Chris: "I could use my sisters name, or I know her social security number," or whatever, I mean, just,  has that ever come up? I mean because he's done this to several other people, we think,  we just don't have anybody that has been willing to do it recently.

Julie: Oh really.

Chris: They've already given a statement that that's happened before, but we need it to happen while we're monitoring it.

Julie: Right, I'll do that. What do I have to tell him? Just tell him I want more medicine and put it in somebody else's name.

Chris: Well, I imagine yes, that's a possibility. Can you do that.

Julie: I think I could. Yeah, I'm sure I could. Yeah, I could.

Chris: So, there's no doubt in your mind you could get him to fill out a prescription for somebody else and give it to you.

Julie: Well, I could try it. All he going to do is tell me no, right?

Chris: Well, right, but now I need to have a fairly for sure thing, I mean I don't want them going out on a wild goose chase. We've done that too much with him.

Julie: Right.

Chris: We've wasted a lot of time with people saying they could do things with him and go to him and they can't do anything to him, so that's the reason I'm asking you if that's a pretty for sure deal. I don't want to ......

Julie: Well, I'll do it. Yeah, I'll do it.

Chris: Is it possi... do you think, you think he'll do that?

Julie: I'm pretty sure. Yeah, I'll try it. At least, I don't think he would think he would think it was uncommon for me to ask it, I don't know.

Chris: You don't think what?

Julie: I don't know. All I can do is ask him. I don't see, you know, where it would be a big deal.

Chris: Okay.

Julie: But I'll try to, you know, set him up that way and see what happens.

Chris: Well, when can you make an appointment with him?

Julie: Well I could probably go in .... I'll call the office. If you want I'll it and call you back or something.

Chris: Okay. Set it up for this afternoon if you can.

Julie: This afternoon?

Chris: Yeah.

Julie: Okay.

Chris: Or any afternoon I guess. That's kind of one of those we would need an afternoon thing.

Julie: Alright, let me see what I can do and I'll give you a call back.

Chris: Okay.

Julie: Alright. Bye, bye.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

**Fifth Conversation**

Chrissy: Hey, Patricia?

Patricia: Yeah?

Chrissy: This is Chrissy at Dr. Mann's. Uh, is David around by any chance to where we could talk to him?

Patricia: Who?

Chrissy: David.

Patricia: Oh, yeah, hang on a minute.

Dr. Mann: Listen, listen, uh Patricia hang on one second.

Patricia: Dr. Mann?

Dr. Mann: Patricia?

David: Hello?

Dr. Mann: Hey, David?

David: Yeah?

Dr. Mann: This is Dr. Mann.

David: Yeah?

Dr. Mann: Listen, I want to ask you a few questions, you know, you got a couple of minutes?

David: Yeah.

Dr. Mann: Listen, I want to ask you a small question, man. You know, a few things are going down and I am going to talk to you about this later. Who was the police officer who was talking to you and what did they.... After they busted you for all that stuff, who was the police officer you dealt with?

David: Did what now?

Dr. Mann: Who was the police officer you were dealing with when you got busted?

David: Oh the one that caused all the trouble for me?

Dr. Mann: Yeah.

David: Goodman.

Dr. Mann: What did he ......

David: Chris Goodman.

Dr. Mann: Okay. What did he want you to do?

David: He wanted me to see if I could purchase a , a ...... he didn't want no automatic gun.... He wanted a..... He wanted an automatic. He didn't want a handgun. He said he wanted an automatic gun, if I could purchase one from you, if I could buy one, that way we can uh.... He could wreck, you know ruin your life, I mean, you know, he ...... If I could do that I would get out of trouble. That's what he told me. That's the God's truth, and my wife was sitting right there listening. My little boy was there but he can't, he don't know, you know he's handicapped. He wouldn't be able to say anything, but my wife knows. We went in there and he acted like he was talking to the DEA, going back and forth, you know. He was trying to get me to _____ some people busted to make deals to get myself out of trouble with some people that caused all this trouble. They're drug addicts, bad drug addicts. They've got about six people in trouble, see?

Dr. Mann: Mm Mmm.

David: Well that's what he told me.  You're using people against other people. It's not right, what they're doing. They're entrapment on people, and he told me if I could do this, to get you, you'd be a big boy. You're the only one I would have to do, he goes, and you would be the only one, just to do this for us, to do it, and I said, " No, I don't think I would want to do that 'cause that ain't right." It's not right. You don't do that to people. That would ruin your life, you know?

Dr. Mann: Listen. Got a question. Did they refer to me as being the Taliban or an outsider or anything of that sort?

David: Excuse me?

Dr. Mann: Did he refer to me as being a Taliban or an outsider?

David: No. He hasn't nothing about no Taliban or nothing like that. He just said that he wanted to get you out of this town and he's gonna run you out of town and there's another cop that's said the same thing cause I was working over there. I don't know his name, but I could get this police report. I was doing a job over here at the City Mall and my medication got stolen and I've only done it one time. It's been filled since it got stolen too. It got stolen, just one time. I've only done that one time of the time I've been

going with you and you can verify this, and the guy tells me, " Well, are you a patient of Dr. Mann?" I said, "Yeah. Yes." He said, " Well, you ain't gonna get nothing." I said, " I'm gonna file a police report. I don't care." He said, "I ain't filing nothing." He goes, " any patient of Dr. Mann's, we don't acknowledge him as a physician," you know as a doctor, physican, what do you call it?

Dr. Mann: Physician. Yes.

David: Physician, what do you call it? I can't say it. But anyway, and that's what he said, "We don't recognize him as a, you know," I said, " That's wrong. I want a police report and I said by law", I said, "I'm going to you commander and officer and I'll get one. He goes, "Well, you come down and get it. It'll be filed." But you have to pay, I guess, like three or four dollars, I don't know how much they are, but I never did go to extremes to get it or nothing like that, but it's there and if I have to get it I can get it.

Wife's voice in background (Trish): I think it's Greg.

David: His name was what? (to Trish)

Trish: His name was Greg.

David: Trish thinks his name was Greg. I can get the report, I mean, if that's what we got to do.

Dr. Mann: Okay, no that's fine. It's, uh......

David: But I know this for a fact, these people, they're not doing the right thing, you know, and I can tell a lot more stuff just than that, I mean this is..... I'm not lying. I'm trying to do the right thing. I've been turning my life around. This... I mean ... cause I'm going to church now, you know, and I work. I'm not a dealer, I work, and they know that. You know I just got pulled over again. You didn't know that? I got pulled over again the other night. They pulled me over again, man, searched the car, just hara.... I mean just told me drunk driving and all this. I did all my tests for them. I blew in their machines, nothing, nothing, nothing! I said, " Do me a favor." My wife came over there and told me. She got up and told them, " Can we leave the car here. This is my husband." She said, "I'm not a coward." And the cop come up and Greg goes _____. This cop's name is Glen and I said, " Yeah, you're the one that caused all this trouble for me." I said, " I'm coming in from Little Rock, man." He goes, " Well, you ain't got no tags. You blow in the machine for me." I said, " I just blew in the machine once." He said, " Yeah, you're telling me you ain't gonna blow?" And I said, " I'll blow if that's what it takes to get you guys off me." So I blew in his machine and I still didn't come up nothing. They're just trying to harass me all the time. They counted my medication and everything. They're, you know, trying to cause trouble man. I need to move, cause I just can't even work around here. I can't do nothing. I feel like I need to leave, because if I don't they're gonna set me up. I got to lock my cars and my doors cause I feel like they're gonna put something there, you know.

Dr. Mann: Okay, listen. Do you know about anybody they've talked to about me?

David: Do I know anybody?

Dr. Mann: Yeah.

David: Yeah. I could.....yeah. Do we know anybody else that talked about Dr. Mann? Like any officers or ?

Dr. Mann: Officers who have made remarks about whatever. Getting me. You know getting people to wear wires on me.

David: (to wife, Trish) Getting people to get him. Set him up.

Trish: We could ask around (to David).

David: We could, I could check around.

Trish: We got out of the crowd (to David).

David: I mean I'm not in a crowd. I'm not in with all that man. I just, Dr. Mann this is the God's truth, I'm not in with nobody.

Dr. Mann: Okay.

David: You know, I haven't been. I mean, people, I just, I mean, I don't want none of the carry off, you know. I got kids. I don't want to leave my babies or nothing man. It's not worth it and, uh, I could find out. I could honestly do that for you. Honest to God, I could find out, I could check around, 'cause.....

Dr. Mann: I would appreciate that man, and I'll talk to you later....

David: Okay.

Dr. Mann: I'll talk to you later. Is it okay if I hand over your recorded conversation to somebody?

David: That's fine...I don't... You know what? The more the merrier, I mean more power, you know someone needs to stop this. I don't care if it's recorded or not 'cause it's the God's truth.... Do what ?  (To Trish)

Trish: (to David) Is he dealing with Francis Merrifield?

David: Are you dealing with a girl named Francis Merrifield?

Dr. Mann: Ummm. No she's in jail from what I heard.

David: (to Trish) She's in jail, back in jail. ( to Dr. Mann) She couldn't come over here. I run her off numerous times, trying to get us to sell some medication to her and I told her no. Just recently here I had to run her off. She came back twice. She said, " I'm so sorry Phil ratted you guys out" and all this. I said, "No." She said she was losing sleep over it. I said, " Look, we don't feel that way. Just go on back to sleep. Go on and go to sleep. We don't feel that way. We just don't want your company, you know. Just leave. I'm not trying to be rude to you. I just don't want you associating with me no more and I heard a lot of bad things about you , you know."

Dr. Mann: Do one thing. Give me your phone number.

David: Give you my phone number?

Dr. Mann: Yeah.

David: My home phone?

Dr. Mann: Yeah.

David: My home phone is ███████ and my cell phone, my cell number, okay, its uh ███████

Dr. Mann: Okay chief. I appreciate that man. Thanks for your time.

David: Alright.

Dr. Mann: I'll talk to you later.

David: Okay Dr. Mann

Dr. Mann: Okay chief.

David: Bye, bye.

Dr. Mann: Thanks a lot.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

**Fourth Conversation**

Dr. Mann: Barry?

Barry: Hey.

Dr. Mann: Listen. I've got a question chief. I just spoke to one of the guys down in the FBI early this morning......

Barry: Uh huh.

Dr. Mann: Um, to Mr. Smith. Uh, he wants, uh.... I'm gonna be.... Somebody's gonna be in my office on Monday morning.

Barry: Okay.

Dr. Mann: Um, I want again, you know, just the way it was, what transpired between you and Warren. Could you give me a statement to that regard?

Barry: Okay. Yeah, we didn't get off till late yesterday. Uh, I'll come by there this evening, if that's alright, and talk to you.

Dr. Mann: Okay. What time could you be by.

Barry: Uh, probably later on Dr. Mann. Probably about 7:00 or so.

Dr. Mann: That's great. When did you meet this guy for the first time man? Let me just write a few things down. When was the first time you met him?

Barry: Uh, let me see, I believe it would be August of last year.

Dr. Mann: Okay, and did you approach him or did he approach you?

Barry: Uh.... I approached him.

Dr. Mann: Okay, and what does he want you to do. I mean, did he ever give you a reason....

Barry: He wanted me to buy some guns from you, trying to get me to see if I could get a machine gun from you.

Dr. Mann: Did you, okay, huh. Did he offer you money for this or ......

Barry: Yeah. Yeah, he offered me some money. He didn't give me an amount, but he did say he would pay me well.

Dr. Mann: And that's the Newman guy, Warren, is it Warren Newman we talked about.

Barry: Yes. Yeah. Warren Newman.

Dr. Mann: Was anybody with him or .......

Barry: Uh, yeah. I don't remember his name, but he did have somebody else with him, but he was with the DEA, the other guy was.

Dr. Mann: Huh, interesting. So anyway, when was the last time you talked to this guy?

Barry: It's been a while.

Dr. Mann: How long? How long?

Barry: I don't know. Probably 8 months I guess.

Dr. Mann: What was the last conversation ..... Do you remember this last conversation you had with him?

Barry: Uh, he wanted to know if I had talked to you about getting those AK-47's.

Dr. Mann: Listen, what did he say about my cars man? What was the, which ....

Barry: Oh, he said that he was gone, they were gonna get that Viper and they'd be sportin' around in it makin' busts in it.

Dr. Mann: Did the DEA guy say that or did Warren Newman.......

Barry: ATF. Warren Newman.

Dr. Mann: No, no. Who was the one who was going to be riding around in it?

Barry: Warren Newman. He's the ATF agent.

Dr. Mann: Okay....okay boss, yeah, if you could come by and if you could give me something to that effect, you know, I mean I appreciate it because I've got to compile something for these guys before, or on Monday I've got to turn this stuff over to them.

Barry: Okay. Yeah, I called you yesterday evening to let you know what I couldn't ... they wouldn't let me talk to you.

Dr. Mann: Okay, that's fine. I'll be free this evening.

Barry: Okay, well we'll see you this evening Dr. Mann.

Dr. Mann: I appreciate that boss.

Barry: Alright, bye-bye.

Dr. Mann: Bye.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

Mann v. United States
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 11

# SKYLINE
# MEDICAL CLINIC, P.A.

111 Skyline Drive
Russellville, AR  72801

(479) 880-8828  Fax:  (479) 880-8826

December 5, 2002

TO:  Jeff Brzowski, BATF

Little Rock, AR

Dear Sir:

As per our telephone conversation of a few days ago, I would like to provide you with tape-recorded conversation of one of your agents, Warren Newman.

Upon reviewing the tape, you will note that the agent or the agency of BATF, along with the Pope County drug task force, have been targeting me for reasons that are not clear to me.  It is obvious that they are willing to go way beyond the law to see me humiliated, insulted, and incarcerated.  The agencies have resorted to entrapment measures, which are rather unconventional, and I presume, illegal.  These have been difficult to fathom by even the DEA and the FBI, with whom I have had the chance to discuss this issue.

I have been practicing in Russellville for over three years.  I am board certified in Internal Medicine, Emergency Medicine, and Pain Management.  I have a well-established practice in Russellville and am a respected member of the community.  The harassment to which I have been subjected to in the past year by the agencies in questions, has been quite unwarranted.  I have a large pool of chronic pain management patients to whom I prescribe opiates on a regular basis.  The agencies in question are challenging my medical judgment, which, in fact, is an issue, which falls under the jurisdiction of the state medical board rather than a law enforcement agency.

I hope that this endless harassment will be addressed and stopped by you and your department.

Sincerely,

R. S. MANN, MD

*Mann v. United States*
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 12

Dr Mann:  I ve got a few questions, I m having

DEA receptionist:  Regarding what?

Dr Mann:  I m having a little problem here, ya know.  I ve got a practice here in Russellville.  I m being told by a lot of my patients, that they are being approached by the police and everybody, that all their charges and any criminal background is expunged if they say that they ve been having sex with me for drugs.  They have to come up with that particular line.

DEA receptionist:  Ok hold on, let me see if I can find someone to talk to you, just a second please.

Dr Mann:  Sure mam.

DEA receptionist:  And you said this was Dr Mann?

Dr Mann:  That s right mam, is there a Mr. Chris Anderson there?  That works there?

DEA receptionist:  Uh, I don t know, just a moment.

(on hold)

(new male voice): DEA can I help you?

Dr Mann:  Hi this is Dr Mann, who am I speaking to sir?

(new male voice):  Bill Bryant.

Dr Mann:  Hi, uh

Bill Bryant:  Dr Mann I think I ve talked to you before

Dr Mann:  I know sir, I know, my problems don t stop.  It s a state of frustration that I m calling in.  Is there a Mr Chris Anderson that works there?

Bill Bryant:  Uh he s one of the task force officers assigned to one of the offices in the state, he doesn t work here in Little Rock.

Dr Mann:  Ok, you know, my thing is, this thing has been going on for two and a half years now and I don t know what to do.  Is there anything I can do?  I will be glad to do it.  I mean, these guys, 5-6 names keep popping up every time, patients of mine, you know, who are in jail get offered, in the process of being in prison or whatever, get offered deals that all you got to say is that you ve been having sex with Dr Mann for drugs, and all your charges will be given federal immunity.  All we want is him.  We are having federal charges against him.  But you ve got to say it s sex for drugs, and that s all we want to hear from you.

Bill Bryant:  Well, I ve talked to you before about this, I thought you were saying, you had a tape, or something, and then you called the ATF, or the Russellville Task force or something?

Dr Mann:  I called the ATF, ok, and the ATF amazingly says the officer there is not one of their officers, and they want the person, the female that was on the tape to come and sign a statement for them there.  And if she was lying, they were going to prosecute her, and only after she signed a statement there, would they do something about it.  Now, you know, these guys are freaked out, I mean, you know, half these guys are convicts, felons, or whatever.  You know, I m ready, fine, if they can find any person without a record to come and say I did something that was inappropriate, I d say fine I did it and do what you got after that.  But I mean, every person they bring is a felon, with a record, with a deal that all you ve got to say is that you ve had sex with this guy, but it has to be for drugs, you know.  It can t be just plain sex, it has to be sex for drugs.  And you have been granted federal immunity, the term comes up, federal immunity, the term comes up every time.

Bill Bryant:  Do you have any examples of any DEA personell doing this or saying this?

Dr Mann: Well last time I turned this into the ATF, the ATF came and gave this tape to the "boys" over here. Ya know, I mean the question is, if somebody can be unbiased about this, I can give you so much evidence that it s mind-boggling. I mean. I m not a paranoid kind of guy.

Bill Bryant: My question to you, Dr Mann, is, is any DEA employee doing this?

Dr Mann: There are a bunch of them doing this sir, there s a bunch..

Bill Bryant: No I m talking about the Federal Drug Enforcement Administration, not local drug task force

Dr Mann: It s not the federal, its local, every one of them is local, they keep saying federal every time, but I ve checked, and they are all local drug enforcement. And I don t know what to do, I mean, I ve tried to go to the FBI with this, and the FBI tells me it s fully legal for them to do that and they are within their rights to you know, authorize somebody to steal a car if it is in the name of justice and in their case, for them to pick up felons to say stuff like that, they are in their rights, and they have it s ok for them to do it.

Bill Bryant: I mean, it s common practice, unfortunately when you re in law enforcement you don t deal with all the Popes and the Chaplains, or nothing like that, but it s up to law enforcement to corroborate the statement. So if they say like, Bill Bryant is a bank robber, I can t go arrest Bill Bryant to corroborate and have evidence, that "hey Bill Bryant is a bank robber". But I guess what I direct to you, is DEA, I don t know if we have any jurisdiction for investigating complaints, I mean that s more of the FBI, or the loc..I mean like if it s drug task force or the police department there doing it, you need to talk to that chief or that supervisor of that department. DEA doesn t have the supervision over all narcotics related matters or personnel. I mean you have to go to that individual department, does that make sense?

Dr Mann: It s just that every time it turns around, somebody s been told federal charges are being brought agai .in fact again if you can keep this confidential sir, a patient comes to me, and her lawyer is telling her, "this guy s going down, just say what they want you to say. Get all your records expunged, and move on from there". I mean this is an attorney, telling a patient this. He s got his own handwriting on this piece of paper, because, you know, that s something he gave her. Saying that, cooperate with the guy, he gave his name there.. And, you know, she said, it s a damn good deal, what else am I gonna say? They re gonna take off every record, I won t have to serve time in jail, whatever they want me to say, what do I have to lose.

Bill Bryant: Well, you told me the people telling you this have records right?

Dr Mann: Every one of them has a record. I mean none of them is without a record.

Bill Bryant: That was my point I mean before..I m just speaking for DEA..before any information we get, before we use it in court or anything, we have to corroborate it, so I don t know if these people are feeding you lies, coming back to you, getting you all excited. I can just tell you how the DEA works, that if we receive any information before we present it as evidence in court, we have to corroborate it

Dr Mann: Well, to tell you very frankly, sir, again, please, off the record, I m being blackmailed by patients.

Bill Bryant: Uh..how?  What do you mean by blackmailed?

Dr Mann: Well, it s like they want me to say this (a false statement), and because I m not saying this, I m being so tired, I m being so stressed, so I need this (pain medicine).  Now what am I supposed to do with this information?

Bill Bryant: Well, doctor, don t you have an oath not to fill a prescription if you think someone is trying to .

Dr Mann: Well, if somebody s stressed out, because of pressure that a federal agency is putting on them, ok, that s a stressful situation.  If somebody wants medication for that stressful situation, it s my job to help with that somewhere down, deep down, the question is..is this real, or is this made up, or what s going on here?



Bill Bryant: I mean, I don t know if I can answer that one for you, cause I mean, I m not a doctor. You know, you might check with the medical board and see what they say, if you want to run this by them. Have you talked to the medical board?

Dr Mann: Well I talked to the medical board about it and they just said "You ve got yourself a local political issue". See the thing is, these guys sent a guy to my office to copy, 50, 60, 70 records, their charge at that time was overprescribing and not following the guidelines laid by the State Board. I follow every single guideline by the Board. I mean, they sent this guy in here from Little Rock, Mr Morris. He came and copied charts, charts, charts. I hadn t even been called by the state board. Everything was I talked to Mr Ray Jouett about this everything was, you know, above board there was no problem. And I asked the guy, I said, you know, it s a pleasure seeing you sir, I expected guys with badges and guns here, because from what the community has been telling me, that "you re gonna go down, they are gonna bust you, they are gonna arrest you, they re gonna throw you in jail and stuff". So he told me, he laughed and said, you know, the guys with badges and guns actually sent me, yes, I am here because of them. So I mean, if this is a witch-hunt situation, if I need to move from here, I mean, if someone can even tell me that, if someone can even tell me what I need to do, I ll do it. I even offered this guy, you know, I said, what do these guys want me to do? Ok, I m for the underdog. A lot of guys come to me who are ex convicts, who are in pain, who need medicine, and I give them medicine, you know, I don t distinguish between the kinda guy, I don t distinguish the character, it s not my judgement on these people. I treat whoever comes to me. And that is pretty much what is the price I m paying for, is having "scumball" patients. Now, you know, that s not my job to determine whether they are "scumballs" or not, I m just gonna treat them if I can.

Bill Bryant: I mean, as a doctor you take an oath to treat everybody, so as long as you are not doing anything wrong, Dr Mann, I wouldn t worry about anything. You re hearing rumors and stuff that are getting you all spun up, I mean if you re obeying every law and doing, living up to your oath as a doctor, you should have no worries.

Dr Mann: I am, you know, I mean it s so funny, I get guys every day who get convicted for selling cocaine then they are coming to me wanting to buy guns from me. I ask them why, they tell me the cops have sent me, and if I buy a gun from you, my charges are dropped.

Bill Bryant: Well, all I can tell ya is that the DEA is not doing that. I have the responsibility to supervise all DEA personell in the state of Arkansas, and uh, you need to, if you know what agency it is, you need to talk to those supervisors and tell them.

Dr Mann: Is it legal that if I m a drunk driver, if I, if I, have multiple convictions from drunk driving and all that, can I tell you somebody is selling cocaine and get off my charges? Can those charges be dropped?

Bill Bryant: An issue like that is left up to the local prosecutor. I mean, it would explain prosecutor hey this guy has information about this or that, but the prosecutor will decide whether or not to file.

Dr Mann: Because, you know, I can

Bill Bryant: A law enforcement officer doesn t have that authority.

Dr Mann: I called David Gibbons, who is the Prosecu

Bill Bryant: Prosecutor in Russellville, I know him

Dr Mann: I called this guy about this tape that somebody dropped off here, about somebody paying this woman $250 to sleep with me. Shortly after I called his office, she got a massive threat. So when I called her back I said, listen, I m gonna take this thing to the ATF. And she was just freaking out at the tape. I m not gonna testify, I don t even know how you got this tape. I I Leave me out of this thing. I mean she was just frantic and almost losing it, and, I mean, what am I supposed to do? I can t even get

Bill Bryant: Well bottom line is that if you obey the law and do what you are supposed to do as a doctor, you should have no worries. You know, if you listen to all these other things on the street it will drive you crazy. If you know that you re doing the right thing, you shouldn t have anything to worry about.

Dr Mann: Well see you know, my dad s a lawyer, and I know the way the law works. If 25 people say that, you know, the ring



you were wearing today was stolen from Dr Mann in front of 20 of us guys standing, then that ring becomes mine, I mean, you know.  So, it s just a matter of----And that s what they are doing, they are trying to gather 20 names for everybody to say, yeah he s been having sex for drugs.

Bill Bryant:  All I can tell you is as far as the DEA is concerned.  Is before we use any evidence in federal court we have to corroborate that evidence we have to prove that it s true.  And that s the way the DEA works, and that s the way that most law enforcements should work.

Dr Mann:  Well, I appreciate that sir, it s just that I m in a situation that s embarrassing.  I ve got kids, if I didn t have kids, I wouldn t care.  Play the game, lost in the end, who cares.  I mean you know, out on the streets, or in jail, I really don t care.  I ve passed that stage in my life where, I mean, I ve worked in the jail long enough to I ve spent more time working in a jail as a doctor, than most people have served as convicts.  You know, that part doesn t bother me, sh lock me up, go ahead, make your day, but I ve got kids, that s the only thing I m worried about, is my kids, not me.  And I don t know, I m trying to get some answers, I don t even know who to talk to.  I try to talk to the FBI, and the FBI says that s legal.

Bill Bryant:  Well, if you know what agency it is, you need to go to the supervisor of that agency.  So if it s the Russellville Police Department, go talk to the chief of Russellville.  Or if it s the ATF, go talk to the head of the ATF.

Dr Mann:  It s not the ATF, it s not the Russellville Police, it s the Pope County Drug Task Force.

Bill Bryant:  Well, go talk to the boss of that.

Dr Mann:  Well, how do you know who that person is?  Cause I get Larry Johnson, Casto, Goodman, Anderson

Bill Bryant:  I mean, well, overall, either the Sheriff, the Sheriff, or I think they have a Board it s over, but the Sheriff or the prosecutor, David Gibbons.

Dr Mann:  ok I ll

Bill Bryant:  You know Jay Winters?  Talk to the Sheriff

Dr Mann:  Jay Winters, from what I heard, doesn t know anything about it.  But let me talk to Jay Winters and see what he s got to say.  And let me try that route

Bill Bryant:  Alright sir

Dr Mann:  I really appreciate that sir

Bill Bryant:  Alright take care

Dr Mann:  Thanks a lot

Mann v. United States
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 13

1             MR. TRICE:  Call Amanda Virden

2  WHEREUPON,

3               AMANDA VIRDEN,

4  having been called for examination, and having been first

5  duly sworn by the undersigned notary public, was examined and

6  testified, as follows:

7             DIRECT EXAMINATION

8  BY MR. TRICE:

9  Q   Ms. Virden, would you state your name and where you

10  live?

11  A   Amanda Virden, Russellville, Arkansas.

12  Q   Have you been a patient of Dr. Mann's?

13  A   Yes, sir.

14  Q   Okay.  Why were you seeking treatment?

15     Did you have a -- we've heard talk that there was a

16  spider bite.  Did you have some kind of a spider bite

17  problem?

18  A   No.

19  Q   No?  Okay.

20     Ma'am, it's been alleged that you've engaged in improper

21  relations with Dr. Mann.  Is that true?

22  A   Those are false accusations.

23  Q   Those -- were those made by your mother?

24  A   Yes, sir.

25  Q   But you didn't do that?

```
 1  A    No, sir.

 2  Q    Okay.  Do you know if she did?

 3  A    No, sir.  Not that I'm aware of.

 4  Q    Okay.  I don't mean to cause you undue embarrassment,

 5  but the board needs to have a comprehension of who your

 6  mother is.  Do you know where she is?

 7  A    McPherson Unit.

 8  Q    Is that a --

 9  A    It's a prison facility.

10  Q    -- part of the Department of Corrections?

11  A    Uh-huh.

12  Q    For what reason is she down there?

13  A    Negligent homicide.

14  Q    Did you ever receive any controlled drug prescriptions

15  from Dr. Mann?

16  A    Yes, sir.  I got Xanax.

17  Q    Pardon?

18  A    Xanax.

19  Q    Xanax?

20  A    Uh-huh.

21  Q    And do you know for what reason you were receiving it?

22  A    Post traumatic stress syndrome, anxiety.

23       I'm not really sure what else.

24  Q    Okay.  And was your mother a patient of his as well?

25  A    Yes, sir.
```

```
 1  Q      Do you know if she received the same type medications?

 2  A      She received Xanax and Hydrocodone.

 3              MR. TRICE:  Does the board have any questions

 4          of Ms. Virden?

 5              Tender the witness.

 6                      CROSS EXAMINATION

 7  BY MR. MANN:

 8  Q    Ms. Virden, when we spoke in the past, you had expressed

 9  concern about testifying in open circumstances.  And I had

10  indicated that I would, if you wanted, ask that the room be

11  cleared of other perspective witnesses, so that you might

12  feel more comfortable testifying.  Would you like for me to

13  do that still?

14  A      Yes, sir.

15              MR. MANN:  May I ask the board to --

16              MR. TRICE:  Other than Dr. Ackerman.

17              MR. MANN:  Fine.

18              MR. TRICE:  If there is anyone here that's

19          been subpoenaed as a witness for either side, would

20          you wait outside?

21              THE WITNESS:  I also have one more thing to

22          add for --

23              MR. TRICE:  I'll let him --

24              THE WITNESS:  Yeah, okay.

25              MR. TRICE:  He's got you right now.
```

1                    THE WITNESS:  All right.

2  BY MR. MANN:

3  Q    You said you had one more thing to add.

4       What was that?

5  A    For the Xanax, I was also receiving it because I was

6  molested by my uncle when I was three; and then I was raped

7  at the age of 16, by a 51-year-old man.

8  Q    All right.  Now, the board ordered you to come here

9  because it's accused Dr. Mann of having sexual relations with

10  you.  And I want the record to be clear.  Is that true?

11  A    No, sir.  No, it's not.

12  Q    Now, before you were served with the subpoena, you were

13  visited by other law enforcement officials.  Weren't you?

14  A    Yes, sir.

15  Q    Describe for the board what happened.

16  A    The ones that came and saw me were Chris Ridenhour, Tony

17  Haley, and Warren Newman.

18                    MR. TRICE:  And who?  I'm sorry.

19                    THE WITNESS:  Chris -- Chris Ridenhour, Tony

20           Haley, and Warren Newman.  And --

21                    MR. TRICE:  Okay.  Who are they with?

22  BY MR. MANN:

23  Q    Yes.  Do you know which law enforcement agencies each

24  one works for?

25  A    They are all supposed to be drug task force, I guess.

1  Q      Okay.  Good.  Thank you.

2  A      And all they -- all they wanted to do, to talk to me

3  about was, they wanted me to work for them.  And they told me

4  if I could get Dr. Mann, they would give me $500, or anyone

5  else.  And if I testified, I would get $500 a person.

6  Q      All right.  Has anyone in law enforcement ever

7  approached you with a similar arrangement like that before?

8  A      Yes.  Chris Haley and -- no, Chris Ridenhour and Tony

9  Haley.  It's been over a year and a half ago.  Sat my mother

10 and I down and told us that if we would say we had had sex

11 with him, they would give us money.

12 Q      When you say him, you mean Dr. Mann?

13 A      Dr. Mann.

14 Q      So, over a year ago law enforcement officers approached

15 you and said they would pay you $500 if you would say you had

16 sex with Dr. Mann.  Is that right?

17 A      Yes, sir.

18 Q      All right.  Do you believe Dr. Mann is a good doctor?

19 A      Yes, sir.  I do.

20 Q      Why?

21 A      He's not like most doctors.  When you go in, when I went

22 in to see him, he would sit down, he would talk to me, he

23 would ask me how things were, spend time, you know, being

24 just -- asking me just normal things, you know.  He would, at

25 least ten, 15 minutes at a time.  He wasn't like most

1   doctors, just write you a prescription and send you out the

2   door.  He would -- you know, he acted like he cared.  He's a

3   real caring person, I believe, in my opinion.

4   Q    Dr. Mann is here because the board believes he's written

5   too many prescriptions and gotten people -- handled his

6   prescribing practices the wrong way.

7       Do you believe that's the case in your instance?

8   A    No, sir.  I do not.

9       I think the only thing he should be charged for is being

10  too good of a doctor.  He is the best doctor that I've ever

11  went to in my entire life.

12      I was also getting Xanax in South Carolina before I

13  moved up here for rape.  He's not the only one that ever did

14  prescribe me Xanax.

15              MR. MANN:  I'm finished with the board's

16          witness.

17                  REDIRECT EXAMINATION

18  BY MR. TRICE:

19  Q    Ms. Virden, just so we don't get confused between people

20  who have done investigations --

21  A    Uh-huh.

22  Q    The people that you say encouraged you to make

23  statements about Dr. Mann --

24  A    Yes, sir.

25  Q    -- were they local law enforcement up in your part of

1  the state there in Russellville?

2  A    Yes, sir.

3  Q    Were any of them working for the health department or

4  the State Medical Board investigators?

5  A    Not that I'm aware of.  No, they were all drug task

6  force.

7  Q    You know that bunch up there that deals in drug law

8  enforcement?

9  A    Uh-huh.  My mother dealt with them.

10 Q    Because she's had her own set of problems?

11 A    Right.

12 Q    And these were law enforcement, but not anybody involved

13 with this board?

14 A    Not that I'm aware of.  No.

15 Q    Okay.  Have I ever questioned you or requested any type

16 of answer from you at all?

17 A    No, sir.

18 Q    Okay.  Have you ever seen me until today?

19 A    No, sir.

20            MR. TRICE:  Okay.  Thank you.

21            DR. PIERCE:  What dose of Xanax was Dr. Mann

22       prescribing for you?

23            THE WITNESS:  When I first moved back from

24       South Carolina, I was on 90 blue Xanax.  And I

25       guess that's what, one milligram?

1      DR. PIERCE:  Yes.

2          THE WITNESS:  Okay.  And he kept me on those.

3      And then I kept having reoccurrent panic attacks,

4      so he upped the dosage to two milligrams.

5          DR. PIERCE:  And over what length of time did

6      you take that?

7          THE WITNESS:  I'm not sure.  I think it was 2

8      1/2 years, three years.

9          DR. PIERCE:  If you were having panic attacks,

10     did he have you on any other medication at that

11     time?

12         THE WITNESS:  Yes, sir.  I --

13         DR. PIERCE:  What were you taking?

14         THE WITNESS:  I -- I've taken Ativan, I've

15     taken Paxil, I've taken Zoloft.  None of those

16     seemed to work.

17         DR. PIERCE:  But were you taking those at the

18     same time that you were taking the Xanax?

19         THE WITNESS:  I took -- I believe I took Paxil

20     when I was taking the Xanax.

21         DR. ZINI:  Are you presently on anything with

22     the Xanax to treat your panic attacks?

23         THE WITNESS:  No, sir.  Not right now.

24         DR. PIERCE:  Did Dr. Mann refer you for any

25     type of counseling?

1      THE WITNESS:  Yes, sir.  I went to Counseling

2  Associates and I also admitted myself in William S.

3  Hall psychiatric mental institution to try to get

4  off the Xanax.  And they put me on clonazepam or

5  clonazepam.  I don't know how to say that.

6      DR. ZINI:  Clonazepam?

7      THE WITNESS:  Yeah, they put me on that.  And

8  it worked for a while.  He kept me on that for a

9  few months, and then it just really wasn't working

10  as well.  So, he put me back on the Xanax.

11      DR. ZINI:  Any of those institutions that you

12  were in, did you see a psychiatrist?

13      THE WITNESS:  Yes, sir, I did.

14      DR. ZINI:  They put you on the clonazepam but

15  nothing else?

16      THE WITNESS:  I don't believe they had me on

17  anything else.  No.

18      DR. ZINI:  No other antidepressant?

19      THE WITNESS:  No, sir.

20      DR. ZINI:  Are we to understand that the

21  officers who asked you about Dr. Mann, were they

22  asking you, in your opinion, to be untruthful?

23      THE WITNESS:  Yes, sir.

24      DR. ZINI:  Or were they asking you if it was

25  the truth, would you come forward?

1        THE WITNESS: · They were asking -- in my
2    opinion, they were asking me to be untruthful.
3        DR. SIMMONS:  Do you have an opinion as to why
4    they would do that?
5        THE WITNESS:  Because they have been wanting
6    him for so long and they just -- they are pretty
7    much willing to do anything to get him.
8        DR. SIMMONS:  And what do you mean by they
9    have wanted to get him?
10        THE WITNESS:  They have just -- they have been
11    questioning, from hearsay, a bunch of people,
12    telling them they will give them stuff to say they
13    had sex with him or this or that.
14        DR. ZINI:  But why do you feel they are doing
15    that?  Do you have an opinion?
16        THE WITNESS:  Well, it's not only him.
17    It's -- it's other people they were wanting me
18    to -- that's why I think that it's -- I don't know
19    how to word this.
20        DR. ZINI:  Well, I guess my question is, is
21    what is it about him?  What problem did they think
22    they are trying to address by asking you to do
23    that?
24        THE WITNESS:  They think I will do it because
25    my mom says that it's true.  And that so she can

1    get out of jail.

2         They want me to get -- she's wanting out of

3    jail.  And if I come up and say that I had sex with

4    Dr. Mann, to try to get her out of jail, it would

5    help her get out.

6         DR. SIMMONS:  But why do they have it in for

7    him?  That's what we're trying --

8         DR. ZINI:  That's what I was getting at.

9         THE WITNESS:  Oh.  I have no idea.

10        DR. PIERCE:  Did Counseling Associates try and

11   take over your prescription for the Xanax?

12        THE WITNESS:  They kept me on the Xanax.

13        DR. PIERCE:  I guess my -- my belief would be,

14   if I referred you to a psychiatrist or to a

15   counselor --

16        THE WITNESS:  Uh-huh.

17        DR. PIERCE:  -- I would let them manage that

18   medication.  But Dr. Mann continued to do that for

19   you?

20        THE WITNESS:  Yes.

21        DR. PIERCE:  And was that of you asking him to

22   do that or was that -- how did that happen?

23        THE WITNESS:  No.  I just went back in and saw

24   him and he prescribed what he thought was the best

25   thing to prescribe.

1    DR. PIERCE:  And did you -- did he say to you,

2    are you continuing to go to counseling?  Are they

3    willing -- are they taking care of your medication

4    there for you?

5        THE WITNESS:  Yes.

6        DR. PIERCE:  And your answer to him was?

7        THE WITNESS:  Yes.

8        DR. ZINI:  So, did the counseling --

9        DR. PIERCE:  Were you getting medicine in two

10   places, then?

11       THE WITNESS:  No, I thought you were saying --

12   he was giving me the medicine and they were making

13   sure that it was -- I don't understand that.

14       DR. CHAMBERS:  Are you seeing a psychiatrist

15   at Counseling Associates or a psychologist?

16       THE WITNESS:  I was seeing a psychiatrist.

17       DR. CHAMBERS:  A psychiatrist.  Okay.

18       DR. ZINI:  And that's a doctor who can write

19   for medications.  So that doctor prescribed

20   medicine for you?

21       THE WITNESS:  Uh-huh.

22       DR. ZINI:  When you left, what were their

23   instructions to you?

24       THE WITNESS:  To follow up with Dr. Mann.

25       DR. ZINI:  Okay.

RECROSS EXAMINATION

BY MR. MANN:

Q    Did Dr. Mann ever try to wean you off, decrease your dosage?

A    Yes, he did.

Q    He did?

A    Yes, he did.

Q    And what happened when he tried to reduce your dosage?

A    A few times I was in the hospital and they were, I guess, from anxiety, they would admit me for two or three days at a time.  And --

Q    When you were hospitalized, did you have to get an I.V.?

A    Yes, sir.

Q    Of Ativan?

A    Yes, sir.  Ativan.

          DR. PIERCE:  So, if you were hospitalized, were you having withdrawal?

          THE WITNESS:  No, sir.

          MR. MANN:  All right.

          MS. BRITTON:  Now, she didn't say the -- now, is she the same as A.V., or is that a typo?

          She is?

          What -- what can you tell us about what happened to you when you were found unconscious?

          THE WITNESS:  When I was found unconscious?

1    MS. BRITTON:  Yes, there is a -- something

2    about the EMS, that you were initially unconscious

3    when they arrived.

4        THE WITNESS:  That was a drug overdose.

5        MS. BRITTON:  And what -- what did you

6    overdose at that time on?

7        THE WITNESS:  Methamphetamine.

8        MS. BRITTON:  So, you were not just taking

9    prescription drugs, you were also taking street

10   drugs?

11       THE WITNESS:  No.  Not often.  No.

12       MS. BRITTON:  I'm sorry?

13       THE WITNESS:  Not often, no.  No, ma'am.

14       MS. BRITTON:  But methamphetamine is a street

15   drug?

16       THE WITNESS:  Right.  But I didn't take it

17   every day or was not -- I was not addicted to it,

18   no.  But I did overdose.

19       MS. BRITTON:  When was the last time you used

20   meth?

21       THE WITNESS:  It's been so long, I don't

22   even -- two years ago or more.

23       MS. BRITTON:  Uh-huh.  Are you in a -- in a

24   treatment program, then, for --

25       THE WITNESS:  No, ma'am.

SUSAN B. WHITSON, CCR, INC. (501) 455-1170

1       MS. BRITTON:  -- problems with addiction?

2       THE WITNESS:  No, ma'am.  I was never

3  addicted.  I don't have a problem.

4       CHAIRMAN JOUETT:  Anyone else have questions?

5       MR. TRICE:  May she be excused?

6       MR. MANN:  With great thanks and praise for

7  her courage.  Yes.

8       Thank you.  Particularly considering the

9       potential consequences she faces with the law

10      enforcement folks.

11  BY MR. MANN:

12  Q    Oh, yeah.  Have you been threatened?

13      In addition to being promised money, were you also

14  threatened?

15  A    I have not been threatened myself, but other people I

16  know, they have told them, you know, if you don't do this, we

17  will put cocaine in your car or, you know, things like that.

18  But I haven't been threatened myself, no, sir.

19      MR. MANN:  Thank you.

20      CHAIRMAN JOUETT:  Thank you, ma'am.

21      MR. TRICE:  Call Ms. -- Shelley Green is not

22      here?

23      Call Mr. Jim Moss.

24      Mr. Moss, if you will be sworn in.

25  WHEREUPON,

United States
Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 14

June 10, 2003

TO: WHOM IT MAY CONCERN

I have been a patient of Dr. Mann's since April of 2000.

Since I have been involved in numerous legal battles with the local police, I have been asked to testify that I have had sex with Dr. Mann on many occasions in exchange for narcotic drugs. I was videotaped and recorded, without my knowledge. Officers Goodman and Daniels told me that if I did not cooperate with them, that they would "screw me over" and make sure that I received no plea bargain and that I would serve time. Believing that it was either tell them what they wanted to hear or go to jail for a long time, I complied with their wishes.

I hereby swear that none of the statements, which I have made to the police in reference to having sex with Dr. Mann in exchange for drugs, are true. I have never exchanged sexual favors for drugs from Dr. Mann. In addition, I swear that Dr. Mann's behavior has been nothing but extremely professional and that he has never used his position to engage in any illegal or immoral activity.

Shelly Green

AMELIA L. PRATER
Pope County
My Commission Expires
October 16, 2010

a Notary for Pope Co. Arkansas witnessed today June 10, 2003

Page 1 of 1

Mann v. United States
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 15

April 4, 2005

I, Asia Montgomery, am making this statement on my own behalf, without any coercion from anyone.

I have been approached by Detective John Wade of the Russellville Police Department and have been asked to make false statements to the effect that Dr. Randeep Mann has agreed to have sex with me in return for unlimited medications. In addition, Detective Wade has asked me to wear a wire into Dr. Mann's office in hopes of entrapping him into making such statements.

Dr. Mann has been nothing been professional in all his dealings with me. He has never behaved in any manner other than a most professional one. His conduct has always been principled and ethical. He is an excellent doctor and has always treated me with respect and courtesy.

Asia Montgomery

*I was present at time of signature 4-4-05.*

*Robin Marple*

Robin Marple
County of Yell
Notary Public - Arkansas
My Commission Exp. 06/25/2012

Page 1 of 1

*Mann v. United States*
U.S. Dist. Ct. E.D. Ark.
PCR/Habeas Exhibit 16

# SKYLINE
# MEDICAL CLINIC

111 Skyline Drive
Russellville, AR  72801

(479) 880-8828  Fax:  (479) 880-88

April 25, 2005

TO:  WHOM IT MAY CONCERN

I, Brenda Beavers, am making this statement of my own accord.

On 04/01/2005 I was at my residence at 1140 Silex Road, Dover, AR in the early evening.  About 8 policemen, along with my husband, Ronny Ivey's, probation officer, Kerrie Williams, arrived at my residence.  They were searching for a possible meth lab presumed to be in the area.  After searching my home they were unable to locate any incriminating evidence.

One officer in particular, Detective John Wade, started questioning my ex-husband, Mike Beavers, who was also at my address at that time, about Dr. Mann.  The officer stated that if Mike cared anything about me, the mother of his children, that he should make sure I stay away from Dr. Mann's clinic, since he had been killing people.  The officer proceeded to question me regarding all the medications that Dr. Mann has been prescribing people, presumably resulting in their deaths.  He said that the police department knows that anyone can walk into Dr. Mann's clinic and ask for anything and he will give it to them.  I told them that that was not the case since I had been going there for a while and had not received anything inappropriate.

They proceeded to harass me regarding my medications and my husband's medications.

Brenda Beavers

*Brenda Beavers*

*Robin Marple*

4/25/05

Page 1 of 1