

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 3 1 2015

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

UNITED STATES OF AMERICA )
)
v. ) No. 4:09CR00099-01 BSM
)
RANDEEP MANN )

## RESPONSE OF THE UNITED STATES IN OPPOSITION TO PETITIONER'S MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE UNDER 28 U.S.C. § 2255

COMES NOW the United States of America, by and through its attorneys, Christopher R. Thyer, United States Attorney for the Eastern District of Arkansas, and Michael Gordon, Assistant United States Attorney, and responds to Petitioner Randeep Mann's Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. § 2255.

### I.    Factual Background

On February 4, 2009, at approximately 7:50 a.m., an explosive device detonated and severely injured Dr. Trent Pierce, who was then the Chairman of the Arkansas State Medical Board (ASMB), as he was leaving his home in West Memphis, Arkansas. *Trial Transcript (hereinafter "TT") at 91, 93, 94-95, 196, 238-242, 273-278, 280, 329-333.* That morning, Dr. Pierce had planned to go to his medical clinic in West Memphis and then drive to Little Rock to attend some

1

ASMB meetings. *TT at 78, 90, 736, 2550.* Before the explosion, three witnesses saw a spare tire in front of Dr. Pierce's SUV, as it sat parked in the Pierces' driveway. *TT at 138-39; 177-78; 185.* As Dr. Pierce was being transported away from the scene of the bombing, he told emergency medical personnel that a spare tire "blew up on him." *TT at 227.* Further investigation by experts with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and the Shelby County, Tennessee, Sheriff's Office Bomb Squad determined that the explosion was caused by a spare tire that had been booby-trapped with a military MK3A2 offensive hand grenade and placed in front of Dr. Pierce's SUV in such a manner that, when Dr. Pierce moved the tire, the grenade detonated. *TT at 380-390; 477; 528; 536; 551; 564-566.*

The first person to come to Dr. Pierce's aid was his wife, Melissa. She described his injuries as follows: "He smelled like singed hair. He had bags of blood hanging from his eyes. I wasn't sure [he] had a nose, in fact, I was sure he did not have a nose. He was absolutely charred... He was missing flesh and muscle, and I could see bone in his left thigh... He was just charred all over." *TT at 94-95.* Several other witnesses who knew Dr. Pierce responded to the scene of the bombing and testified that Dr. Pierce was unrecognizable. *TT at 95-96; 208, 211-12; 224-25.*

2

As a result of the explosion, Dr. Pierce suffered injuries to his face including tattooing, charring, lacerations, and bone injuries; loss of his left eye; reduced vision in his right eye; abdominal injuries; injuries to his right leg, knee and forearm; severe dental damage; numbness in his hands; destruction of his olfactory nerve - resulting in a loss of Dr. Pierce's sense of smell; and damage to both eardrums. *TT at 274, 27, 305-306, 329-333, 2256-2258.* On a couple of occasions during Dr. Pierce's hospitalization, doctors feared Dr. Pierce might die, including one time when a code was called on him. *TT at 279, 314-315.* Dr. Pierce will have long-term effects from the injuries he sustained. *TT at 340.*

As part of the bombing investigation, ATF agents asked the ASMB for a list of doctors who had been disciplined by the board during the previous five years. *TT at 737; 1601.* In response to that request, the ASMB provided investigators with a list of five doctors, including the defendant Randeep Mann. *TT at 737-40; 1602.*

Mann had an extensive history with the ASMB. *TT at 740.* A board verification showing every action Mann had before the ASMB from March 1, 2010, back to his date of licensure on March 10, 1995, was introduced at trial. *TT at 748-749; Gov. Ex. 82.* This verification showed numerous disciplinary actions and hearings before the ASMB, as well as Mann's appeals of ASMB decisions. *TT at 751, 754-755, 759-760, 764-766, 768, 774-775, 776-777.* Dr. Pierce was

3

present at the hearings which took place before the ASMB. *TT at 754, 768, 2534.* Prior to a 2006 disciplinary hearing, Mann filed two petitions asking that two board members recuse from participating in that hearing. Those members were Ray Jouett and Trent Pierce. *TT at 766-767, 2540-2542.*

Transcripts of various ASMB hearings were introduced at trial, and the portions of the transcripts where Dr. Pierce spoke were highlighted for the jury. *TT at 818-826, 828-833.* The court reporter from the hearings testified that, in the 2006 hearing, Dr. Pierce made it clear that he did not want Mann to have a DEA permit and that the only option for a violation of that would be total revocation of Mann's license. *TT at 834.* Further, a newspaper reporter who was present at both hearings testified about the interactions between Mann and Dr. Pierce at the hearings, one of which involved Dr. Pierce shaking his finger at Mann. After that hearing, in 2003, Mann called the ASMB a "hostile board." *TT at 850, 852.*

Part of Mann's punishment after the 2006 disciplinary hearing required him to surrender his DEA permit, a federal permit a physician must have in order to prescribe scheduled drugs. *TT at 756, 769-770, 2543-2544.* On a number of occasions, Mann requested to have his DEA permit reinstated. His request was denied on each occasion. *TT at 776-784, 2545, 2546.* When Mann appeared before the ASMB in 2007 seeking reinstatement of his DEA permit, Dr. Pierce told him that the ASMB would not allow Mann to reapply for his DEA permit and that

4

Mann should not reappear before the board in the foreseeable future to ask for another permit. *TT at 2546.* The last time Mann requested reinstatement, the ASMB denied the request and stated Mann would be allowed to appear at the June 2009 meeting. *TT at 783-784, 2548.*

In January 2009, however, a new investigation was requested by the ASMB regarding Mann. *TT at 797, 812.* The new investigation began after Rita Barthelme, a patient of Mann's, overdosed on prescription drugs in January 2009 and her sister, Jeanice Brown, made a complaint about Mann to various entities, including the ASMB. *TT at 987, 993.* At the time of her overdose in January 2009, Ms. Barthelme was getting her pills from Mann. *TT at 1019.* Ms. Barthelme testified that even though Mann had lost his DEA permit, he continued to give her prescription pills such as Lorcet, Xanax, and morphine. *TT at 1016.* Sometime between January 5 and January 8, 2009, Ms. Brown told Ms. Barthelme that she made a complaint to the ASMB about Mann. *TT at 996-997.* After she learned that Ms. Brown had made the complaint to the ASMB, Ms. Barthelme told Mann about that fact. *TT at 1020.* Shortly thereafter, the West Memphis bombing occurred.

On the evening of the West Memphis bombing, an ATF agent and a Special Agent with the Arkansas State Police (ASP) interviewed Mann and his wife, Sangeeta "Sue" Mann, at the Mann's residence in London, Arkansas. *TT at 868-*

*72; 1710-12.* During that interview, the agents questioned both Mann and his wife about their activities on the day before and the morning of the West Memphis bombing. *TT at 873-877; 1714-15.*

During the interview, Mann mentioned that he had a federal firearms license and asked the agents if they would like to see his guns. *TT at 883.* Before leaving the Mann's house, agents took Mann up on his offer and went downstairs into a room containing four (4) large gun safes filled with machine guns. *TT at 886-888.* One of the machine guns had an M-203 grenade launcher attached to it. *TT at 888-889; 1719.* An M-203 grenade launcher is capable of firing 40mm HE, M406 grenades. *TT at 890; 1319-1322.*

On March 3, 2009, two city workers discovered ninety-eight (98) 40mm HE, M406 grenades and one (1) blue-tipped "practice" (or training) grenade in a green military ammunition canister buried in a wooded area approximately 875 feet from Mann's residence.[1]   *TT at 934, 938-945; 1070, 1073-1078; 1093-1099; 1267;*

---

[1] Lloyd Hahn, a former federal firearms licensee who had many dealings with Mann, testified that he sold approximately ninety to one hundred 40-mm grenades to Mann in the late 1990's. *TT at 1952-1954.* He testified that he used carburetor cleaner to remove some black numbers (the date of manufacture) off every grenade before sending them to Mann. *TT at 1955.* Each of the 40mm grenades found in the buried ammunition canister had either a portion or all of the date of manufacture removed from its casing. *TT at 1310, 2032-2035.* Hahn testified that

*1309*.  The next day, ATF agents and local law enforcement officers obtained and executed a state search warrant on Mann's residence looking for evidence related to the buried 40mm grenades.  *TT at 1131; 1606; 1720*.  During the execution of that warrant, law enforcement officers located and seized five (5) green military ammunition canisters identical to the buried ammunition canister containing the ninety-eight 40mm grenades.  *TT at 1158-60*.  Of those five canisters, two canisters bore the lot number LC-07A606L248, and two other canisters bore the lot number LC-06B602L312.  *TT at 1161*.  The fifth canister found in Mann's garage bore lot number LC-07B606L250, which matched the lot number on the buried canister containing the ninety-eight 40mm grenades.  *TT at 1162*.

Agents and officers also located and seized the following items from Mann's residence:  a box containing forty-six (46) blue-tipped practice grenades – similar to the practice grenade found in the buried ammunition canister (*TT at 1166-68; 1610*); a manual for a 40mm grenade launcher (*TT at 1168-70; Gov. Ex. 107*); a manual for hand grenades (*TT at 1170-72; Gov. Ex. 108b*); 18 firearms,[2] including

---

he also sold Mann eight "concussion grenades," which he identified in court as an MK3A2 offensive hand grenade (the type of grenade used in the West Memphis bombing).  *TT at 1956-1958*.

[2] ATF agents originally seized these eighteen (18) firearms because they were not on Mann's list of registered firearms.  *TT at 1611-14*.  However, upon further

a Colt AR-15 machine gun with a 40mm grenade launcher attached to it (*TT at 1174-82*); and another 40mm grenade launcher (*TT at 1182*). During the search, officers also located, but did not seize, approximately 110 fully automatic firearms (machine guns).[3]   *TT at 1182*. Additionally, officers found, but did not seize, a spare tire in a shower. *TT at 1239; 1617*.

The ninety-eight buried grenades and at least two of the firearms found in Mann's house were not registered to Mann in accordance with federal firearms regulations. *TT at 1457-58, 1473*. At the conclusion of the execution of the state search warrant, federal agents arrested Mann for possessing the ninety-eight buried, unregistered 40mm grenades. *TT at 1192; 1617, 1622, 1725*.

On March 5, 2009, Mann was charged by criminal complaint with unlawful possession of the unregistered grenades, in violation of Title 26, United States Code, Section 5861(d). *Doc. No. 1*. He appeared for an initial appearance in federal court on that date, and a detention hearing was scheduled for March 9, 2009. *Doc. No. 2-3*. Sangeeta Mann attended Mann's initial appearance and was present when the detention hearing was scheduled and announced. *TT at 1624-25*.

---

inspection, agents later determined that only three of the firearms were not registered to Mann. *TT at 1614-16*.

[3] Some of these firearms were later seized pursuant to a search warrant executed at Mann's residence in August 2009. *TT at 2202, 2204*.

On the evening of March 5, 2009, agents executed a federal search warrant on Mann's residence to search for evidence related to the West Memphis bombing. *TT at 1625, 1627, 1725-1726.* Sangeeta Mann met the agents at the house and let them inside. *TT at 1627.* When agents began executing the warrant, they informed Sangeeta Mann that they were there to seize, among other things, the spare tire they had seen the night before in a shower. *TT at 1627.* As a result of the search, the agents located a number of items which they thought could have been used in the construction of an explosive device, including the spare tire and some white string. *TT at 1633-37.*

After his arrest, Mann talked to his wife by telephone while in jail. *TT at 1663.* The United States obtained audio recordings of some of those conversations. *TT at 1655-56, 1814.* The recorded conversations revealed that Sangeeta Mann provided Mann with information about ATF's investigation, including details about each warrant she knew had been executed and each witness she knew had been interviewed. *TT at 1672, 1678, 1679; Gov. Ex. 143a, 148a, 151a.*

During one of those calls, on March 6, 2009, Sangeeta Mann advised Mann that one of his attorneys told her that "chances are high that they will be coming to the office soon." Mann and Sangeeta Mann then spoke in code about Sangeeta Mann needing to go Mann's medical clinic to remove certain items from his desk

9

before federal agents searched the clinic.  Mann told Sangeeta Mann to "go right now" and to give those items to Tim or Riley because Mann "[didn't] want that to be a problem." *TT at 1672; Gov. Ex. 143a.*

Sangeeta Mann then contacted Gerald Riley, a close friend of Mann, and asked him to hold onto an envelope containing bank statements and records for her. *TT at 1552-1554.*   A day or so later, Sangeeta Mann returned and got the items back from Riley. *TT at 1554-55.*   Later on, Riley informed Sangeeta Mann that ATF agents knew about the items she had taken from the office and given to him.  Sangeeta Mann told Riley that was "impossible" and further stated, "Well, they don't know everything." *TT at 1557.*

Mann's detention hearing was held on March 9-10, 2009.  At the conclusion of the hearing, Mann was detained pending trial. *Doc. No. 6.*

On March 10, 2009, law enforcement executed a search warrant at Mann's medical clinic in search of evidence related to the West Memphis bombing. *TT at 1727, 1803.*   During the execution of that warrant, agents located various newsletters from the Arkansas State Medical Board, a letter written from the board to Mann, newspaper clippings, and transcripts from the medical board. *TT at 1731, 1805.*   One of those newsletters contained a picture of Dr. Trent Pierce. *TT at*

10

*1733.*   Agents also located information showing Mann's email address and Sandip Mann's email address.[4]   *TT at 1733-34.*

On March 11, 2009, at 7:12 a.m., Sangeeta Mann informed Mann that federal agents had executed a search warrant at the clinic on the previous night. Sangeeta Mann stated, "They had a search warrant on the office last night." When Mann questioned her about whether she had gone into the office and gotten anything, Sangeeta Mann responded, "We did good. We did good." *TT at 1678; Gov. Ex. 148a.*

In a phone call on March 10, 2009, Mann told Sangeeta Mann that they (federal agents) were trying to link seized items to the bombing. *TT 1677; Gov. Ex. 147a2.* Information from other conversations that occurred after March 26, 2009, revealed that Sangeeta Mann, operating pursuant to Mann's directions, approached several witnesses, all of whom had information relevant to both the West Memphis bombing and Mann's weapons charges, in an attempt to interfere with the investigation of her husband. *TT 1822-1825; Gov. Ex. 167a1, 167a2, 168a, 170a.*

Evidence presented at trial also showed that, in addition to the items she took to Gerald Riley, Sangeeta Mann also moved, concealed, and/or destroyed

---

[4] Sandip Mann is Mann's brother. As detailed later, Sandip Mann was investigated for potentially playing a role in the West Memphis bombing.

other potential evidence in this case while her husband was in custody.  In some of

the phone calls, she talked to Mann about firearms located in the medical office.

*TT at 1674; Gov. Ex 223a.*  However, when ATF agents executed a search warrant

at the clinic, they did not find any firearms.  *TT at 2336.*   Mann, speaking in code

on one of the jail calls, also directed Sangeeta Mann to remove "Dan's papers"[5]

from the medical clinic; Sangeeta Mann later confirmed that she had done so.  *TT*

*at 1677, 1678; Gov. Ex. 147a1, 148a.*  In another phone call, on March 9, 2009

(after the search warrant at Mann's residence but before the search warrant at

Mann's medical clinic), Sangeeta Mann asked, "What about those things that are in

the office, should I bring them home...?"  Mann responded, "Bring them home.

Yeah, bring them home.  Put them in the garage or ... or put them in the gun

room." *TT at 1676; Gov. Ex. 146a.*

In a phone call on March 28, 2009, Mann – once again using coded language

– questioned Sangeeta Mann about whether she cleaned his "papers" out of a van.

When she replied that she had not, Mann got very agitated.  When Sangeeta Mann

told Mann that "it was the Lexus" (i.e., not the van) and that she did "clean" it,

Mann calmed down.  *TT at 1824; Gov. 169a.*  The Mann's Lexus was searched

during the execution of residential search warrant on March 5, 2009.  The agent

---

[5] "Dan" is an alias for one of Mann's sons, Kundan Mann.  Kundan Mann has

legally changed his name to "Dan Carlton."

found a map open to the Memphis, Tennessee area, documentation regarding a disability policy, and other paperwork; however, none of that information was seized. *TT at 1609.*

Two witnesses, Phil and Rita Barthelme, also testified that, shortly after Mann had been arrested, Sangeeta Mann called them and asked them to haul away a truck-load and a car-load of items from Mann's residence. *TT at 1022-1024, 2134-2135.* Those items were taken to the Barthelme's house, and most of the items were then burned in the Barthelme's yard. *TT at 1025, 2136, 2137.* When ATF agents searched the burn pile, they located a three-ring binder from a bank bearing the name "Sunny Mann"[6] on it. *TT at 2224, 2226-2227.*

On April 8, 2009, the Grand Jury for the Eastern District of Arkansas charged Mann with one count of unlawfully possessing ninety-eight (98) 40mm HE grenades which were not registered to him in the National Firearms Registration and Transfer Record (NFRTR), in violation of Title 26, United States Code, Section 5861(d). *Doc. No. 11.* On that same date, Sangeeta Mann testified before the Grand Jury. *TT at 1847.* After extended questioning, Sangeeta Mann eventually admitted that she had removed some items from Mann's medical clinic prior to the execution of a federal search warrant. *TT at 1857.* She stated that she

---

[6] "Sunny" is the nickname of Mann's brother, Sandip Mann.

removed them because she did not feel they would be safe at the office. *TT at 1857.* She further stated that was the only reason she removed the items from the office (i.e., she failed to mention that Mann had directed her to do so). *TT at 1862.*

On April 22, 2009, in a telephone call with Mann, Sangeeta Mann made a comment that she knew Mann was being investigated for the bombing. In that same conversation, she told Mann that they should not be talking about her meetings with witnesses since the calls were being recorded. *TT at 1825; Gov. Ex. 170a.* She made a similar admonishment in a telephone call on June 12, 2009, after visiting with Pramoud "Pete" Patel, whose residence was searched, pursuant to a federal search warrant, for evidence related to the West Memphis bombing.[7] *TT at 2213, 2221; Gov. Ex. 178a.*

---

[7]The tire used in the West Memphis bombing was a Firestone tire mounted on a Nissan wheel manufactured on April 29, 2002. *TT at 2108-2109, 2111.* Based on that date and other information, a witness from Nissan testified that the tire was more than likely a spare tire from a 2002 Nissan Altima. *TT at 2111.* Pete Patel owned a 2002 Nissan Altima that was missing a spare tire at the time of the execution of the search warrant at his residence. *TT at 2213, 2216, 2218.* His vehicle was manufactured in June 2002. *TT at 2112.* Phil Barthelme testified that he went to Pete's house with Mann on one occasion when Mann stated he (Mann) was picking up a spare tire. *TT at 2131.*

On May 3, 2009, Sangeeta Mann was served with a Grand Jury subpoena requesting the production of the items she removed from Mann's medical clinic. *TT at 2174-75.* The items she produced in response to that subpoena included: a power of attorney from Sandip S. Mann to Randeep Mann; a general power of attorney from Sandip Mann to Randeep Mann and Sangeeta Mann; bank records regarding an account in the name of Sandip Mann; photocopies of signed checks on the account of Sandip Mann; and deposit tickets for the Sandip Mann account. *TT 2176-2181.*

During the investigation, agents learned that Sandip "Sunny" Mann was Mann's brother and that Sandip Mann had been deported from the United States to India in 2002. *TT 2181-2182.* The investigation further revealed that a number of assets located at Mann's residence, as well as Mann's medical clinic and other real property, were titled in the name of Sandip Mann, and that some of those assets had been acquired by Mann after Sandip Mann's deportation from the United States. *TT 2182, 2187-2188, 2190-2191.*

During the investigation, agents discovered an email sent from Mann to Sandip Mann on February 24, 2008, that contained a picture of Dr. Pierce and another man. The picture came from a newsletter located during the search of Mann's medical clinic. *TT at 2193- 2194.* The text of the email stated, "I hope

15

this picture is good.  The guy on the left is Dr. Trent Pierce, the current chairman of the board, and the guy on the right is Dr. Ray Jouett, the old chairman." *TT at 2194.*  The email was sent eight days after the medical board wrote a letter to Mann denying Mann's request to have his DEA permit reinstated. *TT at 2195.*  Because of this email, Sandip Mann was investigated for potentially playing a role in the West Memphis bombing. *TT at 2186, 2194-2195.*

On August 6, 2009, the Grand Jury returned a Superseding Indictment which charged Mann with unlawfully possessing ninety-eight (98) 40mm grenades and two (2) firearms which were not registered to him in the NFRTR, in violation of Title 26, United States Code, Section 5861(d) (Counts One through Three) and also charged him with unlawfully possessing a machine gun, in violation of Title 18, United States Code, Section 922(o) (Count Four).  Mann was also charged, along with his wife, Sangeeta Mann, with conspiring to obstruct an official proceeding in violation of Title 18, United States Code, Section 1512(k) (Count Five) and aiding and abetting tampering with evidence, in violation of Title 18, United States Code, Sections 1512(c)(1) and 2 (Count Six). *Doc. No. 39.*

On January 6, 2010, the Grand Jury returned a Second Superseding Indictment. *Doc. No. 63.*  The Second Superseding Indictment added three charges against Mann (including two counts related to the West Memphis bombing of Dr. Pierce) and changed the count numbers of previously charged offenses.    Count

16

One of the Second Superseding Indictment charged that Mann, aided and abetted by a person or persons unknown to the Grand Jury, used or conspired to use a "weapon of mass destruction" against a person and property within the United States, in violation of Title 18, United States Code, Section 2332a. Count Two charged that Mann, aided and abetted by a person or persons unknown to the Grand Jury, maliciously damaged or destroyed a vehicle by means of an explosive, in violation of Title 18, United States Code, Section 844(I). Counts Three through Five charged Mann with possessing ninety-eight 40mm grenades (98) and two (2) firearms (a SPAS 12 shotgun and a machine gun) which were not registered to him in the NFRTR, in violation of Title 26, United States Code, Section 5861(d). Count Six charged Mann with unlawfully possessing a machine gun, in violation of Title 18, United States Code, Section 922(o). Mann was also charged, along with Sangeeta Mann, with conspiring to obstruct an official proceeding, in violation of Title 18, United States Code, Section 1512(k) (Count Seven) and aiding and abetting tampering with evidence, in violation of Title 18, United States Code, Sections 1512(c)(1) and 2 (Count Eight). Count Ten charged Mann with unlawfully possessing chloroform while held in federal detention at the Pulaski County jail, in violation of Title 18, United States Code, Section 1791. In addition to Counts Seven and Eight, Sangeeta Mann was charged in Count Nine with making a false declaration before the Grand Jury. *Doc. No. 63.*

The jury trial of both Mann and his wife commenced on July 6, 2010, before the Honorable Brian S. Miller, United States Chief District Judge for the Eastern District of Arkansas.[8]   During a pre-trial conference, the Government dismissed Count Ten of the Second Superseding Indictment.  *Doc. No. 123*.  Jury selection began on July 6, 2010, and continued until a jury was seated on July 12, 2010.  *TT at 5*.  On August 9, 2010, the third day of jury deliberations, the jury convicted Mann of Counts One through Three and Five through Eight.  *Doc. No. 154-156, 158-161*.  Mann was acquitted of Count Four.  *Doc. No. 157*.  Sangeeta Mann was convicted of Counts Seven and Eight and was acquitted of Count Nine.  *Doc. No. 162-164*.

On February 28, 2011, a sentencing hearing was held; however, the issue of restitution was held open for 90 days.  *Mann Sentencing Transcript "MST" at 12*. Mann was sentenced to life imprisonment on Count One, 360 months of imprisonment on Count Two, 120 months of imprisonment on Counts Three, Five, and Six, and 60 months of imprisonment on Counts Seven and Eight, with all

---

[8] At trial, Mann was represented by Blake Hendrix, Jack Lassiter, and Erin Cassinelli.  Drake Mann and John Wesley Hall, Jr., were also counsel of record for Mann.  Although it is unclear, it does not appear Mann's claims of ineffective assistance of counsel in his §2255 motion extend to Hall and Drake Mann. Therefore, the United States' response will address only decisions made and actions taken by Hendrix, Lassiter, and Cassinelli.

sentences to run concurrently with each other; five years supervised release (if released); a $100,000 fine; and $700 in special assessments. *MST at 25-27; Doc. No. 222.* On March 4, 2011, Mann filed a notice of appeal. *Doc. No. 230.*

A restitution hearing was held on May 12, 2011. *Doc. No. 286.* A restitution order was entered on May 13, 2011, and then amended on June 15, 2011, ordering Mann to pay $1,015,281.24 in restitution. *Doc. Nos. 287, 295.* Mann then filed an amended notice of appeal on June 20, 2011. *Doc. No. 297.*

In his appeal to the Eighth Circuit Court of Appeals, Mann asserted: (1) that the evidence was insufficient to support his convictions on any of the offenses; (2) that the Government failed to provide sufficient notice of the criminal conduct and that the bill of particulars amended the indictment; (3) that the district court erred in denying Mann's motions to sever; (4) that the district court erred in denying a multiplicity motion; (5) that the district court erred in denying a motion to dismiss the original indictment; (6) that the district court erred in calculating the sentencing guidelines; and (7) that cumulative errors denied Mann the right to a fair trial.

On December 6, 2012, the Eighth Circuit Court of Appeals affirmed Mann's convictions on Counts 1, 2, 3, 7, and 8, but remanded Counts 5 and 6 with instructions to set aside one of the convictions. *United States v. Randeep Mann,* 701 F.3d 274, 311 (8th Cir. 2012). Mann's sentence was affirmed as to Counts 7 and 8 but was remanded for resentencing on Counts 1, 2, 3, and 5 or 6. *Id.*

Mann's petition for rehearing and petition for rehearing *en banc* was denied on March 12, 2013.

Mann was resentenced on May 1, 2013, to life imprisonment on Count One, 360 months of imprisonment on Count Two, 120 months of imprisonment on Counts Three and Six, with all sentences to run concurrently with each other; five years supervised release (if released); a $100,000 fine; and $600 in special assessments. *Doc. Nos. 363, 364,369.* Count Five was vacated by the Court on the same date. *Doc. No. 363.*

Mann's petition for writ of certiorari was denied on October 21, 2013.

On October 20, 2014, Mann filed a Motion to Vacate, Set Aside or Correct Sentence under Title 28, United States Code, Section 2255. *Doc. No. 395.* The motion asserted nineteen (19) grounds of relief. On October 21, 2014, Mann filed a Notice of Amendment by Interlineation, adding a twentieth ground of relief to his § 2255 motion.[9]  *Doc. No. 410.*

On December 3, 2014, Mann filed a Motion for Evidentiary Hearing, a 15-page brief in support, and a Verified Memorandum in Support of Motion under 28 U.S.C. § 2255. *Doc. Nos. 406, 407, 408.*

---

[9] The United States objects to any additions or modifications to the grounds asserted in Mann's § 2255 motion filed after October 21, 2014, as untimely, regardless of form or how the pleading is titled.

20

On February 25, 2015, Mann filed a Verified Memorandum in Support of Motion for Evidentiary Hearing, which included thirty-seven (37) new exhibits (depending on how the exhibits are counted). *Doc. No. 421.* Those exhibits included twenty-seven (27) separate, new declarations by Mann that effectively assert several new grounds of ineffective assistance of counsel not previously raised in his initial § 2255 motion.

On March 18, 2015, Mann filed a Supplemental Memorandum in Support of Motions for Relief under § 2255 and Evidentiary Hearing, which included seven (7) more exhibits. *Doc. No. 428.*

On April 29, 2015, Mann filed a Supplemental Offer of Proof, which included ten (10) more exhibits. *Doc. No. 450.* Those exhibits included several separate, new declarations by Mann that effectively assert new grounds of ineffective assistance of counsel not previously raised in Mann's initial § 2255 motion.

On May 5, 2015, Mann filed an additional Declaration in Support of Motions. *Doc. No. 452.*[10]

---

[10] Mann has filed numerous other pleadings related to his § 2255 motion. The United States has only listed the pleadings discussed in its response.

## II.   Mann's § 2255 Motion

In the § 2255 motion now before the Court, Mann asserts twenty (20) various claims of ineffective assistance of counsel, due process violations, and *Brady* violations. *Doc. Nos. 395, 410.* Some of Mann's claims, however, have been procedurally defaulted. Other claims seek to re-litigate his trial using a strategy that was contemplated, investigated, and rejected for tactical reasons by his trial counsel. Several claims are simply factually incorrect and unsupported by the record. Similarly, on many of the claims, Mann has not and cannot meet his burden. In sum, all of his claims fail for one reason or another (or for multiple reasons). Thus, for the reasons set forth below, the United States respectfully requests that Mann's § 2255 motion be denied in its entirety without a hearing.

## III.   No Need for an Evidentiary Hearing

A § 2255 motion may be dismissed without a hearing if: (1) petitioner's allegations, accepted as true, would not entitle him to relief; or (2) the allegations cannot be accepted as true because they are contradicted by the record, are inherently incredible, or are conclusions rather than statements of fact. *Winters v. United States*, 716 F.3d 1098, 1103 (8th Cir. 2013)(quoting *Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir.2001)). If the district court can determine from the motion and the supporting record that the petitioner is not entitled to relief under § 2255, then no hearing is required. *Id.* An affidavit may be considered as

22

part of the files and records of a case. *Thomas v. United States*, 737 F.3d 1202, 1207 (8th Cir. 2013).

As discussed separately in each ground below, the record conclusively shows that Mann is not entitled to an evidentiary hearing on any of the grounds raised in his § 2255 motion.

## IV.   The Law

### A. Ineffective Assistance of Counsel.

The benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper function of the adversarial process such that the trial cannot be relied upon as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).   To prevail on a claim of ineffective assistance of counsel, the defendant must show:   (1) that his lawyer's performance was deficient; and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687 (1984); *Cabal v. United States*, 281 F.3d 778, 780 (8th Cir.2002).   Both prongs of the *Strickland* test must be met for an ineffective assistance claim to succeed. *Strickland*, 466 U.S. at 687; *Williams v. United States*, 452 F.3d 1009, 1014 (8th Cir. 2006).   However, a court need not address whether counsel's performance was deficient if the ineffective assistance of counsel claim may be disposed of for failure to show prejudice. *Strickland*, 466 U.S. at 697; *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996).

## 1. Deficient Performance

The proper measure of attorney performance is simply "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. The performance inquiry must be whether counsel's assistance was reasonable considering all of the circumstances. *Id.* Proving that counsel was deficient "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Thus, the "deficient performance" prong is met only when a petitioner shows that counsel's representation fell below the range of competency demanded of attorneys in criminal cases. *Strickland*, 466 U.S. at 688. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. *Strickland*, 466 U.S. at 688-689. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. *Strickland*, 466 U.S. at 689. Thus, judicial review of counsel's performance under this prong is highly deferential. *Strickland*, 466 U.S. at 689; *Williams*, 452 F.3d at 1013.

A fair assessment of attorney performance requires that "every effort be made to eliminate the distorting effects of hindsight, to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Because of the difficulties inherent in making the evaluation, a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Id.*

Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. *Strickland*, 466 U.S. at 690. Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *Strickland*, 466 U.S. at 691. Stated another way, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Id.*

Defense counsel, however, is not required to raise meritless or frivolous challenges in order to avoid a charge of ineffective assistance. *Rodriguez v. United States,* 17 F.3d 225, 226 (8th Cir. 1994).

25

## 2. Prejudice

The prejudice prong of the *Strickland* test requires the defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id*. When a defendant challenges a conviction, the question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. In determining whether there is a reasonable probability that but for counsel's mistakes the result would have been different, the Court must consider the totality of the evidence before the judge or the jury. *Id*. at 695.

It is not enough for the defendant to show that the errors had "some conceivable effect" on the outcome of the proceeding. *Strickland*, 466 U.S. at 693.

## B. *Brady Violations*

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963). The Court later held that the duty to disclose exculpatory evidence applies even when the defense has made no request. *United*

26

*States v. Agurs*, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399, 49 L. Ed. 2d 342 (1976). The prosecutor's duty to disclose exculpatory evidence extends to impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481 (1985); *Giglio v. United States*, 405 U.S. 150, 154-55, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972). Moreover, the "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567, 131 L. Ed. 2d 490 (1995). In other words, "the knowledge of some of those who are part of the investigative team is imputed to prosecutors regardless of prosecutors' actual awareness." *United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010). "[W]e do not accept the defendant's proposal that we impute the knowledge of the State of [Arkansas] to a federal prosecutor." *United States v. Kern*, 12 F.3d 122, 126 (8th Cir. 1993); *see also Robinson*, 627 F.3d at 952 (misconduct by investigation officers, even though obviously known to the officers, was not imputed to the prosecutor); *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999) (refusing to impute knowledge from state investigators to federal prosecutors).

As the Eighth Circuit has explained: To prove a violation, the defendant must show that the evidence was both favorable and material, and that the government suppressed the evidence. *United States v. Barraza-Cazares*, 465 F.3d

327, 333 (8th Cir. 2006). The government has suppressed evidence when it was otherwise unavailable to the defendant, and the prosecution failed to disclose the evidence in time for the defendant to use it. *Id.* at 334. Thus, "[t]he government does not suppress evidence in violation of *Brady* by failing to disclose evidence to which the defendant had access through other channels." *United States v. Zuazo,* 243 F.3d 428, 431 (8th Cir. 2001). *United States v. Santisteban,* 501 F.3d 873, 877 (8th Cir. 2007) (alteration in *Santisteban*); *see also United States v. Ladoucer,* 573 F.3d 628, 636 (8th Cir. 2009) (failure to produce a transcript of a witness's state-court testimony did not violate *Brady* because the transcript was equally available to both sides); *United States v. Coplen,* 565 F.3d 1094, 1097 (8th Cir. 2009) ("The government does not suppress evidence in violation of *Brady* by failing to disclose evidence to which the defendant had access through other channels."); *United States v. Willis,* 277 F.3d 1026, 1034 (8th Cir. 2002) ("Publicly available information which the defendant could have discovered through reasonable diligence cannot be the basis for a *Brady* violation."); *United States v. Albanese,* 195 F.3d 389, 393 (8th Cir. 1999) (failure to turn over a transcript of testimony from a public proceeding does not violate *Brady*); *United States v. Jones,* 160 F.3d 473, 479 (8th Cir. 1998) (there is no *Brady* violation if the defendant could have obtained the information through reasonable diligence; information that is readily available to the defendant is not *Brady* material); *United States v. Willis,* 997 F.2d

407, 412 (8th Cir. 1993) (no *Brady* violation in failing to provide a plea agreement that was a matter of public record); *Reese v. Frey*, 801 F.2d 348, 350 (8th Cir. 1986) (a warrant was not *Brady* material because it was in a court file where it was readily available).

Evidence is material "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70, 129 S. Ct. 1769, 1784, 173 L. Ed. 2d 701 (2009). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566. "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678, 105 S. Ct. at 3381).

## IV.   Petitioner's Claims

**A.  Ground 1:**  In his first claim, Mann asserts that, in March 2009, federal agents violated the Due Process Clause of the Fifth Amendment by "the fabrication and planting of an ammunition canister containing ninety-eight M406 40-mm. high-explosive grenades by the respondent's agents or at their behest in March 2009 on property close to Dr. Mann's home for the purpose of obtaining a search

29

warrant, and the prosecution-police team's use of the fruits of the resulting search." *Doc. No. 395 at 8.*

Although Ground 1 is identified in Mann's § 2255 motion (*Doc. No. 395 at 8*) as a violation of "the Due Process Clause of the Fifth Amendment," it appears the complaint includes not only allegations of prosecutors' and law enforcement's knowing use of perjured testimony (a Fifth Amendment issue) but also allegations that a search warrant affidavit contained deliberately or recklessly false information (a Fourth Amendment issue under *Franks v. Delaware,* 438 U.S. 154 (1978)).  Both assertions – just like later grounds in Mann's § 2255 motion – hinge upon Mann's assertion that the ninety-eight 40mm high explosive grenades were planted by people who were out to get him.  The record, however, clearly shows that such was not the case and that, instead, the grenades were innocently stumbled upon and reported by a city worker who didn't even know Mann.

At trial, Mark Rinke, a worker for the Street and Water Department of the City of London (Arkansas), testified that, on March 3, 2009, he was checking water lines in an area near Mann's residence when he stopped in the woods for a restroom break and tripped over a box wrapped in black plastic that was buried in the ground.[11]  *TT at 1069-74.*  Rinke uncovered the top of the box, but then

---

[11] Rinke did not know Mann.  *TT at 1091-92.*

"figured it was nothing, none of my business" and left the area to go eat lunch. *TT at 1073-74.* Rinke later told a co-worker, Ryan Kimbell,[12] about the box, and the two city workers went back to the box's location that afternoon. *TT at 1074-75.* The two men then removed the box from the ground, opened the black plastic, and discovered that the box was a "green military-grade container." *TT at 1075.* When Rinke and Kimbell opened the lid, they saw the canister was full of grenades.[13] *TT at 1075-1076.* The men then called their boss (the mayor) and reported their discovery. *TT at 1076.* Soon thereafter, Jason Smith, a deputy sheriff arrived and took over the situation. *TT at 1077.* The next day, local law enforcement officers and ATF agents obtained and executed a state search warrant on Mann's residence looking for evidence related to the buried 40mm grenades. *TT at 1131; 1606; 1720.* Arkansas State Police Special Agent Stacie Rhoads signed the affidavit in

---

[12] Kimbell also testified at trial, and his testimony corroborated the facts presented by Rinke. *TT at 1092-1103.*

[13] Rinke did not know the contents of the box were grenades, but Kimbell, a former Marine and current Army Reservist, immediately recognized the objects as 40mm grenades that he used to carry in combat zones. *TT at 1095-96.*

support of the search warrant on Mann's residence. Rhoads' affidavit is attached as Respondent's Exhibit ("R. Ex.") 1.[14]

### 1. Ground 1 has been Procedurally Defaulted.

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Jennings v. United States*, 696 F.3d 759, 762-63 (8th Cir. 2012)(citing *Bousley v. United States,* 523 U.S. 614, 621 (1998)). Thus, a petitioner may not raise an issue before the district court for the first time in a § 2255 motion if the issue was not presented on direct appeal from the conviction. *Jennings v. United States*, 696 F.3d at 762; *United States v. Hamilton*, 604 F.3d 572, 574 (8th Cir. 2010)("Claims not made during district court proceedings or on direct appeal are procedurally defaulted and may not be raised for the first time in a § 2255 motion."); s*ee also Swedzinski v. United States*, 160 F.3d 498, 500 (8th Cir.1998); s*ee also Matthews v. United States,* 114 F.3d 112, 113 (8th Cir.1997). "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'

---

[14] Rhoads' affidavit is also named as Exhibit 17 in Mann's § 2255 Motion (*Doc. No. 408-2),* but the United States has attached the same document as *R. Ex. 1* as a matter of convenience for the Court and the parties.

" *Jennings*, 696 F.3d at 763(quoting *Bousley,* 523 U.S. at 622 (internal citations omitted)).

Mann failed to raise the issues presented in Ground 1 on appeal. Therefore, he must demonstrate either "cause and prejudice" or "actual innocence" in order to avoid procedural default of Ground 1.

### a. Mann has Not Demonstrated Cause and Prejudice

"Cause" under the "cause and prejudice test" must be "something external to the [petitioner], something that cannot be fairly attributed to him." *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). If a movant fails to show cause, a court need not consider whether actual prejudice exists. *McCleskey v. Zant*, 499 U.S. 467, 501, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). Ineffective assistance of counsel may constitute "cause and prejudice" to overcome a procedural default. *Boysiewick v. Schriro,* 179 F.3d 616, 619 (8th Cir.1999). To establish ineffective assistance of counsel, both as an independent claim and as cause and prejudice to excuse a procedural default, the defendant must show under *Strickland* that "counsel's performance was deficient" and "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Becht v. United States*, 403 F.3d 541, 545 (8th Cir. 2005).

Undoubtedly, Mann will attempt to establish "cause and prejudice" by claiming that the issues alleged in Ground 1 were not raised in the district court or

on appeal because his counsel were ineffective.  However, Mann's counsel were not deficient for failing to raise the issues Mann presents in Ground 1 because – as discussed below – the issues are meritless and not based on actual, true facts.  *See Rodriguez v. United States,* 17 F.3d 225, 226 (8th Cir. 1994)(defense counsel is not required to raise meritless or frivolous challenges in order to avoid a charge of ineffective assistance).  As such, Mann also has not and cannot establish prejudice under *Strickland* because, as discussed below, it is highly unlikely any challenge to Rhoads' search-warrant affidavit and any claims that prosecutors and law enforcement knowingly used perjured testimony would have succeeded, or that the results of the trial would not have been any different.  Therefore, Ground 1 has been procedurally defaulted.

### b.  Mann also has Not Demonstrated "Actual Innocence."

To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, "it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623(quoting *Schlup v. Delo*, 513 U.S. 298, 327-328, 115 S.Ct. 851, 867-868, 130 L.Ed.2d 808 (1995); *Dejan v. United States*, 208 F.3d 682, 687 (8th Cir. 2000).  "Actual innocence" means factual innocence, not mere legal insufficiency. *Bousley*, 523 U.S. at 623; *Dejan*, 208 F.3d at 687. This is a strict standard, and, generally, a petitioner cannot show actual innocence where the evidence is sufficient to support the crime of conviction. *See McNeal v.*

*United States,* 249 F.3d 747, 749-50 (8th Cir. 2001); *see also Johnson v. United States,* 278 F.3d 839, 844 (8th Cir. 2002).

Mann was convicted by a jury that heard the evidence in the case. The Eighth Circuit Court of Appeals held on appeal that the evidence was sufficient to support Mann's convictions. In his § 2255 motion, as discussed later, Mann has offered no reliable evidence – taken individually or collectively – to show that he is actually innocent of his convicted crimes. Thus, Mann has fallen well-short of meeting his burden, and Ground 1 has been procedurally defaulted.

Even if not procedurally defaulted, Ground 1 still must fail on the merits, as discussed below.

### 2. No Fourth Amendment Due Process Violation.

Although it is not entirely clear, Ground 1 appears first to allege that federal agents planted, or had someone else plant, the buried ammunition canister containing ninety-eight 40mm grenades near Mann's residence so that agents could get a search warrant for Mann's house.[15] In short, Mann wants the Court to believe that he is the victim of a vast government conspiracy and cover up. Of course,

---

[15] If Mann wanted to contest the facts contained in the search warrant affidavit, then he should have filed a motion under *Franks v. Delaware,* 438 U.S. 154 (1978) before trial. He did not do so. Therefore, as discussed above, Ground 1 has been procedurally defaulted.

there is no evidence to support Mann's grand conspiracy theory or his proposition that Rinke and Kimbell lied about their discovery of the buried grenades.

### a. Hole Experts

Mann seems to assert that Rinke and Kimbell must have been lying because, according to him, the ammunition canister containing the ninety-eight 40mm grenades could not have come from the hole where Rinke and Kimbell testified they found the buried canister. In support of this proposition, Mann has submitted affidavits and pictures from various people who, years later, reviewed pictures of the location where the buried grenades were found and opined that the hole in the ground was not "freshly dug" or deep enough to hold the buried ammunition canister. However, there is no way, based upon the information and evidence available to the parties – whether presented at trial or not – any expert – whether for Mann or for the United States – could reliably or accurately determine the depth or age of the hole where the grenades were buried. It is just not possible.

The pictures that Mann's "hole experts" relied upon – as listed in each of their opinions – are attached as Respondent's Exhibits 2 and 3. *R. Ex. 2* is a set of photographs taken by Investigator Smith on March 3, 2009, shortly after Rinke discovered and reported the buried grenades. *See R. Ex. 4 at Para 2* (Affidavit of ATF Special Agent David Oliver). *R. Ex. 3* is a set of photographs taken the following day, March 4, 2009, by former ATF agent Bill Buford. *See R. Ex. 4 at*

*Para 4 (Aff. of Oliver).*  These pictures were clearly *not* taken with an eye towards determining the depth or age of the hole and are a wholly inadequate basis for any sort of reliable opinion on those issues.

For example, Mann's first hole expert, Ming-Chih Hung, claims in his opinion, "the actual depth of the hole cannot exceed 25.94 centimeters." *Doc. No. 445-2 at 4.*  Without even discussing the issues related to Hung's mathematical reasoning, his opinion is based upon his apparent random selection of where the bottom of the hole is.  *See Doc. No. 445-2 at 6 (Figure 2).*  There is no way to determine exactly where the bottom of the hole is in this picture because it is a picture of a hole covered with leaves.  No one knows where the bottom of the hole is.  If the bottom of the hole is slightly further than where Hung assumed or deemed it to be, then all of a sudden the hole is deeper than Hung opined it to be. Hung's analysis also fails to account for the loose dirt that undoubtedly slid into and piled onto the bottom of the hole when Rinke and Kimbell extracted the canister from the earth, thus creating a "new bottom" of the hole that did not exist when the canister was actually buried.  Also, Hung's calculations hinge upon some duct tape found in or near the hole being "about 4.5 centimeters in width." *Doc. No. 445-2 at 3.*  However, the duct tape is actually 4.9 centimeters in width. *R. Ex. 4 at 14 (Aff. of Oliver).*  A photograph of the measurement of the duct tape has been submitted as Respondent's Exhibit 8.  Thus, because the tape is wider than

37

Hung assumed it to be, the hole is necessarily deeper than Hung calculated it to be. When these faults in Hung's opinion and calculations are considered, the hole soon becomes deep enough to accommodate the ammunition canister.

Mann has also presented declarations from two other hole experts who claim to be able to determine the age of the hole where the grenades were found.  One of them, Larry West, simply concludes that the hole was "not a freshly dug hole." *Doc. No. 395 at 66.*   West did not provide any explanation of what his determination means.  Mann's next hole expert, Frederick Spiegel, opines that the hole:

> ... was not a freshly dug hole nor a freshly opened hole, but had been created by some means and left open for at least several weeks before these pictures were taken.  It would take that amount of time for the layer of leaves in that hole to have blown in and be continuous with the leaves in the surrounding ground litter. *Doc. No. 395 at 85.*

Or maybe the leaves that Spiegel thinks took several weeks to blow into the hole were knocked into the hole[16] by two men crawling around on the ground as they

---

[16] When asked by Mann's counsel at trial if he thought it was odd that there were leaves in the hole, Rinke said no, because "there was leaves all around." *TT at 1090.*

38

struggled to unearth – and then open and inspect the contents of – a buried ammunition canister full of 98 high explosive grenades.[17]

Three witnesses, however, who physically stood next to and looked into the actual hole where the grenades were found (Rinke, Kimbell, and Bill Buford[18]) – as opposed to some people who merely looked at a few less-than-ideal pictures of the hole on a computer screen or on a piece of paper – testified at trial that they thought the hole was freshly dug. *TT at 1074, 1090-91; 1094, 1101; 1271-72.* To be precise, Rinke did not state that *the hole* looked freshly dug, rather he stated *the dirt around the buried canister* looked "fresh" and "recently disturbed." *TT at 1074.* Even on cross examination, Mann's counsel clarified that any opinion that Rinke had about the hole being freshly dug was <u>not</u> based on the hole itself, but was based on *the fresh dirt around the box. TT at 1090-91.* Kimbell also did not

---

[17] Spiegel also opines that the hole "could be not more than one foot deep, and not necessarily even one foot deep." *Doc. No. 395 at 84.* Spiegel's methodology and analysis, however, is even less reliable than Hung's and should not be deemed authoritative by any means.

[18] At the time of trial, Buford was the bomb squad coordinator for the Arkansas State Police. He was formerly a special agent with ATF for 31 years. *TT at 1262-64.* He assisted with processing the grenades the day after they were found and also measured and took pictures of where the grenades were found. *TT at 1264-70.* According to Buford, he's "dug a few ditches in [his] day." *TT at 1272.*

state that *the hole* looked freshly dug, rather he stated that it "didn't look like the box had been there that long. I mean, the dirt was freshly put around it." *TT at 1094.* When pressed on cross examination about his opinion that the buried canister had not been there very long, Kimbell did not talk about the hole itself, rather he stated his opinion was based on "things that I have seen that have been buried in the ground for a long time. They are going to have some deterioration and look dirtier than what the canister and plastic appeared to be." *TT at 1101.*

Quite frankly, however, it is of no consequence how deep the hole was or how long the grenades had been buried. It does not matter one bit whether the grenades had been buried one hour, one day, one week, or one year. Similarly, it does not matter if the grenades were found in a shallow hole, in a deep hole, or in a tree. What does matter is that they were Mann's grenades. The evidence at trial showed that, on March 3, 2009, Rinke and Kimbell discovered ninety-eight 40mm HE, M406 grenades, as well as a blue-tipped practice grenade, buried in a green ammunition canister in a wooded area approximately 875 feet from Mann's residence. *TT at 934, 938-945, 1070, 1073-1078, 1093-1096.* The next day, during the execution of a state warrant at Mann's residence, law enforcement officers located and seized: five (5) ammunition canisters identical in shape, size, and color to the buried canister containing the 98 grenades; a box of blue-tipped practice grenades; a manual about grenade launchers; a manual about hand

grenades; and numerous firearms. *TT at 1131, 1159, 1162, 1167, 1169, 1170, 1174, 1606, 1610-1611, 1614, 1720.*   Law enforcement also located two M203 grenade launchers capable of firing 40 mm grenades. *TT at 1182.*   Of the five ammunition canisters seized from Mann's residence, two of them bore the same lot number, two more of them shared another lot number, and the fifth bore a lot number that matched the lot number on the buried canister containing the 98 grenades - as if Mann had purchased the ammunition canisters in pairs.[19]  *TT 1162.* Additionally, Lloyd Hahn, a federal firearms licensee from 1988-2002, testified about his lengthy business relationship with Mann – some of which was legal, some of which was not – and stated that he sold Mann between ninety and one hundred 40mm grenades in the late 1990's. *TT at 1916-2023; 2016-2023.*  Hahn stated that before he sold the 40mm grenades to Mann, he (Hahn) used acetone to remove numbers that showed the date of manufacture from each of the grenades because he didn't want Mann to know how old the grenades were. *TT at 1954-1956.*   ATF explosives expert Stephen Shelley testified that, during his examination of the buried 40mm grenades, he noticed that some numbers had been removed from the grenades' casings.  He stated that the removed numbers were

---

[19] Steven Scott, a representative of the manufacturer of the ammunition canisters, testified that only 528 canisters in the world bore the lot number printed on the buried canister. *TT at 1522, 1527-28.*

part of the lot number for the casing and were numbers that identified the date of manufacture. *TT at 1310.* Special Agent Ed Starr, ATF, testified that he examined all ninety-eight of the buried grenades and determined that all of the grenades had some numbers removed from the casing and that, on some of the grenades, the entire lot number had been removed. *TT at 2032-2035.* Finally, Jeff Kimbrough, the person who installed the alarm system at the Mann residence in 2003 or 2004, testified that he saw "large bullets" in the gun safe room and the garage of Mann's residence that looked similar to the inert 40mm grenade introduced into evidence. *TT at 2057-2058; Gov. Ex. 122.*

The evidence showing that the buried grenades belonged to Mann was so great that even the Eighth Circuit noted the "overwhelming evidence of guilt" against Mann on Count 3 (for illegally possessing the unregistered grenades). *United States v. Randeep Mann*, 701 F.3d 274, 291 (8th Cir. 2012).

Nonetheless, even if the Court were to accept the opinions of Mann's hole experts as fact – which the United States neither recommends nor concedes – Mann has, *at absolute best*, only established that the hole was approximately 10-12 inches deep (or deeper). That fact – which, again, the United States does not concede – still does <u>not</u> prove (as discussed earlier) that Rinke and Kimbell were lying about their discovery of the canister. The actual buried canister was measured by Agent Oliver and determined to be approximately 14.5 inches tall. *R.*

42

*Ex. 4 at Para 14 (Aff. of Oliver).* The hole, however, must <u>not</u> be 14.5 inches deep in order to have held the ammunition canister. Rinke testified that there was a depression near the buried canister and that he "tripped," or "stumbled," or "caught the heel of his boot" on "something" as he was walking by, thus exposing a corner of the canister. *TT at 1073-74; 1082-84.* In order for Rinke to have caught his heel on the canister, it must have been protruding from the ground. Furthermore, Kimbell testified that when he arrived at the area with Rinke, he saw "a box with black plastic on it sticking out of the ground." *TT at 1093.* Kimbell stated that the box was "still in the ground" when he got there, but the top was "uncovered." *TT at 1095.* From this testimony, it is clear that the top of the canister was above the ground (but covered with dirt when Rinke tripped over it). Thus, even if Mann's hole experts' opinions are taken as true, Mann still has not shown that Rinke and Kimbell were lying. Mann, however, attempts to fill this hole with a declaration from Will Elkins. *Doc. No. 395 at 119-24.*

### b.  Will Elkins

In a declaration dated March 14, 2014, Elkins – who, by his own admission, is schizophrenic and bi-polar – claims that, in March of 2009, he was

approximately 900 yards[20] from Mann's front yard doing some yard work when he saw a white truck "[come] down the cul de sac in front of Dr. Mann's home, [turn] around, and [back] up to the loop." *Doc. No. 395 at 119.*  Two men then jumped out of the truck and got shovels and an "odd-shaped box with black material looking like trash bags wrapped around it" out of the truck.  The two men then took the shovels and box "into the loop" for about fifteen minutes and then came out without the box and left. *Doc. No. 395 at 120.*  According to Elkins, the two men he saw worked for the City of London, and one of them has moved away, but the other still "works for the Mayor as a water worker." *Doc. No. 395 at 120.*

Elkins, however, told vastly different stories to federal agents and to a federal grand jury back in late 2013.  In November 2013, federal agents received information that Mann's son, Kundan "Dan" Mann, had been trying to corruptly influence several witnesses who testified at Mann's trial, as well as other people. *R. Ex. 4 at Paras. 7-10 (Aff. from Oliver).*  During interviews of the people who had been approached by Dan Mann, ATF agents learned that Dan Mann had convinced Will Elkins to lie for him. *R. Ex. 4 at Paras. 9-10 (Aff. from Oliver).*  So, on November 20, 2013, ATF agents interviewed Elkins at his (Elkins') residence. *R. Ex. 4 at Para. 11 (Aff. from Oliver).*  Elkins stated that at exactly

---

[20] The grenades were found approximately 875 *feet* (not yards) from Mann's residence.

6:00 AM on March 1, 2009,[21] he saw a white city truck pull up to the end of the Star Harbor Lane (not Galaxy Lane) cul de sac.[22]  He then saw Kimbell, "another guy," and "one more" get out of the truck with two shovels.  Two of the men then pulled out a box of grenades while the third man was a "look out."  Elkins claimed he knew there were grenades in the box because he heard the metal sound they made when the men picked up the box.  Elkins stated that he was about thirty feet away from the men and hiding behind some bushes at the time.  He then saw the men go into the woods for about 5 minutes and dig a hole.  The men then left. Elkins claimed he then walked up to the box but did not touch it because he didn't want his fingerprints on it.  Elkins claimed he did not call the police because he did not want Kimbell to know he (Elkins) was there.  Elkins did not tell anyone about the incident until about a week before ATF agents visited him, when Dan Mann asked Elkins to write an affidavit.  Elkins claimed to have a photographic memory and remembered all of the details.  Elkins stated that his fiancée brought him to Dan Mann because Elkins had important information for Dan Mann.  Elkins told

---

[21] The grenades were found on March 3, 2009.

[22] Star Harbor Lane is the lower road that runs along Lake Dardanelle's shoreline and ends at a cul de sac. *Gov. Ex. 101a-c; TT at 929-37*.  The grenades were found off of Galaxy Lane, not anywhere near Star Harbor Lane. *R. Ex. 4 at Para. 11 (Aff. from Oliver)*.

agents that Dan Mann offered Elkins "six figures" for the above information. *R. Ex. 4 at Para. 11 (Aff. from Oliver)*.   ATF agents took notes during Elkins' interview; Elkins then reviewed and signed those notes as his statement.   Elkins mother was present during the interview and signed the statement as well.   Elkins statement is attached as Respondent's Exhibit 5.   *See R. Ex. 4 at Para. 11 (Aff. from Oliver)*.

Elkins was later subpoenaed by the United States and testified before the Grand Jury on December 3, 2013.   Before Elkins testified in front of the Grand Jury, he was interviewed by undersigned counsel in the presence of ATF Agent David Oliver.   *R. Ex. 4 at Para. 12 (Aff. from Oliver)*. During that interview, Wilkins was presented with an aerial photograph very similar to Gov. Ex. 101a in order to clarify exactly where Elkins claimed he saw the men with the box of grenades.   Elkins pointed to the cul de sac on Star Harbor Lane, not the cul de sac on Galaxy lane; in other words, he indicated a location *nowhere near where the grenades were actually buried*.   *R. Ex. 4 at Para 12 (Aff. from Oliver)*. Respondent's Exhibit 6 is an aerial photograph similar to the one shown to Elkin's before he testified in front of the Grand Jury.   *R. Ex. 4 at Para. 12 (Aff. from Oliver)*.   An "X" has been placed where Elkins indicated he saw the men bury the canister of grenades.   A circle has been drawn around the location where the buried canister of grenades was actually found. *R. Ex. 4 at Para. 12 (Aff. from Oliver)*.

46

Elkins also testified in front of the Grand Jury.  His sworn testimony is attached **under seal** (along with the Order authorizing its disclosure) as Respondent's Exhibit 7.  *R. Ex. 4 at Para. 13 (Aff. from Oliver).* In his testimony, Elkins told yet another, highly unbelievable version of the events he claimed he saw.[23]  The circumstances surrounding his first meeting with Dan Mann are different than what he previously stated.  *R. Ex. 7 at 6-7.*  The number of men he claims were involved in burying the canister is also different.  *R. Ex. 7 at 9, 17.*  His explanation for why he was in the area is different.  *R. Ex. 7 at 10, 17, & 22-24.*  His explanation for how he was able to see what he claims the men did in the woods is highly suspect.  *R. Ex. 7 at 14-15.*  His explanation about what the men did after burying the box is different.  *R. Ex. 7 at 15.*  His explanation about how he knew there were grenades in the box is more detailed, but the details are simply incredible (and perhaps not even humanly possible).  *R. Ex. 7 at 16-17.*  The same can be said for Elkins' explanation for how he knew the grenades were buried about 900 yards (not 900 feet) away from Mann's residence.  *R. Ex. 7 at 23-24.*  Finally, Elkins is adamant about the date that these events occurred; however, the date is different than the date in his declaration, and it is different than the date he told ATF agents.  *R. Ex. 7 at 25, 28-29.*  More importantly, the date that he is sure

---

[23] Because Elkins' Grand Jury testimony is under seal, the United States will only generally refer to the relevant portions of his testimony.

these events occurred on is well after the date the grenades were, in reality, found. *R. Ex. 7 at 28-29*. The totality of Elkins' grand jury testimony exposes Elkins' story for what it truly is: a coached and complete fabrication motivated by the promise of a large sum of money by Dan Mann. *R. Ex. 7 at 18-22*.[24]

### c. The Vast Government Conspiracy

Finally, Mann seems to assert in his Memorandum in Support of his § 2255 motion (filed on December 3, 2014), that state and federal law enforcement officers must have planted the grenades because law enforcement officers had a "motive to have [the] canister planted." *Doc. No. 408 at 24*. Mann states that the evidence of motive is developed in Ground 8 of his § 2255 motion and various exhibits filed on October 20, 2014, and later on December 3, 2014, and May 11,

---

[24] It must be noted that Will Elkin's story conflicts with the opinions of Mann's hole experts. According to Elkins (except for the time when Elkins says the grenades were buried *after* the date they were actually found), the hole in which the grenades were buried was dug just a few days before they were found. Thus, according to Elkins, the hole *was* freshly dug. Elkins' story also conflicts with Mann's theory that rogue agents planted the grenades by placing the ammunition canister next to a pre-existing hole. *See Doc. No. 395 at 13, Para. 1.9* ("The ammunition canister and the grenades it held were fabricated and subsequently planted—placed next to a pre-existing hole—in order to obtain a search warrant and the subsequent convictions and sentences on multiple counts.").

2015. From that evidence (transcripts of recordings, newspaper articles[25], denial of Freedom of Information Act requests,[26] etc...), Mann wants this Court to believe and infer that the 40mm grenades were planted because law enforcement has been out to get Mann since September 11, 2001. *See Doc. No. 395 at 29-36.*

Before moving on, it must be pointed out that, as discussed in Ground 2, Mann's trial attorneys investigated the possibility that the grenades had been planted, but they could not find any evidence to support that proposition. *See infra at 76-77.* Nonetheless, in support of his theory that the grenades were planted as part of a vast government conspiracy, Mann has submitted what he claims are

---

[25] In support of his conspiracy theory, Mann has submitted a series of newspaper articles from early 2003 about allegations that the Russellville Chief of Police ordered officers to stop a local businessman (not Mann) in the parking lot without probable cause as the man was leaving a city council meeting. *Doc. No. 408-4, 408-5, 408-6.* These articles, however, are not related in any way to the facts or circumstances of Mann's case.

[26] Mann claims that ATF's denial of Mann's various requests for information under Freedom of Information Act (FOIA) is evidence of a government conspiracy. *Doc. No. 395 at 36, Para. 8.2.2.11.* However, as noted in ATF's denial of Mann's most recent FOIA request, his requests have been denied because, among other things, the investigation of the West Memphis bombing is "still open." *Doc. No. 453-2.*

transcripts of recordings of various conversations between local and federal law enforcement officers and some of Mann's former patients in which Mann claims law enforcement officers tried to entrap him. *See Mann Ex. 10 – 10.5.* The United States does not concede to the authenticity or accuracy of these transcripts or the recordings because the United States has not seen or heard the recordings, except for one of them. That one recording *purports* to be a recording between ATF agent Warren Newman and D.E., a former patient of Mann's.[27] *See Mann Ex. 10.1a.* A copy of this recording was turned over to ATF in 2002 when Mann presented it to Jeff Brzozowski, ATF's Resident Agent in Charge (RAC) at the time, and complained that ATF agents were illegally targeting him. *See Mann Ex. 11.* However, upon listening to the recording, RAC Brzozowski immediately recognized that the male voice on the recording was *not* Agent Newman. *R. Ex. 9 (Aff. of Brzozowski).* Agent Newman also denies that he is on the recording. *R. Ex. 10 (Aff. of Newman).* Thus, the United States cannot and will not concede the authenticity or accuracy of any of the transcripts submitted by Mann in support of his § 2255 motion.[28]

---

[27] D.E. was a confidential informant for both ATF and the local drug task force at the time. *R. Ex. 10 (Aff. of Newman); R. Ex. 12 (Aff. of Haley).*

[28] Mann has even written a note at the bottom of his own exhibit (Exhibit 10.1b) acknowledging that "numerous people who are familiar with Agent Newman have

However, even if the recordings were authentic and the transcripts were accurate, they do <u>not</u> reveal that law enforcement officers were targeting Mann because of his ethnicity and "dark complexion" in a post-9/11 atmosphere, as Mann claims in *Doc. No. 395 at Paras 8.2.2.1-8.2.2.3*. Additionally, the transcripts do *not* reveal that law enforcement was illegally targeting or trying to entrap Mann.

Affidavits[29] have been submitted from Arkansas State Police Trooper Chris Goodman (*R. Ex. 11*), Arkansas State Police Trooper Tony Haley *(R. Ex. 12)*, and ATF Special Agent Warren Newman (*R. Ex. 10*), explaining why law enforcement began investigating Mann in the early 2000's.[30] According to those affidavits, in

---

stated that the voice in these 2 recordings is not that of Agent Newman" but Mann then insists that a "voice altering device was utilized."

[29] These affidavits have been filed with the Court under seal because they contain information about crimes that Mann was never charged with. They are also submitted under seal because the affidavits contain the names of several confidential sources used by law enforcement to investigate Mann (and others) in the early 2000's. Those informants will be referred to by their initials in the United States' response.

[30] On August 2, 2005, Mann filed a civil lawsuit in federal court against Goodman, Haley, Newman, and other law enforcement officers claiming that they violated

approximately 2001, local law enforcement began receiving information that Mann was engaged in some illegal practices at his medical clinic (e.g., trading sex for prescriptions or prescribed medication, writing unnecessary prescriptions, overprescribing medications, and writing prescriptions in the names of other people). They also noticed that many people who were patients of Mann were dying from drug overdoses. That information is supported by the affidavit of Leonard Krout, who was the coroner for Pope County, Arkansas, from 1989 until 2014, which is attached to the United States' response as Respondent's Exhibit 14. According to Krout, he noticed the historical average number of deaths in Pope County caused by drug overdoses increase from 0-2 deaths per year to 5 deaths in 2004. The number then continued to increase through 2005 to a high of 12 overdose deaths in 2006. According to Krout, Mann's name kept appearing as the primary or secondary physician for the deceased. Since Mann's medical practice

---

Mann's civil rights by making false statements about Mann, including allegations that Mann over-prescribed medications, traded sex for drugs, and that Mann's prescribing practices caused the deaths and emergency hospitalization of Mann's patients. That lawsuit was summarily dismissed on April 25, 2006, by the Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas. Mann's lawsuit and the order dismissing it are attached as Respondent's Exhibit 13.

has been closed, the number of overdose deaths in Pope County has returned to normal. *See R. Ex. 14 (Aff. of Krout)*.

Local and federal officers had also received information that Mann was illegally selling machine guns and other prohibited firearms to local citizens. Based upon that information, local and federal officers attempted to use several different informants – as they are lawfully allowed to do – to obtain illegal prescriptions from Mann or to illegally purchase a fully-automatic firearm from Mann. Those informants included:  B.D., D.E., J.L.,[31] and A.V.[32] – all of whom are named in the transcripts submitted by Mann and all of whom apparently were also informants for (and patients of) Mann.

Mann has also submitted a purported transcript of a recording of a meeting in 2003 between S.G. and law enforcement.  According to Trooper Goodman, S.G. came to the Russellville Police Department unannounced one day (not the day of the recording submitted by Mann).  *R. Ex. 11 (Aff. of Goodman).* She gave an interview in which she cried, and begged for law enforcement to help her by

---

[31] J.L. died from an overdose on July 23, 2003.  Her husband, R.H., is also named in the transcripts submitted by Mann.  *R. Ex. 11 (Aff. of Goodman).*

[32] A.V. and her mother were informants for the local drug task force, but they were never used in the investigation of Mann.  Agents deny that they ever offered A.V. money to say that Mann traded pills for sex with her.  *R. Ex. 10, 12 (Affs. of Newman and Haley).*

getting Mann to stop trading drugs and prescriptions for sex with her. She stated

she was very addicted, needed help badly, but couldn't quit taking drugs as long as

Mann made them so easy to obtain. *R. Ex. 11 (Aff. of Goodman).* Trooper

Goodman later learned that, during a second interview with law enforcement (of

which Mann has submitted a purported transcript), S.G. was found to be wearing a

monitoring device at the request of Mann. S.G. died from an overdose on October

4, 2005. *R. Ex. 11 (Aff. of Goodman).*

   None of law enforcement's efforts ever proved to be successful, however

(which might be expected when it turns out that law enforcement's informants

were also informants for Mann), and no criminal charges were ever filed against

Mann on those grounds. *Approximately five years later*, ATF opened a new

investigation of Mann for the West Memphis bombing of Dr. Pierce on February 4,

2009. Mann, however, was named as a suspect in that investigation *not* because of

the allegations from the early 2000's, but because Mann's name was provided to

ATF agents by the Arkansas State Medical Board when ATF agents asked the

board for a list of doctors who had recently been disciplined by the board. *TT at

1601-02.*

   Thus, when Mann's purported evidence of harassment by local law

enforcement officers (listed in Ground 8 of Mann's § 2255 motion) is fully

explained, it does *not* show evidence that the 98 grenades were planted as part of a

vast government conspiracy to get Mann.  Rather, it only shows that law enforcement had legitimate reasons to investigate Mann in the early 2000's, that they tried to do so using lawful investigative methods, but, for various reasons, they were unable to develop the evidence against Mann, and the investigations of Mann in the early 2000's were closed without prosecution.  Several years later, in 2009, a new, separate investigation of Mann was opened when his name was provided by the ASMB to federal agents in the unrelated matter of the West Memphis bombing.  This evidence does not a conspiracy make.

### d. Rhoad's Search Warrant Affidavit

Which finally brings us back around to the ultimate issue presented in Ground 1:  Did Agent Rhoads, in violation of the Fourth Amendment, present false information in, or omit exculpatory information[33] from, the search warrant affidavit used to obtain a state search warrant on Mann's residence on March 4, 2009?  That assertion is premised upon Mann's unsupported claim – as discussed above – that the ninety-eight 40mm high explosive grenades were planted by people who were out to get him and is absolutely false.

On March 4, 2009, the day after the grenades were found, Arkansas State Police Special Agent Stacie Rhoads swore to the facts contained in the search

---

[33] Most, if not all, of the information Mann claims that Rhoads omitted from her affidavit was either unavailable or unknown at the time of Rhoads' affidavit.

warrant affidavit.  Her sworn affidavit is attached to this response as Respondent's

Exhibit 1.  In her affidavit, Rhoads states that Investigator Jason Smith (of the

Pope County Sheriff's Office) told her the following facts:

> On March 3, 2009, at approximately 5:00 PM, deputies with the Pope
> County Sheriff's Office were contacted by Mark Rinke and Ryan
> Kimble (sic) who had located a partially buried ammo canister that
> contained several rounds of ammunition.  The area was located .1
> mile on Galaxy Lane from its intersection with Milky Way Lane in
> London, AR.  Prior to deputies arrival, Rinke and Kimble extracted
> the ammo can from the ground.  Inv Smith arrived and observed a
> green military type ammo can.  The can was secured with silver duct
> tape and was wrapped in a black plastic or similar type material.
> Inside the can were numerous 40 [m]illimeter high explosive and
> practice projectile grenades.   The grenades were located inside
> standard drab green military pouches.  The ammo can was collected
> by INV Smith and was secured at the Pope County Sheriff's office.

R. Ex. 15 at 1.  Each one of these facts was supported – without any

meaningful difference – by the sworn trial testimony of Jason Smith, Mark

Rinke, and Ryan Kimbell.  TT at 927-53; 1069-1092; Gov. Ex. 98a-98j, 99a,

99a1, 101a, 101b.

Agent Rhoads' sworn affidavit then continues:

> On March 4, 2009, I was at the Pope County Sheriff's
> Office and learned of the findings of the grenades and the
> location.   I knew this area to be in close proximity
> (approximately 600 feet) to the RANDEEP MANN residence
> which is located at 313 Milky Way Lane.  His residence is
> located at the intersection of Milky Way Lane and Galaxy
> Lane.
> On February 4, 2009, I went to the MANN residence in
> relation to a separate investigation.  While at his residence, I

56

> observed numerous weapons of varying caliber. I also saw a M203 which is capable of launching a 40 millimeter grenade like the ones found at the site approximately 600 feet from the MANN residence.

*R. Ex. 15 at 2.* Each one of these facts was also supported – without any meaningful difference – by the sworn trial testimony of Agent Rhoads and ATF Special Agent Tony McKutcheon. *TT at 1709-66; 866-927; Gov. Ex. 100 PP.* Thus, Rhoads' search warrant affidavit did not contain any false information, or omit exculpatory information, in violation of the Fourth Amendment.[34] Ground 1 is without merit.

---

[34] Mann claims that he should be "discharge[d]... from custody forthwith" because the "bulk" of the evidence on Counts One and Two came from "the search predicated on the respondent's story about 'finding' the canister," and the conviction on those charges was "entirely dependent on the fruits of the search procured by the perjury about 'finding' the canister by accident." *Doc. No. 408 at 25.* However, even if the Court were to believe Mann's grandiose conspiracy theory, his convictions and prison sentences on Counts One, Two, Three, Seven, and Eight remain intact because those convictions resulted from evidence independent of the search warrant obtained on March 4, 2009. Counts 1 and 2 (which were related to the West Memphis bombing) are supported by evidence derived independently and separately from the initial search of Mann's residence and also by evidence obtained through other search warrants that, although the affidavits mention Rinke and Kimbell's discovery of the buried grenades, are still supported by probable cause if the affidavits are reviewed without consideration of

### 3. No Fifth Amendment Violation.

Although it is not entirely clear, Ground 1 appears to also allege that prosecutors and law enforcement knowingly used perjured testimony, and failed to correct such false testimony, in violation of the Fifth Amendment. This claim also hinges upon Mann's assertion that the ninety-eight 40mm high explosive grenades were planted by people who were out to get him, which, as discussed earlier, is completely false. Thus, because there was no use of perjured testimony, there was no violation of the Fifth Amendment. Furthermore, even if prosecutors and law enforcement had used perjured testimony, Mann has not shown that prosecutors and law enforcement *knew* the testimony was false or that there was any wrongdoing by an agent of the United States or any person whose knowledge or intent is imputable to the United States. Similarly, even if Rinke and Kimbell were

---

the results of the initial search warrant. Count 3 (for possessing the unregistered, buried ninety-eight 40mm grenades) would still be supported by Agents Rhodes and McCutcheon seeing the grenade launchers in Mann's residence when they interviewed Mann about the West Memphis bombing (before the grenades were found), Lloyd Hahn selling 90-100 40mm grenades to Mann (after Hahn wiped the date of manufacture off all of the grenades), and Kimbrough's seeing "large bullets" that looked like 40mm grenades in Mann's house around 2003. Mann still would have been arrested on March 4, 2009, for possessing the grenades, and he still would have been in jail, where his phone calls with his wife still would have been recorded.

58

lying, Mann has not demonstrated that anyone in law enforcement was aware that Rinke and Kimbell were lying such that the "good faith exception" announced in *United States v. Leon*, 468 U.S. 897 (1984) would not apply. *See also Walden v. Carmack*, 156 F.3d 861, 872 (8th Cir. 1998).

Therefore, Ground 1 is without merit and must fail.

### 4. No Evidentiary Hearing is Required on Ground 1.

A § 2255 motion may be dismissed without a hearing if: (1) petitioner's allegations, accepted as true, would not entitle him to relief; or (2) the allegations cannot be accepted as true because they are contradicted by the record, are inherently incredible, or are conclusions rather than statements of fact. *Winters v. United States*, 716 F.3d 1098, 1103 (8th Cir. 2013)(quoting *Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir.2001)). If the district court can determine from the motion and the supporting record that the petitioner is not entitled to relief under § 2255, then no hearing is required. *Id.* An affidavit may be considered as part of the files and records of a case. *Thomas v. United States*, 737 F.3d 1202, 1207 (8th Cir. 2013).

Mann is not entitled to a hearing on Ground 1 for a variety of reasons. First, if Mann wanted to contest the facts contained in the search warrant affidavit, then he should have filed a motion under *Franks v. Delaware,* 438 U.S. 154 (1978) before trial. Because he did not do so, Ground 1 has been procedurally defaulted

and Mann is not entitled to a hearing.  Second, Mann is not entitled to a hearing because his allegations that the grenades were planted and that he is a victim of a vast government conspiracy cannot be accepted as true because they are contradicted by the overwhelming evidence in the record.  Finally, Mann is also not entitled to a hearing on Ground 1 because his allegations are inherently incredible.

**B.   Ground 20.**[35]   In his twentieth claim, Mann asserts that "the police-prosecution team did not disclose to the defense the evidence from which the inference could be drawn that an ammunition canister containing ninety-eight M406 40-mm. high-explosive grenades was planted on property close to Dr. Mann's home for the purpose of obtaining a search warrant, and for the police-prosecution team's use of the fruits of the resulting search" in violation of the Due Process Clause of the Fifth Amendment or, "in the alternative, the deprivation of

---

[35] Ground 20 was added to Mann's § 2255 motion after Grounds 1-19 were originally filed.  Although numerically out of order, the United States will respond to Ground 20 here because the assertions presented in Ground 20 are factually related to the assertions in Ground 1.  Mann has similarly addressed Ground 20 immediately after Ground 1 in his pleadings filed after amending his § 2255 motion to include Ground 20.

his right to the effective assistance of counsel in violation of the Sixth Amendment." *Doc. No. 410 at 4.*

### 1. The United States Did Not Fail to Timely Disclose Any Exculpatory Evidence.

Just like Ground 1, Ground 20 hinges upon Mann's assertion that the ninety-eight 40mm high explosive grenades were planted by people who were out to get him, not innocently stumbled upon and reported by a city worker who didn't even know Mann. In Ground 20, Mann uses the "planting conspiracy" espoused in Ground 1 to now claim that the United States committed a *Brady* violation by failing to turn over evidence "from which the inference could be drawn" that the grenades were planted. Mann, however, has *not* provided any specific piece of evidence that the United States purportedly withheld from him.[36] Instead, Mann

---

[36] It is Mann's burden to demonstrate that the evidence was both favorable and material, and that the government suppressed the evidence. *United States v. Barraza-Cazares*, 465 F.3d 327, 333 (8th Cir. 2006). Because Mann himself cannot say and has not said what the supposedly suppressed evidence is, his claim must fail right out of the gate.

only vaguely alludes to "information [Mann's trial counsel] sought by attempting to interview Kimbell"[37] and "the statements Rinke made at trial."

Reading between the lines – and this is just a guess – it appears that Mann is arguing that the United States should have disclosed any statements that Rinke and Kimbell made to law enforcement officers that in any way related to the age or size of the hole where the grenades were found, because, according to Mann, those statements somehow show that Rinke and Kimble were lying, prove that the grenades were planted, and expose a vast government conspiracy to get Mann.

None of Rinke and Kimbell's statements, however, were in any way exculpatory. Mann, however, through factual and legal gymnastics, has tried to convert Rinke's and Kimbell's statements about finding the grenades into exculpatory information by claiming those very statements prove that the men were lying about finding the grenades. But, that assertion is based upon the unreliable opinions of a few people who looked at a few less-than-ideal pictures of the hole where the buried grenades were found and the fabricated story of Will Elkins, a self-admitted bi-polar

---

[37] Kimbell testified at trial that, although he was willing to talk to members of law enforcement (ATF agents) about the case, he refused to talk to a private investigator hired by Mann because he thought the investigator had an "agenda." *TT at 1102.*

schizophrenic.[38] The United States already addressed these issues in its response to Ground 1 and hereby asserts the same response on Ground 20.

Furthermore, the fact that the grenades were found by two city workers in a canister buried in the ground near Mann's house was no great secret.  This information was disclosed in the very beginning of the case in the criminal complaint filed against Mann on March 5, 2009. *Doc. No. 1; R. Ex. 15.*  The information was then repeated during the detention hearing on March 9, 2009. *Doc. No. 7 at 4-9.*  At that detention hearing, pictures of the hole, the canister, and the grenades were also provided to Mann's counsel. *Id.*  Those pictures and more pictures of where the grenades were found, including the pictures that former ATF agent Buford took on March 4, 2009, were provided to Mann's counsel in discovery on May 5, 2009, and February 17, 2010.  Information about the finding of the grenades was also included in the sworn affidavits that supported the various search warrants executed in this case, which were provided in discovery on February 2, 2010.[39]   Investigator Smith's report about the finding of the grenades

---

[38] It must be noted that the United States was unaware of Elkins or his story until he was interviewed by ATF agents on November 20, 2013, well after Mann's trial.

[39] Each one of the affidavits contain the following language:

was included in the discovery with the search warrants on February 2, 2010;

Smith's report named Rinke and Kimbell as the two men who found the buried

grenades and also listed their addresses and phone numbers.[40]   Armed with all of

this information and evidence, Mann's attorneys were able to locate and make

---

On March 3, 2009, at approximately 5:00 PM, the Pope County, AR, Sheriff's Office responded to call concerning military ordinances discovered on Galaxy Lane in London, AR, approximately 875 feet from Mann's residence.  The responding deputies met with employees of the City of London public works department.  The employees stated they had been walking through a wooded area, and one of them employee tripped over what he believed to be a black plastic bag buried in the ground.  The worker dug up the black plastic and discovered a large green military canister wrapped in duct tape.  The employee cut open the duct tape and opened the canister.  Inside the canister, he discovered what he believed to be several rounds of ammunition. The deputies recovered the green military canister, its contents, and the black plastic material and transported those items to the Pope County Sheriff's Office.

---

[40] Smith's report has already been submitted by Mann (who clearly already had it) as PCR Ex 18.  *Doc. No. 408-7.*  In that report, Smith states, in pertinent part: "Mr. Rinke advised that he had entered the woods to use the restroom when he tripped over something in the ground.  Mr. Rinke stated that he noticed a black trash bag buried in the ground."

contact with Rinke and Kimbell.  Rinke provided a statement to an investigator for Mann.  *R. Ex. 16 at Para. 3A (Aff. of Hendrix); R. Ex. 17 at 2 (Aff of Cassinelli).* Kimbell would not provide a statement to Mann's investigator, but he did "speak briefly with the investigator, confirming what Rinke said, including that Rinke said he was originally at the scene looking at a pool and denying that any law enforcement agent directed him to look around that area."  *R. Ex. 17 at 2 (Aff of Cassinelli); TT at 1101-02.*

Mann even states several times in both his § 2255 motion and his Verified Memorandum during his argument on Ground 2 (not Ground 20) that his trial counsel were "on notice of the appearance of the hole from which Rinke and Kimbell claimed to have pulled the canister well before trial." *Doc. No.395 at 14; Doc. No. 408 at 26-27.*  Thus, Mann was well aware of the facts about the findings of the grenades, and there was no *Brady* violation by the United States.

Mann also asserts in his Verified Memorandum of Support that "the [United States] knew or in the exercise of reasonable diligence should have known that the 'finding' story was false" because "[t]he pictures of the hole... are sufficient to demonstrate to a person in the vicinage of the trial, of ordinary intelligence and practical judgment, that the hole was too small and too old to match the substance

of [Rinke and Kimbell's testimony.]"[41]  *Doc. No. 408 at 27-28*.  Mann repeats this position about the pictures during his argument on Ground 2 (not 20) in the same document:  "Dr. Mann's position [is] that the pictures from the respondent show that the hole from which Rinke and Kimbell claimed to have extracted the canister was too old and too small to have held the object."  *Id. at 40*.  If such were the case, however, then why was it necessary for Mann to hire a series of hole experts for his § 2255 motion?  If such were the case, then why does Mann later claim in Ground 2 that his counsel were ineffective for failing to hire some hole experts?  Mann cannot have it both ways.

At trial, Mann's attorneys raised the issues about the age and size of the hole through the cross examination of various government witnesses and through the testimony of a defense witness, Wayne Henry.  Defense counsel also argued the points to the jury during closing arguments.  However, the jury – twelve people with ordinary intelligence and practical judgment *who had seen pictures of the hole* (Gov. Ex. 98a-j) – rejected Mann's position that the hole was not freshly dug and was not deep enough to hold the buried ammunition canister.

Finally, Mann claims that "the information about the story surrounding the hole was material [under *Brady*], *inter alia*, in that it would have provided a basis

---

[41] These pictures are the pictures provided to Mann in discovery by the United States, as discussed earlier.

for quashing the indictment and for suppressing the evidence..." *Doc. No. 410*. However, under *Brady*, the standard for materiality is whether there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Heppner, 519 F.3d 744, 750 (8th Cir. 2008)*. A reasonable probability "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal,"... but is satisfied when the suppression "undermines confidence in the outcome of the trial." *United States v. Norris*, 485 F.3d 415, 422 (8th Cir. 2007)(quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).    As stated earlier, the age and precise depth of the hole in which the grenades were buried are immaterial because the evidence that the buried grenades belonged to Mann was overwhelming.  A summary of those facts were recited in the United States' response to Ground 1 and are hereby incorporated into its response to Ground 20.  Based on those facts, any failure of the United States to disclose any statements of Rinke and Kimbell – if there was such a failure – did not undermine confidence in the outcome of Mann's trial. Thus, there was no *Brady* violation, and Ground 20 is without merit.

### 2. *Mann's Trial Counsel were Not Ineffective under* Strickland.

As almost an afterthought, Mann obscurely and confusingly references the Sixth Amendment, without elaboration or explanation, in Ground 20 of § 2255.[42] He never states how he contends his counsel were ineffective. *Doc. No. 410 at 4-6.* In his Verified Memorandum in Support of his § 2255 motion (filed on December 3, 2014), Mann only mentions the purported Sixth Amendment issue in Ground 20 by stating, "If trial counsel were not ineffective for failing to take more action sooner to unmask the fiction that the canister was 'found' near Dr. Mann's property, it was because the police-prosecution team failed to disclose enough evidence soon enough for the defense team to hire experts for pretrial motions and trial testimony as Dr. Mann has hired experts on post-conviction relief." *Doc. No. 408 at 29.* Thus, the United States is unsure how Mann contends his counsel were

---

[42] Ground 20 states: "Respondent's custody over Dr. Mann depends on the respondent's failure to produce exculpatory evidence in violation of the Due Process Clause of the Fifth Amendment or, in the alternative, the deprivation of his right to the effective assistance of counsel in violation of the Sixth Amendment, that occurred when the prosecution-police team did not disclose to the defense the evidence from which the inference could be drawn that an ammunition canister containing ninety-eight M406 40-mm. high-explosive grenades was planted on property close to Dr. Mann's home for the purpose of obtaining a search warrant, and for the police-prosecution team's use of the fruits of the resulting search." *Doc. No. 410 at 20.*

ineffective and cannot respond to any such claim in Ground 20, except to say, as discussed earlier in Ground 1, the grenades were not planted and Rinke and Kimbell did not lie about their discovery of the buried grenades. Additionally, to the extent that the United States can decipher any meaning from Mann's claim of ineffective assistance of counsel in Ground 20, the claim sounds strikingly similar to Mann's claim in Ground 2; therefore, the United States will hereby incorporate and rely on its response to Ground 2.

### 3. No Evidentiary Hearing is Required on Ground 20.

Mann is not entitled to a hearing on Ground 20 because he has not produced any evidence that he claims the United States suppressed; therefore, his assertion is, in reality, an unsupported conclusion that is contradicted by the record. Additionally, Ground 20 – just like Ground 1 – hinges upon Mann's allegations that the grenades were planted and that he is the victim of a vast government conspiracy – both of which cannot be accepted as true because they are contradicted by the record and are inherently incredible.

**C. Ground 2:** In his second claim, Mann asserts that his trial counsel were ineffective because they "failed to consult with experts and present expert evidence to demonstrate the perjured nature of the assertions on which the first search warrant of March 4, 2009, was based, and otherwise to establish that the initial

search of Dr. Mann's home and all subsequent searches were in violation of the Searches and Seizures Clause of the Fourth Amendment to the Constitution of the United States and the Due Process Clause of the Fifth Amendment." *Doc. No. 395 at 14.*

### 1. Mann's Trial Counsel were Not Ineffective under Strickland.

Just like Grounds 1 and 20, Ground 2 hinges upon Mann's assertion that the ninety-eight 40mm high explosive grenades were planted by people who were out to get him, not innocently stumbled upon and reported by a city worker who didn't even know Mann. In Ground 2, Mann now uses his "planting conspiracy" to turn against his trial attorneys and claim they were ineffective because they failed to consult with any hole experts to show that Rinke and Kimbell were lying about finding the grenades and then failed to use those experts to attack the search warrants executed in this case on that basis.

For a variety of reasons, Ground 2 must fail. As stated earlier, under *Strickland*, Mann must demonstrate: (1) that his counsel's performance was deficient; and (2) that, but for his counsel's performance, there is a reasonable probability that the outcome of the proceeding would have been different. If either the prejudice or deficient performance prong of *Strickland* is not met, then Mann's claim for ineffective assistance of counsel cannot prevail.

70

### a. No Prejudice

A court need not address whether counsel's performance was deficient if the ineffective assistance of counsel claim may be disposed of for failure to show prejudice. *Strickland*, 466 U.S. at 697; *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996).

First, Mann presumes that hiring a series of hole experts earlier would have resulted in evidence from the initial search of Mann's residence being suppressed. However, as discussed in the United States' response to Ground 1, Rinke and Kimbell were not lying and Rhoads' search warrant affidavit did not contain any false information or omit exculpatory information (whether imputable to the United States or not).   Therefore, any challenge to the initial search warrant on Mann's residence (or any subsequent search warrants) would have been unsuccessful, and the results of Mann's proceedings would have been the same.

Second, Mann seems to contend that a hiring a hole expert would have prevented the jury from finding him guilty on Count 3 for possessing the buried grenades.   However, as stated earlier and as noted by the Eighth Circuit, the evidence of guilt against Mann on Count 3 was overwhelming. *United States v.*

*Randeep Mann*, 701 F.3d 274, 291 (8th Cir. 2012).)[43] To say that a hole expert would have changed the jury's verdict is rank speculation, which is not sufficient to meet Mann's burden under *Strickland*.

Third, in his § 2255 motion, Mann also claims that "suppression of the fruits of the search of respondent's agents conducted on the basis of the ill-gotten search warrant would have had a reasonable probability of a different outcome" on all counts of Mann's convictions. *Doc. No. 395 at 17-18*. Other than that conclusory statement, however, Mann has offered nothing to demonstrate that "there is a reasonable probability that, absent the [claimed] errors, the factfinder would have had a reasonable doubt respecting guilt." Again, Mann's proposition that the entire case against him would have collapsed if Mann's trial counsel had hired some hole experts is premised on Mann's "planting conspiracy" and the theory that Rinke and Kimbell were lying, that Rhoads' search warrant affidavit contained false information or omitted exculpatory information imputable to the United States, that *Leon*'s good faith exception would not apply, and that evidence from the initial search of Mann's residence would have been suppressed – none of which is true.

For argument's sake, however, even if the evidence from the initial search warrant had been suppressed, there was still sufficient evidence to convict Mann

---

[43] The evidence presented at trial against Mann on Count 3 is summarized in the United States' response to Ground 1.

on all of the counts, except for Count 6 (for possessing an unregistered firearm found in Mann's residence during the initial search). Counts 1 and 2 (which were related to the West Memphis bombing) are supported by evidence derived independently and separately from the initial search of Mann's residence and also by evidence obtained through other search warrants that, although the affidavits mention Rinke and Kimbell's discovery of the buried grenades, are still supported by probable cause if the affidavits are reviewed without consideration of the results of the initial search warrant. Count 3 (for possessing the unregistered, buried ninety-eight 40mm grenades) would still be supported by Agents Rhodes and McCutcheon seeing the grenade launchers in Mann's residence when they interviewed Mann about the West Memphis bombing (before the grenades were found), Lloyd Hahn selling 90-100 40mm grenades to Mann (after Hahn wiped the date of manufacture off all of the grenades), and Kimbrough's seeing "large bullets" that looked like 40mm grenades in Mann's house around 2003. Mann still would have been arrested on March 4, 2009, for possessing the grenades, and he still would have been in jail, where his phone calls with his wife still would have been recorded.

In sum, Mann has not demonstrated that there is a reasonable probability that, absent the error claimed by Mann in Ground 2, the factfinder would have had a reasonable doubt respecting guilt. Therefore, Ground 2 must fail.

### b. Trial Counsel Were Not Constitutionally Deficient.

Although Mann has failed to show prejudice, the United States will nonetheless address the issue of trial counsel's performance. *Strickland*, 466 U.S. at 697; *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996).   Under *Strickland*, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. *Strickland*, 466 U.S. at 690.   Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *Strickland*, 466 U.S. at 691.   Stated another way, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.*   In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Id.*

On the onset, it must be pointed out that, in Ground 20 (not Ground 2), Mann asserts in his Verified Memorandum of Support that "[t]he pictures of the hole... are sufficient to demonstrate to a person in the vicinage of the trial, of ordinary intelligence and practical judgment, that the hole was too small and too

old to match the substance of [Rinke and Kimbell's testimony.]"[44] *Doc. No. 408 at 27-28.* Mann now repeats this position about the pictures during his argument on Ground 2: "Dr. Mann's position [is] that the pictures from the respondent show that the hole from which Rinke and Kimbell claimed to have extracted the canister was too old and too small to have held the object." *Id. at 40.* If that is Mann's position, however, then there was no need for Mann's counsel to consult with any hole experts, and Mann's counsel necessarily were not deficient for failing to do so.

Additionally, as discussed in the United States' response to Ground 1, Rinke and Kimbell were not lying about their discovery of the buried grenades. Therefore, Mann's attorneys did not have an obligation to file a series of frivolous motions to contest the search warrants executed in this case. *See Rodriguez v. United States,* 17 F.3d 225, 226 (8th Cir. 1994)(defense counsel is not required to raise meritless or frivolous challenges in order to avoid a charge of ineffective assistance).

Finally, Mann's attorneys investigated the possibility that the grenades were planted and ultimately decided there was no evidence to support that proposition. As discussed in Ground 20, they had pictures and information about the finding of

---

[44] These pictures are the pictures provided to Mann in discovery by the United States, as discussed in Ground 20.

the grenades on March 3, 2009. They actually visited the site where the grenades were found. *R. Ex. 16 at Para 3A (Aff of Hendrix).* They also sent an investigator to interview Rinke and Kimbell. Rinke provided a statement to their investigator. *R. Ex. 16 at Para. 3A (Aff. of Hendrix); R. Ex. 17 at 2 (Aff of Cassinelli).* Kimbell would not provide a statement to Mann's investigator, but he did "speak briefly with the investigator, confirming what Rinke said, including that Rinke said he was originally at the scene looking at a pool and denying that any law enforcement agent directed him to look around that area." *R. Ex. 17 at 2 (Aff of Cassinelli); TT at 1101-02.* They interviewed Lynn Blunier, the homeowner who owned the house where Rinke said he went to see the pool. *R. Ex. 16 at Para. 3A (Aff of Hendrix).* As far as investigating the finding of the grenades, there was nothing else for Mann's attorneys to investigate. They even went as far as to hire a Fourth Amendment expert, John Wesley Hall, to review the case with them. *R. Ex. 16 at Para.2, 3R (Aff of Hendrix).* However, based upon their investigation, there was no evidence to factually support the proposition that the grenades were planted. Thus, in the words of Cassinelli, "We did not move to suppress the grenades or evidence obtained as a result because we did not have a good faith factual basis to assert a law enforcement conspiracy to plant them and use them against Mann." *R. Ex. 17 at 3 (Aff of Cassinelli).* As such, Mann's attorneys were not ineffective for not filing a motion which, after thorough investigation, they believed had no merit.

*See Rodriguez v. United States,* 17 F.3d 225, 226 (8th Cir. 1994)(Defense counsel is not required to raise meritless or frivolous challenges in order to avoid a charge of ineffective assistance.).

As for the trial, as fully explained in their affidavits, Mann's attorneys decided strategically not to overtly present a defense that the grenades were planted as part of a government conspiracy. *R. Ex. 16 at Para. 3A (Aff. of Hendrix); R. Ex. 17 at PP. 1-3 (Aff. of Cassinelli).* This decision was made partly because, in light of all the evidence, the jury might find the defense "ridiculous," and Mann's attorneys feared they would lose all credibility in the their defense of the case. *R. Ex. 16 at Para. 3A (Aff. of Hendrix); R. Ex. 17 at Pg. 2 (Aff. of Cassinelli).* As noted by Hendrix, "A jury in this area, we decided, simply wouldn't accept that several law enforcement agencies, both local, state, and federal, would conspire with local city workers to set up Dr. Mann." *R. Ex. 16 at Para. 3A (Aff. of Hendrix).* As stated by Cassinelli:

> It was our best judgment that demonstrating to the jury that the city workers, government employees, likely were intentionally providing biased testimony, that the investigators failed to gather certain data concerning the scene, that the pictures themselves were logically inconsistent with the explanation of the buried canister, and that objective witnesses questioned the age and size of the hole was a better presentation than attempting to argue that it was planted *without any evidence to present them to factually support it.*

*R. Ex. 17 at Pg. 3 (Aff. of Cassinelli)(emphasis added).*

Instead, the decision was made to "not emphatically state [that the grenades were planted] as a theory, but rather drop hints of that theory throughout the trial so an acquittal-prone juror might latch on to it."   *R. Ex. 16 at Para. 3A (Aff. of Hendrix)*.   Once that strategic decision had been made, there was no need to consult with or to present the testimony of any hole experts because such evidence would not fit with the defense Mann's attorneys decided to employ.   Undoubtedly, Mann will argue that his attorneys should have consulted with hole experts *before* they made that strategic decision.   But to what end?   The driving force behind Mann's attorneys' decision was to maintain their credibility with the jury.   They did not believe an Arkansas jury would believe that the grenades were planted as part of a government conspiracy, and certainly not if there was no evidence to support that theory.[45]   There wasn't any such evidence.   And hole experts could not fill that void.

Thus, Mann has failed to meet his burden under *Strickland*, and Ground 2 is without merit.

### 2. No Evidentiary Hearing is Required on Ground 2.

Mann is not entitled to a hearing on Ground 2.   Even if Mann's assertions are taken as true, he is not entitled him to relief because he has not demonstrated

---

[45] The United States further discusses the lack of evidence of a government conspiracy in its response to Grounds 1 and 8.

that his attorneys were deficient under *Strickland* and because he has not demonstrated prejudice under *Strickland.*    Additionally, Ground 2 – just like Grounds 1 and 20 – hinges upon Mann's allegations that the grenades were planted and that he is the victim of a vast government conspiracy – both of which cannot be accepted as true because they are contradicted by the record and are inherently incredible.

**D.  Ground 3:**  In his third claim, Mann asserts that "the police-prosecution team (Assistant U.S. Attorneys and ATF employees) suborned, sponsored, adduced, and failed to correct perjured grand-jury testimony commencing in January 2010," in violation of the Due Process Clause of the Fifth Amendment. *Doc. No. 395 at 18.*  This ground, much like Grounds 4 and 5, hinges upon Mann's assertion that Al Shareqi presented perjured testimony before the Grand Jury and that Al Shareqi's subsequent recantation is truthful – assertions that, as discussed below, are not true.

*1. Ground 3 has been Procedurally Defaulted.*

Allegations of impropriety before the grand jury generally are not grounds for permissible attack on habeas review.  *See Houser v. United States,* 508 F.2d 509, 513–17 (8th Cir.1974) (trial errors, challenges to grand jury proceedings, indictment defects, Jencks statement claims, evidentiary rulings, denied requests

for witness subpoenas, and improper statements by the court or prosecutor are not permissible § 2255 claims); *Blade v. United States*, No. 01-002301CRWGAF, 2009 WL 1330805, at *2 (W.D. Mo. May 12, 2009). As such, Mann has procedurally defaulted Ground 3 by not raising the issue with the district court or on direct appeal. *See Jennings,* 696 F.3d at 762; *Hamilton*, 604 F.3d at 574 (8th Cir. 2010)("Claims not made during district court proceedings or on direct appeal are procedurally defaulted and may not be raised for the first time in a § 2255 motion."); s*ee also Swedzinski*, 160 F.3d at 500 (8th Cir.1998); s*ee also Matthews,* 114 F.3d at 113 (8th Cir.1997). Additionally, Mann has failed to avoid procedural default because he has not shown "cause" and actual "prejudice" or shown that he is "actually innocent.'" *Jennings*, 696 F.3d at 763 (quoting *Bousley,* 523 U.S. at 622 (internal citations omitted)). In Grounds 4 and 5, Mann asserts that his trial counsel were ineffective for failing to investigate Alshareqi's recantation and for failing to use Alshareqi's recantation to challenge Mann's indictment. For the same reasons stated in the United States' response to those grounds, Mann's counsel were not ineffective in their handling of Alshareqi's recantation. Therefore, Mann cannot and has not demonstrated "cause and prejudice." He also has not demonstrated "actual innocence." Thus, Ground 3 has been procedurally defaulted.

Even if not procedurally defaulted, Ground 3 still must fail on the merits, as discussed below.

### 2. The United States did Not Suborn, Sponsor, Adduce, or Fail to Correct Any Perjured Testimony.

The Supreme Court has repeatedly held that, because of the special nature and historical function of the grand jury, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence. *United States v. Williams,* 504 U.S. 36, 51-55 (1992); *United States v. Calandra,* 414 U.S. 338, 344-45 (1974); *United States v. Costello,* 350 U.S. 359, 363 (1956); *Holt v. United States,* 218 U.S 245 (1910). The mere fact that evidence is unreliable is not sufficient to require a dismissal of an indictment, and a challenge to the reliability or competence of the evidence presented to the grand jury will not be heard. *Bank of Nova Scotia v. United States,* 487 U.S. 250,261 (1988). Furthermore, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant. *Bank of Nova Scotia,* 487 U.S. at 254-57. In such cases, dismissal of the indictment is appropriate only "if it is established that the violation substantially influenced the grand jury's decision to indict or if there is 'grave

doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 257.[46]

Within the Eighth Circuit, the law in this area is not very clear.   In his Verified Memorandum, Mann cites *United States v. Vallie*, 284 F.3d 917, 921 (8th Cir. 2002), for the proposition that "an indictment cannot be based on perjured testimony." *Doc. No. 408 at 17, n. 6.* Those eight words, however, are not the holding of the case and have not appeared or been repeated within the Eighth Circuit in any other case.   Furthermore, *Vallie* cites to *United States v. Basurto*, 497 F.2d 781, 785 (9th Cir. 1974) as the legal basis for that proposition.   However, in *United States v. Claiborne*, 765 F.2d 784, 791 (9th Cir. 1985) (abrogated on other grounds, *Ross v. Oklahoma*, 487 U.S. 81 (1988)), the Ninth Circuit modified *Basurto* and held that courts should *not* dismiss an indictment due to the presence

---

[46] The Supreme Court adopted this standard where dismissal of the indictment is sought for "nonconstitutional error" but did not explain any further. *Bank of Nova Scotia*, 487 U.S. at 257.   The Supreme Court did, however, use this standard in its analysis of whether "misleading and inaccurate summaries" by federal agents before the grand jury required dismissal of the indictment. *Bank of Nova Scotia*, 487 U.S. at 260-61.   Ultimately, the Supreme Court held that the Bank of Nova Scotia was essentially challenging the reliability or competence of the evidence before the grand jury, and the Supreme Court refused to hear such a challenge. *Bank of Nova Scotia*, 487 U.S. at 260-61.

of perjured testimony before the grand jury, if sufficient non-perjurious testimony exists to support the indictment. *Claiborne* is more consistent with earlier Eighth Circuit cases that held, upon allegations of perjury before the grand jury, if there was some competent evidence presented to the grand jury that sustains the indictment, then the indictment should be sustained. *United States v. Johnson*, 767 F.2d 1259, 1275 (8th Cir.1985); *see also Truchinski v. United States*, 393 F.2d 627, 633 (8th Cir. 1968); *United States v. Levine*, 700 F.2d 1176, 1180 (8th Cir. 1983). The defendant has the burden to show that the grand jury heard *no competent evidence* that could sustain the indictment. *Johnson*, 767 F.2d at 1275.

Even then, however, any error in a grand jury proceeding connected with a charging decision is rendered harmless beyond a reasonable doubt by a jury's guilty verdict. *United States v. Exson*, 328 F.3d 456, 459 (8th Cir. 2003)(citing *United States v. Mechanik*, 475 U.S. 66, 70 (1986)("... the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.")

Finally, there is another line of cases that holds, in order for a defendant to prove that the government's use of false testimony violated his right to due

process, the defendant must show that "(1) the prosecution used perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is a 'reasonable likelihood' that the perjured testimony could have affected the jury's judgment." *United States v. Papajohn*, 212 F.3d 1112, 1117 (8th Cir. 2000)(abrogated by *Crawford v. Washington*, 541 U.S. 36 (2004)); *United States v. Martin*, 59 F.3d 767, 770 (8th Cir.1995); *United States v. Nelson*, 970 F.2d 439, 443 (8th Cir.1992), *cert. denied*, 506 U.S. 903, 113 S.Ct. 293, 121 L.Ed.2d 217 (1992). These cases, however, involve facts where the alleged perjury occurred during trial, not before the grand jury. But, in *Bank of Nova Scotia*, 487 U.S. at 260-61, the Supreme Court in dicta scrutinized whether prosecutors knew evidence presented to the grand jury by federal agents was false or misleading before ultimately refusing to entertain the defendant's challenge to the reliability or competence of the evidence before the grand jury.

Regardless of the standard used, for the reasons stated below, the United States did not violate the Due Process Clause of the Fifth Amendment by suborning, sponsoring, adducing, or failing to correct perjured grand-jury testimony.

### a. Hamis Alshareqi

Mann first claims that the United States "suborned perjured grand jury testimony from Hamis Alshareqi." *Doc. No. 395 at 18-20.* The only evidence

Mann provides to support that allegation is an affidavit from Mann's close friend and former cellmate, Hamis Alshareqi. Alshareqi's affidavit is attached to this Response as R. Ex. 19.[47] In that affidavit, Alshareqi essentially claims that he was intimidated, coerced, and enticed by federal prosecutors and ATF agents into making false, incriminating statements about Mann during interviews and during his testimony before the Grand Jury. As detailed below, however, Alshareqi's affidavit, although sworn, is a complete lie.

Alshareqi was indicted by a federal grand jury in the Eastern District of Arkansas in a three-count indictment in Case Number 4:09CR00021 on January 7, 2009, for being an alien who failed to depart the United States (Count 1), in violation of Title 8, United States Code, Sections 1253(a)(1)(A) and 1227 (a)(1)(c)(i); for being an alien in possession of a firearm (Count 2), in violation of Title 18, United States Code, Section 922(g)(5); and for being a felon in possession of a firearm (Count 3), in violation of Title 18, United States Code, Section 922(g)(1).[48] *R. Ex. 20.* Alshareqi was detained pending trial. *R. Ex. 21.* During

---

[47] Alshareqi's affidavit is also named as Exhibit 8 in Mann's § 2255 Motion. *Doc. No. 395 at 141.* The United States has attached the same document as an exhibit as a matter of convenience for the Court and the parties.

[48] Pursuant to a plea agreement with the United States, Alshareqi pled guilty to Count 2 on November 2, 2009. Counts 1 and 3 were dismissed upon motion of the

the investigation the West Memphis bombing, the United States received information from federal inmates that Mann was cellmates and friends with Alshareqi and that Mann frequently talked about his case with Alshareqi. *R. Ex. 23 at 1 (Affidavit of ATF Special Agent John Norris)*. Based upon that information, the United States contacted Alshareqi's defense attorney, Omar Greene, seeking permission to approach Alshareqi and to ask him about any statements Mann had made to him about Mann's case. *R. Ex. 23 at 1 (Aff. of Norris)*. In order to minimize the chance of Alshareqi fabricating any information, a plan was devised to have Alshareqi pulled from his jail cell without any notice and taken to a room where he would first meet with Greene and decide if he (Alshareqi) wanted to provide information about Mann. *R. Ex. 23 at 1 (Aff. of Norris)*.

On September 11, 2009, ATF Agents Glen Cook and John Norris had Alshareqi removed from his cell at the Pulaski County Regional Detention Center and transported him to an interview room at the jail, where he met privately with Greene. *R. Ex. 23 at 1 (Aff. of Norris)*. Alshareqi decided he would talk to the United States and then met with AUSA Karen Whatley and Agents Cook and Norris. Greene was also present during the meeting as well. *R. Ex. 23 at 1 (Aff. of Norris)*. During that meeting, Alshareqi was asked if Mann had made any

---

United States. On June 18, 2010, Alshareqi was sentenced to 21 months imprisonment. *R. Ex. 22*.

statements to him about Mann's case (for possession of the unregistered grenades and firearms) or about a doctor (the West Memphis bombing was not specifically mentioned). *R. Ex. 23 at 1 (Aff. of Norris)*. Alshareqi then provided several statements Mann had made, including that Mann stated that doctor with a glass eye (which Dr. Pirce now has) on the medical board has suspended Mann's medical license and that "it started one way but ended another." *R. Ex. 23 at 1-2 (Aff. of Norris)*. Mann also talked to Alshareqi about the 40mm grenades case and showed Alshareqi a picture of the grenades in Time Magazine, telling Alshareqi that "these were the type of grenades." *R. Ex. 23 at 2 (Aff. of Norris)*. At no time was Alshareqi threatened, coerced, or promised anything. *R. Ex. 23 at 1 (Aff. of Norris)*. There was a discussion about Alshareqi's immigration status, but no promises were made. *R. Ex. 23 at 1 (Aff. of Norris)*.

The United States has submitted an affidavit from Alshareqi's attorney, Omar Greene, as Respondent's Exhibit 24. Greene was present during the first meeting between Alshareqi and AUSA Karen Whatley and ATF agents Cook and Norris, and he confirms that AlShareqi was never threatened, was not coached ("No one put words in Mr. Alsarki's mouth or told him what to say or even suggested what he should say"), and was not promised anything about his immigration status. *R. Ex. 24 at 2 (Aff. of Greene)*. Additionally, Greene states:

> Before the meeting, I told Mr. Alsarki several times that he had to be 100% truthful with the agents and the AUSA. The AUSA and the agents did the same. This was clearly and emphatically communicated to Mr. Alsarki. He could not help himself except by telling the truth.

*R. Ex. 24 at 2 (Aff. of Greene).*

Alshareqi was then brought before the Grand Jury on October 7, 2009. A transcript of Alshareqi's sworn grand jury testimony (and the court order authorizing its use as a *sealed* exhibit in this matter) is submitted as Respondent's Exhibit 25.

On April 22, 2010, AUSA Whatley, Agent Cook, and another ATF agent[49] once again met with Alshareqi. Alshareqi's attorney, Omar Greene, was unable to attend the meeting, so Floyd Hancock, Chief Investigator for the Federal Public Defender Organization, attended in Greene's stead. Hancock's affidavit has been submitted as Respondent's Exhibit 26. According to Hancock, during that meeting, AUSA Whatley and federal agents did not threaten or coerce Alshareqi, they did not promise him anything or use profanity, and they told Alshareqi to tell the truth. *R. Ex. 26 at 1 (Aff. of Hancock).* During the meeting, Alshareqi made statements that were "substantially different" than what he had previously said. *R. Ex. 26 at 1 (Aff. of Hancock).* Sometime after that meeting, the United States

---

[49] The ATF agent was not David Oliver or Warren Newman. *R. Ex. 4 at Para. 2 (Aff. of Oliver); R. Ex. 10 at Para. 8 (Aff. of Newman).*

decided that the government would not use Alshareqi as a witness in Mann's trial and communicated that decision to Greene, who shared that information with Alshareqi. *R. Ex. 24 at 3 (Aff. of Greene)*. Shortly thereafter, Alshareqi wrote the twenty-page affidavit, dated May 12, 2010, which is now before the Court.

The United States, in fact, did *not* call Alshareqi as a witness during trial. Alshareqi, however, attempted to influence the trial by assaulting Steven Briscoe, a government witness who was being housed at the Pulaski County Regional Detention Center while awaiting his turn to testify.[50] On July 22, 2010, Alshareqi confronted Briscoe about testifying against Mann and then assaulted him with a metal showerhead wrapped up in some sort of cloth, causing injuries to Briscoe's head and mouth. *R. Ex. 4 at Para. 6 (Aff. of Oliver); R. Ex. 27 (Complaint filed*

---

[50] Steven Briscoe had been housed with Mann at the Pulaski County Detention Facility in August 2009 and testified at trial that when Mann learned that Briscoe was from West Memphis, Arkansas, Mann offered him $50,000 to finish a job. That job was to kill Dr. Trent Pierce. *TT at 2359-2361*. Mann told Briscoe that "Dan" would get Briscoe the weapon necessary to do the job and that "Dan" would also get the $50,000 to Briscoe. ("Dan" is the nickname of Mann's son, Kundan Mann.) Mann further told Briscoe that the job needed to be finished because "Dan and them didn't do a good job the first time." *TT at 2363*. Evidence showed that Mann had $50,000 available to them in August 2009. *TT at 2457-2459*.

*against Alshareqi).*   Despite the attack, Briscoe testified during Mann's trial on July 28, 2010.  *TT at 2356-2447.*

On July 26, 2010, a federal criminal complaint was filed against Alshareqi for the assault on Briscoe.  *R. Ex. 27.*   On August 3, 2010, a federal grand jury in the Eastern District of Arkansas returned a single-count indictment against Alshareqi, in Case Number 4:10CR00175 BRW, for the same assault, charging him with Tampering with a Witness by Use of Physical Force, in violation of Title 18, United States Code, Section 1512(a)(2)(A).  *R. Ex. 28.*   On July 31, 2012, Alshareqi, who was represented on the case by James W. Wyatt, pled guilty to the indictment, and he was later sentenced to 51 months imprisonment for the assault. *R. Ex. 29.*

Much like the defendant in *Bank of Nova Scotia,* Mann's assertion in Ground 3 "boils down to a challenge to the reliability or competence of the evidence presented to the grand jury." *Bank of Nova Scotia*, 487 U.S. at 260-61. Such challenges cannot be made when the indictment is valid on its face. *Bank of Nova Scotia*, 487 U.S. at 61 (citing *United States v. Calandra*, 414 U.S. 338, 344-45 (1974).  Thus, procedurally, Ground 3 must fail.

Substantively, Ground 3 cannot stand either.   First, Mann has not even shown that Alshareqi committed perjury in front of the grand jury.[51]   The information that Alshareqi provided to the grand jury is almost identical to the information he told the United States when he was first pulled from his jail cell (without any advanced warning) and interviewed in the presence of his attorney, Omar Greene.   Both Greene and Hancock – along with Agent Norris – have submitted affidavits that directly contradict and undermine Alshareqi's claim of coaching, coercion, and enticement by federal prosecutors and federal agents. Thus, despite what Alshareqi *now* claims in his affidavit, the record shows that Alshareqi was actually truthful when questioned in front of the grand jury and that, for some reason, he later recanted his grand jury testimony against his close friend.

Even if Alshareqi's grand jury testimony was untruthful, Mann cannot and has not demonstrated that the grand jury heard *no competent evidence* that sustained the indictment. *Johnson*, 767 F.2d at 1275.   The grand jury began its investigation of the West Memphis bombing immediately after its occurrence on

---

[51] "Perjury" has been defined by the Supreme Court as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Dunnigan,* 507 U.S. 87, 94 (1993) (citing 18 U.S.C. § 1621(1) ("Whoever ... willfully and contrary to [the] oath states or subscribes any material matter which he does not believe to be true ... is guilty of perjury....")).

February 4, 2009.  *R. Ex. 23 at 1 (Aff. of Norris)*.   Mann was indicted for possessing the ninety-eight (98) buried high-explosive grenades on April 8, 2009. *Doc. No. 11*.  Mann's indictment was then superseded on August 6, 2009, to add counts related to unregistered firearms and tampering with evidence. *Doc. No. 39*. Alshareqi did not testify in front to the grand jury until October 2009.  Then, on January 6, 2010, nearly eleven months after the grand jury investigation of the West Memphis bombing started, Mann was indicted for charges related to the West Memphis bombing. *Doc. No. 63*.  At trial, the United States called approximately seventy (70) witnesses – Alshareqi was not one of them.  Alshareqi's testimony was not the only evidence before the grand jury, and the other evidence – based upon the jury's guilty verdicts – was more than enough to sustain Mann's indictment on the charges (and convictions).

Similarly, even if Alshareqi's grand jury testimony was untruthful, Mann cannot and has not demonstrated that prosecutors knew that his testimony was false.  Sure, Alshareqi *now* claims that federal agents and prosecutors coached, coerced, and enticed the false testimony out of him, but that claim has been directly refuted by people who were present each time Alshareqi met with federal agents and prosecutors.  So, if Alshareqi did actually lie to the grand jury, it was of his own doing and was unbeknownst to federal prosecutors and agents.

Finally, even if Alshareqi perjured himself before the grand jury, the petit jury's guilty verdicts render any error in the grand jury proceedings harmless beyond a reasonable doubt. *See United States v. Mechanik*, 475 U.S. 66, 70 (1986); *United States v. Exson*, 328 F.3d 456, 459 (8th Cir. 2003).

Thus, Ground 3 must fail.

### b. Phil Barthelme

Almost in passing, Mann also claims that the United States "suborned perjured trial[52] jury testimony from Phil Barthelme,[53] by threatening to arrest him." *Doc. No. 395 at 20.* The only evidence Mann points to in support of this claim is a couple of cherry-picked statements that Phil Barthelme made at trial on cross examination. *Id; TT at 2146.* When asked by Mr. Lassiter, "Did you tell [a

---

[52] Although Ground 3 clearly is a complaint about purported perjured *grand jury* testimony, for some reason, Mann has lumped in a complaint about Phil Barthelme's purported *trial* testimony. Despite this incongruous fit, the United States will respond to the allegations about Phil Barthelme's testimony in short order.

[53] In his Verified Memorandum filed on December 3, 2014, Mann refers to "threats to Rita Barthelme" in Ground 3 (i.e., not Phil Barthelme). *Doc. No. 408 at 44.* The United States assumes that this was a mistake by Mann and that he was referring to Phil Barthelme because Mann later refers to "the factual averments" set forth in Doc. No. 395 at 18-20 (which discuss Phil Barthelme, not Rita Barthelme).

defense investigator and defense attorney Drake Mann] that you felt like you were going to be cuffed and stuffed that day?" Barthelme answered, "Well, I told them that." Mr. Lassiter then asked, "And tell me what you mean. Does that mean that you felt like you were about to be arrested?" To which Barthelme answered, "Yeah. And I didn't know what for."

Mann, however, failed to include the relevant portions of Barthelme's redirect examination in which Barthelme explained that, although he felt like he was going to be arrested, the information that he provided to ATF agents – and, more importantly, to the jury – was the truth:

> Q. This cuffed and stuffed comment, it sounded like you were going to get arrested when you talked to the ATF agents?
>
> A. At the time it did, yes.
>
> Q. Tell us what that's all about.
>
> A. I've never been in this predicament before, and they were just kind of like pushing me into giving information.
>
> Q. Okay.
>
> A. So if I didn't -- if I didn't answer the questions correctly, you know, then they would think that I was lying. So it was coming down to where it's like you answer this question, it's the wrong answer, then, you know, I felt like I was fixing to get, you know, handcuffed and –
>
> Q. Is that what they told you or is that what you were worried about?

94

A. Well, basically, it sounded like that.

Q. Explain that to us.

A. Well --

Q. Tell us exactly what they did.

A. They were asking me a question, which I answered to the best of my knowledge, and then they didn't kind of -- kind of -- it was kind of like "I don't believe you."

Q. Okay.

A. "And if you don't tell me, if you don't tell me right now, It's not going to be good."

Q. Okay. And so we're clear, one of the points that they were talking to you about was, they were trying to figure out if you were -- if you actually saw the spare tire. Correct?

A. Exactly.

Q. Because they wanted to see if you were covering for your friend Dr. Mann or not?

A. Exactly, exactly.

Q. So they pushed you on that?

A. They tried to push me on that.

Q. To see if you would come clean?

A. Right.

Q. And?

A. I did.

Q. What did you come clean on?

A. Well, there wasn't nothing I seen.

Q. Right. Do you see how they were trying to make sure you were telling the truth?

A. Right, they were pressing me.

Q. Do you remember in your grand jury testimony you told them that Dr. Mann was one of your best friends?

A. He was.

Q. So you could maybe see their concern that you might be protecting him?

A. Right.

Q. Okay. But they didn't make you say something that wasn't the truth?

A. No.

Q. Right?

A. No.

Q. They were just trying to make sure what you were telling them was the truth?

A. Right.

Q. And did you tell them anything just because, you know, they want me to say the sky is purple, so I'm going to tell them the sky was purple?

A. No.

Q. So no matter how far they pushed you to make sure you were telling the truth, you told them the truth?

A. Right.

Q. Right?

A. Yes, sir.

Q. Okay. On this spare tire and the trip to Memphis --

A. Uh-huh.

Q. -- you're sitting there under oath --

A. Right.

Q. -- and we're all here. Okay? You've got a roomful of witnesses.

A. Uh-huh.

Q. Nothing bad's going to happen to you. Is that the truth, what you told this jury about the spare tire?

A. That is the truth.

Q. Okay. That Dr. Mann said that you all were going to go by Pete's house to pick up a spare tire?

A. Yeah, he talked about it.

Q. Did ATF put those words in your mouth?

A. No.

Q. Did they make you say that?

A. No. He could have -- he could have had a flat tire at his

97

house. I don't know. Didn't have -- it didn't pertain to me.

Q. Right. And to this day you don't know why --

A. To this day.

Q. But you know that's why Dr. Mann said you all were going to Pete's house?

A. Right.

Q. And then ATF pushed you really hard to make sure you were telling them the truth?

A. Yes, sir.

MR. GORDON: Thank you. No further questions.

*TT at 2158-61.*

After a brief re-cross examination, Barthelme's testimony concluded on further re-direct examination as follows:

Q. Mr. Barthelme, despite all the pressure and the intimidation that ATF used when they questioned you, did you lie to them?

A. No, sir.

Q. Did you lie to this jury?

A. Did not lie to the jury.

MR. GORDON: No further questions.

THE COURT: You can stand down.

THE WITNESS: Thank you.

*TT at 2165.*

Thus, when viewed in its entirety, the record clearly shows that, because Barthelme considered Mann one of his best friends, ATF agents put pressure on Barthelme when they interviewed him in order to get Barthelme to tell them the truth, and that is exactly what Barthelme did – tell the truth, both to ATF agents and to the jury. Phil Barthelme's testimony was not perjured at all.

Ground 3 is without merit.

### 3. *No Evidentiary Hearing is Required on Ground 3.*

Mann is not entitled to a hearing on Ground 3. First, even if Mann's allegations are accepted as true, he is not entitled to relief because he has procedurally defaulted Ground 3 by failing to raise it with the district court or on direct appeal. Similarly, even if Mann's allegations are accepted as true, he is not entitled to relief because Mann also has not demonstrated that the indictment was not supported by other competent evidence. Finally, Mann is not entitled to a hearing on Ground 3 because the allegations raised in Ground 3 are contradicted by the record and are inherently incredible.

**E. Ground 4:** In his fourth claim, Mann asserts that his trial counsel were ineffective because they "failed to use the Alshareqi recantation affidavit, and to investigate Mr. Alshareqi's averments and to subpoena and call him as a witness if

appropriate, to challenge Dr. Mann's indictment as violating of the Indictment and Due Process Clauses of the Fifth Amendment to the Constitution of the United States." *Doc. No. 395 at 21.*

### 1. Mann's Trial Counsel were Not Ineffective under <u>Strickland.</u>

Just like Grounds 3 and 5, Ground 4 hinges upon Mann's assertion that Alshareqi's grand jury testimony was untruthful and that Alshareqi's recantation was truthful. In Ground 4, Mann now uses Alshareqi's recantation to turn against his trial attorneys and to claim they were ineffective because they failed to investigate Alshareqi's recantation and failed to use Alshareqi to challenge Mann's indictment.

For a variety of reasons, Ground 4 must fail. As stated earlier, under *Strickland*, Mann must demonstrate: (1) that his counsel's performance was deficient; and (2) that, but for his counsel's performance, there is a reasonable probability that the outcome of the proceeding would have been different. If either the prejudice or deficient performance prong of *Strickland* is not met, then Mann's claim for ineffective assistance of counsel cannot prevail.

### a.   <u>No Prejudice</u>

The facts, law, and arguments presented by the United States in response to Ground 3 are reasserted here on Ground 4. On those facts and the law, it is highly unlikely any challenge by Mann against his indictment based upon Alshareqi's

recantation would have been successful, if such a challenge was even legally permitted.   Thus, any prejudice is both far-fetched and speculative.   Mann has not and cannot meet his burden under *Strickland,* and Ground 4 must fail.

### b.  Trial Counsel's Performance was Not Constitutionally Deficient.

A court need not address whether counsel's performance was deficient if the ineffective assistance of counsel claim may be disposed of for failure to show prejudice.   *Strickland*, 466 U.S. at 697; *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996).   Although Mann has failed to show prejudice, the United States will nonetheless address the issue of trial counsel's performance.   According to Omar Greene, who represented Alshareqi on his initial federal case, Greene was visited by Drake Mann, who was Mann's civil attorney and who was also assisting Hendrix, Cassinelli, and Lassiter on Mann's criminal case, and was asked questions about Alshareqi's allegations about federal prosecutors and agents. Greene answered Drake Mann's questions and told him that Alshareqi's allegations were false.   *R. Ex. 24 at 3 (Aff. of Greene).*   Based upon that information, there was nothing that needed to be done or could be done with Alshareqi's recantation.   Additionally, Cassinelli did not believe (and she was correct) that "Alshareqi's allegations of misconduct and his allegedly coerced testimony before the grand jury were a basis to dismiss the indictment.   *R. Ex. 17 at 5 (Aff. of Cassinelli).*   Therefore, no motion was filed to dismiss the indictment

based on Alshareqi's recantation.  *See Rodriguez v. United States,* 17 F.3d 225, 226 (8th Cir. 1994)(Defense counsel is not required to raise meritless or frivolous challenges in order to avoid a charge of ineffective assistance.)

On these facts, Mann's trial attorneys' failure to challenge Mann's indictment based upon Alshareqi's recantantion not deficient.  Thus, Mann has once again failed to meet his burden under *Strickland*, and Ground 4 must fail.[54]

### 2. No Evidentiary Hearing is Required on Ground 4.

Mann is not entitled to a hearing on Ground 4.  First, even if Mann's allegations are accepted as true, he is not entitled to relief because he has not demonstrated that his attorneys were deficient under *Strickland* or that he suffered any prejudice under *Strickalnd.*  Also, Mann is not entitled to a hearing on Ground 4 because the allegations are contingent upon Alshareqi being coached, coerced,

---

[54] To the extent that Ground 4 – or any other claim related to Alshareqi – claims that Mann's trial counsel were ineffective for failing to call Alshareqi as a witness at trial, that issue is addressed by both Hendrix and Cassinelli in their affidavits.  *R. Ex. 16 at Para. 3B (Aff. of Hendrix); R. Ex. 17 at Pp. 3-5 (Aff. of Cassinelli).* Mann's trial counsel filed a motion under seal, which was granted by the district court, to place a detainer on Alshareqi so that he could be called as a defense witness at trial.  However, after Alshareqi assaulted Briscoe during trial (as discussed in Ground 3), the defense made the strategic decision – for a multitude of reasons – not to call Alshareqi as a witness at trial.

and threatened into giving perjured testimony, which as discussed in Ground 3, is contradicted by the record and is inherently incredible.

**F.   Ground 5:**   In his fifth claim, Mann asserts that his trial counsel were ineffective because they "failed to investigate the Alshareqi recantation by interviewing and, if appropriate, subpoenaing and calling, the federal public defenders representing Mr. Alshareqi at the time, Omar Green and Floyd Hancock, to confirm Mr. Alshareqi's account of what Assistant U.S. Attorneys Gordon and Whatley and their teammates Newman and Oliver[55] did in their presence or to their knowledge to procure Mr. Alshareqi's grand-jury testimony." *Doc. No. 395 at 22.*

*1.   Mann's Trial Counsel were Not Ineffective under* <u>*Strickland.*</u>

Just like Grounds 3 and 4, Ground 5 hinges upon Mann's assertion that Alshareqi's grand jury testimony was untruthful and that Alshareqi's recantation was truthful.   In Ground 5, Mann now uses Alshareqi's recantation to claim his trial attorneys were ineffective because they failed to investigate Alshareqi's recantation by interviewing Omar Greene and Floyd Hancock, who were members of the Federal Public Defender's Office and who represented Alshareqi in his

---

[55] Presumably to boost the credibility of his "planting conspiracy," Mann names Warren Newman and David Oliver as the agents who interviewed Alshareqi. Neither of them, however, were involved in Alshareqi's interviews.   *R. Ex. 4 at Para. 2 (Aff. of Oliver); R. Ex. 10 at Para. 8 (Aff. of Newman).*

pending criminal case (before Alshareqi was also charged for assaulting Briscoe during trial[56]).

For a variety of reasons, Ground 5 must fail.  As stated earlier, under *Strickland*, Mann must demonstrate: (1) that his counsel's performance was deficient; and (2) that, but for his counsel's performance, there is a reasonable probability that the outcome of the proceeding would have been different.  If either the prejudice or deficient performance prong of *Strickland* is not met, then Mann's claim for ineffective assistance of counsel cannot prevail.

### a.    No Prejudice

The facts, law, and arguments presented by the United States in response to Grounds 3 and 4 are reasserted here on Ground 5.  As stated in Ground 4, Drake Mann did interview Greene about Alshareqi's allegations of coercion, threats, and coaching by federal prosecutors and agents, and Greene told him none of it was true.  *See R. Ex. 24 at 3 (Aff. of Greene).*  Now, Mann's attorneys may not have interviewed Hancock, but it is safe to presume that, even if they had done so, Hancock would have provided them with the same information he has now provided in his sworn affidavits (i.e., he would not have supported Alshareqi's allegations of coaching, coercion, and enticement by federal prosecutors and

---

[56] Alshareqi was represented by James W. "Jim" Wyatt on the federal charges related to Alshareqi's assault on Briscoe.

federal agents). *See R. Ex. 26 (Aff. of Hancock)*.   Greene and Hancock certainly

have not provided, and would not have provided, any information helpful to Mann.

Mann claims that his prejudice is that the indictment against him was not

dismissed.   However, as noted above, neither Greene nor Hancock provided or

would have provided any information that would have assisted Mann in his

endeavor to get his indictment dismissed based on Alshareqi's recantation (if such

a challenge was even legally permissible).   As such, Mann has not demonstrated

and cannot demonstrate a reasonable probability that the outcome of the

proceeding would have been any different had his trial attorneys interviewed

Hancock about Alshareqi's recantation.   Therefore, Mann's claim of ineffective

assistance of counsel in Ground 5 must fail.

b.  Trial Counsel's Performance was Not Constitutionally Deficient.

A court need not address whether counsel's performance was deficient if the

ineffective assistance of counsel claim may be disposed of for failure to show

prejudice. *Strickland*, 466 U.S. at 697; *United States v. Apfel*, 97 F.3d 1074, 1076

(8th Cir. 1996).   Although Mann has failed to show prejudice, the United States

will nonetheless address the issue of trial counsel's performance.

Again, upon learning of Alshareqi's recantation, Mann's attorneys sent

attorney Drake Mann to talk to Omar Greene, the attorney for Alshareqi.   Greene

told Drake Mann that none of the statements made by Alshareqi about federal

prosecutors and federal agents were correct. *See R. Ex. 24 at 3 (Aff. of Greene).* At that point, no further investigation was required. Nonetheless, Mann's trial counsel filed a motion under seal, which was granted by the district court, to place a detainer on Alshareqi so that Alshareqi could potentially be called as a defense witness at trial. *R. Ex. 17 at Pp 3-4 (Aff of Cassinelli).* However, after Alshareqi assaulted Briscoe during trial (as discussed in Ground 3), the defense made the strategic decision – for a multitude of reasons – not to call Alshareqi as a witness at trial. *R. Ex. 16 at Para. 3B (Aff. of Hendrix); R. Ex. 17 at Pp 3-5 (Aff. of Cassinelli).*

On these facts, Mann's attorneys' took all of the reasonable actions necessary in light of Alshareqi's recantation. Those actions never bore fruit, however, because, among other reasons, Alshareqi assaulted Briscoe during trial. Trial counsel's handling of Alshareqi's recantation was not deficient under *Strickland.* Thus, Mann has once again failed to meet his burden under *Strickland,* and Ground 5 must fail.

### 2. No Evidentiary Hearing is Required on Ground 5.

Mann is not entitled to a hearing on Ground 5. First, even if Mann's allegations are accepted as true, he is not entitled to relief because he has not demonstrated that his attorneys were deficient under *Strickland* or that he suffered any prejudice under *Strickalnd.* Also, Mann is not entitled to a hearing on Ground

5 because the allegations are contingent upon Alshareqi being coached, coerced, and threatened into giving perjured testimony, which as discussed in Ground 3, is contradicted by the record and is inherently incredible.

   **G.   Ground 6:**   In his sixth claim, Mann asserts that his trial counsel were ineffective because they "failed to obtain an expert on Hindu ceremonial practices to confirm that at least in northern India—where the pictures were sent—some Hindus use pictures of persons they are praying for in services, or a witness of any kind who had attended the service at which Dr. Mann's family had used the pictures of Drs. Jouett and Pierce in their prayers.   Instead, trial counsel called Randeep and Sangeeta Mann's daughter, an American college student, when her parents were both on trial in the same case, as their witness on this issue." *Doc. No. 395 at 22.*   According to Mann, "[r]eliance on an immediate family member who was neither an expert nor an occurrence witness was ineffective assistance of counsel because it left Dr. Mann's side of the issue unsupported by any competent, credible evidence." *Doc. No. 408 at 48.*

   *1.  Mann's Trial Counsel were Not Ineffective under Strickland for Calling Sarina Mann to Testify instead of an Expert Witness.*

   As agents investigated Mann, they discovered an email Mann sent to his brother Sandip in India.   The email contained a picture of Dr. Pierce aside another man.   It read: "I hope this picture is good.   The guy on the left is Dr. Trent Pierce,

the current chairman of the board, and the guy on the right is Dr. Ray Jouett, the old chairman." *TT at 2194.* Mann sent the email about a week after the medical board wrote him a letter denying his request to have his DEA permit reinstated. *TT at 2195.* At trial, the United States introduced this email and the picture. *Gov. Ex. 181.*

To prove that Mann innocently sent the email and picture to his family in India for use in a Hindu worship service, his counsel called Mann's daughter, Sarina, to testify. Mann says the decision to call Sarina, and not an expert in Hindu religious practices or someone who was at the alleged worship service, was ineffective assistance.

But, as he must, Mann cannot show that by calling Sarina instead of an expert witness (1) his counsel's performance was deficient; and (2) that, but for his counsel's performance, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88.

a. Counsel's Performance was Not Constitutionally Deficient.

Because it was a matter of trial strategy, trial counsel's decision to call Sarina Mann, and not some expert, is a "virtually unchallengeable" decision. *See United States v. Staples*, 410 F.3d 484, 488 (8th Cir. 2005). And calling Sarina *was* a strategic decision. *R. Ex. 16 at 6 (Aff. of Hendrix)*; *R. Ex. 17 at 5-7(Aff. of Cassinelli).* Sarina's testimony touched upon a range of topics, not just the

purported significance of the picture that Mann emailed to his brother in India. Sarina's testimony alone personalized Mann and his family; she discussed her brothers and sisters, where they were in school or working, and what they were studying. *TT at 3017-19*. In more than a month of trial, Sarina alone attempted to explain away the presence of a damning piece of evidence—the spare tire found in the bathtub in Mann's house. *TT at 3019-3020*. Sarina explained that her dad, who was particular about his cars, was trying to clean the tire in the shower because it was too cold to do so outside. *Id*. And of course, Sarina discussed her parents' religious practices.

Sarina's testimony about Hinduism was tailored specifically to the Mann family. Moreover, it was accurate and largely consistent with what Mann's now-proposed experts contend they would have offered. Sarina testified that Hinduism was a peaceful religion and that it would not be unusual for her father to send the picture to India for use in a worship service. *TT at 3024*. Along with discussing her family's religious practices, *TT at 3021-22*, Sarina talked about her own attendance at a similar worship service where photos, like the one her dad sent to India, were used. *TT at 3024*. She refuted the idea that her dad intended anyone harm by sending the picture. In short, the value of Sarina's testimony went well beyond the use of the Pierce and Jouett photo—and counsel surely recognized that. Her testimony about the picture and her family's religious practices was, by all

metrics, accurate and effective—more so than any expert's testimony could have been.

Counsel weighed calling an expert, and decided against it. *R. Ex. 17 at 5-6 (Aff. of Cassinelli).* They just could not find someone willing to say what Mann needed them to say. Mann's lawyers reached out to a number of people associated with Hindu temples both inside and outside of Arkansas, and found no one who could confirm Mann's reasoning for sending the picture. *Id.* In fact, some of the people counsel spoke with flatly disagreed with Mann's explanation for transmitting the photo. *Id.* Under the circumstances, counsel can hardly be faulted for not rolling the dice with expert testimony they feared may be inconsistent at best, and outright contradictory at worst. *Id.* The decision to call Sarina, and not some expert, falls well within the "wide perimeter of protection" owed to trial counsel in making strategic decisions just like this one. 410 F.3d at 488.

      b.    <u>Calling Sarina as a Witness Instead of an Expert did Not Prejudice Mann's Case.</u>

Assuming Mann's counsel's performance was deficient, calling Sarina in lieu of an expert caused no prejudice to Mann's case. Sarina was an effective witness—one the United States was anxious to get off the stand. There is no evidence, apart from the ultimate finding of Mann's guilt, that the jury found her testimony particularly unpersuasive. Even if trial counsel had been able to find

experts like the two Mann has dug up—an uncertain assumption,[57] *see, e.g., Miller,* 255 F.3d at 45, any expert testimony would have been, at absolute best, of nominal added value.   Even with the luxury of time and hindsight, what Mann now proposes in place of Sarina's testimony is inconclusive, impersonal, and far less pertinent than what Sarina offered.

Mann offers an affidavit from Rameshwar Dass, a Hindu pandit. *No. 395 at 163.* Dass says he would have testified that at some Hindu worship services, called pujas, "*some* people in India *may* use the individual's picture. *Usually* this is done by Tantrics and not the priest, *to the best of my knowledge.*" *No. 395 at 163* (emphasis added).   Dass's affidavit is uncertain at best.   Meaningful cross examination of Dass or someone like him would have spotlighted the scant evidence that Mann's family in India subscribed to the vein of Hinduism that partook in puja worship services; that a worship service for Dr. Jouett and Dr. Pierce ever occurred; that a Tantric was at any such worship service; and that, even if all of the preceding were miraculously true, the picture Mann sent to India was actually used in a worship service.

---

[57] Counsel tried doggedly but was unable to find an expert willing to testify to Mann's explanations for sending the picture. *R. Ex. 17 at 5-6 (Aff. of Cassinelli).* This perhaps speaks more to the credibility of Mann's explanation than it does to counsel's efforts.

John Llewellyn's declaration, lengthy as it is, likewise provides no certainty about the purpose of the photo. *Doc. No. 421-6.* Llewellyn admits that his opinion on the use of images in Hindu worship services is informed in large part not by his personal experience, but by a book on the topic. *Doc. No. 421-6 at 9 & 23.* The few personal experiences Llewellyn does relate are inapposite. He discusses seeing displayed at a worship service a poster-size image of "Sathya Sai Baba," a "famous and somewhat controversial miracle worker who was regarded by his followers as an incarnation of God." *Doc. No. 421-6 at 22.* That is not helpful. It would be neither surprising nor useful to a Bible-belt jury to hear that an image of a supposed deity was present at a prayer service. *Doc. No. 421-8.* And of course, no one is speculating that Dr. Jouett or Dr. Pierce are deities.

Llewellyn's other examples, hearsay though they are, likewise miss the mark. He discusses "surrogate pilgrims" who would carry pictures not of people they were offering prayers in support of, but rather pictures of the people in whose stead they were praying. *Doc. No. 421-6 at 23-24.* Neither Dr. Jouett nor Dr. Pierce hired Indian pilgrims to pray for them. The next example, *Doc. No. 421-6 at 24*, relates a story about a Hindu and Buddhist festival in the Kathmandu Valley, where attendants offered prayers for those present, and used pictures of family and "member[s] of the household" for those not present. *Id.* No one has alleged that Dr. Jouett or Dr. Pierce has family or residence in India. Oddly, this last example

was reported to Llewellyn not by an expert in religious studies, but by "a faculty member in communication in a state university." *Doc. No. 421-6 at 24*. That is no insignificant detail. While criticizing trial counsel's decision to call Sarina because she was a non-expert, Mann simultaneously proposes offering less detailed, less relevant, or less personal testimony in the use of images in Hindu worship services, or testimony from others who, just like Sarina, *are not experts at all*.

Mann's now-proposed experts are not game changers. They offer uncertain and impersonal testimony. Sarina's testimony, on the other hand, accomplished exactly what the newfound experts hope to accomplish; she provided an innocent reason why the picture was sent to India. And while doing so, she painted the Mann family as a normal one in a way no expert could have. Calling Sarina, and not an expert, did not render the result of the trial unreliable, or make the proceeding fundamentally unfair. *Carter v. Hopkins*, 92 F.3d 666, 669 (8th Cir. 1996). Accordingly, Ground 6 should be denied.

### 2. *Trial Counsel were Not Ineffective under* Strickland *for Failing to Call a Witness that Attended the Alleged Worship Service.*

Counsel did not err by not calling someone who claimed to attend the alleged worship service in India at which the picture was allegedly used. Glaringly, there is a vacuum of evidence that a worship service involving the

picture ever happened. Apart from a lone unauthenticated letter[58] from someone claiming to be a Dr. Pt. Ram Kishan that claims he supervised the event, there is not a smidgen of evidence that any service took place. *Doc. No. 421-13 at 3.* There is no information about when Kishan's letter was written or sent. Nor is "Dr. Kishan's" identity verified—Mann says Kishan requested the Jouett-and-Pierce photo, but later says even he never met Kishan nor interacted with him. *Doc. No. 421-13 at 2. Anyone* could have written that letter.

Problematically, neither Mann nor Kishan have identified on the record a single person who was at the alleged service.[59] Nor has Mann or Kishan identified precisely when the alleged service took place. How counsel ought then to have presented a witness from this event, whose attendees and timing are *still*

---

[58] Trial counsel saw the letter prior to trial, and recognized its lack of evidentiary value. *R. Ex. 17 at 5 (Aff. of Cassinelli).* She also points out that the contents of the Kishan letter are not entirely consistent with Mann's explanation for sending the photo. *Id.*

[59] Trial counsel acknowledges that Mann might have mentioned who was at the service. *R. Ex. 17 at 5 (Aff. of Cassinelli).* Trial counsel likewise acknowledges the problems attendant in calling any of the alleged participants—including the possibility of exposing members of Mann's family to criminal liability. *R. Ex. 17 at 5-6 (Aff. of Cassinelli).*

114

unidentified in the record, is far from clear, and the failure to do so was not deficient.

Assuming for argument's sake that counsel knew about the worship service, knew who attended the service, were able to contact the participants in India, and found someone willing to travel to Arkansas on a moment's notice to testify at trial—even then, there is no prejudice to Mann's case because the evidence on the bombing counts was plenty strong without the photo. There is not a slight chance, let alone a *significant* one that the same six-week trial omitting the Dr. Pierce and Dr. Jouett photo would have yielded a verdict more favorable to Mann. *See Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2001).

Of course, it is un-know-able how much weight the jury lent the picture. Setting the photo aside though, Mann's motive for orchestrating the bombing of Dr. Pierce and his vehicle was primarily demonstrated through extensive testimony about Mann's interactions with the Arkansas State Medical Board and his clashing of heads with Dr. Pierce. *See infra at 3-5.* Omitting the photo cannot change that. Accordingly, Ground 6 should be denied.

### 3.  *No Hearing is Necessary on Ground 6.*

Many, if not most, of Mann's allegations in Ground 6 are flatly contradicted by the record.  *Winters v. United States*, 716 F.3d 1098, 1103 (8th Cir. 2013). Counsel had thoughtful, strategic reasons for calling Sarina Mann and omitting

Hindu experts and a percipient witness.   Mann likewise has not proven how counsel's decisions in this regard prejudiced his case, and is clearly not entitled to relief.   *Id.*   The record is adequately developed and further testimony is unnecessary.  Accordingly, no hearing is necessary to dispose of Ground 6.

**H.  Ground 7:**  In his seventh claim, Mann asserts that his trial counsel were ineffective because they "failed to investigate the official complaint Dr. Mann had presented to FBI Agent John Ford in connection with the loss of about $200K in 2005 in a scam by individuals in Amsterdam through the misuse of pre-signed checks as showing that safety, not failure to cooperate, was the reason for removing Sandip Mann's materials from the office that was about to be vacated." *No. 395 at 25.*

### 1. Trial Counsel were Not Ineffective under Strickland for Disregarding the Dutch Fraud Defense.

Mann says that his counsel ought to have provided an alternate theory for why Mann and his wife furtively removed certain documents, including blank checks, from Mann's clinic prior to his detention hearing.  He now points to a story about being defrauded by someone—it is not clear whom—in the Netherlands.  He says he sought law enforcement's help in recovering the money, but neither state nor federal agents would help with the investigation or call Interpol on his behalf. So, Mann continues, he feared these same "rogue" state and federal agents would

steal the blank checks once agents found them in Mann's clinic.   Mann again

cannot show that, in making this strategic decision, his trial counsel's performance

fell short and that the result of the trial would have been different but for counsel's

alleged errors.   *Engelen v. United States*, 68 F.3d 238, 241 (8th Cir. 1995).

Accordingly, Ground 7 must fail.

a.   <u>Counsel's Performance was Not Deficient.</u>

Through various witnesses and during closing, trial counsel explored

Mann's possible motivation for directing his wife to remove documents and checks

from his clinic.   *See, e.g., TT at 1681*.   Mann acknowledges that his trial counsel

did try to explain that there were innocent, safety-related reasons the Manns

wanted the checks out of the clinic.   *Doc. No. 395 at 25*.   Because the jury did not

buy Mann's explanation though, he now, with the benefit of hindsight, wishes that

his trial counsel would have explained the *very same point* in a *slightly different*

*way*.   This is just the sort of rearview second-guessing *Strickland* prohibits, and

reason enough to deny Ground 7.   466 U.S. at 690.   But there are other reasons

still.

Notably, the line of defense simply strains belief.   While the alleged Dutch

fraud might have happened—again, there is just no proof— the ensuing leap to

Mann's "honest concern" that federal agents would burgle his home and clinic is

hard to swallow.   Counsel were completely unaware of the supposed relationship

117

between the Dutch fraud and the secreting away of the blank checks. *R. Ex. 1 at 6 (Aff. of Hendrix); R. Ex. 17 at 7 (Aff. of Cassinelli); R. Ex. 18 at 2 (Aff. of Lassiter).* Counsel remember Mann seeming ashamed or embarrassed by the event, but not much else. *Id.* That makes sense, the story hardly endears upon Mann as a maker of sound decisions. Counsel points out that, even if Mann had relayed the supposed connection between the Dutch fraud and the checks, he still would not have raised the story as a defense. *R. Ex. 16 at 7 (Aff. of Hendrix).*

Presenting the tale as an explanation for removing the checks from the clinic would have cost Mann's lawyers their credibility. *See, e.g., Loefer v. United States*, 604 F.3d 1028,1030 (8th Cir. 2010) *and Walsh v. Mueller*, 2007 WL 2302484 (E.D. Mo.). Or worse, as his trial counsel points out, the story might have painted Mann as foolish or rash. *R. Ex. 16 at 7 (Aff. of Hendrix).* Or yet still, it might have drawn more attention to Mann's brother, Sandip, who was also the subject of the bombing investigation, and who had a suspicious financial relationship with Mann. *R. Ex. 17 at 7 (Aff. of Cassinelli).* The story would have led to more questions than answers.

Next, this proposed line of defense is wholly unsupported by the trial and post-conviction record. There is no proof that any of what Mann says happened, ever actually happened. Apart from Mann's word, the record is silent about the alleged Dutch fraud itself, and about Mann traveling to the Netherlands to confront

the alleged scammers.   Nothing supports Mann's accusation that law-enforcement agents "enabled the fraud" allegedly perpetrated on him.   *Doc. No. 395 at 27.* Nothing confirms that Agent Ford or Russellville Police refused to condone an Interpol investigation because the alleged fraud perpetrators were not Muslim. *Doc. No. 395 at 26.*   The trial record makes no mention of Mann's concern that law-enforcement officers might take the checks and use them.   And if, as Mann asserts, his wife Sue knew about the alleged Dutch fraud, she could and probably would have raised it during her Grand Jury testimony.   She did not.   It is unlikely she brought this line of reasoning to her counsel's attention—the story was never raised by her attorney during closing argument.

There is a vacuum of evidence about the Dutch-fraud issue or its relation to the checks in Mann's office.   Trial counsel had no valid reason to research it further; they cannot be expected to read Mann's mind.   Moreover, counsel's trial strategy was based on a relatable, common-sense explanation that Mann's clinic had been essentially abandoned, and sensitive items needed removing.   *R. Ex. 17 at 7 (Aff. of Cassinelli).*   If Mann's counsel somehow knew, yet chose not to raise the Dutch fraud issue, it was a reasonable strategic decision.   *Strickland,* 466 U.S. at 690–91.   There was no deficient performance for not raising the Netherlands story, and Ground 7 must fail.

### b.  Counsel's Performance did Not Prejudice Mann's Case.

If counsel's performance here was deficient, no prejudice resulted.  It was not just removal of the checks for which Mann and his wife were convicted.  The Manns also removed other financial documents and powers of attorney.  *Doc. No. 165 at 38.*  Thus, some reasonable excuse for removing just the checks is of little legal moment; it provides no explanation why Mann's wife took other documents and removed those things from the clinic too.  And more, the evidence on count 8 as to the checks and the other documents was overwhelming.  *See Christenson v. Ault,* 598 F.3d 990, 997 (8th Cir. 2010); *Rodden v. Delo,* 143 F.3d 441, 448 (8th Cir. 1998).

The evidence introduced at trial, mostly jail phone calls and transcripts, showed that while Mann was incarcerated pending a detention hearing, his wife knew that law-enforcement agents would probably be searching the clinic soon.  *TT at 1672; Gov. Ex. 143a.*  In one call, Mann asked his wife to remove "the Sunny stuff" from a drawer in his office and to give it to Gerald Riley or "Tim."  *TT at 1672.*  The "Sunny stuff" referred to papers belonging to Mann's brother, Sandeep, who was also being investigated for the bombing.  In various calls, Mann's wife referenced the upcoming detention hearing and her own grand jury testimony.  Mann told his wife to go to the clinic and "take out Dan's (Mann's

son) papers, ownerships, and all that stuff.  Give it to Dan."  Later, after the search warrant was executed on the clinic, Mann's wife told him that "we did good."  *TT at 1678.*

In another conversation, Mann asked his wife whether she had "clean[ed] the van" because he "had some medical record stuff in plastic" that he wanted removed.  *TT at 1824.*  Mann initially appeared aggravated when he believed his wife had not cleaned the van.   Gerard Riley **testified that after Mann was arrested, S. Mann called him and asked him if she could take something over to his house for him to keep. While on the phone, S. Mann did not tell Riley what the documents were, but she showed up at Riley's house about twenty minutes later.**  *TT at 1552-1553.*  **When she arrived she gave him a manila envelope with rubber bands wrapped around it. She stated it was bank statements and records.**  *TT at 1553.*  **Riley said S. Mann had never made a request like that before. Riley also testified that S. Mann came back about a day later and retrieved the envelope.** *TT at 1554.*  **Later on, Riley informed S. Mann that ATF agents knew about the items she had taken from the office and had given to him; S. Mann told Riley that was impossible and further stated, "Well, they don't know everything."** *TT at 1557.*  **Among the many dozens of hours of phone calls between Mann and his wife, there are**

hundreds of discussions about many different topics. **What there *is not* is a single solitary lonely mention of the Dutch fraud or its relation to the checks in Mann's office.**

In reviewing this evidence, the Eighth Circuit noted that "[t]he Manns' conversations indicated that they were clearly aware of the pending detention hearing and search of Mann's office when they agreed to have Mann's wife remove certain documents and give them to friends." 701 F.3d at 306. The Court of Appeals was of course right. Additional testimony and argument about the alleged Dutch fraud would not have changed that inevitable finding of guilt with regard to the removal of documents from the clinic. The Dutch-fraud defense doesn't explain why Mann had his wife remove from the office powers of attorney, or Dan's stuff, or Sandip's stuff, or why it was necessary to give some items to Tim Riley. Mann's point that not raising this creative line of defense prejudiced his case amounts to little more than hopeful conjecture. Thus, Ground 7 must fail.

### 2. *No Hearing is Necessary on Ground 7.*

The record, including counsel's affidavits, makes abundantly clear that Mann is entitled to no relief on Ground 7. Counsel knew very little about the Dutch fraud, and even less about its alleged connection to the checks in Mann's office. Had counsel known, they still would not have presented the story line as a

defense. Under the circumstances, counsel cannot be said to have been ineffective. The record on Ground 7 is well developed; testimony or further argument is unnecessary for its resolution. *Winters v. United States*, 716 F.3d 1098, 1103 (8th Cir. 2013). This Court should therefore deny a hearing on Ground 7.

**I. Ground 8:**   In his eighth claim, Mann asserts that *the trial court* deprived Mann of his right to effective assistance of counsel by "[denying] their motion for severance of the counts relating to the planting of a grenade outside the vehicle of Dr. Pierce, on the one hand, and the grenade/regulatory counts." *Doc. No. 395 at 28.*

### *1. Mann has Failed to State a Cognizable Claim.*

Mann asserts that his claim in Ground 8 "invokes the authority of" *Herring v. New York*, 422 U.S. 853 (1975) and *Geders v. United States,* 425 U.S. 80 (1976) and that Ground 8 is "analogous to" the grievances raised in those cases. *Doc. No. 395 at 28*; *Doc. No. 408 at 50*.   Neither *Herring* nor *Geders,* however, create any authority for Mann's claim in Ground 8, and neither case is factually similar to Mann's case.

In *Herring*, the defendant waived a jury and was tried before a judge on charges of attempted robbery in the first and third degrees and possession of a dangerous instrument. *Herring*, 422 U.S. at 854. Pursuant to a New York statute that conferred upon every judge in a non-jury trial the power to deny counsel any

opportunity to make a summation of the evidence before the rendition of judgment,

the trial judge chose not to hear summations and found Herring guilty of attempted

robbery in the third degree. *Herring*, 422 U.S. at 856. On direct appeal, Herring

challenged the court's denial of summation as a violation of the Sixth Amendment.

The Supreme Court granted certiorari and found that the law violated a defendant's

right to counsel under the Sixth Amendment. *Herring*, 422 U.S. at 857-66.

Specifically, the Supreme Court noted:

> [T]he right to assistance of counsel has been understood to
> mean that there can be no restrictions place upon *the function of
> counsel* in defending a criminal prosecution in accord with the
> traditions of the adversary factfinding process that has been
> constitutionalized in the Sixth and Fourteenth Amendments... The
> right to the assistance of counsel has thus been given a meaning that
> ensures to the defense in a criminal trial the opportunity to participate
> fully and fairly in the adversary factfinding process."

422 U.S. at 857-58 (emphasis added.)

The Court's denial of Mann's motion to sever did not impede the function of

Mann's defense counsel to any degree. It did not, in any way, limit the evidence or

defense that Mann could present, and it did not limit his counsel's opportunity to

participate fully and fairly in the adversarial, fact-finding process. Thus, by no

stretch of the imagination does the holding in *Herring* create a claim of ineffective

assistance of counsel in a § 2255 motion when a district court denies a defendant's

motion to sever, as suggested by Mann. *Herring* simply says that the Sixth

Amendment does not permit the total denial of closing argument in a criminal trial. It stands for nothing more and nothing less and is wholly inapplicable to Mann's case.

*Geders* is similarly inapplicable.  In *Geders*, the defendant was on trial for drug-related crimes and testified in his own defense.  *Geders*, 425 U.S. at 81-82. After direct examination of the defendant, the court recessed for the night and the prosecutor asked the judge to instruct the defendant not to discuss the case overnight with anyone, just like the judge had instructed every other witness whose testimony was interrupted by a recess.  *Geders*, 425 U.S. at 82.  Geders' attorney objected, but the judge ordered the defendant not to talk to his attorney about anything overnight. *Geders*, 425 U.S. at 82.  Defense counsel complied with the court's order.  *Geders*, 425 U.S. at 83.   Geders was later convicted on all counts and sentenced to three years in prison.  *Geders*, 425 U.S. at 85.  Geders challenged the court's order prohibiting him from consulting with counsel overnight as a Sixth Amendment violation.  The Supreme Court granted certiorari on the limited claim that the court's order denied Geder his Sixth Amendment right to counsel.  *Geders*, 425 U.S. at 86.  The Supreme Court ultimately found that court's order "impinged upon [the defendant's] right to the assistance of counsel guaranteed by the Sixth Amendment," *but limited its holding to only the facts of Geders' case.  Geders*, 425 U.S. at 91.  Once again, by no stretch of the imagination does the holding in

*Geders* create a claim of ineffective assistance of counsel in a § 2255 motion when a district court denies a defendant's motion to sever, as suggested by Mann.   In fact, the Supreme Court expressly limited the ruling in *Geders* to only the facts of that case – facts which are entirely different from Mann's case.

Legally speaking, both *Herring* and *Geders* held that the trial court's orders violated the Sixth Amendment's right to counsel because the orders placed restrictions of the fundamental function of counsel, which is vastly different from Mann's claim of ineffective assistance of counsel in Ground 8.  However, even if the Court were to find that Ground 8 states a valid claim under *Herring* and *Geders*, Mann should have raised his claim in Ground 8 on appeal – just like Herring and Geders did.  Because Mann did not do so, any cognizable claim under *Herring* and *Geders* has been procedurally defaulted.  *Jennings v. United States*, 696 F.3d at 762; *United States v. Hamilton*, 604 F.3d at 574 ("Claims not made during district court proceedings or on direct appeal are procedurally defaulted and may not be raised for the first time in a § 2255 motion.")

The United States recognizes that claims of ineffective assistance of counsel are generally *not* barred when they are first raised in a § 2255 motion.  *See United States v. Wells*, 646 F.3d 1097, 1104 (8th Cir. 2011).  However, Mann's claim in Ground 8 is not truly a claim of ineffective assistance of counsel.  Instead, in reality, Ground 8 is a disguised attempt to revisit the Court's denial of Mann's

motion to sever.  On appeal, Mann argued that the Court's ruling kept him from

testifying on Count 3 (a purported Fifth Amendment violation).[60]  Mann is *now*

arguing in his § 2255 motion that the Court's ruling kept his counsel from

presenting evidence – presumably through a witness other than Mann[61] – of law

---

[60] Before trial, in his motion to sever, Mann hinted that the grenade and gun counts
should be severed from the West Memphis bombing because he *might* want to
testify about the gun and grenade counts, but not about any counts related to the
bombing.  *Doc. No. 83 at 28, n.22*.  Nowhere in his motion to sever did Mann
specifically mention that he had evidence of harassment that he wanted to present
in defense of Count 3 that he could not present if Count 3 were tried with the
bombing counts.  The very first time Mann mentioned any evidence of
"harassment" was on August 3, 2011, during a proffer to the Court *after the close
of evidence in the trial*. *TT at 3091-94*.  In his brief to the Eighth Circuit Court of
Appeals, Mann argued that joinder was prejudicial under Rule 14 because "joinder
prevented Mann from exercising his right to testify in his own defense as to the
regulatory counts and to avoid providing inculpatory evidence related to the other
counts." *Appellant Brief*, 2011 WL 4071520 at 86.  Part of the evidence that Mann
claimed he "could have provided" was "he had a history with law enforcement in
the rural area where he lived which would have supplied a motive to plant the
grenades." *Appellant Brief*, 2011 WL 4071520 at 77.

[61] Because Mann only knows about the "harassment" from what other people told
him, the United States will assume that Mann would have introduced – or at least
attempted to introduce – the evidence through other witnesses.  The United States

enforcement's "harassment" of Mann (a purported Sixth Amendment violation). Mann could have raised this purported Sixth Amendment argument on appeal, but he didn't. He cannot bring it now and couch it as a habeas claim. *Jennings v. United States*, 696 F.3d at 762; *United States v. Hamilton*, 604 F.3d at 574 ("Claims not made during district court proceedings or on direct appeal are procedurally defaulted and may not be raised for the first time in a § 2255 motion.") Additionally, Mann should not be allowed to perform this sleight of hand because, otherwise, any defendant could convert any procedural or evidentiary ruling by a trial court into a claim of ineffective assistance of counsel by simply claiming that the court's ruling made his counsel ineffective. That would undermine finality and lead to absurdity, as here in Ground 8.

### 2. Res Judicata

To the extent that Ground 8 seeks to readdress the Court's denial of Mann's motion to sever, that issue was already decided by the Eighth Circuit on appeal and is not properly before the Court in a § 2255 motion. *Davis v. United States*, 673 F.3d 849, 852 (8th Cir. 2012).

---

would have strictly held Mann to the Federal Rules of Evidence and believes that Mann would have had great difficulty getting his purported evidence of harassment into evidence because, among other reasons, some of his key witnesses (who were former patients of his) died of drug overdoses before trial.

### 3. *Mann's Trial Counsel were Not Ineffective under* Strickland.

To the extent Ground 8 presents a valid claim of ineffective assistance of counsel, if at all, Mann has not met his burden under *Strickland*.

### a. Trial Counsel's Performance was Not Constitutionally Deficient.

According to Mann, "[d]enial of the [severance] motion deprived Dr. Mann of the effective assistance of counsel by effectively disenabling trial counsel from adducing evidence of the negative treatment by local agents of the respondent and of their state and local counterparts that would explain the planting of the grenades near his property and the concern about leaving pre-signed checks in the Mann clinic or house." *Doc. No. 408 at 49.* Mann, however, does not explain at all *why* or *how* the Court's ruling prevented him from presenting "evidence of negative treatment" by local, state, and federal law enforcement officers.[62] The court did

---

[62] As stated earlier, notwithstanding the reasons behind Mann's decision not to testify, he still could have attempted to present the purported evidence of harassment through other witnesses. In fact, most of the forsaken evidence, if not all, could *not* have been introduced through Mann because Mann was not a party to the recordings and he was not present during the discussions he now laments. Again, the United States does not concede that Mann would even have been able to get the alleged evidence of harassment into evidence because, among other reasons: (1) the Federal Rules of Evidence would have prohibited it; and (2) some

not issue an order saying that Mann could not present evidence of his purported harassment. The decision to not present that evidence, for whatever worth it might have had, was made by Mann's attorneys. And, according to Mann's attorneys, as discussed in Ground 2, that decision was a tactical decision. *See R. Ex. 16 at Para. 3A (Aff. of Hendrix); R. Ex. 17 at Pp.1-3 (Aff. of Cassinelli)* . As such, that strategic decision is virtually unchallengeable, and Mann cannot and has not demonstrated that his trial counsel were constitutionally deficient. Thus, Ground 8 must fail.

## b. No Prejudice

Mann claims that he was prejudiced by the Court's denial of his motion to sever because: (1) but for the ruling, he could have adduced evidence of law enforcement's purported attempts to entrap Mann; (2) but for the ruling, he could have adduced evidence of "personal or family bias" that motivated "rogue agents" to plant the 40mm grenades near Mann's residence; (3) the ruling allowed the prosecution to "ridicule the idea that the ammunition canister had been planted...";

---

of the key witnesses Mann would have needed to introduce the evidence died from drug overdoses before trial. *See R. Ex. 11 (Aff. of Goodman).* Additionally, Additionally, as noted by his attorneys, Mann's purported evidence of harassment would have relied upon witnesses who were drug addicts and had criminal records and would not have been appealing to a jury. *R. Ex. 16 at 4 (Aff. of Hendrix).*

(4) the ruling "removed from the trial the evidence... that Dr. Pierce was not the instigator, but a target, of the attacks on Dr. Mann's ability to continue practicing medicine"; and (5) Mann could not present evidence of local prejudice that "would have explained why Dr. Mann had purchased property to use as a shooting range." *Doc. No. 395 at 30-37.* However, as stated above, the court's denial of Mann's motion to sever did not prohibit Mann from presenting any of the evidence he now complains about. Instead, Mann's counsel chose not to introduce the evidence for strategic reasons. More importantly, according to Blake Hendrix, even if the Court had granted Mann's motion to sever, Mann's trial counsel still would *not* have presented the forsaken evidence of which Mann now blames the Court. *R. Ex. 16 at Para. 3A (Aff. of Hendrix)*("We also concluded that a conspiracy strategy wouldn't succeed even if we were able to get the grenade counts severed. A jury in this area, we decided, simply wouldn't accept that several law enforcement agencies, both local, state, and federal, would conspire with local city workers to set up Dr. Mann.")   Thus, Mann cannot and has not demonstrated prejudice under *Strickland.*

But, even if Mann's attorneys had planned on presenting the purported evidence of Mann's harassment, Mann still has not demonstrated how the outcome of the trial would have been any different if he had successfully presented the forsaken evidence for which he now blames the court. Mann simply assumes,

speculates, and hopes that the "evidence of negative treatment"[63] listed in Paragraph 8.2 of his § 2255 motion would have carried the day for him. However, if Mann had successfully presented this evidence,[64] the United States would have countered his evidence with other evidence explaining why local, state, and federal law enforcement officers were investigating (i.e., not harassing) Mann: (1) they had received reports that Mann was illegally selling machine guns (because he feared he was going to lose his medical license and was going to move back to India); (2) they had received information that Mann was engaged in several

---

[63] The United States not concede or agree with Mann's characterization that law enforcement officers tried to "entrap" Mann. As stated earlier in Ground 1, officers had received information that Mann was engaged in various illegal prescription practices (resulting in the deaths of several of his patients) and illegally selling machine guns, so they enlisted the help of a few informants (who were also patients of Mann) to see if the informants could get Mann to sell them a machine gun or to illegally prescribe them a controlled substance – all of which is perfectly legal. For a variety of reasons, none of those efforts ever succeeded, and no charges were ever filed against Mann.

[64] Again, the United States does not concede that, under the Federal Rules of Evidence, Mann would have successfully been able to introduce his purported evidence of harassment. Additionally, as noted by his attorneys, Mann's purported evidence of harassment would have relied upon witnesses who were drug addicts and had criminal records and would not have been appealing to a jury. *R. Ex. 16 at 4 (Aff. of Hendrix).*

different kinds of illegal prescription practices (including unnecessary and over-prescription of controlled substances and trading sex for pills); and (3) an unusually high number of Mann's patients were dying from overdoses. *R. Ex. 10, 11, 12, 14 (Affs. of Newman, Goodman, Haley, and Krout).* When fully explained, Mann's purported "evidence of negative treatment" would only show that officers were attempting to use lawful investigative techniques to investigate Mann, but that the investigation was unsuccessful (largely because the informants were patients of Mann who were playing both sides of the investigation) and no charges were filed. Thus, the forsaken evidence for which Mann now blames the Court would have had no effect on the overwhelming evidence against Mann on Count 3 (as discussed earlier in Ground 1) and would not have resulted in a different outcome.

Finally, Mann claims that he need not demonstrate prejudice under *Strickland* because Ground 8 "is not a regular *Strickland* claim but one arising from official action external to the defense." *Doc. No. 408 at 50.* The bulk of the cases cited by Mann for that proposition, however, involve cases of conflicts of interest or cases in which counsel was totally or effectively absent or otherwise prevented from assisting the defendant during a critical stage of the proceeding (i.e. the defendant was actually or constructively, completely deprived of counsel) – none of which is present in Mann's case.

More importantly, Mann's case simply does *not* involve any of the circumstances contemplated or cited in *Cronic* that are "so likely to prejudice the accused that the cost of litigating their effect... is unjustified." *See United States v. Cronic*, 466 U.S. 648, 657-62 (1984). In *Cronic*, which was decided the same day as *Strickland*, the Supreme Court identified three situations involving claims of ineffective assistance of counsel in which prejudice may be presumed: (1) "the complete denial of counsel;" (2) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" and (3) "in cases like *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), where counsel is called upon to render assistance under circumstances where competent counsel very likely could not." *Bell v. Cone*, 535 U.S. 685, 696 (2002)(quoting *Chronic*, 466 U.S. at 659, 652. Again, none of these situations are present in Mann's case, so he must show prejudice. Because he has not done so, Ground 8 must fail.

### 4. *No Evidentiary Hearing is Required on Ground 8.*

Mann is not entitled to a hearing on Ground because, even if his allegations are accepted as true, he is not entitled him to relief because he has either failed to state a cognizable claim or he has procedurally defaulted the claim. Also, Mann has not demonstrated how the Court's ruling made his attorneys ineffective under Strickland. Finally, Mann is also not entitled to a hearing on Ground 8 because – just like Grounds 1, 2, and 20 – hinges upon Mann's allegations that the grenades

134

were planted and that he is the victim of a vast government conspiracy – both of which cannot be accepted as true because they are contradicted by the record and are inherently incredible.

**J. Ground 9:**   In his ninth claim, Mann asserts that his trial and appellate counsel (who were the same) were ineffective because they "failed to raise in this Court and advance on appeal the grievance that the denial of severance prejudiced Dr. Mann by effectively precluding him from testifying on the firearms counts and asserting his right not to testify on the "weapons of mass destruction" counts. *Doc. No. 395 at 39.*

### 1. Trial Counsel were Not Ineffective under Strickland.

Before trial, Mann's counsel filed a 30-page motion arguing that Mann and his wife should be tried separately, and also that the bombing charges and regulatory offenses—the illegal possession of the guns and grenades—should be tried separately. *Doc. No. 83.* This Court denied the motion. *Doc. No. 98.* Mann says that despite the many arguments his counsel ably made in their motion and on appeal, they should have a done better job arguing that Mann was prejudiced by his inability to testify about the regulatory counts, while sitting silent on the bombing counts. Mann's argument springs from a number of flawed propositions; the first being that his counsel failed to properly raise or perfect the Fifth

Amendment/severance argument at trial and on appeal.    Because Mann again

cannot overcome *Strickland's* high bar, Ground 9 must fail.

a.  Trial Counsel's Performance was Not Deficient.

The Fifth Amendment/severance argument was properly raised and

preserved when necessary, before both this Court and the Court of Appeals.    The

argument first rears its head in trial counsel's brief in support of the motion for

severance.    Counsel argued:

> "it is clear that [Mann's] testimony on the gun counts would pertain
> solely to his collection of firearms and his knowledge of having failed
> to properly register certain firearms.    That testimony has no bearing
> on any other count in the indictment.    The defendant asks the Court to
> allow him to further consider his anticipated testimony and to proffer
> such testimony under seal at a hearing prior to the Court's
> determination of his motion." *Doc. No. 83 at 28 n .22.*

The Court denied the motion, *Doc. No. 98*, but Counsel renewed the

argument throughout trial, including prior to the issuance of jury instructions:

> "In renewing our motion to sever, we need to make a record on the
> defendant's desire to testify and not testify as it pertains to that
> motion.    In support of that motion and in our brief we discussed when
> a defendant might testify as to one count, but shouldn't testify to
> another count, and then he's put in that Hobson's choice and he can't
> exercise his right not to testify without impeding his defense on
> another count."

*TT at 3091.*    Counsel then proffered a sample of the testimony that Mann

would have given on the various counts.    *TT at 3091 – 3094.*    The Court

again denied the motion. *TT at 3094.*

136

Undeterred, Mann's counsel again raised the Fifth Amendment/severance issue on direct appeal. In its brief, counsel identified for the Court of Appeals its preservation of the argument throughout trial, including counsel's proffer of Mann's likely testimony. *Appellant Brief*, 2011 WL 4071520 at \*64, \*76-77. The Court of Appeals rejected the argument; as the Eighth Circuit clarified, the point failed not because the issue was waived or procedurally improper. It failed because, to succeed in garnering a severance on Fifth Amendment grounds, Mann needed to make a

> "convincing showing that he [had] both important testimony to give concerning [the regulatory counts] and a strong need to refrain from testifying on the [bombing counts].' *United States v. Jardan*, 552 F.2d 216, 200 (8th Cir. 1977) (quoting *Baker v. United States*, 401 F.2d 958, 977 (D.C. Cir 1968)). 'In making such a showing, it is essential that [Mann] present enough information—regarding the nature of the testimony he wishes to give on [the regulatory counts] and his reasons for not wishing to testify on the [bombing counts]—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of 'economy and expedition in judicial administration.' *Id.* (quoting *Baker*, 401 F.2d at 977). Mann did not state in his brief what reason he had for refraining from testifying on the arson and bombing counts, nor did his brief indicate what arguments he made to the district court in this matter or if he made them at all. . . Accordingly, we are in no position to evaluate Mann's proffer as to his need for separate trials based on the Fifth Amendment."

701 F.3d at 291 n. 9. By all appearances, the 8th Circuit overlooked counsel's proffer of Mann's potential testimony, a point Mann's counsel noted and raised *yet again* in its motion for rehearing:

137

"The panel noted Mann did not provide transcripts demonstrating what testimony he would give to satisfy the Court the claim of prejudice was genuine. *Mann*, 701 F.3d 291 at note 9. In the trial transcript, however, the district court accepted defense counsel's proffer of this information at the bench, beginning at transcript page 3091. Based on this proffer of information, and the arguments in Mann's pretrial briefs and appellate briefs, it is clear he would have given definitive testimony concerning the possession of unregistered weapons, including the grenades, but did not do so because he would have been exposed to cross-examination concerning his interactions with Pierce that would have been harmful to his defense."

*Petition For Enbanc Rehearing* at p. 11, 8th Cir. Case No. 11-1500, Feb. 7, 2013. The motion for rehearing was summarily denied.

Short of raising the issue in Mann's petition for writ of certiorari, trial counsel raised and preserved the 5th Amendment/severance issue at every stage of litigation. Through no fault of counsel, the argument was rejected at every turn. If Mann takes umbrage with this Court's and the Court of Appeals' decisions denying the severance, his § 2255 is an improper vehicle to challenge those rulings. *See Sun Bear v. United States*, 644 F.3d 700, 702 (8th Cir. 2011).

### b.  Counsel's Performance did Not Prejudice Mann's Case.

Assuming one can deem counsel's persistence in this regard to be unreasonable, any argument that his counsel's efforts prejudiced his case is speculation heaped on more speculation. First, Mann has to assume that, had the Court of Appeals identified his proffered testimony, it would have found severance was appropriate. As counsel recognized, given the near impossible threshold for

138

severing cases on Fifth Amendment grounds, *R. Ex. 17 at 10*, that assumption is little more than wishful thinking.[65] Even under the mammoth assumption that the Eighth Circuit would have held that the denial of the severance was erroneous, and further held that the lack of severance effected the trial, there is no honest probability that Mann's testimony on the regulatory counts would have changed the result of a trial on those counts for the better. *Strickland*, 466 U.S. at 695.

It is not likely Mann's testimony on the regulatory counts would have changed the outcome of the case. Mann confirms in an affidavit that he discussed with trial counsel many times his potential testimony. *Doc. No. 421-35.* His counsel says that, in his normal course of practice and as a matter of principal, he always leaves the decision to testify entirely to the client. *R. Ex. 16 at 7 (Aff. of Hendrix); see also R. Ex. 17 at 10 (Aff. of Cassinelli).*

---

[65] Based on her research, counsel had well-thought-out reasons to limit the proffer of Mann's testimony. *R. Ex. 17 at 10 (Aff. of Cassinelli).* Counsel offers that, had Mann taken the stand, he would have continued to deny guilt on all counts. The latter circumstance alone almost certainly foreclosed the possibility of the Court of Appeals granting a severance. *See* 701 F.3d 291 n. 9.

Mann says that he wanted to testify. [66] *Doc. No. 421-35*. Maybe that is true. Maybe not. Mann believes that because he (says he) convinced some *jailhouse staff* that his gun collection was innocent, he could have convinced the *jury* of the same. *Doc. No. 421-35*. Mann's naiveté speaks for itself. It demonstrates Mann's utter lack of understanding of the likely severe consequences of cross examination from a prosecution team. As noted in Ground 8, Mann's testimony would have likely opened the door to, among other things, the sordid and salacious allegations surrounding his medical practice. His relationships with his family members— some of whom also had dealings with Lloyd Hahn—would have been dissected. His testimony might have done more harm than good. Above all, though, the evidence against Mann on the regulatory counts was overwhelming. 701 F.3d at 291. While a severance may have provided an opportunity for Mann to present a new line of defense, there is little reason to think his testimony would have won the day.

Mann's counsel was dogged, at every stage of litigation, in pursuit of the severance. And his potential testimony could do little to overcome the overwhelming evidence against him on the possession counts had they been tried

---

[66] Counsel does not remember this. In fact, she recalls Mann agreeing he should not testify unless the Court granted the severance. *R. Ex. 17 at 10 (Aff. of Cassinelli)*.

separately.  Counsel's performance was in no way deficient, nor did it prejudice Mann's case.  Accordingly, Ground 9 should be denied.

### 2. *No Hearing is Necessary on Ground 9.*

Mann's allegations in support of Ground 9 are contradicted by the record; Mann is mistaken that his trial counsel failed to raise and preserve the Fifth Amendment/severance argument properly.  They did.  He is thus entitled to no relief.  *Winters v. United States*, 716 F.3d 1098, 1103 (8th Cir. 2013).  In addition, the basis for the arguments both in support of and opposing Ground 9 arise not from witness testimony, but by the many filings that constitute the trial and appeal records. No hearing is necessary to ventilate the issue further.  Accordingly, Mann's motion for hearing as to Count 9 should be denied.

**K.  Ground 10:**  In his tenth claim, Mann asserts that his trial counsel were ineffective because they "failed to move to strike the testimony of Lloyd Hahn because of its radical internal contradictions, his mental incompetence, and the respondent's threat of his prosecution and imprisonment at his advanced age... [which] left Dr. Mann exposed to highly prejudicial testimony from an unreliable source." *Doc. No. 395 at 40.*

1.    *Trial Counsel were Not Ineffective for Not Moving to Strike*
*Hahn's Testimony.*

Mann says that, on his information and belief, at the time of trial Hahn suffered from advanced stage prostate cancer necessitating mind-altering pain medication, presumably rendering him incompetent. *Doc. No. 395 at 40.* It follows, Mann says, that counsel should have moved to strike Hahn's testimony wholesale. None of Mann's trial counsel, who personally met and spoke with Hahn, found any reason to doubt his competency. *R. Ex. 16 at 7-8; R. Ex. 17 at 10-11; R. Ex. 18 at 3.* Mann cannot show that trial counsel's decision not to move to strike was deficient within *Strickland's* meaning, nor that the decision not to move to strike prejudiced Mann's case. Accordingly, Ground 10 fails.

There was no basis in fact or law for trial counsel to move to strike Hahn's testimony wholesale as Mann suggests—certainly not the inconsistent statements, the specter of illness, or Hahn's immunity grant that Mann argues somehow fatally tainted Hahn as a witness. Mann's arguments, though couched as challenges to the admissibility of Hahn's testimony, are in reality just attacks aimed at the weight the jury assigned it. In short, Mann thinks Hahn was unreliable: "Hahn's credibility was highly questionable to say the least." *Doc. No. 408 at 57.* Of course, "it isn't the role of the court to resolve conflicts in testimony or judge the credibility of witnesses." *United States v. Harrison*, 671 F.2d 1159, 1162 (8th Cir.

142

1982) (*per curiam*).  For this reason alone, Mann's point fails.  But there are other reasons too.

"The test for rejecting evidence as incredible is extraordinarily stringent and is often said to bar reliance only on testimony asserting facts that are physically impossible."  *See United States v. Crenshaw*, 359 F.3d 977, 988 (8th Cir. 2004).  Nothing Hahn said was physically impossible.  His testimony was lucid and detailed.  There is no indication from the trial transcript that Hahn stumbled or was unresponsive.  Trial counsel say that Hahn mentioned at one point that he was sick.  *R. Ex. 16 at 7-8; R. Ex. 17 at 10-11.*  One of Mann's lawyers suspects this may have been a lie.  *R. Ex. 17 at 10.*  Beyond that, any talk of pain medication—much less medication that affected his mental state—is just Mann talking.

Nor does Hahn's immunity grant affect his testimony's admissibility.  "Testimony does not become legally unsubstantial because the witness stands to gain by lying; the defendant is entitled to cross-examine such witnesses to expose their motivations, and it is up to the jury to decide whether the witness is telling the truth despite incentives to lie."  359 F.3d at 988.  And, "an argument that a witness was incredible as a matter of law is weakened when the defendant cross-examined the witness concerning the alleged lies or inconsistencies and the judge instructed the jurors on the degree of suspicion they should hold . . ." 359 F.3d at 991 *quoting United States v. Steele*, 178 F.3d 1230, 1236 (11th Cir. 1999).

Hahn's testimony was challenged in depth by trial counsel; the inconsistencies were homed in on in great detail. *TT at 1966-2021.* Hahn's discrepancies and overall credibility were the focus of large swaths of Mann's and his wife's closing arguments. *TT at 3308-3314, 3320, & 3342-45.* The Court reminded the jury before deliberations to consider the immunity grant as it weighed Hahn's testimony. *Doc. No. 165 at 9.* The Court further instructed the jury that it was entitled to believe some, all, or none of the evidence they found incredible. *Doc. No. 165 at 5.*

The question of the reliability and importance of this evidence is ultimately one for the trier of fact, not Mann. *See, e.g., United States v. Hodge, 594 F.3d 614, 618 (8th Cir. 2010).* Perhaps recognizing this fundamental tenet of trial by jury, counsel did not move to strike and instead tried to undermine Hahn's credibility through cross examination. The jury had ample information to make its own determination about the motivation behind and truth of Hahn's testimony. Hahn was interrogated at length, and all of Mann's arguments as to plausibility and credibility were ably made. Mann has not demonstrated that any of the testimony was so irrational as to take the credibility determination out of the jury's able hands. *Moore v. Novak,* 146 F.3d 531, 535 (8th Cir. 1998). There was no reason to move to strike Hahn's testimony, and any motion to do so likely would have fallen flat. For these reasons, Ground 10 fails.

144

## 2. *No Hearing is Necessary on Ground 10.*

Even assuming the allegations in Mann's motion are true, Mann is entitled to no relief on Ground 10. *Winters v. United States*, 716 F.3d 1098, 1103 (8th Cir. 2013)(quoting *Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir.2001)). If Hahn was sick or on medicine, or tempted to lie because of his immunity grant, even still, Mann's counsel's avenue to challenge Hahn was cross-examination. That opportunity was well taken. There was no legal basis to move to strike Hahn's testimony. No hearing is necessary to adjudicate Ground 10, and Mann's request in this regard should be denied.

**L. Ground 11**: In his eleventh claim, Mann asserts that trial counsel were ineffective because they "failed to move for a mental examination of Lloyd Hahn in light of his admitted memory problems...[which] exposed Dr. Mann to highly prejudicial testimony from an unreliable source." *Doc. No. 395 at 40.*

### 1. *Trial Counsel were Not Ineffective in Not Moving for a Mental Evaluation of Hahn.*

Mann says trial counsel should have sought expert medical data on Hahn on account of Hahn's allegedly faulty memory. Mann again conjectures that Hahn was affected by prostate cancer, medication, and now adds dementia to the mix. There is no proof of Hahn having dementia of course. Hahn was a competent witness; he understood his oath to testify and was appropriately responsive to all

145

counsels' questions.  Mann's counsel's lack of a motion for a mental evaluation was neither deficient, nor did it prejudice Mann's case.  Accordingly, Ground 11 should be denied.

### a.  Trial Counsel's Performance was Not Deficient.

Trial counsel did not need to seek a mental evaluation of Hahn.  He, like all witnesses, is presumed competent.  FED. R. EVID. 601.  And Mann has not offered anything but conjecture to overcome that presumption.  *United States v. Skorniak*, 59 F.3d 750, 755 (8th Cir. 1995).  Counsel, who were in a much greater position than Mann to evaluate Hahn as a witness, found no reason for such a motion.  *R. Ex. 16 at 8 (Aff. of Hendrix); R. Ex. 17 at 10-11 (Aff. of Cassinelli)*.  If Hahn's testimony was, as Mann believes, internally contradictory or doctored or a product of his immunity grant, his counsel were free to explore those points on cross and in closing.  As noted previously, counsel explored those issues thoroughly.  *TT at 1966-2021, 3308-3314, 3320, & 3342-45*.

Aside from some inconsistent testimony—an occurrence not uncommon in trial testimony—Mann can point to no evidence suggesting Hahn suffered from any condition affecting his ability to understand his oath or answer counsels' questions.  Hahn was not, for example, a paranoid schizophrenic.  *See, e.g, United States v. Stout*, 599 F.2d 866, 868-69 (8th Cir. 1979).  He had not suffered serious head injuries.  *See, e.g., Tucker v. Prelesnik*, 181 F.3d 747, 750 & 757 (6th Cir.

146

1999).   Hahn had minor trouble recalling with specificity some details of transactions that happened in the distant past—some more than ten years before trial.  His alleged initial reluctance to testify,[67] hearsay (within hearsay) though it is, *No. 408 at 58*, was more likely a product of his displeasure with having to reveal the guts of his below-the-board weapons dealings (which we know happened) than with an alleged cancer diagnosis or dementia (which Mann speculates happened).  Nothing in the record points the Court toward a reason for Hahn's alleged hesitancy to testify.  Unfounded speculation about that reason is not a basis to establish his trial counsel's deficient performance, much less to vacate Mann's sentence.

Still, inconsistent testimony does not make a witness incompetent.  *See United States v. Ramirez*, 871 F.2d 582, 585 (6th Cir. 1989).  "[E]ven a lunatic or a person affected with insanity is admissible as a witness if he has sufficient understanding to apprehend the obligation of an oath and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue."  *Timm v. Delong*, 59 F.Supp.2d 944, 949-50 (D. NE. 1998) *quoting District of Columbia v. Ames*, 107 U.S. 519, 521-22 (1883).  There is no indication that Hahn did not understand his oath to testify truthfully, nor did he

---

[67] Trial counsel does not remember Hahn being unwilling to testify. *R. Ex. 17 at 10 (Aff. of Cassinelli)*.

struggle to understand counsel's questions. He was thoroughly cross examined and he answered appropriately. The jury's impression of the validity of Hahn's testimony is an issue apart from whether Hahn should have been permitted to testify in the first place. *See, e.g., U.S. v. Skorniak*, 59 F.3d 750, 755 (8th Cir. 1995). And Hahn's testimony, even if Mann believes it not credible, was undeniably admissible.

In any event, it is not clear that the Court could have ordered Hahn, a non-party witness, to submit to a mental evaluation. *United States v. Ramirez*, 871 F.2d 582, 585 (6th Cir. 1989). More likely "[t]he most the court could do is condition [Hahn's] testimony on a prior examination." 871 F2d. at 585 (collecting cases). Even assuming the Court could grant this kind of motion, a Court order directing a psychological evaluation of Hahn would have been a "drastic measure[,]" one falling squarely within the Court's discretion. *U.S. v. Street*, 531 F.3d 703, 707 (8th Cir. 2008). Any motion by counsel would have almost certainly been denied at trial and unassailable on appeal.

Had his counsel moved for a mental evaluation of Hahn and the Court somehow granted the motion, and somehow had the authority to carry it out, there is nothing in the record to indicate the results of a mental examination would have barred Hahn's testimony. Any assertion to the contrary is, once again, no more than a guess. Counsel acknowledges that, had Hahn submitted to evaluation only

to be found competent, the exam would have actually *harmed* Mann's case by bolstering Hahn's testimony. *R. Ex. 17 at 11.* Mann can show neither that his counsel's performance was deficient, nor that any deficiency would have changed the proceeding's outcome. The Court should therefore dismiss Ground 11.

### 2. No Evidentiary Hearing is Necessary on Ground 11.

There was no basis in law or fact for counsel to seek a mental examination of Hahn. Some of Mann's allegations here, even if true, entitle Mann to no relief; if Hahn was on pain medication, there would still be no basis for this Court to order a mental examination. Mann's other allegations are either conclusory or unsupported by the record; only Mann's conjecture supports Hahn's alleged dementia. Last, Mann is entitled to no relief on Ground 11 because his claim of prejudice is far too speculative. A mental examination of Hahn (were it within the Court's authority to order) would have hurt, not helped, Mann's case. Accordingly, no hearing on Ground 11 is merited.

**M. Ground 12:** In his twelfth claim, Mann asserts that the United States failed to produce exculpatory evidence in violation of the Due Process Clause of the Fifth Amendment in that "the police-prosecution team did not disclose to the defense any evidence that they had tested the M406 40-mm. high-explosive grenades (or in arguing that they were live in reckless disregard for the truth)."

Alternatively, Mann asserts his trial counsel were ineffective because they "failed to seek independent forensic testing of the grenades." *No. 395 at 41.*

　1.　　*The United States did Not Fail to Disclose to Mann's Counsel*
*Exculpatory Evidence of Grenade Testing.*

To prove a *Brady* violation, the defendant must show that the evidence [that was in the Government's possession] was both favorable and material, and that the Government suppressed it still. *United States v. Barraza-Cazares*, 465 F.3d 327, 333 (8th Cir. 2006). Mann, however, has not provided any evidence whatsoever that the United States conducted any testing of the 40mm HE grenades beyond the evidence presented at trial (which was disclosed to Mann) or that the United States suppressed evidence of such testing.   That is because, quite simply, no further testing beyond what was disclosed took place.   *R. Ex. 4 at 2 (Aff. of Oliver).* Mann's newest iteration of his argument—that the United States never tested the grenades because it knew the grenades were props—is even more preposterous in the face of the United States' preparedness to conduct additional explosive testing. *Doc. No. 470.*   Mann's accusation of a *Brady* violation is conclusory and unsupported by any facts.

　2.　　*The United States did Not Present the Grenades as Live with*
*Reckless Disregard for the Truth.*

The Government harbored no doubts about whether the grenades were live or inert.   To have presented the grenades with "reckless disregard for the truth,"

*Doc. No. 395 at 41*, the Government must have "entertained serious doubts as to the truth of [Agent Stephen Shelley's] statements or [had] obvious reasons to doubt the accuracy of the information he reported." *United States v. Finley*, 612 F.3d 998, 1002 (8th Cir. 2010). *Id.* At trial, Stephen Shelley, an explosives enforcement officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, testified fully about his examination of the 40mm HE grenades found near Mann's residence. Shelley's qualifications and experience were vetted. *TT at 545-550*. He found that the grenades were indeed live and could be fired from the grenade launchers found in Mann's residence. *TT at 1306-1323*. Shelley did not base his findings just on the presence of a fragmentation ball inside the grenade. Shelley observed the fusing system, the primer in the firing pin, the explosive package, a component called an "inertial weight" and "other components that are indicative of [a 40mm. HE grenade]." *TT at 1311-1313*. In Shelley's opinion, dismantling a grenade would have been a dangerous undertaking. *TT at 1315-16*. Reassembly would have been impossible. *See TT at 1315-16*. And testing the grenades by firing them would have left the Government in the unenviable position of destroying a hypergeometric sampling of its own physical evidence. Nothing about Shelley's qualifications or testimony caused the Government to doubt the validity of his testimony. Nor did it or should it have prompted the Government to take a closer look at the grenades.

151

### 3. Counsel were Not Ineffective Under Strickland for Not
### Conducting Additional Testing on the Grenades.

Mann's counsel's performance wasn't deficient by not having the grenades tested by another expert. That is in part because counsel's strategy did not rely on an unsuccessful grenade test. Mann's counsel instead focused on disclaiming Mann's ownership and possession, and distancing him from them to the extent possible.[68] As this Court recognized, a successful test of the grenades would have been additional overwhelming evidence against Mann, *Doc. No. 474 at 2*, providing both a compelling reason for Mann to bury the grenades, and hamstringing his counsel's ability to potentially make an argument about the grenades inoperability in closing argument.

Unquestionably, firing the grenades would have ended in them exploding downrange. ATF Explosives Expert Johnnie Green, who has recent and extensive experience with 40mm grenades---some manufactured at the same time and place as Mann's grenades---confirms as much. *R. Ex. at 30 (Aff. of Green)*. Greeneoffers that the 40mm grenades are manufactured to survive in battlefield

---

[68] Trial counsel nonethess discussed the viability of the grenades with their expert, John Norrell. *R. Ex. 17 at 10 (Aff. of Cassinelli)*. Norrell relayed that, if the grenades had been rendered inert, they would have been noticeably altered. In the face of two consistent expert opinions that the grenades were live, counsel had little reason to seek additional testing.

conditions, whether hot or cold or wet. Green has recently been detailed to Mexico where he aids the Mexican Government in locating and disposing of munitions including 40mm grenades. Green routinely finds old grenades buried in the ground, wipes them down, and fires them without fail. Green is somewhat familiar with Mann's grenades, having seen them in storage around the time of trial. He agrees that the grenades are in good condition, and that there is no basis to believe the grenades would do anything but explode. There is no reason to believe that testing the grenades would have affected the outcome of Mann's case. *Strickland*, 466 U.S. at 687–88. Accordingly, Ground 12 should be denied.

### 4. *No Evidentiary Hearing is Necessary on Ground 12.*

Mann is not entitled to a hearing on Ground 12 because it is clear he is not entitled to relief. Counsel were advised by two experts, including their own, that Mann's grenades were live. The defense strategy hinged on distancing Mann from the grenades as much as possible; a negative test would have undermined that plan. Undoubtedly, a test would have yielded explosive grenades, obviating Mann's argument that the failure to test prejudiced his case. Accordingly, no hearing is merited on Ground 12.

**N. Ground 13:** In his thirteenth claim, Mann asserts that his trial counsel were ineffective because they "failed to obtain independent forensic testing of the

M203 40mm. grenade launchers to determine whether they had ever fired a live round." *Doc. No. 395 at 44.*

### 1. Mann's Trial Counsel were Not Ineffective under Strickland.

Mann says that not testing the grenade launchers found in his home to determine if Mann used them was a critical mistake on counsel's part. But, apart from being additional proof connecting Mann to the grenades, the functionality or prior use of Mann's grenade launchers is irrelevant. Mann cannot show that it was an unreasonable decision not to test the launchers, or that the failure to test the them casts any real doubt on his guilt. Accordingly, Ground 13 should be denied.

### a. Trial Counsel's Performance was Not Deficient.

There was no good strategic reason to seek testing of Mann's grenade launchers. *See R. Ex. 17 at 11-12.* Mann's possession of them was not illegal, and he was not charged with possessing or firing anything from the grenade launchers. The United States has never alleged that Mann shot any of his live grenades from the launchers. Rather, the grenade launchers were simply a small part of the overwhelming proof that the 40mm HE grenades buried near Mann's residence belonged to Mann.

Mann acknowledges that it makes sense that an owner of a weapon might possess ammunition for that weapon. *Doc. No. 469 at 38-39.* Whether or not the ammunition is fired from that weapon, though, is of no legal import. This holds

even truer here, where many of the weapons in Mann's house were collectors' items, and might not have been used often or ever. But whether or not Mann's grenade launchers had ever been fired was immaterial to whether Mann possessed the illegal grenades that accompanied them.

Trial counsel affirmatively chose not to test the launchers. They recognized that Mann was not the launchers' first owner. *R. Ex. 17 at 11-12 (Aff. of Cassinelli)*. Counsel were wary that, with the launchers' unknown past, any test results would have been unpredictable;[69] it was impossible to know what types of grenades had been fired through them. *Id.* Any unexpected results would have hamstrung any potential arguments about the United States' failure to test the launchers. *Id.*

b. Trial Counsel's Performance did Not Prejudice Mann's Case.

Even assuming independent forensic testing would have shown that the grenade launchers had not been fired, or had not fired the grenades Mann buried in the woods, the evidence against Mann on Count 3 was, as the 8th Circuit pointed out, overwhelming. 701 F.3d at 291. Mann continually presses that a "but-you-

---

[69] Or, maybe the test results would have been predictable. In 1994, Thao Le sold Mann one of the launchers and a bore brush which, incidentally, is used for cleaning residue, probably like that left behind by grenades, from the launcher's bore. *TT at 1891*.

can't-prove-I-shot-them!" line of defense somehow overcomes the glut of evidence against him. *Doc. No. 469 at 40-41*. It would not. It would demonstrate only that the United States cannot prove Mann fired the grenades he illegally possessed. Of course, the United States never set out to prove such a thing. And why should it? Assuming a launcher test would have led to a more favorable verdict for Mann is a wild guess at best. That is not enough to carry the day here. *See Christenson v. Ault*, 598 F.3d 990, 997 (8th Cir. 2010); *Rodden v. Delo*, 143 F.3d 441, 448 (8th Cir. 1998)). Accordingly, Ground 13 should be denied.

### *2. No Hearing is Necessary on Ground 13.*

Mann is not entitled to a hearing on Ground 13 because it is clear he is entitled to no relief. *Winters v. United States*, 716 F.3d 1098, 1103 (8th Cir. 2013). He can meet neither prong of the *Strickland* test. Mann's counsel acknowledges they did not test the grenade launchers and that they had legitimate, tactical reasons for not doing so. Likewise, his prejudice argument is tenuous at most; Mann conjectures that demonstrating that he never shot the grenades disclaims his possession of them. Even if that were the unlikely case, the remaining evidence of his possession is overwhelming. Accordingly, no hearing is merited on Ground 13.

**O.   Ground 14:**   In his fourteenth claim, Mann asserts that trial counsel were ineffective because they "failed to investigate and, if appropriate, call the workers who went to Dr. Mann's home with Jeff Kimbrough to bring out the weaknesses in his testimony regarding what he said he thought he saw in the home." *Doc. No. 395 at 44.*

> *1.   Mann's Trial Counsel were Not Ineffective under* <u>Strickland.</u>

At trial, Jeff Kimbrough testified that he was the owner and manager of an alarm system company and that he was personally involved in the installation of an alarm system at Mann's residence in 2003-04. *TT at 2049-50.*   Kimbrough stated that while working in the house, he saw "large bullets" in both Mann's gun safe room and Mann's garage that looked similar to the inert 40mm grenade introduced into evidence and that also looked similar to pictures of the buried grenades. *TT 2057-2058, 2061-62, 2091-95; Gov. Exs. 122, 98e-g, 118d, 194.*   Kimbrough testified that he also saw several grenades that looked similar to the inert MK3A2 introduced at trial. *TT 2059-60, 2093-95; Gov. Ex. 69.*

In Ground 14, Mann claims his trial attorneys were ineffective because they failed to investigate and, if appropriate call as witnesses at trial, the workers who worked with Kimbrough on Mann's residence in order to "bring out the weaknesses" in Kimbrough's testimony about what Kimbrough said he saw in Mann's house.

For a variety of reasons, Ground 14 must fail. As stated earlier, under *Strickland*, Mann must demonstrate: (1) that his counsel's performance was deficient; and (2) that, but for his counsel's performance, there is a reasonable probability that the outcome of the proceeding would have been different. If either the prejudice or deficient performance prong of *Strickland* is not met, then Mann's claim for ineffective assistance of counsel cannot prevail.

### a. No Prejudice

To begin with, Mann's claim on Ground 14 assumes that Kimbrough's employees would have said something different from or contradictory to Kimbrough's testimony. Mann certainly, however, has not produced any statements from any employees showing that they would have said anything different than Kimbrough. Of course, they might *not* have said anything different than Kimbrough. As such, Ground 14 is completely conclusory and must fail.

Nonetheless, even assuming Kimbrough's employees would have said something different from or contradictory to Kimbrough's testimony, such facts would not have changed what Kimbrough said he saw – testimony that the jury clearly believed. And it cannot be forgotten that Kimbrough's testimony did not go unchallenged at trial. Not only did Mann's attorneys thoroughly cross-examine Kimbrough about what he thought he saw, they also called Wayne Henry as a witness to contradict Kimbrough's testimony. Henry owns his own construction

company and added approximately 1600 square feet onto Mann's residence during a six-month period in 2003 (and also added landscaping, driveways, and patios). *TT at 3052-55.*   Henry testified that, during that time, he had been throughout Mann's house and that he did not "see anything that looked like" Government Exhibit 118a (a picture of the buried 40mm grenades) or Government Exhibit 69 (the inert MK3A2 grenade) in Mann's house.   *TT at 3056.*   Thus, Mann's trial attorneys put in front of the jury the very evidence that Mann is assuming, speculating, and hoping Kimbrough's employees would have provided, only it was through a different witness.   However, despite that stark conflict in the Kimbrough and Henry's testimony, the jury still found Mann guilty.   Thus, in light of the fact that the jury heard – and rejected – the best-case-scenario evidence that Kimbrough's employees could have provided (which the United States does <u>not</u> concede they would have provided), Mann cannot prove that the outcome of the proceedings would have been any different if his attorneys had interviewed Kimbrough's employees.

Additionally, even if Kimbrough's employees had provided information contrary to Kimbrough's testimony, it would *not* have changed the outcome of the proceedings because, as noted by the Eighth Circuit in their opinion on this case, the evidence against Mann on Count 3 (for possessing the ninety-eight buried 40mm grenades) was "overwhelming." *United States v. Randeep Mann*, 701 F.3d

274, 291 (8th Cir. 2012).[70]  Similarly, Kimbrough's testimony had no bearing on Mann's convictions on Count 6 (unlawful possession of a machine gun) and Counts 7 and 8 (related to tampering with evidence).  His testimony also had only a minimal bearing on Counts 1 and 2, only to the extent that he said he saw something that looked like an MK3A2 grenade in Mann's residence. (But Kimbrough was not the only person who linked Mann to an MK3A2 grenade. Lloyd Hahn testified that he sold Mann eight (8) MK3A2 grenades in the late 1990's at the Knob Creek gun show in Kentucky. *TT at 1956-58.*)  Thus, Mann has failed to show "prejudice" under *Strickland,* and his claim of ineffective assistance of counsel in Ground 14 must fail.

### b.  Trial Counsel's Performance was Not Constitutionally Deficient.

A court need not address whether counsel's performance was deficient if the ineffective assistance of counsel claim may be disposed of for failure to show prejudice. *Strickland*, 466 U.S. at 697; *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996).  Although Mann has failed to show prejudice, the United States will nonetheless address the issue of trial counsel's performance.

The United States issued a subpoena for records from Kimbrough.  Those records were provided in discovery (Bates number 1360-1367) on February 2,

---

[70] That evidence is summarized earlier in the United States' response to Ground 1.

2010. Those records, however, did not contain the names of any of Kimbrough's employees. Mann's attorneys attempted to interview Kimbrough, but he would not talk to them. *R. Ex. 16 at 9 (Aff. of Hendrix); R. Ex. 17 at 12 (Aff. of Cassinelli).* None of these efforts resulted in them being able to identify the names of the employees that assisted Kimbrough when he installed the alarm system on Mann's residence. So, as an alternative, Mann's counsel located and presented the testimony of Wayne Henry, who, as discussed above, said everything that Mann could have ever hoped Kimbrough's employees would have said. Based on these facts, trial counsel's failure to interview Kimbrough's employees and failure to call them as witnesses was not constitutionally deficient. Thus, Mann has failed to meet his burden under *Strickland*, and Ground 14 must fail.

### 2. No Evidentiary Hearing is Necessary on Ground 14.

Mann is not entitled to a hearing on Ground 14 because it is conclusory in that assumes - without any evidence to support it - Kimbrough's employees would have provided information that was helpful to Mann. Additionally, even if the allegations are accepted as true, Mann still is not entitled to relief because he has not demonstrated deficient performance or prejudice under *Strickland*.

**P. Ground 15:** In his fifteenth claim, Mann asserts that the United States failed to produce exculpatory evidence in violation of the Due Process Clause of the Fifth Amendment in that "the prosecution did not disclose to trial counsel the

records of the complaint to the Arkansas State Medical Board (ASMB) in relation to Rita Barthelme." Alternatively, Mann asserts his trial counsel were ineffective because they "failed to investigate the circumstances of the complaint to ASMB in relation to Rita Barthelme and, if necessary, to subpoena the records of ASMB to determine whether Dr. Mann had received any indication of the nature and cause of the complaint against him before the West Memphis explosion and to determine whether her trial testimony was consistent with the allegations presented to ASMB in respect to her care by Dr. Mann." *Doc. No. 395 at 46.*

At trial, Jeanice Brown testified that her sister, Rita Barthelme, has been abusing prescription pills since 2003 and that Rita has overdosed on pills twice, most recently on January 4, 2009. *TT at 985-86.* After the first overdose, Jeanice called Mann, who was Rita's doctor, and asked him to stop giving Rita pills or Rita was going to die. *TT at 986.* According to Jeanice, Mann responded to her very rudely and asked Jeanice why she wasn't here to help Rita." *TT at 987.* Six months later, on January 4, 2009, Rita overdosed again. This time, Jeanice called the Arkansas State Medical Board (ASMB), the United States Drug Enforcement Administration, and the Arkansas State Police to complain about Mann. *TT at 987-92.* Jeanice was told by the ASMB to put her complaint in writing, so she wrote a letter about Mann and emailed it to the ASMB and to an investigator with the Department of Health on January 13, 2009. *TT at 993.* Jeanice also testified

162

that, sometime between January 5-8, 2009, she told Rita that she (Jeanice) had called the ASMB and complained about Mann. *TT at 994.*

Rita Barthelme was also called as a government witness. She testified, among other things, that, Mann was both her doctor and her good friend. *TT at 1101.* According to Rita, Mann started prescribing her pills (e.g., Lorcet, Xanax, and Robaxin) about ten years earlier, and, after the first few years, she became addicted to pain pills while under Mann's care and overdosed two times. *TT at 1014-15.* Rita testified that, even after Mann lost his DEA permit to prescribe controlled substances, he continued to provide Rita with prescription pills (e.g., Lorcet, Xanax, and morphine). *TT at 1016-18.* When Rita overdosed the second time, she overdosed on some pills she had gotten from Mann. *TT at 1019.* After her second overdose, Rita's sister Jeanice told Rita that she (Jeanice) had called the ASMB about Mann. Rita then passed that information along to Mann. *TT at 1020.* Although Rita could not remember the exact date she told Mann about her sister's complaint to the ASMB, she testified that she shared that information with Mann some time while she was in treatment after her second overdose. *TT at 1018-20.* Records admitted at trial show that Rita was court-ordered into a local drug treatment center on January 8, 2009, for a period not to exceed 21 days. *Gov. Ex. 95a-c.* The West Memphis bombing occurred shortly thereafter, on February 4, 2009.

163

1. *No Brady Violation.*

In Ground 15, Mann first claims that the United States failed to disclose to Mann's trial attorneys "the records of the complaint to the Arkansas State Medical Board (ASMB) in relation to Rita Barthelme." *Doc. No. 395 at 46.* Later on, Mann adds that the United States also failed to disclose "evidence of [its] coercion" of Rita Barthelme. *Doc. No. 395 at 47.*

a. ASMB Records

Mann has not specifically or adequately described the records he claims the United States failed to disclose, rather he only refers to them as "the records of the complaint to the Arkansas State Medical Board (ASMB) in relation to Rita Barthelme." More importantly, Mann has not produced any records that he has discovered or claims were not disclosed by the United States.[71] Rather, he appears to be fishing and cavalierly making accusations about violating *Brady*. (See Ground 12 (failure to disclose testing of the 40mm grenades) for another example.) As such, Ground 15 is purely conclusory and must fail.

---

[71] Again, it is Mann's burden to demonstrate that the evidence was both favorable and material, and that the government suppressed the evidence. *United States v. Barraza-Cazares*, 465 F.3d 327, 333 (8th Cir. 2006). Because Mann himself cannot say and has not said what the supposedly suppressed evidence is, his claim must fail right out of the gate.

Nonetheless, the United States will attempt to address the issue to the best of its ability given the accusation at hand. Peggy Cryer, the executive secretary of the ASMB, testified about Mann's lengthy, adverse relationship with the medical board from 2003 until shortly before the West Memphis bombing, including the stayed revocation of Mann's medical license and the permanent surrender of Mann's DEA permit in 2006.[72] *TT at 688-816, 2831-2971.* According to Cryer, the ASMB was contacted in December of 2008 by a sister of Rita Barthelme complaining about Mann. *TT at 796-97.* Cryer officially referred the complaint on behalf of the ASMB to an investigator with the Department of Health on January 5, 2009, to determine if Mann had once again violated the Arkansas Medical Practices Act. *TT at 2909, 2968.* According to Cryer, if the new allegations against Mann were found to be true, then the ASMB would revoke Mann's medical license. *TT at 797.* As of the date of Cryer's testimony at trial, the ASMB had not held any hearings about the new allegations involving Rita Barthelme. *TT at 797.*

The United States turned over all of the ASMB records in the government's possession to Mann's trial attorneys on March 19, 2010, and May 12, 2010. Mann's attorneys confirm that they had Mann's ASMB records, including the

---

[72] See pages 3-5 of the Factual Background, *infra*, for a summary of Mann's history with the ASMB.

records pertaining to the new complaint involving Rita Barthelme.  *R. Ex. 16 at 9-10 (Aff. of Hendrix); R. Ex. 17 at 12-13 (Aff. of Cassinelli).*  Of all of the ASMB records, the only records that pertained to an investigation involving Rita Barthelme were identified on the record – but never admitted – during the trial as Government Exhibit 91.  Those records are attached *under seal* to this Response as Respondent's Exhibit 31.  It is clear from the trial transcript that Mann's attorneys had a copy of Gov. Ex. 91.  *See TT at 681-85* (where the parties and the Court discuss the admissibility of Gov. Ex. 91).  Mann's attorneys even introduced one of the documents from Gov. Ex. 91 as a defense exhibit at trial to show that Mann was served a subpoena for records as part of the new investigation after the West Memphis bombing.  *TT at 812-16; Def. Ex. 5.*  If Gov. Ex. 91 is the records Mann now claims the United States did not disclose, then he is mistaken.  If Gov. Ex. 91 is not the records Mann now claims the United States did not disclose, then the United States does not know what records he is complaining about (and does not believe the records even exist).

In any event, according to Peggy Cryer, the records of the ASMB are matters of public record (subject to some exceptions), and a licensee is entitled to see his/her entire licensure file.  *R. Ex. 32 (Aff. of Cryer).*  As such, "the government does not suppress evidence in violation of *Brady* by failing to disclose evidence to which the defendant had access through other channels."  *United States*

*v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001); s*ee also United States v. Coplen*, 565 F.3d 1094, 1097 (8th Cir. 2009) (finding that prior testimony of witnesses was a "matter of public record"); *United States v. Santisteban*, 501 F.3d 873 (8th Cir. 2007); *United States v. Albanese*, 195 F.3d 389 (8th Cir. 1999)(failure to turn over prior testimony given in a public proceeding did not violate *Brady*); see also *United States v. Jones*, 160 F.3d 473, 479 (8th Cir. 1998)(holding that the government's failure to disclose a plea agreement was not a *Brady* violation "because transcripts of Whitley's plea and sentencing hearing were readily available.... There is no *Brady* violation if the defendant[s], using reasonable diligence, could have obtained the information themselves."(quoting *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996)); *United States v. Willis*, 277 F.3d 1026, 1034 (8th Cir. 2002)(rejected a post-trial *Brady* claim in part because the information in issue was "a matter of public record" and "was available by merely entering the phrase...into a search engine on a legal database such as Westlaw or Lexis.")

Mann appears to be looking for the proverbial "smoking gun" that proves that the ASMB notified Mann that he was under a new investigation. However, it is clear from the record that those records do not exist. Because of that, at trial, the United States proved that Mann was aware of the new investigation through the testimony of Rita, who testified that she told Mann *in person* about Jeanice's

complaint about Mann to the medical board when she (Rita) went to Mann's office for treatment on her ankle during the time that she (Rita) was in court-ordered drug treatment the Freedom House for twenty-one days. *TT at 1018-1020.*  Similarly, there are no records that the AMSB notified Mann about the new investigation before the West Memphis bombing because the investigation was brand new and was just getting started when the bombing occurred.  The proof at trial was that Mann learned about the investigation through Rita, not through any formal notification by the ASMB.  As such, the records that Mann appears to be seeking do not exist, and the United States has no obligation to disclose that which does not exist.

Therefore, no *Brady* violation occurred, and Ground 15 is without merit.

### b. Coercion of Rita Barthelme.

Mann also claims that the United States failed to disclose "evidence of [its] coercion" of Rita Barthelme. *Doc. No. 395 at 47.*  Again, Mann has not presented any evidence that Rita actually was coerced.  As such, Ground 15 is conclusory and must fail.

Nonetheless, this accusation appears to be based upon a card that Rita Barthelme mailed to Mann on April 22, 2010, while he was detained in a local jail. The card (and envelop) is attached to this Response as Respondent's Exhibit 33. Mann claims that the card "[indicates] that the federal authorities had coerced her

into testifying as she had." *Doc. No. 395 at 47.* Such is not the case, however. In the "friendship card," Rita tells Mann how much she misses him and talks about some treatment she recently received for a car accident. She closes the letter with the phrase, "The fed's (sic) won't leave us alone" written in big letters, without any further explanation.

It is clear from Cassinelli's affidavit, however, that Mann's attorneys had Rita's card. *R. Ex 17 at 12-13 (Aff. of Cassinelli).* That fact is supported by the record because Mann's attorneys – although they did not introduce the card into evidence[73] – used words from the card to cross-examine Rita. *TT at 1030.* Thus, Rita's card was not suppressed. *United States v. Barraza-Cazares*, 465 F.3d at 334.

To the extent that Mann suggests – but certainly has not proven – that Rita's testimony was coerced, the record does not support that suggestion. At trial, Rita testified on cross examination that she had contact with law enforcement about Mann on three or four times occasions, including two visits to her home and one

---

[73] According to Cassinelli, she did not introduce Rita's card into evidence because: (1) it contained content that showed a "close personal relationship between Rita and Mann;" (2) it supported Rita's testimony that she would give Mann, her very close friend, warning about Brown's complaint to the ASMB; and (3) it would have made it unlikely that Rita would testify falsely about someone she cared so much about. *R. Ex. 17 at 12-13 (Aff. of Cassinelli).*

meeting at the courthouse for trial. *TT at 1027-29.* She stated that she was not a "happy camper" about being involved in the investigation and that she didn't know why she and her husband Phil were involved in the investigation.[74] *TT at 1030, 1044-45.* On redirect examination, Rita explained that agents had talked to her husband Phil many times before they ever approached her.[75] *TT at 1051.* When agents first talked to Rita, she "was not a happy camper" because she was Mann's friend and "didn't want to get involved." *TT at 1051.* She admitted, for that reason, that she was not honest with federal agents about Mann when she first met with them, but she later told the truth "because no matter who it was -- who, what -- who it was about, I was not going to jail for anybody." *TT at 1051-52.* Rita testified that she was admonished by federal prosecutors that the one rule that she had to follow was "to tell the truth" and that she had done so in Mann's trial. *TT at 1052.*

The United States did not fail to disclose any evidence of the coercion of Rita Barthelme – because there was no coercion. The words "The fed's won't leave us alone" do not mean that Rita was coerced, as Mann espouses. Rather, when read in context of what was going on at the time (i.e. that federal agents were

---

[74] Mann also claims without merit in Ground 3, *infra*, that federal agents "suborned perjured trial jury testimony from Phil Barthelme, by threatening to arrest him."

[75] Thus, explaining the "us" in "the Feds won't leave *us* alone."

wanting to talk to Phil and Rita but Rita and Phil didn't want to talk to federal agents, so agents had to keep coming back to see them), the words mean just what they say – and nothing more.   Nonetheless, Mann's attorneys had Rita's card in advance of trial, enabling them to cross-examine Rita with her own words – which they did.   Thus, there was no *Brady* violation, and Ground 15 is without merit.[76]

### 2. *Mann's Trial Counsel were Not Ineffective under* Strickland.

Alternatively, Mann asserts if there was no *Brady* violation, then his trial attorneys were ineffective for failing to "investigate the circumstances of the

---

[76] In two of Mann's belated declarations (discussed in Ground 16), Mann claims that the ASMB voted on the new investigation involving Rita and "decided to return my medical license to me without any restrictions whatso ever (sic)." *Doc. No. 421-19; Doc. No. 450-6.*   Mann claims that he asked his attorneys to get the "requisite records from the ASMB" and that those records would have been further evidence that Rita was coerced by ATF agents. *Doc. No. 421-19; Doc. No. 450-6.* However, once again, Mann's facts are not quite right.   According the Peggy Cryer, Mann's medical license was not returned to him "without any restrictions whatsoever," as claimed by Mann.   To the contrary, Mann's license "lapsed" or expired in July 2010 under the same revoked/stayed status it was under at the time of trial. *R. Ex. 32 (Aff. of Cryer).*   Additionally, according to Cryer, no hearings or votes were ever held in the investigation involving Rita, and the board has not conducted any business involving Mann since June of 2009 (when the board merely acknowledged a newspaper article indicating that Mann was filing another lawsuit against the board). *Id.*

complaint to ASMB in relation to Rita Barthelme" and to subpoena the records of ASMB to determine whether Mann had received notice of the complaint against him before the West Memphis bombing. *Doc. No. 395 at 46.* Later on, Mann adds that his trial attorneys were also ineffective for failing to determine whether Rita Barthelme's testimony had been coerced by the United States and whether her testimony was "consistent with the allegations presented to ASMB in respect to her care" by Mann. *Doc. No. 395 at 47.*

For a variety of reasons, Ground 15's claim of ineffective assistance of counsel must also fail.   As stated earlier, under *Strickland*, Mann must demonstrate: (1) that his counsel's performance was deficient; and (2) that, but for his counsel's performance, there is a reasonable probability that the outcome of the proceeding would have been different.   If either the prejudice or deficient performance prong of *Strickland* is not met, then Mann's claim for ineffective assistance of counsel cannot prevail.

### a.  Counsel's Performance did Not Prejudice Mann's Case.

Mann's chief complaint in Ground 15 is that he had no notice of the new ASMB investigation.  He claims that "trial counsel was constitutionally ineffective for failing to seek the same evidence." *Doc. No. 395 at 46, Para. 15.1.2.* But, as discussed below and above, they did seek such evidence.  And they found it in the ASMB records that they had.  And they made it perfectly clear to the jury that

Mann did not receive official notification from the board about the new investigation until after the West Memphis bombing. They did exactly what Mann claims they didn't do. Any they could not have done more to make the point that Mann wanted made. Therefore, whatever additional things Mann thinks his attorneys should have done – which he has not specified – would not have made a difference in the outcome of the proceedings.

Additionally, as discussed below, Mann's attorneys investigated Jeanice's new complaint with the ASMB. No matter how thorough Mann's attorneys' investigation of the new complaint was, the relevance of the new complaint was *not* whether the allegations against Mann were true, but just the fact that a new complaint had been filed and a new inquiry into Mann's medical practices had begun. And no amount of investigation by Mann's attorneys could have changed that fact.

Thus, Mann has failed to show "prejudice" under *Strickland,* and his claim of ineffective assistance of counsel in Ground 15 must fail.

b. Trial Counsel's Performance was Not Constitutionally Deficient.

A court need not address whether counsel's performance was deficient if the ineffective assistance of counsel claim may be disposed of for failure to show prejudice. *Strickland,* 466 U.S. at 697; *United States v. Apfel,* 97 F.3d 1074, 1076

(8th Cir. 1996). Although Mann has failed to show prejudice, the United States will nonetheless address the issue of trial counsel's performance.

With regard to Mann's attorneys allegedly failing to "subpoena the records of ASMB to determine whether Mann had received notice of the complaint against him before the West Memphis bombing," it does not matter how Mann's attorneys got Mann's ASMB records, it only matters that his attorneys had the records. As stated earlier, those records do not show that Mann was officially notified about the new investigation before the West Memphis bombing. Rather, a subpoena from the ASMB records shows that Mann was officially notified of the investigation after the bombing – a point that Hendrix made perfectly clear during his cross examination of Peggy Cryer and by admitting the subpoena as a defense exhibit. The United States proved Mann's knowledge of the investigation (or at least Rita's sister's complaint to the board) through Rita, who testified that she told Mann about Jeanice's complaint in person when she (Rita) went to Mann's clinic while she was in drug rehabilitation.

The United States is not sure what Mann means by claiming his attorneys failed to "investigate the circumstances of the complaint to ASMB in relation to Rita Barthelme." *Doc. No. 395 at 46.* Again, however, Mann's attorneys had Mann's ASMB file, including documents related to the investigation. They also had various public/court records, police reports, and medical records that they used

to cross examine Jeanice and Rita.  *R. Ex. 17 at 13 (Aff. of Cassinelli)*.  They also sent Drake Mann to talk to Rita and Phil Barthelme on several occasions, and Drake Mann and an investigator conducted a fairly lengthy interview of both Phil and Rita.  *R. Ex. 17 at 13 (Aff. of Cassinelli)*.  In light of the circumstances, there was nothing else for Mann's attorneys to investigate.

Mann adds that his trial attorneys were also ineffective for failing to determine whether Rita Barthelme's testimony was "consistent with the allegations presented to ASMB in respect to her care by Dr. Mann."  *Doc. No 395 at 46*.  He restates this complaint in Paragraph 15.2.4 of his § 2255 motion by stating:

> If the prosecution-police team did <u>not</u> violate the Fifth Amendment by failing to turn over the evidence of their coercion of Ms. Barthelme, then trial counsel were constitutionally ineffective for failing to obtain the complaint regarding Ms. Barthelme's care by Dr. Mann to determine whether her testimony was consistent with the averments of the ASMB complaint and whether her testimony had been coerced by the prosecution.

*Doc. No. 395 at 47 (emphasis in original)*.  Mann does not explain or elaborate about this allegation anywhere else in any of his numerous, subsequent filings. Unfortunately, the United States once again has no idea what Mann is complaining about.  Only this time, the United States doesn't even know how or where to begin to even attempt to respond.  However, the heart of the complaint seems to be that trial counsel failed "to obtain the complaint regarding Ms. Barthelme's care by Dr. Mann," but the record clearly shows they *did* obtain those records from the ASMB.

175

Whether or not "her testimony was consistent with the averments of the ASMB complaint" does not matter (but, by the way, her testimony was consistent with Jeanice's complaint to the board). The relevance of the new complaint was *not* whether the allegations about Mann continuing to provide prescription pills to Rita (despite the fact he had lost his DEA permit) were true, but just the fact that a new complaint had been filed and a new inquiry into Mann's medical practices had begun. And no amount of investigation by Mann's attorneys could have changed the fact that a new investigation of Mann had begun.

In summary, Mann's attorneys had Mann's ASMB file, including documents related to the new complaint made by Jeanice. They met with Rita several times and interviewed her. They also had various public/court records, police reports, and medical records that they used to effectively cross examine Jeanice and Rita. They also used a record from Mann's ASMB file to show that Mann did not receive official notification from the board about the new investigation until after the West Memphis bombing. Based on these facts, Mann's attorneys' performance was not constitutionally deficient and Mann has not met his burden under *Strickland*. Ground 15 must fail.

### 3. No Evidentiary Hearing is Required on Ground 15.

Mann is not entitled to a hearing on Ground 15 because his allegations about the United States failing to turn over ASMB records are both conclusory and

176

refuted by the record.  The same holds true for Mann's claim that the United States failed to disclose evidence of its coercion of Rita Barthelme.  Additionally, even if Mann's factual allegations of ineffective assistance of counsel are accepted as true, Mann still is not entitled to relief because he has not demonstrated deficient performance or prejudice under *Strickland.*

**Q.  Ground 16:**  In his sixteenth claim, Mann asserts that his trial counsel were ineffective because they "failed to pay attention to information and ideas from Dr. Mann without investigating or even considering them, whether or not such consideration or investigation would have yielded the conclusion in every instance that anything should have been done in addition to or differently from what trial counsel did do.  Dr. Mann provided information to counsel and requested counsel to act on it in respect to several of the foregoing grounds for relief, including the pivotal failure to obtain expert evidence of the planting of the 40-mm. grenades near his home.  As a result of the disparagement of his attempt to communicate with counsel, there was a breakdown of the attorney-client relationship on which the legal system relies for the reliable determination of guilt and punishment.  As a result, the police-prosecution team's case was not subjected to the crucible of meaningful adversarial testing on which the Bill of Rights and our legal culture generally relies for the protection of the rights of everyone in this

Country whether they arrived last week or their ancestors came over on the Mayflower." *Doc. No. 395 at 48.*

In his § 2255 motion (timely filed on October 20 and 21, 2014), Mann asserts that his trial counsel "failed to pay attention to information and ideas from Dr. Mann without investigating or even considering them," and he gives two examples of this alleged "breakdown" in the attorney-client relationship:   (1) failing to hire a hole expert (to contest Mann's guilt on Count 3 for possessing the 98 buried 40mm grenades near his residence); and (2) failing to get "more official" transcripts of PCR/Exhibit 10. *Doc. No. 395 at 47-49.*  Since that time, Mann has filed thirty-four (34) declarations in which he details other alleged "disparagements of his attempt to communicate with counsel."[77]   Each one of those declarations were filed well-past the one-year limitation for filing a claim for post-conviction

---

[77] Mann filed many other declarations outside of the one-year limitations period that are completely unrelated not only to Ground 16, but also to any of the other original twenty grounds raised in his § 2255 motion. *See, e.g., Doc. No. 425-35 (Mann wanted to testify if "the tide turned against [him] and all hope was lost"); Doc. No. 450-4 (videotapes of Shelly Green were allegedly taken by ATF agents); Doc. No. 450-11 (pretrial solitary confinement); Doc. No. 450-12 (alleged use of Mann as "live bait" during jail exercise).*  The United States objects to any consideration of these claims because they are time-barred and do not relate back to any of his timely-filed claims.

relief under § 2255. *See 28 U.S.C. 2255(f)*. Under these circumstances, the declarations are untimely unless they "relate back" to a claim presented in Mann's timely-filed § 2255 motion. *See Federal Rule of Civil Procedure 15(c)(2)*[78]; *United States v. Hernandez*, 436 U.S. 851, 856-58 (8th Cir. 2006), *cert. denied*, 547 U.S. 1172 (2006). Claims relate back to the original motion when they assert a claim that "[arises] out of the same conduct, transaction, or occurrence... set out in the original" motion. *See Fed.R.Civ.Proc. 15(c)(1)(B)*. To arise out of the same conduct, transaction, or occurrence, the claims must be "tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005). It is not enough that the original motion and the new claim both allege ineffective assistance of counsel during the same trial, conviction, or sentence. *Mayle*, 545 U.S. at 664. Rather, the allegations of ineffective assistance of counsel "must be of the same 'time and type' as those in the original motion, such that they arise from the same core set of operative facts." *Dodd v. United States*, 614, F.3d 512, 512 (8th Cir. 2010)(quoting *Hernandez*, 436 F.3d at 857).

---

[78] Although Mann has not formally filed the declarations as part of an amended § 2255 motion, the declarations in effect seek to amend Mann's § 2255 motion by adding new claims of ineffective assistance of counsel and should be treated as an amendment.

Thus, the issue is whether Ground 16 is a single claim of ineffective assistance of counsel (failure to pay attention to information and ideas from Mann without investigating or even considering them) that encompasses all of the relevant declarations filed by Mann, regardless of when the declarations were filed; or whether the relevant, untimely declarations filed by Mann are separate, individual claims of effective assistance of counsel that must relate back to one of the original claims filed in Mann's § 2255 motion in order to be considered filed timely.  In an abundance of caution, the United States will address Ground 16 as both a series of individual claims of ineffective assistance of counsel and also as a single claim of ineffective assistance of counsel.  Either way, Ground 16 must fail.

### 1. *Ground 16 as a Series of Individual Claims of Ineffective Assistance of Counsel.*

Mann repeatedly attempts to characterize Ground 16 as a single complaint of effective assistance of counsel supported by Mann's various declarations as examples of the breakdown in communication between Mann and his trial attorneys.  However, practically and legally speaking, Mann's declarations should be treated for what they really are:   separate claims of ineffective assistance counsel cleverly camouflaged as one purported claim of ineffective assistance of counsel.

Although the declarations Mann has submitted in support of Ground 16 are related in the *very* broad sense that they pertain to instances where Mann claims he made a request or suggestion to his counsel that was not followed or complied with, these instances are not of the "same time and type" required by Federal Rule of Civil Procedure 15(c)(1)(B). For example, failing to object to evidence is not the same type of claim as failing to call a witness, or failing to make a particular argument to the jury, or failing to hire a particular expert. *See e.g. Mandacina v. United States,* 328 F.3d 995, 1002 (8th Cir. 2003)(failure to discover exculpatory evidence is not the same type of claim as failure to investigate exculpatory evidence). Similarly, each "example" given by Mann arises from its own set of facts (i.e., *not* the same core set of operative facts) and, therefore, is its own, separate instance of "failure to communicate" and should be treated as such. S*ee e.g. Hernandez,* 436 F.3d at 858 (claims about the admission of evidence and claims about cross examination of witnesses are not the same time and type, nor do they arise from the same set of operative facts). Otherwise, the approach used by Mann would allow him to add "new examples" of the alleged breakdown of communication with his trial counsel *ad nauseum* and *ad infinitem* – which is exactly what Mann has done.[79]  Allowing such a practice would permit any

---

[79] As late as June 30, 2015 – more than eight months after the statute of limitations

petitioner in a § 2255 motion to dissect every single communication with his or her counsel – from the inception of the attorney-client relationship all the way through trial, sentencing, and most post-conviction matters – and then assert that the claim relates back to a timely-filed claim of "failure to communicate." The danger is that just about any claim for relief under § 2255 can easily be converted into a claim of "failure to communicate" with almost no effort. For example, Mann's declarations about failing to call various witnesses,[80] failing to file a motion based upon "newly discovered evidence" (*Doc. No. 421-18*), failing to produce or elicit certain evidence,[81] failing to object to certain evidence or testimony,[82] failing to hire a

---

has run – Mann attempted to add Ground 12 as another "example" of the alleged breakdown of the attorney-client relationship asserted in Ground 16.  *See Doc. No. 469 at 37, n.46.*

[80] *Doc. No. 421-11, re: Agent Newman; Doc. No. 421-15, re: Raman Bansal; Doc. No. 421-17, re: Unnamed ATF Agents who interviewed Lloyd Hahn in 2001; Doc. No. 421-21, re: Jeanice Brown; Doc. No.421-22, re: Terry Sanders.*

[81] *Doc. No.421-14, re: "prayer" found in Sangeeta Mann's shoe; Doc. No.421-16, re: jail calls; Doc. Nos. 421-23 & 24, re: jail videos; Doc. No. 429-29, re: unspecified information from Rita Barthelme, Phil Barthelme, Lloyd Hahn, Jeff Kimbrough, Velma Gales, Mark Rinke, and Ryan Kimbell; Doc. No. 421-32, re: algae on tire; Doc. No. 450-5, re: machine gun belonging to Col. Frank; Doc. No. 450-13, re: newspaper clippings found in Mann's residence.*

plastic expert (*Doc. No. 421-26*), failing to hire an expert to assess the damage to Dr. Pierce's SUV (*Doc. No. 421-25*), failing to make certain arguments to the jury,[83] and failing to rectify malfunctioning courtroom equipment (*Doc. No. 421-33*) would *all* have been time-barred, but now, according to Mann, they have had new life breathed into them simply because Mann has camouflaged the claims as "a failure to communicate" that relate back to a timely-filed, catch-all claim like Ground 16.  This practice, however, effectively renders the one-year statute of limitations useless, which is the very evil that the Supreme Court sought to avoid in *Mayle*.  *See Mayle*, 545 U.S. at 662 ("Congress enacted [the one-year statute of limitations for § 2255 motions] to advance the finality of criminal convictions... If claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, [the] limitation period would have slim significance.").  In *Mayle*, the Supreme Court rejected the defendant's argument that "same conduct, transaction, or occurrence" in Federal Rule of Civil Procedure 15(c)(1)(B) means "the same trial, conviction,

---

[82] *Doc. No.421-30, re: Mann allegedly purchasing medical certifications off of the internet; Doc. No. 421-31, re: pictures of Mann's garage and cars; Doc. No.421-34, re: unspecified objections during trial.*

[83] *Doc. No. 421-27, re: "impossibility" of Velma Gale's testimony; Doc. No.421-28, re: testimony of three witnesses who saw the tire outside of Dr. Pierce's residence.*

or sentence" because such a definition would essentially render the one-year statute of limitations useless.  Similarly, Mann is, in effect, asking the Court to define "same conduct, transaction, or occurrence" to include "the life of a defendant's attorney-client relationship," which is essentially the same as, if not broader than, the definition rejected by the Supreme Court in *Mayles*.

Additionally, it is nearly impossible – not to mention completely speculative – to determine the prejudicial effect, if any, of the purported breakdowns in communication asserted in Mann's declarations.  Not even Mann is sure whether his complaints in Ground 16 "would have yielded the conclusion in every instance that anything should have been done in addition to or differently from what trial counsel did do." *Doc. No. 395 at 48.*  Nonetheless, Mann wants this Court to "consider the errors of counsel in the context of the entire proceeding" (*Doc. No. 395 at 49)* and to "consider the totality of prejudice from all of the instances in which it occurred." *Doc. No. 395 at 49.*  This approach, however, as discussed in the United States' response to Ground 19, *infra,* has been repeatedly rejected by the Eighth Circuit.  *See, e.g., Girtman v. Lockhart,* 942 F.2d 468, 475 (8th Cir. 1991)(expressly rejecting the petitioner's cumulativeness claim in light of post-*Strickland* circuit precedent by holding that "'cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own.'"(quoting *Scott v. Jones,* 915 F.2d 1188, 1191 (8th Cir.1990), *cert. denied* 499 U.S. 978, 111 S.Ct.

1626, 113 L.Ed.2d 723 (1991)).  Thus, once again, Mann's declarations should be treated as separate claims of ineffective assistance of counsel.

To the extent that Ground 16 is a series of individual claims of ineffective assistance of counsel that must be analyzed separately, only two of the claims were timely filed in Mann's § 2255 Motion:  (1) failing to hire a hole expert (to contest Mann's guilt on Count 3 for possessing the 98 buried 40mm grenades near his residence); and (2) failing to get "more official" transcripts of PCR/Exhibit 10. *Doc. No. 395 at 47-49.*  The remaining claims of ineffective assistance that are purported "examples" of Ground 16 were untimely filed in declarations by Mann in his Verified Memorandum in Support of Motion for Evidentiary Hearing filed on February 25, 2015 *(Doc. No. 421, PCR Exhibits 28-54);* in his Supplemental Offer of Proof, filed on April 29, 2015 *(Doc. No. 421, PCR Exhibits 83-92);* and in his Declaration in Support of Motions, filed on May 5, 2015 *(Doc. No. 452, PCR Exhibit 93).*  Of all of the declarations filed in support of Ground 16 after October 21, 2014, the following declarations do *not* relate back to Mann's timely filed § 2255 Motion and are, therefore, time-barred:[84]

---

[84] Although time-barred, the United States does not concede the factual averments made by Mann (or any conclusions drawn therefrom) in each of these declarations. Mann's trial attorneys have responded to these declarations in their affidavits and the United States hereby incorporates those responses. *R. Ex. 16 at Paras. E, O-V*

| Doc. No. | Dated Filed | PCR/Habeas Exhibit | Claim |
|---|---|---|---|
| 421-11 | 2/25/15 | 28 | Failure to get Agent Newman on witness stand |
| 421-14 | 2/25/15 | 31 | Failure to introduce "prayer" found in Sangeeta Mann's shoe into evidence |
| 421-15 | 2/25/15 | 32 | Failure to call Raman Bansal as a witness |
| 421-16 | 2/25/15 | 33 | Failure to get all of the recorded jail calls |
| 421-17 | 2/25/15 | 34 | Failure to subpoena unnamed ATF agents who interacted with Lloyd Hahn in 2001 |
| 421-18 | 2/25/15 | 35 | Failure to file motion based on "newly discovered evidence" |
| 421-21 | 2/25/15 | 38 | Failure to call or recall Jeanice Brown as a witness |
| 421-22 | 2/25/15 | 39 | Failure to subpoena notes of inmate Terry Sanders and failure to call Sanders as a witness |
| 421-23 | 2/25/15 | 40 | Failure to get surveillance tapes and witnesses from jail |
| 421-24 | 2/25/15 | 41 | Failure to get surveillance tapes and witness from holding cell |
| 421-25 | 2/25/15 | 42 | Failure to hire expert to assess damage to Pierce's SUV |
| 421-26 | 2/25/15 | 43 | Failure to hire expert on plastic bags and sheeting |
| 421-27 | 2/25/15 | 44 | Failure to address the "impossibility" of Velma Gale's testimony to the jury |
| 421-28 | 2/25/15 | 45 | Failure to address testimony of 3 witnesses who testified about the seeing the tire near Pierce's SUV |
| 421-29 | 2/25/15 | 46 | Ambiguities in testimony of 7 witnesses |

*(Aff. of Hendrix); R. Ex. 17 at Pp 15-18 (Aff. of Cassinelli); R. Ex. 18 at Paras. 5, 9-19 (Aff. of Lassiter).*

| 421-30 | 2/25/15 | 47 | Failure to object to testimony that Mann purchased his certifications off of the internet |
| 421-31 | 2/25/15 | 48 | Failure to object to repeated showing of pictures of Mann's garage/cars that were admitted into evidence |
| 421-32 | 2/25/15 | 49 | Failure to explain algae on tire to jury |
| 421-33 | 2/25/15 | 50 | Failure to rectify malfunctions of courtroom equipment |
| 421-34 | 2/25/15 | 51 | Failure to object to unspecified evidence |
| 421-35 | 2/25/15 | 52 | Mann wanted to testify if "the tide turned against [him] and all hope was lost" |
| 450-5 | 4/29/15 | 86 | Failure to get machine gun from Col. Matthews |
| 450-13 | 4/29/15 | 92 | Failure to clarify content of newspaper clippings seized during search of Mann's residence |

On the other hand, reading the law *very broadly*, it appears the following untimely declarations *may* relate back to a timely-raised claim asserted in Mann's § 2255 motion:

| Doc. No. | Date Filed | PCR/Habeas Exhibit | Claim | Relates Back to Ground Number |
|---|---|---|---|---|
| 421-12 | 2/25/15 | 29 | Failure to use Al Shareqi's recantation to challenge indictment | 4 |
| 421-13 | 2/25/15 | 30 | Failure to hire expert on Hindu religion | 6 |
| 421-19 | 2/25/15 | 36 | Failure to get records from ASMB to show coercion of Rita Barthelme | 15 |
| 421- | 2/25/15 | 37 | Failure to use Rita's card to | 15 |

187

| 20 | | | show her coercion | |
| 421-36 | 2/25/15 | 53 | Failure to object to picture containing flags | 17 |
| 421-37 | 2/25/15 | 54 | Failure to object to recording containing Mann's use of "derogatory gay term" | 17 |
| 450-2 | 4/29/15 | 83 | Failure to ask Rinke and Kimbell questions to show they were lying | 20 |
| 450-3 | 4/29/15 | 84 | Failure to hire hole expert | 2, 20 |
| 450-6 | 4/29/15 | 87 | Failure to get records from ASMB to show coercion of Rita Barthelme | 15 |
| 452-1 | 5/5/15 | 93 | Failure to call witnesses to rebut Kimbrough | 14 |

The United States has already responded to all of the declarations listed above that appear to relate back to a timely-filed claim of ineffective assistance of counsel and hereby incorporates its earlier responses.

Thus, the only remaining issue is whether the original, timely-filed, two "examples" of the alleged "breakdown" in the attorney-client relationship have any merit. *See Doc. No. 395 at 47-49.* The United States has responded to the first "example" (failing to hire a hole expert to contest Mann's guilt on Count 3 for possessing the 98 buried 40mm grenades near his residence) earlier in Grounds 2 and 20 and hereby incorporates those responses. As for the second "example" (failing to get "more official" transcripts of PCR/Exhibit 10), no version of the

188

transcripts of PCR/Exhibit 10 was ever introduced at trial, and the transcripts are not related to any evidence presented at trial. There was no need for "more official transcripts" because, as discussed in Grounds 2 and 8, Mann's attorneys made the strategic decision not to present evidence pertaining to the matters raised in the transcripts (e.g., law enforcement's use of informants to investigate Mann for illegal prescription practices and illegal firearms transactions). *See R. Ex. 16 at Para 3A (Aff. of Hendrix); R. Ex. 17 at Pp. 1-3 (Aff. of Cassinelli).* Because of this strategic decision (i.e., not a breakdown in the attorney-client relationship), "more official transcripts" were not needed because they were not going to be used at trial. Additionally, Mann cannot and has not shown how "more official transcripts" would have affected the outcome of the trial.

Thus, for the reasons stated above, Ground 16, when analyzed as a series of individual claims of ineffective assistance of counsel, must fail.

2. *Ground 16 as a Single Claim of Ineffective Assistance of Counsel*

To the extent that Ground 16 is a single claim of ineffective assistance of counsel (based upon trial counsel failing "to pay attention to information and ideas from Dr. Mann without investigating or even considering them"), Mann has not met his burden under *Strickland*.

189

### a. Trial Counsel were Not Constitutionally Deficient

According to Mann's trial counsel, there was no breakdown in communications with Mann or in their attorney-client relationship. *R. Ex. 16 at Pp. 10-11 (Aff. of Hendrix); R. Ex. 17 at Pp. 15-18 (Aff. of Cassinelli); R. Ex. 18 at Para. 20 (Aff. of Lassiter).* Mann had four lawyers, two investigators, and a civil attorney who were almost in constant contact with him. *R. Ex. 16 at 10 (Aff. of Hendrix).* They talked to him in person, on the phone, and by letter. According to Hendrix, "We entertained all of his ideas. Like most clients, some of his ideas were good, some were bad. But, we paid attention to them all." *R. Ex. 16 at 10 (Aff. of Hendrix).* Cassinelli provides greater detail about their communications with Mann:

> Mann sent many, many letters to us, both to us directly and through Drake Mann and Sue Mann. Typically, Mr. Hendrix and/or Drake would review them, and then we would discuss them. Usually, we would discuss issues Mann raised with him and explain our opinions regarding them; if the attorneys had differing opinions, we would share that with him as well. Usually, we, including Mann, would reach agreement on a particular issue. At times, Mann would agree and then later raise an issue we had previously addressed and decided, and we would then recount our previous discussions and decisions. I recall that Mann most often deferred to our best professional judgment; I recall discussing that he, as a physician, understood and appreciated that we, as lawyers, had more informed knowledge and experience to make such decisions.
>
> We did not disparage Mann's input about matters to which he was a witness. I cannot think of any input about matters Mann witnessed that we disregarded. We did not disparage Mann's ideas in any

respect. In fact, we found Mann to be a very intelligent person and
very able to assist us in his defense. We valued his ideas, thoughts,
and opinions and addressed them regularly. Between Drake Mann,
Mr. Hendrix, Mr. Lassiter, and myself, we visited Mann frequently
and communicated in writing regularly. Mann would send word
through Sue or by letter if he needed to meet with us about something,
and we would make arrangements and visit him.

*R. Ex. 17 at 15 (Aff. of Cassinelli).* Mann was even positioned at trial so he

could easily communicate with his wife and all of the attorneys. They met

during breaks and fully discussed all of the developments. *R. Ex. 16 at 10-*

*11 (Aff. of Hendrix).*

Simply because Mann's trial counsel did not agree with or respond to

Mann's every idea and request, does not mean their performance was

constitutionally deficient. The fundamental choices that a defendant always has

the right to make regarding his or her case are the decisions whether to plead

guilty, waive a jury, testify in his or her own behalf, or take an appeal. *Thomas v.*

*United States*, 737 F.3d 1202, 1207-08 (8th Cir. 2013). The remaining decisions

are in the hands of counsel. *United States v. Boyd*, 86 F.3d 719, 723 (7th Cir.

1996) (cited with approval in *Thomas*, 737 F.3d at 1208). As the Seventh Circuit

stated in *Boyd*:

It could hardly be otherwise, unless trials are to be indefinitely
extended as judges ask the defendant whether each decision (or
omission) meets with his pleasure. The process would be worse than
cumbersome. It would undermine the defendant's ability to entrust
decisions to a legally trained person. People charged with crime are

> by and large better off accepting the decisions of experienced trial
> lawyers than they would be making their own decisions; an amateur
> who receives professional advice is still an amateur. A patient can
> decide whether to undergo an operation, but once that decision has
> been taken the surgeon is in charge of implementation; so too with
> lawyers and trials. The defendant decides whether to go to trial and
> makes a few strategic decisions (such as whether to demand a jury)
> that shape the events, but the tactical choices rest with counsel.

*Id.* Cf. *Thomas*, 737 F.3d 1202 (even if counsel did not confer with client as to the decision not to move for dismissal of indictment on speedy trial grounds, this was a tactical decision which counsel could properly make without his client's input). Some of the ideas suggested by Mann were contrary to the strategy his attorneys chose to employ in order to fight the charges against him. Some of Mann's ideas were raised much too late (e.g., during trial) for anything to be done about them. Some of Mann's suggestions were just bad ideas, or they were not based on accurate information. Regardless of the reason Mann's suggestions or requests were not followed, the law does not require Mann's trial counsel to do everything that Mann suggests or proposes, nor should it. If even Mann is not sure whether his complaints in Ground 16 "would have yielded the conclusion in every instance that anything should have been done in addition to or differently from what trial counsel did do" (*Doc. No. 395 at 48)*, then how can he expect this Court to find that his trial counsel were deficient? They were not.

b. No Prejudice

Additionally, Mann has not demonstrated how any purported deficiency prejudiced him to the extent there is a reasonable probability that the results of his trial would have been different.   As stated earlier, one of the difficulties in establishing prejudice in Ground 16 is that Mann wants this Court to "consider the totality of prejudice from all of the instances in which it occurred," but that approach has been repeatedly rejected by the Eighth Circuit.   *See, e.g., Girtman v. Lockhart,* 942 F.2d 468, 475 (8th Cir. 1991)(expressly rejecting the petitioner's cumulativeness claim in light of post-*Strickland* circuit precedent by holding that "'cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own.'"(quoting *Scott v. Jones,* 915 F.2d 1188, 1191 (8th Cir.1990), *cert. denied* 499 U.S. 978, 111 S.Ct. 1626, 113 L.Ed.2d 723 (1991)).   However, whether taken individually or as a whole, Mann has not demonstrated, beyond speculation and conclusory statements, prejudice under *Strickland*.   Thus, even when analyzed as a single claim of ineffective assistance of counsel, Ground 16 must fail.

*3.  No Evidentiary Hearing is Required on Ground 16.*

Mann is not entitled to a hearing on Ground 16 because, even if the allegations are accepted as true, Mann still is not entitled to relief because he has not demonstrated deficient performance or prejudice under *Strickland*.

**R. Ground 17**: In his seventeenth claim, Mann asserts that his trial counsel were ineffective because they "failed to seek protective orders against displaying to or playing for the jury gratuitous prejudicial matter, or seeking appropriate relief even after the fact… [which] allowed the police-prosecution team to create the false impression that Dr. Mann was predisposed to violence, disloyal to our country, and hateful to substantial proportions of its citizens." *Doc. No. 395 at 50.*

*1. Trial Counsel were Not Ineffective under Strickland.*

Among the proof at trial were dozens upon dozens of photos of the inside and outside of Mann's house. *See Tr. Ex. 100a – 100ggggg.* ATF Agent Tony McCutcheon, who interviewed Mann at his home the day of the Pierce bombing, discussed some of these photos. *TT at 883.* McCutcheon testified that, at the close of the Mann interview, Mann offered him an opportunity to come look at Mann's guns in the safe room in his basement. *TT at 883.* McCutcheon detailed for the jury his journey from the kitchen, where he interviewed Mann, to the safe room located on the bottom floor of Mann's house, adjacent to Mann's exercise room. *TT at 884.* On the floor in Mann's exercise room was a .50 caliber machine gun sitting on a tripod on the floor.[85] The United States accompanied McCutcheon's testimony with photos that tracked his progress through the house to the gun room.

---

[85] Mann says this weapon was never shown at trial. *Doc. No. 421-36.* He is mistaken. *Gov. Ex. 100-NN.*

As part of these pictures, the United States offered and admitted a single photo of Mann's exercise room along with another photo of the machine gun on the floor. *Govt. Exs. 100-MM & 100-NN.*

Mann says his counsel should have objected to the exercise-room photo because it showed pictures of Mann's memorabilia: flags were strewn about the walls, including flags of southern states, a United States flag, various Confederate flags, and what appears to be a Nazi flag – barely visible in the corner of the room. *Gov. Ex. 100-MM.* Mann's counsel's handling of this photo was neither deficient, nor did it prejudice his case. Accordingly, Ground 17 fails.

a. <u>Trial Counsel's Performance was Not Constitutionally Deficient.</u>

Upon information and belief, during six weeks of trial, the exercise-room photo, *Gov. Ex. 100-MM*, appeared four times—each occasion brief and purposeful. The photo first appeared during agent McCutcheon's identification of the exercise room, and was quickly followed by the picture of the machine gun on the floor. *TT at 884.* The exercise room photo was displayed for seconds at most. The next display involved agent McCutcheon pointing out the entrance to Mann's gun room. *TT at 885-886.* Upon information and belief, the exhibit was published for no more than a few seconds. No one ever mentioned the flags.

The exercise-room photo briefly reappears during the United States' examination of Jeff Kimbrough, the alarm-company technician who saw grenade

launchers and 40mm grenades in Mann's house. Through the photo, Kimbrough identified Mann's gun safe room, *TT at 2053*, and a crawlspace adjacent to the exercise room, where Kimbrough saw more boxes and bullets. *TT at 2055*. Once again, no one drew attention to the flags during the cursory display.

There was no reason to object to the flag picture. *R. Ex. 17 at 13 (Aff. of Cassinelli)*. No juror could have gleaned from the flags the obviously erroneous conclusion that Randeep Mann, of Indian descent, was a white supremacist or Nazi sympathizer. Counsel considered this. *R. Ex. 16 at 11 (Aff. of Hendrix)*. The flags, displayed alongside Mann's collection of exotic and historic firearms, appeared to be just another part of Mann's collection, not the justification for it. No one alleged or insinuated anything otherwise. Though, one can appreciate the disharmony of Mann claiming he displayed the flags to give intruders the false impression that he was sympathetic to their respective causes, while simultaneously grieving that a juror might have gathered that same false impression[86]. *Doc. No. 408 at 68*.

---

[86] One of Mann's counsel was actively involved in the *Lee* and *Kehoe* cases, which Mann cites as his motivation for his flag collection. Another is quite familiar with the facts of the case. Counsel do not remember Mann ever presenting this reasoning for hanging the flags. *R. ex. 17 at 14 (Aff. of Cassinelli); R. Ex. 18 at 5 (Aff. of Lassiter)*.

Mann acknowledges that the failure to object to the picture was a matter of trial strategy aimed at minimizing attention to the otherwise nominal detail that was the exercise-room photo. *Compare No. 421-36 and No. 408 at 68.* Counsel agree. *R. Ex. 16 at 11 (Aff. of Hendrix); R. Ex. 17 at 13 (Aff. of Cassinelli).* In any event, it was one of hundreds of exhibits in a marathon trial. Counsel acknowledge that the picture was unquestionably relevant. *R. Ex. 16 at 11 (Aff. of Hendrix).* Objecting to it had no strategic purpose. Counsel also remember discussing the pictures with the United States, either on or off the record, and agreeing to limit both the number and the discussion around the photos. *R. Ex. 16 at 13-14.* And as a reasonable decision of strategy—undeniably more reasonable than trying to explain Mann's creative rationale for the flags' presence—it is protected from Mann's post-game quarterbacking. *See Francis v. Miller*, 557 F.3d 894, 900-01 (8th Cir. 2009).

b.    Counsel's Performance did Not Prejudice Mann's Case.

Even if the failure to object or move for a protective order fell below a constitutionally acceptable level of representation, there was no prejudice in the brief displays of the solitary picture. The discussion surrounding exhibit 100-MM lasted perhaps a few seconds. *TT 884.* It was never "demagogue[d]," as Mann's hyperbole suggests. *Doc. No. 408 at 69.* Counsel shares this perception. *R. Ex. 17*

*at 13-14 (Aff. of Cassinelli).*   The Government did not mention the flags, nor did any witness, nor did defense counsel.

Plus, there is no demonstrated reason to believe that any member of the jury convicted Mann on the belief that he was bigoted or racist or sympathetic to a particular ideology.   Alternatively, if Mann's counsel had successfully moved to keep the picture out of evidence, there is not any reason to believe that the trial would have ended differently.   The exercise-room picture was hardly a linchpin of the United States' case.   Mann's claim of prejudice on this ground is, once again, nothing but speculation; that is insufficient to top *Strickland*'s high hurdle. Accordingly, Ground 17 should be denied.

### 2. *Mann's Counsel's Performance was Not Constitutionally Deficient for Not Objecting to Mann's Jail Call.*

At trial, the United States introduced a series of phone calls and transcripts of calls between Mann and his wife, Sue.   These calls were introduced to establish a number of points, including Sue's removal of items from Mann's clinic prior to his detention hearing and other proceedings.   In one of these calls, Mann acknowledges that a number of his guns were not properly registered, and that they should have been.   *Gov. Ex. 145-A &145-B.*   Mann also alludes to his reliance on an ATF agent's statement that his gun registration was above board.   *Id.*   In this same phone call, Mann, while speaking to his wife, refers to himself using an

impolitic term for a homosexual.   On information and belief, this brief recording was played twice during the six weeks of Mann's trial.  *TT at 1676, 1687-88.*

a.  <u>Trial Counsel's Performance was Not Deficient.</u>

The phone call, *Gov. Ex. 145-A &145-B,* was relevant; in it, Mann admits that three of his guns are unregistered.   Despite the (barely intelligible) use of a pejorative, the call has strong evidentiary value, and there was no basis to move to strike it or to seek a protective order prohibiting its admission.   The relevant portion of the call is this:

SM:   Love you honey.  Love you.  Okay.

RM:   What did you do? What did you do?

SM:   Nothing, just hang in there.

RM:   You married a fag.  They told me to get out.  I never could get out.  I should have got out.

SM:   It's alright.  It's okay.

RM:   God dammit.  Three of my guns have fucking problems, man.  I was supposed to register two of them.  I didn't.

SM:   They're not or they're…

RM:   No.  They, it, they would, the date I bought them fine.  There was a law later on that had registered them.  I called ATF and they said whenever we sell it.

SM:   Oh yeah, yeah.  You told me.  You told me.

*Gov. Ex. 145-A &145-B.*

Context makes clear why the United States introduced the call and transcript: it contained a series of admissions by Mann about his inability to get out of the exotic gun business, and immediately preceded another admission regarding Mann's failure to register two of his guns. Counsel had no grounds to exclude the call; an in-trial objection would only have called greater attention to it. No one drew any special attention to the word or attempted to paint Mann as a bigot.

The call was also crucial to Mann's defense on the regulatory counts. His counsel alluded to the call during closing arguments. *TT at 3306*. Mann argued that, based upon discussions he had with ATF, he relied upon ATF's assurances that his registration of the charged guns was proper. Thus, he argued, the United States essentially entrapped Mann into unlawfully possessing an unregistered gun. *Id; Doc. No. 165 at 28*. Mann was acquitted on Count 4, which charged Mann's illegal possession of a shotgun—the entrapment by estoppel defense was likely the basis of the jury's not guilty verdict on this count. Excluding the recording would have been strategically counterproductive; Mann's counsel would have removed a key piece of the evidence necessary to support what became a successful line of defense on the ONLY account on which the jury acquitted him.

### b.   Counsel's Performance did Not Prejudice Mann's Case.

Counsel's failure to object to or limit the use of the recording did not unfairly prejudice Mann's case. Mann can offer nothing but a conclusory

speculation that the foreman of the jury was homosexual, or that he was offended by the term. More speculative, though, is Mann's conclusion that this juror, unlike his eleven compatriots, might have chosen to convict Mann not on the weeks of evidence against Mann, but was instead swayed by a single, brief, contextually harmless but possibly offensive noun. There is nothing in the record to support such a leap. To the extent Mann believes other telephone calls may have explained the reason for his using the word "fag," *No. 421-37 at par. 4*, Mann has not identified any of these calls, and the Government knows of no such recordings. Counsel's performance was neither deficient, nor did any alleged deficiency prejudice Mann's case. Accordingly, Ground 17 should be denied.

### 3. No Hearing is Necessary on Ground 17.

Mann is clearly entitled to no relief on Ground 17. He greatly exaggerates both the use and the effect of the exercise-room photo and the phone call in which he admits to his unlawful possession of unregistered firearms. The record makes clear that counsel affirmatively considered the use and presentation of these two pieces of evidence. Nor can Mann prove that introduction of either of these items impermissibly prejudiced his case. No development or testimony regarding this evidence is merited. Accordingly, Mann's request for a hearing as to Count 17 should be denied.

**S. Ground 18:** In his eighteenth claim, Mann asserts that the "prosecution presented evidence from which the jury could have concluded that Dr. Pierce's clinic suffered a gross loss of income in 2009 compared with what it made in 2008, without attempting to show that it suffered a net loss over the same period, and trial counsel failed to preserve and explain their disagreement with the police-prosecution accountant's conclusions or to present expert evidence to counter her testimony. These acts and omissions were the deprivation of his rights to due process of law under the Fifth Amendment and the effective assistance of counsel under the Sixth Amendment, respectively." *Doc. No. 395 at 51.*

At trial, the United States proved that Mann's actions damaged Pierce, his clinic, his SUV, and thus affected interstate commerce. As part of this evidence, the United States called Dr. Pierce's accountant, Pam Falkner. She testified about the losses in prospective income suffered by Pierce and his clinic as a result of the bombing. *TT at 2471-77.* Mann now says, among other things, that his trial counsel didn't do enough to challenge Falkner's testimony or the charts she compiled. Mann's arguments on this point wander about from alleged insufficiency of the evidence to ineffective assistance to prosecutorial misconduct. None of the myriad arguments are availing. Some are procedurally defaulted. The rest fail on the merits for one reason or another.

### 1. The Government Presented Sufficient Evidence on the Bombing Counts.

Mann's first due-process argument looks like a redux of his sufficiency-of-the-evidence arguments on Count 1 made on direct appeal. Specifically, Mann says the United States failed to prove the bombing had an effect on interstate commerce. *Doc. No. 395 at 51.* "Generally, an alleged insufficiency of the evidence is not a ground for relief under § 2255." *United States v. Johnson*, 582, F.2d 1186, 1188 (8th Cir. 1978); *United States v. Gaus*, 751 F.2d 1506 (8th Cir. 1985). In Mann's case, the Eighth Circuit Court of Appeals affirmed the jury's verdict on Count 1, finding there was sufficient evidence that Dr. Pierce's clinic was engaged in interstate commerce and the bombing subsequently affected the business. 701 F.3d at 294-304. Even if this were the proper vehicle to yet again attack the sufficiency of the evidence regarding the bombing, Mann presents no new evidence or reasons to disturb the jury's finding.

To secure a conviction on Count 1, which charged Mann with use or conspiracy to use a weapon of mass destruction against a person or property, the Government had to prove beyond a reasonable doubt that 1) Mann used a weapon of mass destruction without lawful authority; 2) that he knowingly did so against a person or property; and, 3) that the offense affected interstate commerce. *Doc. No. 165 at 15.* Mann says the third prong was not met. The Court of Appeals reasoned that one manner of satisfying this interstate-nexus requirement would be a showing

that a violation of the statute [resulted] in the depletion of assets—*including lost business opportunities*—of a business operating in interstate commerce." 701 F.3d at 295 (emphasis added).

The United States proved, beyond a reasonable doubt, that Dr. Pierce's clinic lost assets, including lost business opportunities.  Pam Falkner testified about the clinic's lost profits.   Along with Falkner's testimony, the United States introduced a chart of data regarding Dr. Pierce's clinics gross income, expenses, and net income.  *Gov. Ex. 204A.*   Falkner testified that, in 2009, the year of the bombing, Dr. Pierce's clinic suffered a decrease in gross receipts of $269,343.00 or 24.53%. Total earnings decreased $155,695.00—a drop of 28.81%.  *TT at 2475.*

Mann conjectures that the math does not work out because, despite the decline in gross receipts, the clinic's expenses should have been lower in 2009 because Dr. Pierce was not working.  *Doc. No. 395 at 51.*  So, he implies, if Dr. Pierce was not being paid,[87]  net profits must have been higher.  Mann is right that Dr. Peeples, another doctor who covered at the clinic part time for Dr. Pierce, was paid less than Dr. Pierce.  Mann is also right that unpaid volunteers leapt to Dr. Pierce's aid to help keep the clinic afloat.  Perhaps the United States' case would

---

[87] This is incorrect.  Dr. Pierce recorded $363,564.00 in income in 2009.

have been even stronger here had Dr. Pierce permitted his clinic to flounder and his patients to go untreated.

Otherwise, Mann fundamentally misunderstands the numbers. Dr. Pierce is the sole proprietor of a sole proprietorship. 701 F.3d at 296; *R. Ex. 34 (Aff. of Falkner)*. Dr. Pierce's income is driven by and equivalent to the clinic's net profits. *Id*. That is, Dr. Pierce's "salary" is determined after business expenses have been subtracted from gross receipts. *Id*. His "salary" is not itself a business expense—and thus does not affect net profits—as Mann argues. To beat a dead horse, Dr. Pierce's "salary" does not affect the bottom line—it *is* the bottom line. What the clinic makes after expenses, Dr. Pierce makes. This is demonstrated by the fact that the same numbers are reported as both the clinic's and Dr. Pierce's income, and why Pierce's lost wages coincide with the clinic's decrease in net profits.

Mann's argument fails because the clinic's profits *are not* dependent on Dr. Pierce's income. It's vice versa. Thus, the 2009 decrease in profits is a function of the receipts brought in and the cost of doing business. The clinic made far less money in February, March, April, May, June, July, and August of 2009. *See Gov't Ex. 4 to Restitution Hearing, attached as R. Ex. 35*. It did not cut other costs sufficiently to maintain its previous profit levels. This explains why, in 2009, the

clinic's net profit decreased $155,695.00. *Gov. Ex. 204A*. And likewise why Dr. Pierce made $155,695.00 less than the previous year.

If Mann is arguing that this loss of potential business and cashflow is insufficient to satisfy the nexus requirement, he is outright wrong. The 8th Circuit acknowledged that "lost business opportunities—of a business operating in interstate commerce satisfies the "affecting commerce" language of the statute warranting federal jurisdiction." 701 F.3d at 294-304; *see also Williams v. United States*, 308 F.3d at 838-39 (8th Cir. 2002). That point has been proven conclusively. If that rationale is not satisfactory: additionally, after the blast, Pierce's clinic closed for a few days. This alone, the 8th Circuit has hinted, is probably sufficient to satisfy the nexus requirement. 701 F.3d at 295; *see also United States v. Quigley*, 53 F.3d 909, 910 (8th Cir. 1995). Evidence of the clinic's closure was presented at trial. *TT at 2512*.

All the evidence of record supports the conclusion that the clinic suffered a loss of assets in the form of drastically reduced profits. This includes the report done for Mann's restitution hearing by accountant and economist Jay Marsh, *R. Ex. 36*. The Marsh report primarily challenges Faulkner's projection of Dr. Pierce's *future* lost earnings. It does point out what it believes to be a $21,202.75 discrepancy in Falkner's report of Pierce's 2008 net income. *R. Ex. 34*. At the restitution hearing, Falkner explained the discrepancy was a result of her use of

numbers from certain tax forms, whereas Marsh used numbers from certain financial reports from Falkner. *Doc. No. 293 at 31.* Marsh later acknowledged there was a valid reason for the slightly differing amounts. *Doc. No. 293 at 84.* But even for argument's sake crediting fully Marsh's numbers, Marsh acknowledges that Dr. Pierce's clinic, and thus Dr. Pierce personally, suffered a decrease in net profits exceeding $100,000.00. *No. 293 at 65.* Nothing beyond Mann's information and belief contradicts all the hard evidence that Pierce's clinic suffered a loss of assets in the year following the bombing. *No. 395 at 51.*

### 2. Falkner's Testimony was Not Misleading or Inaccurate.

Mann's other due-process claim in Ground 18—that Pam Falkner's testimony was inaccurate or misleading to the extent that it "predisposed the jury to convict in order that the otherwise horrific offense would not go unpunished at least as to someone," *No. 395 at 52,* is procedurally defaulted. Alternatively, there is no foundation to the claim and it should be dismissed on the merits; there is not a scrap of evidence that Falkner misled the jury.

### a. Mann's Due Process Argument is Procedurally Defaulted.

The misleading-evidence argument was not raised at trial or on direct appeal, and cannot be raised here unless Mann can first demonstrate both cause and actual prejudice, or that he is actually innocent. *Becht v. United States,* 403 F.3d 541, 545 (8th Cir. 2005). Mann presents no claim of actual innocence. He

could satisfy the cause and prejudice requirement with a showing that his trial and appellate counsel were ineffective. *Boysiewick v. Schriro,* 179 F.3d 616, 619 (8th Cir.1999).

To establish ineffective assistance of counsel, both as an independent claim and as cause and prejudice to excuse his procedural default, Mann must again meet both prongs of the *Strickland* test. *Becht v. United States*, 403 F.3d 541, 545 (8th Cir. 2005). Because Mann can prove neither, his due process claim is defaulted, and his corollary independent ineffective assistance claims should be denied.

   b. Mann's Counsel were Not Ineffective on the Bombing Counts.

Mann does not allege in Ground 18 that his counsel were ineffective on appeal. He argues that his trial counsel were ineffective regarding Count 1 by "fail[ing] to refute testimony and exhibits from which the prosecution argued that Dr. Pierce's clinic suffered a loss as a result of the incident in West Memphis with which Dr. Mann was charged with aiding and abetting." *Doc. No. 395 at 52.*[88]

---

[88] Mann also suggests that his counsel were ineffective in their representation regarding Count 2. *Doc. No. 395 at 53.* But he does not explain, either in his § 2255 motion or his brief in what regard his counsel's representation on Count 2 fell short. He avers that "[t]rial counsel had no strategic reason for failure to hold the prosecution to its burden of proof . . . on the jurisdiction element of subsection 844(i)[.]" *Doc. No. 395 at 53.* He gives no specifics about what counsel allegedly did wrong; there is mention of the nebulous "failure to consult with an

There is no evidence that Falkner's testimony or the chart that accompanied her testimony was inaccurate or misleading.  Counsel acknowledge there was no reason whatsoever to believe either that Falkner was misrepresenting the truth.  R. Ex. 17 at 15 *(Aff. of Cassinelli)*.  Nor was there any reason for counsel to believe that a bomb that successfully targeted the sole proprietor of a sole proprietorship would not negatively and significantly affect the clinic's business.  *Id*.  Hindsight has proved both preconceptions to be correct.  It is not even clear what parts of the testimony or chart Mann now believes were unclear or that he believes convinced a jury to convict him for some reason other than the six weeks of evidence against him.  Falkner's testimony was truthful; her use of charts was appropriate and consistent with the rules of evidence.  FED. R. EVID. 1006.  Plus, Mann hasn't offered anything beyond speculation that the failure to object to Falkner's chart might have affected his case.

The numbers Falkner entered into exhibit 204A were real, hard numbers derived from the Schedule C portion of Dr. Pierce's filed tax returns.  *R. Ex. 34*

---

accountant."  *Doc. No. 408 at 70*.  Pam Falkner did not testify regarding Count 2; it is unclear how an accountant would have aided Mann's defense here.  Nor does Mann say with specificity how his counsel's performance prejudiced the verdict on Count 2.  If Mann is again revisiting the sufficiency of the evidence here, the Court of Appeals addressed the point head on.  701 F.3d 274.

*(Aff. of Falkner)*. The United States gave trial counsel notice of the use of Falkner's charts and the basis for the data the chart set forth. *R. Ex. 37* . The United States also provided trial counsel an opportunity to review the returns and the other financial documents that underlie the charts. *Id.* Trial counsel is unsure at this point whether they came to look at the financial documents or not. *R. Ex. 17 at 14-15.* Whether or not counsel ever saw the financial documents underlying Falkner's charts, though, ultimately makes no difference. A review of the underlying information leads to a foregone conclusion—the numbers were accurate and representative of the financial information in Dr. Pierce's and the clinic's tax returns. *R. Ex. 34 at 2 (Aff. of Falkner).* There's no real chance that, had counsel sought to undermine the financial data regarding the clinic, that Mann would not have been found guilty. *Strickland*, 466 U.S. at 687–88.

The analogous due-process argument fails for the same reason. Beyond his allegation, there is no basis to believe that the United States or Falkner presented inaccurate or misleading evidence. Accordingly, Ground 18 fails.

### 3. *No Hearing is Necessary on Ground 18.*

Mann is clearly not entitled to relief on Ground 18, and thus merits no hearing. There is no evidence that Falkner's testimony was misleading or inaccurate, or that the United States offered inadequate proof on the effects of Mann's actions on interstate commerce. Some of Mann's allegations are both

conclusory and unsupported by the record.  Others are just too vague.  *See United States v. Robinson,* 64 F.3d 403, 405 (8th Cir.1995) (allegations of attorney coercion too vague and conclusory to warrant evidentiary hearing).  No hearing is needed to flesh out these claims.  Mann's motion for a hearing as to Ground 18 should be denied.  *Winters v. United States*, 716 F.3d 1098, 1

   **T.  Ground 19:**  In his nineteenth claim, Mann asserts that "in light of all the circumstances, the acts or omissions throughout this motion were outside the wide range of professionally competent assistance, with the effect that on balance Dr. Mann's case did not receive the adversarial testing the Fifth and Sixth Amendments require for the deprivation of life, liberty, and property of persons within the jurisdiction of the United States." *Doc. No. 395 at 54.*

   1.  *Ground 19 does Not State a Cognizable Claim.*

   The "cumulative error" claim asserted by Mann in this ground has been repeatedly rejected as a viable ground of relief by the Eighth Circuit.  *See Girtman v. Lockhart,* 942 F.2d 468, 475 (8th Cir.1991)(expressly rejecting the petitioner's cumulativeness claim in light of post-*Strickland* circuit precedent by holding that "'cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own.'"(quoting *Scott v. Jones,* 915 F.2d 1188, 1191 (8th Cir.1990), *cert. denied* 499 U.S. 978, 111 S.Ct. 1626, 113 L.Ed.2d 723 (1991)); see also *Middleton v. Roper,* 455 F.3d 838, 851 (8th Cir. 2006)("A habeas petitioner cannot

build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test."(quoting *Hall v. Luebbers*, 296 F.3d 685, 692 (8th Cir. 2002)); *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation." (citation omitted)).  Thus, Ground 19 must fail.

### 2. *No Evidentiary Hearing is Required on Ground 19.*

Mann is not entitled to a hearing on Ground 19 because even if his allegations are accepted as true, he is not entitled to relief as a matter of law.


WHEREFORE, for the many foregoing reasons, the United States respectfully requests that Petitioner's motion be denied without a hearing.

Respectfully submitted,

CHRISTOPHER R. THYER
United States Attorney

By: _____
MICHAEL GORDON
TX Bar No. 00795383
HUNTER BRIDGES
AR Bar No. 2012282
Assistant U.S. Attorneys
P.O. Box 1229
Little Rock, AR  72203
(501) 340-2600
michael.gordon@usdoj.gov
hunter.bridges@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 31, 2015, I filed the foregoing with the Clerk of Court and mailed by FedEx a copy of said filing to the attorney for the defendant:

John William Simon
7201 Delmar Blvd, Suite 201
St. Louis, Missouri 63130-4106

By: _____

MICHAEL GORDON
TX Bar No. 00795383
Assistant U.S. Attorney
P.O. Box 1229
Little Rock, AR  72203
(501) 340-2600
michael.gordon@usdoj.gov

IN THE CIRCUIT COURT OF POPE COUNTY, ARKANSAS

STATE OF ARKANSAS      }
                       }ss
COUNTY OF POPE         }

### AFFIDAVIT FOR SEARCH WARRANT

BEFORE the Honorable Gordon M. McCain, Judge of the Circuit Court of Pope County, Arkansas.

The undersigned being duly sworn deposes and states that she has reason to believe and in fact does believe that on the premises known as the RANDEEP MANN residence located at 313 Milky Way Lane in the City of London, County of Pope, State of Arkansas, there is now being concealed certain property, namely M203 rifle or other weapons capable of firing 40 millimeter grenades, silver duct tape, documentation to indicate ownership or other documents related to explosives, ammo pouches, olive drab bandoliers, black plastic or similar material, shovels or other digging tools, other explosives, or other similar ammo containers, which is evidence of the crime of Criminal Use of Prohibited Weapons, and Criminal Acts Involving Explosives, which is in violation of the laws of the State of Arkansas, to wit: Ark. Code Ann 5-72-104 a Class D Felony and 5-73-108 (e) a Class A misdemeanor.

The residence is located by traveling on SH 333 to Flatwood. Travel south on Flatwood approximately .4 miles then turn west on to Milky Way Lane. Travel approximately .3 miles on Milky Way Lane and the house is on the right. The house is described a red brick single family dwelling that faces east.

The facts establishing the grounds for issue of a search warrant are as follows:

My name is STACIE RHOADS and I am a Special Agent with the Arkansas State Police assigned to the Criminal Investigation Division, Company E. I have been employed with ASP for eleven years. In the course of my employment I have been involved with numerous investigations involving crimes against persons and property. I have also received numerous training hours relating to the investigation of such crimes. I served in the United States Marine Corps for six years and familiar with various small arms including M203 which fires a 40 millimeter grenade.

The following information was relayed to me by Investigator Jason Smith:

On March 3, 2009, at approximately 5:00 P.M., deputies with the Pope County Sheriff's Office were contacted by Mark Rinke and Ryan Kimble who had located a partially buried ammo canister that contained several rounds of ammunition. The area was located .1 mile on Galaxy Lane from its intersection with Milky Way Lane in London, AR. Prior to deputy's arrival, Rinke and Kimble extracted the ammo can from the ground. Inv Smith arrived and observed a green military type ammo can. The can

RESPONDENT
EXHIBIT
1

was secured with silver duct tape and was wrapped in a black plastic or similar type material.  Inside the can were numerous 40 Millimeter high explosive and practice projectile grenades.  The grenades were located inside standard drab green military pouches.  The ammo can was collected by INV Smith and was secured at the Pope County Sheriff's Office.

On March 4, 2009, I was at the Pope County Sheriff's Office and learned of the finding of the grenades and the location.  I knew this area to be in close proximity (approximately 600 feet) to the RANDEEP MANN residence which is located at 313 Milky Way Lane.  His residence is located at the intersection of Milky Way Lane and Galaxy Lane.

On February 4, 2009, I went to the MANN residence in relation to a separate investigation.  While at his residence, I observed numerous weapons of varying caliber.  I also saw a M203 which is capable of launching a 40 millimeter grenade like the ones found at the site approximately 600 feet from the MANN residence.

The affiant requests a warrant authorizing the search of the above premises for property, namely silver duct tape, documentation to indicate ownership or other documents related to explosives, ammo pouches, ammo bandoliers,  black plastic material, shovels or other digging tools, other explosives, or other similar ammo containers, which is evidence of the crime of Criminal Use of Prohibited Weapons, and Criminal Acts Involving Explosives, which is in violation of the laws of the State of Arkansas, to wit:  Ark. Code Ann 5-72-104 a Class D Felony and 5-73-108 (e) a Class A misdemeanor and that law enforcement be authorized to execute the warrant between the hours of 6 A.M. and 8 P.M.

Dated this _4_ day of _March_, 2009.

_____ #78
Special Agent STACIE RHOADS #78
Arkansas State Police

Sworn to before me and subscribed in my presence this _4_ day of _March_, 2009. @ 2:37 pm at Pope County Ct. Hosse, Russellville AR

_____
Judge

RESPONDENT
EXHIBIT
2



















RESPONDENT
EXHIBIT
3











































## AFFIDAVIT

I, David Oliver, do hereby swear and depose that the following facts are true and correct to the best of my knowledge:

1.    I, David Oliver, am a Special Agent with the Bureau of Alcohol, Tobacco Firearms & Explosives ("ATF"), United States Department of Justice, and have been so employed since April 1999.  Prior to this, I was employed as a police detective at the Middletown, Rhode Island, Police Department for approximately ten years.  I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy.  I am also a certified fire investigator.  I am currently assigned to the Little Rock Field Office.  As a result of my training and experience as an ATF Special Agent, I am familiar with federal criminal laws relating to firearms, explosives, controlled substances, arson, and violent crime.

2.    On March 4, 2009, the Pope County Sheriff's Office contacted ATF for assistance about some military ordinance that had been found the previous day (March 3, 2009), buried in a green, military canister near Galaxy Lane in London, AR, approximately 875 feet from Randeep MANN's residence.  PCSO Investigator Jason Smith was the first deputy to respond to the scene where the canister had been found.  He took pictures of the canister, its contents, and where it had been found.  Copies of those pictures have been submitted as Respondent's Exhibit 2 in the United States' response to Mann's § 2255 motion.

3.    I responded to the Pope County Sheriff's Office on March 4, 2009, and observed that the ordinances were marked "40mm HE, M406."  I know from my training and experience as an ATF agent that a 40mm HE, M406 is a military high explosive round that is designed to inflict personal casualties using a ground burst effect.  The round is designed to be fired from an M79 or M203 grenade launcher.  Arkansas State Police Bomb Technician William Buford (who

1

RESPONDENT
EXHIBIT
4

is also a retired ATF agent) counted the grenades and determined that there were ninety-eight 40mm HE, M406 rounds (grenades) and one M781 40mm practice type ammunition.

  4.  On March 4, 2009, Buford also took a series of photographs in the cul-de-sac at the end of Galaxy Lane in London, AR, where the buried canister containing the 40mm grenades was found. Copies of those photographs have been submitted as Respondent's Exhibit 3 in the United States' response to Mann's § 2255 motion.

  5.  I was the case agent for the investigation of the 98 buried 40mm grenades found near Mann's residence. To my knowledge, no evidence (including the 40mm grenades) was planted by law enforcement officers or any other witness in the case. Additionally, other than the examination conducted by ATF Explosives Enforcement Officer Stephen Shelley, no further testing was conducted on the 40mm grenades to determine if they were live grenades.

  6.  On July 22, 2010, during the trial of Randeep Mann, a former cellmate of Mann's, Hamis Alshareqi, confronted Steven Briscoe, a government witness, in the Pulaski County jail about testifying against Mann. Alsharqi then assaulted Briscoe with a metal showerhead wrapped up in a sock, causing injuries to Briscoe's head and mouth. Alshareqi was charged in a criminal complaint and then by a federal grand jury for the assault on Briscoe. I was the case agent on Al Shareqi's criminal prosecution. I did not, however, participate in any interviews with Al Shareqi about his potential cooperation in the prosecution of Mann.

  7.  In November of 2013, the Little Rock Field Office received information that Dan Carlton, AKA Kundan Mann, the son of Randeep Mann, was attempting to corruptly influence witnesses in the case of the United States v Randeep Mann et al. On November 20, 2013, other ATF agents and I interviewed Philip Barthelme, who had previously testified before the federal Grand Jury as well as at the trial of Randeep Mann and Sangeeta Mann. Barthelme stated that in

November of 2013, Dan Carlton asked him to write a letter changing his (Barthelme's) testimony. Dan told Barthelme that his father (MANN) never forgets a favor. Barthelme understood this to mean that he would be paid. Dan told Barthelme specific verbiage to write in the letter.

8.      In November of 2013, other ATF agents and I interviewed Mark Rinke. Rinke had previously testified before the Grand Jury as well as at the trial of Randeep Mann and Sangeeta Mann. Rinke stated that Dan Carlton approached employees at the London City Hall and offered to pay them $10,000 and to give them a seven bedroom house if one of the London City workers could get Rinke to change his testimony. Rinke also stated that Dan Carton had found an unknown individual who lives in London, AR, and who was collecting a disability check, to make false statements regarding the case. Carlton had convinced the unknown person to say that he saw someone wearing a military uniform, driving a white truck, bury the (40mm) grenades.

9.      In November of 2013, other ATF agents and I interviewed Mayor Eddie Price. Price is the Mayor for the City of London, AR. Mayor Price is the supervisor of London City employee Mark Rinke. Price stated that Dan Mann, the son of Randeep Mann, had approached him (Price) in November of 2013 and told Price that there was money available (up to 1.6 million dollars after the Mann's house was sold) if Mayor Price would come (to court) and say that Mark Rinke had planted the stuff (40mm grenades). Mann also told Mayor Price that he (Price) would be paid the same amount of money if he could find someone else to say that Mark Rinke lied. Mayor Price said that Mann had offered money to a boy who was a resident of London, AR, to say that he had seen someone else in the area where the grenades were buried.

3

10.     In November of 2013, other ATF agents and I interviewed Debby Sorrells. Sorrells was an employee at the City of London, AR. Sorrells stated that she learned that Dan Carlton had convinced Will Elkins to lie for him, and she told agents where they might find Elkins.

11.     On November 20, 2013, other ATF agents and I interviewed Will Elkins. Elkins stated that in 2009 he was on the Star Harbor Lane cul de sac in London, AR. (The 40mm grenades were located the end of the Galaxy Lane cul de sac approximately 875 feet from Randeep MANN's residence. Star Harbor Lane is a lower road that runs parallel to Lake Dardanelle's shoreline, and the Star Harbor Lane cul de sac is located approximately 1000 feet south of the Galaxy Lane cul de sac (but is much further away if you travel by road). I have been to the Star Harbor Lane cul de sac and observed that it is not possible to see the Galaxy Lane cul de sac from the Star Harbor Lane cul de sac because of the terrain and elevation.) Elkins said that at exactly 6AM on March 1, 2009 he was hiding behind some bushes, when he observed a white Chevy City of London truck pull up to the end of Star Harbor Lane. Elkins was approximately 30 feet away. Elkins saw (Ryan) Kimbell get out along with another male. The two subjects pulled out a case of grenades from the back of the truck. Elkins knew that there were grenades in the box by the metal sound that they made. Elkins said that they dug a hole and then he saw the two men speed away. Elkins walked up to the box but did not touch it. Elkins did not call the police nor did he tell anyone about the incidence until approximately one week prior to his interview with ATF. Elkin's fiancé Rosa Torres brought him to meet Dan Carlton. Dan Carlton offered Elkins money in the dollar amount of "six figures" for the information. When the interview was over, Elkins reviewed notes taken during the interview, made a few changes to the notes, and then signed the notes as his statement.  Elkins' mother was also

present during the interview.  She reviewed and signed the agent notes as well.  Elkins' statement is submitted as Respondent's Exhibit 5 in the United States' response to Mann's § 2255 motion.

12.     In December of 2013, Assistant United States Attorney (AUSA) Michael Gordon and I met with William Elkins prior to his appearance before the grand jury.  AUSA Gordon showed Elkins an aerial photograph that included Milky Way Lane, the Galaxy Lane, and the Star Harbor Lane in London, AR.  AUSA Gordon asked Elkins to point out where he observed the individuals burying the case of grenades.  Elkins pointed to the Star Harbor Lane cul de sac and stated that he had observed the individuals burying the case of grenades in that area.  An aerial photograph similar to the one shown to Elkin's has been submitted as Respondent's Exhibit 6 in the United States' response to Mann's § 2255 motion.  An "X" has been placed where Elkins indicated he saw the men bury the canister of grenades.  A circle has been drawn around the location where the buried canister of grenades was actually found.  I have also labelled the streets and Mann's residence.

13.     Elkins' grand jury testimony is submitted as Respondent's Exhibit 7 in the United States' response to Mann's § 2255 motion.

14.     At the request of federal prosecutors, in May of 2015, I measured the previously-buried, green, metal, ammunition canister that contained the 40mm grenades located on Galaxy Lane in London, AR.  The canister measured to be approximately 14.5 inches high with the lid on.  It was approximately 18.5 inches long to the outside edge of the handles.  The canister was approximately 17.25 inches long in between the handles.  It was approximately 7.5 inches wide.

15.     At the request of federal prosecutors, on July 9, 2015, I also measured remnants of grey duct tape that were found on the ground near the buried ammunition canister described above.  The duct tape measured slightly less than 2 inches, or more precisely 4.9 centimeters (49

millimeters).   A photograph of my measurement of the duct tape has been submitted as

Respondent's Exhibit 8 in the United States' response to Mann's § 2255 motion.


DAVID OLIVER
Special Agent/CFI, ATF

Subscribed and sworn to before me, a notary public, this _10th_ day of _July, 2015_


KIM SQUIRES

My commission expires:

7-12-2022

*(Notary seal: KIMBERLY K. SQUIRES, COMM. EXP. 7-12-2022, No. 12388585, PULASKI COUNTY, NOTARY PUBLIC - ARKANSAS)*

1 of 4

c/m

wme

WILL ELKINS

12TH GRADE

IN 29 2009 I SAW WHITE 4x4
TRUCK CHEVY 4 DR CITY
TRUCK PULL UP END OF
STAR HARBOR LANE CULDE SAC

wme
I KNEW
THAT THERE
WERE
GRENADES
IN THE
BOX BY
THE METAL
SOUND
THEY
MADE.
villiam
ELKINS
william
Elkins

KIMBALL & ANOTHER GUY & 1 MORE
GET OUT OF TRUCK w/ 2 SHOVELS
PULLED A CASE OF GRENADES TO
BACK OF TRUCK   I KNEW THERE
WHERE GRENADES IN THE BOX   I HEAR
THE GRENADES IN THE BOX WHEN
THEY PICKED IT UP.   TWO GUYS PICKED
UP THE BOX & I WAS THE LOOK OUT
I WAS HIDING BEHIND SOME BUSHE
BECAUSE I WAS AFRAID THEY WERE GOIN
TO KILL   I WAS ABOUT 30 FT AWAY
FROM THEM   IT WAS EXACTLY
6 AM ON MARCH 2009 I THINK
IT WAS AMONDA   WENT IN WOODS
ABOUT 20 YARDS TOOK 5 MIN TO
DIG ONE HOLE, THEY THEN SPED AWAY
I WALKED UP TO THE BOX BUT DEE
NOT TOUCH IT BECAUSE I DID NOT
WANT MY FINGER PRINTS ON THE

RESPONDENT
EXHIBIT
5

2 of 2

wme

BOX I DID NOT CALL THE
POLICE BECAUSE I DID NOT WANT
KIMBALL TO KNOW I WAS THE

I DID NOT TELL ANYONE ABOUT
THIS UNTIL A WEEK AGO UNTIL
DAN ASKED ME TO WRITE AN AFFIDA
ABOUT WHAT I OBSERVED ON MARCH
1, 2009, I HAVE A PHOTO GRAPH
MEMORY AND REMEMBER ALL DETAILS

I HAD A WIERD FEELING ABOUT
WHAT I OBSERVED AND KNEW
KIMBALL AND THE OTHER TWO
WERE DOING SOMETHING WRONG.
KIMBALL IS A BAD PERSON
I DO NOT KNOW WHY I JUST
FEEL THIS WAY

MY ESSENCE

ROSA TORRES BROUGHT ME TO DAN BECAUSE
I HAD IMPORTANT INFORMATION FOR HIM
DAN OFFERED ME SIX FIGURES FOR
THIS INFORMATION. HE DID NOT
GIVE AN EXACT AMOUNT.

I AM GIVING THIS STATEMENT VOLUNTARILY

Jackie Jones

ATF 3697                    11/20/13        1549 HR



Mann's house

RESPONDENT
EXHIBIT
6

# UNDER SEAL

RESPONDENT
EXHIBIT
7



RESPONDENT
EXHIBIT
8

## AFFIDAVIT

I, JEFF BRZOZOWSKI, do hereby swear and depose that the following facts are true and correct to the best of my knowledge:

On or about 2002, I was serving as the Resident Agent in Charge of the Little Rock Field Office, Bureau of ATF, when my office initiated an investigation of Randeep Mann of Russellville, AR.  The investigation was initiated based on information from a confidential informant, alleging that Mann was illegally selling machineguns.  At some point after the initiation of the investigation, I was contacted by Mann, who alleged that Special Agent Warren Newman, assigned to the ATF Little Rock Field Office and the case agent on the Mann investigation, was harassing him.  Mann provided a tape recording that he alleged was a recorded conversation between a female named Daisy and a male alleged to be Special Agent Warren Newman.  I listened to the recording and it was obviously not the voice of Special Agent Warren Newman on the tape recording.  I surmised that the recording was crudely made in an attempt by Mann to determine if ATF was investigating him.

_Jeff Brzozowski_

Subscribed and sworn to before me, a notary public, this 14 day of July, 2015.



MARY L. HODDE
MY COMMISSION EXPIRES
July 13, 2016

_Mary L. Hodde_

My commission expires:

1

RESPONDENT
EXHIBIT
9

# UNDER SEAL

RESPONDENT
EXHIBIT
10

# UNDER

# SEAL

RESPONDENT
EXHIBIT
11

# UNDER SEAL

RESPONDENT
EXHIBIT
12

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION 4

AUG 0 1 2005

JAMES W. McCORMACK, CLERK
By:_____
PLAINTIFF, DEP CLERK

**R.S. MANN,**

v.                            Case N° 4 - 05 - CV - 0985 JLH

**TONY HALEY, CHRIS RIDENHOUR,**
**GLEN DANIEL, RONALD STOBAUGH,**          This case assigned to District Judge Holmes
**CHRIS GOODMAN, WARREN NEWMAN, and**      and to Magistrate Judge_____
**RAYE TURNER,**

**DEFENDANTS.**

### COMPLAINT

For his complaint against Defendants, Plaintiff states as follows:

1.      Plaintiff, R.S. Mann, is a resident of Pope County, Arkansas.

2.      Defendants, Tony Haley, Chris Ridenhour, Glen Daniel, Ronald Stobaugh, and

Chris Goodman, were, at all times relevant to this complaint, law enforcement officials

employed by the City of Russellville or the Fifth Judicial District Drug Task Force or both;

Defendant Raye Turner was at all times relevant to this complaint, an officer of the City of

Russellville (namely, its mayor); Defendant Warren Newman was, at all times relevant to this

complaint, a federal law enforcement officer; all acts complained of occurred in or near Pope

County, Arkansas; Defendants believed to reside in the Eastern District of Arkansas, Western

Division.

3.      This action arises under federal law, particularly the Civil Rights Act of 1871, 42

U.S.C. § 1983, under the Fourteenth Amendment to the Constitution of the United States; and

under Arkansas state law, particularly the Arkansas Civil Rights Act of 1993, Ark. Code Ann.

§ 16-123-105; as well as the common law torts of civil conspiracy, slander, intentional

interference with contractual relations, and outrage.

**RESPONDENT**
**EXHIBIT**
**13**

4.      This court has jurisdiction of this cause under Title 28 U.S.C. § 1343 and Title 28

U.S.C. § 1367, and venue properly lies in this Court.

5.      Each act of Defendants alleged in this complaint was done by Defendants under

the color and pretense of the statutes, ordinances, regulations, customs, and usages of the City of

Russellville, the County of Pope, and the State of Arkansas, and under the authority of his office

as police detective for the City of Russellville.

6.      In the scope and course of their employment and under color of law, Defendants

made statements about Plaintiff to third parties (the "Statements").

7.      The Statements were either false and intended to disparage Plaintiff in his

profession or intentionally misleading to the point of casting the plaintiff in a false light and were

intended to disparage Plaintiff personally and in his profession.

8.      Defendants knew the Statements were false or Defendants were recklessly

indifferent to the Statements' truth.

9.      Defendants' Statements included the allegations and insinuations that Plaintiff

maintained an arsenal of guns and that, given that he was born in India, reason existed to be

suspicious of him, especially since September 11, 2001.

10.     Defendants' Statements included allegations that Plaintiff had over-prescribed

scheduled medications and that his prescribing practices caused the deaths and emergency

hospitalizations of his patients.

11.     Defendants' Statements included the allegations that Plaintiff "had had sex for

drugs."

12.     Defendants intended for the Statements:

        a.  to cause Plaintiff to lose his license to practice medicine,

2

     b.  to cause Plaintiff professional and personal opprobrium and disgrace;

     c.  to cause Plaintiff's patients to stop seeking medical services from Plaintiff.

13.    Defendants' making the Statements were not a random acts.

14.    Defendants' Statements caused Plaintiff financial and personal injury, significantly impeded Plaintiff's ability to practice his profession, and deprived Plaintiff of his federally protected liberty and property interests.

     a.  Plaintiff is a licensed physician, and Defendants' Statements proximately caused one or more investigations by licensing authorities into Plaintiff's compliance with the Arkansas Medical Practices Act.

     b.  Defendants' Statements proximately caused the Arkansas State Medical Board to issue an emergency order suspending Plaintiff's license to practice medicine, thus altering his legal status.

     c.  Defendants' Statements proximately caused a hospital to deny Plaintiff clinical hospital staff privileges.

15.    Defendants' Statements caused a significant alteration of Plaintiff's status as a matter of state law.

16.    Defendants deprived Plaintiff of his liberty and property without due process of law and denied Plaintiff the equal protection of the laws.

17.    Defendants wrongfully deprived Plaintiff of his right to earn a living.

18.    Plaintiff has suffered the following damages:

     a.  the reasonable value of past earnings and business opportunities;

     b.  the reasonable value of earnings and business opportunities which with reasonable probability will be lost in the future;

3

    c.  the reasonable value of damage to his reputation; and

    d.  the reasonable value of mental and emotional pain and suffering in the past.

19.    Plaintiff demands a jury trial.

WHEREFORE, Plaintiff seeks judgment against Defendants for general, special, and punitive damages, in a sum that to this Court may deem just and reasonable, for costs of suit, including a reasonable attorney's fee, and for such other relief as the court may deem just, equitable, and proper.

Respectfully submitted,
GILL ELROD RAGON OWEN & SHERMAN, PA
3801 Metropolitan Tower
425 West Capitol Avenue, Suite 3801
Little Rock, Arkansas 72201
(501) 376-3800

By:    *Drake Mann*

Drake Mann, Arkansas Bar number 87108

4

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

R.S. MANN                                                                      PLAINTIFF

v.                                    No. 4:05CV00985 JLH

TONY HALEY; CHRIS RIDENHOUR;
GLEN DANIEL; RONALD STOBAUGH;
CHRIS GOODMAN; WARREN NEWMAN;
and RAYE TURNER                                                          DEFENDANTS

### OPINION AND ORDER

This is a 42 U.S.C. § 1983 action seeking redress of Fourteenth Amendment rights. R.S.

Mann, a licensed physician, alleges that Glen Daniel, Ronald Stobaugh, Chris Goodman, Raye

Turner, Tony Haley, Chris Ridenhour (collectively, "the remaining defendants"), and Federal Agent

Warren Newman deprived him of federally protected liberty and property interests by making false

and disparaging statements to third parties, thereby causing third parties to investigate his practice,

suspend his license, and deny him hospital privileges. On March 14, 2006, the Court dismissed the

claims against Newman, ruling, in relevant part, that the complaint failed to state a *Bivens* claim

because the conduct alleged did not violate any federally protected constitutional right. The

remaining defendants now move for judgment on the pleadings on the grounds that the complaint

fails to state a § 1983 claim against them for that same reason. Because the Court finds its March 14

ruling applies with equal force with respect to bar any § 1983 claim, the Court dismisses the

complaint in its entirety.

Judgment on the pleadings is appropriate under Rule 12(c) of the Federal Rules of Civil

Procedure if, after assuming all factual allegations in the complaint as true and construing all

reasonable inferences therein in favor of the plaintiff, "it appears beyond doubt that the plaintiff can

prove no set of facts which would entitle him to relief." *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990) (internal marks omitted) (noting identical treatment of Rule 12(b)(6) and Rule 12(c) motions).

According to the complaint, the remaining defendants are law enforcement officials employed by the City of Russellville or the Fifth Judicial District Drug Task Force or both. *Id.* ¶ 2. The complaint alleges that the remaining defendants and Newman made false and disparaging statements to third parties while acting "[i]n the scope and course of their employment and under color of law" and that, by so doing, they significantly impeded Mann's ability to practice his profession and deprived him of "federally protected liberty and property interests," including his "right to earn a living."[1] *Id.* ¶¶ 6, 7, 14, 17. Specifically, Mann alleges that the defendants' statements caused licensing authorities to investigate his compliance with the Arkansas Medical Practices Act, the Arkansas State Medical Board to suspend his license to practice medicine, and the hospital to deny him clinical hospital staff privileges. *Id.* ¶ 14.

On March 14, 2006, the Court dismissed the claims against Newman, stating, in relevant part:

Even if this suit were against Newman in his individual capacity, the complaint would fail to state a claim against Newman. In *Siegert v. Gillery*, 500 U.S. 226, 233-34, 111 S. Ct. 1789, 1794, 114 L. Ed. 2d 277 (1991), the Supreme Court held that defamation, by itself, is a tort actionable under the laws of most states, but not a constitutional violation. "[S]o long as [the alleged] damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a *Bivens* action." *Id.* at 234, 111 S. Ct. at 1794. Here, the alleged harms flow directly from the injury to Mann's reputation inflicted by statements purportedly made by Newman and the other defendants. Mann has not alleged that Newman played any part in deciding to investigate, suspend, or deny Mann privileges; he has alleged only that Newman and the other defendants, by making defamatory statements against him, caused third parties to investigate,

---

[1] Except to identify the parties and their occupations, the complaint refers to Newman and the remaining defendants as "Defendants" and never individually.

2

suspend, and deny Mann privileges. This case is indistinguishable from *Siegert*. Therefore, insofar as the complaint alleges a *Bivens* claim against Newman in his individual capacity, it fails to state a claim.

The same reasoning applies to bar the § 1983 claim against the remaining defendants. Section 1983 actions, like *Bivens* claims, redress constitutional violations. *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000) ("Section 1983 does not confer substantive rights but merely provides a means to vindicate rights conferred by the Constitution or laws of the United States."). The Court ruled on March 14 that the conduct alleged, which is the same with respect to all the defendants, did not constitute a constitutional violation. Because Mann fails to allege that the remaining defendants' conduct deprived him of any federally protected right, the Court dismisses the § 1983 claim against them with prejudice. In the absence of a federal claim against these defendants, the Court declines supplementary jurisdiction over the pendent state claims brought in this action and dismisses those claims without prejudice.[2] In sum, the Court dismisses the complaint in its entirety and grants judgment in favor of Daniel, Stobaugh, Goodman, Turner, Haley, and Ridenhour. Document #46 and #48.

IT IS SO ORDERED this 25th day of April, 2006.

_J. Leon Holmes_

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

---

[2] In addition to the § 1983 claim, Mann sues under the Arkansas Civil Rights Act and common law. *See* Compl. ¶ 3.

## **AFFIDAVIT**

I, Leonard Krout, do hereby swear and depose that the following facts are true and correct to the best of my knowledge:

I, Leonard Krout, was coroner of Pope County, Arkansas, from 1989 until 2014, at which time I retired. On or about the 2nd or 3rd year I was coroner it became evident that physicians were unable to fill out death certificates properly. I decided to require all deaths in Pope County to be monitored by my office. This required all medical facilities to call with basic information about the patient's death, where it took place, the patient's basic health information, the funeral home, and lastly the physician signing the death certificate. This information helped us keep track of what type of deaths were taking place in Pope County. The average number of deaths caused by drug overdoses was normally 0 to 2 per year. In or about 2004, I noticed an increase in overdose deaths to 5. The number continued to increase through 2005 to a high of 12 overdose deaths a year in 2006. As the deaths increased during this time, one physician's name kept appearing as the primary care provider or as secondary physician for the deceased and that physician was Dr. Randeep Mann. At this time, I implemented a directive for drawing blood from the bodies of Dr. Mann's deceased patients or, if needed, having the bodies sent for autopsy at the State Medical Examiner's Office. About this time, my office was receiving complaints from family members complaining that their loved one's death was due to over prescribing medications by Dr. Mann. I eventually received a visit from an investigator from the Arkansas State Medical Board requesting information on cases concerning Dr. Mann. Soon after that, Dr. Mann's medical license was suspended by the state and our overdose deaths returned to normal. A few months later Dr. Mann's suspension was lifted and our overdose deaths began to increase once again. It was at this time that more of my cases were requested by the state and Dr. Mann's

1

RESPONDENT
EXHIBIT
14

practice was closed down.  After Dr. Randeep Mann left Pope County (because of federal charges), the number of overdose deaths returned to normal.  Since then our overdose deaths each year remained normal.

Leonard Krout

Subscribed and sworn to before me, a notary public, this 22 day of July, 2015.

KIMBERLY K SQUIRES

My commission expires:

7-12-2022

91 (Rev.5/85) Criminal Complaint

# United States District Court

**FILED**

## EASTERN DISTRICT OF ARKANSAS

U.S. DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

MAR - 5 2009

IN OPEN COURT
JAMES W. McCORMACK, CLERK
DEPUTY CLERK

NITED STATES OF AMERICA

V.

ANDEEP MANN

**CRIMINAL COMPLAINT**

CASE NUMBER:  09-mj-4014 HDY

David Oliver, the undersigned complainant being duly sworn state the following is true and correct to the best
f my knowledge and belief.  On or about _March 4, 2009,_  in _Pope County,_ in the _Eastern_ District of _Arkansas,_
e defendant, (Track Statutory Language of Offense)

**lid possess one or more firearms, as defined in Title 26, United States Code, Section 5845, which were
not registered to him in the National Firearms Registration and Transfer Record**

in violation of Title  **26**  United States Code, Section (s)  **5861(d).**

further state that I am a **Special Agent with U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives**
and that this complaint is based upon the following facts:

### SEE ATTACHED AFFIDAVIT.

A TRUE COPY I CERTIFY
JAMES W. McCORMACK, CLERK

By _____ D.C.

ontinued on the attached sheet and made a part hereof.   X Yes _ No

Signature of Complainant

DAVID OLIVER, Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

worn to before me and subscribed in my presence,

Date **3-5-09**                    at         Little Rock, Arkansas
                                        City and State

**Hon. H. David Young, U.S. Magistrate Judge**          _____
Name & Title of Judicial Officer                        Signature of Judicial Officer

**RESPONDENT
EXHIBIT
15**

## AFFIDAVIT

I, David P. Oliver, being duly sworn, depose and state that:

1.    I am a Special Agent with the Bureau of Alcohol, Tobacco Firearms & Explosives ("ATF"), United States Department of Justice, and have been so employed since April of 1999. Prior to this, I was employed as a police detective at the Middletown Rhode Island Police Department for approximately ten years.  I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy.  I am currently assigned to the Little Rock Field Office.

2.    As a result of my training and experience as an ATF Special Agent, I am familiar with federal criminal laws relating to firearms and violent crime. I am aware that it is a violation of Title 26 U.S.C. 5861(d) for a person to receive or possess a firearm under the National Firearms Act (NFA) that is not registered to him in the National Firearms Registration and Transfer Record (NFRTR). The NFA defines a firearm to include machine guns and destructive devices. A machine gun is a weapon which shoots automatically more than one shot, without manual reloading, by single function of the trigger. A destructive device includes any explosive grenade.

3.    I submit this affidavit in support of an application
for a criminal complaint and arrest warrant of Dr Randeep MANN,
DOB 07/11/1958. My belief that probable cause exists to conclude
that Randeep MANN committed one or more federal criminal offenses
is based on the following facts that I have learned from my own
personal investigation of this matter, including interviews of
witnesses, as well as from information supplied by other law
enforcement officials.

4.    On March 3, 2009 at approximately 5:00 PM, the Pope
County, AR, Police Department responded to call for found
military ordinance on Galaxy Lane in London, AR.  The responding
deputies met with employees of the City of London Public works.
The employees stated they had stopped to urinate in a wooded area
and one of them tripped over what he believed to be a black
plastic bag buried in the ground.  The worker dug up the black
plastic and discovered a discovered a large green military
canister wrapped in duct tape. The employee cut open the duct
tape and opened the canister.  Inside he discovered what he
believed to be several rounds of ammunition. The Pope County
Sherriff's deputies recovered the green military canister, with
it contents, along with the black plastic material, and
transported it to the Pope County Sherriff's Office and secured

2

it.  On March 4, 2009 the Pope County Sherriff's Office contacted ATF for assistance.

5.   On March 4, 2009, I responded to the Pope County Sherriff's Office.  I observed that the contents of the green military canister contained military ordinances.  The ordinances were marked "40mm HE, M406". I know from my training and experience as an ATF agent that a 40mm HE, M406 is a military high explosive round that is designed to inflict personal casualties using a ground burst effect.  The round is designed to be fired from an M79 or m203 grenade launcher. Arkansas State Police Bomb Technician William Buford counted the munitions and determined there were ninety-eight 40mm HE, M406 rounds and one M781 40mm practice type ammunition.

6.   On February 4, 2009, ATF and the Arkansas State Police interviewed Dr. Randeep MANN in regards to a separate investigation. Randeep MANN lives at 313 Milky Way Lane London, AR, which is approximately 875 feet from where the military green military canister containing the military ordinance was recovered.  During that interview, Dr. Randeep MANN showed the investigators a M203 grenade launcher he legally owned.

3

7.   On March 4, 2009, the Arkansas State Police obtained a
State warrant to search 313 Milky Way Lane, London, AR.   I, along
with other ATF agents, assisted the Arkansas State Police and the
Pope County Sherriff's Office during the execution of the search
warrant.   Located inside a shop attached the garage were five
military canisters that were the exact shape, size, and color as
the canister recovered. I observed that one of the lot numbers on
the military canisters matched the canister which was recovered
on Galaxy Lane.   Located in the same shop was a box containing
forty-five M781 practice 40mm rounds of ammunition. Also located
in the shop was at least one roll of plastic material similar to
the plastic material that the military canister was found wrapped
in.   Investigators located in a safe in the basement two m203
grenade launchers which are capable of firing the 40mm HE, M406.


8.   Located through out the house were approximately 110
fully automatic machine guns valued in excess of $1,000,000.00.
Investigators compared a list of machine guns, which Dr. Randeep
Mann legally has registered to him, in the National Firearms
Registration and Transfer Record (NFRTR) National Firearms Act
licensing section, to the approximately 110 machine guns that
were found in Dr. Randeep Mann's residence.   Investigators were

4

unable to determine if seventeen of the machine guns were legally
registered to Dr. Randeep Mann.

9.   On March 5, 2009, I spoke with ATF Supervisory
Explosives Enforcement Officer (EEO) Joe Hanlin.   Joe Hanlin is a
bomb technician and has previously qualified as an expert witness
in Federal Court regarding the recognition, construction and
operation of destructive devices.   EEO Hanlin told me that a 40mm
HE, M406 is an instrument of war and has no social purpose.
According to EEO Hanlin a 40mm HE, M406 is a destructive device
as defined as in 18 U.S.C. 5845 (F).

10.   On March 4, 2009, I queried the National Firearms
Registration and Transfer Record (NFRTR) and determined that Dr.
Randeep MANN does not have any 40MM ME, M406 destructive devices
registered to him in the National Firearms Registration and
Transfer Record (NFRTR)

11.   Based upon the above information, I believe probable
cause exists to conclude that Dr Randeep Mann has committed a
violation of Title 26 U.S.C. 5861(d) for a person to receive or
possess a National Firearms Act (NFA) weapon that is not

registered in the National Firearms Registration and Transfer
Record (NFRTR).

David P. Oliver
Special Agent, ATF

Subscribed and sworn to before me this 5 day of March 2009.

H. David Young
United States Magistrate Judge

6

## AFFIDAVIT OF J. BLAKE HENDRIX

1.      My name is J. Blake Hendrix. I live in Little Rock, Arkansas. I am an attorney,

licensed since 1986. I graduated from the University of Arkansas School of Law that year. I am

admitted to the Bars of the State of Arkansas, the Eastern and Western Districts of Arkansas, and

the Supreme Court of the United States. I have practiced criminal law since being licensed, first

as an Assistant Attorney General for the State of Arkansas and, since, as a criminal defense

lawyer. My practice in the past fifteen to twenty years has been centered on federal criminal

defense work. I'm a former member of the original Criminal Justice Act Committee that formed

the present Criminal Justice Act Plan for this district and have served twice as the Criminal

Justice Act Panel Representative for this district. I've handled many post-conviction cases, and

I've testified as an expert witness in at least three cases as a "Strickland" expert to establish the

standard of care of criminal defense lawyers. I am familiar with the duties criminal defense

lawyers owe their clients under the Arkansas Code of Professional Conduct, the ABA Standards

for Criminal Justice, and the NLADA Standards. I have testified and lectured many times on the

standard of care criminal defense lawyers owe the client.

2.      Drake Mann, Dr. Randeep Mann's long-time civil lawyer (no relation), referred

Dr. Mann to me shortly after Dr. Mann was arrested on a Criminal Complaint alleging a single

violation of the federal firearms laws.  Drake Mann and I have been friends since law school, and

I was somewhat familiar with Dr. Mann's history with the state medical board. Through the

press, I also knew about the bombing of Dr. Trent Pierce, and I immediately inferred Dr. Mann

could be implicated in the Pierce bombing. I then asked Jack Lassiter and his partner, Erin

Cassinelli, if they would agree to assist me in Dr. Mann's defense. I think I met with Dr. Mann

and Drake Mann at the Pulaski County jail, and it was agreed that Mr. Lassiter, Ms. Cassinelli

1

RESPONDENT
EXHIBIT
16

and I would represent Dr. Mann. I was lead counsel, delegated tasks to the team members, and was ultimately responsible for making final decisions.

The detention hearing showed us the case was not just about an unregistered firearm. We then assumed the government would indict Dr. Mann for the Pierce bombing, that it would allege the motive to be his contentious relationship with the Board, that the grenades found in his neighborhood were not just part of the bombing, but a separate offense, and that there might be more ATF regulatory offenses. In all, we put together a team to build a defense that included Mr. Lassiter, Ms. Cassinelli, John Wesley Hall (a search and seizure expert), and two investigators. We decided Drake Mann shouldn't be an attorney of record, so he could provide background information, and, if necessary, testify.

3.    Let me be clear: I support Dr. Mann in his efforts to overturn his convictions. What follows is not a defense of my, or my team's, conduct. If my acts or omissions fell below an objective standard of care and caused his conviction – that the outcome might have been different because of what I did or didn't do -- I hope the Court will overturn his convictions.

A.    The Hole Issue

We discussed the hole issue exhaustively with Dr. Mann before and during trial.  The evidence was strong: two witnesses allegedly found the grenades in Mann's neighborhood, they were found in canisters of the same type and lot as the ammo canisters found in Mann's home, and Dr. Mann had they same type practice rounds, and launchers capable of firing the grenades, in his collection. We had some pretrial discovery about what the witnesses might say: a city worker stumbled across the box while on the job. We hired an investigator to interview the witnesses. One, Rinke, I believe, gave a statement consistent with the discovery material. The other, Kimbell, refused to talk. Ms. Cassinelli and I went to the scene to determine if the physical

2

layout was consistent with the reports we had. We compared what we saw with what was described and found nothing to contradict the witnesses. We investigated the reason the first witness gave for being there – that he went to check out a swimming pool a friend had installed in the neighborhood. We found the neighbor, Lynn Blunier, and called her in our case-in-chief. She testified she didn't have problems with her pool and never saw a city worker inspecting her pool. We discussed trying to find an expert witness who could contradict the government's theory that Mann buried the canister within days of it being found. I remember we talked about a geology professor from, I think, the University of Arkansas who could look at the pictures of the scene and give an opinion that the hole was not freshly dug. But, we concluded that a "hole" expert likely wouldn't survive a *Daubert* challenge and that our best strategy was to appeal to the common sense of the jury. We decided the best strategy was to show the jury the pictures and have a lay witness, who we believed the jury could relate to, testify the hole did not appear to have been freshly dug.

We thoroughly considered, among ourselves and with Dr. Mann, the option to argue a conspiracy between municipal workers, the local government, local law enforcement, and federal law enforcement to plant the grenades. We considered whether that strategy could succeed or whether the jury would view that strategy, in light of all the evidence, as so ridiculous that we would lose all credibility in defending against the bombing and regulatory offenses. We made this strategic decision: an overly stated conspiracy theory would cause us to lose credibility with the jury on the bombing and gun counts, which, we believed, were more defensible than the grenade counts. We concluded that a vast law enforcement conspiracy to set Dr. Mann up would make the total defense appear ridiculous to the jury. So, we decided to not emphatically state it as a theory, but, rather, to drop hints of that theory throughout the trial so an acquittal-prone juror

3

might latch on to it. We also concluded that a conspiracy strategy wouldn't succeed, even if we were able to get the grenade counts severed. A jury in this area, we decided, simply wouldn't accept that several law enforcement agencies, both local, state, and federal, would conspire with local city workers to set up Dr. Mann. Tactically, this was a very difficult situation. Nevertheless, we didn't abandon the theory; we just decided to not emphasize it.

We investigated whether the past investigations of Dr. Mann could support the conspiracy theory. We obtained the ASMB files, interviewed Drake Mann who represented Dr. Mann regarding these allegations, reviewed transcripts and records, and, of course, discussed the issue with Dr. Mann. Dr. Mann had earlier been accused of all sort of unlawful conduct – supplying illegal pills, trying to sell unregistered firearms, and having sex with a patient – all of which the medical board eventually rejected. We decided to not overemphasize this defense, but to suggest it though the ASMB records introduced at trial. Even though the medical board had rejected these allegations, we would introduce the allegations, which the jury might believe. Several of the claims where similar to the accusations in this case, leading us to conclude it was prudent to not raise the claims. Our investigation revealed that some of the witnesses we would have to rely on were drug addicts and witnesses with criminal records who would not be appealing to the jury.

Ultimately, we decided the best strategy was to avoid bringing up old accusations, infer, but not overly argue a conspiracy theory, and argue both sides of the government's "hole" theory by appealing to the jury's common sense the hole was not freshly dug, but also arguing in closing that, even if the jury accepted the government's theory, freshly dug supported the notion the grenades were not Mann's because he was too smart to let such incriminating evidence sit

around for a month after the bombing knowing law enforcement would come to visit him sooner or later.

The petition states that I had a conversation during trial with Danny Crabtree, Sue Mann's co-counsel, that he had a hole expert we could use. That didn't happen, and I've talked to Mr. Crabtree to make sure. He agrees with me.

B.   Alshareqi

I remember a great deal of discussion about Alshareqi, we even had him subpoenaed, but ultimately it came down to a strategic decision to not call him as a witness, first, because he had mental health issues, second, because his testimony could backfire and implicate Mann in the beating of a witness, and, third, because we were told he would assert his Fifth Amendment privilege if called.

On first blush, Ashareqi's potential testimony was intriguing: he claimed government agents coerced him into falsely implicating Mann before the grand jury. But on further investigation, we found out Ashareqi had a history of mental problems and that he and Mann were close in jail - close enough to raise a reasonable concern the jury would believe Mann had Alshareqi attack a witness (Briscoe) to keep him from testifying. We conducted a full investigation -- Alshareqi was subpoenaed and we talked to his attorney. Ms. Cassinelli and I went to his sentencing hearing and concluded he would not be a credible witness. Word got back that Alshareqi's recantation of his grand jury testimony was fabricated. We concluded Alshareqi was not a viable witness for many reasons: he had given inconsistent statements, he had mental health issues, and Mann could be implicated in the beating of a witness. We also constantly fought a battle to deflect that Mann was some sort of terrorist. That Alshareqi was from Yemen did not help. Finally, we were told Alshareqi would invoke this Fifth Amendment privilege if we

tried to put him on the stand. By the time of Mann's trial, Alshareqi was indicted in the beating of the witness who testified against Mann. I talked to his lawyer, who told me Alshareqi would claim the privilege to refuse to testify in the Mann trial.

We did not use Alshareqi's recantation as a basis to move to dismiss the indictment. Based on all we knew, we concluded he was not a credible witness. Knowing he was not the only basis for Mann's indictment, a motion to dismiss would have been frivolous.

C.    The Hindu Expert

Mann told us that the picture he sent to his brother in India of Pierce and Jouett was part of a Hindu religious ceremony in which prayers are offered to those in a position of authority that they exercise that authority wisely. A similar explanation was given for a piece of paper found in Sue Mann's shoe that had the name of the judge and prosecutor. I remember we researched this issue on the Internet, but couldn't confirm the theory. I believe Ms. Cassinelli was able to interview some local Hindus, but was again unable to confirm the practice. In all, I believe the investigation was reasonable under the circumstances. But, we decided to put on one of Mann's daughters, who, I think, was a student at the University of Arkansas. We interviewed her and were genuinely impressed by her. She came across as candid and honest. A very sweet girl. So good, I believe, that the government didn't cross her. Our theory also involved the timing of the email to India as too remote in time to have relevance to the bombing and that the inclusion of Jouett indicated it had nothing to do with the bombing because it was never alleged Jouett was a target of Mann.

D.    The Netherlands Fraud

Mann and his civil attorney explained to me the Amsterdam fraud. Mann had borrowed money from his brother to invest in an obviously fraudulent scam and lost his brother's money. I

6

don't remember Mann offering this as another explanation why documents were removed from his clinic. I remember him saying he reported the situation to, I believe, local law enforcement and reporting it to an FBI agent in Little Rock. Interpol was somehow involved. I don't remember if it was my decision alone, or the collective judgment of attorneys, but the decision was made that this evidence, if relevant, would only show that Mann, at a minimum, was foolish. At worst, it promoted a theory that Mann was the victim of a conspiracy that involved not just local government and law enforcement, federal law enforcement, but international law enforcement. It was our judgment, or at least mine, that this type of theory was so reckless the jury could view Mann as an unhinged crank capable of planning a car bombing of his perceived enemies.

To us, the most reasonable theory was Mann had his wife remove the unsigned checks from his clinic because unsigned checks could easily be filled out and cashed. That seemed to us prudent and rationale. And that theory was supported by the fact that Sue Mann turned over those documents when she received a subpoena.

E.   Mann Testifying

Mann alleges I told him not to testify. Actually, we moved to sever offenses, claiming that Mann wanted to testify about the regulatory offenses, but remain silent as to the others. I am extremely careful in my cases to make sure my client's understand that, while I make many if not most decisions in their case, there are two decisions that are purely for the client to decide -- whether to plead guilty and whether to testify. I cannot ever remember a time in my career I told a client not to testify if that was his or her wish.

F.   Hahn

I delegated Hahn to Jack Lassiter. Ms. Cassinelli and I interviewed Hahn in St. Louis. I did not leave that interview with the impression this was a man with any mental issues that would justify a mental evaluation.

Our original theory was simple: Hahn sold an RPD re-weld to Mann with serial number 1442, and an RPD with serial number 1442 was registered in Mann's name. Hahn's grand jury testimony indicated as much. The wording on that weapon's receiver indicated as much. Mr. Lassiter conducted the investigation into this matter, and spoke with who the records indicated Hahn sold the previous weapon, serial number 1441. We hoped to get that weapon to confirm that the wording on its receiver was the same as that on 1442. The owner, however, told us that ATF had the weapon. We then attempted to get the weapon from ATF, but were told ATF didn't have it.

At trial, Hahn changed his position. He testified, through a demonstration with a magnet, that he, in fact, did not manufacture the weapon seized. He also testified that he didn't make the etchings on the receiver of the weapon, implying Mann did. Mr. Lassiter impeached Hahn with his prior inconsistent statements. Our investigation revealed that ATF had sanctioned Hahn in the past for making the same type of etchings used on the seized weapon. Hahn had been granted complete immunity for his testimony. Hahn, our investigation revealed, had terminal cancer and was somewhat elderly and that he had committed many firearms violation for which he could be convicted and sentenced. The remainder of our theory was that Hahn falsely implicated Mann so that he didn't face the prospect of dying in the pen.

G.     Not Testing the Grenades

I remember we discussed testing the grenades to see if they were inert. We decided the best strategy was to argue the government didn't test the grenades, so it couldn't prove whether

8

they were live or inert. If we had the grenades tested and it proved they were live rounds, we could not ethically argue they were inert.

      H.    <u>Not Testing Launchers</u>

We also discussed whether we should have the launchers tested to show a live round had not been fired from them to counter the theory the grenades must have been Mann's because he had instruments capable of firing them. I remember discussing that the launchers were bought used and, as a used military weapon, had likely been fired before. A test, therefore, would likely come back positive for something having been fired from them. This seemed too risky of a proposition. We decided the best strategy was a theory that, since the government didn't have them tested, it was unable to prove the grenades were linked to the launchers.

      I.    <u>Kimbrough</u>

We discussed our approach to Kimbrough in many of our strategy sessions. I think Kimbrough refused to talk to us, so we couldn't find out who were his employees that could have been at the house with him. The discovery material gave us no leads on who the employees were. I remember discussing the likely futility of getting anything productive from his employees, because they wouldn't want to contradict their boss. We decided the best strategy was to cross Kimbrough with his inability to recall specifics. I remember Kimbrough was not able to identify with any degree of certainty what was alleged to be the grenades in the Mann home. The other part of our strategy was to call a disinterested witness who had greater access to the house than Kimbrough. We called Wayne Henry who testified he never saw any such devices in the home, despite having greater access to Mann's residence.

      J.    <u>Rita Barthelme</u>

The government's theory was that Mann knew of a new investigation so he planted the car bomb. Our theory was that Mann did not know about the new investigation until after the bombing when he received a subpoena from the ASMB. We obtained the ASMB file, and discovered the subpoena, which became the central exhibit in support of our argument. Barthelme's sister, however, testified she told Rita she filed a complaint while Rita was in rehab, which was prior to the bombing, and Rita testified she told Mann. I delegated this issue to Ms. Cassinelli, and I believe she did an effective job crossing both Brown and Rita, causing some question as to when, exactly, Rita was in rehab. Our investigation included sending an investigator and Drake Mann to interview Rita, and I remember being told Rita did not intend to testify. We had the ASMB file, which showed the official notice Mann received was after the bombing, which I believe we introduced through the Board's executive director. To my knowledge, Rita never testified before the Board regarding this complaint.

K.     Ignoring the Client

Even though Mann was incarcerated, we had enough personnel that there was almost constant contact with him before trial. Eventually, we had four lawyers, two investigators, and Mann's civil lawyer tending to him. His needs and thoughts were never ignored. We paid him many visits where he as detained, sometimes one or two at a time, sometimes more. We spoke to him on the phone and encouraged him to write, which he often did. We entertained all his ideas. Like most clients, some of his ideas were good, some were bad. But we paid attention to them all.

At trial, we situated Mann so that he could be close to his wife so they could confer and placed him essentially in the middle of all the attorneys so he could express his thoughts and ideas. We met with him during breaks in the trial and fully discussed all developments. While his

accent sometimes required that we ask him to repeat himself, we almost always met with him in groups so we could make sure he was understood.

    L.    <u>The Flags</u>

I remember not objecting to the photograph with the flags so not to draw undue attention to it. I remember we met with the government at some point prior to trial to go over what pictures would be introduced. If I remember correctly, this was the only one that showed the entrance to the gun-safe room. The pictures were taken in a way to show the outside of the house, leading to its interior, down to the work out room, and finally into the gun safe room. This picture led to the gun safe room.  The Nazi flag is not emphasized in it. Mann is Indian, so we didn't fear anyone would think he was a new-Nazi American skinhead or that the confederate flag would suggest he was an American racist. There were flags of other states where he had lived. In my judgment, there was nothing so prejudicial about the flags that, in light of its value of showing the entrance to the gun-safe room, an objection would be successful.

    M.    <u>The Gay Reference in the Audiotapes</u>

I don't believe the record bears out the contention the government "repeatedly" played a conversation from the jailhouse recordings in which Mann used a homosexual pejorative. The only reference I remember was part of a conversation we used to support the successful entrapment by estoppel defense.

    N.    <u>Interstate Commerce</u>

We discussed the interstate commerce element before trial, and Ms. Cassinelli researched the line of cases that known as the Commerce Clause revolution. The WMD statute was new, and there was no Eighth Circuit precedent on the issue. I was not present for the Rule 29 motion because I was preparing for our case, but I've reviewed the transcript and see she began arguing

it was a classic Interstate Commerce claim, that is, the connection to interstate commerce was thin. But she was cut-off before she could complete her presentation. I then was in charge of writing the issue for appeal and for the cert petition.

I determined that a depletion of assets theory was not the only way to prove the interstate commerce element and concluded that there were a variety of ways the government could prove the element, and a depletion of assets was one of many ways. At trial, depletion was only one of several ways the government attempted to prove the interstate-commerce element.

We hired Marsh, and used him at the restitution hearing, to dispute the government's restitution figure. On appeal, I just took advantage of that testimony to argue the depletion of assets theory couldn't justify federal jurisdiction. I also relied on Marsh's testimony in the cert petition. Both courts rejected our argument. The Eighth Circuit noted that the clinic was shut down for three days after the bombing, and cited a case holding that the temporary closing of a business as a result of a robbery was sufficient to prove jurisdiction. There was no way to dispute that the clinic was closed, so, even if its assets were not depleted, the element was proved. The Eighth Circuit also held that the element was proved because it was "likely" the clinic suffered lost business opportunities. Disproving the depletion of assets theory could not have been successful in light of the court's holding.

O.    Oliver and the Fake Degrees

In questioning Oliver, he made, in my opinion, a typical law enforcement overstatement - he implied Mann's degrees were fake. Of course he had no proof. It was my strategy to just remind him of Mann's association with Johns Hopkins, one of the finest healthy providers in the world. In my view, the claim was so outrageous it hurt Oliver's credibility.

P.     Failure to Adequately Cross Kimbell and Rinke

The grenades were the least defensible charges. The tin was the same type as found in Mann's home, he had the same caliber test grenades in his home, and launchers capable of firing the grenades. Ms. Cassinelli and I went to the scene where they grenades were found to see if the physical circumstances revealed anything to us and we attempted to interview Kimbell and Rinke. Our investigator got a statement from Rinke, but Kimbell refused to be interviewed. This, along with the photographs taken the day the grenades were discovered, was shared with Mann.

Our strategy was to avoid an overt allegation of a vast conspiracy between local city workers, local law enforcement, and federal law enforcement. Our strategy, however, was to suggest that local official may have been responsible for planting the grenades and that, due to the distance from Mann's home and the lack of forensics linking Mann to the weapons, they likely belonged to someone else. My strategy on the cross of Kimbell and Rinke was not to expose any particular inconsistencies in their version of events, but to suggest they may have planted the grenades. I do not remember Mann giving me any list of questions to ask, or that he had just realized at trial that the photographs were not some sort of reenactment. I don't remember any impassioned pleas, and I most assuredly did not tell Mann it was no big deal and we would call Kimbell and Rinke in our case.

Q.     The Shower Tire

This was another situation where the government took advantage of a situation that some thought might seem odd, but actually had a plausible explanation. Mann told us that the tire was from one of his cars, a Mazda, and the he put it in the shower to clean off some rust that had accumulated on it when water got on it from rain when it was outside. Based on what Mann told us, we conducted an investigation and determined the tire could have come from his Mazda and

that he took the car to a mechanic to try to fix the leak, but he was unable. The mechanic testified in our case-in-chief. David Oliver typically refused to admit he saw rust on the tire, but admitted it was "pitted." I think this was a reasonable investigation of issue and a reasonable tactical decision.

> R.   Overall Strategy and Closing Argument

Mann was fully advised of all developments in his case. The case was referred to me. Knowing this would be a difficult and complex case, I recommended Mann also hire Mr. Lassiter and Ms. Cassinelli. John Wesley Hall was included for his expertise in search issues. We also used several investigators. Between all of us, Mann was kept constantly apprised of our strategy, and his ideas were always considered and treated seriously. Despite the unusual tactics of the government – refusing discovery until the last minute, trying to subpoena two defense lawyers to the grand jury – we conducted what we believed to be a reasonable investigation into the allegation and keep our client apprised. Our investigation and our reasoned decisions produced what we believed was a coherent and rational strategy – the government couldn't prove the grenades belonged to Mann; those that said they were lied to save themselves; and they likely belong to some one else or were planted by the locals; that Mann had no real motive to injure Pierce.

I was lead counsel. There was never any discussion that Mr. Lassiter would close. I don't remember telling Mann anything different, and it was expected I would close.

> S.   Velma Gales

I'm not sure what his claim means, except that we didn't cross-examine Gales to suggest she must have seen the joggers face. I don't know how this would have helped. It was clear the jogger was not Mann. She admitted as much.

T.      The Cars

Part of our strategy was to show that Mann was a lawful collector of exotic items. In fact, his gun business was called Exotic Weaponry, or something like that. The picture we hope to paint was that Mann collected exotic weapons, not to use against anyone, but because he like to collect exotic articles, including exotic and expensive cars. This helped explain why he had a tire in his shower.

U.      Inconsistent Testimony Where the Tire was positioned

Our theory was that Mann was not involved because he had a documented alibi for the evening before the bombing. An alibi for that morning was not as solid. It makes no sense to allege the bomb was planted that morning, because we didn't have as good an alibi for Mann at that time. That could leave the government open to theorizing that Mann was the actual bomber.

V.      Gordon's Alleged False Statement in Closing About the Plastic Sheeting

The record does not bear out this claim.

I have reviewed the foregoing and state that it is true and correct to the best of my knowledge and belief.

J. Blake Hendrix

## ACKNOWLEDGEMENT

STATE OF <u>Arkansas</u> }

                    } §§

COUNTY OF <u>Pulaski</u> }

On this date, <u>Blake Hendrix</u>, did appear before me, the undersigned Notary Public, and executed the foregoing Affidavit of his own free will and volition, and for the purposes stated therein.

Subscribed and sworn before me, the undersigned Notary Public, within and for the above County and State, this the <u>29th</u> day of <u>July</u>, 2015.

Notary Public

My Commission Expires:

16

## <u>AFFIDAVIT OF ERIN CASSINELLI</u>

| | |
|---|---|
| **STATE OF ARKANSAS** | ) |
| | ) |
| **COUNTY OF PULASKI** | ) |

Before the undersigned Notary Public, duly qualified and acting in and for said county and state, appeared Erin Cassinelli, to me well known to be the affiant herein, who stated the following under oath:

I am Erin Cassinelli, and I live in Little Rock, Arkansas. I have been a licensed attorney in the State of Arkansas since 2005. I am admitted to the bars of the State of Arkansas, the United States District Court for the Eastern and Western Districts of Arkansas, and the Eighth Circuit Court of Appeals. I have worked with Jack Lassiter since prior to graduating law school, and have practiced with him since obtaining my license, focusing nearly exclusively on criminal defense. I have been appointed to the Federal Practice Committee for the Eastern District of Arkansas and have been a member of the Criminal Justice Act Panel for the majority of my time as a lawyer. I have also lectured on various criminal law topics during that time. I am familiar with the standard of care in criminal cases.

I was an attorney of record in *United States of America v Randeep Mann*, Case No. 4:09CR00099 at the trial and appellate stages. This affidavit is based on my best recollection several years after the events occurred and on reference to certain records related to the case. We turned our trial files over to Dr. Mann's post-conviction counsel, and I have not had access to all of them since that time.

Mr. Hendrix was lead counsel and thus responsible for the final decisions made in the case. He also had the most contact with Mann prior to, during, and following the trial. Mr. Hendrix, Mr. Lassiter, and I often shared our opinions on issues, but Mr. Hendrix was the final decision maker. I am providing the information herein to the best of my recollection; however, Mr. Hendrix may have made certain decisions for reasons that are different than mine on any given issue.

1.  The Hole/Conspiracy Theory.

To be best of my recollection, it was not until closer to or during trial that I became aware of Mann's increased concern about the hole not being sufficiently large to hold the canister and inquiring about finding an expert to testify.

I do not recall Mann ever expressing to me that he thought the photographic exhibits relating to the canister's discovery were a re-enactment. I recall during trial Mann mentioned the size of the hole several times and either he or Mrs. Mann advised that one of their children had spoken to her geology teacher about it. They wondered if her teacher might be able to testify. Since the trial was on-going, and I did not have this information prior to it, we had not provided that person with any information (pictures etc.) to review. After discussion with co-counsel, we decided a geology professor, as described to us, would likely not be qualified to render the opinions Mann desired, and particularly under the time constraints, we would not be able to

1

RESPONDENT
EXHIBIT
17

prepare and obtain that witness for trial. I cannot recall if I actually talked to a geology professor or not.

We also felt that a person of ordinary intelligence using common sense would easily question whether the hole was physically large enough to hold the canister that was clearly very large and sat on a table in the courtroom. It was also obvious from photographs that there were old leaves inside the hole and insufficient piles of dirt surrounding it. Further, to the extent we were able to obtain information about the statements of Kimbelll and Rinke, it seemed that the box was not completely buried and thus the hole likely not large enough to contain the entire canister. They deviated somewhat from these descriptions at trial; however, it was our belief that their testimony being inconsistent with logic and common sense when viewing the photographs was more helpful than showing it may have been only partially buried or that they were lying entirely about ever discovering it on the date suggested (an assertion that we could not factually support). Both witnesses testified they could not say how long the hole had been there and based their guesses on the dirt (that Rinke moved and walked on) around it or on the condition of the tape/plastic around it.

Additionally, because the canisters matched by lot number those at Mann's house, and the same practice grenade found in it were at his house, and because we could not develop any evidence linking any specific person or event to fabricating those connections, we would lose credibility with the jury if we said the city workers conspired with others unknown, likely law enforcement, particularly since we could not develop any motive for the city workers to lie. We could not locate any neighbors who could provide any information confirming that they saw anyone or any vehicle in the area that could have planted the grenades. At trial, we first learned about Rinke's assertion that he was in the area to look at a pool; thus, we located Ms. Blunnier to testify that she did not recall that or have any need for his services. We felt Ms. Blunnier and Wayne Henry, who did construction at the Mann's home, were credible witnesses with no long-term, or current as of trial, ties to the Manns and no motive to testify untruthfully.

Well in advance of trial, our investigator(s) attempted to interview Kimbelll and Rinke. We did not have their contact information until early 2010, when the government provided us an associated incident report. Kimbell said he would not make a statement to our investigator, although he did speak briefly with the investigator, confirming what Rinke said, including that Rinke said he was originally at the scene looking at a pool and denying that any law enforcement agent directed him to look around that area. Rinke gave a statement to the investigator.

It remains unclear to me how attempting to prove the hole was "older" fit our theory of the case if we could not say with any certainty how old or who put it there. The government suggested Mann hid the grenades in anticipation of or after the bombing, the date on which law enforcement interviewed him, a month prior to their discovery. If law enforcement planted the grenades to frame Mann, logically they would have done so around the same time, after the bombing. If the theory is that the grenades were planted just in time for the city workers to find (or pretend to) find them, showing the hole was not freshly dug does not make that more likely unless we could prove the box was never in the hole; and we could not find any factual information or any motive of Kimbellll or Rinke to prove that was the case. Whether or not the

2

hole was large enough to fit the box, in my opinion, we had no factual support for suggesting that the canister was never actually in the hole to any degree, and I believe the jury would have disregarded any such suggestion. It was our best judgment that demonstrating to the jury that the city workers, government employees, likely were intentionally providing biased testimony, that the investigators failed to gather certain data concerning the scene, that the pictures themselves were logically inconsistent with the explanation of the buried canister, and that objective witnesses questioned the age and size of the hole was a better presentation than attempting to argue it was planted without any evidence to present them to factually support it. We did not move to suppress the grenades or evidence obtained as a result because we did not have a good faith factual basis to assert a law enforcement conspiracy to plant them and use them against Mann.

More importantly, we felt the bombing counts were the priority, and given Mann's extensive firearm and ammunition collections, some firearms arguably unregistered, and his possession of a grenade launcher and practice rounds, jurors were very likely to believe he would have possessed those grenades, and we would have lost a great deal of credibility with the jury, and our defense on the bombing counts, by asserting a conspiracy to plant them without factual support. We felt that if we could prove registration of the allegedly unregistered firearms during the trial, the jury was even more likely to believe the grenades were not located consistent the witnesses' testimony (were not Mann's). We were unaware until Hahn testified that he would claim one of the allegedly unregistered firearms was not manufactured by him or that he would connect the 40MM grenades and the MK3A2 grenade as items he provided to Mann. Thus it was not clear pre-trial that the 40MM grenades had any connection to the bombing other than that the bombing was alleged to be the reason Mann removed them from his home and buried them, anticipating law enforcement would be coming to speak to him.

I do not recall being aware that Mann sent FOIA requests for information concerning the buried canister. I do not recall Sue Mann's counsel advising he was aware of professors who could testify as experts. I have never heard of Will Elkins. Our team interviewed neighbors and were not advised that anyone had been in the area at the relevant time who could have witnessed the planting of the canister.

2.  Alshareqi.

I recall that Alshareqi and Mann had developed a personal friendship and communicated frequently, including about the case. Alshareqi's letter indicated as much; at one point I recall reading that Alshareqi had access to discovery in Mann's case, which was consistent with their correspondence. That caused me concern, including concerns about Alshareqi's credibility as a witness. I recall that Alshareqi communicated with Mann concerning the name of a potential witness against Mann. I recall that Alshareqi talked with Drake Mann on several occasions, and I believe our investigator, on one or more occasions. Alshareqi had mental health issues too, which we were able to learn more about when we attended his sentencing hearing, particularly that he had not been consistently provided his medications while in jail, when his communications related to this case occurred. When we learned about Alshareqi, we did everything we could to secure his appearance as a witness. In early June, we served him a trial

3

subpoena and delivered a sealed, ex parte writ of habeas corpus ad testificandum for the Court's signature. We obtained the sealed, signed writ in mid-June. At the time, it was unclear what agency, if any, would have custody of Alshareqi at the time of trial. Drake Mann was in most frequent contact with him in this regard. In late June, we made a Brady demand of the government requesting all communication between the government and Alshareqi and communications to the court or any third party in the government's possession complaining of the conduct of any government attorney or law enforcement officer. The government responded that it did not have any such information.

On July 7, 2010, Judge Miller sentenced Alshareqi in his underlying case to 21 months imprisonment, a sentence within his guideline range (I believe he had served a good portion of that sentence already). I attended the sentencing and recalled the court mentioning he had received, but not read, a letter from Alshareqi that the Court forwarded to counsel. I believe we received it through Mann, although I am not certain. I believe, during the following week or so, Drake Mann and our investigator met with Alshareqi. I do not recall the specifics, if I ever learned any, of that conversation. My co-counsel, Blake Hendrix, was to my recollection receiving this information during this time, as I was working diligently on pleadings we were filing and trial documents due to the Court. During this time period, I recall we asked if Counsel Omar Greene would speak to us about Alshareqi's allegations but I cannot recall if he provided much, if any, information.

As the trial began, we intended to call Alshareqi as a witness in an attempt to expose the government's conduct during the investigation and prosecution of Mann. I believe we obtained a sealed order to arrest and detain a material witness from the Court in mid-July to further secure his availability if he were released prior to trial or transferred to ICE custody.

On July 22, 2010, Alshareqi allegedly assaulted witness Stephen Briscoe; however, I do not recall having any knowledge of this until Briscoe testified at trial. Shortly after, Alshareqi was appointed or obtained new counsel who, at the end of July, advised me Alshareqi would plead the Fifth and refuse to testify if called as a witness at Mann's trial. On July 28, 2010, Stephen Briscoe testified at the Mann trial, and I first learned of the alleged assault. At that time, the government indicated that Alshareqi had said the beating was for his "uncle" and either said or implied it was done at Mann's request. The government attempted to introduce those circumstances through Briscoe, but the Court did not allow it, subject to the defense rendering it relevant through questioning or through calling Alshareqi as a witness for the defense.

I learned around August 2, 2010 that Alshareqi's wife had flown in to testify before the grand jury and to something involving bank records. We were concerned the government was pursuing a theory that Mann was involved and had solicited the attack. By August 3, 2010, Alshareqi was indicted for the assault on a witness in Mann's trial.

During the final days of the trial, we discussed whether to call Alshareqi and determined that calling him would allow the government to admit their correspondence, Alshareqi's contradictory statements and grand jury testimony, and suggest that Mann had influenced Alshareqi to provide favorable testimony and to threaten a witness. I recall that there was

4

information that Mann had shown or given Alshareqi material from the discovery in the case. It seemed that the government would be able to persuasively argue that Mann provided the information necessary for Alshareqi to identify Briscoe as a witness at his trial, and, in combination with statements Alshareqi made at the time of the assault, played a role in it. Further, Alshareqi's counsel advised he would refuse to testify by pleading the Fifth, which he could not do in front of the jury; even if he could do so before the jury, it would be very damaging. Although we had secured his attendance, we determined calling him as a witness at trial would likely have a very negative impact on Mann's defense, and the jury would likely find him to have no credibility as it related to his allegations of government misconduct and would likely implicate Mann in the assault on a significant witness in his case. I also felt that introduction of the assault would serve to bolster Briscoe's credibility with the jury.

I recall discussing and would have researched the issue of whether his allegations formed a basis to move for dismissal of the indictment. Although, without access to my files, I do not specifically recall what cases or other sources I reviewed, I am familiar with the state of the law in this area and was at that time as well. I did not then and do not now believe Alshareqi's allegations of misconduct and his allegedly coerced testimony before the grand jury were a basis to dismiss the indictment. I do not recall ever being provided his grand jury testimony, other than through Alshareqi's own summary of it.

3.  The Hindu Expert.

I do not recall Mann insisting on or raising the issue of a Hindu expert until during the trial, when the government presented the picture as evidence of Mann communicating with someone in India to solicit assistance in planning the bombing. We were not aware until the weekend before trial that Velma Gales would testify that she saw a person of Indian descent at the scene. During the trial, Mann explained that the picture was used at a Hindu service to pray for wisdom for Pierce as a person with authority over Mann. It was my understanding the participants were Mann's parents and brother, Sandip, and the pooja in India. At the beginning of August, late in the trial, Sue Mann forwarded me a translated statement from the pandit (or priest) who she said performed the service involving the picture. I explained I could not get such a statement admitted in evidence. I also explained my concerns about the content of it. The explanation provided in it was not consistent with what I understood Mann's explanation to be or with some other background facts. Mrs. Mann also late in the trial provided me some contact information for people she thought might be able to help Mann's case in this regard.

I immediately began, while conducting the trial, to identify and locate an expert in Hindu religious practices. I made several calls in this regard. I believe I did some online research but could not find sufficient information concerning the matters the Manns explained to me. I contacted a personal acquaintance who had Hindu family members, and he assisted me in understanding the Hindu religion and gave me ideas of who I could call. He, however, did not confirm what Mann had said about the Hindu services using pictures under the circumstances Mann said his family used Pierce's picture. To the best of my recollection, I believe I contacted or attempted to contact two or three other individuals associated with Hindu Temples, both inside and outside of Arkansas. I cannot recall which specifically I spoke to, but I do recall that

none of the people I spoke to would testify that the circumstances of Mann transmitting Pierce's picture and the purpose for which it was transmitted were consistent with Hindu religious principles. I recall that at least one person felt that using a picture as the one used in the case would not be appropriate for such a suggested purpose. I recall that there was some concern that Hindu religious principles at times involved praying for someone who was dead or dying using a symbol for their presence, and I was concerned that such an explanation may have bolstered the government's theory to Mann's detriment. The people I spoke to did not explain the religious practices to include Mann's explanation about why the picture was sent – that Pierce was in a position of decision-making authority over him, necessitating a prayer for wisdom using a photograph.

I also recall that the timing of the email attaching the picture was well before Mann was advised by the medical board that he could reapply for his license, and a year prior to the bombing. I was concerned also that Pierce, as chairman of the board, only voted if the board reached a tie vote; thus, he had very limited decision-making authority. There were other board members who had verbally spoken out against Mann and had pushed hard to have his license restricted or revoked. If emailed for the proposed purpose, it concerned me that the jury would feel that the other board members who were voting and who had caused and continued to cause Mann's medical board issues should have been included. Further, Mann had been given a positive indication from the board between the emailing of the picture and the bombing, making it less likely the picture was in fact an attempt at soliciting a bombing a year later.

We did not call family members from India who attended the service because they were not available at the time the issue was raised, and, more importantly, if called, they likely would have been forced to give damaging testimony. The government provided information asserting Mann's father was heavily involved in the military and had traveled to and from the United States. A witness alleged Mann's father had access to and was seen in possession of some of the larger ammunition. The government also suggested Mann's brother, Sandip, was directly involved in the bombing and had been illegally entering and exiting the United States. I felt that if either Mann's father or brother entered the United States, they would be arrested. I also believed that if we called them as witnesses, the government would be permitted to present additional, inadmissible, information concerning Sandip, his finances, and his travels, as well as his knowledge of Mann's practices in the United States, particularly regarding their joint finances. I also feared, based on what I knew about Sandip and Mann's business interests and the flow of money, that the government would likely try to indict Mann and Sandip for offenses related to them. Witnesses testified that Mann's father and brother were present at gun shows and were potentially present for illegal firearms transactions, including transactions involving grenades and/or Hahn, and were present in the Mann's home during a time when a witness testified grenades were in plain view. If they had been called as witnesses, I felt Mann's dad and brother would likely have given testimony that would have supported the government's case against Mann.

Sarina Mann was a well-spoken, very Americanized young lady, and she had attended similar services with her family in India. Sarina could also provide the necessary explanation and

6

context for a religious item belonging to Sue Mann that included the names of the Judge, prosecutors, and an ATF agent. The Court permitted us to have Sarina describe and explain the item, but the Court would not accept it as an exhibit for the jury's review. After Sarina testified, we believed her testimony was credible and that she provided very good explanations of the issues. We felt that if we additionally called a Hindu expert, the testimony would have differed from Sarina's testimony, consistent with whatever beliefs and education that person had, as they had explained to me in my calls to them.

I determined the jury may likely find the Hindu expert credible but find the purpose of the picture Mann sent was not consistent with the principles about which the expert would testify. I determined Sarina Mann was a credible witness and could explain the scenario in a way that would be consistent with the sending of the picture and other of her family's religious practices and that the jury would likely credit her testimony in this regard.

4.   The Netherlands Fraud.

I recall having little to no details of this event, and I do not recall Mann ever saying it was the reason for removing the checks from the office. I remember early on in the representation talking briefly with Mann about it and him usually shrugging it off as irrelevant and embarrassing to him. I personally don't even recall knowing the fraud involved pre-signed blank checks or that numerous law enforcement agencies from Interpol, the FBI, to Russellville were involved. I vaguely remember Mann saying it was that he had lost Sandip's money in a fraudulent scam and that was why Sandip held property in his name that Mann used and why Mann had various debts to Sandip. If I had known the details now suggested, I still would not think this occurrence years prior would have made it more likely Mann would have believed a particular person or agency would steal checks from his office if he did not have Sue remove them. More importantly, I think it would have negatively impacted the defense's credibility before the jury if we asserted that not only local law enforcement and ATF but also Interpol and the FBI were engaged in a decade-long conspiracy to hurt Mann.

We believed common sense supported the assertion that removal of the pre-signed checks from an office that was essentially abandoned, and that the public knew was abandoned by virtue of the media coverage and local gossip, was done for safety reasons. In talking with Sue Mann on the jail phone, they discussed this need to keep Sandip's papers safe, as well as "Dan's papers." There was no mention during those conversations of the scam, or in Sue Mann's statements to the grand jury. Further, the suggestion of it would have potentially allowed introduction of various financial transactions that appeared suspicious between Mann and Sandip for a number of years through the time of trial. I felt it best to minimize Sandip's involvement in the trial, as the government consistently looked for any possible way to imply he was the bomber or actively participated in the bombing. It was not necessary to take such a risk given the logical safety reason that any rational juror would understand. Particularly given the phone discussions and that Sue Mann provided the records at issue when requested by the government, raising the issues involving the fraud and Sandip were much more likely to hurt the defense than help it.

5.   Entrapment Theory/Set Ups/Severance.

If severance had been granted, we could have presented with less risk to the defense information about the background attempts to frame Mann to support the theory that the grenades were planted, although we believed even then it would possibly be too risky a defense. If we had decided to do that with them joined, I felt it would have been detrimental to the defense of the bombing counts. First, we had no factual evidence to present linking any person to any specific act of framing Mann for the indicted offenses. We had historical allegations of coercion by varying agencies and officers related to Mann's medical practice and patients. We investigated the allegations to the greatest extent we could but were unable to find a link between them and the grenades or the bombing. We located and interviewed witnesses and obtained materials from prior proceedings in this regard. We verified the accuracy of transcripts of recordings, although if we used the statements, we would not use the transcripts but the recordings themselves. Because we could not present evidence that a particular law enforcement individual committed some particular act of dishonesty in order to obtain (even purportedly) incriminating evidence of the charged offenses against Mann, we faced significant risks in dedicating serious trial time to that theory while reaping little benefit in support of our defense of innocence.

Admitting evidence of the past attempts at framing Mann permitted introduction of the allegations related to those attempts – and those allegations were primarily the reason for Mann's troubles with the medical board and his increasing frustration due to his inability to get his license back in order. I believed it would be very damaging to provide information supporting the government's theory that Mann grew increasingly angry and hostile over the course of several years to the point that he committed the bombing out of frustration that he would not be treated fairly by law enforcement or the medical board. Family members and law enforcement officers would have testified that Mann did in fact cause harm to patients by overprescribing drugs or having inappropriate relationships with them, whether or not there was evidence that indicated otherwise. The testimony would have been that they intended to and did pursue those claims, increasing Mann's frustration and his inability to clear his medical license. It would have been consistent with the government's theory by making it more likely Mann would have felt helpless and a need to use violence. This evidence would also have served to corroborate the testimony regarding Rita Barthleme. Also, this evidence likely would have been extremely damaging in that it would have served to severely tarnish Mann's character in the eyes of the jury.

I felt calling Warren Newman as a witness would be damaging to the defense for the reasons stated above. Additionally, Newman and others had participated in investigations of Mann that we did not have information about because there was no one associated with them that advised Mann that law enforcement had spoken to them or used them in attempts to set Mann up. We were only aware of those people who told Mann about what Newman and others were doing or who testified or were the subjects of medical board hearings at which this conduct was uncovered. We would not have been able to limit the evidence to instances of misconduct by law enforcement involving Mann but would have instead rendered many historical, similar allegations (about which we would not have had information necessary to defend) admissible.

8

The witnesses who provided information that they were coerced or bribed or solicited to set Mann up had credibility problems and were risky witnesses. They had drug problems/histories and were obtaining prescriptions from Mann at times when it was arguably inappropriate, at least according to certain family members and physicians. If the jury felt that was the case, and could see how easily they were persuaded to give false evidence at local law enforcement's request and for personal gain, I felt the jury would not necessarily credit their statements in support of Mann. I believed the jury would have been extraordinarily prejudiced by hearing about the prior allegations of overprescribing and resulting deaths and inappropriateness with patients and that they would not believe they lacked any merit whatsoever. By utilizing the information the government admitted in evidence, such as the medical board transcripts, we could admit the information concerning these prior attempts to frame Mann and the findings that the allegations were fabricated or unfounded while also successfully keeping out of evidence the law enforcement officer's opinions and additional knowledge of Mann's alleged bad acts and other prejudicial information concerning the prior allegations.

The Court limited evidence of certain controlled medications found in Mann's house or that he was associated with. If we had presented evidence related to prior allegations involving patients, which we would have to do to introduce instances of previous law enforcement coercion, we would have rendered admissible evidence of Mann's potentially illegal possession of controlled substances, at least to the extent those medications were allegedly provided to patients. We could have rendered admissible testimony from other patients that was consistent with Rita's testimony, that Mann provided medications in violation of the restrictions on his license and possibly provided medications he had stored at his home.

I recall Mann advising us that Newman's wife, Terri Jacobs, was a patient, and I recall having information from clinic records pertaining to her. I recall that we believed they were either divorced or not living together or something similar at that time. I recall Mann saw her in about 2001-2002, years prior to the bombing. I do not recall ever being able to identify anything Jacobs did or said that appeared to in any way harm Mann, and I do not recall the medical information I reviewed, or that Mann provided me by way of discussion, to involve sex, a stripper pole, or attempts to lure Mann to her house where he could be killed. I recall the information I obtained seemed consistent with Jacobs being Mann's patient at the clinic.

I did subpoena or attempt to subpoena Newman, and I did subpoena records relating to Newman. Because I do not have my trial file, I cannot say whether we were able to serve him or not, although I recall difficulty serving several law enforcement officers despite significant efforts.

I barely recall the Wiley story, and did not know it by that name. I believe I first heard of it in late June 2010, and I deferred to Mr. Hendrix about whether and how to follow up. I do recall that occurred in 2003, well before the bombing.

6.  Severance/Right to Testify.

I raised in a brief to the Court, renewed throughout the trial, and proffered Mann's testimony regarding the denied severance motion, including that it violated Mann's Fifth Amendment right

9

to testify. I recall during my research that I could not find many, if any, cases in which the appellate court found a defendant had adequately preserved the issue for review. It appeared a defendant had to be forced to testify before the issue was adequately preserved for appellate review, although the case law did not explicitly say that was required. To allow my client to provide testimony would be a waiver of his right not to give testimony against himself and would be part of the appellate record that could be assessable in the future to many people, definitely to his adversary. I felt to do so could negatively impact future litigation of this case. I was also constrained in my ability to satisfy the law's unreachable burden in this regard by refusing to violate the attorney-client privilege or Mann's Fifth Amendment rights to do so. It appeared to me from case law that a defendant generally has to admit guilt on one offense and deny on the other, and raise inconsistencies between the defenses, to show prejudice, and Mann was not admitting guilt on any of the offenses.

While Mr. Hendrix discussed this more with Mann, I did not think it best Mann testify. We, however, always leave that choice to the client to make. If he had testified, he would have been subject to questioning regarding numerous suspicious interactions with Sandip and negative character-type questions regarding patients. He could not consistently explain some of the evidence and had previously given contradictory statements in phone calls and letters. Most of the points on which Mann wanted to testify, and that would have helped the defense, were admitted through other evidence, such as transcripts, phone calls, and defense witnesses. At the end of the trial, there was a substantially greater risk of harm in him testifying than there was by him asserting his right to remain silent and holding the government to its burden of proof. I do not recall Mann ever telling me that he wanted to testify; I recall that he did not think it was a good idea for the reasons stated herein, and because he felt the jury would be more prejudiced against him because of his background after hearing him personally speak and try to explain things that were generally unfamiliar or odd to them. I recall Mann agreeing he should not testify but that if the Court granted severance, he would testify as to the regulatory and obstruction counts. On those counts, he could easily and clearly explain where or why he did what he did and logically prove his innocence while the bombing counts rested on circumstantial evidence that generally tarnished his character and indicated a propensity for violent retaliation on which his testimony could not be nearly as factually firm or persuasive.

7. Hahn.

Prior to trial, Hahn told me and Mr. Hendrix that he had cancer and likely would not be alive by the time of trial and that the government was not aware of his medical status. He did not say he was unwilling to testify but instead just that he may not be alive to do so. I am unsure if he was truthful in saying he was ill. When we visited him in St. Louis, he was lucid and did not give me any impression that he was incompetent or that there was any basis for requesting a mental evaluation. He was able to recall specific information to a reasonable degree given the passage of time. During his testimony, he had no problem recalling information during the government's direct examination and only asserted memory problems when asked for information on cross-examination and when the government attempted to explain the contradictions in his testimony on re-direct examination. This behavior in front of the jury demonstrated his intent to give biased

10

testimony favorable to the government, and favorable to his own personal interest, and to withhold information that favored the defense, greatly impacting his credibility before the jury. I did not then and do not now see any basis for striking his testimony or requesting a mental examination. I also felt that alerting the jury to him alleging he had prostate cancer would serve to elevate his credibility rather than detract from it.

I recall that Mr. Lassiter located and spoke with Nick Groszowski; however, ATF had seized the firearm Hahn sold him and ATF stated it did not have it.

I also believe that a mental evaluation likely would have had a negative impact on the defense because it was most likely to find Hahn competent and sufficiently reliable, or provide him a legitimate excuse for his selective memory while not disqualifying him as a witness. If so, the government could potentially use it to bolster the reliability of Hahn's testimony in the face of his questionable medical status or to rehabilitate Hahn after a cross-examination in which he used his memory as an excuse to withhold relevant information by virtue of an expert opinion on Hahn's medical issues.

8.   Failure to Test Grenades.

Prior to and during trial, we had no reason to believe the grenades were inert. Mann did not assert this was a possibility; I recall that he did discuss testing the grenade launchers but I do not recall him focusing on testing the grenades. ATF's explosives expert x-rayed the grenades and testified about the contents and that they were live rounds. Another government witness testified to the manufacturing of the lot of grenades, that generally the same components are used to manufacture that type of grenade today, and that they could be fired at the time of trial. It was my understanding from discussions with our expert that if they were not live rounds, it would have been fairly apparent in viewing them because certain parts are removed when the grenade is deactivated. Our expert gave us no reason to question that the testimony concerning the live nature of the rounds was inaccurate, and neither did Mann. We considered whether we should do independent testing; however, we determined there was no reason to believe that would result in defense-favorable information. If we had tested them and confirmed they were live, it is my opinion that challenging such a fact through cross-examination may have been improper, lacking any good faith basis. Without this, we were able to challenge the effectiveness of the grenades due to age and condition.

9.   Failure to Test Grenade Launchers.

I recall Mann discussing a desire to test the launchers. Mann said he had not fired the grenades from the launchers but had fired some type of device from them. Also, the launchers were used when he purchased them, although they were in good condition. Because the launchers had been used before, we felt testing them would simply verify this known fact and potentially verify that the precise type of grenades at issue, or other illegal grenades, were fired from them; only Mann could testify that they were only fired prior to his possession of them. The jury would likely question whether Mann actually used them or if the use was prior to his possession of them, and we had no way to verify that one way or the other. All information we had indicated that testing the launchers would have been futile and would verify what we knew –

11

that they had in fact been used – and very likely to fire grenades, their intended use. Additionally, whether or not the launchers had fired the grenades, it was the possession of the launchers capable of firing the grenades, and possession of the grenades, that were at issue, not whether Mann actually fired them. Being that any probative value of testing them would be minimal, if there was any at all, we felt asserting that the government failed to test them was a more appropriate way to raise a reasonable doubt about the reliability of the government's proof.

10. Jeff Kimbrough.

I recall that we investigated Kimbrough, but he would not speak with our investigator. We were not able to determine who, if anyone, installed the alarm system along with Kimbrough until he testified. If we had located the employee Kimbrough asserts was with him at the Mann's residence, someone with a military background, I think it likely would have hurt our efforts to discredit Kimbrough because it is likely Kimbrough would not have named the person unless he felt that person would confirm seeing the items Kimbrough said he saw in the Mann's home. If we located the person and confirmed Kimbrough's story, there is little chance that information would be kept from government lawyers. The government would have known nearly immediately about this person and would have called that person as a witness to corroborate Kimbrough's testimony. I also would have great reservations about calling a witness with a military background under the circumstances of the case. Standing alone, Kimbrough was a less than credible witness for several reasons, including his demeanor. He tended to agree with any suggestion that he saw a particular item, both that the prosecution showed him and the defense showed him, both grenades and non-lethal and/or non-regulated items.

We called Wayne Henry, who was in our opinion a credible witness. He was present at the house very often both before, during, and after Kimbrough testified he saw the grenades, and Henry recalled the alarm being installed. Henry was also at the house at a later time. He also had no motive to provide false testimony favorable to Mann. I do not recall anyone identifying or locating anyone else who was regularly in the Mann residence during the same time period Kimbrough testified that he saw the devices at issue.

11. Rita Barthleme.

We had the complaint Jeanice Brown sent to the medical board; the government provided the ASMB file regarding the complaint in discovery. Since I do not have my files, I do not recall whether we also obtained that information separately by subpoena or request to the ASMB. To the best of my recollection, we confirmed and were able to show at trial that the ASMB did not provide notice of this complaint to Mann prior to the bombing.

I recall that Rita sent Mann a card indicating "the feds" would not leave them alone. I believe that card also contained content that I felt would be hurtful to Mann's defense, or otherwise negate any progress we had made with regard to Rita's testimony, which is why I chose to bring out the favorable part through testimony but did not admit the card. The card indicated a *very* close personal relationship between Rita and Mann and included language indicating Rita looked up to Mann. The card served to support Rita's testimony that she would give Mann, her very close friend, warning after Brown advised she was going to make a complaint to the ASMB

12

regarding Mann. It also would have served to elevate Rita's credibility in that it minimized the likelihood that she would testify falsely against someone she cared so much about. The card also made it seem more likely Mann kept Rita close by providing her drugs she desperately needed due to her drug dependency. I also recall we were aware of several letters Mann and Rita had sent back and forth prior to trial, and I was very concerned that the government also had them and would admit them if I admitted this one piece of correspondence.

I recall we determined the date on which Rita saw Mann and determined Brown drafted her letter after that date. Rita testified both that she told Mann about the complaint while she was in rehab and that she had told agents she had told Mann about the complaint either before or after rehab. Both Brown and Rita testified they told Mann that Brown would be or had made a call-in complaint to the ASMB. I do not believe the evidence demonstrated that Mann was aware of the written complaint during the relevant time period, but that he may be been advised Brown intended to make one. The testimony established that Brown and family had made similar calls to Mann, and to the ASMB about which Mann was aware, on several previous occasions including six months prior and that this instance was no different from prior instances.

I cross-examined both Brown and Rita utilizing various public/court records, ASMB information, police reports, and medical records. I believe I used the complaint to cross-examine both Brown and Rita about statements they had made contained within it. I am not aware of any pertinent records in existence that we did not review and utilize, regardless of how we obtained them.

Drake Mann and our investigator conducted a fairly lengthy interview of both Phil and Rita Barthleme. I recall Drake talked with them on several occasions. I do not recall Rita telling us about the communication with Mann concerning the complaint or that Mann provided her drugs illegally. She denied that she would testify as she eventually did at trial.

12. Prejudicial Matter.

Generally, I recall discussing photographs that included what I think was a confederate flag, among several other flags, including American flags. I believe we did raise an objection to photographs including the flags, and the government was limited to one photograph, although I cannot recall if this was by agreement of the parties or order of the Court. I vaguely recall discussion of the issue with the Court, although I am not certain if this is reflected in the trial transcript; I do not think the Court was inclined to exclude the photographs altogether, so limiting it to one was better than the Court allowing many of them into evidence. Mr. Hendrix handled this issue, and he asserted necessary objections as he deemed appropriate. I believe there was one photograph admitted that included the flags, and we agreed they would not draw attention to them. Any objection to the photograph in front of the jury would have brought unnecessary attention to, and a negative character connotation to, what was otherwise not an uncommon thing to see in Arkansas at the time.

I do not recall this photograph being shown over and over. I do not recall phone conversations wherein the Manns were discussing the flags. I recall that there were numerous

13

flags hanging around the room. The asserted Nazi flag did not stand out to me that I can recall. The .50 caliber machinegun was included in photographs admitted in evidence.

I do not recall ever knowing that Mann was aware of or considered the Lee/Kehoe story, and I would recall that if I was aware of it because I am familiar with the facts of that case. I do not recall ever being told that case was a reason Mann had the flags; I do not recall any particular reason given for them, other than I vaguely recall that some of the flags may have been gifts.

13. Photos.

   We made numerous objections to the government bringing lots of firearms in the courtroom; to a great extent the Court allowed the use of photographs but would not exclude them altogether. To the best of my recollection, we did not want the jury to be exposed to a portion of the firearms but not to the collection. We felt it important to show Mann was a collector, and not just of firearms but cars and other items as well. We felt that showing how many historical and interesting collector's items he had would help ease the potential for a juror being fearful of Mann and his weapons and instead see that he collected them, as many people collect many things. We also felt they helped prove that any failure to register the firearms was a mistake, as Mann had legally kept hundreds of weapons for many years, had kept them clean and well-organized, and had legally registered and kept necessary records to do so.

14. Gay Comment.

   I only recall one comment on one phone call between Mann and his wife. They were talking, and were very emotional, as Mann had just recently been arrested for registration violations. The comment was made while Mann was talking about how he should have gotten out of the firearms business but didn't take the advice to do so and about his mistake in not registering one of the firearms at issue. I do not recall if we requested the Court redact that portion of the call; however, I think to do so, given the context in which the comment was made, would have caused more confusion and alarm in juror's minds – wondering what was withheld during a conversation in which the two defendants were discussing the charges. We minimized the focus of the call to portions that did not include the comment, and neither side drew any particular attention to the comment. I also felt the comment and context of it were not overly inflammatory and that at least some jurors would identify with the Manns and likely they or their spouses could have made a similar comment under the circumstances. I do not specifically recall knowing that a juror was gay, although I recall at some point thinking that may have been the case. I am not aware of other phone conversations pertaining to the comment; even if there were calls wherein Mann explained why he used the term, based on the Court's rulings, I do not believe the Court would have excluded the call at issue or permitted the defense to admit various other calls on different dates that included Mann's statements. Also, this call was necessary to support the defense of entrapment by estoppel.

15. CPA.

   The government provided little information pre-trial about this expert and the bases for her opinions. During the summer of the trial, I believe we received the spreadsheet and graph

14

admitted at trial; in late June, the government advised we could review records in support of those summaries. I recall reviewing patient sign-in sheets and information concerning out of state patients and clinic business. I cannot recall being provided tax returns or other financial information, and I do not have access to my file to attempt to determine whether we did or did not. I do not recall them being made available by the government, and I do not recall specifically knowing CPA Faulkner based her documents on tax returns. However, I do not recall having any reason to suspect that CPA Faulkner had provided inaccurate numbers. I still have no reason to believe that Pierce's clinic business was not impacted, however arguably slightly, during some period of time following the bombing. Later, in 2011, after we had 2010 information available, it was clear Pierce's clinic did not suffer substantial long-term financial losses, as Faulkner had expected. While I now believe an expert could have possibly shown Faulkner's tax return numbers to be inaccurate, I do not believe the inaccuracies would produce a result that would have shown that there was never any decrease in business at all following the bombing. The primary issue was whether that, along with other evidence, satisfied the interstate commerce element of the offense, and we believed that it did not. The government did not establish that any loss in clinic income effected interstate commerce, for instance, because supplies purchased out of state ceased. However, it was indisputable that the clinic was closed for several days.

16. Failure to Pay Attention to Mann.

Mann sent many, many letters to us, both to us directly and through Drake Mann and Sue Mann. Typically, Mr. Hendrix and/or Drake would review them, and then we would discuss them. Usually, we would discuss issues Mann raised with him and explain our opinions regarding them; if the attorneys had differing opinions, we would share that with him as well. Usually, we, including Mann, would reach agreement on a particular issue. At times, Mann would agree and then later raise an issue we had previously addressed and decided, and we would then recount our previous discussions and decisions. I recall that Mann most often deferred to our best professional judgment; I recall discussing that he, as a physician, understood and appreciated that we, as lawyers, had more informed knowledge and experience to make such decisions.

We did not disparage Mann's input about matters to which he was a witness. I cannot think of any input about matters Mann witnessed that we disregarded. We did not disparage Mann's ideas in any respect. In fact, we found Mann to be a very intelligent person and very able to assist us in his defense. We valued his ideas, thoughts, and opinions and addressed them regularly. Between Drake Mann, Mr. Hendrix, Mr. Lassiter, and myself, we visited Mann frequently and communicated in writing regularly. Mann would send word through Sue or by letter if he needed to meet with us about something, and we would make arrangements and visit him.

I do not recall any issue regarding the transcribing of recordings Mann had provided. I recall there were transcripts, and we would have verified their accuracy. I think Drake Mann transcribed some of these and provided them to us.

I do not recall discussing potentially calling an expert to testify to the damage to Pierce's Lexus. I do not recall discussing that the damage to the Lexus could even possibly have been caused by something other than the bomb that went off right next to it. If this issue had been discussed with me at the time, I would not have agreed that pursuing that theory was strategically sound. In my opinion, it is unreasonable to assert that the Lexus was not damaged by the bomb. The bomb was designed and placed to cause damage to Pierce, and the car was used to ensure Pierce would be next to the bomb at the time it detonated (because he would need to use his vehicle). The car was incidentally damaged by the bomb apparently intended to harm Pierce; it was clear that whoever set the bomb did so knowing and intending for Pierce to be injured and the car to be damaged in the process. The primary issue in the case were whether Mann committed, or conspired or aided someone to commit, the bombing. Whether or not the Lexus was damaged slightly or significantly by the bomb was irrelevant, both as to the required elemental proof and as to our defense.

I recall Newman's print on the Lexus bumper. I cannot recall all of the specifics, but I believe it was in a location that was consistent with his handling of it as evidence and that it was placed there after the bombing. I do not recall Newman's prints being found on any other item of evidence.

I recall that Mann had a visitor of Indian descent at his home. I cannot recall the specifics regarding this. To the best of my recollection, we determined this person was not going to be a good witness. I recall that Mann's explanation of the purpose of this visit and the circumstances of it changed a few times and seemed inconsistent and were also inconsistent with what Sue said and with what they discussed on the jail calls. I also recall that there was an issue regarding taking him to the airport and destroying evidence. I believe, although this is very fuzzy in my memory, that the Manns' phone discussions about taking the visitor to the airport were inconsistent with what the visitor would have said occurred and could have been very damaging on the obstruction-related and bombing counts. I do not recall whether Mann and Sue discussed getting the visitor to court to testify on the jail phone. To the best of my recollection, Mann did not insist on calling him as a witness.

To the best of my knowledge, the government provided all of the jail calls in the government's possession, which were voluminous. We requested them all and made additional Brady demands for them. We specifically requested transcripts, and verified their accuracy. I recall we did not get these until shortly before trial and did not have notice of the portions the government intended to use until immediately before or during trial. I do not recall Mann ever saying he believed calls were missing or asking us to find calls containing certain discussions that we were unable to locate. Pursuant to the Federal Rules of Evidence, we could not admit Mann's phone calls with limited exceptions.

I do not recall whether Hahn said he was told years ago not to do business with Mann, but I do not recall him so testifying. He may have told that to us during our investigation; however, I do not specifically recall but do not think I would have thought it prudent to have suggested to the jury that federal agents nationwide were concerned about Mann for a decade prior to the bombing.

16

Based on all information I have reviewed, Mann did not get his license reinstated without restrictions in June 2009. In December 2008, the board voted that they would consider allowing him to reapply for a DEA permit after he had been without it for three years; the board voted to permit him to request to appear at the June 2009 meeting. Mann was arrested in prior to that meeting, and he filed a lawsuit against the board in June 2009. To my knowledge, Rita Barthelme has never testified at the ASMB.

I do not recall knowing or believing that Terry Sanders had "field notes" of his conversations with Mann. I have little recollection of Sanders without the benefit of the case files.

Mr. Hendrix primarily addressed Briscoe-related issues; thus, I do not know the full extent of what he did or did not do or why he made certain decisions. I do not recall knowing that Briscoe would testify that the alleged conversation with Mann occurred in the rec yard; I recall he previously stated it occurred while playing spades. We had little to no information about Briscoe pretrial; we received his prior statements immediately before he testified, and I believe we had no information from which to identify any other individuals until that time. I do not recall whether we located or attempted to locate Samuel Silva. I do not recall discussing the potential for obtaining videos to dispute Briscoe's account. Given that we did not know Briscoe would be a witness until close in time to trial, if we had attempted to obtain them, we would likely have been unable to do so because nearly a year had passed.

I recall Cecil Norwood had been in lock up at the federal courthouse with Mann. I recall we were not provided notice that he would testify until very close in time to trial, as with the other informant witnesses, and that we did not know what he would testify to until he testified at trial. I do not recall Mann suggesting we obtain surveillance tapes; however, tapes, if they existed, would show they were in the same cell but would not demonstrate what was said. It was not clear to me that there were other inmates who heard the conversation. Since we did not know Norwood was going to testify to this conversation being at courthouse lockup and that other defendants were in the same cell until the trial had commenced, it was unlikely we were able to obtain any video or locate in time to call as witnesses anyone else detained with them over a year prior.

I recall some inconsistencies regarding witness testimony relating to the placement of the rigged tire relative to Pierce's Lexus. I believe these were illustrated on cross-examination. The inconsistencies were not drastic and could be expected under the circumstances. These witnesses did not have any motive to lie. The inconsistencies did not impact our defense because our defense was that Mann was not involved in the bombing, regardless of when the bomb was planted. I do not understand how the inconsistencies serve to show the bomb was placed early the morning of February 3, 2009, thereby destroying the testimony of Velma Gales. The government's theory was that Mann personally did not plant the bomb so there was no potential for an alibi defense to show Mann was not in the area either the night before or morning of the bombing to be successful.

I do not recall Oliver testifying that Mann fraudulently obtained his qualifications and certifications from the Internet. Mr. Hendrix made the decision concerning Oliver's remark about

17

Mann obtaining his certifications by paying a fee, as he was examining the witness. In my opinion, Oliver's comment served to damage his credibility because he added information not responsive to question, and without factual support, and obviously designed to be inflammatory. Mr. Hendrix immediately pointed out that Mann was associated with Johns Hopkins, refuting any implication that Mann was less than a qualified physician. In my opinion, Oliver appeared to be very biased in his responses, this one particularly so, making his testimony less credible than it would have otherwise been.

I recall that numerous photographs of the ammunition room were shown to the jury and many witnesses discussed the layout and its contents. I also recall we did not object to photographs of this room as there was no legal basis to do so. Items directly relevant to the charges were located there. Further, they served to show Mann's tendency to collect and organize his collections. The cars also served this purpose. Further, we needed the jury to understand Mann's love for cars, attention to detail, and desire for organization and maintenance. The tire in the shower was explained through demonstrating that Mann was hyper-focused on keeping his cars clean and in good repair and often did so himself. We also had to foreclose the idea that Mann obtained a tire for use in the bombing through tires he had for his vehicles.

Regarding the tire in the shower, Oliver admitted to seeing something on it, Sarina Mann explained why it was in the shower, and we called another witness to discuss what had happened to it that caused some kind of discoloration from water damage. The rust issue was sufficiently addressed during the trial.

I do not recall Mann mentioning the malfunctioning equipment in court. I only recall that certain government exhibits were on a computer operated by their assistant and thus we had to rely on her to use them on the screens. Other than that, both parties had general issues with the equipment, and I do not recall it appearing that it was primarily the defense.

I do not recall Mann ever saying he desired certain objections to be made that were not made. We always planned for Mr. Hendrix to do the closing statement. As he did closing, he made decisions about whether to object to the government's closing or not, although I do not recall the AUSA making statements consistent with what Mann now asserts pertaining to the black plastic.

I recall we attempted to admit tapes of phone calls of Mann while in jail; however, the Court would not permit us to do so unless it was the portion of a call surrounding a potion introduced by the government that in fairness should be admitted to provide accurate context. The Court's ruling was consistent with the rules of evidence.

I do not recall seeing many of the notes Drake Mann says he provided us. However, it is likely he provided them to Mr. Hendrix. I have some of them, although they appear to be different in some regards than those that appear in the petition. It appears to me that I obtained and saved those in my computer a year after the trial. It would have been typical for Mr. Hendrix and Drake Mann to discuss those and for Mr. Hendrix to then apprise me of the contents and of any issues raised in them that he wanted my opinion about or wanted me to follow up on.

18

I have reviewed the foregoing and state that it is true and correct to the best of my knowledge and belief.

_____
Erin Cassinelli


SUBSCRIBED AND SWORN to before me, a Notary Public, on this 26 day of _____, 2015.

JENE LOUVIERE
Notary Public-Arkansas
Pulaski County
My Commission Expires 04-07-2025
Commission # 12404190

_____
Notary Public, State of Arkansas

My Commission Expires: 4/7/2025

19

# AFFIDAVIT

**STATE OF ARKANSAS**    )
                          )
**COUNTY OF PULASKI**    )

Before the undersigned Notary Public, duly qualified and acting in and for said county and state, appeared Jack T. Lassiter, to me well known to be the affiant herein, who stated the following under oath:

My name is Jack T. Lassiter. I received my J.D. Degree from The University of Arkansas School of Law at Fayetteville in 1973. I clerked for Associate Justice Frank Hope at The Arkansas Supreme Court in 1973 and in 1974. Following my clerkship, I was an Assistant Attorney General in the Criminal Division of The Arkansas Attorney General's Office from 1974 to 1977. I went in to private practice in 1977. My practice has been almost exclusively criminal for the past 25 years. I am a Fellow of The American College of Trail Lawyers. I have served on The Arkansas Supreme Court Criminal Practice Committee and The Model Criminal Jury Instructions Committee. I was a member of the Federal Magistrate Selection Committee for the Eastern District of Arkansas in 2005 and in 2014. I am Admitted to Practice in the Arkansas State Courts, the United States District Courts for the Eastern and Western Districts of Arkansas and the United States Courts of Appeal for the 5th, 8th, and 11th Circuit. I was admitted to practice before the United States Supreme Court in 1978 where I have had the privilege of arguing twice.

1.     I, Jack T. Lassiter, was an attorney of record in United States of America v Randeep Mann, Case No. 4:09CR00099. This affidavit is based on my best recollection several years after the events occurred and on reference to certain records related to the case. We turned our files over to Dr. Mann's post-conviction counsel, and I have not had access to all of them since that time.

2.     Failure to call Alshareqi.  We had Alshareqi under subpoena. However, we were notified by his attorney Jim Wyatt that if he were called to testify he would assert his Fifth Amendment Privilege. Had he not asserted the privilege, we would not

1

RESPONDENT
EXHIBIT
18

have called him. After the Briscoe incident, he was compromised. Calling him would have led to questions on cross examination about Dr. Mann's involvement.

3.      The paper in the shoe and the Hindu ceremony issue. We called Dr. Mann's daughter Sarina who testified concerning the ceremony. Ms Cassinelli did the research on this issue. The piece of paper in Mrs. Mann's shoe was discussed at a bench conference. The Court's final ruling after a lengthy bench conference was that Ms. Cassinelli could show the exhibit to the jury and ask about it but that the court would not allow its introduction into evidence. Sarina testified that the exhibit was something that her mother put inside of her shoe, and that was a religious practice. The exhibit contained circles on a piece of paper with the names of Judge Miller, Agent Oliver, Michael Gordon and Julie Peters. She testified that it was typical in the Hindu faith for everyone to pray for somebody who is presiding over something that effects one's family. Sarina's demeanor was excellent, and she was a very credible witness.

4.      The $200,000.00 Loss. We did not go into the $200,000.00 loss and the trip to Amsterdam because it was not relevant to our case. We also were not sure how the jury would react to that story. That might have made them more suspicious of Dr. Mann. I did not recall discussions about the Amsterdam mess being the basis of the removal of the documents from the office.

5.      Failure to call Warren Newman. It was a strategy decision not to call Mr. Newman and to try to establish law enforcement persecution of Dr. Mann. We did not want to give an experienced law enforcement officer the opportunity to testify before the jury about why he had been trying to arrest Dr. Mann for years.

6.      Failure to test the grenades. Prior to trial we received in discovery a forensic report indicating that the grenades were live. Also, Stephen Shelly, the gun expert, testified at trial that he x-rayed some of the grenades to determine their contents. He testified that he could see the fusing system, the explosive package and other components indicating that the device was an M406. The x-ray of one of the grenades was introduced, Shelly identified the fragmentation ball which was the actual weapon on the x-ray. He also identified the fusing system. He testified that based on what he saw in the x-ray, the grenades were live. He testified they were live because of a steel ball that

wasn't placed in practice grenades as well as the fusing system and the inertial weights. He also testified that he had seen these grenades hundreds if not thousands of times and could identify them by sight. We knew of nothing suggesting the grenades were inoperable or that we should have one tested.

7.     Witness Kimbrough. Our investigator recalls that Mr. Kimbrough would not talk to him prior to trial. I do not recall what efforts were made to determine who his employees were at the time of the installation of the alarm system at the Mann residence.

8.     Witness Lloyd Hahn. Erin and Blake had previously interviewed Hahn in St. Louis. Nothing in that interview indicated to them that he was incompetent. It became unnecessary to call Nick Groscowski to testify. I talked to Mr. Groscowski several times prior to trial. Mr. Groscowski was under subpoena but Mr. Hahn acknowledged Mr. Groscowski's firearm with serial number 1441. Mr. Groscowski had turned that weapon over to ATF some time prior to the trial. I do not recall when or why. I asked Mr. Gordon to contact ATF to locate the weapon. I was informed that ATF was unable to locate the weapon. Mr. Hahn also testified that he delivered one of these weapons off the books to Colonel Frank Matthews. Following Mr. Hahn's testimony, I attempted to locate Colonel Matthews in Georgia, but I was unable to do so.

9.     Jail calls. Many hours of calls were provided in discovery that were not introduced into evidence. It is my recollection that we reviewed all of the tapes that were provided. We did not think we would be successful in entering a defense consisting of portraying Dr. Mann as a victim of governmental persecution.

10.     ATF contact with Hahn in 2001. There was nothing in Lloyd Hahn's testimony to the effect that ATF agents told him back in 2001 not to have dealings with Dr. Mann.

11.     Terry Sanders. I recall no conversation with Dr. Mann concerning "field notes" of Terry Sanders. I do recall a memorandum concerning Mr. Sanders by Dr. Mann. It makes no mention of notes by Sanders.

12.     Car damage expert. Dr. Mann complains that I didn't get an expert to review the damage to the car. We had numerous pictures of the vehicle taken at the crime scene immediately after the explosion with absolutely nothing to suggest that they

3

were staged and no reason for them to have been staged.

13.     Remarks in Mr. Gordon's closing statement. Michael Gordon did not make the statements attributed to him in this allegation.  Mr. Gordon argued that Dr. Mann took the remains of two rolls of black plastic and wrapped up the can. That consists of the sole reference to the plastic sheeting in closing argument.

14.     Witness Velma Gales. Ms. Gales testified that she saw the jogger in the darkness at 11 p.m. from her car at an intersection. The man  was jogging in place. She testified, "Well, I didn't see him good. He was just a man. He had a baseball cap on his head with a pretty long ponytail hanging in the back and he had some jeans on and a short t-shirt." She moved her head for him to come on through the intersection but he declined. She testified she didn't see his face. There was nothing implausible in Ms. Gale's testimony. She was at an intersection at 11:00 at night without a streetlight.  She testified that this person had his head down and that she didn't get a good look at his face.

15.     Witness inconsistent testimony as to the location of the tire. The fact the witnesses may have testified as to different locations of the tire has nothing to do with when the tire was placed there.

16.     Oliver testimony. As to Dr. Mann's assertion that Agent Oliver willfully and with the intent to deceive and mislead testified falsely that Mann's medical qualifications and board certifications had been fraudulently purchased off the internet, that was not Mr. Oliver's testimony.

17.     Photographs of cars. I have no recollection of any complaint from Mr. Mann in that regard.

18.     Courtroom equipment. I have no recollection of the electronic equipment choosing to work for the prosecutors but not for the defense.

19.     Blake Hendrix told to close. As to the allegation that Dr. Mann told me to back down and let Blake Hendrix do the closing argument, that conversation never occurred. I do not recall ever being responsible for closing argument. I always assumed that Blake would do close since he was lead counsel.

20.     Failure to pay attention to the client. I spent numerous hours with Dr.

Mann while he was pre trial detained. I met with him by myself and also with Drake Mann. During trial I tried to talk with him when he wanted to discuss testimony and I paid attention to his remarks. He could be difficult to understand and I frequently had to ask him to repeat his remark. We used a notepad to communicate throughout trial

21.     I recall no conversation with Dr. Mann concerning his flags, or a conversation with a nurse relating to the Mueller murder which arose in the case of United States of America v. Kehoe and Lee, a Federal Prosecution in the Eastern District of Arkansas in 1999. I was court appointed counsel for Mr. Lee along with Cathi Compton. If I had such a conversation with Dr. Mann, I believe I would recall it.

Further the affiant sayeth naught.

IN WITNESS WHEREOF, I here unto set my hand this 6th day of July, 2015.

Affiant

SUBSCRIBED AND SWORN to before me, a Notary Public, on this 28 day of _____, 2015.

JENE LOUVIERE
Notary Public-Arkansas
Pulaski County
My Commission Expires 04-07-2026
Commission # 12404190

Notary Public, State of Arkansas

My Commission Expires: 4/7/2025

5

RESPONDENT
EXHIBIT
19

To the Honorable Brian S. Miller,

My name is Hamis Alsharki, your my Judge in case no. 4:09CR00021-01 BSM. I'm writing you this out of fear for my life. The stuff I'm going to tell you are true facts of what happened. I feel like your the only one (other then (GOD) I can trust at this time. I've meet you, your an up-standing guy, I like the way you handle your business and most of all I can tell your a man of truth. Please I NEED YOUR HELP! Please take a few mins out of your time and hear what I got to say. I was forced to do something I didn't want to be part of. I have seen these people mess a man up with mill-ions of dollars and if they can do what they want to him, well then i'm a nobody. If tom-morrow they find me hang in my cell, well I bell-eve and trust in you and want to let you know if anything where to happen to me, you'll know before hand the "Why." Your Honor I'm scared for my life. I don't trust my lawyer or even to tell my wife over the phone, or even write her in a letter. My lawyer is a part of this criminal offense.

At frist I thought they came to me with an future, an opportuinty for me and my wife

2 of 26

and kids. I don't have nobody else here in America, my mom, dad, brothers, and sisters got deported back to Yemen. I've been locked-up for over a year, all my friends I'k had, gone. They offered me an imunty so I can be with my wife and kids here in America. But at the same time I was scared because they told me "... if you don't take up on this offer, you would regreat it" So what other chause I had? I was scared and I did what they wanted me to do and say out of fear. It all started on Aug. 28, 2009...

~Aug. 28, 2009~

One that Friday in the afternoon I was moved from cell number P-311 to P-317 with Randeep Mann. We became cellmates and we got to know each other better. Six (6) day later...

~Sept. 3, 2009~

I was one of the units clean-up craw. My job that night was to clean the showers. I have-did the showers because I need some bleach (so called "clorform") to wash my clothes They keep the bleach in the deputy's bath-room just cause we (inmates) keeps on taking

it but only brings out just enough for a spray bottle. I had went to the utility room and grabed a small trash bag and poured the bleach in to it. I went by our room (P.317) and asked Randeep if he needed some and he tells me 'NO, I'm alright'. I then asked him if I should sell it he say "Whatever, do what you want". I had took it in to the room and put it beside of the sink and had put a fase rag on top of it (in a way was trying to hide it). The next day...

Sept 4, 2009.

After eating lunch me and Randeep was back in the room. Deputy Evins and Sgt Tensley and Sgt Bangs came in to the cell and told us to step out. There was 3 U.S. Marshal's waiting to search our room. The Sgt put me in the cellyport and Randeep in to a shower for a strip search. I thought I would be next but the Marshals never searched me or said anything to me. The deputy asked me which was my stuff in the room, when I was still in the cellyport. They (Sgt's and US Marshal's) walked Randeep out of the unit and moved him to a suicide cell by himself in another

unit. The deputy let me went back to my room (P-317). I had changed rooms and moved back to my old room (P-311). Six (6) days later.

~Sept. 10, 2009~

I was in my room (P-311) and was told to get ready to go to court. So I grabed my paperwork thinking you wanted to see me. One of the Sgt. thats in the transport deportment, Sgt. Redmen came and got me from the unit and walked me to where the Marshals always come and get the inmates for court, but on our little walk we talked a little bit. She asked me how I was doing and I told her I was fine and asked her the same but then I asked her "was the Marshals' down stairs already" she said "No, not yet but A.T.F is coming for you." So, I was like "huh, what's the differens" she said "I don't know, but they called and asked to get you ready, they was on the way" so, I get down to the holding booth and they ainly come. Two (2) A.T.F agents (still don't know they names, but one is 5'9, 150 lbs, w/m, about 30-35 years old and the other one's about 5'7, 190-210 lbs, buld body, w/m,

about 40-48 years old) comes and tell me
"Hi, how are you doing?" I tell them good and
then asked me "You ready". So they put the
akelcuffs on but no handcuffs, I thought that
was kind of alered because every time I went
to any court, they'll have both on. On our
way out I asked them "Whats the differens
between you two and the Marshal's taking
me to coort?" They say "we'll tell you in a
few mins". So now I'm like "What the hell is
going on?" "What's happening here?". I get in to
a gray Impala and they tell me "We're going
to have a meeting with you, your lawyer-
Omar Green, and US Attorney Karen Whatley,
in the front building, when we get there
we'll talk about this some more". I was
like "well, at lest Omar will be there." We get
there and Karen Whatley husn't showed up yet
so the short A.T.F. agent says "Omar, I'll let
you bring him up to date and we'll be out
here until Karen shows up. He leaves and
I start talking. (note * Omar Green (O.G.), Karen
Whatley (K.W.), short A.T.F. agent (S.A.), and tall
A.T.F. agent (T.A.))
      Me: Omar whats going on here?
      O.G: I got good news for you.

6 of 2

Me: What?

O.G.: These people is fanna ask you about Randeep Mann and in return they are willing to give you a "time-cut" on your sentence. But I advice you its in your best in trust.

Me: What? like what plus my time is already short, I ant got nothing but like 6 to 9 months and plus I'm fasing deportion anyway.

O.G.: Really you only got that much left? I believe they can help you get imuinter to stay here in the States.

Me: Man, I wouldn't know what to tell them anyway, its not like I knew him from the free world.

O.G.: Just answer what they ask you.

By that time they all walked in the room, the two unknown A.T.F. agents and Karen Whitley. We all said our "Hi's" and "How are you doing's" and then it went on like this.

O.G.: He doesn't have a lot of time to get any "time-cut," but he do has an immigration hold and theire going to deport him back to Yemen. He's been here 18 years but

all his family had got deported not to
long ago and he don't wants to go. What
you think?

KW: We can grant him imunite to
stay in the States.

CI: It sounds like an opperturnity
of a life time to me. What you think
Hams?

Me: Yea, but what I got to do?

SA: Answer to what we ask you.

Me: And if I don't?

SA: Well, it's like this off the record
if you help us with what we need, wen
will give you imunite to stay here with
your wife and kids in the States and will
not get deported to Yemen, but if you
don't take up on this offer you would
regreat it.

KW: I'm going to make sure every-
thing works out with immigration. I got
alot of friends in that department.

Me: Okay, where do we start?

(*note* They wouldn't tell me what to
say but as you'll see, they were telling
me how to say what they wanted me
to say. This is what they were

asking and me answering)

S.A: Did Mr. Mann send anybody to do the bombing on Dr. Peires car?

Me: I don't know

S.A: No, try again

Me: Yes

S.A: That's better

S.A: How does he feel about Dr. Peires?

Me: He don't like him

S.A: Better

S.A: Have you hard him say; "Good thing come to an end, or "It starts one way but it ends another way," or "People get what they deserve" or even "An eye for an eye" Do you think he was talking about the bombing?

Me: I might or I might not have hard him say them, but I even say stuff like that —

S.A: We're talking about him

Me: Well, okay

S.A: Do you think it had something with the bombing?

Me: No, he couldn'e been talking about nything

S.A: Nope, that's not it
Me: Yea, it did
S.A: Your getting better at this
S.A: Whos clorform was that?
Me: Mine, I got it from a spray bottle
S.A: No, try again
Me: It was his
S.A: Who put them gernades there?
Me: Somebody
S.A: Was it somebody he knows
Me: It could be
K.W: Thats real good today. You did
a good job. We advice you, that you should
not talk to nobody about this, even your
wife. Do you have anything you want
to ask anyone there?
Me: No
K.W: Well, then if you want to get
in contact with us, you could let Omar
know and he'll let us know then we'll
set-up a meeting. But we'll be telling
the county that your going to court
because we want to keep this between
us only.
Me: Alright

We had said our good-byes, and then
the two A.T.F. agents brought me back
to the holding booth and then they
left and I hit back to the unit.

Your Honor I was scared what else
I was suppose to do when they told
me "...if you don't take up on this
offer you would regreat it", I did
what they wanted me to do out of
fear, I mean after my lawyer said "
It sounds like an oppertunity of a life
time to me what you think Hamis." I
knew he wasn't there to be on my side
and after he seen and herd the whole
thing and knew it was wrong, he didn't
stop it at all but let it happen. After
that day I didn't hear nothing from
them not until....
~ Nov. 2, 2009 ~

On this day I had came back in front
- you but before I seen you I was
brought in to an interview room (the
one where I would talk to my lawyer
before we go in front of you). I wasn't
supprised when I seen the two unknown

A.T.F. agents, Karen Whatley with Omar Green in the room. We said our "Hi's" and "How are you doing's", and then we got in to it;

S.A: We see you've been getting letters from him.

Me: Yea, he's been writing me since Sept.

K.W: Anything you want to add?

Me: No, he's not saying anything about his case, you got all the letters I ever got from him.

Me: Do you want me to stop writing him?

K.W: It doesn't matter, other then you can't be asking him about his case and that's because you haven't read him his rights and that's only because since your with us, your concered an agent and that would be unuseable in court because mostlikly he'll show the court, what you asked him is on paper.

Me: So, it's alright to write him?

K.W. Yea, just don't set-your self up.

Me: Alright

The 3 left and Omar stood behind me and him talked about my case for a little bit. He told me he had got the P.S.R. that day and I was going to plead guilty and put in a motion for a continuance on my sentencing. A few mins after that I came in front of you plead guilty and then Omar and the U.S. Attorney had approached the barch and informed you that, I'm being used as a leading witness in another case and if I would to get sentence that day then immigration will deport me and need a continuance for that reson.

Now the next date will be when I was put in front of the Grand Jury, but I was never told about seeing the Grand Jury....
- Nov. 7, 2009

On this day, I thought something happened with my case and you wanted to see me. Again I was seen by Omar, Daren Whatley, the two unknown A.T.F.

agents, and a male prosecutor (I
don't remember his name, but he looks
like about 5'7, 150 lbs, looks about 28
years but is about 30-35 years, w/m and
pink in the face). Before they put me in
front of the Grand Jury the male
prosecutor (M.P.) asked me the same
questons I was asked in my frist
interviwe and when I hard the frist
questen, I already knew what I had
to do because I was scraed of what
they said in the frist interviwe (".... you
would regreat it "), so I said what
they wanted me to say out of fear,
And it went like this....

M.P.: Did Mr. Mann send anybody to
do the boming on Dr Peres' car?
Me: Yes
M.P.: Do you know who?
me: No, but it was some body
M.P.: Did you ever hear him say, "People
get what they deserve, or "Good things
Come to an end", or what about "It sta-
rts one way but it ends another way",
Do you think he was talking about the

booming?

Me: Yea, it did

M.P: who put them Grenades there?

Me: somebody, he knew

M.P: who's clorform was that?

Me: it was his

M.P: Karen tells me you'll be getting an imunte to stay in the States for doing this. Right

Me: Yea

K.W: You will be asked "Why are you doing this?" and you would responed with "I want to stay in the States and be with my wife and kids." That way it will help me get you the imunte when you go to immigration court.

Me: Alright

K.W: You ready to do this, so we can get you back to your family and stay here in the States?

Me: Yea

I was then brought in frount of the Grand Jury in min's, they told me after we finshed that I did a great job and proud of me and it went

well but I swar Your Honor I felt
like I could jump out the window. I
know that was wrong what they had
me do, but it was like "do it or you'll
pay" and I just want to tell the truth
why now? Because it's eatting me up from
inside-out. at frist it was just a name
but then that name gots a fase and that
fase gots a wife, kids, a momma and a
dady, and may be a brother and a sister.
I'll never forgive myself for letting
them send a man to prison by using me.
   The next date Your Honor, was my
last and resent vist by them and that
when I grow some balls.....
   ~April 22, 2010~


   I was brought down to the holding
booth that morning. The two A.T.F. age-
nts was already there waiting on me to
come down from the unit. I was joking
and said "I didn't do it" to the agents
because I could tell there was something
on there minds and the short agent said
to his parter "Well, he already knows
why we're here", and that kind of freakes

1606.20

me out because with these guy you don't
know what to expect. They asked me
what have I been up to and told me
my lawyer won't be there and Floyd
Hancock- chief of investigators of the F.P.D
office will be there insted and also karen
Whatley. We all got our seats but this
time the short bodybuild agent grabs
a chair and sits besides of me and
says "I'm gonna sit here just in case
he acts up." (*note* all the other time
he and everybody else sat across from
and only my lawyer would sit besides
of me, but now he's putting a lot of
pursher on me already knows I'm uncom-
forble as it is) Karen Whatley. starts;

  K.W: whats new with Mr.Mann these
days?
  Me: Well, ever since he got his dis-
covey and found out that there was NO
evidence he's been very carfull of what
he says.
  K.W: Has he spoken about Dr.Peires or
the Med bord?
  Me: Nope, not a word

K.W: Gernades?

Me: No

K.W: How about the booming?

Me: Not that eather

K.W: Bullshit! We know he like's to run his mouth, and your the closer't perso to him. He like's you, trost you, and you two have been writing to eachother for a long time.

Me: Yes, that is true but like I said he's not saying a word about the case.

K.W: Clorform, what about that?

Me: It was mine, I got it out of the spray bottle, I brought it in to the room.

K.W: Really, where was it in the room?

Me: By the sink

K.W: Was anything on top, beside, or under it?

Me: Yea, a fase rag on top of the bag, I was kind of hinding it in away.

K.W: In one letter he asks you to find out about a person but then on the next he's thanking for the infomation. What was that infomation?

Me: O' that was a name he needed

18 of 20

and I happen to come across him.

K.W. : Why him? What did he do? Whats
hes name?

Me : The dude had got over on him and
wanted his real name not nickname. I dont
remember his name right now, it was some-
thing I had wrote down because I was
in a rush, but when I get back to the
unit I'll call Omar and let him know.

K.W. : We believe your helping him.

Me →

K.W. : We need that name.

Then up and gone, and I was on my
way back to the unit, no good-byes
where said, no hang-in there, no nothing.
The next day I called Omar and I talk-
ed to him, he tells me he couldn't be
there because he had Jury trail and I
told him about the interview and how
they where putting pusher on me and
the short A.T.F. making me uncomforble,
and he says "It's how the case is going
and from what you said yesterday it's go-
ing down the drain and don't take it
personal it's just business and don't worry

every thing will be alright", but then
the phone cuts off and I've tried to
call back a few time that day and
a few times this past week.
    I would like to end this by saying,
I'm sorry for what I was forced to
do and should've spoke up earlyah, but
trial for this case is still 7 weeks
from now and I pray it's not to late. But
Please understand what I'm doing now, I
I didn't and never did wanted to be
apart of this, to send a man to pri-
son without evidence, that would be very
wrong and I don't want to be the
person to help them. NO! Not no more! But
Your Honor you see why I'm coming to
you. I need your help, I can't trust no-
body at this time. Your Honor I'm more
then willing to do whatever you need me
to do, if that mean to get a lie detecter
test 'I'll do it', get on the stand 'I'll do
it', whatever you want. Yea, I won't get
to stay here in America and get send
back to Yemen, but in my heart I'll
know I did the right thing. Thank
you for your time, and please Your

Honor, let me get some type of resp-
ounds letting me know you got this.
I'm doing this on my free will. This
right here, I can say I wasn't forced,
bribed, or even threated to do this. I
just want to tell the truth, and let
it be known to you

Respectfully,
Hamis Alshark

In witness wherefore, I hereunto set my hand
this 12th day of May 2010.

State of Arkansas )                    Hamis Alshark
                  )ss
County of Pulaski )

Subscribed and sworn to before me this
12th day of May 2010.

My commission expires. 04/21/2019

OFFICIAL SEAL - #12370966
ELIZABETH M. CROUCH
NOTARY PUBLIC-ARKANSAS
SALINE COUNTY
MY COMMISSION EXPIRES: 04-21-19

U.S. DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

**FILED**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

**JAN - 7 2009**

IN OPEN COURT
JAMES W. McCORMACK, CLERK
BY: _____
DEPUTY CLERK

UNITED STATES OF AMERICA,               )
                                        )     4:09-CR-00021 BSM
vs.                                     )
                                        )     8 U.S.C. § 1253(a)(1)(D)
HAMIS ALSHAREQI                         )     18 U.S.C. § 922(g)(5)
a/k/a HAMIS ALSARKI                     )     18 U.S.C. § 922(g)(1)

### INDICTMENT

THE GRAND JURY CHARGES:

### COUNT 1
### (Alien Failing To Depart)
{8 U.S.C. § 1253(a)(1)(A) }

On or about October 30, 2007 and continuing until on or before January 6, 2009, in the

Eastern District of Arkansas and elsewhere,

### HAMIS ALSHAREQI
### a/k/a HAMIS ALSARKI

being an alien against whom a final order of removal was outstanding by reason of being a

nonimmigrant who failed to maintain his nonimmigrant status for which he was admitted, willfully

failed and refused to depart from the United States within a period of ninety days from the date of

the final order of removal, to wit; the defendant was ordered removed on August 15, 2006 and that

removal order was affirmed by the Board of Immigration Appeals on October 30, 2007 and the

defendant failed to depart the United States ninety days thereafter as required, all in violation of Title

8, United States Code Sections 1253(a)(1)(A) and 1227(a)(1)(C)(i).

A TRUE COPY I CERTIFY
JAMES W. McCORMACK, CLERK

By _____ D.C.

RESPONDENT
EXHIBIT
20

## COUNT TWO
### (Alien In Possession of Firearm)
{18 U.S.C. § 922(g)(5) }

On or about May 15, 2008, in the Eastern District of Arkansas, the defendant,

### HAMIS ALSHAREQI
### a/k/a HAMIS ALSARKI

who being an alien, illegally and unlawfully in the United States, knowingly and unlawfully

possessed a firearm in and affecting interstate commerce, namely a Titan Tiger .38 caliber pistol

bearing serial number N007679

All in violation of Title 18, United States Code, Sections 922(g)(5) and 924(a).

## COUNT TWO
### (Felon In Possession of Firearm)
{18 U.S.C. § 922(g)(1) }

On or about May 15, 2008, in the Eastern District of Arkansas, the defendant,

### HAMIS ALSHAREQI
### a/k/a HAMIS ALSARKI

having previously been convicted of a crime punishable by imprisonment for a term exceeding one

year, to wit; robbery, State of Michigan, Wayne County, cause number 07-4930-01, judgment

entered on or about February 27, 2007, did knowingly and unlawfully possess a firearm in and

affecting interstate commerce, namely a Titan Tiger .38     caliber pistol bearing serial number

N007679.

All in violation of Title 18, United States Code, Section 922(g)(1) and 924(a).


(END OF TEXT. SIGNATURE PAGE ATTACHED)

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 04 2009

JAMES W. McCORMACK, CLERK
By:_____
                        DEP CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**UNITED STATES OF AMERICA**                                      **PLAINTIFF**

**VS.**                          **NO. 4:09CR00021-BSM**

**HAMIS ALSHAREQI**
**a/k/a HAMIS ALSARKI**                                          **DEFENDANT**

### ORDER

On this date, Defendant appeared before the Court, with counsel, for arraignment.

Due to Defendant's current incarceration on pending state charges, as well as a detainer

filed by Immigration and Customs Enforcement, the issue of bond is deferred, with

Defendant's reservation of right to a later hearing when appropriate.

IT IS SO ORDERED this 4th day of January, 2009.


_____
**UNITED STATES MAGISTRATE JUDGE**


A TRUE COPY I CERTIFY
JAMES W. McCORMACK, CLERK

By_____ D.C.


RESPONDENT
EXHIBIT
21

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AO 245B   (Rev. 06/05) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF ARKANSAS

JUN 21 2010
JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

| UNITED STATES OF AMERICA | JUDGMENT IN A CRIMINAL CASE |
|---|---|
| **V.** | |

**HAMIS ALSHAREQI a/k/a Hamis Alsarki**

| Case Number: | **4:09CR00021-01 BSM** |
|---|---|
| USM Number: | **25438-009** |

**Omar Greene**
Defendant's Attorney

## THE DEFENDANT:

X pleaded guilty to count(s)   2 of the Indictment

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § § 922(g)(5) and 924(a) | Alien in Possession of a Firearm, a Class C Felony | 5/15/2008 | 2 |

The defendant is sentenced as provided in pages 2 through ____6____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

X Count(s)   1 and 3 of the Indictment   ☐ is   X are   dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

June 18, 2010
Date of Imposition of Judgment

_____
Signature of Judge

Brian S. Miller
UNITED STATES DISTRICT JUDGE
Name and Title of Judge

6-21-2010
Date

A TRUE COPY I CERTIFY
JAMES W. McCORMACK, CLERK

By_____D.C.

RESPONDENT
EXHIBIT
22

AO 245B    (Rev. 06/05) Judgment in Criminal Case
           Sheet 2 — Imprisonment

| | |
|---|---|
| DEFENDANT:    **HAMIS ALSHAREQI a/k/a Hamis Alsarki** | Judgment — Page ___2___ of ___6___ |
| CASE NUMBER:    **4:09CR00021-01 BSM** | |

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:    **TWENTY-ONE (21) MONTHS**

X    The court makes the following recommendations to the Bureau of Prisons:
Defendant shall participate in mental health counseling, educational and vocational programs during incarceration.

Defendant shall serve his term of imprisonment at FCI close to Dallas, Texas to be near his family.

X    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

    ☐  a _____  ☐ a.m.  ☐ p.m.  on  _____ .

    ☐  as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m.  _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B   (Rev. 06/05) Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | | | | |
|---|---|---|---|---|
| | Judgment—Page | 3 | of | 6 |

DEFENDANT:   **HAMIS ALSHAREQI a/k/a Hamis Alsarki**
CASE NUMBER:   **4:09CR00021-01 BSM**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of : **TWO (2) YEARS**

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

X   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

X   The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 3B — Supervised Release

Judgment—Page ___4___ of ___6___

DEFENDANT:     **HAMIS ALSHAREQI a/k/a Hamis Alsarki**
CASE NUMBER:   **4:09CR00021-01 BSM**

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall participate in mental health counseling under the guidance and supervision of the U.S. Probation Office.

2. The defendant is not a legal resident of this district.  Therefore, the period of supervised release is to be administered by the district where the defendant is a legal resident and/or the district where a suitable release plan has been developed.

3. If the defendant is deported , after serving his period of incarceration,  a special condition is imposed where he will not be allowed to return to the United States illegally during the period of his supervised release.  If he does return illegally, it will be considered a violation of his supervised release. If the defendant is not  deported, he shall contact the U.S. Probation Office within 72 hours of release from custody

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___5___ of ___6___

DEFENDANT:        **HAMIS ALSHAREQI a/k/a Hamis Alsarki**
CASE NUMBER:      **4:09CR00021-01 BSM**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ **100.00** | $ **0** | $ **0** |

☐  The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  |  |  |  |
| **TOTALS** | $ _____ 0 | $ _____ 0 |  |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐  the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B     (Rev. 06/05) Judgment in a Criminal Case
            Sheet 6 — Schedule of Payments

DEFENDANT:        **HAMIS ALSHAREQI a/k/a Hamis Alsarki**          Judgment — Page ___6___ of ___6___
CASE NUMBER:      **4:09CR00021-01 BSM**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**   X   Lump sum payment of $ ____100.00____ due immediately, balance due

     ☐   not later than _____ , or
     ☐   in accordance   ☐  C,   ☐  D,   ☐  E, or   ☐  F below; or

**B**   ☐   Payment to begin immediately (may be combined with   ☐  C,   ☐  D,   ☐  F below); or

**C**   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
     term of supervision; or

**E**   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
     imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
     and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

**AFFIDAVIT**

I, JOHN NORRIS, do hereby swear and depose that the following facts are true and

correct to the best of my knowledge:

My name is John Norris. I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) for over 10 years and have been assigned to the Little Rock Field Office for all of that time. Before becoming an ATF agent, I was a police officer with the Germantown (TN) Police Department from 1999-2005.

The ATF office in Little Rock is normally staffed with about 10 agents and is responsible for investigating federal crimes related to firearms and explosives that occur in the State of Arkansas. I assisted in the investigation of the West Memphis bombing from the very beginning of the case. The grand jury investigation of the bombing began right after it occurred. Special Agent Glen Cook was the lead case agent. (Cook is now retired.) I did not participate in the investigation of Randeep Mann's possession of unregistered grenades and firearms until the two cases overlapped each other.

During the investigation of the West Memphis bombing, federal prosecutors interviewed several inmates and learned that Mann was very talkative about his case and that he was cellmates and friends with a federal inmate from Yemen named Al Shareqi who Mann treated like a son. We then decided to approach Al Shareqi to see if Mann was talking about the West Memphis bombing (Mann had not yet been indicted for the bombing). In order to keep Al Shareqi from making up information or talking to Mann about the interview, we decided to show up unannounced one day and pull Al Shareqi from his cell to see if he would talk to us and what he had to say. Al Shareqi's attorney, Omar Green, was told of this plan and agreed to be present when we talked to Al Shareqi.

On September 11, 2009, I was present during an interview of Hamis Alshareqi. On this date Agent Cook and I picked up Alshareqi from the Pulaski County Jail and transported him to an interview room located at the Pulaski County Sheriff's Department Criminal Investigation Division, located on the same grounds as the jail. We did not tell Al Shareqi we were coming to get him. Agent Cook and I introduced ourselves and advised Alshareqi that we wanted to talk with him but would explain later once we arrived at the interview room. Alshareqi's attorney Omar Green was present and spoke with him in private before the interview. Alshareqi was then interviewed by Assistant United States Attorney Karen Whatley, ATF Special Agent Glen Cook and myself at the Pulaski County jail. Omar Green was present during the interview. Alshareqi was interviewed in regard to Mann. Alshareqi was asked during the interview if Mann had made any statements to Al Shareqi regarding Mann's case or a doctor. No words were put in Al Shareqi's mouth. No one threatened him or promised him anything, but I do recall there was a discussion about his status of being in the United States. He told us several things that Mann had said but I do not remember everything he told us. I do remember some things he told us though. Alshareqi stated that Mann had stated that a doctor on the medical board had suspended his license. Mann referred to this doctor as having a glass eye. Alshareqi stated that Mann said "it

1

RESPONDENT'S
EXHIBIT
23

started one way but ended another." I recall Alshareqi stating that Mann showed him a Time magazine photo of grenades that were the ones involved in Mann's case. Alsharqi explained that he and Mann were discussing the case against Mann regarding the illegal possession of grenades. Alsharqi advised that Man showed him this photo in a Time magazine and stated that these are the types of grenades.

I do not recall pulling Al Shareqi from his cell a second time. I am not saying it didn't happen, I just do not remember doing it.


JOHN NORRIS
Special Agent, ATF


Subscribed and sworn to before me, a notary public, this _13th_ day of _____July_____, 2015.


KIMBERLY SQUIRES


My commission expires:

7-12-2022

2

# AFFIDAVIT

I, Omar Greene, do hereby swear and depose that the following facts are true and correct to the best of my knowledge:

My name is Omar F. Greene. I am an attorney at law. Currently, I am engaged in the private practice of law, with an office at 813 West Third Street, Little Rock, AR 72201. In the past, I have worked as: a law clerk for Judge Annabelle Clinton Imber; a deputy prosecuting attorney in Pulaski County, Arkansas; in private practice for about three years in the 1990s; and from June 1995 until March 2012, I served as an Assistant Federal Public Defender for the Office of the Federal Defender in Arkansas.

In my capacity as an Assistant Federal Defender, I represented Hamis Alshareqi, also known as Hamis Alsarki (hereinafter, "Mr. Alsarki"), in case 09-cr-21 BSM in the United States District Court for the Eastern District of Arkansas. Mr. Alsarki pleaded guilty to the one-count indictment charging him with being an illegal immigrant in possession of a firearm, which violated 18 U.S.C. §§ 922(g)(5) and 924(a). He received a sentence of 21 months in prison, the minimum under the federal sentencing guidelines that applied in his case. He told me that he was pleased with my representation of him in this matter.

The purpose of this affidavit is to respond to Mr. Alsarki's allegations, which a convicted defendant, Dr. Randeep Mann, has incorporated into his petition to vacate his life sentence pursuant to 28 U.S.C. § 2255. *See* Docket Entry 395, allegations 3.1 to 3.1.6 of Dr. Mann's § 2255 Petition, in case 09-cr-99 BSM. Dr. Mann was convicted of several firearms offenses and with conspiracy to detonate a bomb that severely, permanently injured the state medical board chairman, Dr. Trent Pierce. The trial of Dr. Mann concluded on August 9, 2010. My response is based on my recollection of the events set forth by Mr. Alsarki in a letter to Chief Judge Brian Miller. I have reviewed Mr. Al-Sarki's closed file at the Federal Defender's Office, which included my notes from a meeting between myself, Mr. Alsarki, then-Assistant United States Attorney (AUSA) Karen Whatley, and two ATF agents. The meeting was held in the Criminal Investigation Division of the Pulaski County Sheriff's Office on September 11, 2009. My responses are as follows:

- The purpose of the agents' and the AUSA's meeting with Mr. Alsarki was to determine if Mr. Alsarki could provide information useful to the prosecution of Dr. Mann, whose trial was pending. Mr. Alsarki had been Dr. Mann's cell mate in a two-person cell, and Mr. Alsarki said that he had, to some degree, gained the trust of Dr. Mann.

- If Mr. Alsarki could provide substantial assistance to the government, he might

1

RESPONDENT
EXHIBIT
24

benefit in his sentence – or as I urged the prosecutor, Mr. Alsarki possibly might obtain some help with his immigration status. He faced deportation to Yemen, after having lived since early childhood in the United States. The language in Yemen is Arabic. Mr. Alsarki could not read Arabic and had only rudimentary comprehension and speaking ability in the language. Yemen was then in a state of political unrest that has steadily escalated until the present time.

- AUSA Whatley stated several times that the best she could do was try to persuade immigration authorities to permit Mr. Alsarki to remain in the United States. Even if she could accomplish this, it probably would only be temporary, she said. She emphasized that she could not guarantee this in any way.

- Before the meeting, I told Mr. Alsarki several times that he had to be 100% truthful with the agents and the AUSA. The AUSA and the agents did the same. This was clearly and emphatically communicated to Mr. Alsarki. He could not help himself except by telling the truth.

- No one put words in Mr. Alsarki's mouth or told him what to say or even suggested what he should say. When he could not answer questions about the activities of Dr. Mann, the agents (and myself) encouraged him to respond truthfully – that he did not know and could not provide any information in answer to the questions.

- Mr. Alsarki provided several quotes he attributed to Dr. Mann when he and Dr. Mann had discussed the bombing of Dr. Pierce. Those included: "payback is a bitch" and "people get what they deserve." He also quoted Dr. Mann as saying that "all people care about in the United States is sex and money, and if you have enough money you can do anything you want." As I recall, Mr. Alsarki was uncertain whether Dr. Mann's quotes were alluding to actually being involved in the bombing, and the agents responded by encouraging Alsarki to tell the truth, "Not what you think we want to hear."

- No one threatened Mr. Alsarki. The tone of the meeting was not threatening or hostile, and Mr. Alsarki had his lawyer, myself, present as a witness and to counsel him.

- Later, Mr. Alsarki received several letters from Dr. Mann when he and Dr. Mann were held in separate jails. Mr. Alsarki provided them to me to release to the United States Attorney's Office. As I recall, Dr. Mann did not say anything incriminating in the letters. The point in turning over the letters was to underscore that Mr. Alsarki was willing to do whatever he could in his cooperation with the government.

- I do not recall what was said in telephone conversations between myself and Mr. Alsarki.

- I did not tell Mr. Alsarki that I had obtained his presentence report on the day that he entered his plea of guilty.

AUSA Whatley and ATF agents met with Mr. Alsarki a second time, but I was unable to attend that meeting. FPD Chief Investigator Floyd Hancock attended the second meeting for me. Sometime after that second meeting, I was informed that the government would not be calling Mr. Alsarki as a witness at Dr. Randeep Mann's trial. I passed that information along to Mr. Alsarki.

I do not recall the date, but Drake Mann, an Attorney, at some point started calling me and wanting to talk to me to about Mr. Alsarki. Attorney Drake Mann was very persistent. Eventually, I met with Drake Mann, and he asked me questions about Mr. Alsarki's allegations about federal prosecutors and agents. I answered his questions and told him, consistent with the information stated above in this affidavit, that Mr. Alsarki's allegations were false.

OMAR F. GREENE

Subscribed and sworn to before me, a notary public, this 29 day of July, 2015.

My commission expires: 4/7/2025

JENE LOUVIERE
Notary Public-Arkansas
Pulaski County
My Commission Expires 04-07-2025
Commission # 12404190

3

# UNDER SEAL

RESPONDENT
EXHIBIT
25

## AFFIDAVIT

My name is Floyd Hancock, and I am the Chief Investigator for the Federal Public Defender Organization for the Eastern District of Arkansas - - a position which I have held for the past twenty years. Before joining the Federal Defender Office, I was a law enforcement officer for twenty-three years. I left the force at the rank of Captain.

In my capacity as Chief Investigator, I worked on the Hamis Alsharki/Alshareqi case with AFPD Omar Greene at the Federal Public Defender Office, and I met with the client a number of times. In preparation for making this formal statement, I reviewed the case file - - along with the twenty page letter from Mr. Alsharki/Alshareqi to the Court and excerpts from the pending §2255 petition. I was present for the April 22, 2010, interview of Mr. Alsharki/Alshareqi by AUSA Karen Whatley, Special Agent Glenn Cook, and another ATF agent. AFPD Greene was not present on April 22nd, due to a scheduling conflict. I was present for the entire interview with Mr. Alsharki/Alshareqi on that date, and my recollection of the meeting includes the following:

– At no time did anyone threaten or coerce Mr. Alsharki/Alshareqi about participating in the interview.

– Nor did anyone promise him anything or use profanity during the meeting.

– Mr. Alsharki/Alshareqi was not coached by anyone about what to say.

– Nor was he forced to take part in the interview.

– Mr. Alsharki/Alshareqi was told to tell the truth.

– At no time did Mr. Alsharki/Alshareqi say he was scared or that he did not want to be interviewed.

– Nor did he request a break or express any concern about where people were sitting in the room during the interview.

– What Mr. Alsharki/Alshareqi said during the interview was substantially different than what he said during other meetings which I attended.

7/8/15
DATE

Floyd Hancock
Chief Investigator
Federal Public Defender Office

RESPONDENT
EXHIBIT
26

STATE OF ARKANSAS, COUNTY OF PULASKI, LITTLE ROCK, ARKANSAS

On this the 8th day of July, 2015, before me, Caletta L. Jones, the undersigned notary, personally appeared Floyd Hancock known to me to be the person whose name is subscribed to the above instrument and acknowledged that he executed the same for the purposes therein contained. In witness whereof I hereunto set my hand and official seal.

Notary Public: _Caletta L. Jones_

My Commission expires: _March 19, 2024_

CALETTA L. JONES
PULASKI COUNTY
NOTARY PUBLIC - ARKANSAS
My Commission Expires March 19, 2024
Commission No. 12366262

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Arkansas

United States of America
)
v.
)
)   Case No.  4:10MJ4031-HDY
)
HAMIS ALSHAREQI
)
)

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ July 22, 2010 _____ in the county of _____ Pulaski _____ in the

_____ Eastern _____ District of _____ Arkansas _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18:1512(a)(2) | Use of physical force or the threat of physical force against any person with the intent to influence, delay or prevent the testimony of any person in an official proceeding |

This criminal complaint is based on these facts:

See attached

A TRUE COPY I CERTIFY
JAMES W. McCORMACK, CLERK
By _____ D.C.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

David P. Oliver, Special Agent - ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 07/26/2010 _____

_____
*Judge's signature*

City and state: _____ Little Rock, Arkansas _____

H. David Young, U.S. Magistrate Judge
*Printed name and title*

RESPONDENT
EXHIBIT
27

personal investigation of this matter, including interviews of witnesses, as well as from

information supplied by other law enforcement officials.


4.      On February 4, 2009, the chairman of the Arkansas State Medical Board

was seriously injured when an improvised explosive device (a grenade attached to the

underside of a spare tire) exploded outside of the chairman's residence in West

Memphis, Arkansas.


5.      On September 3, 2009, Individual 1 was interviewed by ATF agents.

Individual 1 provided information relevant to the bombing investigation.   On

November 3, 2009, Individual 1  testified before the Grand Jury in the Eastern Judicial

District of Arkansas, regarding his knowledge of Randeep MANN.


6.      Hamis ALSHAREQI, a cell mate of Randeep MANNS, was interviewed by

ATF agents.  ALSHAREQI provided information relevant to the bombing investigation.

ALSHAREQI testified before the grand jury in the Eastern Judicial District of Arkansas

on November 7, 2009. It was later learned that ALSHAREQI was still communicating

with MANN. ALSHAREQI was re-interviewed and provided information that was

contrary to what he previously had said.  The United States Attorney's Office then

notified the Federal Public Defender's Office that ALSHAREQI would not be used a

witness for the United States.

7.      On January 6, 2010, Randeep MANN was indicted for aiding and abetting someone unknown to the grand jury to use a weapon of mass destruction in relation to the February 4, 2009 bombing.  A trial for Randeep MANN began on July 6, 2010 in United States District Court, Eastern Judicial District of Arkansas.

8.      On July 22, 2010, Individual 1 was transferred to the Pulaski County Regional Detention Facility by United States Marshal's Service.  Individual 1 was transferred to PCRDF to facilitate his testimony in the trial of United States v. Randeep MANN, in United District Court, Eastern Judicial District of Arkansas. On the same date Hamis ALHAREQI was an inmate at PCRDF in the United States Marshal's service custody.  ALSHAREQI was housed in "P"-unit.

9.      On July 22, 2010, I interviewed Individual 1.  Individual 1 told me that he was transferred to the Pulaski County Regional Detention Facility on July 22, 2010. Individual 1 was assigned to "P"-Unit.  After arriving in "P"-unit, Individual 1 went outside to the "yard" recreation area.  Individual 1 was approached by a person who was unknown to him, but later identified as Hamis ALSHAREQI.  ALSHAREQI stated, "You are here to testify against my uncle, Dr. Randy Mann".  Individual 1 denied the allegation.  ALSHAREQI said that an investigator had come to talk to him, and showed him a statement that Individual 1 had made.  ALSHAREQI asked Individual 1 if his date of birth of was XX-XX-XXXX.  Individual 1 admitted that it was his date of birth but denied being there to testify.  ALSHAREQI told Individual 1 he needed to leave.

ALSHAREQI then went inside the building and came out with sock that had a hard shiny metal object similar to door knob in it.  ALSHAREQI approached Individual 1. Individual 1 told ALSHAREQI that he was going to get himself in more trouble for messing with a government witness.  ALSHAREQI swung the sock striking Individual 1 in the head twice, and striking him on the side two times.  The two were subsequently separated by the guards.  Individual 1 asked one the PCSO guards the name of the person whom assaulted him, and was told ALSHAREQI. Individual 1 showed me a laceration on the left side of his head, and a contusion on his lip.  He told me that he had sustained the injuries during the incident.  I photographed the injuries.


11.  Based upon the above information, I believe probable cause exists to conclude that Hamis ALSHAREQI has committed a violation of Title 18 U.S.C. 1512(a) (2) for a person to use physical force or the threat of physical force against any person with the intent to influence, delay or prevent the testimony of any person in an official proceeding.


David P. Oliver
Special Agent, ATF


Subscribed and sworn to before me this 26th day of July 2010.


H. David Young
United States Magistrate Judge

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**AUG 03 2010**

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA            )
                                    )
v.                                  )        NO.   4:10CR00175 WRW
                                    )        18 U.S.C. § 1512(a)(2)(A)
HAMIS ALSHAREQI                     )

## **INDICTMENT**

THE GRAND JURY CHARGES THAT:

On or about July 22, 2010,  in the Eastern District of Arkansas,

### HAMIS ALSHAREQI

used physical force against an individual by striking the individual with a metal object, with

the intent to influence and prevent the testimony of the individual in an official proceeding,

that is, a jury trial in the case of *United States v. Mann*, et. al., 4:09CR00099 BSM.

All in violation of Title 18, United States Code, Section 1512(a)(2)(A).

A TRUE COPY I CERTIFY
JAMES W. McCORMACK, CLERK

By_____ D.C.

(End of text.  Signature page attached).

RESPONDENT
EXHIBIT
28

AO 245B    (Rev. 09/11) Judgment in a Criminal Case
Sheet 1   

# UNITED STATES DISTRICT COURT

## Eastern District of Arkansas

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| HAMIS ALSHAREQI | ) Case Number:  4:10CR00175-01 BRW |
| | ) USM Number: 25438-009 |
| | ) James W. Wyatt |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)   1 of the Indictment.

☐ pleaded nolo contendere to count(s)
  which was accepted by the court.

☐ was found guilty on count(s)
  after a plea of not guilty.

**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**NOV 2 6 2012**

JAMES W. McCORMACK, CLERK
The defendant is adjudicated guilty of these offenses:  **By:** _____
DEP CLERK

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 1512(a)(2)(A) | Tampering with a Witness, a Class B Felony | 7/22/2010 | 1 |

    The defendant is sentenced as provided in pages 2 through    **6**    of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

11/21/2012
Date of Imposition of Judgment

_____
Signature of Judge

BILLY ROY WILSON,       U.S. District Judge
Name and Title of Judge

11-26-2012
Date

A TRUE COPY I CERTIFY
JAMES W. McCORMACK, CLERK
By _____ D.C.

**RESPONDENT
EXHIBIT
29**

AO 245B (Rev. 09/11) Judgment in Criminal Case
Sheet 2 — Imprisonment

Case 4:09-cr-00099-BSM   Document 483   Filed 07/31/15   Page 361 of 390
Case 4:10-cr-00175-BRW   Document 47   Filed 11/26/12   Page 2 of 6

Judgment — Page __2__ of __6__

DEFENDANT: HAMIS ALSHAREQI
CASE NUMBER: 4:10CR00175-01 BRW

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

51 months.

☑  The court makes the following recommendations to the Bureau of Prisons:

The Court recommends the defendant participate in mental health counseling during incarceration. The Court also recommends the defendant be designated to the institution located in or a close as possible to Fort Worth, TX.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at  _____  ☐ a.m.  ☐ p.m.  on  _____ .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on  _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

a  _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

AO 245B ' (Rev. 09/11) Judgment in a Criminal Case
Sheet 3 — Supervised Release

DEFENDANT:  HAMIS ALSHAREQI
CASE NUMBER:  4:10CR00175-01 BRW

Judgment—Page  3  of  6

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

2 years.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☑ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☑ The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐ The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐ The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT:  HAMIS ALSHAREQI
CASE NUMBER:  4:10CR00175-01 BRW

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 0.00 | $ 0.00 |

☐   The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| **TOTALS** | $ _____ 0.00 | $ _____ 0.00 | |

☐   Restitution amount ordered pursuant to plea agreement   $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐   the interest requirement is waived for the   ☐   fine   ☐   restitution.

   ☐   the interest requirement for the   ☐   fine   ☐   restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT:  HAMIS ALSHAREQI
CASE NUMBER:  4:10CR00175-01 BRW

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $ ___100.00___  due immediately, balance due

      ☐  not later than _____ , or
      ☐  in accordance    ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with   ☐ C,    ☐ D, or    ☐ F below); or

**C**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount,
    and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

### *AFFIDAVIT*

Your Affiant, Johnnie Green, being duly sworn, deposes and states:

1.        Affiant is an Explosives Enforcement Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). Affiant has been employed as an ATF Explosives Enforcement officer since July 1997. Additionally, Affiant was employed as a Police Officer and Bomb Technician with the Wichita, Kansas, Police Department Bomb Squad for 12 years. Affiant has a total of approximately 37 years of law enforcement experience, 26 of those years dedicated to the field of explosives, and is currently a certified Bomb Technician with ATF. Affiant during his tenure has completed courses on the identification, handling and destruction of military ordnance, including 40-millimeter grenades. In addition, Affiant has fired over 100 grenades of various types, including the M406 40-millimeter high explosives grenade. Affiant's investigations and participation in investigations conducted by other agencies has kept Affiant familiar with the appearance, component parts, functionality, and dangers associated with 40-millimeter grenades.

2.        Most recently, affiant has been frequently detailed to Mexico where he has been involved in the identification, recovery, and destruction of hundreds U.S. military 40-millimeter grenades.  Your Affiant, through ATF, has been assisting the Mexican government since 2006 with the identification and recovery of military ordnance, which includes M406 40-millimeter grenades. The lot numbers of these grenades were traced and it was determined they were thirty or more years old.  Many of these 40-millmeter grenades were recovered caches, some of which had been buried. These grenades were x-rayed, and x-rays showed that the internal components were still intact. Even though the grenades had been buried, Affiant was able to wipe them clean, place them in a grenade launcher, and successfully fire them.

3.        Each 40-millimeter grenade contains an explosive charge in the projectile and an expelling charge in the casing. These grenades are designed to function independently of one another and to be utilized in extreme conditions, including hot, cold, or wet weather and dusty climates. Each grenade is sealed to protect the explosive

1

RESPONDENT
EXHIBIT
30

charge in the projectile.  The explosive components of these grenades, when concealed in any type of container would easily withstand the effects of the environment.

4.      Based upon my training and experience, I do not believe that the mere passage of time would render a properly assembled and manufactured 40-millimeter grenade inoperable.  The explosive material in the projectile, Composition B, has a very long shelf life and will not inert itself over time.  The melting point for Composition B is 214 degrees, and environmental conditions in the geographical area from which the grenades in the Randeep Mann case were recovered do not reach the extreme levels necessary for rendering the explosives inert.

5.      Affiant examined the 40-millimeter grenades recovered in the case against Randeep Mann while in the ATF explosives bunker for the Little Rock, Arkansas, ATF Field Office after they were seized, exact date unknown.  Affiant noted that the grenades were manufactured in the same time-frame, and by the same manufacturer, as many of the grenades Affiant has been firing in Mexico for the last nine years.  The grenades appeared to be in very good condition.  There was no visual damage to the casings or projectiles, no obvious signs of rust, and the lettering on the outside of the casings, which is stenciled on and subject to wear, was visible and legible.  Based upon my observations and training, there is no reason to believe the condition of these grenades has deteriorated or that the grenades have in any way been rendered incapable of functioning as designed.  In fact, I hope to be able to use the grenades for training purposes when and if they are no longer needed as evidence.


**JOHNNIE GREEN**
Explosives Enforcement Officer, ATF


SWORN TO and SUBSCRIBED before me this ___ day of July, 2015, at Fort Worth, Texas.



KATHERINE L. HAMILTON
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 09-11-2016

# UNDER SEAL

RESPONDENT
EXHIBIT
31

# AFFIDAVIT

I, Peggy Pryor Cryer, live in Little Rock, Arkansas and have been employed as the Executive Secretary of the Arkansas State Medical Board (ASMB) since July 1, 1991. I am the custodian of the records at the Medical Board.

Randeep Mann, M.D. was licensed by the ASMB on March 10, 1995 until it expired in July 31, 2010. During that time, Dr. Mann's license status was in several different categories.

On April 6, 2006 Dr. Mann was issued an Emergency Order of Suspension (EOS). On July 7, 2006, Dr. Mann's EOS was lifted and his license status became Revoked/Stayed. On numerous occasions between June 2007 through December 2008 Dr. Mann asked the Board to allow him to reapply for his DEA; each request was denied. Dr. Mann did not personally appear before the Medical Board after August 2007 and his license status remained Revoked/Stayed until it lapsed in July 2010.

The Board did discuss two complaints regarding Dr. Mann in April 2009, but the Board took no action and the minutes read "Information Only". One of those complaints was an investigation originating from a complaint written by Rita Bartholomew. No hearing or votes were ever held in Ms. Bartholomew's complaint.

In June of 2009 the Board reviewed a newspaper article indicating Dr. Mann was filing a lawsuit against the Board; that also received a vote of "Information Only". No further information has been placed on the Board's agenda regarding Dr. Randeep Mann. The Board did not make any votes on any issues in June 2009 and did not return his medical license to him without any restrictions.

No further business involving Dr. Mann has been conducted by the Board since June 2009.

1. Records are public with the exception of the following:
   - Adverse Action Reports to National Data Bank, submitted by the Board and/or other reporting facilities
   - Income tax records
   - Military form DD214
   - Medical records (patient and licensee) or copies of prescriptions
   - Scholastic records
   - Adoption records
   - Undisclosed investigations which may lead to criminal investigation
   - Personal information: home address, social security numbers, financial records, date of birth
   - Identity of an undercover officer working with this agency
   - Hospital reporting
   - Malpractice reporting

2. A licensee is entitled to see his/her entire licensure file.

RESPONDENT
EXHIBIT
32

_Peggy Pryor Cryer, Executive Secretary_   July 15, 2015
Arkansas State Medical Board

## VERIFICATION

STATE OF ARKANSAS          )
                           )SS
COUNTY OF PULASKI          )

SUBSCRIBED and sworn to before me this 15th day of July, 2015.

_Laurel J. Mills_
NOTARY PUBLIC

MY COMMISSION EXPIRES:

9/14/2016

LAUREL J. MILLS
MY COMMISSION # 12349792
EXPIRES: September 14, 2016
Pulaski County



You've shown me

in a million ways

what great friendship is all about,

and I feel lucky every day

to have an amazing friend

like you.

—MELISSA WOO—

Rita

MISS YA!

*Personal Expressions*





0 3 8 9 1

6  10290 10530  1

U.S.A. 2.69
Canada 3.49
LCC 389 J
© HMK, LIC.
MADE IN U.S.A.

RESPONDENT
EXHIBIT
33

Hi Dr. Wan, Now are you doing? ...

The FED'S
Won't
Leave us
Alone

J. Bartlana
555 Monastery Ln
Russellville, AR 72802

FORT SMITH AR 729
22 APR 2010 PM 1 L

Randeep Mann
P.C.R.D.F Block T
3201 W. Roosevelt Rd
Little Rock, Ar 72204

## Pam Falkner, CMA, CGMA, CPA
### 1310 South Avalon - West Memphis, AR  72301
#### Phone 870-732-6180   Fax 870-732-6189   E-mail pfalkner@mindspring.com

I have known Dr. Pierce since 1983.  I have also been his CPA, maintaining the books and records and performing the accounting for Dr. Pierce's clinic (Family Practice Center) and preparing Dr. and Mrs. Pierce's personal tax returns annually since then as well.  I have advised Dr. Pierce on most financial decisions, including, but not limited to: funding for his children's education-from elementary school to post graduate degrees, investment decisions, insurance needs, estate planning, tax planning, growth of the business, home buying and selling, building vs renting space for the business, and business management decisions.

Dr. Pierce's medical practice is and has always been a sole proprietorship.  He and his business are one and the same.  The reporting of taxable income and tax deductible expenses of the clinic is reflected on Schedule C which is a part of his annual personal 1040.  Dr. Pierce is not compensated with a "salary," instead, whatever the bottom line profit (or loss) of the clinic is, is his money and his income.  The clinic's net income (bottom line profit) is the addition of all fees collected minus all expenses it takes to operate the clinic (none of which are related to Dr. Pierce).  The "net profit" of the clinic, annually reflected on line 31 of Schedule C is Dr. Pierce's taxable net income from the clinic.

In addition, this number has to be increased by the dollars Dr. Pierce annually makes as a "pre-tax" contribution to AR Diamond.  These are Medicaid fees earned and paid by the State to Dr. Pierce, which are allowed to be taxed at a later date.

At trial, I testified about Dr. Pierce's income from the clinic and how it was affected by the bombing.  During my testimony, I referred to numbers in a chart that I prepared.  Those numbers were presented in exhibit 204A, which I have recently reviewed.

The numbers in exhibit 204A were pulled directly from Schedule C of the tax returns filed for Dr. Pierce.  The information in the Schedule C forms comes from accounting books and records we maintain here on Dr. Pierce's clinic-"Family Practice Center."  All returns were timely filed with the IRS.  The amounts in column 1-"Gross Medical Fees"-comes from Schedule C, line 7.  The amounts in column 2-"Operating Expenses"-comes from Schedule C, line 28.  The amounts in column 3-"Net Income of Clinic"-is column 1 minus column 2 and comes from Schedule C, line 31.

In the year 2005, Schedule C of the tax return was filed without the line by line detail of gross fees and operating expenses.  The "net income of the clinic" was put in the return for extension purposes.  This "net" amount was mistakenly left in the return and not detailed item by item prior to the filing of the final return.  However, the chart in exhibit 204A is the correct detail, with the difference being $292.00 of interest income which was reported on Schedule B.

On the chart, there is one entry for the year 2009 that was not directly pulled from on the Schedule C, line 28.  The number representing the 2009 total expenses is $858.47 different than that represented on Schedule C.  That $858.47 is a combination of two items.  In that year's return, there is a specific operating expense for "meals" in the amount of $1,115.06.  This amount is only 50% tax deductible and that difference is reflected on Schedule C, line 24(b) which shows a tax deduction of $557.  The second difference is an expense of "contributions" in Dr. Pierce's accounting books and records of $300, which is tax deductible, but not on Schedule C.  Instead, that $300 is reflected as a deduction on Dr. Pierce's itemized deductions on Schedule A.  The total of these two differences accounts for the entire $858.47.

RESPONDENT
EXHIBIT
34

To the best of my professional knowledge, the chart accurately reflects the fees and expenses related to Family Practice Center.


_Pam Falkner_
PAM FALKNER


Subscribed and sworn to before me, a notary public, this 28th day of July, 2015.


_Tammie Caster_


My commission expires:

April 12, 2021


TAMMIE CASTER
MY COMMISSION # 12381215
EXPIRES: April 12, 2021
Crittenden County

Table 2.  Trent P. Pierce Proprietorship - Revenues & Expenses (Monthly)

| | Jan-03 | Feb-03 | Mar-03 | Apr-03 | May-03 | Jun-03 | Jul-03 |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Fees | 87,286.05 | 85,618.12 | 75,053.90 | 80,761.12 | 80,082.00 | 72,780.63 | 66,548.24 |
| Fees: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Less Returns & Allowances | -205.53 | -241.48 | -342.71 | -112.72 | -47.20 | -808.83 | -466.08 |
| **Total Sales** | 87,080.52 | 85,376.64 | 74,711.19 | 80,648.40 | 80,034.80 | 71,971.80 | 66,082.16 |
| | | | | | | | |
| **Gross Profit** | 87,080.52 | 85,376.64 | 74,711.19 | 80,648.40 | 80,034.80 | 71,971.80 | 66,082.16 |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Advertising | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Auto Expense | 781.59 | 27.41 | 1,003.98 | 230.41 | 997.21 | 115.56 | 972.78 |
| Bank Service Charges | 4.00 | 0.00 | 5.50 | 2.00 | 2.00 | 3.00 | 5.00 |
| Merchant Charges | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Clinic expenses | 12,832.17 | 1,349.34 | 6,003.32 | 9,025.70 | 0.00 | 10,957.82 | 4,224.23 |
| Continuing Education | 0.00 | 0.00 | 45.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Drugs & Medicines | 0.00 | 0.00 | 172.00 | 0.00 | 0.00 | 0.00 | 1,704.27 |
| Dues & Subscriptions | 55.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 88.87 | 88.87 | 88.87 | 1,953.27 | 0.00 | 196.16 | 88.87 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,161.48 |
| Insurance-Building | 0.00 | 0.00 | 2,263.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Employee | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Liability | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Vehicles | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 550.00 |
| Insurance-Worker's Comp | 0.00 | 0.00 | 959.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance Malpractice | 0.00 | 2,702.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,921.33 |
| Lab Expense | 212.30 | 3,685.95 | 0.00 | 4,146.44 | 0.00 | 4,199.30 | 0.00 |
| Laundry & Uniforms | 0.00 | 96.60 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Licenses, Fees, Permits | 75.00 | 0.00 | 0.00 | 95.00 | 75.00 | 400.00 | 0.00 |
| Maintenance | 3,146.54 | 156.76 | 2,866.93 | 1,960.38 | 1,935.00 | 2,112.50 | 3,486.71 |
| Meals | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Office expense | 11,874.87 | 1,487.30 | 4,286.75 | 10,149.65 | 641.28 | 6,037.49 | 6,544.06 |
| Professional Fees | 375.00 | 1,040.00 | 1,608.44 | 1,040.00 | 275.00 | 1,040.00 | 0.00 |
| Professional Fees-Accounting | 0.00 | 0.00 | 0.00 | 0.00 | 1,306.00 | 0.00 | 2,310.00 |
| Professional Fees-Legal | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,434.50 |
| Repairs | 0.00 | 0.00 | 60.00 | 60.00 | 600.00 | 0.00 | 0.00 |
| Rent | 120.00 | 60.00 | 60.00 | 60.00 | 60.00 | 0.00 | 120.00 |
| Salaries: General | 16,787.64 | 17,006.68 | 17,745.46 | 18,455.17 | 24,464.66 | 17,099.95 | 15,681.08 |
| Salaries: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Chester Peeples FICA & M | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: FICA | 1,902.51 | 597.14 | 1,509.99 | 1,038.78 | 1,131.70 | 1,013.11 | 1,531.03 |
| Taxes: MCAR | 444.83 | 139.71 | 353.15 | 242.93 | 264.67 | 240.76 | 342.52 |
| Taxes: FUTA | 50.40 | 0.00 | 0.00 | 356.87 | 0.00 | 0.00 | 148.14 |
| Taxes: SUTA | 76.19 | 0.00 | 0.00 | 456.36 | 0.00 | 0.00 | 356.44 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Property | 0.00 | 0.00 | 0.00 | 2,500.92 | 0.00 | 0.00 | 0.00 |
| Taxes: Real Estate | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone | 1,455.02 | 237.34 | 1,964.58 | 1,418.65 | 147.52 | 1,715.32 | 1,641.07 |
| Uniforms | 0.00 | 0.00 | 0.00 | 129.43 | 0.00 | 0.00 | 0.00 |
| Utilities | 294.73 | 112.56 | 309.71 | 200.25 | 30.53 | 273.05 | 390.31 |
| X ray expense | 80.85 | 274.67 | 241.73 | 80.85 | 0.00 | 586.19 | 451.12 |
| **Total Operating Expenses** | 50,657.51 | 29,002.83 | 41,487.41 | 53,643.06 | 31,930.57 | 45,990.21 | 49,064.94 |
| | | | | | | | |
| **Operating Income (Loss)** | 36,423.01 | 56,373.81 | 33,223.78 | 27,005.34 | 48,104.23 | 25,981.59 | 17,017.22 |
| | | | | | | | |
| **Other Income** | | | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 58.66 | 44.07 | 64.18 | 63.69 | 47.05 | 45.00 | 10.87 |
| **Total Other Income** | 58.66 | 44.07 | 64.18 | 63.69 | 47.05 | 45.00 | 10.87 |
| | | | | | | | |
| **Net Income (Loss)** | 36,481.67 | 56,417.88 | 33,287.96 | 27,069.03 | 48,151.28 | 26,026.59 | 17,028.09 |



GOVERNMENT EXHIBIT

RESPONDENT
EXHIBIT
35

Table 2. Trent P. Pierce Proprietorship

| | Aug-03 | Sep-03 | Oct-03 | Nov-03 | Dec-03 | Jan-04 | Feb-04 |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Fees | 68,603.50 | 72,371.96 | 79,300.21 | 73,301.88 | 91,323.75 | 79,709.16 | 78,100.69 |
| Fees: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Less Returns & Allowances | -201.35 | -221.66 | -262.78 | -189.00 | 177.80 | -298.88 | -325.10 |
| **Total Sales** | 68,402.15 | 72,150.30 | 79,037.43 | 73,112.88 | 91,501.55 | 79,410.28 | 77,775.59 |
| | | | | | | | |
| **Gross Profit** | 68,402.15 | 72,150.30 | 79,037.43 | 73,112.88 | 91,501.55 | 79,410.28 | 77,775.59 |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Advertising | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,145.70 | 0.00 |
| Auto Expense | 559.84 | 324.82 | 366.71 | 47.98 | 0.00 | 135.55 | 344.34 |
| Bank Service Charges | 1.00 | 4.00 | 1.00 | 3.00 | 3.00 | 7.00 | 4.00 |
| Merchant Charges | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Clinic expenses | 11,329.85 | 2,640.67 | 3,682.59 | 1,912.89 | 8,972.28 | 6,017.01 | 2,232.61 |
| Continuing Education | 0.00 | 199.00 | 0.00 | 0.00 | 0.00 | 50.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Drugs & Medicines | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dues & Subscriptions | 120.00 | 0.00 | 1,655.00 | 55.00 | 0.00 | 0.00 | 0.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 134.85 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 88.87 | 0.00 | 89.26 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Building | 0.00 | 0.00 | 0.00 | 0.00 | 468.00 | 0.00 | 0.00 |
| Insurance-Employee | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Liability | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Vehicles | 0.00 | 1,714.00 | 1,633.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Worker's Comp | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance Malpractice | 2,702.50 | 0.00 | 0.00 | 0.00 | 0.00 | 2,908.00 | 0.00 |
| Interest Expense | -1,000.00 | 0.00 | 0.00 | 0.00 | 2,034.37 | 0.00 | 0.00 |
| Lab Expense | 2,274.25 | 4,411.55 | 2,326.15 | 2,673.59 | 1,939.40 | 1,442.75 | 0.00 |
| Laundry & Uniforms | 0.00 | 298.56 | 0.00 | 1.41 | 0.00 | 0.00 | 0.00 |
| Licenses, Fees, Permits | 50.00 | 45.00 | 0.00 | 0.00 | 900.00 | 75.00 | 0.00 |
| Maintenance | 2,743.72 | 671.11 | 421.15 | 663.45 | 442.86 | 1,839.21 | 941.76 |
| Meals | 0.00 | 242.26 | 0.00 | 0.00 | 155.64 | 0.00 | 324.42 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Office expense | 7,820.34 | 1,531.64 | 6,424.74 | 690.79 | 3,049.18 | 2,253.69 | 1,305.82 |
| Professional Fees | 0.00 | 0.00 | 1,353.00 | 110.00 | 1,040.00 | 700.00 | 1,040.00 |
| Professional Fees-Accounting | 310.00 | 0.00 | 2,580.00 | 160.00 | 160.00 | 1,230.00 | 445.00 |
| Professional Fees-Legal | 1,200.60 | 0.00 | 395.26 | 0.00 | 0.00 | 0.00 | 380.85 |
| Repairs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent | 60.00 | 60.00 | 60.00 | 0.00 | 120.00 | 120.00 | 0.00 |
| Salaries: General | 19,132.00 | 12,578.79 | 18,991.12 | 18,385.47 | 24,129.24 | 18,845.93 | 18,401.24 |
| Salaries: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Chester Peeples FICA & M | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: FICA | 1,186.17 | 779.89 | 1,177.43 | 1,139.91 | 1,496.03 | 1,168.45 | 1,140.90 |
| Taxes: MCAR | 277.41 | 182.40 | 275.37 | 266.58 | 349.87 | 273.26 | 266.81 |
| Taxes: FUTA | 0.00 | 0.00 | 22.08 | 0.00 | 0.00 | 0.00 | 53.40 |
| Taxes: SUTA | 0.00 | 0.00 | 46.07 | 0.00 | 0.00 | 85.12 | 0.00 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Property | 0.00 | 250.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Real Estate | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone | 1,539.80 | 1,047.65 | 1,401.82 | -4,738.73 | 6,851.68 | 1,132.93 | 769.43 |
| Uniforms | 0.00 | 0.00 | 0.00 | 390.17 | -390.17 | 0.00 | 0.00 |
| Utilities | 405.69 | 424.42 | 341.15 | 569.21 | -64.48 | 276.81 | 295.72 |
| X ray expense | 358.42 | 79.55 | 449.06 | 265.06 | -42.02 | 358.42 | 104.74 |
| **Total Operating Expenses** | 51,160.46 | 27,485.81 | 43,691.96 | 22,730.63 | 51,614.88 | 40,064.83 | 28,051.04 |
| | | | | | | | |
| **Operating Income (Loss)** | 17,241.69 | 44,664.49 | 35,345.47 | 50,382.25 | 39,886.67 | 39,345.45 | 49,724.55 |
| | | | | | | | |
| **Other Income** | | | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 10.11 | 11.96 | 13.11 | -200.56 | 237.22 | 20.13 | 16.32 |
| **Total Other Income** | 10.11 | 11.96 | 13.11 | -200.56 | 237.22 | 20.13 | 16.32 |
| | | | | | | | |
| **Net Income (Loss)** | 17,251.80 | 44,676.45 | 35,358.58 | 50,181.69 | 40,123.89 | 39,365.58 | 49,740.87 |

Table 2.  Trent P. Pierce Proprietorship

| | Mar-04 | Apr-04 | May-04 | Jun-04 | Jul-04 | Aug-04 | Sep-04 |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Fees | 83,768.67 | 74,882.75 | 78,358.67 | 78,232.42 | 73,503.06 | 78,986.92 | 79,992.62 |
| Fees: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Less Returns & Allowances | -110.51 | -302.88 | -181.13 | -508.18 | -429.85 | -70.00 | -156.46 |
| **Total Sales** | 83,658.16 | 74,579.87 | 78,177.54 | 77,724.24 | 73,073.21 | 78,916.92 | 79,836.16 |
| **Gross Profit** | 83,658.16 | 74,579.87 | 78,177.54 | 77,724.24 | 73,073.21 | 78,916.92 | 79,836.16 |
| **Operating Expenses** | | | | | | | |
| Advertising | 561.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Auto Expense | 55.07 | 38.15 | 276.75 | 32.22 | 93.02 | 384.48 | 294.13 |
| Bank Service Charges | 3.00 | 2.00 | 22.40 | 12.80 | 10.70 | 11.70 | 8.80 |
| Merchant Charges | 22.27 | 47.80 | 55.37 | 57.19 | 67.39 | 53.69 | 76.24 |
| Clinic expenses | 4,098.17 | 1,514.73 | 2,821.81 | 3,210.90 | 3,896.93 | 4,578.01 | 9,633.03 |
| Continuing Education | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Drugs & Medicines | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,802.27 | 0.00 |
| Dues & Subscriptions | 300.00 | 0.00 | 405.00 | 0.00 | 0.00 | 0.00 | 210.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Building | 2,526.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Employee | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Liability | 495.00 | 0.00 | 0.00 | 0.00 | 510.00 | 0.00 | 3,413.00 |
| Insurance-Vehicles | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Worker's Comp | 1,035.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance Malpractice | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,400.00 |
| Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 8.61 | 0.00 |
| Lab Expense | 1,604.20 | 1,880.70 | 4,742.70 | 0.00 | 2,726.05 | 2,619.05 | 4,716.10 |
| Laundry & Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 300.00 |
| Licenses, Fees, Permits | 335.00 | 195.00 | 400.00 | 0.00 | 0.00 | 0.00 | 225.00 |
| Maintenance | 1,773.79 | 333.78 | 1,375.14 | 408.55 | 1,819.48 | 966.88 | 864.45 |
| Meals | 145.24 | 125.79 | 211.49 | 299.29 | 109.84 | 223.36 | 71.02 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 72.56 | 0.00 |
| Office expense | 3,972.04 | 1,954.66 | 3,168.62 | 3,208.90 | 2,813.49 | 4,016.72 | 4,687.87 |
| Professional Fees | 50.00 | 1,340.00 | -300.00 | 0.00 | 0.00 | 700.00 | 0.00 |
| Professional Fees-Accounting | 1,090.00 | 980.00 | 1,090.00 | 160.00 | 470.00 | 890.00 | 160.00 |
| Professional Fees-Legal | 0.00 | 0.00 | 472.16 | 172.41 | 177.42 | 0.00 | 0.00 |
| Repairs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent | 120.00 | 0.00 | 0.00 | 0.00 | 0.00 | 60.00 | 120.00 |
| Salaries: General | 17,732.48 | 19,088.99 | 18,059.14 | 18,858.91 | 18,590.50 | 24,931.44 | 23,558.06 |
| Salaries: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Chester Peeples FICA & M | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: FICA | 1,099.40 | 1,183.49 | 1,119.67 | 1,169.28 | 1,152.60 | 1,545.75 | 1,460.60 |
| Taxes: MCAR | 257.11 | 276.81 | 261.84 | 273.44 | 269.55 | 361.49 | 341.58 |
| Taxes: FUTA | 0.00 | 389.72 | 0.00 | 0.00 | 125.68 | 0.00 | 0.00 |
| Taxes: SUTA | 0.00 | 551.15 | 0.00 | 0.00 | 394.56 | 0.00 | 0.00 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Property | 347.62 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 250.50 |
| Taxes: Real Estate | 1,580.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone | 395.95 | 141.60 | 187.52 | 521.44 | 880.11 | 1,005.85 | 1,607.00 |
| Uniforms | 150.00 | 0.00 | 0.00 | 0.00 | 369.60 | 0.00 | 0.00 |
| Utilities | 302.05 | 69.05 | 423.79 | 34.95 | 360.82 | 380.55 | 766.78 |
| X ray expense | 220.00 | 369.11 | 95.00 | 220.00 | 232.91 | 389.35 | 338.72 |
| **Total Operating Expenses** | 40,270.82 | 30,482.53 | 35,008.40 | 28,640.28 | 35,130.65 | 46,001.71 | 56,502.88 |
| **Operating Income (Loss)** | 43,387.34 | 44,097.34 | 43,169.14 | 49,083.96 | 37,942.56 | 32,915.21 | 23,333.28 |
| **Other Income** | | | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 20.39 | 20.03 | 8.83 | 10.80 | 15.39 | 17.27 | 15.88 |
| **Total Other Income** | 20.39 | 20.03 | 8.83 | 10.80 | 15.39 | 17.27 | 15.88 |
| **Net Income (Loss)** | 43,407.73 | 44,117.37 | 43,177.97 | 49,094.76 | 37,957.95 | 32,932.48 | 23,349.16 |

Table 2.  Trent P. Pierce Proprietorship

| | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Fees | 81,494.92 | 82,568.35 | 86,332.70 | 71,837.33 | 80,425.22 | 86,649.77 | 86,214.19 |
| Fees: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Less Returns & Allowances | -253.00 | -250.43 | -254.00 | -352.01 | -402.89 | -101.21 | -769.53 |
| Total Sales | 81,241.92 | 82,317.92 | 86,078.70 | 71,485.32 | 80,022.33 | 86,548.56 | 85,444.66 |
| **Gross Profit** | 81,241.92 | 82,317.92 | 86,078.70 | 71,485.32 | 80,022.33 | 86,548.56 | 85,444.66 |
| **Operating Expenses** | | | | | | | |
| Advertising | 0.00 | 0.00 | 0.00 | 0.00 | 1,202.70 | 0.00 | 0.00 |
| Auto Expense | 0.00 | 0.00 | 250.95 | 91.17 | 69.92 | 0.00 | 74.05 |
| Bank Service Charges | 12.90 | 31.80 | 12.00 | 8.90 | 9.10 | 9.00 | 10.80 |
| Merchant Charges | 66.63 | 86.08 | 70.40 | 56.29 | 86.22 | 80.09 | 77.39 |
| Clinic expenses | 13,930.98 | 10,270.61 | 8,642.84 | 496.77 | 3,129.80 | 286.00 | 3,366.28 |
| Continuing Education | 0.00 | 0.00 | 0.00 | 0.00 | 60.00 | 0.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 0.00 | 0.00 | 18,646.73 | 0.00 | 0.00 | 0.00 | 0.00 |
| Drugs & Medicines | 825.90 | 799.10 | 5,294.00 | 0.00 | 1,238.85 | 1,651.80 | 0.00 |
| Dues & Subscriptions | 234.60 | 1,610.00 | -60.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Building | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,525.00 | 0.00 |
| Insurance-Employee | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Liability | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Vehicles | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Worker's Comp | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,137.00 | 0.00 |
| Insurance Malpractice | 0.00 | 0.00 | 0.00 | 0.00 | 3,713.00 | 0.00 | 0.00 |
| Interest Expense | 0.00 | 0.00 | 2,877.61 | 0.00 | 0.00 | 0.00 | 0.00 |
| Lab Expense | 0.00 | 2,572.90 | 6,657.85 | 0.00 | 0.00 | 0.00 | 6,481.38 |
| Laundry & Uniforms | 290.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Licenses, Fees, Permits | 130.00 | -130.00 | 1,025.00 | 0.00 | 0.00 | 0.00 | 595.00 |
| Maintenance | 4,379.43 | 2,867.49 | 7,372.05 | 1,776.41 | 442.13 | 1,501.45 | 8,119.23 |
| Meals | 128.24 | 276.27 | 593.25 | 0.00 | 201.64 | 232.16 | 360.17 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Office expense | 4,789.26 | 3,793.94 | 18,369.48 | 892.01 | 6,654.06 | 1,718.38 | 4,402.02 |
| Professional Fees | 1,040.00 | 0.00 | 1,740.00 | 0.00 | 1,040.00 | 0.00 | 1,060.00 |
| Professional Fees-Accounting | 2,495.00 | 160.00 | 1,170.00 | 190.00 | 160.00 | 806.00 | 1,110.00 |
| Professional Fees-Legal | 0.00 | 0.00 | 1,172.34 | 0.00 | 250.00 | 0.00 | 0.00 |
| Repairs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent | 0.00 | 65.55 | 65.55 | 0.00 | 131.10 | 0.00 | 0.00 |
| Salaries: General | 23,853.32 | 22,649.64 | 62,346.92 | 14,053.69 | 23,018.75 | 22,587.53 | 23,287.64 |
| Salaries: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Chester Peeples FICA & M | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: FICA | 1,478.93 | 1,404.27 | 3,316.00 | 1,420.91 | 1,427.16 | 1,400.44 | 1,443.83 |
| Taxes: MCAR | 345.86 | 328.42 | 775.52 | 332.30 | 333.78 | 327.55 | 337.68 |
| Taxes: FUTA | 87.60 | 0.00 | 0.00 | 27.98 | 0.00 | 0.00 | 407.01 |
| Taxes: SUTA | 147.41 | 0.00 | 0.00 | 124.38 | 0.00 | 0.00 | 2,058.54 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Property | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Real Estate | 0.00 | 1,706.22 | 0.00 | 0.00 | 0.00 | 0.00 | 3,611.85 |
| Telephone | 685.14 | 503.07 | 1,478.48 | 370.23 | 1,247.45 | 365.04 | 1,150.96 |
| Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Utilities | 67.66 | 373.43 | 483.50 | 79.50 | 505.08 | 94.24 | 497.72 |
| X ray expense | 387.95 | 151.30 | 523.08 | 0.00 | 163.08 | 138.46 | 439.98 |
| Total Operating Expenses | 55,379.26 | 49,520.09 | 142,823.35 | 19,920.54 | 45,083.82 | 34,860.14 | 58,891.53 |
| **Operating Income (Loss)** | 25,862.66 | 32,797.83 | -56,744.65 | 51,564.78 | 34,938.51 | 51,688.42 | 26,553.13 |
| **Other Income** | | | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | -110.07 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 11.43 | 11.67 | 11.77 | 12.07 | 13.83 | 23.22 | 28.31 |
| Total Other Income | 11.43 | 11.67 | -98.30 | 12.07 | 13.83 | 23.22 | 28.31 |
| **Net Income (Loss)** | 25,874.09 | 32,809.50 | -56,842.95 | 51,576.85 | 34,952.34 | 51,711.64 | 26,581.44 |

**Table 2.  Trent P. Pierce Proprietorship**

| | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Fees | 78,115.89 | 80,221.99 | 65,445.22 | 84,082.02 | 71,107.11 | 83,921.04 | 85,316.03 |
| Fees: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Less Returns & Allowances | -85.00 | -151.95 | -81.16 | -710.14 | -1,124.36 | -575.57 | -161.05 |
| **Total Sales** | 78,030.89 | 80,070.04 | 65,364.06 | 83,371.88 | 69,982.75 | 83,345.47 | 85,154.98 |
| | | | | | | | |
| **Gross Profit** | 78,030.89 | 80,070.04 | 65,364.06 | 83,371.88 | 69,982.75 | 83,345.47 | 85,154.98 |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Advertising | 0.00 | 572.00 | 0.00 | 0.00 | 0.00 | 2,111.50 | 0.00 |
| Auto Expense | 247.07 | 1,208.49 | 10.72 | 0.00 | 182.60 | 178.71 | 208.05 |
| Bank Service Charges | 10.00 | 9.90 | 10.70 | 9.70 | 14.80 | 39.70 | -10.30 |
| Merchant Charges | 95.13 | 108.34 | 122.28 | 93.42 | 81.40 | 120.69 | 87.92 |
| Clinic expenses | 2,892.74 | 3,213.20 | 4,645.80 | 3,509.71 | 2,749.81 | 1,212.94 | 2,491.43 |
| Continuing Education | 400.00 | 0.00 | 0.00 | 358.00 | 0.00 | 0.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9,691.08 | 0.00 |
| Drugs & Medicines | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dues & Subscriptions | 275.00 | 70.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,815.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Building | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Employee | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Liability | 0.00 | 965.00 | 114.00 | 0.00 | 0.00 | 0.00 | 940.00 |
| Insurance-Vehicles | 0.00 | 0.00 | 1,687.30 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Worker's Comp | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance Malpractice | 0.00 | 0.00 | 0.00 | 3,713.00 | 0.00 | 0.00 | 0.00 |
| Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Lab Expense | 0.00 | 1,763.70 | 4,916.40 | 0.00 | 2,781.80 | 0.00 | 1,742.00 |
| Laundry & Uniforms | 0.00 | 0.00 | 0.00 | 199.99 | 0.00 | 0.00 | 199.99 |
| Licenses, Fees, Permits | 0.00 | 375.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Maintenance | 399.33 | 4,638.31 | 3,573.77 | 752.86 | 513.87 | 8,359.33 | 1,221.33 |
| Meals | 220.00 | 163.57 | 199.31 | 231.57 | 66.42 | 254.56 | 204.61 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Office expense | 1,674.67 | 8,293.30 | 1,893.55 | 1,714.71 | 3,033.81 | 746.85 | 3,312.04 |
| Professional Fees | 0.00 | 530.00 | 700.00 | 520.00 | 0.00 | 1,060.00 | 0.00 |
| Professional Fees-Accounting | 820.00 | 160.00 | 1,230.00 | 480.00 | 480.00 | 2,280.00 | 480.00 |
| Professional Fees-Legal | 5,286.45 | 0.00 | 0.00 | 0.00 | 675.88 | 0.00 | 0.00 |
| Repairs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Salaries: General | 22,270.20 | 23,183.94 | 22,816.43 | 22,832.41 | 23,623.67 | 26,043.99 | 24,025.21 |
| Salaries: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Chester Peeples FICA & M | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: FICA | 1,380.75 | 1,437.44 | 1,414.65 | 1,415.60 | 1,464.67 | 1,621.52 | 1,489.53 |
| Taxes: MCAR | 322.93 | 336.17 | 330.82 | 331.11 | 342.55 | 379.20 | 348.39 |
| Taxes: FUTA | 0.00 | 0.00 | 156.19 | 0.00 | 0.00 | 67.70 | 0.00 |
| Taxes: SUTA | 0.00 | 0.00 | 1,661.72 | 0.00 | 0.00 | 394.23 | 0.00 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Property | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Real Estate | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone | 700.01 | 713.76 | 944.07 | 152.41 | 701.89 | 742.87 | 1,224.50 |
| Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Utilities | 30.43 | 291.98 | 824.85 | 22.81 | 433.46 | 499.66 | 677.72 |
| X ray expense | 104.75 | 748.32 | 82.84 | 82.84 | 490.72 | 159.02 | 359.74 |
| **Total Operating Expenses** | 36,929.49 | 48,782.42 | 47,315.40 | 36,420.14 | 37,637.35 | 55,963.55 | 40,817.16 |
| | | | | | | | |
| **Operating Income (Loss)** | 41,101.40 | 31,287.62 | 18,048.66 | 46,951.74 | 32,345.40 | 27,381.92 | 44,337.82 |
| | | | | | | | |
| **Other Income** | | | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 31.57 | 31.64 | 31.09 | 3.48 | 30.39 | 25.09 | 28.13 |
| **Total Other Income** | 31.57 | 31.64 | 31.09 | 3.48 | 30.39 | 25.09 | 28.13 |
| | | | | | | | |
| **Net Income (Loss)** | 41,132.97 | 31,319.26 | 18,079.75 | 46,955.22 | 32,375.79 | 27,407.01 | 44,365.95 |

Table 2. Trent P. Pierce Proprietorship

| | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 | Jun-06 |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Fees | 75,341.10 | 83,192.11 | 83,461.22 | 88,975.18 | 79,710.42 | 93,453.54 | 73,678.57 |
| Fees: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Less Returns & Allowances | -157.79 | -339.49 | -188.04 | -458.55 | -187.35 | -457.54 | -353.35 |
| **Total Sales** | 75,183.31 | 82,852.62 | 83,273.18 | 88,516.63 | 79,523.07 | 92,996.00 | 73,325.22 |
| | | | | | | | |
| **Gross Profit** | 75,183.31 | 82,852.62 | 83,273.18 | 88,516.63 | 79,523.07 | 92,996.00 | 73,325.22 |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Advertising | 0.00 | 1,430.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Auto Expense | 270.56 | 125.96 | 535.83 | 231.01 | 458.42 | 231.85 | 311.82 |
| Bank Service Charges | 9.10 | 8.70 | 8.70 | 8.90 | 8.60 | 8.70 | 9.30 |
| Merchant Charges | 79.35 | 80.59 | 114.65 | 138.01 | 152.50 | 124.81 | 153.28 |
| Clinic expenses | 6,885.69 | 61.65 | 4,639.83 | 739.45 | 1,946.17 | 1,026.00 | 3,233.67 |
| Continuing Education | 0.00 | 0.00 | 60.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Drugs & Medicines | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dues & Subscriptions | 0.00 | 0.00 | 0.00 | 0.00 | 275.00 | 0.00 | 0.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Building | 0.00 | 0.00 | 0.00 | 2,689.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Employee | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Liability | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Vehicles | 1,838.90 | 0.00 | 0.00 | 0.00 | 674.50 | 86.20 | 0.00 |
| Insurance-Worker's Comp | 0.00 | 0.00 | 0.00 | 1,191.00 | 0.00 | 0.00 | 0.00 |
| Insurance Malpractice | 0.00 | 3,902.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Expense | 4,538.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Lab Expense | 6,768.45 | 2,148.00 | 0.00 | 2,045.50 | 4,853.35 | 0.00 | 2,221.80 |
| Laundry & Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Licenses, Fees, Permits | 825.00 | 300.00 | 740.00 | 0.00 | 435.00 | 400.00 | 0.00 |
| Maintenance | 5,287.08 | 421.82 | 233.99 | 2,171.45 | 602.17 | 3,891.36 | 335.00 |
| Meals | 588.72 | 0.00 | 138.43 | 188.23 | 297.64 | 252.28 | 141.21 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Office expense | 3,958.63 | 1,073.11 | 7,245.45 | 3,928.89 | 3,543.20 | 1,576.08 | 3,429.55 |
| Professional Fees | 980.00 | 700.00 | 1,060.00 | 0.00 | 0.00 | 0.00 | 1,060.00 |
| Professional Fees-Accounting | 160.00 | 1,030.00 | 646.00 | 160.00 | 1,390.00 | 480.00 | 160.00 |
| Professional Fees-Legal | 0.00 | 0.00 | 287.06 | 0.00 | 367.60 | 0.00 | 0.00 |
| Repairs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent | 60.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Salaries: General | 49,509.49 | 23,490.51 | 23,962.17 | 22,890.25 | 23,113.36 | 23,175.80 | 23,901.65 |
| Salaries: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Chester Peeples FICA & M | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: FICA | 3,063.07 | 1,456.41 | 1,485.62 | 1,419.19 | 1,433.01 | 1,436.91 | 839.98 |
| Taxes: MCAR | 716.30 | 340.60 | 347.46 | 331.90 | 335.16 | 336.04 | 196.48 |
| Taxes: FUTA | 0.00 | 40.90 | 0.00 | 0.00 | 466.62 | 0.00 | 0.00 |
| Taxes: SUTA | 0.00 | 378.04 | 0.00 | 0.00 | 2,477.19 | 0.00 | 0.00 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Property | 0.00 | 0.00 | 0.00 | 295.29 | 0.00 | 0.00 | 0.00 |
| Taxes: Real Estate | 0.00 | 0.00 | 0.00 | 0.00 | 3,136.65 | 0.00 | 0.00 |
| Telephone | 690.10 | 612.42 | 666.86 | 909.51 | 632.91 | 683.61 | 780.48 |
| Uniforms | 0.00 | 200.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Utilities | 267.84 | 327.94 | 371.67 | 359.99 | 328.53 | 359.94 | 489.04 |
| X ray expense | 247.42 | 82.84 | 359.74 | 82.84 | 371.84 | 94.94 | 99.31 |
| **Total Operating Expenses** | 86,744.40 | 38,212.19 | 42,903.46 | 39,780.41 | 47,299.42 | 34,164.52 | 37,362.57 |
| | | | | | | | |
| **Operating Income (Loss)** | -11,561.09 | 44,640.43 | 40,369.72 | 48,736.22 | 32,223.65 | 58,831.48 | 35,962.65 |
| | | | | | | | |
| **Other Income** | | | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 33.18 | 28.48 | 21.56 | 31.49 | 36.99 | 28.09 | 33.12 |
| **Total Other Income** | 33.18 | 28.48 | 21.56 | 31.49 | 36.99 | 28.09 | 33.12 |
| | | | | | | | |
| **Net Income (Loss)** | -11,527.91 | 44,668.91 | 40,391.28 | 48,767.71 | 32,260.64 | 58,859.57 | 35,995.77 |

Table 2.  Trent P. Pierce Proprietorship

| | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 | Jan-07 |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Fees | 77,694.17 | 83,738.19 | 67,263.37 | 82,403.18 | 83,761.27 | 99,493.22 | 80,393.88 |
| Fees: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Less Returns & Allowances | -325.60 | -1,072.57 | -547.89 | -503.43 | -202.08 | -916.71 | -150.68 |
| **Total Sales** | 77,368.57 | 82,665.62 | 66,715.48 | 81,899.75 | 83,559.19 | 98,576.51 | 80,243.20 |
| | | | | | | | |
| **Gross Profit** | 77,368.57 | 82,665.62 | 66,715.48 | 81,899.75 | 83,559.19 | 98,576.51 | 80,243.20 |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Advertising | 0.00 | 0.00 | 594.00 | 2,822.00 | 0.00 | 0.00 | 0.00 |
| Auto Expense | 288.02 | 566.79 | 168.49 | 352.04 | 963.19 | 210.48 | 441.60 |
| Bank Service Charges | 12.10 | 9.10 | 12.00 | 12.10 | 9.60 | 12.40 | 12.00 |
| Merchant Charges | 139.00 | 119.90 | 154.43 | 117.36 | 142.97 | 142.46 | 132.24 |
| Clinic expenses | 273.45 | 3,280.03 | 3,339.34 | 4,205.04 | 4,083.51 | 14,763.26 | 1,299.32 |
| Continuing Education | 0.00 | 0.00 | 100.00 | 0.00 | 70.00 | -70.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 0.00 | 0.00 | 0.00 | 12,185.35 | 0.00 | 0.00 | 0.00 |
| Drugs & Medicines | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dues & Subscriptions | 0.00 | 0.00 | 0.00 | 795.00 | 920.00 | 0.00 | 0.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Building | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Employee | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Liability | 965.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Vehicles | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Worker's Comp | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance Malpractice | 0.00 | 3,902.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,251.30 | 0.00 |
| Lab Expense | 0.00 | 6,000.00 | 657.60 | 2,432.81 | 5,182.93 | 2,577.43 | 0.00 |
| Laundry & Uniforms | 0.00 | 0.00 | 414.23 | 0.00 | 0.00 | 0.00 | 0.00 |
| Licenses, Fees, Permits | 0.00 | 0.00 | 0.00 | 0.00 | 250.00 | 250.00 | 75.00 |
| Maintenance | 1,420.87 | 1,254.13 | 2,684.50 | 810.00 | 1,484.49 | 1,688.00 | 791.83 |
| Meals | 129.74 | 0.00 | 278.61 | 141.94 | 147.58 | 255.22 | 152.81 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | 276.08 | 0.00 | 0.00 | 0.00 |
| Office expense | 935.57 | 2,367.71 | 5,692.94 | 5,147.73 | 5,002.37 | 20,890.82 | 2,771.16 |
| Professional Fees | 0.00 | 1,810.00 | 0.00 | 0.00 | 0.00 | 560.00 | 750.00 |
| Professional Fees-Accounting | 800.00 | 640.00 | 2,150.00 | 590.00 | 1,880.00 | 80.00 | 340.00 |
| Professional Fees-Legal | 0.00 | 0.00 | 184.80 | 0.00 | 0.00 | 0.00 | 0.00 |
| Repairs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Salaries: General | 23,301.40 | 23,531.48 | 27,237.21 | 23,184.72 | 26,449.18 | 31,639.76 | 24,029.04 |
| Salaries: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Chester Peeples FICA & M | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: FICA | 2,086.55 | 1,459.00 | 1,688.67 | 1,437.44 | 1,639.84 | 1,981.69 | 1,489.82 |
| Taxes: MCAR | 488.02 | 341.15 | 394.96 | 336.18 | 383.51 | 458.80 | 348.42 |
| Taxes: FUTA | 110.29 | 0.00 | 0.00 | 87.13 | 0.00 | 0.00 | 7.96 |
| Taxes: SUTA | 1,446.43 | 0.00 | 0.00 | 499.18 | 0.00 | 0.00 | 303.78 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Property | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Real Estate | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone | 88.60 | 1,113.76 | 98.58 | 230.42 | 199.71 | 195.48 | 208.96 |
| Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Utilities | 16.49 | 899.94 | 14.99 | 489.62 | 638.19 | 1,025.10 | 86.12 |
| X ray expense | 783.24 | 94.94 | 368.54 | 466.78 | 169.63 | 349.30 | 0.00 |
| **Total Operating Expenses** | 33,284.77 | 47,389.93 | 46,233.89 | 56,618.92 | 49,616.70 | 81,241.50 | 33,240.06 |
| | | | | | | | |
| **Operating Income (Loss)** | 44,083.80 | 35,275.69 | 20,481.59 | 25,280.83 | 33,942.49 | 17,335.01 | 47,003.14 |
| | | | | | | | |
| **Other Income** | | | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 16.21 | 22.33 | 19.30 | 11.83 | 13.56 | 23.75 | 18.79 |
| **Total Other Income** | 16.21 | 22.33 | 19.30 | 11.83 | 13.56 | 23.75 | 18.79 |
| | | | | | | | |
| **Net Income (Loss)** | 44,100.01 | 35,298.02 | 20,500.89 | 25,292.66 | 33,956.05 | 17,358.76 | 47,021.93 |

**Table 2.  Trent P. Pierce Proprietorship**

| | Feb-07 | Mar-07 | Apr-07 | May-07 | Jun-07 | Jul-07 | Aug-07 |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Fees | 91,614.33 | 89,193.32 | 70,410.62 | 92,095.53 | 67,058.53 | 95,915.35 | 76,846.94 |
| Fees: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Less Returns & Allowances | -330.14 | -466.65 | -782.15 | -441.29 | -613.13 | -1,307.06 | -161.06 |
| **Total Sales** | 91,284.19 | 88,726.67 | 69,628.47 | 91,654.24 | 66,445.40 | 94,608.29 | 76,685.88 |
| | | | | | | | |
| **Gross Profit** | 91,284.19 | 88,726.67 | 69,628.47 | 91,654.24 | 66,445.40 | 94,608.29 | 76,685.88 |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Advertising | 0.00 | 1,530.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Auto Expense | 189.98 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Bank Service Charges | 18.70 | 14.90 | 15.20 | 12.00 | 15.00 | 18.10 | 15.10 |
| Merchant Charges | 153.62 | 161.83 | 240.52 | 145.62 | 186.75 | 142.33 | 136.35 |
| Clinic expenses | 243.50 | 4,366.30 | 1,523.23 | 5,036.26 | 311.47 | 4,003.31 | 1,445.04 |
| Continuing Education | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Drugs & Medicines | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dues & Subscriptions | 0.00 | 0.00 | 0.00 | 275.00 | 50.00 | 280.00 | 0.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Building | 0.00 | 2,553.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Employee | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Liability | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Vehicles | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Worker's Comp | 0.00 | 1,098.00 | 0.00 | 0.00 | 0.00 | 253.00 | 0.00 |
| Insurance Malpractice | 3,902.00 | 0.00 | 50.00 | 0.00 | 0.00 | 0.00 | 3,902.00 |
| Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Lab Expense | 2,490.30 | 1,849.55 | 5,000.00 | 0.00 | 2,571.61 | 5,358.65 | 0.00 |
| Laundry & Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Licenses, Fees, Permits | 0.00 | 0.00 | 200.00 | 400.00 | 75.00 | 0.00 | 0.00 |
| Maintenance | 107.50 | 3,003.52 | 1,203.50 | 385.00 | 565.00 | 1,169.76 | 1,005.00 |
| Meals | 75.42 | 113.50 | 150.33 | 115.90 | 358.50 | 80.30 | 73.76 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Office expense | 3,237.78 | 6,229.18 | 1,761.49 | 7,695.29 | 3,388.48 | 10,247.34 | 631.60 |
| Professional Fees | 1,060.00 | 0.00 | 1,060.00 | 0.00 | 0.00 | 750.00 | 1,040.00 |
| Professional Fees-Accounting | 160.00 | 1,345.50 | 1,220.00 | 500.00 | 500.00 | 160.00 | 950.00 |
| Professional Fees-Legal | 0.00 | 0.00 | 0.00 | 1,043.96 | 0.00 | 0.00 | 0.00 |
| Repairs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Salaries: General | 26,133.75 | 23,787.21 | 25,256.43 | 24,503.52 | 23,873.74 | 21,674.59 | 26,649.94 |
| Salaries: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Chester Peeples FICA & M | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: FICA | 1,620.31 | 1,474.82 | 1,565.91 | 1,519.21 | 1,480.23 | 1,343.84 | 1,652.33 |
| Taxes: MCAR | 378.94 | 344.91 | 366.23 | 355.29 | 346.19 | 314.29 | 386.43 |
| Taxes: FUTA | 0.00 | 0.00 | 542.64 | 0.00 | 0.00 | 101.50 | 0.00 |
| Taxes: SUTA | 0.00 | 0.00 | 2,542.75 | 0.00 | 0.00 | 1,220.26 | 0.00 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Property | 0.00 | 0.00 | 351.97 | 0.00 | 1,518.86 | -0.00 | 0.00 |
| Taxes: Real Estate | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone | 83.11 | 265.97 | 172.41 | 83.21 | 198.77 | 237.99 | 168.96 |
| Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Utilities | 357.18 | 641.80 | 307.83 | 35.91 | 307.23 | 832.74 | 14.99 |
| X ray expense | 100.00 | 758.76 | 99.31 | 158.20 | 0.00 | 1,599.59 | 323.88 |
| **Total Operating Expenses** | 40,312.09 | 49,539.41 | 43,629.75 | 42,244.37 | 35,746.83 | 49,787.59 | 38,395.38 |
| | | | | | | | |
| **Operating Income (Loss)** | 50,972.10 | 39,187.26 | 25,998.72 | 49,409.87 | 30,698.57 | 44,820.70 | 38,290.50 |
| | | | | | | | |
| **Other Income** | | | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 12.43 | 24.41 | 33.85 | 13.19 | 17.46 | 15.92 | 19.20 |
| **Total Other Income** | 12.43 | 24.41 | 33.85 | 13.19 | 17.46 | 15.92 | 19.20 |
| | | | | | | | |
| **Net Income (Loss)** | 50,984.53 | 39,211.67 | 26,032.57 | 49,423.06 | 30,716.03 | 44,836.62 | 38,309.70 |

Table 2.  Trent P. Pierce Proprietorship

| | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Fees | 83,746.34 | 98,898.37 | 143,930.12 | 78,515.02 | 92,891.55 | 103,199.25 | 95,900.23 |
| Fees: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Less Returns & Allowances | -129.48 | -499.07 | -475.26 | -449.48 | -1,186.82 | 87.10 | -782.72 |
| **Total Sales** | 83,616.86 | 98,399.30 | 143,454.86 | 78,065.54 | 91,704.73 | 103,286.35 | 95,117.51 |
| | | | | | | | |
| **Gross Profit** | 83,616.86 | 98,399.30 | 143,454.86 | 78,065.54 | 91,704.73 | 103,286.35 | 95,117.51 |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Advertising | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 625.00 | 0.00 |
| Auto Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 357.26 | 559.29 |
| Bank Service Charges | 23.90 | 18.00 | 15.00 | 12.50 | 17.90 | 15.40 | 20.90 |
| Merchant Charges | 152.71 | 142.73 | 157.17 | 331.65 | 118.45 | 150.86 | 203.52 |
| Clinic expenses | 7,355.02 | 15,703.33 | 2,547.21 | 276.85 | 3,209.96 | 758.17 | 5,566.34 |
| Continuing Education | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 0.00 | 0.00 | 0.00 | 15,639.43 | 0.00 | 0.00 | 0.00 |
| Drugs & Medicines | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dues & Subscriptions | 0.00 | 555.00 | 0.00 | 979.00 | 0.00 | 0.00 | 0.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Building | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Employee | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Liability | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,724.00 |
| Insurance-Vehicles | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Worker's Comp | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,136.33 |
| Insurance Malpractice | 0.00 | 0.00 | 0.00 | 4,773.80 | 110.67 | 4,026.00 | 0.00 |
| Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16.04 | 0.00 |
| Lab Expense | 2,666.49 | 2,468.13 | 0.00 | 4,348.43 | 2,040.80 | 1,753.88 | 1,829.18 |
| Laundry & Uniforms | 0.00 | 300.00 | 0.00 | 175.89 | 0.00 | 0.00 | 99.41 |
| Licenses, Fees, Permits | 0.00 | 40.00 | 0.00 | 450.00 | 75.00 | 1,911.89 | 0.00 |
| Maintenance | 473.87 | 5,985.00 | 2,403.78 | 2,325.47 | 712.13 | 93.70 | 330.77 |
| Meals | 210.55 | 175.47 | 55.98 | 193.75 | 140.29 | 108.19 | 156.51 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | -276.08 | 0.00 | 0.00 | 0.00 |
| Office expense | 3,673.12 | 1,903.88 | 525.54 | 7,113.64 | 5,230.28 | 3,884.42 | 3,969.30 |
| Professional Fees | 0.00 | 0.00 | 0.00 | 1,300.00 | 0.00 | 2,050.00 | 0.00 |
| Professional Fees-Accounting | 550.00 | 2,240.00 | 300.00 | 770.00 | 1,185.00 | 1,088.00 | 180.00 |
| Professional Fees-Legal | 495.92 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Repairs | 0.00 | 0.00 | 0.00 | 0.00 | 60.00 | 0.00 | 0.00 |
| Rent | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Salaries: General | 24,577.83 | 26,192.12 | 26,346.52 | 39,513.20 | 14,955.16 | 25,679.47 | 24,318.29 |
| Salaries: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Chester Peeples FICA & M | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: FICA | 1,523.83 | 1,623.93 | 1,633.49 | 1,843.08 | 1,533.98 | 1,592.13 | 1,507.76 |
| Taxes: MCAR | 356.39 | 379.77 | 382.03 | 431.05 | 358.76 | 372.36 | 352.60 |
| Taxes: FUTA | 0.00 | 34.25 | 0.00 | 0.00 | 11.54 | 0.00 | 0.00 |
| Taxes: SUTA | 0.00 | 278.49 | 0.00 | 0.00 | 188.24 | 0.00 | 0.00 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 112.62 | 37.54 | 32.04 | 0.00 |
| Taxes: Property | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Real Estate | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone | 254.20 | 239.70 | 186.63 | 128.92 | 221.48 | 380.18 | 0.00 |
| Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Utilities | 1,004.71 | 518.29 | 369.62 | 772.34 | 367.66 | 452.78 | 579.00 |
| X ray expense | 104.63 | 453.58 | 0.00 | 172.30 | 181.60 | 1,000.85 | 0.00 |
| **Total Operating Expenses** | 43,422.65 | 59,251.67 | 34,922.97 | 81,387.84 | 30,756.44 | 46,348.62 | 43,533.27 |
| | | | | | | | |
| **Operating Income (Loss)** | 40,194.21 | 39,147.63 | 108,531.89 | -3,322.30 | 60,948.29 | 56,937.73 | 51,584.24 |
| | | | | | | | |
| **Other Income** | | | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 25.43 | 19.67 | 23.90 | 85.15 | 24.55 | 15.63 | 61.41 |
| **Total Other Income** | 25.43 | 19.67 | 23.90 | 85.15 | 24.55 | 15.63 | 61.41 |
| | | | | | | | |
| **Net Income (Loss)** | 40,219.64 | 39,167.30 | 108,555.79 | -3,237.15 | 60,972.84 | 56,953.36 | 51,645.65 |

Table 2.  Trent P. Pierce Proprietorship

| | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 | Oct-08 |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Fees | 88,541.47 | 82,915.22 | 86,654.25 | 91,715.31 | 77,594.84 | 87,961.90 | 107,039.24 |
| Fees: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Less Returns & Allowances | -585.71 | -586.00 | -372.00 | -1,493.13 | -482.45 | -327.13 | -471.94 |
| **Total Sales** | 87,955.76 | 82,329.22 | 86,282.25 | 90,222.18 | 77,112.39 | 87,634.77 | 106,567.30 |
| | | | | | | | |
| **Gross Profit** | 87,955.76 | 82,329.22 | 86,282.25 | 90,222.18 | 77,112.39 | 87,634.77 | 106,567.30 |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Advertising | 1,650.00 | 0.00 | 20.55 | 778.90 | 404.25 | 54.58 | 38.92 |
| Auto Expense | 357.38 | 375.83 | 336.81 | 408.90 | 269.94 | 368.74 | 166.59 |
| Bank Service Charges | 15.40 | 23.90 | 8.90 | 17.90 | 11.80 | 27.10 | 47.10 |
| Merchant Charges | 184.08 | 181.31 | 214.73 | 199.95 | 182.03 | 182.07 | 198.43 |
| Clinic expenses | 4,557.42 | 4,567.00 | 3,144.27 | 5,383.19 | 2,399.28 | 6,801.06 | 3,276.12 |
| Continuing Education | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Drugs & Medicines | 855.01 | 476.57 | 0.00 | 39.97 | 0.00 | 0.00 | 0.00 |
| Dues & Subscriptions | 489.00 | 0.00 | 50.00 | 0.00 | 0.00 | 0.00 | 1,565.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Building | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Employee | 0.00 | 15.50 | 0.00 | -15.50 | 0.00 | 0.00 | 0.00 |
| Insurance-Liability | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Vehicles | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Worker's Comp | 0.00 | 0.00 | 0.00 | 7.67 | 0.00 | 0.00 | 0.00 |
| Insurance Malpractice | 0.00 | 0.00 | 0.00 | 0.00 | 4,026.00 | 0.00 | 0.00 |
| Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Lab Expense | 4,646.11 | 0.00 | 0.00 | 4,424.27 | 4,409.60 | 0.00 | 4,257.75 |
| Laundry & Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 594.93 | 0.00 |
| Licenses, Fees, Permits | 435.00 | 400.00 | 0.00 | 200.00 | 0.00 | 350.00 | 0.00 |
| Maintenance | 3,947.03 | 5,087.52 | 5,037.92 | 9,445.18 | 2,379.18 | 1,279.36 | 2,182.37 |
| Meals | 59.70 | 176.70 | 0.00 | 320.34 | 211.43 | 259.77 | 260.59 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Office expense | 5,431.00 | 5,107.53 | 4,657.71 | 6,894.59 | 958.82 | 5,550.21 | 7,675.66 |
| Professional Fees | 1,300.00 | 0.00 | 0.00 | 750.00 | 650.00 | 0.00 | 0.00 |
| Professional Fees-Accounting | 520.00 | 1,480.00 | 400.00 | 180.00 | 640.00 | 520.00 | 2,780.00 |
| Professional Fees-Legal | 370.67 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Repairs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent | -60.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Salaries: General | 24,429.38 | 22,563.42 | 22,912.21 | 23,563.17 | 25,031.70 | 23,378.96 | 24,721.14 |
| Salaries: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Chester Peeples FICA & M | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: FICA | 1,514.63 | 1,398.94 | 1,420.58 | 1,460.92 | 1,551.96 | 1,449.53 | 1,532.71 |
| Taxes: MCAR | 354.23 | 327.16 | 332.24 | 341.67 | 362.97 | 338.96 | 358.49 |
| Taxes: FUTA | 487.18 | 0.00 | 0.00 | 143.34 | 0.00 | 0.00 | 34.14 |
| Taxes: SUTA | 638.70 | 0.00 | 0.00 | 402.63 | 0.00 | 0.00 | 94.16 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Property | 310.80 | 3,355.92 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Real Estate | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone | 411.51 | 214.83 | 136.23 | 305.37 | 629.53 | 721.72 | 711.43 |
| Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Utilities | 499.91 | 36.13 | 15.02 | 955.85 | 567.57 | 14.99 | 875.57 |
| X ray expense | 214.60 | 107.30 | 107.30 | 707.45 | 97.03 | 107.30 | 467.86 |
| **Total Operating Expenses** | 53,618.74 | 45,895.56 | 38,794.47 | 56,915.76 | 44,783.09 | 41,999.28 | 51,244.03 |
| | | | | | | | |
| **Operating Income (Loss)** | 34,337.02 | 36,433.66 | 47,487.78 | 33,306.42 | 32,329.30 | 45,635.49 | 55,323.27 |
| | | | | | | | |
| **Other Income** | | | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 31.58 | 17.77 | 36.85 | 11.33 | 15.19 | 30.79 | 17.59 |
| **Total Other Income** | 31.58 | 17.77 | 36.85 | 11.33 | 15.19 | 30.79 | 17.59 |
| | | | | | | | |
| **Net Income (Loss)** | 34,368.60 | 36,451.43 | 47,524.63 | 33,317.75 | 32,344.49 | 45,666.28 | 55,340.86 |

Table 2. Trent P. Pierce Proprietorship

| | Nov-08 | Dec-08 | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Fees | 96,260.63 | 94,102.98 | 98,254.96 | 75,829.63 | 65,404.37 | 70,278.11 | 45,560.30 |
| Fees: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Less Returns & Allowances | -304.24 | -199.12 | -483.10 | -75.94 | -125.00 | 0.00 | -419.08 |
| **Total Sales** | 95,956.39 | 93,903.86 | 97,771.86 | 75,753.69 | 65,279.37 | 70,278.11 | 45,141.22 |
| **Gross Profit** | 95,956.39 | 93,903.86 | 97,771.86 | 75,753.69 | 65,279.37 | 70,278.11 | 45,141.22 |
| **Operating Expenses** | | | | | | | |
| Advertising | 0.00 | 0.00 | 119.65 | 0.00 | 1,716.00 | 0.00 | 0.00 |
| Auto Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Bank Service Charges | 18.30 | 15.30 | 12.00 | 9.30 | 12.10 | 8.80 | 12.00 |
| Merchant Charges | 200.80 | 202.64 | 208.80 | 252.30 | 170.17 | 222.01 | 164.55 |
| Clinic expenses | 7,803.97 | 3,882.90 | 3,738.50 | 4,332.63 | 435.91 | 796.03 | 13.36 |
| Continuing Education | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 300.00 |
| Depreciation Expense | 0.00 | 30,773.43 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Drugs & Medicines | 478.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dues & Subscriptions | 0.00 | 0.00 | 308.52 | 99.00 | 0.00 | 175.00 | 0.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 52.52 | 0.00 | 284.60 | 18.52 | 18.52 | 0.00 | 52.52 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Building | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Employee | 0.00 | -40.85 | 40.85 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Liability | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,246.00 | 0.00 |
| Insurance-Vehicles | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Worker's Comp | 0.00 | 0.00 | 0.00 | 0.00 | 1,048.00 | 1,636.00 | 0.00 |
| Insurance Malpractice | 0.00 | 0.00 | 0.00 | 4,060.50 | 0.00 | 0.00 | 0.00 |
| Interest Expense | 4,432.62 | 317.94 | 185.88 | 0.00 | 1,261.36 | 319.15 | 319.15 |
| Lab Expense | 0.00 | 3,276.74 | 1,418.46 | 0.00 | 0.00 | 0.00 | 3,218.36 |
| Laundry & Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Licenses, Fees, Permits | -100.00 | 0.00 | 1,065.00 | 0.00 | 0.00 | 200.00 | 475.00 |
| Maintenance | 5,193.58 | -7,808.86 | 5,570.84 | 256.67 | 192.03 | 435.00 | 729.24 |
| Meals | 171.50 | 209.99 | 173.02 | 124.57 | 50.00 | 50.00 | 50.00 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Office expense | 4,229.72 | 618.66 | 2,008.75 | 1,295.87 | 1,541.39 | 1,807.00 | 3,291.43 |
| Professional Fees | 0.00 | 1,380.00 | 750.00 | 0.00 | 1,750.00 | 0.00 | 0.00 |
| Professional Fees-Accounting | 180.00 | 1,130.00 | 90.00 | 1,007.50 | 0.00 | 0.00 | 0.00 |
| Professional Fees-Legal | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Repairs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Salaries: General | 24,759.05 | 37,629.07 | 9,875.02 | 25,871.78 | 18,194.61 | 19,441.01 | 18,106.30 |
| Salaries: Chester Peeples | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Chester Peeples FICA & M | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: FICA | 1,535.01 | 1,702.10 | 1,243.20 | 1,604.07 | 1,128.06 | 1,205.34 | 1,122.59 |
| Taxes: MCAR | 359.02 | 398.08 | 290.73 | 375.14 | 263.82 | 281.92 | 262.54 |
| Taxes: FUTA | 0.00 | 0.00 | 7.34 | 0.00 | 0.00 | 404.21 | 0.00 |
| Taxes: SUTA | 0.00 | 0.00 | 48.75 | 0.00 | 0.00 | 588.59 | 0.00 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Property | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Real Estate | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone | 723.62 | 16.91 | 1,793.38 | 565.99 | 349.15 | 381.09 | 819.95 |
| Uniforms | 0.00 | 105.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Utilities | 359.50 | 806.70 | 453.71 | 871.45 | 406.82 | 97.05 | 620.07 |
| X ray expense | 242.31 | 65.00 | 227.61 | 100.46 | 112.84 | 70.37 | 100.41 |
| **Total Operating Expenses** | 50,639.69 | 74,680.75 | 29,914.61 | 40,845.75 | 28,650.78 | 30,364.57 | 29,657.47 |
| **Operating Income (Loss)** | 45,316.70 | 19,223.11 | 67,857.25 | 34,907.94 | 36,628.59 | 39,913.54 | 15,483.75 |
| **Other Income** | | | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 23.20 | 49.35 | 25.33 | 18.58 | 74.14 | 25.85 | 24.85 |
| **Total Other Income** | 23.20 | 49.35 | 25.33 | 18.58 | 74.14 | 25.85 | 24.85 |
| **Net Income (Loss)** | 45,339.90 | 19,272.46 | 67,882.58 | 34,926.52 | 36,702.73 | 39,939.39 | 15,508.60 |

Table 2.  Trent P. Pierce Proprietorship

| | Jun-09 | Jul-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Fees | 48,180.55 | 39,112.58 | 46,990.99 | 64,971.50 | 67,737.28 | 67,383.99 | 81,406.72 |
| Fees: Chester Peeples | 0.00 | 0.00 | 0.00 | 6,480.19 | 14,467.06 | 18,517.48 | 20,597.84 |
| Less Returns & Allowances | -32.57 | -833.31 | -75.21 | -259.65 | -59.00 | 0.00 | -81.26 |
| **Total Sales** | 48,147.98 | 38,279.27 | 46,915.78 | 71,192.04 | 82,145.34 | 85,901.47 | 101,923.30 |
| | | | | | | | |
| **Gross Profit** | 48,147.98 | 38,279.27 | 46,915.78 | 71,192.04 | 82,145.34 | 85,901.47 | 101,923.30 |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Advertising | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Auto Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Bank Service Charges | 18.90 | 8.90 | 8.70 | 23.70 | 12.00 | 12.00 | 15.20 |
| Merchant Charges | 155.77 | 162.65 | 121.34 | 138.22 | 189.05 | 212.84 | 219.72 |
| Clinic expenses | 3,188.80 | 635.29 | 1,457.68 | 4,030.17 | 6,058.15 | 1,116.17 | 3,024.06 |
| Continuing Education | 89.00 | 0.00 | 370.00 | 0.00 | 370.00 | 0.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 0.00 | 0.00 | 0.00 | 0.00 | 8,679.68 | 0.00 | 0.00 |
| Drugs & Medicines | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dues & Subscriptions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 590.00 | 920.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 52.52 | 0.00 | 52.52 | 210.08 | 0.00 | 0.00 | 127.04 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Building | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Employee | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -40.85 |
| Insurance-Liability | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Vehicles | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Worker's Comp | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance Malpractice | 0.00 | 0.00 | 2,408.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Expense | 319.15 | 319.15 | 319.15 | 319.15 | 0.00 | 0.00 | 3,615.38 |
| Lab Expense | 3,171.44 | 0.00 | 3,028.02 | 1,459.20 | 0.00 | 0.00 | 4,992.54 |
| Laundry & Uniforms | 0.00 | 0.00 | 0.00 | 598.02 | 0.00 | 0.00 | 0.00 |
| Licenses, Fees, Permits | 0.00 | 0.00 | 590.00 | 0.00 | 0.00 | 0.00 | 195.00 |
| Maintenance | 1,413.18 | 1,193.72 | 447.80 | 2,849.44 | 2,381.09 | 2,606.33 | 2,501.06 |
| Meals | 50.00 | 80.43 | 0.00 | 120.35 | 178.28 | 106.08 | 132.33 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Office expense | 2,667.28 | 1,142.51 | 1,942.96 | 9,300.97 | 3,785.91 | 5,462.09 | 5,239.72 |
| Professional Fees | 1,000.00 | 0.00 | 1,360.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Professional Fees-Accounting | 0.00 | 2,400.00 | 180.00 | 640.00 | 2,440.00 | 1,330.00 | 270.00 |
| Professional Fees-Legal | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 25.00 |
| Repairs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Salaries: General | 14,911.18 | 14,310.01 | 18,816.73 | 15,983.80 | 17,077.26 | 19,162.89 | 33,064.13 |
| Salaries: Chester Peeples | 0.00 | 0.00 | 0.00 | 8,833.60 | 9,393.60 | 7,827.20 | 10,132.80 |
| Taxes: Chester Peeples FICA & M | 0.00 | 0.00 | 385.56 | 675.77 | 718.61 | 598.78 | 775.16 |
| Taxes: FICA | 924.54 | 887.21 | 1,166.64 | 991.02 | 1,058.81 | 1,188.11 | 2,225.05 |
| Taxes: MCAR | 216.20 | 207.50 | 272.85 | 231.76 | 247.62 | 277.88 | 304.36 |
| Taxes: FUTA | 0.00 | 103.25 | 0.00 | 0.00 | 80.75 | 0.00 | 0.00 |
| Taxes: SUTA | 0.00 | 347.54 | 0.00 | 0.00 | 177.16 | 0.00 | 0.00 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Property | 0.00 | 0.00 | 0.00 | 0.00 | 265.87 | 0.00 | 0.00 |
| Taxes: Real Estate | 0.00 | 0.00 | 0.00 | 0.00 | 1,820.84 | 0.00 | 0.00 |
| Telephone | 438.82 | 354.70 | 739.71 | 1,539.14 | 357.13 | 0.00 | 691.36 |
| Uniforms | 0.00 | 37.16 | 0.00 | 37.16 | 0.00 | -0.10 | 113.40 |
| Utilities | 325.63 | 14.99 | 490.14 | 935.95 | 365.40 | 18.69 | 1,317.59 |
| X ray expense | 437.90 | 0.00 | 254.14 | 215.41 | 101.18 | 0.00 | 292.12 |
| **Total Operating Expenses** | 29,380.31 | 22,205.01 | 39,452.44 | 49,132.91 | 55,758.29 | 40,509.16 | 70,152.17 |
| | | | | | | | |
| **Operating Income (Loss)** | 18,767.67 | 16,074.26 | 7,463.34 | 22,059.13 | 26,387.05 | 45,392.31 | 31,771.13 |
| | | | | | | | |
| **Other Income** | | | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 19.11 | 23.54 | 20.66 | 40.24 | 11.39 | 13.84 | 44.90 |
| **Total Other Income** | 19.11 | 23.54 | 20.66 | 40.24 | 11.39 | 13.84 | 44.90 |
| | | | | | | | |
| **Net Income (Loss)** | 18,786.78 | 16,097.80 | 7,484.00 | 22,099.37 | 26,398.44 | 45,406.15 | 31,816.03 |

Table 2.  Trent P. Pierce Proprietorship

| | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 |
|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | |
| Fees | 79,046.92 | 77,550.49 | 120,637.10 | 58,427.07 | 74,408.57 | 79,170.07 | 82,059.40 |
| Fees: Chester Peeples | 0.00 | 0.00 | 0.00 | 39,160.40 | 9,327.73 | 10,612.32 | 5,735.11 |
| Less Returns & Allowances | -73.08 | -563.52 | -1,110.29 | -795.46 | -1,380.63 | -1,342.31 | -827.25 |
| Total Sales | 78,973.84 | 76,986.97 | 119,526.81 | 96,792.01 | 82,355.67 | 88,440.08 | 86,967.26 |
| | | | | | | | |
| Gross Profit | 78,973.84 | 76,986.97 | 119,526.81 | 96,792.01 | 82,355.67 | 88,440.08 | 86,967.26 |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Advertising | 0.00 | 74.20 | 625.00 | 356.00 | 178.00 | 178.00 | 0.00 |
| Auto Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Bank Service Charges | 11.90 | 12.00 | 9.10 | 18.10 | 8.80 | 8.80 | 17.80 |
| Merchant Charges | 154.14 | 252.40 | 267.42 | 343.90 | 254.44 | 236.55 | 286.62 |
| Clinic expenses | 686.01 | 9,410.96 | 820.22 | 3,279.55 | 2,617.51 | 3,774.02 | 3,207.04 |
| Continuing Education | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Drugs & Medicines | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dues & Subscriptions | 0.00 | 0.00 | 0.00 | 175.00 | 0.00 | 0.00 | 0.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 0.00 | 127.04 | 0.00 | 30.52 | 52.52 | 75.08 | 0.00 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Building | 0.00 | 0.00 | 2,241.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Employee | 40.85 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Liability | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Vehicles | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Worker's Comp | 872.56 | 0.00 | 1,094.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance Malpractice | 0.00 | 4,151.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 | 109.40 | 116.67 | 159.98 |
| Lab Expense | 0.00 | 3,265.33 | 1,854.67 | 0.00 | 6,324.61 | 1,433.87 | 0.00 |
| Laundry & Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Licenses, Fees, Permits | 1,475.00 | 0.00 | 550.00 | 435.00 | 400.00 | 325.00 | 0.00 |
| Maintenance | 5,383.84 | 3,207.40 | 6,243.20 | -9,329.57 | 749.87 | 4,003.97 | 5,207.58 |
| Meals | 50.00 | 190.05 | 90.26 | 225.10 | 151.28 | 220.82 | 200.18 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Office expense | 1,668.99 | 3,408.45 | 1,757.81 | 2,578.32 | 1,078.52 | 3,374.38 | 3,282.71 |
| Professional Fees | 0.00 | 1,500.00 | 0.00 | 0.00 | 0.00 | 1,280.00 | 0.00 |
| Professional Fees-Accounting | 1,230.00 | 518.00 | 880.00 | 540.00 | 1,180.00 | 1,170.00 | 180.00 |
| Professional Fees-Legal | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Repairs | 0.00 | 60.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Salaries: General | 12,750.82 | 23,120.63 | 24,513.62 | 5,891.02 | 18,297.60 | 18,947.40 | 19,168.85 |
| Salaries: Chester Peeples | 0.00 | 0.00 | 0.00 | 18,835.20 | 6,916.00 | 5,501.60 | 4,947.20 |
| Taxes: Chester Peeples FICA & M | 0.00 | 0.00 | 0.00 | 1,440.89 | 529.08 | 420.87 | 378.46 |
| Taxes: FICA | 790.55 | 1,433.48 | 1,519.85 | 365.23 | 1,134.47 | 1,174.75 | 1,188.45 |
| Taxes: MCAR | 184.90 | 335.25 | 355.43 | 85.42 | 265.32 | 274.73 | 277.97 |
| Taxes: FUTA | 87.41 | 0.00 | 0.00 | 422.07 | 0.00 | 0.00 | 116.48 |
| Taxes: SUTA | 156.95 | 0.00 | 0.00 | 2,404.38 | 0.00 | 0.00 | 0.00 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Property | 0.00 | 0.00 | 0.00 | 289.17 | 0.00 | 0.00 | 0.00 |
| Taxes: Real Estate | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone | 95.40 | 694.72 | 67.70 | 661.11 | 396.68 | 388.03 | 297.74 |
| Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Utilities | 114.60 | 832.31 | 179.09 | 668.06 | 340.78 | 435.97 | 262.99 |
| X ray expense | 113.56 | 113.56 | 113.56 | 113.56 | 461.47 | 132.42 | 113.56 |
| Total Operating Expenses | 25,867.48 | 52,707.28 | 43,181.93 | 29,828.03 | 41,446.55 | 43,472.93 | 39,293.61 |
| | | | | | | | |
| Operating Income (Loss) | 53,106.36 | 24,279.69 | 76,344.88 | 66,963.98 | 40,909.12 | 44,967.15 | 47,673.65 |
| | | | | | | | |
| **Other Income** | | | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 17.68 | 15.21 | 43.77 | 24.74 | 14.60 | 40.57 | 10.79 |
| Total Other Income | 17.68 | 15.21 | 43.77 | 24.74 | 14.60 | 40.57 | 10.79 |
| | | | | | | | |
| Net Income (Loss) | 53,124.04 | 24,294.90 | 76,388.65 | 66,988.72 | 40,923.72 | 45,007.72 | 47,684.44 |

Table 2.  Trent P. Pierce Proprietorship

| | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 |
|---|---|---|---|---|---|
| **Sales** | | | | | |
| Fees | 82,895.74 | 84,254.65 | 94,241.80 | 97,209.42 | 71,831.77 |
| Fees: Chester Peeples | 4,641.60 | 4,126.06 | 1,713.63 | 674.19 | 310.72 |
| Less Returns & Allowances | -549.13 | -116.44 | -243.26 | -208.51 | 39.10 |
| **Total Sales** | 86,988.21 | 88,264.27 | 95,712.17 | 97,675.10 | 72,181.59 |
| | | | | | |
| **Gross Profit** | 86,988.21 | 88,264.27 | 95,712.17 | 97,675.10 | 72,181.59 |
| | | | | | |
| **Operating Expenses** | | | | | |
| Advertising | 356.00 | 0.00 | 178.00 | 356.00 | 0.00 |
| Auto Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Bank Service Charges | 11.90 | 11.90 | 11.70 | 20.80 | 12.10 |
| Merchant Charges | 262.80 | 334.76 | 269.03 | 242.08 | 314.18 |
| Clinic expenses | 6,202.96 | 1,001.00 | 2,967.45 | 5,987.42 | 3,389.62 |
| Continuing Education | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Contributions | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Depreciation Expense | 0.00 | 0.00 | 30,904.41 | 0.00 | 0.00 |
| Drugs & Medicines | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dues & Subscriptions | 0.00 | 0.00 | 0.00 | 0.00 | 1,135.00 |
| Entertainment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Equipment Rental | 105.04 | 0.00 | 105.04 | 105.04 | 0.00 |
| Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Building | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Employee | 0.00 | 0.00 | 0.00 | 0.00 | -62.50 |
| Insurance-Liability | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Vehicles | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance-Worker's Comp | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Insurance Malpractice | 4,151.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Lab Expense | 1,676.70 | 0.00 | 4,221.54 | 1,853.75 | 2,957.15 |
| Laundry & Uniforms | 0.00 | 0.00 | 759.68 | 0.00 | 0.00 |
| Licenses, Fees, Permits | 200.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Maintenance | 2,083.68 | 360.00 | 1,977.77 | 2,204.65 | 1,577.81 |
| Meals | 130.49 | 0.00 | 234.62 | 56.81 | 282.72 |
| Miscellaneous-Penalty | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Office expense | 8,431.99 | 416.98 | 2,847.17 | 6,747.58 | 1,443.62 |
| Professional Fees | 1,642.50 | 0.00 | 0.00 | 0.00 | -892.50 |
| Professional Fees-Accounting | 1,045.00 | 180.00 | 2,220.00 | 1,405.00 | 270.00 |
| Professional Fees-Legal | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Repairs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Salaries: General | 18,255.13 | 18,582.15 | 19,215.40 | 18,483.53 | 27,447.54 |
| Salaries: Chester Peeples | 2,773.60 | 2,088.72 | 0.00 | 0.00 | 2,335.87 |
| Taxes: Chester Peeples FICA & M | 212.18 | 159.79 | 0.00 | 0.00 | 178.69 |
| Taxes: FICA | 1,131.81 | 1,152.11 | 1,191.38 | 1,145.98 | 1,146.72 |
| Taxes: MCAR | 264.70 | 269.44 | 278.61 | 268.03 | 268.19 |
| Taxes: FUTA | 0.00 | 0.00 | 24.17 | 0.00 | 0.00 |
| Taxes: SUTA | 1,731.53 | 0.00 | 495.57 | 0.00 | 0.00 |
| Taxes: Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Property | 1,971.84 | 0.00 | 0.00 | 0.00 | 0.00 |
| Taxes: Real Estate | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Telephone | 812.33 | 0.00 | 386.53 | 800.87 | 429.29 |
| Uniforms | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Utilities | 1,629.69 | 0.00 | 628.83 | 937.41 | 36.50 |
| X ray expense | 642.38 | 0.00 | 124.44 | 332.24 | 203.75 |
| **Total Operating Expenses** | 55,725.75 | 24,556.85 | 69,021.34 | 40,947.19 | 42,473.75 |
| | | | | | |
| **Operating Income (Loss)** | 31,262.46 | 63,707.42 | 26,690.83 | 56,727.91 | 29,707.84 |
| | | | | | |
| **Other Income** | | | | | |
| Gain/Loss: Book Value | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Income | 11.03 | 34.19 | 7.44 | 12.11 | 13.01 |
| **Total Other Income** | 11.03 | 34.19 | 7.44 | 12.11 | 13.01 |
| | | | | | |
| **Net Income (Loss)** | 31,273.49 | 63,741.61 | 26,698.27 | 56,740.02 | 29,720.85 |

# UNDER SEAL

RESPONDENT
EXHIBIT
36

**Whatley, Karen (USAARE)**

| | |
|---|---|
| **From:** | Gordon, Michael (USAARE) |
| **Sent:** | Tuesday, June 22, 2010 10:44 AM |
| **To:** | Jack Lassiter |
| **Cc:** | Whatley, Karen (USAARE) |
| **Subject:** | RE: Accountant's testimony |

It will be used to show one of the effects the bombing had on interstate commerce (e.g. the clinic lost money).

*Michael S. Gordon*
Michael S. Gordon
Assistant United States Attorney, EDAR
425 W. Capitol Ave, Suite 500
Little Rock, Arkansas 72201-3536
(501) 340-2652

---

**From:** Jack Lassiter [mailto:jack@lassiterandcouch.com]
**Sent:** Tuesday, June 22, 2010 10:41 AM
**To:** Gordon, Michael (USAARE)
**Subject:** RE: Accountant's testimony

I need to be sure I understand the relevance of this data. Want to explain?

---

**From:** Gordon, Michael (USAARE) [mailto:Michael.Gordon@usdoj.gov]
**Sent:** Tuesday, June 22, 2010 9:41 AM
**To:** Jack Lassiter; todudley@swbell.net
**Cc:** Whatley, Karen (USAARE); Michael.Gordon@usdoj.gov
**Subject:** Accountant's testimony

A couple of weeks ago, I provided each of you with summaries and charts from Dr. Pierce's accountant, Pam Falkner.  In order to keep from having to redact numerous bank and tax records, I intend to admit the summaries under FRE 1006.  If you would like to review the underlying records, please let me know and we can set up a time and place to make that happen.  Thanks.

*Michael S. Gordon*

Michael S. Gordon

Assistant United States Attorney, EDAR

425 W. Capitol Ave, Suite 500

Little Rock, Arkansas 72201-3536

(501) 340-2652

RESPONDENT
EXHIBIT
37