**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**RANDEEP SINGH MANN**                                                                 **PETITIONER**

**v.**                             **CASE NO. 4:09CR00099 BSM**

**UNITED STATES OF AMERICA**                                         **RESPONDENT**

<u>**ORDER**</u>

Petitioner Randeep Mann's motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255 [Doc. No. 395] and his motion for hearing on motion for post-conviction relief [Doc. No. 406] are denied.

## I. BACKGROUND

On the morning of February 4, 2009, Dr. Trent Pierce, Chairman of the Arkansas State Medical Board, found a spare tire leaning against his vehicle at his home in West Memphis, Arkansas. When Pierce moved the tire, a grenade taped to the underside of the tire exploded, leaving him severely injured. As officials began their investigation into the bombing, they obtained a list of all doctors who had been disciplined by the medical board within the past five years. One of the doctors on this list was petitioner Randeep Mann, who had a history before the board. The night of the bombing, an agent of the Bureau of Alcohol, Tobacco and Firearms and a special agent with the Arkansas State Police interviewed Mann and his wife at their home. During the interview, Mann showed the two officials his extensive gun collection, which included machine guns and grenade launchers.

On March 3, 2009, two city workers discovered a canister filled with ninety-eight grenades buried in a wooded area approximately 875 feet from Mann's home. The next day,

agents obtained a search warrant for Mann's residence to search for evidence related to the buried grenades. Mann was arrested because the ninety-eight grenades and at least two other firearms were not registered to Mann in violation of federal firearms laws. On March 5, 2009, officials obtained a search warrant for Mann's residence to search for evidence related to the February 4, 2009, bombing of Dr. Pierce. Ultimately, eight charges were brought against Mann in relation to the Pierce bombing and the possession of unregistered firearms.

On August 9, 2010, a jury convicted Mann of seven of the eight charges: Count 1, conspiring to use and aiding and abetting in the use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a; Count 2, causing the damage or destruction of a vehicle by means of an explosive resulting in personal injury in violation of 18 U.S.C. § 844(I); Count 3, possession of unregistered grenades in violation of 26 U.S.C. § 5861(d); Count 5, possession of an unregistered machinegun in violation of 26 U.S.C. § 5861(d); Count 6, possession of a machinegun in violation of 18 U.S.C. § 922(o); Count 7, conspiring to corruptly obstruct an official proceeding in violation of 18 U.S.C. § 1512; and Count 8, aiding and abetting in the corrupt concealment of documents with the intent to impair the use of the documents in an official proceeding in violation of 18 U.S.C. § 1512.

On February 28, 2011, Mann was sentenced as follows: life imprisonment for Count 1; 360 months imprisonment for Count 2; 120 months imprisonment for Counts 2, 5, and 6; and 60 months imprisonment for Counts 7 and 8, with all sentences to run concurrently; five years of supervised release; a $100,000 fine; and $700 in special assessments. On appeal, the Eighth Circuit Court of Appeals affirmed Mann's convictions as to Counts 1, 2, 3, 7, and 8,

and remanded Counts 5 and 6 with instructions to set one of the two convictions aside. The Eighth Circuit also affirmed the sentences as to Counts 7 and 8 but remanded Counts 1, 2, 3, and 5 or 6 for resentencing. *United States v. Mann*, 701 F.3d 274, 311 (8th Cir. 2012). On May 1, 2013, Count 5 was vacated, and Mann was resentenced as follows: life imprisonment for Count 1; 360 months imprisonment for Count 2; 120 months imprisonment for Counts 3 and 6, with all sentences to run concurrently; five years of supervised release; a $100,000 fine; and $600 in special assessments.

On October 20, 2014, Mann filed this motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255. *See* Doc. No. 395. On December 3, 2014, Mann filed a motion for hearing on motion for post-conviction relief. *See* Doc. No. 406. Mann has presented twenty grounds for relief, including multiple claims of the ineffective assistance of counsel, *Brady* violations, and other miscellaneous grounds. The parties have thoroughly briefed the issues, with Mann submitting numerous memoranda, briefs, and a reply, and the government submitting a response to Mann's motion.

## II. LEGAL STANDARDS

A prisoner in custody under sentence of a federal court "may move the court which imposed the sentence to vacate, set aside or correct the sentence" on any of the following bases: (1) the sentence was imposed in violation of the Constitution or laws of the United States, (2) the court was without jurisdiction to impose the sentence, (3) the sentence was in excess of the maximum authorized by law, or (4) is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). "Where a defendant has procedurally defaulted a claim by failing to raise

it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Jennings v. United States*, 696 F.3d 759, 763 (8th Cir. 2012) (quoting *Bousely v. United States*, 523 U.S. 614, 622 (1998)). Two of the most common issues raised in section 2255 motions involve claims for the ineffective assistance of counsel and violations under *Brady v. Maryland*, 373 U.S. 83 (1963). Ineffective assistance of counsel claims may be brought for the first time in a section 2255 motion. *Massaro v. United States*, 538 U.S. 500, 504 (2003). Moreover, proof of a *Brady* violation will usually run parallel to proving cause and prejudice. *See Banks v. Dretke*, 540 U.S. 668, 671 (2004).

A. Ineffective Assistance of Counsel

An ineffective assistance of counsel claim is considered according to the framework provided by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). According to *Strickland*, an ineffective assistance of counsel claim has two prongs: deficient performance and prejudice. As for deficient performance, the defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. This first prong considers whether a lawyer's representation "fell below an objective standard of reasonableness." *Id.* at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.*

Consideration of deficient performance does not extend to strategic decisions made by counsel. "Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. When reviewing a strategic decision made by counsel, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Before making a strategic decision, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

As for prejudice, the defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Even if a defendant shows that particular errors of counsel were unreasonable, he must show that the errors had an adverse effect on his defense. *Id.* at 693. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding" because "[v]irtually every act or omission of counsel would meet that test." *Id.* Instead, to establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). When considering prejudice, "a court should

presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." *Strickland*, 466 U.S. at 694. "*Strickland* prejudice is a rigorous standard." *Rodela-Aguilar v. United States*, 596 F.3d 457, 463 (8th Cir. 2010).

A court may address the *Strickland* prongs in either order, and a court does not need "to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

B.     *Brady* Violations

When the government suppresses material evidence favorable to the accused, due process is violated, notwithstanding the government's good or bad faith. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To prove a *Brady* violation, the defendant must show that: (1) the evidence was favorable to the defendant, either because it was exculpatory or impeaching; (2) the government suppressed the evidence willfully or inadvertently; and (3) the defendant was prejudiced by the suppression. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1999). The government has a duty to disclose such evidence, even when it has not been requested by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the

police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). But, there is no duty to disclose evidence that is neutral, speculative, inculpatory, or available to the defense from other sources. *United States v. Flores-Mireles*, 112 F.3d 337, 340 (8th Cir. 1997). As for prejudice, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

## III.  DISCUSSION

At the outset, it must be emphasized that the purpose of a section 2255 motion is not to relitigate what happened back in 2009 and 2010 or to determine Dr. Mann's guilt or innocence. The parties and the jury have already performed these functions. "The guilt or innocence of the defendant is not in issue in a § 2255 proceeding, but rather the validity and the fairness of the proceedings against him." 3 Charles Alan Wright et al., Federal Practice and Procedure § 625 (4th ed.); *see also Strickland*, 466 U.S. at 689 ("The purpose is simply to ensure that criminal defendants receive a fair trial."). Thus, the sole purpose of Mann's section 2255 motion is to ensure that his proceedings were fair, and principally in this case, that his right to the effective assistance of counsel under the Sixth Amendment was not abridged, and that the government did not violate Mann's Fifth Amendment rights. With this in mind, Mann's twenty grounds for relief will be addressed.

Ground 1: Due Process Rights Based on Conspiracy

Mann's first three grounds involve Mann's allegations that local officials conspired against him by planting a canister of grenades near his home, fabricating a story about

7

finding these grenades, and using this information to obtain a search warrant for Mann's residence. The evidence presented to the jury was that, on March 3, 2009, Mark Rinke, a local city worker, stepped into the woods to urinate, when he tripped over a box wrapped in black plastic that was buried in the ground. Rinke mentioned the box to a coworker, Ryan Kimbell, and the two men returned to the box later that afternoon. The two men removed the box from the ground and discovered that the box was a military-style canister. It was full of ninety-eight grenades, which were capable of being launched by an M203 grenade launcher like one owned by Mann. Rinke and Kimbell alerted local authorities, and a search warrant was obtained the following day for Mann's residence. During the execution of the warrant, officials found an assortment of grenades, grenade launchers, firearms, ammunition, and a spare tire in a shower. As a result of this search, Mann was arrested for possessing the ninety-eight unregistered grenades and other unregistered firearms. This initial search and arrest led to additional searches and an investigation into Mann's role in the bombing of Dr. Pierce.

According to Mann, this story about accidentally stumbling upon the grenade-filled canister is a complete sham. Mann has now retained experts who opine that the canister could not have fit in the hole in question, and Mann believes the pictures introduced at trial were of an old hole that could not have held the canister. Mann has also submitted an affidavit from Will Elkins, in which Elkins states that in March 2009 he saw two local city workers carry a canister like the one found by Rinke to the area where the canister was eventually found. *See* Elkins Suppl. Decl., Doc. No. 491, Ex. 4. Mann believes other facts make the government's story suspect: Rinke has stated that he was told not to talk about finding the

canister. Additionally, Rinke told reporters the canister was half buried, yet his original story was that he tripped on a corner of a completely buried box. Rinke also stated that he was in the area to check out potential leaks in water lines at a pool, yet the property owner testified that she was home that day and never saw a city worker inspect her pool. Trial Tr. Vol. 15, 3080-82.

Ground 1 is denied. In ground 1, Mann argues that his Fifth Amendment due process rights were violated by the fabrication and planting of ninety-eight grenades near his home for the purpose of obtaining a search warrant. Mann also seems to bring a Fourth Amendment search and seizure challenge. Ground 1 is denied because it is procedurally defaulted.

A claim brought for the first time in a section 2255 motion is procedurally defaulted if the issue was not presented on direct appeal, unless the petitioner can demonstrate cause and prejudice, or actual innocence. *Jennings*, 696 F.3d at 762. Mann's Fourth and Fifth Amendment claims were not raised on direct appeal and Mann has not shown that he meets the cause and prejudice standards, or that he can satisfy the actual innocence standard. Instead, Mann offers affidavits from scientists, purporting to show that the canister found by Mark Rinke could not have fit in the hole in question.

According to Mann, the hole was not deep enough, wide enough, or freshly dug enough to support the government's story that the hole was accidentally stumbled upon. Mann also seems to argue that an evidentiary hearing regarding the search warrant should have been held according to *Franks v. Delaware*, 438 U.S. 154 (1978), because the warrant

was supported by deliberately or recklessly included false statements. Ultimately, Mann argues that this is one big conspiracy by the government to get him and that the real perpetrator is still out there somewhere. The purpose of a section 2255 motion, however, is to correct unconstitutional procedures inflicted upon a defendant, not to consider substantive arguments attempting to re-litigate the case. Accordingly, ground 1 is denied.

Ground 20: Failure to Disclose Evidence of Conspiracy

Ground 20 is denied. In ground 20, which was timely filed and is addressed immediately after ground 1 because it involves similar facts, Mann argues that the government violated his Fifth Amendment right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to produce exculpatory evidence. In support of this, Mann argues two points. First, Mann argues that the government did not turn over exculpatory evidence to his trial counsel, or in the alternative, that Kimbell and Rinke possessed exculpatory information that should have been turned over to Mann's trial counsel. *Brady* applies not only to evidence actually known by the prosecution, but it also imposes on the individual prosecutor a "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437. This rule even extends to exculpatory evidence "known only to police investigators and not to the prosecutor." *Id.* at 438. "*Brady* thus applies to relevant evidence in the hands of the police, whether the prosecutors knew about it or not, whether they suppressed it intentionally or not, and whether the accused asked for it or not." *Harris v. Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009) (citations omitted). Although Mann has not produced a single piece of exculpatory evidence

that was not given to his trial counsel, he asserts there may be information known by Kimbell and Rinke that should have been given to him.

Mann also argues that if his lawyers were not ineffective for failing to investigate whether the canister was placed in the hole by local officials, it is because "the police-prosecution team failed to disclose enough evidence soon enough for the defense team to hire experts for pretrial motions and trial testimony as Dr. Mann has hired experts on post-conviction relief." Doc No. 408, at 15. To prove a *Brady* violation, however, Mann is required to identify evidence that is material to either guilt or punishment. *Brady*, 373 U.S. at 81. Mann fails to identify a single piece of evidence that the government withheld. Moreover, he has not presented evidence that was withheld by Kimbell, Rinke, or any other local official acting on behalf of the government. Mann's entire argument hinges on his belief that Kimbell and Rinke are lying about accidentally finding the canister and that their testimony throughout the case was false. The government cannot be held responsible for failing to turn over evidence that it does not possess.

Second, Mann cites *Geders v. United States*, 425 U.S. 80 (1976), and *Herring v. New York*, 422 U.S. 853 (1975), for the proposition that the government's failure to turn over exculpatory information rendered his lawyers ineffective. In *Geders*, the Supreme Court held that a trial judge's order preventing a criminal defendant from consulting his lawyer during an overnight recess violated the defendant's right to the assistance of counsel. 425 U.S. at 91. In *Herring*, the Supreme Court held that a New York statute allowing a judge to deny counsel the opportunity to make a closing argument violated the defendant's right to the assistance

of counsel. 422 U.S. 864-65. Mann asks that this line of cases, holding that the judiciary's actions can render a defendant's counsel ineffective, be read to hold that the government's actions can render Mann's counsel ineffective.

Mann's argument fails because he has not shown how he was prejudiced by the government's actions. *See Strickler*, 527 U.S. at 282 (requiring prejudice to prove a *Brady* violation); *see also Harrington*, 562 U.S. at 112 (holding that the likelihood of a different result when considering ineffective assistance of counsel "must be substantial, not just conceivable"). *Geders* and *Herring* stand for the proposition that a defendant can be prejudiced by a judge's decision. The defendant in *Geders* was prejudiced when he denied the right to speak with his lawyer, and the defendant in *Herring* was prejudiced when he was denied the right to have his lawyer sum up the evidence at the end of trial. Here, however, Mann has failed to show how the government prejudiced him, and there can be no prejudice when Mann is unable to point to any individual action or evidence that prejudiced him.

Ground 2: Failure to Consult with Experts About Conspiracy

Ground 2 is denied. In ground 2, Mann argues that his lawyers were ineffective because they failed to consult with experts and to present expert testimony to show that the evidence used to obtain the search warrant was perjured. Again, Mann asserts that Rinke and Kimbell did not accidentally stumble upon the grenade-filled canister and that the hole was too small for the canister. He also states that counsel should have retained experts to provide scientific opinions about the size of the hole and that there is no strategic reason for failing to investigate whether the canister was truly found by accident. In support of this argument,

12

Mann has provided a declaration from William Elkins, who testifies that he saw two city workers with shovels drag "an odd-shaped box with black material looking like trash bags wrapped around it" to a spot about 900 feet from Mann's home. *See* Elkins Decl., Doc. No. 395, Ex. 4.

Ground 2 fails because Mann's counsel's decisions regarding the hole were strategic, and therefore not deficient. *Sanders v. Trickey*, 875 F.2d 205, 207 (8th Cir. 1989) ("A court must avoid second-guessing trial strategy."). Mann makes two arguments in support of his position that counsels' decisions were ineffective, not strategic. First, Mann contends that a decision is not strategic if counsel does not properly research the issue. Although Mann is correct that lawyers have a duty to conduct a reasonable investigation, *Strickland*, 466 U.S. at 691; *see also Thomas v. United States*, 737 F.3d 1202, 1207 (8th Cir. 2013), this argument still fails. Mann's expert witnesses base their opinions on pictures taken at the scene. Even if Mann's experts could prove to a degree of scientific certainty that the canister could not fit in the hole, this evidence does not relieve Mann of proving to the jury that government officials conspired to frame an innocent person. Indeed, after researching and considering these issues, Mann's trial counsel made the strategic decision not to present this argument to the jury. The thought process behind this decision is best explained by one of his lawyers:

> We thoroughly considered, among ourselves and with Dr. Mann, the options to argue a conspiracy between municipal workers, the local government, local law enforcement, and federal law enforcement to plant the grenades. We considered whether that strategy could succeed or whether the jury would view that strategy, in light of all the evidence, as so ridiculous that we would lose all credibility in defending against the bombing and regulatory offenses. We made this strategic decision: an overly stated conspiracy theory would cause

> us to lose credibility with the jury on the bombing and gun counts, which, we believed, were more defensible than the grenade counts. We concluded that a vast law enforcement conspiracy to set Dr. Mann up would make the total defense appear ridiculous to the jury. So, we decided to not emphatically state it as a theory, but, rather, to drop hints of that theory throughout the trial so an acquittal-prone juror might latch on to it.

Affidavit of J. Blake Hendrix. 3-4, Doc. No. 483, Ex. 16. These words clearly indicate that these issues were studied and that a strategic decision was made.

Further, another member of Mann's trial team, Erin Cassinelli, decided not to present a conspiracy theory to the jury because she was "without any evidence to present them to factually support it." Cassinelli Aff. 3, Doc. No. 483, Ex. 17. In response to Will Elkins's declaration that he saw two city workers planting the canister, Cassinelli now says, "I have never heard of Will Elkins. Our team interviewed neighbors and were not advised that anyone had been in the area at the relevant time who could have witnessed the planting of the canister." Cassinelli Aff. 3. Mann's counsel diligently investigated this purported conspiracy. Ultimately, Mann's trial counsel determined that setting a conspiracy theory before the jury would be "ridiculous." Because this decision was a strategic one, the inquiry into deficient performance ends there.

Mann's second argument is that his lawyers were deficient because they used a layman's opinion to support the theory that the canister was too large to fit in the hole. This, too, was a strategic decision. Hendrix explained the rationale:

> We discussed trying to find an expert witness who could contradict the government's theory that Mann buried the canister within days of it being found. I remember we talked about a geology professor from, I think, the University of Arkansas who could look at the pictures of the scene and give an

14

opinion that the hole was not freshly dug. But, we concluded that a "hole" expert likely wouldn't survive a *Daubert* challenge and that our best strategy was to appeal to the common sense of the jury. We decided the best strategy was to show the jury the pictures and have a lay witness, who we believed the jury could relate to, testify the hole did not appear to have been freshly dug.

Hendrix Aff. 3. Mann's second ground for relief is completely results based, not process based. It is very easy to view his counsels' actions in hindsight now that the trial is over and the outcome was not favorable. A poor result, however, is not the benchmark of an ineffective assistance of counsel claim. Because counsel did not believe that a jury would buy the notion of a conspiracy to plant the canister to frame Mann, they chose to poke holes in the government's proof by using a lay witness to challenge the evidence. Mann's trial team made the strategic decision to proceed in this fashion.

<u>Ground 3: Due Process Violation for Perjured Testimony</u>

Ground 3 is denied because it is procedurally barred. In ground 3, Mann argues that the use of Hamis Alshareqi's grand jury testimony violated the due process clause of the Fifth Amendment because it was perjured and based on the government's coercion. Further, he argues that law enforcement threatened Phil Barthelme, another government witness, with arrest, which caused Barthelme to commit perjury before the grand jury.

As Mann's petition makes clear, he was aware of these circumstances before and during trial, but this is the first time Mann raises the argument. "Claims not made during district court proceedings or on direct appeal are procedurally defaulted and may not be raised for the first time in a § 2255 motion." *United States v. Hamilton*, 604 F.3d at 574 (8th Cir. 2010); *see also Houser v. United States*, 508 F.2d 509, 514-15 (8th Cir. 1974) (holding

that defects in the indictment are generally not permissible Section 2255 claims).

Even if he could make the argument now, the argument fails on the merits. First, despite Barthelme's fear of arrest, he testified that he told the truth and that ATF agents did not put words in his mouth. *See, e.g.,* Trial Tr. vol. 11, 2160:14–2167:8, 2165:11-16. Second, even without Alshareqi's testimony, the government had probable cause to prosecute, as demonstrated by the government obtaining a guilty verdict beyond a reasonable doubt without putting Alshareqi on the stand at trial. *See United States v. Mechanik*, 475 U.S. 66, 67 (1985) ("[G]uilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendant[] with the offenses for which [he was] convicted."); *see also United States v. Alonzo*, 147 F. App'x 617, 619 (8th Cir. 2005).

Grounds 4 and 5: Failure to Move to Quash the Indictment and Investigate Alshareqi's Recantation

Grounds 4 and 5 are denied. Mann argues that his lawyers were ineffective because they failed to pursue Alshareqi's allegedly false grand jury testimony. In ground 4, Mann argues that his lawyers should have called Alshareqi as a witness, presumably to either attack the indictment or to introduce his recantation at trial. In ground 5, Mann argues that his lawyers should have called Alshareqi's lawyers to confirm whether the grand jury testimony was improperly obtained. Both grounds fail because Mann cannot satisfy either of the *Strickland* prongs.

The first *Strickland* prong requires Mann to demonstrate that his lawyers' representation fell below the range of competency demanded by lawyers in criminal cases.

*Strickland*, 466 U.S. at 688. Although he argues that his lawyers failed to use Alshareqi's recantation, investigate his statements, call him as a witness, or call his lawyers as witnesses, the record does not support these allegations, nor would those failures rise to the level of deficient conduct.

Defense counsel had Alshareqi ready to testify, but made a strategic decision not to call him because of how the testimony might harm Mann's defense. *See* Hendrix Aff. 5. After Alshareqi assaulted another government witness in jail, Mann's lawyers were concerned that the government might introduce correspondence suggesting Mann's complicity in that assault if Alshareqi testified. Cassinelli Aff. 4. Mann's complicity in the assault could have also been inferred by Mann sharing case discovery with Alshareqi, which could have been elicited on cross-examination. Cassinelli Aff. 4-5. The defense team attended Alshareqi's sentencing hearing after he pleaded guilty, and considering everything counsel had learned, they decided not to have Alshareqi testify for three reasons: he made inconsistent statements, he had mental health issues, and Mann could be implicated in the assault. Hendrix Aff. 5.

Counsel also considered a claim Alshareqi made about government coercion. Drake Mann was one of Mann's lawyers. Drake Mann was in contact with Alshareqi and had discussed Alshareqi's allegations with Alshareqi's lawyer, Omar Greene. Cassinelli Aff. 3. Greene, who was present during Alshareqi's interview with government investigators when it is alleged the coercion occurred, reported to Drake Mann that Alshareqi's allegations were false. Greene Aff. 3, Doc. No. 483, Ex. 24. Drake Mann, however, met with Alshareqi and had a positive impression of Alshareqi's credibility. *See* Drake Mann Aff. 3, Doc. No. 491,

Ex. 8 (describing a consistent story but not stating opinion on credibility). Defense counsel clearly investigated Alshareqi's stories and made a strategic decision that Alshareqi could not be trusted or, alternatively, may harm Mann's defense. Under the circumstances, it cannot be said that the trial strategy was unreasonable. *See Johnson v. Lockhart*, 921 F.2d 796, 799 (8th Cir. 1990) (explaining that, with knowledge of a witness's background, not calling witness is trial strategy that should not be second guessed.).

Although Mann wanted his lawyers to do more, the Constitution does not require perfect performance, but only reasonably effective assistance. *Strickland*, 466 U.S. at 688. Under these circumstances, defense counsel was not constitutionally deficient. Counsel did not ignore Alshareqi; indeed, they considered Alshareqi and made strategic decisions not to push the issue considering the inconsistent statements, assault, communications between Alshareqi and Mann, and the concern for implicating Mann in Alshareqi's jailhouse assault. Counsel considered moving to dismiss the indictment, but felt that such a motion was not warranted. Cassinelli Aff. 5; Hendrix Aff. 6 ("Knowing that [Alshareqi] was not the only basis for Mann's indictment, a motion to dismiss would have been frivolous."). Counsel was not expected to file frivolous motions, especially when counsel investigated Alshareqi's allegations and discovered that Alshareqi's own lawyer denied Alshareqi's version of the events. *See Rodriguez v. United States*, 17 F.3d 225, 226 (8th Cir. 1994). Considering there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, Mann has failed to point to any deficient conduct.

Even if counsel's work fell below constitutional minimums, Mann cannot satisfy *Strickland*'s prejudice prong. *Id.* at 694. Mann concludes that presenting Alshareqi's recantation would have resulted in the indictment's dismissal. His argument does little more than question Alshareqi's reliability, and the Constitution does not require mini-trials on the competency of evidence before the grand jury so long as the indictment is valid on its face. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 261 (1988). Additionally, the government obtained a conviction beyond a reasonable doubt without relying on Alshareqi's testimony, which reinforces the argument that probable cause existed for the grand jury to return an indictment. *See Mechanik*, 475 U.S. at 67.

Therefore, the defense team's failure to produce the affidavit, call Alshareqi as a witness, or interview and call Alshareqi's lawyer as witness was not constitutionally deficient and was not prejudicial.

Ground 6: Expert on Hindu Ceremonial Practices

Ground 6 is denied. In ground 6, Mann asserts that his lawyers were ineffective because they failed to present expert testimony regarding Mann's Hindu practices. About a week after the medical board sent Mann a letter denying his request to have his DEA permit reinstated, Mann sent an email to his brother in India that contained a picture of Dr. Pierce. At trial, the government presented this evidence to the jury. Mann's counsel called Mann's daughter to testify that some Hindus in northern India use pictures of those they are praying for in their worship services. Mann claims that his counsel was ineffective for calling his daughter instead of an expert to testify on Hindu ceremonial practices. Mann contends that

an expert would have proved that Mann's real purpose for using the picture of Dr. Pierce was for religious practices, and he further contends that the jury discounted his daughter's testimony because she is his daughter.

Contrary to Mann's contention, counsel's decision was the result of a reasonable professional judgment and therefore not deficient. Indeed, defense counsel has testified that they looked for an expert to testify that sending the picture was consistent with Hindu practices, but one potential expert flatly contradicted Mann's position. Accordingly, counsel did not pursue this strategy because they believed it would have been too damaging. Hendrix Aff. 6; Cassinelli Aff. 5-6; Lassiter Aff. 2. Because Mann's daughter was a "well-spoken, very Americanized young lady," who had attended similar ceremonial Hindu practices with her family, counsel believed she would be an efficient witness in providing "the necessary explanation and context" for the religious practices at issue. Cassinelli Aff. 6. As such, counsel's decision was sound trial strategy. *See Thomas*, 737 F.3d at 1207 (8th Cir. 2013) ("An attorney is not incompetent in exercising reasonable professional judgment even when, in hindsight, the decision may have been a mistake.").

Even if counsels' performance was deficient, Mann has failed to show there is a reasonable probability that, but for counsel's decision to call his daughter instead of an expert, the outcome of the trial would have been different. To show prejudice, Mann must make more than a showing of some conceivable effect on the outcome of the case. *Strickland*, 466 U.S. at 693. Simply arguing that Mann's purported expert's testimony (which would have been virtually the same as the testimony of Mann's daughter) would have

resulted in a different outcome simply because the jury would viewed him as an expert is merely speculative and therefore not sufficient to show prejudice. *See Scott v. Guntharp*, No. 4:07CV00032, 2010 WL 2985886, at *8 (E.D. Ark. Mar. 31, 2010) (explaining that absent an affirmative showing that relevant testimony by an expert would have exculpated him, a petitioner cannot show the prejudice required for an ineffective assistance of counsel claim).

Ground 7: Failure to Investigate Amsterdam Scam

Ground 7 is denied. In ground 7, Mann argues that he was a victim of a scam perpetrated against him in Amsterdam in 2005. According to Mann, local and federal law enforcement officials prevented Interpol from investigating the scam, and Mann was unable to recover the lost money. He argues that this prior incident was the motivation for his instruction to his wife to remove documents from his office prior to his office being searched by law enforcement officials. Mann argues that his lawyers were ineffective because they failed to investigate and pursue this alternative theory regarding the motivation for removing the documents, including unsigned checks.

At trial, Mann's lawyers presented theories regarding his motivations for removing the documents. Counsel chose not to pursue Mann's proposed theory regarding the Amsterdam scam because it would confuse the jury and possibly present him to the jury in an unfavorable light. Hendrix Aff. 6-7; Cassinelli Aff. 7; Lassiter Aff. 2. Counsel also considered the possibility that the jury would not find Mann's explanation credible, so they pursued a simpler, more relatable theory of his motivation: unsigned checks could be filled out and cashed, so the checks were removed for safety reasons. Unquestionably, this was a

strategic decision on the part of Mann's counsel and falls well within the bounds of what a reasonable attorney might do during the course of representation.

Although this argument fails at the first prong of the *Strickland* test, Mann has also failed to demonstrate that any prejudice resulted from the jury not hearing this alternate story. If Mann's lawyers had presented evidence of the Amsterdam scam, there is no indication that the jury would have ruled differently. *See Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (explaining that to satisfy *Strickland*'s prejudice prong, the likelihood of a different result must be "substantial, not just conceivable" (citing *Harrington*, 562 U.S. at 112)).

Ground 8: Failure to Sever

Ground 8 is denied. In ground 8, Mann argues that the denial of his motion to sever forced defense counsel not to introduce certain evidence, which had the effect of causing constitutionally ineffective assistance of counsel. To the extent that his argument challenges the appropriateness of severance, the Eighth Circuit has already affirmed that issue, and it is improper to collaterally attack it. *See Mann*, 701 F.3d at 289–94; *see also United States v. Shabazz*, 657 F.2d 189, 190 (8th Cir. 1981). To the extent that the argument claims an independent ineffective assistance of counsel claim, the claim fails.

Mann again uses the *Geders* and *Herring* cases to argue that a judge's actions can render counsel ineffective, *see supra* ground 20, this time arguing that the failure to sever placed restrictions on defense counsel that forced them to be ineffective. Mann's argument is again distinguishable from *Herring* and *Geders* because the severance denial did not control counsel's actions. In *de la Garza v. Fabian*, the Eighth Circuit recognized that a key

component of *Geders* (and a similar case, *Perry v. Leeke*, 488 U.S. 272 (1989)), was that a court order prevented counsel from carrying out a vital function. 574 F.3d 998, 1002 (8th Cir. 2009). Mann does not argue that a court order directed his attorneys from presenting this evidence, only that counsel made strategic decisions because the motion to sever was denied. *See, e.g.,* Pet'r's Mot. 29, Doc. No. 395 ("If counsel had not been or at least felt trammeled by the threat of harming their client's chances of acquittal on counts 1 and 2 by presenting the motives of rogue agents . . . ."). Mann's argument could be made for virtually any court decision – whether on severance, on suppression, in limine, or for admitting hearsay evidence – that causes counsel to adjust trial strategy as a result. The fact that evidence was not presented because of trial strategy and not a court order makes Mann's theory inapplicable. *See de la Garza*, 574 F.3d at 1002 (distinguishing the orders prohibiting the claimed deficiencies in *Geders* and *Perry* with de la Garza's claim caused by an order from a prison guard).

Ground 9: Failure to Preserve Issue

Ground 9 is denied.  In ground 9, Mann argues that his trial and appellate lawyers were ineffective because they failed to preserve Mann's grievance that the severance denial violated his right to testify on the non-severed counts.

Mann's lawyers were not deficient. At trial, counsel properly objected to Mann's inability to testify, stating that "we need to make a record on the defendant's desire to testify and not testify as it pertains to that motion." Trial Tr. vol. 15, 3091:6-7. Indeed, counsel specifically argued that Mann's inability to testify "infringes his right to choose whether or

not he's going to testify in his own defense." Trial Tr. vol. 15, 3094:5-6. Counsel went on to proffer what Mann would have testified about, namely that law enforcement had been harassing him and speaking to his friends and patients; his connections to Dr. Pierce and the medical board; when he received a weapon; that he was unaware he had to register it; and that he would "corroborate everything else we presented in our defense" of another firearm. *See* Trial Tr. vol. 15, 3093:4-3094:8. Although Mann asserts the Eighth Circuit held that it was not properly preserved, he points to no language in the opinion that supports such a holding.

As for appellate counsel, the record is less clear, but still demonstrates reasonable performance. On appeal, the Eighth Circuit referenced in a footnote that "Mann did not state in his brief what reason he had for refraining from testifying on the arson and bombing grounds, nor did his brief indicate what argument he made to the district court in this matter or if he made them at all. . . . Accordingly, we are in no position to evaluate Mann's proffer as to his need for separate trials based on the Fifth Amendment." *Mann*, 701 F.3d at 291 n.9. Although the Eighth Circuit indicates that appellate counsel did not bring that issue on appeal, appellate counsel filed a petition for rehearing, referencing portions of the record in which the issue had in fact been raised. *Mann v. United States*, Petition for Rehearing 11, 8th Cir. Case No. 11-1500, Feb. 7, 2013. Even after pointing out the error, the Eighth Circuit summarily denied the petition. Thus, it appears the argument was raised on appeal and rejected.

Even if counsel did not properly raise the issue on appeal, Mann has not shown prejudice because the inability to testify would have no impact on the underlying convictions. As an initial matter, Mann's affidavits, declarations, and other filings suggest disagreement with trial counsel about whether he should testify. Mann states that he wanted to testify, Mann Decl. ¶ 4, Doc. No. 421, Ex. 35 ("At trial I had wanted to take the stand and testify in my defense."), but his lead defense lawyer states that the decision to testify was Mann's decision. Hendrix Aff. 7 ("I cannot ever remember a time in my career I told a client not to testify if that was his or her wish."). Although not critical to the prejudice prong, one must consider whether Mann's true intention was to testify or whether it was an after-thought to create a constitutional issue. "When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so now." *United States v. Webber*, 208 F.3d 545, 551 (8th Cir. 2000)*; see also id.* ("Although the ultimate decision whether to testify rests with the defendant, when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed. . . . A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel."). Mann's counsel rested Mann's defense without calling him. Mann did not insist on calling another witness when he rested, he did not communicate an intent to testify to the court, and he did not discharge counsel. Thus, to the extent that Mann implies error for him not testifying – apart from counsel's ineffectiveness – the argument is meritless.

Mann was only concerned about testifying regarding the regulatory and obstruction counts, presumably counts three through eight. *See* Cassinelli Aff. 10; Pet'r's Mot. 38, Doc. No. 395 ("[T]rial and direct-appeal counsel (who were also trial counsel) failed to raise in this Court and advance on appeal the grievance that the denial of severance prejudiced Dr. Mann by effectively precluding him from testifying on the firearms counts and asserting his right not to testify on the 'weapons of mass destruction' counts."). Mann states that this testimony would have helped him on these charges, yet he provides no argument for how any of his testimony relates to an element of any crime. For example, Mann proffered testimony that he was not aware of the need to register firearms. *See* Trial Tr. 3093:24–3094:25 ("[H]e didn't receive the letter telling him that he should have registered it, that he was unaware of that."). Ignorance of the law, however, is not an excuse. *Lambert v. California*, 355 U.S. 225, 228 (1957); *United States v. Miller*, 646 F.3d 1128, 1131–1134 (8th Cir. 2011). Mann also states that he wanted to present testimony to explain why he amassed a cache of weapons. Mann Decl. ¶ 4, Doc. No. 421, Ex. 35 This has no relevance to the elements for knowingly possessing one or more unregistered firearms (counts 3, 4, and 5), *see* 26 U.S.C. 5861(d), or knowingly possessing a machine gun (count 6). *See* 18 U.S.C. 922(o)(1).

As a final example, he argues that his testimony would have been persuasive to the jury because he convinced health care workers during his incarceration why they should not be prejudiced against him. Mann has failed to explain how the jury's prejudice had any impact on his verdicts. The jury was specifically instructed "not [to] allow sympathy or prejudice to influence you. The law demands of you a just verdict, unaffected by anything

except the evidence, your common sense, and the law as I give it to you." Jury Instruction 2, Doc. No. 165. Mann has presented nothing to indicate that the jury rejected these instructions or that prejudice crept into the jury room. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("[J]uries are presumed to follow their instructions.").

<u>Grounds 10-11: Failure to Strike Testimony or Move for a Mental Examination of Lloyd Hahn</u>

Grounds 10 and 11 are denied. In grounds 10 and 11, Mann contends that his lawyers were ineffective because they did not move to strike the testimony of Lloyd Hahn and because they did not request that Hahn undergo a mental examination. Mann argues that Hahn's testimony was internally inconsistent and that Hahn was not competent to testify due to medication that Mann reasons he must have been taking for cancer. Mann believes that Hahn was not competent to testify and that a mental examination of Hahn would have revealed his incompetence.

Mann's arguments are unpersuasive. First, Mann argues that Hahn was unreliable and not a credible witness. Credibility determinations are within the province of the jury. Mann insists that his lawyers should have been alerted to Hahn's incompetence due to inconsistencies in his testimony and his illness. Every person, however, is presumed competent to be a witness, *see* Fed. R. Evid. 601, and Mann has provided no evidence, aside from his own speculation, that supports his argument that Hahn was incompetent. Hahn was cross-examined by Mann's lawyers, who attempted to discredit Hahn. Second, the decision to move to strike testimony rests within the professional judgment of the lawyer, and Mann's

lawyers determined that such a motion was not necessary or prudent. Third, Mann's lawyers interviewed Hahn and found no strategic basis to challenge his competency. Hendrix Aff. 8; Cassinelli Aff. 10-11.

Beyond this, Mann cannot show that he suffered any prejudice from counsel's decision not to strike Hahn's testimony or move to obtain a mental evaluation of Hahn. As stated above, both of these motions would have been meritless, and counsel is not required to make such motions. *See Gray v. Bowersox*, 281 F.3d 749, 756 n.3 (8th Cir. 2002) (explaining that a claim of ineffective assistance of counsel is not viable if the desired action would have been without merit).

Ground 12: Failure to Disclose Evidence of Grenade Testing

Ground 12 is denied. In ground 12, Mann asserts that the government suppressed evidence by failing to disclose that it conducted additional testing of the 40mm HE grenades. This argument is rooted in testimony from an explosives enforcement officer from the Bureau of Alcohol, Tobacco, Firearms, and Explosives, who testified that the grenades were "live." The government denies that it or any of its agents conducted any additional testing, and it asserts that all of its evidence related to the grenades was available to Mann. Mann has produced no evidence that such additional testing was conducted and cannot show that the results of such testing, if it did occur, would have aided in his defense.

Mann additionally argues that his lawyers were ineffective because they failed to conduct independent tests of the same grenades. The decision whether to test the grenades was one that clearly fell within the strategic purview of defense counsel. Mann's lawyers

have testified that the results of such tests were not important to the overall trial strategy. Importantly, counsel considered that a positive test result would only harm Mann's defense. They chose not to seek additional testing so that the functionality of the grenades could be questioned. Hendrix Aff. 8-9; Cassinelli Aff. 11.

Ground 13: Failure to Independently Test Grenade Launcher

Ground 13 is denied. In ground 13, Mann argues that his lawyers were ineffective because they did not conduct independent tests of the M203 40mm grenade launchers to determine whether they had ever fired a live round.

Mann's lawyers had no strategic reason to test the launchers. Mann's possession of the grenade launchers was not illegal, and he was not charged with any offense that required a showing that he had fired a grenade launcher. Instead, the grenade launchers were offered as proof that the grenades found near Mann's property belonged to him. Thus, a negative test result would not advance his defense. *See Hood v. United States*, 342 F.3d 861, 865 (8th Cir. 2003) (holding that counsel is not deficient for failing to take an action that is "devoid of legal merit"). Additionally, Mann's lawyers considered the possibility of a positive test result, which would only harm his defense. This second point also illustrates that Mann cannot show that any prejudice resulted from a lack of testing on the launchers. He cannot show that the tests would have produced favorable results. Further, the government had no reason and made no effort to prove that Mann ever fired the launchers. For these reasons, ground 13 satisfies neither prong of the *Strickland* test.

Ground 14: Failure to Investigate Jeff Kimbrough Witnesses

Ground 14 is denied. In ground 14, Mann argues that his lawyers were ineffective because they did not talk to, and potentially call as witnesses, the workers who went to Mann's home with Jeff Kimbrough to determine the weaknesses in Kimbrough's testimony. Kimbrough owned an alarm system company and was personally involved in installing an alarm system at Mann's home in 2003-2004. At trial, Kimbrough testified that he saw "large shells" at Mann's home that looked similar to the grenades introduced during trial. Trial Tr. vol. 10, 2057-58, 2061-62. Mann now argues that counsel should have investigated and potentially examined Kimbrough's employees who were with him to challenge Kimbrough's credibility. Mann's trial counsel described its actions in relation to Kimbrough as follows:

> We discussed our approach to Kimbrough in many of our strategy sessions. I think Kimbrough refused to talk to us, so we couldn't find out who were his employees that could have been at the house with him. The discovery material gave us no leads on who the employees were. I remember discussing the likely futility of getting anything productive from his employees, because they wouldn't want to contradict their boss. We decided the best strategy was to cross Kimbrough with his inability to recall specifics. I remember Kimbrough was not able to identify with any degree of certainty what was alleged to be the grenades in the Mann home. The other part of our strategy was to call a disinterested witness who had greater access to the house than Kimbrough. We called Wayne Henry who testified he never saw any such devices in the home, despite having greater access to Mann's residence.

Hendrix Affidavit 9.

Mann's lawyers considered the possibility of calling Kimbrough's employees to testify, but they decided on a different course of action. Instead of engaging in what might have been a futile endeavor (finding Kimbrough's employees and convincing them to testify against their boss), defense counsel decided to call Wayne Henry to testify. Henry was a

construction worker who had worked at Mann's home for approximately six months in 2003. He had seen much more of Mann's home than Kimbrough had seen, and he contradicted Kimbrough's testimony.

The reasonableness of this strategy will not be reconsidered. Mann's conclusory statement that "[a]ssuming that they testified truthfully, these workers' testimony would have impeached that of Mr. Kimbrough" is not sufficient to show deficient performance. Pet'r's Mot. 44, Doc. No. 395. Even if these potential witnesses "might have provided some benefits," it was not unreasonable for Mann's trial lawyers "to decide that the potential costs of calling the witnesses outweighed the potential benefits." *United States v. Staples*, 410 F.3d 484, 488-89 (8th Cir. 2005).

Additionally, Mann has failed to show how he was prejudiced by the failure to call Kimbrough's employees to testify. This is the case because, as held by the Eight Circuit, there was "overwhelming" evidence of guilt on count 3, possession of unregistered grenades. *See Mann*, 701 F.3d at 291. Simply arguing that these potential witnesses could have potentially affected the outcome of the trial, does not meet the "rigorous standard" of *Strickland*'s prejudice prong. *Rodela-Aguilar*, 596 F.3d at 463.

Alternatively, Mann asserts that if his lawyers were not ineffective, it is because the government committed a *Brady* violation because it failed to turn over all of the evidence it had about the other men on the scene with Kimbrough. This is merely conclusory. There is no evidence that the government hid anything from Mann, nor is there evidence that the government even possessed this information. It is implicit that there can be no *Brady*

violation without specifically identifying the evidence withheld. *See Brady*, 373 U.S. at 87-88.

<u>Ground 15: Failure to Disclose Arkansas State Medical Board Complaint</u>

Ground 15 is denied. In ground 15, Mann argues that the government committed a *Brady* violation by failing to disclose a complaint made about Mann to the medical board, and in the alternative, that counsel was ineffective for failing to investigate the circumstances of the complaint. The complaint to the medical board involved Rita Barthelme, one of Mann's patients. Barthelme overdosed on pain pills twice while under Mann's care. After the second overdose, Barthelme's sister, Jeanice Brown, contacted the medical board about Mann. An investigation began to determine whether Mann's license should be revoked.

There is no *Brady* violation because Mann does not state what piece of evidence the government withheld. *United States v. Barraza Cezares*, 465 F.3d 327, 333 (8th Cir. 2006) (requiring three steps to proceed on a *Brady* claim). The United States contends that it turned over all of the medical board records in its possessions, including records pertaining to an investigation regarding Barthelme. Mann's trial counsel possessed this information, and the United States attached this information to its response under seal. *See* Cassinelli Aff. 12 ("We had the complaint Jeanice Brown sent to the medical board; the government provided the ASMB file regarding the complaint in discovery."). Mann also alleges that the government committed misconduct by coercing testimony from Rita Barthelme and failing to provide evidence of this coercion. Mann's allegations seems to be based on a card sent from Barthelme to Mann, in which Barthelme writes, "The fed's [sic] wont leave us alone."

Doc. No. 483, Ex. 33. It is true that federal authorities met with Barthelme, but there is no evidence that the government improperly coerced Barthelme, or that the government withheld evidence of coercion. Without stating what additional piece of evidence the government withheld, Mann's *Brady* claim must fail.

Mann's ineffective assistance of counsel claim fails for similar reasons. It was not ineffective for counsel to decline to investigate Brown's complaint to the medical board when they already possessed this information. Further, Mann's counsel argued to the jury that he did not receive official notification from the board about the investigation until after the Pierce bombing. Thus, it is unclear what further actions Mann believes his counsel should have taken, or how this investigation is relevant to the bombing itself. Finally, Mann has not shown that he was prejudiced by his lawyers' failure to further investigate the Brown complaint. He has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Ground 16: Ignoring Mann's Ideas

Ground 16 is denied. In ground 16, Mann argues that his lawyers were ineffective because they failed to consider and/or investigate information he provided them and because they did not consider his ideas. Such ideas include obtaining a hole expert and obtaining "more official" copies of the PCR/Exhibit 10 transcripts. According to Mann, this constitutes a disparagement of the client as a source of information, leading to a breakdown of the attorney-client relationship.

As discussed above, counsel was not ineffective for failing to retain a hole expert. Further, counsel's mere failure to transcribe the PCR/Exhibit 10 transcripts in a "more official way than Dr. Mann" would have done does not amount to deficient performance. Therefore, even if counsel had ignored Mann on these issues, they would not have been ineffective. Importantly, ground 16 asserts that counsel was ineffective because counsel erroneously refused to consider Mann's suggestions regarding a series of claims, which led to a breakdown in communication. As the government has correctly noted, this seems to be an attempt to group several errors together, which does not constitute a proper ground for habeas relief. *See Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990) ("[C]umulative error does not call for habeas relief, as each habeas claim must stand or fall on its own.").

Moreover, aside from the four fundamental decisions, "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal," all other trial decisions are strategic decisions reserved for counsel. *Thomas*, 737 F.3d at 1208. Neither the ideas nor the information on which Mann alleges counsel failed to consider his input is related to one of these fundamental decisions. Therefore, counsel was not deficient, as they were not required to follow Mann's suggestions, although they assert they did so. *See Thomas*, 737 F.3d at 1209 (holding that counsel may properly make strategic decisions without client's input).

Ground 17: Objections to Prejudicial Matters Presented to the Jury

Ground 17 is denied. In ground 17, Mann argues that his lawyers were ineffective for failing to object to photographs depicting the Confederate and Nazi flags and the audio recording in which Mann used the word "fag." Mann contends that his lawyers were

ineffective because they failed to seek a protective order regarding these prejudicial matters, which were displayed to the jury.

Mann's lawyers have testified that they chose not to address the flags because there was no reason to believe anyone could conclude that a man of Indian descent was a "neo-Nazi American skinhead" or a "racist." Hendrix Aff. 11. Making an objection would have been more damaging, as it would have brought unnecessary attention to the flags. Cassinelli Aff. 13. Also, counsel believed that in light of the probative value of the photographs, which purpose was to show the entrance of Mann's gun-safe room, and the non-prejudicial nature of the flags, an objection would not have been successful. Hendrix Aff. 11; Cassinelli Aff. 13. Moreover, counsel testified that they needed the recording with the word "fag" for the defense of entrapment by estoppel and also did not believe the court would grant an objection given the context in which it was presented. Cassinelli Aff. 14.

Counsel's decision not to object to the photographs or the recording was reasonable trial strategy and therefore not deficient. *Thomas,* 737 F.3d at 1208. Even if counsel was incompetent, Mann cannot show there is a reasonable probability that, but for counsel's decision not to object to the photographs and recording, the outcome of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. Importantly, the flags and the "fags" comment were never emphasized by anyone during the trial, and Mann presents no evidence that the jury considered or even noticed them.

Ground 18: Accountant's Testimony

Ground 18 is denied. In ground 18, Mann argues that his lawyers were ineffective

because they failed to object to Pam Faulkner's accounting conclusions and because they failed to hire an expert to counter Faulkner's testimony. To convict Mann on count 1, the government had to prove that the offense affected interstate commerce. *See Mann*, 701 F.3d at 294. The Eighth Circuit held that because Mann's attack on Dr. Pierce resulted in a depletion of the assets of Dr. Pierce's clinic, there was ample evidence to support the jury's finding that the interstate commerce requirement was met. *Id.* at 295. Mann contends Faulkner erroneously concluded that Dr. Pierce's clinic suffered a gross loss of income in 2009. According to Mann, there was no depletion of assets because the clinic actually made money in Dr. Pierce's absence.

Defense counsel chose not to counter the government on the depletion of assets theory because counsel believed an objection would have been futile. Counsel determined this was only one of several theories the government could have used to prove the interstate commerce requirement. Hendrix Aff. 12. As such, counsel's decision not to expend time and resources to counter Faulkner's conclusions was a reasonable professional judgment. *See New v. United States*, 652 F.3d 949, 953 (8th Cir. 2011) (explaining that the Sixth Amendment does not require attorneys to make meritless arguments or futile objections).

Even if counsel was deficient for not challenging Faulkner's conclusions, Mann cannot show prejudice. The government needed to prove only a minimal effect on commerce. *United States v. Williams*, 308 F.3d 833, 838 (8th Cir. 2002). The fact that Dr. Pierce's clinic had to close for three days was by itself sufficient to prove the interstate commerce requirement. *See United States v. Quigley*, 53 F.3d 909, 910 (8th Cir. 1995) (citing *United*

*States v. Davis*, 30 F.3d 613, 615 (5th Cir. 1994)). Importantly, the Eighth Circuit held that Dr. Pierce's absence likely caused the clinic to lose business opportunities. *Mann*, 701 F.3d at 296. Accordingly, Mann cannot show that hiring an expert to attack Faulkner's theory would have changed the outcome.

<u>Ground 19: Cumulative Ineffective Assistance of Counsel</u>

Ground 19 is denied. In ground 19, Mann contends that his lawyers were ineffective because their combined acts and omissions listed throughout Mann's motion violated his constitutional rights. The Eighth Circuit, however, does not recognize a cumulative error test in support of habeas relief based on ineffective assistance of counsel. *See Girtman v. Lockhart*, 942 F.2d 468, 475 (8th Cir. 1991) (rejecting a habeas petitioner's cumulative error claim). As discussed above, none of Mann's claims of ineffective assistance of counsel are granted. Accordingly, this ground fails.

## IV.  WHETHER TO HAVE A HEARING

After much contemplation, Mann's motion for a hearing is denied. When considering a section 2255 motion, "the judge must review the answer, any transcripts and records or prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rule 8(a), Rules Governing Section 2255 Proceedings for the United States District Court.  I am absolutely aware that a hearing should be held "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," 28 U.S.C. § 2255(b), and that "[e]videntiary hearings on 28 U.S.C. § 2255 motions are preferred, and the general rule is that a hearing is necessary prior to the

motion's disposition if a factual dispute exists." *Thomas*, 737 F.3d at 1206. "In the context of a motion under 28 U.S.C. § 2255, an evidentiary hearing is designed to flesh out details not apparent in the record. *Taylor v. United States*, 792 F.3d 865, 871 (8th Cir. 2015) (Kelly, J., concurring). A hearing is not required, however, if "(1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Tinajero-Ortiz v. United States*, 635 F.3d 1100, 1105 (8th Cir. 2011) (quoting *Sanders v. United States*, 341 F.3d 720, 722 (8th Cir. 2003)). Importantly, an evidentiary hearing is not warranted when there is second guessing of tactical decisions of trial strategy. *See Thomas*, 737 F.3d at 1209.

The present case is not one in which a hearing is needed to make a factual determination. *See Witthar v. United States*, 793 F.3d 920, 923 (8th Cir. 2015) (holding that an evidentiary hearing was needed when a defendant instructed her attorney to appeal, yet he did not do so); *United States v. Sellner*, 773 F.3d 927, 932 (8th Cir. 2014) (same). Instead, this is primarily a case challenging counsel's strategic decisions. Mann's trial lawyers have provided extensive and reasoned analysis about the decisions they made and why they made them, not to defend their own actions, but to provide a straightforward analysis of their decision-making during investigation of the case and throughout trial. Hendrix Aff. 2. Counsel's decisions may not have been perfect, especially in hindsight, but incorrect strategic decisions do not make counsel ineffective. *Thomas*, 737 F.3d at 1207. A hearing to rehash the strategic decisions made by counsel is not required.

The remaining grounds (excluding those involving strategic decisions by counsel) do not warrant an evidentiary hearing either, as they are conclusory, contradicted by the record, or inherently incredible. For example, Mann asserts multiple *Brady* violations but has identified no actual evidence that the government failed to turn over. There is no reason to conduct a hearing on such conclusory assertions that are refuted by the record. The thorough record in this case has been reviewed and carefully considered, and these documents "conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Therefore, a hearing is not required.

## V. CERTIFICATE OF APPEALABILITY

Finally, when entering a final order adverse to a petitioner, a certificate of appealability must be issued or denied. *See* Rule 11, Rules Governing Section 2255 Proceedings for the United States District Court. A certificate of appealability may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997).

Mann has not made such a showing. All twenty of the grounds presented in Mann's Section 2255 motion are unfounded. The record is filled with strategic decisions made by Mann's counsel throughout their representation, and the record further provides zero evidence of any misconduct by the government. Mann has not identified a single piece of

evidence withheld by the government, and his motion contains numerous conclusory allegations. Unfounded speculation cannot form the basis for relief. Based on the analysis set forth above of all 20 grounds in Mann's motion, Mann has not made a substantial showing of the denial of a constitutional right, and a certificate of appealability is denied.

## VI.   CONCLUSION

For the reasons set forth herein, Petitioner Randeep Mann's motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255 [Doc. No. 395] and his motion for hearing on motion for post-conviction relief [Doc. No. 406] are denied.

IT IS SO ORDERED this 26th day of August 2016.

_Brian S. Miller_
UNITED STATES DISTRICT JUDGE